**E-FILED**
Monday, 28 February, 2005  02:38:52 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| M. JANE MINOR, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 02-3354 |
| | ) | |
| v. | ) | Judge Mills |
| | ) | |
| CENTOCOR, INC., | ) | Magistrate Judge Evans |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| M. JANE MINOR, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04-3114 |
| | ) | |
| v. | ) | Judge Mills |
| | ) | |
| CENTOCOR, INC., | ) | Magistrate Judge Evans |
| | ) | |
| Defendant. | ) | |

**DEFENDANT CENTOCOR, INC.'S MOTION FOR SUMMARY JUDGMENT**

NOW COMES Defendant, Centocor, Inc., by and through its attorneys, Linzey D. Jones

and John M. Broderick of the law firm Pugh, Jones, Johnson & Quandt, P.C., and Christopher

Biswell of the law firm Drake, Narup & Mead, P.C., and pursuant to Fed. R. Civ. P. 56 and

Local Rule 7.1(D)(1)(a), respectfully moves this Court for summary judgment in its favor. In

support of this motion, Defendant states as follows:

**PROCEDURAL HISTORY**

1. On May 9, 2002, Plaintiff, M. Jane Minor, filed the instant lawsuit alleging that

Centocor, Inc. discriminated against her on the basis of her age and gender.[1]

2. On November 12, 2003, the Court dismissed Plaintiff's gender claims because

---

[1]      Plaintiff also named Johnson & Johnson, Inc. ("J&J") as a defendant and this Court dismissed J&J on November 12, 2003 for lack of jurisdiction.

plaintiff had not received the appropriate Right-To-Sue letter.

3.      On May 20, 2004, Plaintiff filed a second lawsuit against Centocor, Inc.,

captioned <u>Minor v. Centocor, Inc., Case No. 04-3114</u>, in which Plaintiff alleged the identical

gender claims that were previously dismissed.

4.      On January 25, 2005, this Court denied Defendant's motion to dismiss case 04-

3114 and ordered the parties to inform the Court whether the cases should be consolidated.

5.      On February 7, 2005, the parties filed a Stipulation to Consolidate.

## MINOR'S ALLEGATIONS

6.      Plaintiff alleges that she was discriminated against on the basis of her age in

violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621 <u>et</u> <u>seq</u>.

("ADEA"), and, that she was discriminated against an basis of her gender in violation of Title

VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e <u>et</u> <u>seq</u>.

7.      The conduct on which Plaintiff bases these claims is the same.  Plaintiff alleges

that her manager, Antonio Siciliano, assigned her more difficult accounts which were not

lucrative and required her to give up accounts which were lucrative, required her to visit her

accounts in a two-week time period, denied her the opportunity to relocate, gave the Plaintiff a

negative and unfair performance evaluation, refused to allow the Plaintiff the opportunity to

participate in decisions involving her accounts and assigned her bonus points unfairly.

8.      Minor claims that as a result of this conduct she had to take a disability leave of

absence and remains in a disability leave status.

## BASIS FOR SUMMARY JUDGMENT

9.      Plaintiff's claims are either not supported by the undisputed material facts or do

not constitute an adverse employment action as required for both her age and gender claims.

10.    Minor was not fired, demoted, forced to transfer, nor was her pay decreased. Minor, a sales representative, sought out her sales position and constructed her account list for that position.

11.    Her remaining complaints are about commonplace, day-to-day inconveniences in the workplace that to do not constitute an adverse employment action.

12.    In the instant motion, Centocor moves for summary judgment on Minor's claims based on age and gender discrimination.

13.    Because no genuine issue of material fact exists as to any of Plaintiff's claims, summary judgment should be granted in Centocor's favor on both Minor's age and gender claims.

## <u>DEFENDANT'S STATEMENT OF UNDIPSUTED MATERIAL FACTS</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.1(D)(1)(b), defendant Centocor, Inc. ("Centocor"), by and through its attorneys, Linzey D. Jones and John M. Broderick of the law firm Pugh, Jones, Johnson & Quandt, P.C., and Christopher Biswell of the law firm Drake, Narup & Mead, P.C., respectfully submits the following statement of material facts as to which defendant contends there is no genuine issue and that entitles defendant to a judgment as a matter of law.[1]

1.      Plaintiff M. Jane Minor ("plaintiff" or "Minor") was born on August 2, 1946 and, at all times relevant, was and is a citizen and resident of Springfield, Illinois, in the Central District of Illinois. Exhibit "A" - Centocor's Answer to the Compl. at 2.

2.      Centocor is a manufacturer of healthcare products and is located in Malvern, Pennsylvania.  Exhibit "A" – Centocor's Answer to the Compl. at 2.

3.      Minor began her employment with Centocor on September 20, 1999 as a Senior Cardiovascular Specialist.  Exhibit "B" – Centocor's Personnel Action Form dated September 22, 1999; Exhibit "C" – Deposition Transcript of Minor, Part I, at 133, lines 5-9.

4.      Minor was hired by Centocor employee, Michele Johnson.  Exhibit "C" - Deposition Transcript of Minor, Part I, at 134, line 24.

5.      Michele Johnson was the supervisor for all Cardiovascular Specialists in the St. Louis District, including Minor.  Exhibit "C" – Deposition Transcript of Minor, Part I, at 134-35.

---

[1]      Defendant includes contentions by plaintiff as undisputed only for purposes of its motion for summary judgment.  Defendant will contest plaintiff's contentions before and at trial, should it become necessary. <u>Market Street Assoc., Ltd. v. Frey</u>, 941 F.2d 588, 590 (7th Cir. 1991)(filing a summary judgment motion does not waive right to contest facts at trial).

6.      Minor's starting annual salary was $77,000.  Exhibit "B" – Centocor's Personnel Action Form dated September 22, 1999; Exhibit "C" – Deposition Transcript of Minor, Part I, at 133, lines 10-13.

7.      As a Senior Cardiovascular Specialist, Minor was responsible for marketing three products for Centocor:  Retavase, Reapro and Fragmin.  Exhibit "C" – Deposition Transcript of Minor, Part I, at 129, lines 18-23.

8.      Retavase was a thrombolytic agent designed to dissolve blood clots.  Exhibit "C" – Exhibit "C" – Deposition Transcript of Minor, Part I, at 129, lines 5-11.

9.      Retavase had an FDA indicated use for dissolving blood clots associated with heart attacks.  Exhibit "C" – Deposition Transcript of Minor, Part I, at 130, lines 3-11.

10.      When a product has an FDA indicated use it means the product has been cleared by the FDA to be marketed for that purpose.  Exhibit "D" – Deposition Transcript of Antonio Siciliano at 61, lines 13-23.

11.      Cardiovascular Specialists marketed Retavase for its indicated use.  Exhibit "D" – Deposition Transcript of Siciliano at 27, lines 13-24.

12.      Minor learned Centocor was hiring Vascular Sales Specialists ("VS") and sought out the position.  Exhibit "C" – Deposition Transcript of Minor, Part I, at 153, lines 3-9.

13.      The position description states that a "moderate to high" level of "multi-state travel" is "required."  Exhibit "E" – Centocor's Employee Position Description for the VS position at 2.

14.      Minor took the job as a VS knowing her territory would become larger.  Exhibit "C" – Deposition Transcript of Minor, Part I, at 155, lines 20-24 & at 156, lines 1-3.

15.     VS for Centocor responded to unsolicited questions for Retavase's non-indicated use and marketed the product to doctors and physicians after they expressed interest in Retavase's non-indicated use.  Exhibit "F" – Deposition Transcript of Randy Van Cleave at 55, lines 13-24 & at 56, lines 1-3; Exhibit "D" – Deposition Transcript of Siciliano at 64, lines 1-11.

16.     VS also marketed a product from a sister-company, Cordis, called a Hydrolyser, which was a mechanical thrombectomy product used to treat blood clots.  Exhibit "D" – Deposition Transcript of Siciliano at 14, lines 22-24 & at 15, lines 1-7; Exhibit "D" – Deposition Transcript of Siciliano at 19, lines 1-16; Exhibit "E" – Centocor's Employee Position Description for the Vascular Sales Specialist position at 1.

17.     On June 1, 2000, Minor was hired as a VS.  Exhibit "G" – Memorandum to Minor dated June 5, 2000.

18.     Minor was hired for the VS position by Centocor employee William Alexander. Exhibit "C" – Deposition Transcript of Minor, Part I, at 167, lines 17-23.

19.     Minor's hiring as a VS was not a promotion.  Exhibit "C" - Deposition Transcript of Minor, Part I, at 157, lines 6-14.

20.     As a VS, she was at the same grade level position as she was when she was a cardiovascular specialist, and she received the same salary.[2]  Exhibit "G" – Memorandum to Minor dated June 5, 2000; Exhibit "C" – Deposition Transcript of Minor, Part I, at 159, lines 9-15.

21.     Minor understood that her territory as a VS would overlap the entire cardiovascular St. Louis District.  Exhibit "C" – Deposition Transcript of Minor, Part I, at 155, lines 20-24; Exhibit "D" – Deposition Transcript of Siciliano at 41, lines 1-5.

---

[2]   Minor received a salary increase for the year 2000 to $77,800. Exhibit "H" –  Centocor's Compensation Administration Summary for Minor in the year 2000.

22.    The St. Louis District included St. Louis, part of Iowa, part of Kentucky, part of Indiana and central and southern Illinois.  Exhibit "I" – Map of St. Louis Cardiovascular District.

23.    The geographic boundaries of the cardiovascular district were determined prior to Antonio Siciliano becoming Minor's supervisor, and were determined by upper management personnel in Centocor.  Exhibit "D" – Deposition Transcript of Siciliano at 269, lines 1-24.

**HOW MINOR'S ACCOUNTS WERE INITIALLY ASSIGNED TO HER.**

24.    In 2000, Minor had sixteen accounts as a vascular representative.  Exhibit "J" – Affidavit of James Alexander.

25.    Minor's initial account list included:

| | |
|---|---|
| Methodist Medical Center | Peoria, Illinois |
| Proctor Community Hospital | Peoria, Illinois |
| St. Francis Hospital | Peoria, Illinois |
| Memorial Medical Center | Springfield, Illinois |
| St. Johns Hospital | Springfield, Illinois |
| | |
| Deaconess Hospital | Evansville, Indiana |
| St. Mary's Medical Center | Evansville, Indiana |
| | |
| Iowa Methodist Medical Center | Des Moines, Iowa |
| Mercy Hospital Medical Center | Des Moines, Iowa |
| Univ. of Iowa Hospital & Clinic | Iowa City, Iowa |
| | |
| Owensboro Mercy Health System | Owensboro, Kentucky |
| | |
| Boone Hospital Center | Columbia, Missouri |
| St. Johns Mercy Medical Center | Creve Coeur, Missouri |
| Barnes-Jewish Hospital | St. Louis, Missouri |
| Missouri Baptist Hospital | St. Louis, Missouri |
| St. Louis Univ. Medical Center | St. Louis, Missouri |

Exhibit "J" – Affidavit of James Alexander.

26.    Minor herself proposed that many of these accounts be included in her portfolio, including the ones in Indiana and Kentucky.  Exhibit "C" – Deposition Transcript of Minor, Part

I, at 171, lines 9-15; Exhibit "K" – Email dated October 3, 2000 from Minor to William Alexander; Exhibit "L" – Minor's notes regarding her accounts.

27.     Minor analyzed the prior sales history of these accounts on her list and prepared a worksheet with her data.  Exhibit "C" – Deposition Transcript of Minor, Part I, at 177, lines 4-17.

28.     Minor had to give a presentation as to why the accounts she selected had potential. Exhibit "C" – Deposition Transcript of Minor, Part I, at 174, lines 1-12.

29.     The accounts located in Iowa were suggested by another manager.  Exhibit "M" – Deposition Transcript of Minor, Part II at 10, lines 14-24 & at 11, lines 1-2.

30.     William Alexander, her manager at the time, did not agree with all of her proposed accounts. Exhibit "C" – Deposition Transcript of Minor, Part I, at 181, lines 21-24 & at 182, lines 1-6.

31.     William Alexander approved her first account list as a VS.  Exhibit "C" – Deposition Transcript of Minor, Part I, at 171, lines 2-13.

32.     William Alexander did not discriminate against Minor based on her age or gender in anyway.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 8, line 24 & at 9, lines 1-3.

**REORGANIZATION OF VASCULAR SPECIALISTS.**

33.     In late 2000, the vascular sales force was reorganized.  Exhibit "D" – Deposition Transcript of Siciliano at 23, lines 18-24 & at 25 lines 1-7.

34.     During 2000, the country had been organized in three regions of VS; the realignment re-organized the country into five regions of VS.  Exhibit "D" – Deposition Transcript of Siciliano at 23, lines 18-24 & at 25 lines 1-7.

35.     Bob Russell was the regional director for the central region.  Exhibit "D" –
Deposition Transcript of Siciliano at 25, lines 7-15 & at 40, lines 17-24.

36.     The St. Louis, Denver, Dallas and Houston districts were in Bob Russell's region.
Exhibit "D" – Deposition Transcript of Siciliano at 40, lines 17-24.

37.     Bob Russell had supervisory responsibility for the cardiovascular and vascular
sales force in the central region.  Exhibit "D" – Deposition Transcript of Siciliano at 25, lines 16-
21.

38.     The assignments of VS to a particular team leader were driven by regional
alignments.  Exhibit "D" – Deposition Transcript of Siciliano at 40, lines 17-24.

## SICILIANO IS HIRED AS TEAM LEADER.

39.     Antonio Siciliano was hired by Bob Russell to be team leader for the central
region in late 2000.  Exhibit "D" – Deposition Transcript of Siciliano at 24, lines 8-11.

40.     Siciliano's responsibilities as team leader included coaching and development of
the individual team members, including coaching on their day-to-day sales skills and their
territory management, for administrative tasks such as signing-off on expense reports and to have
those submitted to the proper people, and completion of field contact reports and year-end
evaluations of the team members.  Exhibit "D" – Deposition Transcript of Siciliano at 49, lines
2-15.

41.     Siciliano supervised the four VS in the central region:  Minor, Randy Van Cleave,
Caroline Kopecky, and Denise Bannister-Hill.[3]  Exhibit "D" – Deposition Transcript of Siciliano
at 41, lines 14-24 & at 42, lines 1-24.

## AGES OF SICILIANO'S TEAM MEMBERS.

---

[3]  Denise Bannister-Hill was recently married and changed her name to Denise Brown.  For simplicity sake,
defendant refers to her by her former name.

42.    Van Cleave was born on November 15, 1952.  Exhibit "F" – Deposition Transcript of Van Cleave at 1, lines 12-14.

43.    Kopecky was born on June 16, 1970.  Exhibit "N" – Deposition Transcript of Kopecky at 1, lines 10-13.

44.    Bannister-Hill was born on October 23, 1970.  Exhibit "O" – Deposition Transcript of Bannister-Hill at 1, lines 15-19.

45.    Bannister-Hill was hired in March of 2001 to fill the position of vascular sales representative for the Dallas region, which was vacated by Siciliano when he was made team leader.  Exhibit "D" – Deposition Transcript of Siciliano at 41, lines 22-24 & at 42, lines 14-19.

**TERRITORIES OF SICILIANO'S TEAM MEMBERS.**

46.    Van Cleave's territory overlapped the CV district in the Denver region. Exhibit "D" – Deposition Transcript of Siciliano at 41, lines 6-7; Exhibit "O" - Map of Denver Cardiovascular District.

47.    Kopecky's territory overlapped the CV district in the Houston region. Exhibit "D" – Deposition Transcript of Siciliano at 41, lines 15-16; Exhibit "Q" - Map of Houston Cardiovascular District.

48.    Bannister-Hill's territory overlapped the CV district in the Dallas region. Exhibit "D" - Deposition Transcript of Siciliano at 41, lines 10-12; Exhibit "R" - Map of Dallas Cardiovascular District.

**ACCOUNT REALIGNMENT.**

49.    At the end of the year 2000, the accounts assigned to each of the VS were reviewed and condensed pursuant to a program called Operation Seal.  Exhibit "J" – Affidavit of James Alexander.

50.     The purpose of this part of Operation Seal was to focus the efforts of the VS. Exhibit "J" - Affidavit of James Alexander.

51.     Each VS under Siciliano began 2001 with 12 accounts.  Exhibit "J" - Affidavit of James Alexander.

52.     In the fourth quarter of 2000 (Q4, 2000), Van Cleave had 22 accounts.  Exhibit "J" - Affidavit of James Alexander.

53.     Van Cleave had no input into the 22 accounts that were assigned to him.  Exhibit "F" – Deposition Transcript of Van Cleave at 25, lines 6-24 & at 26, lines 1-19.

54.     In Q1, 2001, eleven accounts were dropped and one was added.  Exhibit "J" - Affidavit of James Alexander.

55.     In determining which accounts should be dropped or added, Siciliano asked Van Cleave for his opinion, but, Van Cleave went with what was decided.  Exhibit "F" – Deposition Transcript of Van Cleave at 37, lines 1-23.

56.     Thus, in Q1, 2001, Van Cleave had 12 accounts.  Exhibit "J" - Affidavit of James Alexander.

57.     In Q4, 2000, Kopecky had 21 accounts.  Exhibit "J" - Affidavit of James Alexander.

58.     Thirteen accounts were dropped in Q1, 2001 and 4 were added.  Exhibit "J" - Affidavit of James Alexander.

59.     Kopecky did not feel she had any input into her accounts in that she gave Siciliano her opinion as to which accounts should be kept or dropped but knew the final decision was up to him.  Exhibit "N" – Deposition Transcript of Kopecky at 15, lines 18-25 & at 16, lines 1-3.

60.     Thus, in Q1, 2001, Kopecky had 12 accounts.   Exhibit "J" - Affidavit of James Alexander.

61.     In Q4, 2000, Siciliano had 19 accounts.  Exhibit "J" - Affidavit of James Alexander.

62.     Twelve accounts were dropped in Q1, 2001 and 5 were added.  Exhibit "J" - Affidavit of James Alexander.

63.     Thus, when Bannister-Hill took over Siciliano's accounts in Q1, 2001, she had 12 accounts.  Exhibit "J" - Affidavit of James Alexander.

64.     In deciding which accounts were to remain in Minor's territory and which accounts should be added, Siciliano spoke with Minor and Michelle Johnson, the cardiovascular district manager for the cardiovascular division in the St. Louis district.  Exhibit "D" – Deposition Transcript of Siciliano at 35, lines 21-24 & at 36, lines 1-13; Exhibit "C" – Deposition Transcript of Minor, Part I, at 180, lines 4-6.

65.     Minor told Siciliano why she wanted to keep Proctor Community Hospital. Exhibit "M" – Deposition Transcript of Minor, Part II, at 95, lines 8-24 & at 96, lines 1-13.

66.     Minor had several discussions with Siciliano about why Memorial Medical Center should not be dropped from her account list.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 92, lines 1-12.

67.     Michelle Johnson, the cardiovascular district manager for the St. Louis District, had an interest in having Minor, a VS, assigned to certain accounts in her district because it impacted her cardiovascular business; for example, the hospital could be enticed to increase its overall marketshare of Retavase in order to receive a discount, or, the customer could be

influential with other potential accounts in the same area.  Exhibit "D" – Deposition Transcript of Siciliano at 270, lines 1-17.

68.     The accounts lists for the VS under Siciliano had to be ultimately approved by Bob Russell.  Exhibit "D" – Deposition Transcript of Siciliano at 38, lines 9-17.

69.     The accounts added and dropped to Minor's account list were the result of a compromise between what Minor and Michelle Johnson wanted.  Exhibit "D" – Deposition Transcript of Siciliano at 38, lines 16-24 & at 39, lines 1-24 & at 40, lines 1-3.

70.     In Q4, 2000, Minor had 16 accounts; in Q1, 2001, five accounts were dropped and one was added.  Exhibit "J" – Affidavit of James Alexander.

71.     Thus, in Q1, 2000, Minor had 12 accounts.  Exhibit "J" – Affidavit of James Alexander.

72.     Minor does not complain about the removal of three accounts from her account list:  Missouri Baptist Hospital, University of Iowa Clinic, and Boone Hospital Center.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 97, lines 7-24 & 98, lines 17-21.

73.     As to the two other accounts that were dropped, Proctor Community Hospital and Memorial Medical Center, Minor wanted to keep them in her territory because losing them would make it tougher to cover her territories in her opinion.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 101, lines 20-24 & at 103, lines 6-7.

74.     The five accounts dropped from Minor's account list were not reassigned to any other VS.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 112, lines 5-9.

75.     Minor would have preferred the other accounts in Iowa, i.e., Iowa Methodist Medical Center and Mercy Hospital Medical Center, also be dropped because of a turnover in the

cardiovascular representatives for those accounts.  Exhibit "M" – Deposition Transcript of

Minor, Part II, at 97, lines 15-23 & at 99, lines 15-17.

## THE ADDITION OF ST. JOSEPH'S TO MINOR'S ACCOUNT LIST.

76.     St. Joseph's in St. Charles, Missouri was added to Minor's account list to keep

Retavase a viable option although the hospital was not purchasing it.  Exhibit "M" – Deposition

Transcript of Minor, Part II, at 105, lines 15-19 & at 108, lines 15-17.

77.     Johnson, the cardiovascular district manager, for the St. Louis region, Siciliano

and Robert Ginn all wanted Minor assigned to the account because losing St. Joseph's would

mean a loss of a significant amount of sales.  Exhibit "M" – Deposition Transcript of Minor, Part

II, at 108, lines 15-21.

78.     Robert Ginn was a health system account manager based in St. Louis in 2001.

Exhibit "S" – Deposition Transcript of Robert Ginn at 9, lines 20-21.

79.     Ginn was responsible for the contracts through which Retavase was sold, and, for

dealing with the parent companies of hospitals, which were called "health systems." Exhibit "S"

– Deposition Transcript of Robert Ginn at 10, lines 11-24 & at 11, lines 1-7.

80.     A team approach was taken toward marketing Retavase to St. Joseph's.  Exhibit

"S" – Deposition Transcript of Robert Ginn at 26, lines 11-24 & at 27, lines 1-7.

81.     According to Ginn, Minor's role in the St. Joseph's account was to obtain a

request for information for Retavase used as a vascular product and to educate the hospital on

Retavase.  Exhibit "S" – Deposition Transcript of Robert Ginn at 16, lines14-22, at 26, lines 21-

24 & at 27 lines 1-3; Exhibit "T" – Ginn's Analysis Worksheet of St. Joseph's.

82.     Minor's role was part of a larger strategy to market Retavase to St. Joseph's. Exhibit "S" – Deposition Transcript of Robert Ginn at 26, lines 11-24 & at 27, lines 1-7; Exhibit "T" – Ginn's Analysis Worksheet of St. Joseph's.

83.     St. Joseph's never purchased Retavase during 2001.  Exhibit "S" – Deposition Transcript of Robert Ginn at 33, lines 18-24.

84.     In spite of St. Joseph's decision not to purchase Retavase in 2001, Centocor still continued its efforts to market the product to St. Joseph's.  Exhibit "S" - Deposition Transcript of Robert Ginn at 47, lines 14-19.

85.     Minor believes St. Joseph's remaining in her portfolio negatively impacted her Sales Incentive Compensation Plan.[4]  Exhibit "M" – Deposition Transcript of Minor, Part II, at 109, lines 14-20.

86.     Ginn testified that St. Joseph's remained in his account portfolio and he would not have benefited from it as well.  Exhibit "S" - Deposition Transcript of Robert Ginn at 46, lines 7-17 & at 48, lines 9-22.

87.     Many people had a stake in the outcome of the marketing efforts at St. Joseph's. Exhibit "S" - Deposition Transcript of Robert Ginn at 47, lines 2-4.

## ACCOUNT PROBLEMS WITH OTHER VS.

88.     Kopecky wanted Santa Rosa Hospital dropped from her account list because of low volume sales, but it was never dropped from her account list.  Exhibit "M" – Deposition Transcript of Kopecky at 61, lines 3-19.

89.     Kopecky wanted to drop Knapp Memorial Methodist Hospital in Weslaco, Texas and Valley Baptist Medical Center in Harlingen, Texas, from her account list because they were

---

[4]   The Sales Incentive Compensation Plan is discussed infra at ¶¶96-107.

hard to get to, but they were never dropped from her account list.  Exhibit "M" – Deposition

Transcript of Kopecky at 61, lines 21-25 & at 62, lines 1-3.

90.     Although Van Cleave wanted one particular account added to his territory in

Wyoming, he accepted what was decided for him by Siciliano.  Exhibit "F" – Deposition

Transcript of Van Cleave at 37, lines 16-23.

91.     Hill had accounts in her portfolio that did not purchase Retavase.  Exhibit "O" –

Deposition Transcript of Bannister-Hill at 28, lines 6-14 & at 74, lines 7-24.

## SICILIANO ASKS ABOUT AGE OF MINOR'S SON.

92.     Siciliano and Minor met in person in January of 2001 after Siciliano was made

team leader.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 39, lines 1-9.

93.     During this meeting, Siciliano asked Minor the age of her son.  Exhibit "M" –

Deposition Transcript of Minor, Part II, at 41, lines 1-13.

94.     Minor said her son was 28 years old; Siciliano said he was 29 years of age.

Exhibit "M" – Deposition Transcript of Minor, Part II, at 41, lines 1-13.

95.     Minor interpreted this comment to mean that Siciliano thought she was old

enough to be his mother.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 41, lines 22-

24 & at 42, lines 1-6.

## SALES INCENTIVE COMPENSATION PLAN.

96.     At the end of each quarter, the VS received a payment pursuant to Centocor's

"Sales Incentive Compensation Plan" ("SICP") calculated from various metrics derived from

volume sales from their accounts and sales growth.   Exhibit "U" – Affidavit of Paul Williams.

97.     Centocor modified the formula and how each factor was weighted from time to

time.  Exhibit "U" – Affidavit of Paul Williams.

98.     The SICP was not a commission in that it was not a percentage of the sales in a VS's territory.  Exhibit "U" – Affidavit of Paul Williams.

99.     In 2001, in calculating the SICP payment, a formula nationally ranked the VS, 1-23.  Exhibit "U" – Affidavit of Paul Williams.

100.     How high a VS was ranked determined the payout the VS received.  Exhibit "U" – Affidavit of Paul Williams.

101.     The payout for rankings 1-23 was predetermined by upper management.  Exhibit "U" – Affidavit of Paul Williams.

102.     If a VS was ranked 22 or 23 the VS received no SICP payment.  Exhibit "U" – Affidavit of Paul Williams.

103.     Siciliano had nothing to do with how the SICP formula was calculated.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 67; Exhibit "D" – Deposition Transcript of Siciliano at 221, 224; Exhibit "U" – Affidavit of Paul Williams.

104.     Minor generally knew that growth and volume sales affected her ranking.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 66, lines 13-20.

105.     At the beginning of the year 2001, two metrics for growth were added to the SICP formula.  Exhibit "U" – Affidavit of Paul Williams.

106.     In Q1 and Q2 of 2001, the SICP weighted sales growth and sales volume equally.  Exhibit "U" – Affidavit of Paul Williams.

107.     The SICP formula applied to each and every VS in the nation in the same way.  Exhibit "U" – Affidavit of Paul Williams.

## Q1 SICP PAYOUTS AND RANKINGS.

108.    At the end of Q1, 2001, the VS under Siciliano were ranked as follows and

received the following SICP payments:

| VS | Rank | Payment |
|---|---|---|
| Minor | 11 | $6,875 |
| Van Cleave | 12 | $6,359 |
| Bannister-Hill | 15 | $1,588 |
| Kopecky | 23 | $0 |

Exhibit "V" – Incentive Compensation Reports for Q1, 2001.[5]

109.    Siciliano's SICP payments were dependent on the performance of the VS under

him in that a portion of his SICP payment was based on "team earnings."  Exhibit "U" –

Affidavit of Paul Williams; Exhibit "D" – Deposition Transcript of Siciliano at 242, lines 14-18

& at 274, lines 1-24.

110.    For Q1, 2001, Siciliano received $5,722 for his SICP payment and, of that

amount, $3,077 was from "team earnings."  Exhibit "W" – Siciliano's SICP statement for Q1,

2001.

## MINOR'S FIRST LEAVE OF ABSENCE FROM FEBRUARY TO APRIL, 2001.

111.    On February 7, 2001, Minor took a short-term medical leave to have a

hysterectomy.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 34, lines 1-3 & at 50,

lines 22-23.

112.    During her time on leave, Siciliano or Johnson covered her accounts.  Exhibit "M"

– Deposition Transcript of Minor, Part II, at 56, lines 14-23.

---

[5]   The SICP payment was reflected in a statement called an "Incentive Compensation Report."

113.    Minor returned from disability at the end of April, 2001 upon the advice of her doctor.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 72, lines 9-13.

## SICILIANO COMMENTS ON MINOR'S SURGERY.

114.    Around the time that Minor returned from her surgery, Siciliano stated "I kind of understand the female stuff because my mom had that."  Exhibit "M" – Deposition Transcript of Minor, Part II, at 55, lines 17-19.[6]

115.    Minor interpreted this comment to mean that Siciliano was putting her in the same class as his mother.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 55, lines 2-4.

## SICILIANO'S MANAGEMENT OF THE VS INCLUDING MINOR.

116.    Part of Siciliano's responsibilities as team leader would be to coach and develop his team members, including coaching them on their day-to-day sales skills and territory management.  Exhibit "D" – Deposition Transcript of Siciliano at 49, lines 2-15.

117.    In fulfilling his coaching responsibilities, Siciliano would prepare a Field Contact Report ("FCR") usually in connection with his field visits with a VS.  Exhibit "D" – Deposition Transcript of Siciliano at 215, lines 7-18.

118.    An FCR was not put in a VS's personnel file.  Exhibit "D" – Deposition Transcript of Siciliano at 276, lines 11-14.

119.    If coaching a VS was not effective, the first disciplinary measure to be taken would be to place the VS on a performance improvement plan.  Exhibit "D" – Deposition Transcript of Siciliano at 49, line 24 & at 50, lines 1-8.

120.    This step would take consultation with the regional director.  Exhibit "D" – Deposition Transcript of Siciliano at 50, lines 9-16.

---

[6] Minor refers to her procedure as a "female surgery" herself.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 79.

121.    If the employee's performance did not improve after being placed on a performance improvement plan, then steps would be taken to terminate the employee in consultation with the regional director and human resources.  Exhibit "D" – Deposition Transcript of Siciliano at 49, line 24 & at 50, lines 1-20.

122.    Minor was not placed on a performance improvement plan, nor was she disciplined in any way.  Exhibit "D" – Deposition Transcript of Siciliano at 272, lines 22-24.

**FCR FOR MINOR IN APRIL, 2001.**

123.    In April of 2001, Siciliano prepared an FCR for Minor which stated:

    a.      She missed her baseline target for units sold;

    b.      She needed to schedule dinner programs in Des Moines, Iowa, and Evansville Indiana;

    c.      Make initial contact with St. Joseph's Hospital; and,

    d.      Develop project to address interest expressed at various accounts.

Exhibit "X" – FCR for Minor dated April 24, 2001.

124.    Siciliano also stated in the FCR that "There is a lot of work to accomplish due to your absence from the territory…" and that it was necessary for her to "get in front of every account to let them know you are back in the territory."  Exhibit "X" – FCR for Minor dated April 24, 2001.

125.    Minor recalls having an in-person meeting with Siciliano prior to receiving the FCR.  Exhibit "M" – Deposition Transcript of Minor, Part II at 76, lines 13-16.

126.    Siciliano told her the purpose of the meeting was to "welcome [Minor] back into the territory and update me on activities during [Minor's] absence.  He wanted to set up some top

20

projects for [her], which he put down in the critical objectives."  Exhibit "M" – Deposition Transcript of Minor, Part II at 77, lines 11-17.

127.    Minor requested more time to complete the critical objectives.  Exhibit "M" – Deposition Transcript of Minor, Part II at 78, lines 6-7.

**DINNER MEETINGS.**

128.    Pursuant to the April FCR, Minor scheduled a dinner meeting in Des Moines, Iowa, for June 7, 2001.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 137, lines 18-24 & at 138, lines 1-3.

129.    Minor canceled the meeting because a radiologist group disbanded and another group could not make it because they were busy.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 137, lines 1-8.

130.    The Evansville dinner program was scheduled on June 30, 2001.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 137, lines 18-23.

131.    It was attended by only three people because of bad weather.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 131, lines 22-24, at 132, lines 1-11, & at 244, lines 22-24.

**SICILIANO'S SUPERVISON OF OTHER VS.**

132.    Siciliano lectured Kopecky on managing her accounts after she came in last in Q1, 2001.  Exhibit "M" – Deposition Transcript of Kopecky at 51, lines 1-25.

133.    In May of 2001, Siciliano issued to Van Cleave a Field Contact Report which stated:

        a.      He should "complete account coverage approximately every two weeks";

        b.      He missed his baseline target for units sold;

      c.      He needed to improve his focus and follow-up on his accounts;

      d.      He needed to improve his understanding of rules related to selling off-label and compliance; and,

      e.      Follow-up on requests for information from various accounts.

Exhibit "Y" – FCR for Van Cleave, dated May, 2001.

134.    In May of 2001, Siciliano issue to Bannister-Hill an FCR which stated:

      a.      Bannister-Hill missed her baseline target for units sold;

      b.      She learned a lot in a short period;

      c.      She needed to continue to improve her clinical knowledge base; and,

      d.      She had to follow-up on interest expressed at various accounts.

Exhibit "Z" – FCR for Bannister-Hill, dated May, 2001.

## Q2 SICP PAYOUTS AND RANKINGS.

135.    At the end of Q2, 2001, the VS under Siciliano were ranked as follows and received the following SICP payments:

| VS | Rank | Payment |
|----|------|---------|
| Kopecky | 5 | $8,371 |
| Van Cleave | 9 | $7,065 |
| Bannister-Hill | 13 | $6,250 |
| Minor | 18 | $3,266 |

Exhibit "AA" – Incentive Compensation Reports for Q2, 2001.

136.    For Q2, 2001, Siciliano received $6,940 for his SICP payment and of that amount $4,184 was from "team earnings."  Exhibit "BB" – Siciliano's SICP statement for  Q2, 2001.

**NATIONAL SALES MEETING, JULY, 2001.**

137.    Centocor held a national sales meeting in Orlando, Florida at the end of June of 2001.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 148, lines 15-18.; Exhibit "U" – Affidavit of Paul Williams.

138.    At this meeting, Paul Williams announced a change in how the metrics growth and volume in the SICP would be weighted.  Exhibit "U" – Affidavit of Paul Williams.

139.    More emphasis would be placed on growth in one's territory.  Exhibit "U" – Affidavit of Paul Williams.

**MINOR'S CONVERSATION WITH HUMAN RESOURCES.**

140.    Minor had a telephone conversation with Stephanie Moore who was the Director of Human Resources.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 120, lines 7-24 & at 121, lines 1-5.

141.    In her conversation with Moore, Minor stated that she felt she was being treated differently from other representatives.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 120, lines 7-24 & at 121, lines 1-5.

142.    Moore suggested they take her complaint to a "higher level" but Minor stated she only wanted to get ideas to improve communication skills that could enhance her relationship with Siciliano.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 120, lines 7-24 & at 121, lines 1-5.

143.    During a team meeting at the conference in Orlando, Florida, Siciliano told all members of the team they were being treated equally.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 141, lines 16-21.

**BONUS POINTS.**

144.    Centocor had a program whereby Siciliano could award bonus points to his team members.  Exhibit "D" – Deposition Transcript of Siciliano at 186, lines 16-19.

145.    Bonus points could be used to purchase items from a company catalog.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 141, lines 23-24 & at 142, lines 1-3; Exhibit "D" – Deposition Transcript of Siciliano at 187, lines 7-9.

146.    Siciliano only had a limited number of points to award. Exhibit "D" – Deposition Transcript of Siciliano at 201, lines 7-11.

147.    Siciliano had complete discretion to award or not award bonus points to his team members.  Exhibit "D" – Deposition Transcript of Siciliano at 199, lines 20-24 & at 272, lines 10-21.

148.    Siciliano was not required to award any bonus points.  Exhibit "D" – Deposition Transcript of Siciliano at 272, lines 14-17.

149.    The bonus points were not a guaranteed part of a VS's compensation.  Exhibit "D" – Deposition Transcript of Siciliano at 272, lines 18-21.

150.    For the year 2001, Siciliano awarded bonus points to his team members in the way described on the spreadsheet contained in Exhibit CC.  Exhibit "CC" – Bonus points awarded in 2001.

**MINOR'S EMAILS TO COMPANY DIRECTORS.**

151.    Siciliano told Minor that she should stop sending emails to Bob Russell and Keith Cramsey, regional marketing manager.  Minor, II at 184, lines 18-22 & at 185, lines 1-20.

152.    Siciliano was asked by Cramsey or Russell or both to advise Minor that she was communicating to them too frequently about day-to-day activities, however, communications

about particular achievements were welcome.  Exhibit "D" – Siciliano Transcript at 266, lines 9-24.

153.    Minor contacted Cramsey about Siciliano's restriction and Cramsey advised her he wanted her to tell him any news about what was happening in her district, the St. Louis District.  Exhibit "M" – Deposition Transcript of Minor, Part II at 185, lines 1-20.

**ACCOUNT COVERAGE.**

154.    One part of Siciliano's responsibilities was to review the expense reports of the VS.  Exhibit "D" – Deposition Transcript of Siciliano at 49, lines 12-15.

155.    The only way he could get a sense of where the VS went, and how frequently the VS visited their accounts, was by analyzing their expense reports.  Exhibit "D" – Deposition Transcript of Siciliano at 120, lines 15-20.

156.    After reviewing Minor's expense reports, Siciliano discovered Minor had not been covering her accounts in a two to three week time period.  Exhibit "D" – Deposition Transcript of Siciliano at 142, lines 1-23.

157.    Siciliano did not recall Minor visiting in person her accounts in Iowa or Kentucky before the national sales meeting, or almost two full months since she returned from her sick leave.  Exhibit "D" – Deposition Transcript of Siciliano at 142, lines 10-15.

158.    Minor's expense reports show she only had been to Iowa once since she returned from sick leave and had not been to Kentucky since she returned in April of 2001.  Exhibit "DD" – Minor's expense reports from April, 2001 to October, 2001.

159.    In the first six weeks back from medical leave beginning on April 18, 2001, there was a total of 26 possible working business days.  Of these 26 days, Minor's expense reports demonstrated she visited her accounts with the following frequency:

25

| | | |
|---|---|---|
| a. | Springfield (1 account) | 9 days |
| b. | St. Louis area (4 accounts) | 8 days |
| c. | Peoria area (2 accounts) | 6 days |
| d. | Evansville area (2 accounts) | 2 days |
| e. | Owensboro area (1 account) | 0 days |
| f. | Des Moines area (2 accounts) | 0 days |

160.    Siciliano requested Minor to provide him with a two-week routing schedule and a three-week routing schedule.  Exhibit "D" – Deposition Transcript of Siciliano at 140, lines 7-18.

161.    Although account coverage had come up with other VS, Siciliano did not think it was a persistent problem with the other VS, and so he did not request a routing schedule from them.  Exhibit "D" – Deposition Transcript of Siciliano at 141, lines 1-12.

162.    Minor tried to formulate a routing schedule for Siciliano but did not complete it. Exhibit "M" – Deposition Transcript of Minor, Part II, at 179, lines 18-23.

163.    Siciliano sent Minor a "sample" routing schedule showing how she could cover her accounts in a two-week period.  Exhibit "D" – Deposition Transcript of Siciliano at 139, lines 16-24 & at 140, lines 1-18; Exhibit "EE" – Email from Siciliano to Minor with attached sample routing schedule.

164.    Siciliano's email states that it is a "sample" schedule.  Exhibit "EE" – Email from Siciliano to Minor with attached sample routing schedule.

165.    It was a coaching document.  Exhibit "D" – Deposition Transcript of Siciliano at 141, lines 13-14.

166.    The proposed schedule was intended to show Minor it was possible to cover her accounts in a two-week time period.   Exhibit "D" – Deposition Transcript of Siciliano at 140, lines 16-18.

167.    Minor felt that it was a requirement even though it said "proposed."  Exhibit "M" – Deposition Transcript of Minor, Part II, at 179, lines 13-17.

168.    Siciliano discovered that all VS he supervised were not covering their territory as adequately as he wanted.  Exhibit "D" – Deposition Transcript of Siciliano at 115, lines 7-11.

169.    Siciliano himself covered his territory in a two to three week period as a VS before he was team leader.  Exhibit "D" – Deposition Transcript of Siciliano at 131, lines 11-19.

170.    Siciliano had a conversation with Bob Russell in which Russell agreed that the territory should be covered in a two to three week period.  Exhibit "D" – Deposition Transcript of Siciliano at 131, lines 20-24 & at 132, lines 1-6.

171.    Russell told Siciliano that each individual will cover their accounts with different frequency and each individual would require coaching on that particular matter.  Exhibit "D" – Deposition Transcript of Siciliano at 131, lines 20-24 & at 132, lines 1-6.

172.    Siciliano communicated verbally and in writing to all of his VS that he expected accounts to be covered in a two to three week period.  Exhibit "D" – Deposition Transcript of Siciliano at 132, lines 7-24.

173.    Each of the Q3, 2001 FCRs stated that accounts had to be covered in two week time period.  Exhibit "FF" – FCR from Siciliano to Kopecky; Exhibit "GG" – FCR from Siciliano to Van Cleave; Exhibit "HH" – FCR from Siciliano to Bannister-Hill; Exhibit "II" – FCR from Siciliano to Minor.

174.    Siciliano told Kopecky she had to cover her accounts more frequently.  Exhibit "M" – Deposition Transcript of Kopecky at 51, lines 1-25.

175.    Van Cleave understood that he had to visit all his accounts at least once every two to three weeks.  Exhibit "F" – Deposition Transcript of Van Cleave at 90-92.

176.    Visiting accounts frequently helped drive the business.  Exhibit "F" – Deposition Transcript of Van Cleave at 22, line 24 & at 23, line 15.

177.    Bannister-Hill visited her accounts at least once every two to three weeks.  Exhibit "O" – Deposition Transcript of Bannister-Hill at 40, lines 13-16.

178.    In August of 2001, Centocor issued a Territory Ranking Report, which ranked Minor year-to-date in 22nd place out of 23 VS.  Exhibit "JJ" – Territory Ranking Report dated August, 2001.

179.    If she remained ranked 22, she would not receive a product incentive for the third quarter. Exhibit "U" – Affidavit of Paul Williams.

180.    On August 20, 2001, Siciliano issued an FCR to Kopecky.  See Exhibit CC.  This FCR states:

    a.    She exceeded baseline;

    b.    She had to conduct follow-ups at various accounts; and,

    c.    She had to complete account/territory rotation every 2 weeks.

Exhibit "FF" – FCR from Siciliano to Kopecky.

**RELOCATION.**

181.    Sometime after Minor returned from her sick leave in April, 2001, she asked Siciliano about relocating to St. Louis and whether Centocor would pay for the expenses

28

associated with the proposed move. Exhibit "M" – Deposition Transcript of Minor, Part II, at 224, lines 16-24 & at 225, lines 1-11.

182.    She asked about relocating because it seemed more "logical" to her to be located in St. Louis, flights from Springfield were erratic, and driving to her accounts from Springfield was inconvenient. Exhibit "M" – Deposition Transcript of Minor, Part II, at 225, lines 2-11.

183.    Siciliano told her it was not Centocor's policy to pay for relocations. Exhibit "M" – Deposition Transcript of Minor, Part II, at 225, lines 12-14.

184.    Minor was aware this was the policy but thought Siciliano should have made an exception for her. Exhibit "M" – Deposition Transcript of Minor, Part II, at 225, lines 19-23.

185.    Minor says she was told by another employee, Wendy Jurosek, that another employee, Kevin Brown, was relocated and his expenses paid. Exhibit "M" – Deposition Transcript of Minor, Part II, at 227, lines 19-24 & at 228, lines 1-15.

186.    Minor had a general understanding that another Centocor employee, Chris Praseeb, a younger female employee, moved to St. Louis. Exhibit "M" – Deposition Transcript of Minor, Part II, at 228, lines 9-15 & at 229, lines 2-14.

187.    It was Minor's general understanding that Praseeb and Brown had their relocation expenses paid by Centocor. Exhibit "M" – Deposition Transcript of Minor, Part II, at 228, lines 9-10.

**Q3 FCR'S.**

188.     On September 20, 2001, Siciliano issued a Q3 FCR for Denise Hill. Exhibit "HH" – FCR from Siciliano to Bannister-Hill.

189.    In Section II under "Comments," Siciliano stated that Bannister-Hill exceeded baseline. Exhibit "HH" – FCR from Siciliano to Bannister-Hill.

190.    In Section III, under "Advocate Development," Siciliano stated that she must continue to build a relationship over the long-term with Dr. Rees and that she should continue to develop a relationship with Dr. Slonim. Exhibit "HH" – FCR from Siciliano to Bannister-Hill.

191.    Under Section IV, Siciliano wrote:

      a.      She had a successful dinner program;

      b.      Her efforts at one account had been halted;

      c.      She failed to visit certain accounts within a two-week time frame; and,

      d.      She should follow up at an account that has expressed interest and that a "sense of urgency is needed."

Exhibit "HH" – FCR from Siciliano to Bannister-Hill.

192.    Under Section V "Critical Objectives," Siciliano wrote:

      a.      She had to complete her account/territory rotation every 2 weeks;

      b.      She had to develop an action plan for Wichita; and,

      c.      She had to evaluate new business opportunities.

Exhibit "HH" – FCR from Siciliano to Bannister-Hill.

193.    Under Section VI, Siciliano instructed her that she must improve her clinical and technical skills, and continue to learn anatomy and physiology.

Exhibit "HH" – FCR from Siciliano to Bannister-Hill.

194.    At the end of Q3, 2001, Siciliano issued an FCR to Van Cleave.  Exhibit "GG" – FCR from Siciliano to Van Cleave.

195.    In Section II, Siciliano noted that Van Cleave exceeded baseline.  Exhibit "GG" – FCR from Siciliano to Van Cleave.

196.     In Section III, Siciliano stated that "Dr. Tindall is our new target for advocate development" and that Van Cleave should work on a plan to develop him. Exhibit "GG" – FCR from Siciliano to Van Cleave.

197.     In Section IV, entitled "Observations/Comments/Follow Through on Previous Direction," Van Cleave's Q3 FCR stated:

     a.    Van Cleave's efforts have not met Siciliano's expectations;

     b.    Van Cleave had inadequate follow up and follow through;

     c.    Van Cleave's lapse in coverage of Tulsa, Oklahoma, resulted in delay in getting business;

     d    He needed to keep his top priorities in check and minimize distractions;

     e    He is not covering his accounts in a two week time period; and,

     f.    Siciliano required him to give him weekly account updates.

Exhibit "GG" – FCR from Siciliano to Van Cleave.

198.     In Section V, under "Critical Objectives," Siciliano wrote:

     a.    Van Cleave needed to continue to follow up at three accounts;

     b.    Van Cleave needed to develop action plans for Nebraska; and,

     c.    Van Cleave had to complete his account rotation every two weeks.

Exhibit "GG" – FCR from Siciliano to Van Cleave.

199.     On September 19, 2001, Siciliano issued a Q3 FCR for Minor. Exhibit "II" – FCR from Siciliano to Minor.

200.     In Section IV, entitled "Observations/Comments/Follow Through on Previous Direction," Minor's Q3 FCR stated:

     a.    She missed baseline for Retavase for Q2, 2001;

31

b.      She finished 87% to plan with Cordis products;

c.      She did an outstanding job in developing Dr. Castenada as an advocate
        and he would like her to target Dr. Vedantham as an advocate;

d.      She scheduled her dinner programs in Evansville and Des Moines
        promptly, but due to poor follow up and recruitment, the Evansville
        program was poorly attended and the Des Moines program had to be
        cancelled;

e.      She achieved a breakthrough at Barnes;

f.      She was able to achieve some interest at St. Joseph's but due to
        uncontrollable circumstances St. Joseph's put a hold on Centocor;

g.      She needed to continue to develop relationships at St. Joseph's in
        anticipation of getting the "green light";

h.      Siciliano noted she had made no progress at two of her accounts and cites
        inadequate territory coverage and poor follow through as the reasons;

i.      He noted she had "great impact" at two other accounts; and,

j.      He stated that "her lack of proper territory coverage prevents the necessary
        kind of follow-up and follow through required to achieve a high level of
        success."

Exhibit "II" – FCR from Siciliano to Minor.

201.    In the "Critical Objectives" section, Siciliano wrote:

a.      He wanted her to perform solid follow up and follow through at St. John's
        Creve Couer and St. Mary's Evansville;

      b.      He wanted her to follow up on interest expressed at Mercy Hospital in

              Iowa;

      c.      She should complete new business opportunities at Barnes Hospital in St.

              Louis;

      d.      She should continue to build relationships at St. Joseph's; and,

      e.      She should complete her account/territory rotation every two weeks.

Exhibit "II" – FCR from Siciliano to Minor.

202.    In Section VII, "Other Observations," Siciliano wrote that he was requiring Minor to provide him with weekly account updates due to her lack of territory coverage, which he previously "addressed multiple times; prior to the June [National Sales Meeting], at the June [National Sales Meeting], and during my last visit in August."  Exhibit "II" – FCR from Siciliano to Minor.

203.    Siciliano also requested that she submit her expense reports in a more timely fashion.  Exhibit "II" – FCR from Siciliano to Minor.

204.    Minor claims she was not only 87% to plan in Cordis products but much higher. Exhibit "M" – Deposition Transcript of Minor, Part II, at 242, lines 17-20.

205.    Siciliano put the figure 87% on her FCR based on sales information at the time he drafted the FCR which was not up to date.  Exhibit "D" – Deposition Transcript of Siciliano at 228, lines 10-17 & at 230, lines 1-23.

206.    The sales figures Siciliano put on the FCR did not affect what Minor got paid pursuant to the SICP, which would be based on actual sales data.  Exhibit "D" – Deposition Transcript of Siciliano at 230, line 24 & at 231, lines 1-5.

207.    Minor claims she was unfairly blamed for the low attendance at the Evansville dinner program and the cancellation of the Des Moines dinner program.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 244, lines 11-24, at 245, lines 1-6 & at 247, lines 17-23.

208.    Siciliano based his criticism of Minor for the dinner programs on his review of her expense reports and conversations with Minor, and concluded that she had not the sufficient quantity or quality of visits to those cities to drive attendance.  Exhibit "D" – Deposition Transcript of Siciliano at 233, lines 1-15.

209.    Minor claims that inadequate territory coverage did not prevent her success at St. Louis University Hospital, St. Mary's or St. Joseph's. Exhibit "M" – Deposition Transcript of Minor, Part II, at 248, lines 1-12

210.    Minor disputes that she could complete the follow up at Mercy Hospital in Iowa due to the fact that the hospital had no radiology group and that she could only call on a technician who said he would contact her.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 248, lines 14-18.

211.    Minor denies that Siciliano talked to her about territory coverage prior to the National Sales Meeting in June.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 250, lines 7-19.

212.    Minor failed to turn in her expense reports in a timely fashion. Exhibit "M" – Deposition Transcript of Minor, Part II, at 118, lines 19-23, at 251, lines 21-24 & at 252, lines 1-4.

213.    Minor purchased an airline ticket on her own credit card for work-related travel and Siciliano requested she submit all documentation with the reported expense.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 123.

214.    Siciliano also told her that her cellphone bill was over the maximum amount of $100.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 124.

215.    Minor claims it was unfair for Siciliano to criticize her for failing to promptly return messages because she lived in an area where there was poor cellular phone reception.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 252, lines 13-24.

216.    Minor felt like Siciliano was trying to "squeeze her out" based on the weekly reporting requirement and because she thought the Q3, FCR unfairly, negatively characterized her performance.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 252, lines 9-12.

217.    On August 2, 2001, Minor had a cardiac arrhythmia, which is later diagnosed as being caused by job-related stress.  Exhibit "KK" – Deposition Transcript of Dr. Tsang at 53-55 & at 82, lines 1-9.

## Q3, SICP PAYOUTS AND RANKINGS.

218.    For Q3, 2001, Minor and the other VS on her team received the following SICP payments:

| VS | Rank | Payment |
| --- | --- | --- |
| Bannister | 10 | $7,197 |
| Kopecky | 13 | $6,883 |
| Van Cleave | 18 | $4,726 |
| Minor: | 22 | $0 |

Exhibit "LL" – Incentive Compensation Reports for the third quarter of 2001.

219.    For Q3, 2001, Siciliano received $4,737 for his SICP payment and of that amount $2,743 was from "team earnings."  Exhibit "MM" – SICP statement for Siciliano, Q3, 2001.

**MINOR LOOKS FOR OTHER EMPLOYMENT.**

220.    Because of the two-week routing requirement, the fact that she was ranked last as a vascular specialist, and because she felt like she was not able to give any input, Minor looked for opportunities at other Johnson & Johnson subsidiaries.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 234-235.

221.    Minor spoke to a corporate recruiter in Johnson & Johnson, John Villaneau, about possible employment in other Johnson & Johnson subsidiaries.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 234-235.

222.    On September 10, 2001, Minor asked Siciliano to sign a form to allow her to transfer.  Exhibit "NN" –  Email from Minor to Siciliano, dated September 10, 2001.

223.    On September 13, 2001, Russell emailed Minor stating he understands she wants a transfer and that his email serves as her release to explore other opportunities.   Exhibit "OO" – Email from Russell to Minor, dated September 13, 2001.

224.    Minor faxed the email with the release from Bob Russell to John Villaneau.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 239.

225.    On September 23, 2001, Minor received an email from Lisa Huston at Ethicon asking her to contact her.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 239.

226.    After she received this email, Minor allegedly spoke to Lisa Huston at Ethicon, another subsidiary of Johnson & Johnson, about employment at Ethicon.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 239.

227.    Lisa Huston allegedly asked Minor "are you sure you've gotten a release" and "are you sure this boss is really on board with you?"  Exhibit "M" – Deposition Transcript of Minor, Part II, at 239-40.

228.    Minor's believes that she was prevented from being employed at Ethicon because of the Siciliano's Q3 FCR, and, this belief is solely based on the above-described conversation with Huston.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 239-40.

229.    Siciliano was never contacted by any Johnson & Johnson subsidiaries about Plaintiff.  Exhibit "D" – Deposition Transcript of Siciliano at 275.

230.    Siciliano was never asked to provide anyone with a reference or an opinion about Minor's performance.  Exhibit "D" – Deposition Transcript of Siciliano at 276.

231.    Siciliano only saw FCRs of job-applicants because he requested them.  Exhibit "D" – Deposition Transcript of Siciliano at 280.

**MINOR GOES ON LONG-TERM DISABILITY.**

232.    On November 1, 2001, Minor was diagnosed with depression resulting from job-related stress. Exhibit "PP" – Deposition Transcript of Dr. Bohlen at 18-19.

233.    As of October 19, 2001, Minor begins a long-term disability leave due to depression allegedly caused by job-related stress.  Exhibit "M" – Deposition Transcript of Minor, Part II, at 172; Exhibit "QQ" – Letter approving long-term disability.

## CENTOCOR'S MEMORANDUM OF LAW IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Centocor, Inc., by and through its attorneys, Linzey D. Jones and John M. Broderick of the law firm Pugh, Jones, Johnson & Quandt, P.C., and Christopher Biswell of the law firm Drake, Narup & Mead, P.C., and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.1(D)(1)(c), hereby submits Defendant's Memorandum of Law in support of Defendant's Motion for Summary Judgment.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c). The nonmoving party must do more than raise a "metaphysical doubt" as to the material facts.  Grube v. Lau Industries, Inc., 257 F.3d 723, 728 (7th Cir. 2001)(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co., 475 U.S. at 587.

## ARGUMENT

Plaintiff may establish age or gender discrimination either (1) using direct evidence, or (2) by relying on the "burden-shifting" analysis outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Mills v. First Federal Savings & Loan Assoc. of Belvidere, 83 F.3d 833, 840 (7th Cir. 1995)(ADEA); Lim v. Trustees of Indiana University, 297 F.3d 575, 580 (7th Cir. 2002)(Title VII).

As discussed below, Plaintiff has no direct evidence of discrimination because the comments that she alleges her supervisor, Siciliano, made were not derogatory.  Plaintiff cannot establish a prima facie case under the McDonnell Douglas standard because there is no evidence

that creates a genuine issue of material fact that plaintiff suffered an adverse employment action or that others were treated better than her.  In addition, Plaintiff cannot establish she was constructively discharged because the course of conduct taken as a whole does not amount to an adverse employment action under a constructive discharge theory.  Finally, assuming Plaintiff can establish a prima facie case, she cannot prevail because Defendant can justify its actions based on legitimate business reasons.  "[C]ourts do not sit as super personnel departments to second guess an employer's facially legitimate business decisions."  Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1008 (7th Cir. 2002).

## I.    COMMENTS BY SICILIANO DO NOT EVIDENCE AGE OR GENDER DISCRIMINATION.

Plaintiff alleges that when Siciliano became team leader he asked her son's age and announced that he himself was 29 years of age.  Complt. ¶14; SMF ¶¶92-94.  Plaintiff also alleges that, after she returned from having a hysterectomy, Siciliano stated that his mother had the same surgery.  SMF ¶114.  Assuming for purposes of this motion that Siciliano made these remarks, they cannot be evidence of discrimination because they are not derogatory.  The comments are not improper or offensive.  Nothing negative is said about older people or woman in either comment.  Neutral remarks that make reference to age or gender are not evidence of discrimination. Mills v. First Federal Savings & Loan Assoc. of Belvidere, 83 F.3d 833, 842 (7th Cir. 1995)(holding that remark about older people having difficulty in finding another job was not derogatory).  Plaintiff interprets these comments to mean that Siciliano thought of her as being old enough to be his mother.  SMF ¶¶95, 115.  Plaintiff's subjective interpretation of these remarks is not controlling.  Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391, 401 (7th Cir. 1997)(emphasizing that a plaintiff's subjective interpretation of her employer's statements is not controlling).

II.     **PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE FOR EITHER AGE OR GENDER DISCRIMINATION UNDER <u>MCDONNELL DOUGLAS STANDARD.</u>**

The Seventh Circuit applies the same burden-shifting standard for age and gender discrimination claims. To successfully establish a prima facie case, Plaintiff must show that 1) she was a member of a protected class; 2) she performed her job satisfactorily; 3) despite the satisfactory performance she suffered an adverse employment action; and 4) Centocor treated others outside the protected class more favorably than she was treated. <u>Grube</u>, 257 F.3d at 728. Plaintiff fails to establish a prima facie case for either age or gender discrimination because she cannot demonstrate she suffered an adverse employment action and that Centocor treated others outside the protected class more favorably than she was treated.

A.     **<u>Plaintiff Has Not Suffered An Adverse Employment Action.</u>**

1.     **<u>Plaintiff's Acounts.</u>**

Plaintiff alleges that Siciliano assigned her more difficult sales accounts, which were fallow and further away from her residence, and, required her to give up more lucrative accounts nearer to her residence. Complt. ¶¶17(a), (b) & (g).[7] Plaintiff's allegations grossly overstate what actually happened to her account list as is demonstrated by the undisputed facts and Plaintiff's own deposition testimony. Siciliano only assigned her <u>one</u> account. SMF ¶¶70, 76. Her accounts were substantially established by the time Siciliano became her manager. SMF ¶¶24-32. Plaintiff herself picked the vast majority of her accounts, including the accounts located in Kentucky and Indiana. SMF ¶¶26-28. These out-of-state accounts were in her territory long before Siciliano became her manager. Her prior manager, William Alexander, approved her account list. SMF ¶31. She does not allege Alexander discriminated against her.

---

[7]   <u>See</u> Complaint filed in Minor v. Centocor, 04-3114 ¶12(a), (b) & (g).

SMF ¶32.  The accounts located in Iowa were suggested by another manager in the year 2000.

SMF ¶29.

After Siciliano became her manager, he had to reduce the number of accounts assigned to

Minor and the other VS in his team in accordance with a company-wide program called

Operation Seal.  SMF ¶¶49, 50.  In doing so, he dropped five accounts and added one to Minor's

list.  Minor only disputes the dropping of two of her accounts, which were located in Illinois, and

the addition of a single account, St. Joseph's Hospital, which is located in St. Louis, Missouri.

SMF ¶¶64-65, 69, 71, 72.

The addition of a single account and the dropping of two accounts does not add up to an

adverse employment action under any standard.  Where an employee alleged he was transferred

to a less lucrative territory it was held insufficient to constitute an adverse employment action.

Williams v. Bristol-Myers, 85 F.3d 270, 274 (7th Cir. 1996).  Here, the facts according to

Minor's own testimony fall far short of the involuntary transfer in Williams.  It should be noted

that Minor already had other accounts located in St. Louis, Missouri, so she was not required to

travel further than she already was traveling by having St. Joseph's Hospital added to her

account list.

### 2.    Criticisms of performance.

Plaintiff alleges that she was given performance evaluations that were inaccurate and

unfairly critical of her performance.  Complt. ¶17(e).[8]  The evaluations at issue are the two Field

Contact Reports authored by Siciliano, SMF ¶¶123, 199, and Siciliano's instruction to Plaintiff

concerning her emails to company directors.  SMF ¶¶151-153.

The only critical FCR was the second one in which Siciliano misstated her anticipated

commission payment, criticized Minor for not covering her accounts with enough frequency and

[8] See Complaint filed in Minor v. Centocor, 04-3114 ¶12(e).

for failing to execute dinner programs. SMF ¶¶200-202. These criticisms did not impact her

salary or commission, and in particular, his misstatement of her commission had no effect on the

actual commission received. SMF ¶¶205, 206.

Assuming for purposes of this motion that all of Siciliano's criticisms, oral or written in

the FCRs, contain inaccurate and unfair criticisms of Minor, an adverse employment action

cannot be demonstrated by evidence that an employee disagreed with the employer's criticisms

of the quality of her work. Given the fact that the FCRs were not even placed in Minor's

employment file, SMF ¶118, they had no immediate impact on her employment. Job-related

criticism that does not result in any immediate tangible impact on an employee's employment

benefits or conditions is not an adverse employment action. Oest v. Illinois Dept. of Corrections,

240 F.3d 605, 613 (7th Cir. 2001); Silk v. City of Chicago, 194 F.3d 788, 801-03 (7th Cir.

1999)(unwarranted negative performance evaluations not an adverse employment action); Smart

v. Ball State University, 89 F.3d 437, 441 (7th Cir. 1996)(same).

### 3.    Account coverage.

Minor alleges she was required to visit all of her accounts at two week intervals and visit

more important accounts at a weekly interval while other members of her team did not have to

visit them with the same frequency. Complt. ¶17(c).[9] The essence of this allegation is that it

was difficult for Plaintiff to meet this requirement. Even if Minor herself was the only VS

required to visit her accounts on a 1-2 week basis, this requirement does not constitute an

adverse employment action. Johnson v. Cambridge Indus., 325 F.3d 892, 901 (7th Cir.

2003)(holding that assigning harder work assignments to black employee and not white

employees was not an adverse employment action); Haugerud v. Amery Sch. Dist., 259 F.3d

678, 691-92 (7th Cir. 2001)(adding job responsibilities not adverse employment action).

---
[9] See Complaint filed in Minor v. Centocor, 04-3114 ¶12(c).

An adverse employment action must be materially adverse, not merely an inconvenience or a change in job responsibilities. Griffin v. Potter, 356 F.3d 824, 829 (7th Cir. 2004). Minor's complaint about the account coverage requirement amounts to nothing more than a complaint about a difficult or unpleasant working condition and does not constitute an adverse employment action. Id. The court in Griffin held that an involuntary job transfer causing an increased commute and increased workload was not an adverse employment action. Minor was already supposed to conduct out-of-state travel to visit her accounts before Siciliano became her supervisor. SMF ¶¶13, 14, 21. She was the representative assigned to the St. Louis District beginning in the year 2000, and that was the same geographic area she covered in 2001. SMF ¶¶21, 22. The requirement that she visit her accounts with increased frequency is nothing more than a minor alteration in her job responsibilities, and, while she may view it as inconvenient or even difficult, it is not an adverse employment action. An increased workload is not recognized as an adverse employment action – only a decrease in responsibilities. Buttron v. Sheehan, 2003 WL 21801222, at * 18 (N.D.Ill., Aug. 4, 2003).

### 4.    Denial of bonus points not adverse employment action.

Minor complains that she was awarded less bonus points because of her age and gender. Complt. ¶17(h).[10] Centocor had a program whereby Siciliano could award bonus points to his team members. SMF ¶144. Bonus points could be used to purchase items from a company catalog. SMF ¶145. Siciliano had complete discretion to award or not award bonus points to his team members. SMF ¶¶147-149. The bonus points were a perk, and were not a guaranteed part of a VS's compensation. SMF ¶149.

The Seventh Circuit has repeatedly held that the denial of a monetary perk, such as a bonus, is not an adverse employment action if it is completely within the employer's discretion

---

[10] See Complaint filed in Minor v. Centocor, 04-3114 ¶12(h).

to give.  Hottenroth v. Village of Slinger, 388 F.3d 1015, 1030 (7th Cir. 2004); Rabinovitz v.

Pena, 89 F.3d 482, 488 (7th Cir. 1996).  In Rabinovitz, the court held that the denial of a $600

bonus was not an adverse employment action because he was not automatically entitled to it.

Rabinovitz, 89 F.3d at 488.  Here, the bonus points doled out by Siciliano are nothing more than

a perk.  Siciliano had complete discretion on what he could give his team members.  SMF ¶¶147-

149.  He need not have handed out any.  SMF ¶148.  Even if Siciliano unevenly or unfairly

distributed bonus points, it does not constitute an adverse employment action.

### 5.      Fear of termination is not adverse employment action.

Plaintiff claims she felt like she was being "squeezed out."  SMF ¶216.  Plaintiff's

subjective feelings about her fear of being terminated is not based on any objective evidence that

anyone at Centocor wanted to fire her or force her to resign.  She had not been subjected to any

disciplinary action.  SMF ¶122.  Plaintiff's fears are not relevant or controlling.  Irving v. City of

Elkhart, 94 Fed. Appx. 358, 2004 WL 729171, *3 (7th Cir. 2004).  In Irving, the court held

plaintiff's fear of possible termination did not constitute an adverse employment action.  Id.  No

concrete threat was made to plaintiff in Irving.  In addition, in Ajayi v. Aramark Business

Services, Inc., 336 F.3d 520, 531 (7th Cir. 2003), plaintiff received a concrete threat of a

demotion, which never materialized.  The court held this was not an adverse employment action.

Id.

### 6.      Relocation.

Plaintiff alleges she was denied the opportunity to relocate to a site more centrally located

in her territory, while other younger, male sales representatives were given the opportunity to

relocate.  Complt. ¶17(d).[11]  Plaintiff is not really complaining about the lack of opportunity to

relocate but that Centocor would not pay her expenses to relocate.  Plaintiff lived in Springfield,

---

[11] See Complaint filed in Minor v. Centocor, 04-3114 ¶12(d).

Illinois, at all relevant times.  SMF ¶1.  She took the position of VS in June of 2000.  SMF ¶17.

After a year of being in that position and covering the St. Louis District territory, a region that

contained parts of several states, she desired to relocate to St. Louis and asked Siciliano about

possible reimbursement of any relocation expenses.  SMF ¶¶181, 182.  Siciliano told her that it

was Centocor policy not to pay for her relocation expenses.  SMF ¶183.  Minor agrees that this

was Centocor policy.  SMF ¶184.

These allegations cannot constitute an adverse employment action.  Minor was not

required to relocate nor did Centocor ask her to relocate.  Only after a year of being a VS and

living in her territory did she desire to relocate as a convenience to herself.  SMF ¶182.  The

undisputed fact is that it was Centocor policy not to pay for relocation in her situation.  SMF

¶¶183-184.

Minor testified at her deposition that Siciliano should have "fought" for her relocation

expenses to be paid because she "heard" other employees were relocated with financial

assistance.  SMF ¶187.  This testimony is an acknowledgement that Minor was looking for a

perk-like benefit, the denial of which is not an adverse employment action.  Hottenroth v. Village

of Slinger, 388 F.3d 1015, 1030 (7th Cir. 2004).  Defendant will address plaintiff's lack of

evidence about similarly situated individuals infra at 50.

### 7.    No participation in decisions about her accounts.

Minor alleges Siciliano refused her the opportunity to participate in decisions involving

her account assignments even though other VS were given the opportunity to collaborate with

Siciliano.  Complt. ¶17(f).[12]  As discussed above, Minor only takes issue with two accounts

being dropped and one being added. She had the opportunity to explain to Siciliano why she

wanted to keep the two accounts that were dropped.  According to Minor's own deposition

[12] See Complaint filed in Minor v. Centocor, 04-3114 ¶12(f).

45

testimony, she had several discussions with Siciliano about these two accounts.  SMF ¶¶65, 66.

It is obvious that Minor's real complaint here is that she did not get her way, not that she did not

get to participate.

Plaintiff's complaint about having a lack of participation does not constitute an adverse

employment action.  Her lack of participation had no material impact on her compensation or her

responsibilities.  She still had to go out and market Retavase to about a dozen accounts in her

territory.  A materially adverse employment action is something "more disruptive than a mere

inconvenience or an alteration of job responsibilities."  Rhodes v. Illinois Dept. of Transp., 359

F.3d 498, 504 (7th Cir. 2004).  The dropping of two accounts and the addition of one account is a

trivial complaint and does not amount to more than a mere inconvenience – and a subjective one

at that.  Although the removal of two particular accounts may not have made Minor happy,

"[n]ot everything that makes an employee unhappy qualifies as an adverse action…"  Smart v.

Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996).

### 8.     Lost job opportunity.

Minor also complains that she believes Siciliano "blackballed" her from seeking an

employment opportunity in another Johnson & Johnson subsidiary.  SMF ¶¶220-231.  Minor

looked for other opportunities at other Johnson & Johnson subsidiaries because of the two-week

routing requirement, the fact that she was ranked last as a vascular specialist, and because she

felt like she was not able to give any input.  SMF ¶220.

Minor's evidence of a lost job opportunity is scant and she has absolutely no evidence

that Siciliano had any role in the matter.  Initially, Minor offers no evidence of what the job

opportunity was except for her own testimony.  We do not know what her position, her salary, or

responsibilities would have been.  Minor states she was having talks with an employee of a

46

company named Ethicon.  However, this is a vague description of her pursuit.  She had no actual job interview only an email requesting her to contact the sender.  SMF ¶225.

Minor's evidence that the alleged opportunity was lost is equally inconclusive.  She was never formally rejected from any job opportunity but only had a conversation with an employee at Ethicon who asked her "are you sure you've gotten a release" and "are you sure this boss is really on board with you?"  SMF ¶227.  Minor's subjective interpretation of this conversation is that she was rejected for the job opportunity and she further hypothesizes that the rejection was due to Siciliano's Q3 FCR.  SMF ¶228.  However, Siciliano was never asked to provide any documents, information or opinion about Minor to anyone.  SMF ¶¶229-230.  Minor's own testimony about her conversations offers no clear statement that she was rejected, and the conclusions she draws from these events are wholly speculative.

The statements from the Ethicon employee are inadmissible hearsay.  They cannot be admitted against Centocor because they were not made by a Centocor employee.  Fed. R. Evid. 801(d)(2)(D); see, e.g., Luttrell v. O'Connor Chevrolet, Inc., 2002 WL 1263990, at *7 (N.D.Ill., June 5, 2002)(statement by independent job recruiter about why plaintiff lost job opportunity was inadmissible hearsay); Local Union No. 38, Sheet Metal Workers' Intern. Ass'n, AFL-CIO v. A & M Heating, Air Conditioning, Ventilation & Sheet Metal, Inc., 314 F.Supp.2d 332 (S.D.N.Y. 2004)(statement by spouse about what spouse's manager said was not an admission because the declarant not a party or agent of party).

Even if the statements are admissible, their meaning is inconclusive at best.  It cannot be disputed that Minor obtained her release from her regional director Bob Russell, Siciliano's boss.  SMF ¶223.  According to her own deposition testimony, Minor forwarded that release to a corporate recruiter, and not to Ethicon, where the alleged opportunity existed.  SMF ¶224.  She

47

has no evidence that the paperwork was forwarded to Ethicon. The plain meaning of the question from the Ethicon employee - "are you sure you've gotten a release"- is that Ethicon did not receive the release. Since Siciliano did not author the release, the inquiry about "this boss" can only refer to Russell, who did author the release.

### 9.    Expenses.

Minor complains about Siciliano's handling of her expense reports. SMF ¶¶212, 213. One of Siciliano's responsibilities was to review his team members' expense reports and submit them for approval. SMF ¶40. Minor complains that Siciliano pestered her for documentation for an airline ticket and complained that a cell phone bill of hers was too high. SMF ¶¶212, 213. Minor has never claimed a request for reimbursement was improperly rejected only that she did not like Siciliano questioning them. Even assuming that these two items were rejected, it does not amount to an adverse employment action. Fyfe v. City of Fort Wayne, 241 F.3d 597, 601 (7th Cir. 2001)(holding that denial of a travel expense was not an adverse employment action); see also Vela v. The Village of Sauk Village, 2002 WL 1916835 (N.D. Ill., Aug. 20, 2002)(holding that improper denial of tuition reimbursement was not adverse employment action).

### B.    Plaintiff Also Cannot Establish An Adverse Employment Action Under The Constructive Discharge Theory.

In addition to Plaintiff's complaints about various aspects of her employment by Centocor, Plaintiff also alleges that, as a result of the actions of her supervisor, she "was required to leave active employment with CENTOCOR." Complt. ¶21. In October of 2001, Minor went on long-term disability for depression allegedly caused by work-related stress, and has not returned to work since. SMF ¶233. The only legal theory that applies is one of constructive discharge, i.e., Plaintiff's working conditions were so unreasonable it caused her illness from

job-related stress requiring her to take a medical leave.  However, as detailed above, the course

of conduct alleged does not even come close to meeting the criteria for a constructive discharge

claim.

An employee is constructively discharged when she is forced to leave work because her

working conditions, viewed from the standpoint of a reasonable employee, have become

unbearable.  Grube v. Lau Indus., Inc., 257 F.3d 723, 728 (7th Cir. 2001); Simpson v. Borg-

Warner Auto., Inc., 196 F.3d 873, 877 (7th Cir. 1999); Driver v. Arbor Management, Inc., 2001

WL 1155089, at *5 (N.D. Ill., Sept. 26, 2001).  Plaintiff must show two things to prove

constructive discharge:  (1) her working conditions were so intolerable that a reasonable person

would have been compelled to resign, and (2) the conditions must be intolerable because of

unlawful discrimination.  Simpson v. Borg Warner Automotive, Inc., 196 F.3d 873 (7th Cir.

1999).  Proof of constructive discharge is a high hurdle for a plaintiff to overcome.  Driver v.

Arbor Management, Inc., 2001 WL 1155089 (N.D. Ill., Sept. 26, 2001).  Constructive discharge

has only been found in "egregious cases" usually involving threatened or actual physical

violence.  Id.

Plaintiff's claims do not reach this high standard.  Minor alleges no violence or threat of

violence.  Even though Plaintiff's job may have caused her a stress-related illness, her working

conditions were not egregious or unreasonable in any way.  See Spence v. Maryland Casualty

Co., 995 F.2d 1147 (2nd Cir. 1993)(holding that while plaintiff developed high blood pressure

due to work-related stress, he did not suffer adverse employment action).  Plaintiff's complaints

are banal.  She only complains of her day-to-day working conditions and her supervisor's

management style.  As discussed below, these commonplace complaints do not constitute an

adverse employment action.

Plaintiff's claims are almost indistinguishable from those in <u>Harriston v. Chicago</u> <u>Tribune Co.</u>, 992 F.2d 697 (7th Cir. 1992). In <u>Harriston</u>, plaintiff complained of being excluded from office activities, being reprimanded without reason, and being given one of the least lucrative sales territories, as well as not being assigned new accounts, and not being allowed management opportunities. <u>Id.</u> at 705. The court held these complaints were not intolerable. <u>Id.</u>

The plaintiff in <u>Spence</u> was subjected to a number of oral and written critical comments about his work and performance, which caused him to have high blood pressure due to job-related stress. <u>Spence</u>, 994 F.2d at 1153-54. The court in <u>Spence</u> held such conduct did not constitute an adverse employment action. <u>Id.</u> at 1156. The supervisor's behavior in <u>Spence</u> was much worse than that complained of here by Minor. In <u>Spence</u>, the criticisms persisted over a long period of time and were threatening, abrasive and personal. <u>Id.</u> at 1149-1153. In contrast, Siciliano never threatened Minor with being fired nor personally attacked her in his criticisms. <u>See</u> <u>also</u> <u>Grube v. Lau Indus., Inc.</u>, 257 F.3d 723, 728 (7th Cir. 2001)(holding that unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions).

Minor's complaint about the account coverage requirement amounts to nothing more than a complaint about a difficult or unpleasant working condition and does not constitute an adverse employment action. Whether an employee's working conditions are difficult or unpleasant is not the test to establish the existence of an adverse employment action. <u>Spence</u>, 995 F.2d at 1156; <u>see also</u> <u>Grube</u>, 257 F.3d at 728 (job transfer that caused inconvenience in plaintiff's life was not an adverse employment action); <u>Griffin v. Potter</u>, 356 F.3d 824, 829 (7th Cir. 2004)(involuntary job transfer causing increased commute and increased workload was not adverse employment action). Furthermore, Siciliano had the right to impose this requirement on Minor and the other

VS.  The "employer is entitled to insist on as high a standard of work performance as it deems appropriate."  Spence, 995 F.3d at 1156.

In sum, "[n]ot everything that makes an employee unhappy is actionable."  Villaruel v. Gary Community School Corp., 28 Fed. Appx. 564, 569 (7th Cir. 2002).  "The adverse action must be more than a mere inconvenience or an alteration of job responsibilities."  Id.

In Villaruel, plaintiff complained she had to visit additional schools as part of her job responsibilities.  The court held that this was "a minor alteration" of the plaintiff's job responsibilities because she was already traveling to other schools.  Id.  "Accordingly this change did not constitute an actionable adverse action under Title VII."  Id.

Plaintiff's subjective feeling that she lacked input or participation is analogous to the plaintiff's complaint in Harriston who felt her supervisor did not support her and felt excluded from meetings.  Harriston, 992 F.2d at 705.  Such a complaint does not constitute an adverse employment action.  "[F]ailures of communication… are precisely the kind of disappointments... that reasonable people endure on the job."  Eder v. Motorola, Inc., 1997 WL 51580, at *3 (N.D. Ill., Feb. 4, 1997).  Minor herself admits that when she spoke to Stephanie Moore, an employee in Centocor's Human Resources department, she told Moore that she was looking for better ways of communication with Siciliano.  SMF ¶142.  Assuming Siciliano may have dealt poorly with Minor or even mismanaged her, his mismanagement does not constitute an adverse employment action.  Eder v. Motorola, Inc., 1997 WL 51580, at *3 (N.D. Ill., Feb. 4, 1997).  Just because Minor felt left out of the decision-making process does not mean she was subjected to an adverse employment action.  See Genoar v. Clorox Co., 1990 WL 183953 (7th Cir. 1990)(leaving plaintiff out of meetings held not to be adverse employment action).  Finally, it cannot be disputed that Siciliano, as Minor's supervisor, had the right to set goals for her, indeed even to

51

impose them on her.  <u>Spence</u>, 995 F.3d at 1156 (holding that employer has the right "to insist on as high a standard of work performance as it deems appropriate").

### C.  <u>No Similarly Situated Individual Received Better Treatment.</u>

Plaintiff not only cannot show she suffered an adverse employment action but she also cannot show that similarly situated individuals received better treatment.  First, the other VS are not truly similarly situated because Minor cannot show there were no "differentiating or mitigating circumstances as would distinguish... the employer's treatment of them."  <u>Radue v. Kimberly-Clark Corp.</u>, 219 F.3d 612, 617-18 (7th Cir. 2000).  Minor was off for two months on a short-term medical leave.  Upon her return, she had coaching challenges that were specific to her situation in that she had to make up for lost time and Siciliano said as much to her in his April FCR.  SMF ¶124.  Furthermore, in the second and third quarter, Plaintiff was the lowest ranked VS in her team in the SICP.  SMF ¶¶135, 217.

Furthermore, Plaintiff cannot show that she was treated differently from the other team members.  Each team member had their account lists modified by Siciliano.  Each team member was criticized for their account coverage in writing or orally and was told to cover their accounts with the same frequency.  Each team member received criticisms for their performance.

### 1.    <u>Account lists.</u>

It is undisputed that each team member including Siciliano had their account lists modified at the end of the year 2000 and the beginning of 2001 pursuant to Operation Seal.  SMF ¶¶49-63.  Each VS had accounts dropped or added to their list.  Like Plaintiff, the other VS had discussions with Siciliano about their account lists but knew that the final decision was Siciliano's.  SMF ¶¶55, 59.

## 2.    **Account coverage.**

Furthermore, the undisputed facts show that Minor was not the only person required to cover her accounts in a two-week period. Siciliano discovered by reviewing expense reports of his team members that the VS under him were not covering their accounts with sufficient frequency. SMF ¶¶155, 168. He complained about their lack of coverage either orally or in writing. SMF ¶¶133(a), 172, 174, 180(c), 191(c). Siciliano put the two-week coverage requirement in writing for all VS in their FCRs. SMF ¶¶173, 180(c), 192(a), 198(e).

## 3.    **Criticisms of performance.**

Each VS received individual criticism from Siciliano about different aspects of their performance. Here, Minor cannot show with any precision that the other VS were similarly situated in terms of their conduct. Radue v. Kimberly-Clark Corp., 219 F.3d 612, 618 (7th Cir. 2000). For instance, each quarter the VS's territory performed differently thus requiring different coaching. However, each VS received criticism from Siciliano. Van Cleave received criticism for lapses in coverage, failing to prioritize, having inadequate follow through and generally for not giving enough effort. SMF ¶197. Kopecky was lectured for coming in second to last in the SICP rankings. SMF ¶132. Bannister-Hill was instructed that she needed more training on the science behind her product. SMF ¶193.

## 4.    **Relocation.**

Although Minor testifies she heard through the "grapevine" that two other employees relocated and had their relocation expenses paid, Minor offers no evidence as to the circumstances of the other employees' relocations except for her generalized understandings. SMF ¶¶185-187. She offers no evidence as to what expenses may have been paid, whether the relocations were voluntary or involuntary, whether the relocations involved a promotion or

lateral move, or whether they were within Centocor's relocation policy or exceptions to the rule. Furthermore, the fact that Siciliano had nothing to do with their relocations (they were not managed by him) means they are not similarly situated individuals. Radue v. Kimberly-Clark Corp., 219 F.3d 612, 618 (7th Cir. 2000). Thus, she fails to meet the requirement for establishing the existence of similarly situated individuals who were treated differently. Her own deposition testimony is wholly inadequate and insufficient to create a material issue of fact. Vera v. University of Chicago, 2004 WL 1123817, at *6 (N.D. Ill., May 7, 2004)(conclusory statements in plaintiff's affidavit about other similarly situated individuals was insufficient); Moss-Buchanan v. City of Chicago, 2005 WL 78953, at *5 (N.D. Ill., Jan. 14, 2005)(same); Johal v. Little Lady Foods, Inc., 2004 WL 1745749 (N.D. Ill., July 30, 2004)(plaintiff's testimony about what she heard about other employees through co-worker and not other employees was inadmissible hearsay).

Furthermore, evidence not based on personal knowledge is inadmissible. Payne v. Pauley, 337 F.3d 767, 772 (7th Cir. 2003). Minor's evidence of similarly situated individuals is the definition of hearsay – in one case it is double hearsay, i.e., Minor is repeating what she heard from another Centocor employee about yet another Centocor employee, and, as to the second employee she admits she is testifying only as to her "general understanding." SMF ¶187. Such evidence is totally unreliable and should be rejected by the Court.

### 5. Lack of participation as to accounts.

Simply put, like Plaintiff, the other VS had discussions with Siciliano about their accounts, but they knew that the final decision was Siciliano's. SMF ¶¶54, 58. Indeed, Bannister-Hill simply took over the accounts that used to be assigned to Siciliano. SMF ¶¶45, 63.

III.    __SICILIANO'S DECISIONS WERE BASED ON LEGITIMATE REASONS.__

"[C]ourts do not sit as super personnel departments to second guess an employer's facially legitimate business decisions." Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1008 (7th Cir. 2002). Thus, even if the Court were to find that Minor could establish a prima facie case, the undisputed facts in this case demonstrate that Siciliano based his decisions on legitimate business reasons.

With regard to his decisions about Minor's accounts (again she only complains about dropping 2 and adding 1), Siciliano acted in accordance with Centocor's Operation Seal, i.e., he had to make some decision about Minor's accounts. In deciding which accounts were to remain in Minor's territory and which accounts should be added, Siciliano spoke with Minor and Michelle Johnson, the sales manager for the cardiovascular division in the St. Louis district. SMF ¶64. Michele Johnson had her own business reasons to be involved in this process. SMF ¶67. Siciliano's manager had to approve all account lists. SMF ¶68. The accounts added and dropped to Minor's account list were the result of a compromise between what Minor and Michelle Johnson wanted. SMF ¶69.

Minor admits that St. Joseph's was potentially a significant account and that it was added to her list to keep open the possibility of successfully marketing Retavase to it. SMF ¶¶75, 76. Even after efforts were unsuccessful to market Retavase to St. Joseph's, Centocor continued with its efforts at St. Joseph's, and Minor, as a vascular representative, was part of that overall marketing strategy. SMF ¶¶80, 81, 82. The record contains absolutely no evidence that the account was added to adversely impact Plaintiff, or, to otherwise discriminate against her. Minor was not the only person impacted by success or failure at St. Joseph's. SMF ¶¶86, 87.

With regard to his account coverage requirements, Siciliano imposed a two-week requirement based on his own experience as a sales representative and in consultation with the regional director, Bob Russell.  SMF ¶¶169-171.  It cannot be disputed that visiting one's accounts drives the business.  SMF ¶176.  Siciliano's denial of Minor's request for reimbursement of expenses related to relocation is grounded on his understanding of Centocor policy, a policy Minor admits exists.  SMF ¶¶183, 184.

With regard to Siciliano's FCRs pertaining to Minor, Siciliano's first FCR was geared toward getting her back in "front" of her accounts after being off for two months.  SMF ¶124.  In his second FCR, Minor complains about his criticisms but each has a basis.  As an initial matter, Siciliano's inclusion of the Cordis statistic in the FCR, SMF ¶200(b), was not based on up-to-date information, SMF ¶205; but, it had no effect on what her actual compensation would be as her commission based on Cordis would have been paid based on actual sales and not what he included in his FCR.  SMF ¶206.

Siciliano's criticisms about attendance at Minor's dinner meetings, SMF ¶200(d), is based on the undisputed facts that one dinner meeting had to be canceled because no one was going to attend, and the other one had low attendance.  SMF ¶¶129, 131, 207.

Siciliano's complaints about Minor's territory coverage were based on his review of her expense reports.  SMF ¶¶156, 157, 158, 159.  The expense reports demonstrate that Minor did not cover 25% of her accounts in the first six weeks back from her medical leave and that she spent the most time in Springfield, which has the least amount of accounts and is closest to her home.  Clearly, Siciliano had reason to be concerned.  Coupling this pattern of account coverage with her declining rank in the SICP, SMF ¶¶135, 218, Siciliano had to perform some coaching tasks with Minor, which was one of his responsibilities as team leader.  SMF ¶40.

Even if Siciliano was wrong on all counts, he need not be objectively correct.  Even if Siciliano was incorrect or based his decisions on poorly considered reasons, there is no evidence he did not honestly believe in his reasons.  Wade v. Lerner New York, Inc., 243 F.3d 319, 323 (7th Cir. 2001).

**CONCLUSION**

Based on the foregoing reasons, defendant CENTOCOR, INC. respectfully requests that this Court grant summary judgment in its favor and against Plaintiff M. JANE MINOR on her ADEA and Title VII gender discrimination claims and award CENTOCOR, INC. its costs.

Respectfully submitted,

**Defendant**
**CENTOCOR, INC.**

By: s/ Linzey D. Jones
    Linzey D. Jones, Bar No. 6183113
    John M. Broderick, Bar No. 6255668
    PUGH, JONES, JOHNSON, &
    QUANDT, P.C.
    180 North LaSalle Street, Suite 3400
    Chicago, IL 60601
    (312) 551-1002
    (312) 551-0804 Fax
    ljones@pjjq.com

    David L. Drake
    Drake, Narup & Mead, P.C.
    107 East Allen Street
    Springfield, Illinois 62707
    (217) 528-9776
    (217) 528-9401 Fax

## **CERTIFICATE OF TYPE VOLUME COMPLIANCE**

      I, the undersigned attorney, hereby certify that the Argument section of Centocor, Inc.'s Motion for Summary Judgment complies with the type volume certification contained in Local Rule 7.1(D)(5) and that it contains 5,882 words.

s/ John Broderick
Attorney's Name and Bar Number 6255668
Attorney for Defendant
Pugh, Jones, Johnson & Quandt
180 N. LaSalle Street, Suite 3400
Telephone: (312) 551-1002
jbroderick@pjjq.com

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned attorney, hereby certify that on February 28, 2005, I electronically filed the foregoing Motion for Summary Judgment, Index of Exhibits and Exhibits A through QQ with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: James P. Baker, Esq., Baker, Baker & Krajewski, LLC., 415 South Seventh Street, Springfield, IL 62701.

s/ <u>John Broderick</u> _____
Attorney's Name and Bar Number 6255668
Attorney for Defendant
Pugh, Jones, Johnson & Quandt
180 N. LaSalle Street, Suite 3400
Telephone: (312) 551-1002
jbroderick@pjjq.com