1  Q  Did they draft written reports after each
2  ride?
3  A  I don't recall any.
4  Q  Okay.
5  A  I just remember the annual report pretty
6  much.  I mean I was there like 18 some years and to
7  be honest with you, most of them knew that I had,
8  that I would get the job done, I guess.
9  Q  Was your territory, any of the territory
10  changes we just talked about, were any of those not
11  to your liking?
12  A  I had not thought about that one.  Well,
13  when I lost Urokinase, the doctors I had been
14  calling on for a long time, they kind of become
15  like family.  You know, like after 11 years of
16  seeing them all the time.  They do.  They become
17  your really good friends.  So probably I would say
18  I missed them.
19  Q  Do you think, now describe why you left
20  Abbott then.  Before you do that, I apologize.
21     At Abbott, did you ever take a short term
22  leave of disability?
23  A  No.
24  Q  A long term disability leave?

1  Q  When you left Abbott, so you know, ILCD
2  they felt about your leaving?
3  A  You know what?  I didn't think about it
4  too much because I was excited I was going to get
5  to be with my doctors I liked.
6  Q  To your knowledge, would Abbott rehire
7  you if you went back to them?
8  A  Well, I think that if they had that
9  policy they would but they have a policy of never
10  to rehire someone that's left.  I know that's a
11  standard policy because a friend of mine who was
12  totally outstanding tried to get her job back.
13  Q  And she couldn't?
14  A  She just said that was the policy,
15  period.  Once you leave, that's it.  Sionara.
16  Q  Did you have a final grade when you left
17  Abbott at all or do you know?
18  A  No, just because, I think because of the
19  fact when Urokinase was pulled, it's just like
20  everything was total chaos because it was a real
21  big money maker.  In my territory it was like three
22  million and that was only 25 percent of the Chicago
23  district alone.  So it was a really big product for
24  them.  They called it a cash cow.

1  A  No, not that I can possibly remember.
2  MR. BAKER: Excuse me.  Go off the record for a
3  second.
4     (Discussion off the record.)
5  MR. BRODERICK:  Q  Let me ask you about why
6  you left Abbott and then I'll wrap up Abbott.
7  Describe leaving Abbott and why you left Abbott.
8  A  Well, primarily because I got a really
9  good offer to work with the doctors that I had
10  called my family.
11  Q  Did you seek out the position at
12  Centocor?
13  A  No.
14  Q  Who sought you out from Centocor?
15  A  One of the local reps had asked pharmacy
16  who would be a good person to call in radiology and
17  with lytic therapy and things like that and the
18  pharmacists all knew me in the whole area so they
19  gave my name.
20  Q  Do you remember the name of the person?
21  A  Suzanne Bolger is the one who referred me
22  to Centocor.
23  Q  How do you spell her last name?
24  A  B-O-L-G-E-R.

1  Q  Okay.
2  MR. BAKER: Let's take a break now.
3     (Whereupon a break was taken.)
4  MR. BRODERICK: Let the record reflect that we
5  took a break at 2:45 and that we are back on the
6  record at 2:55.
7  Q  Let me show you what will be marked
8  as Exhibit B.
9     (Whereupon said document was
10     duly marked for purposes of
11     identification as Exhibit B,
12     as of this date.)
13  MR. BRODERICK:  Q  I'll just ask you to
14  review.  What does that mean?
15  A  It pretty well says what I did.  Oh,
16  yeah.  We had profit sharing with Abbott.  I had
17  forgotten all about that.  I'm sorry.
18  Q  Okay.
19  A  But 11/82, '99, I don't remember exactly
20  what this is.  '98, '99 Urokinase was pulled.
21  Never mind.  I don't know the times for everything
22  exactly.
23  Q  Is it noted on there that--
24  A  Say what?

Page 125

1    Q  Did you have a chance to review the
2  application?
3    A  All I was going to say is this shows--
4    Q  Oh.  Robin Lewis on page 2?
5    A  Yes.  That was her name.  Thank you.
6    Q  Is that a female?
7    A  Yeah.
8    Q  Okay.  Let me just ask you, did you
9  submit a copy, if you look at the second to the
10  last page I think there's a copy of your diploma.
11  Is that right?
12    A  I guess I did, didn't I?
13    Q  Do you think you would have submitted a
14  copy of the diploma with the application?
15    A  I don't have any idea whatsoever but I
16  guess they asked for it or it wouldn't be here.
17    Q  I think the last page was attached by
18  mistake.  Looks like the last page to your resume.
19    A  Yeah.  This one.
20    Q  Might be a copy.
21    A  Do you want me to take it off then?
22    Q  If that's the Exhibit, let's leave it
23  part of the Exhibit.
24    A  Do you want to write on there?

Page 126

1    Q  No, that's fine.  Do you think you would
2  have attached your most current resume with your
3  application?
4    A  Yeah.
5    Q  Okay.
6    A  Well, I don't know if I'd attach it but
7  I'm sure it would be attached to it probably, I
8  thin.
9    Q  As far as the first three pages of the,
10  that look like it's the application, is that your
11  signature on page 4 at the bottom?
12    A  Uh-huh.
13    Q  Okay.
14    A  Seems like it is.
15    Q  And Robin Lewis, how long did you work
16  for Robin Lewis at Abbott?
17    A  Just for a very short time.
18    Q  Did she review you at all?
19    A  No.  I wasn't even there long enough to
20  review as far as I know because we went through the
21  training for that Thymoglobulin.  Those the name of
22  the other product we were supposed to have and we
23  didn't get that.  We worked with SangStat reps and
24  we were also supposed to have gotten a product

Page 127

1  called Thymoglobulin but instead we only got the
2  generic product Sansyia, S-A-N-S-Y-I-A, Sansyia.
3  That's kind of what the name of it is.
4    Q  Do you know if Ms. Lewis conducted any
5  reviews or evaluations of you?
6    A  No, not really.  I mean we'd have lunch
7  together a couple of times, things like that.
8    Q  Okay, did you get along with Ms. Lewis?
9    A  I mean she was okay.
10    Q  Did you go along with her better or not
11  as well as some of your previous managers?
12    A  I didn't get a chance to establish much
13  rapport with her because, I'd say, I mean I almost
14  didn't ever see her.  She didn't even hire me
15  because the other person just said she's good, we
16  want her.
17    Q  Okay.
18    A  So I didn't have much rapport
19  relationship with her.
20    Q  Did you have, any do you remember did you
21  have any disagreements with her in the short period
22  of time that you had dealings with her?
23    A  I remember that I was disappointed that
24  we didn't have Thymoglobulin.

Page 128

1    Q  Is that necessarily a disagreement with
2  Ms. Lewis?
3    A  No.
4    Q  Okay.  Did you have any disagreements
5  with Ms. Lewis or anything like that?
6    A  I think I only saw her a couple of times
7  when I went to Indy, so I'm thinking.
8    Q  Is that a no?
9    A  I think that's no because I don't recall
10  anything in particular.
11    Q  Okay.  Now, did you know Suzanne Bolger
12  before you took the job with Centocor?
13    A  No.  Let me correct that.  I did not know
14  her prior to her telling me that she had gotten
15  references for me to sell.  So yes, she knew me
16  prior to my hire date only in that she introduced
17  me to Centocor.  Does that make sense?
18    Q  You didn't necessarily have a
19  relationship with her prior to that.
20    A  Prior to that, no.
21    Q  Looks like you applied to Centocor in
22  August of '99?  Whatever the date on the
23  application is what it is.
24    A  That's when I applied.

Page 129

1    Q  Who hired you at Centocor?
2    A  Michelle Johnson.
3    Q  And who did you interview with at
4  Centocor?
5    A  Michelle and Gorge Hernandez and, you
6  know, I don't remember interviewing with anyone
7  else.  I think that was, was there anybody else
8  there in the middle there?  I'm trying to
9  remember.  I think it was just Michelle and I know
10  I had to go to Florida to meet with the regional
11  manager which would have been her boss, Gorge
12  Hernandez and it's spelled like Gorge.  So it's
13  G-O-R-G-E.
14    Q  What was the position you were
15  interviewing for?
16    A  At that point, it was a cardiovascular
17  representative.
18    Q  And did you know what products you were
19  going to sell?
20    A  Retavase and Reapro.
21    Q  Okay.  And what was--
22    A  I guess we had Fragmin added on there
23  at some point in time.
24    Q  What was Retavase intended for?

Page 130

1    A  Retavase.  It had, you know what it means
2  to be indicated by the FDA?
3    Q  Yes.  Go ahead and describe it, please.
4  You describe it to your understanding.
5    A  My understanding of it?  If someone were
6  having a heart attack and they came to the
7  emergency room, they would get one ten unit bolus
8  of Retavse which was manufactured to dissolve blood
9  clot and then so many minutes later, they would get
10  another ten unit bolus.  So it was a double bolus
11  of the thrombolytic agent in like a clot buster.
12    Q  And that was the indicated use for
13  Retavase?
14    A  Yes, it was.
15    Q  And generally, when a product has an
16  indicated use by the FDA, what does that mean?
17    A  It means it's okay for you to talk about
18  it if all the materials have gone through
19  regulatory with Centocor.
20    Q  And if a product has a nonindicated use
21  or if a product is not indicated for a certain use
22  what does that mean?
23    A  It means just exactly what you said, the
24  reverse of what I just said which was that they did

Page 131

1  not have it indicated through the FDA for that
2  indication.  Is that what you wanted to know?
3    Q  I was just wanting to know your
4  understanding of those ideas.
5       Now, the other product was Reapro, did
6  you say?
7    A  Yes.
8    Q  And what was the, what were you selling
9  Reapro for?
10    A  It was a glycoprotein, 2B3A inhibitor.
11    Q  Who were you selling Retavase to?  What
12  types of individuals?  I assume you were going to
13  hospitals.
14    A  Yes.  Primarily the clinical
15  cardiologists.  Interventional cardiologists for
16  Reapro and pharmacy, of course.
17    Q  And the third, Fragmin.  What was the
18  intended use for Fragmin?
19    A  It's low molecular weight Heparin.
20    Q  And the intended usage?
21    A  I guess in layman's language it would be
22  like a blood thinner to prevent a clot extending.
23  It's supposed to prevent clots from forming like
24  pericatheter thrombosis or whatever to prevent

Page 132

1  occlusions or to prevent them from extending.
2    Q  I don't pretend to be an expert in those
3  areas, so feel free to speak in layman's terms.
4    A  No.  I'm just trying to say how to say
5  it.  Is that okay?
6    Q  Oh, yes, that's fine.  Okay.  Who was
7  Stephanie Moore?
8    A  She was the head of human resources at
9  Centocor.  Very nice lady.
10    Q  Okay.  And Susan Kincade?  Have you had
11  any dealings with her?
12    A  I remember her name.  Was she also in
13  that department?
14    Q  Well, let me mark this as Exhibit C.
15       (Whereupon said document was
16       duly marked for purposes of
17       identification as Exhibit C,
18       as of this date.)
19    MR. BRODERICK:  Q  Have you ever seen
20  Exhibit C before?
21    A  Seen what?
22    Q  Have you ever seen this document before?
23    A  Personnel action form?  Put it this way,
24  I don't recall seeing it.

Page 133

1    Q  Okay.
2    A  I might have because they have a jillion
3  different documents when you come to a company and
4  so I don't know if I did or didn't see that one.
5    Q  I think on the top it indicates an
6  effective start date of September 20th, 1999?
7    A  Uh-huh.  That's right.
8    Q  Is that your start date?
9    A  Uh-huh.
10    Q  And is your starting salary at 77,000?
11    A  Yes, and I got a sign on bonus and some
12  stock options and things because they really wanted
13  me to come aboard.
14    Q  Very good.  Do you remember the sign on
15  bonus?
16    A  They offered me 10,000 and I wasn't sure
17  I was going to move for that and so then Gorge
18  Hernandez called back and said they'd make it a
19  15,000 sign on bonus and a thousand stock options
20  for Centocor and then when it turned to J and J,
21  that would be a thousand J and J options.
22    Q  Okay.
23    A  And I would be one hundred percent vested
24  in that.  So I thought that sounded pretty good.

Page 134

1    Q  Okay.  Did you have any other
2  responsibilities outside of, that we talked about
3  in terms of selling the three products?  Did you
4  have any other responsibilities?
5    A  Like?
6    Q  I don't know.
7    MR. BAKER: You mean when she first hired on
8  with Centocor?
9    MR. BRODERICK:  Q  Yes.  Was there training
10  responsibilities or--
11    A  Not when I first hired on.  No, I went
12  through their training program.
13    Q  So initially when you started in
14  September of '99, the job description was just to
15  sell those three products.
16    A  Basically, yes.  I think Fragmin was in.
17  I'm not sure if it was then or later to be honest.
18  I can't remember.  It was not considered anything
19  that we based our money on and that's what matters
20  to a sales rep usually.  If you're not going to get
21  much bonus on it, you don't spend your most time on
22  it.
23    Q  Who did you report to?
24    A  Michelle Johnson, who hired me.

Page 135

1    Q  Do you know who else she supervised?
2    A  She supervised Suzanne.  There was a
3  whole, from the time I started to the time I left,
4  everybody had turned over in that whole district
5  except for Jerry Nidig (sp) who overlapped with
6  Randy VanCleef (sp) down in southern Missouri and
7  Susan Bolger.  Everybody else had left.  New ones
8  were coming in.
9    Q  What was Michelle's district?  Do you
10  know what it was called?
11    A  I'm trying to remember.  I just know we
12  ended up with central but I'm trying to remember
13  because it was changed from, St. Louis district,
14  yeah.  We were the St. Louis district.  That's a
15  simple question.  Sorry.
16    Q  And how many, do you know approximately
17  how many representatives were in the St. Louis
18  district which she supervised?
19    A  Somewhere, I would say eight, nine, ten.
20  Something like that.  Typical kind of a district.
21    Q  And what was your territory within that
22  district?
23    A  Peoria.
24    Q  That's what it was called?

Page 136

1    A  It was the Peoria territory.
2    Q  And what did that encompass?  What were
3  the geographic limits on that?
4    A  Peoria and Clinton.  Wish I had a map
5  right now.  Oh, and I went over to Quincy.  I would
6  have like Carthage and Havana and all these little
7  towns and I went over to Hannibal, Missouri, was
8  probably the farthest one.
9    Q  Just, that just on that other side of the
10  river?
11    A  Uh-huh.  Yeah.
12    Q  And you were living in Carthage at this
13  time?
14    A  No.  I lived in Springfield.
15    Q  Thank you.
16    A  My mom lived in Carthage.
17    Q  Did you have any territories, any
18  accounts in Iowa or Indiana?
19    A  No, not at that time.
20    Q  How many hospitals were you, did you have
21  in that territory?
22    A  Okay.  I had Bloomington Normal.  I'd
23  just have to stop and count them.  Sorry.  I can't
24  visualize how many there were but I covered

## Page 137

1  Bloomington Normal and Lincoln.  Then there were
2  three in Springfield, three in Peoria.  Galesburg
3  had two, Hannibal, 15.
4      Q  Okay.
5      A  Put approximately too because I don't
6  know.
7      Q  Approximately 15?
8      A  Uh-huh.
9      Q  Okay.  And when you started there,
10  obviously at some point you moved on to be a
11  vascular specialist.
12      A  Right.
13      Q  Do you remember when it was?
14      A  That would have been July of 2000.
15      Q  Okay.  So between the time of, between
16  the time of September of '99 'til July of 2000 when
17  you were a cardiovascular representative--
18      A  Senior cardiovascular representative,
19  yes, my card said.
20      Q  (Continuing.)--did the geographic
21  boundaries of your territory change?
22      A  Not much, I don't think.  I mean I can't
23  remember if I had Hannibal at first.  I think they
24  added it from a more southerly person.  I think

## Page 138

1  that was it.  That's about the only thing I can
2  think of that would have changed.
3      Q  Do you know who would have made that
4  decision to have that account?
5      A  Oh, Michelle.  We talked about it.  It
6  was no big deal anyway.  It was just right across
7  the river there.  I could stay over with my mom.
8      Q  Was there a change in the number of
9  accounts that was in your territory?
10      A  No.  That one I had counted when I was
11  counting with the approximate number.
12      Q  So the accounts themselves stayed pretty
13  much the same to the best of your knowledge?
14      A  Yeah, pretty much I think to the best I
15  can remember.
16      Q  Okay.  Do you know, when you began, did
17  your territory overlap anyone else's territory?
18      A  May I ask you a question?  Do you mean
19  were there other cardiovascular reps that would
20  have covered the same territory?  I overlapped with
21  the Reapro representative from Lily and there was a
22  gentleman that I overlapped with for Fragmin from
23  that company.
24      Q  No.  I mean any other Centocor

## Page 139

1  representatives.
2      A  We had a specialist that did the
3  contracting and so that would have been an overlap,
4  a contracting specialist and we had PHDs that came
5  in.  They were called CIS, Clinical Information
6  Specialists, so they would have been Abbott
7  employees that overlapped.  Is that what you mean
8  or am I not telling you what you want?
9      Q  I'm just wanting did any other sales
10  representative at Centocor have to take a change in
11  their territory to accommodate your hiring?
12      A  No.  Well, I just know that when Suzanne
13  said that Peoria had been part of hers and that she
14  couldn't cover it.  Basically, it had never really
15  been covered.  So her territory was I guess that
16  large and they were looking for someone too.  I do
17  know that there was some representative, a nurse,
18  Chris Perzee, who was living out in, I think it was
19  Columbia, Missouri or something and she wanted to
20  move into St. Louis and Michelle redesigned the
21  district so she could move her in so they could
22  have more of a better, happier metro life instead
23  of being stuck out there and that was the alignment
24  that I'm aware of.  Other than that, I don't

## Page 140

1  anything out of line, necessarily, you know, with
2  regard to me except I think that Chris did not want
3  to come up to Hannibal because it was a ways up for
4  her and it wasn't that far from Quincy.  It was
5  right across the river for me so, and it was fine
6  for me.
7      Q  So who was assigned to your accounts
8  prior to you being assigned to them?
9      A  Either, I guess Suzanne.  Oh, that's not
10  true.  I remember now because Chris Perzee would
11  have been the one that had like the Hannibal
12  account so that was that.
13      Q  How do you spell his last name?  Or is it
14  she?
15      A  Her.  P-E-R-Z-E-E.  I remember I had to
16  get, before they got my territory fixed, I remember
17  that I got sheets from three people.  So one would
18  have been Suzanne.  One would have been Chris.  I
19  know Reuben had covered part of Springfield so
20  maybe I got some of his too.  But I got, until they
21  got it consolidated into one sheet that you
22  received your sales on, I got several just to look
23  at the different accounts.
24      Q  At that time you were having a salary and

Page 141

1 then was there also a bonus component to your, or a
2 commission?
3     A  Yeah, a bonus.  Besides my sign on bonus
4 there was a bonus.
5     Q  And what did Centocor call the commission
6 or bonus that was paid to you that was based on
7 your sales?
8     A  Do you mean did they call it a bonus?
9     Q  Did they call it something, yes.
10     A  They called it a bonus.
11     Q  Do you know how it was being calculated
12 when you were a senior cardiovascular rep?
13     A  It was based, again, we had quotas and
14 many of these jobs, to just give you one bit of
15 information, they might have had, I don't remember
16 to be honest who did or who didn't in all these
17 jobs, but they probably had some portion that they
18 looked at, just your over all being and your level
19 of knowledge and stuff.  But over all, the sales, I
20 would say that it was, they would look at, you
21 know, they would look at what they thought the
22 potential was and determine, if no one had ever
23 worked there before, you'd probably have a lower
24 goal than if somebody had worked there and the

Page 142

1 sales were already huge and I was at 200 percent of
2 quota after June of 2000.  So she was very pleased.
3     Q  Do you know who was in charge of
4 calculating the bonus?
5     A  No.  That's a no.
6     Q  Do you know who was in charge of putting
7 together the formula for calculating the bonus?
8     A  No.
9     Q  At that time was, have you heard of the
10 sales incentive compensation plan?
11     A  Yes, I have.
12     Q  And we refer to that as--
13     A  SICT.
14     Q  We refer to that for short.  Okay?  Was
15 that being used when you were a senior
16 cardiovascular specialist?
17     A  That, or they called it something else
18 but it was a bonus program.
19     Q  And do you know who, did Centocor from
20 time to time make changes to the formula of the
21 SICT?
22     A  Probably.  For all these, I do not know
23 whoever made up the formulas or who did what they
24 did.  We were just presented it.  Just thought I'd

Page 143

1 mention that.
2     Q  Okay.  Very good.  Let's get specific to
3 the first quarter of 2000 and I think you've sort
4 of told us some things here that overlap in this
5 time period but your territory pretty much stayed
6 the same other than what we talked about in the
7 first quarter of 2000?
8     A  Uh-huh.
9     Q  And your accounts pretty much stayed the
10 same?
11     A  Yep, as far as I can remember.
12     Q  Michelle Johnson was still your
13 supervisor?
14     A  Yes, she was.
15     Q  To your knowledge, were there any changes
16 to the SICT, if that was what was in place at the
17 time?
18     A  I do not remember much about Fragmin.  It
19 was like almost, it was so little emphasized that
20 it was almost a nonentity and the only time they
21 did anything with it, they offered some kind of a
22 contract.  If they used so much of another product,
23 then they could get a big discount on Fragmin or
24 something and my hospitals didn't qualify.  So I

Page 144

1 don't mean to be vague about it but we just really,
2 that was not at all an emphasis, so.  Wasn't where
3 the money was.
4     Q  Move on to the second quarter of 2000
5 just to give us some structure.  Again, were your
6 accounts the same, do you believe, in the second
7 quarter of 2000 up until the time that you--
8     A  Became a specialist?  Yeah.  I pretty
9 much think so.
10     Q  All that was the same?
11     A  Except for the Hannibal one which I think
12 was the one that was added on.  I don't even
13 remember when but it was.
14     Q  Did Michelle Johnson ride with you?
15     A  Yeah.
16     Q  Do you know how many times?
17     A  Several.
18     Q  Did she, let me just establish some
19 foundation.  Was there a written report written
20 after Michelle Johnson rode with you?
21     A  Yes.
22     Q  What was that called?
23     A  Field contact report, FCR.
24     Q  To your understanding, to the best of

Page 145

1  your knowledge, did she author an FCR after each
2  time she rode with you?
3     A  She sent me a copy when she had written
4  something about me.
5     Q  Do you think she wrote something about
6  you each time she rode with you?
7     A  Probably.  She was very thorough.  Almost
8  as thorough as you.
9     Q  How did that, she's talking about you,
10  Jim.
11     MR. BAKER: No, no, no, no, John.  She's giving
12  compliments where they're deserved.
13     MR. BRODERICK:  Q How did it make you feel
14  to have Michelle Johnson ride with you?
15     A  Probably tense at first.
16     Q  Pensive?
17     A  Pensive?
18     Q  Is that what you--
19     A  Intense.
20     Q  Intense.  Okay.  Anything else?
21     A  Tense, intensive.  No other thing jumps
22  to my mind.  Like such as?
23     Q  Did Michelle ride with you more than the
24  Abbott reps rode with you?

Page 146

1     A  Yeah.
2     Q  Abbott supervisors?
3     A  Sure.
4     Q  And I mean Abbott supervisors.
5     A  Yeah.  I was new with that company, yeah.
6     Q  Do you recall if Michelle had any
7  criticism of you?
8     A  I think that Michelle had constructive
9  criticism and so I thought over all she was a fair
10  person and I knew that if I, well, that doesn't
11  matter.  I knew that if I needed something, she had
12  it.  She was the most organized woman I ever met.
13  So there was never a time that you couldn't reach
14  her or get what you needed.
15     Q  And I believe you said, how did the
16  criticisms make you feel?
17     A  Well, I can't think.  If there was any,
18  it was more at the first of the time that she would
19  ride with me and probably because I was used to
20  having everything done and I wanted it all done at
21  once and starting a new job, it wasn't necessarily
22  possible.  So she would tell me some things but
23  then she would be constructive and say she
24  understood that, because a major hospital like St.

Page 147

1  Francis was considered the hub account and little
2  dinky hospitals around that would refer patients
3  into that hub were called spokes and we were
4  supposed to call and try to get them to use Reapro
5  in the spoke account.
6        These little hospitals couldn't afford
7  Reapro.  So they actually had a consignment even
8  program where we would give them free a vile of
9  Reapro or whatever and they wouldn't pay for it
10  until they used it.  A lot of pharmacists didn't
11  want to even get it started.  Everybody was having
12  a hard time getting spokes going, so to speak.
13     Q  Okay.  Well, I guess, let me just, I
14  guess I really need to know how did you feel, how
15  did you feel when Michelle gave you some criticism,
16  constructive or otherwise?
17     A  If it was constructive I, you know, I
18  thought about it and I thought that she was an
19  honest person.
20     Q  Did you always agree with Michelle?
21     A  No, but I did what she said.
22     Q  How would you characterize your
23  relationship with Michelle?
24     A  I think even after I became a rep it was

Page 148

1  even better than it had been before then.  She
2  would, she would say strong things but she would
3  give a strong praises as well.  So I mean it seemed
4  to me she was fair and balanced, as the term goes.
5     Q  Do you think she did anything to you that
6  you thought was discriminatory based on your age or
7  gender?
8     A  No.
9     Q  Up until this time, have you had any
10  health issues?
11     MR. BAKER: What time are we talking about?
12     MR. BRODERICK:  Q Up until June of 2000?
13     A  Not that I can think of at that point.
14     Q  Okay.
15     A  I think it was later in 2000 and my back
16  was bothering me from all the driving and lifting
17  of the computer and stuff.  I think it was sometime
18  in 2000 when I saw Dean Naritoku, I think.
19     Q  We're talking a laptop computer?
20     A  Uh-huh.
21     Q  Have you had the laptop computer with you
22  the whole time, even when you were at Abbott or at
23  some point were you given a laptop computer?
24     A  Well, I was but with Abbott, I never took

Page 149

1  it into an account or anything.
2    Q  At Centocor, you were taking the computer
3  in on a regular basis?
4    A  Sometimes they wanted us to take it in,
5  yeah.
6    Q  Okay.  How did you, I mean we obviously
7  know you became a vascular specialist at some
8  point.  How did you find out about the position?
9    A  Well, actually I had thought that, I knew
10  I had been hired as the cardiovascular specialist
11  but I also knew that they wanted me because of all
12  of my experience and rapport with the Prairie
13  Cardiovascular group, vascular surgeons,
14  radiologists, anybody who would be doing that kind
15  of work.
16    Q  Were there vascular specialists, was this
17  position existing all along that you were at
18  Centocor?
19    A  No.  It started in January of 2000, I
20  think.  Something around there and they hired some
21  people to be vascular specialists.  It was after I
22  was hired as a cardiovascular specialist.
23    Q  And what was the purpose of this
24  position?

Page 150

1    A  Their position, you mean?
2    Q  The vascular specialist position.
3    A  Their position was that because your
4  products had been pulled off the market, the
5  competitor for Retavase with Centocor was TPA with
6  Genentec (sp).  Are you familiar with that at all?
7  Let's say it's the competitor and the two were very
8  similar drugs in acute myocardial infarctions.
9  Basically, it was a bloody battle out there.
10    Q  Okay.
11    A  They were very competitive.  Just
12  unbelievably competitive and they offered certain
13  types of accounts, like health premiere contracting
14  where you had to get 95 percent of it being PPA or,
15  you know, they would cut back on the discount you
16  could get on the drug so, and there were all
17  different kinds of buying groups and everything.
18  So it became really complex at that point.
19    Q  And Genentec had the premiere contracts?
20    A  Genentec offered premiere.
21    Q  And they'd offer the deep discounts based
22  on volume?
23    A  Yeah.  If they had other kinds of
24  contracts when I'd go into a different hospital, it

Page 151

1  would be an easier thing to go after than if they
2  had an agreement with Genentec, you know, premiere
3  contract.  That was like, it was very hard to break
4  that because they had the most off percentwise.
5    Q  It sounds a lot more competitive than
6  anything was at Abbott.  Is that fair to say?
7    A  I had a hundred percent of the market at
8  Abbott, because it was the gold standard.  It was
9  very competitive with antibiotics.  It was very
10  competitive with epileptic drugs.  I mean those
11  were all competitive.
12    Q  The vascular specialist position was
13  created to market a product to compete with
14  Genentec?
15    A  TPA.
16    Q  TPA?  And the product was?
17    A  TPA.
18    Q  And what was Centocor's product?
19    A  Retavase.  RET.  You know that already
20  probably if you looked at the stuff.
21    Q  How did you first become aware of the
22  position?  Was there a posting or an e-mail?
23    A  No.  You mean after I was already a
24  cardiovascular rep?

Page 152

1    Q  Yes.  How did you become aware of the
2  vascular specialist position?
3    A  There was an e-mail saying they were
4  going to have an expansion and Randy VanCleef had
5  covered the area overlapping with me.  He was a
6  vascular specialist, come at it that way, although
7  he didn't really come up because he knew I could
8  totally handle it and he'd go with other accounts
9  and then he handled a lot of other accounts.  When
10  there was going to be an expansion, he said, you
11  know, he was going to refer me and Michael
12  Montgomery, the doctor that was in charge of the
13  vascular sales program recommended that I get the
14  position, which was a pretty stout recommendation.
15    Q  So you knew Randy VanCleef at this point?
16    A  Yeah.  He had been at Abbott.
17    Q  Okay.  Did he come over about the same
18  time you did?
19    A  No.  That's, well, I think I came over
20  like first but not very far from that.  After I was
21  hired as a cardiovascular rep, then he was hired as
22  a vascular rep with some other people and then I
23  didn't become a vascular rep until that July 2000.
24    Q  Did you talk with Randy about the

Page 153

1 position?
2     A Yeah.
3     Q Did you seek this position out, I mean
4 after you heard about it?
5     A After I heard about it. It was a real
6 mutual thing with Michelle and I. She knew that I
7 would be very good at that. She was very excited
8 about it and yes, I wanted it. I'd see my doctors
9 that were my family again and stuff like that.
10     Q So in part you desired it because it
11 would bring you back in contact with prior people
12 you worked with?
13     A Yeah.
14     Q Let me have this marked as Exhibit D.
15             (Whereupon said document was
16             duly marked for purposes of
17             identification as Exhibit D,
18             as of this date.)
19 MR. BRODERICK: Q You can look at that one,
20 Ms. Minor. Thank you.
21     A 9/16/99, vascular sales rep. I was a
22 senior cardiovascular rep.
23     Q At some point did you see a description
24 of the position?

Page 154

1     A No.
2     Q Oh, okay. Did you ever, have you ever
3 seen a written description of the position of
4 vascular specialist?
5     A I'm trying to think. I think it was
6 mostly verbally communicated.
7     Q Okay. From who?
8     A From when I went to training.
9     Q Training?
10     A For, I had been to training once for the
11 cardio. In other words, the things with the heart
12 and then I went back to training again and actually
13 Tony was in my training class at that point and,
14 can I just read this for a minute? I need to
15 clarify my brain because 9/20 of '99--
16 MR. BAKER: Let's go off the record for a
17 second.
18             (Discussion off the record.)
19 MR. BRODERICK: Q Have you seen a document,
20 have you seen this document before?
21     A No.
22     Q Do you recall seeing a written employee
23 position description of a vascular sales specialist
24 ever at any time?

Page 155

1     A I don't remember it.
2     Q Okay.
3     A I really don't remember this.
4     Q Okay. You haven't seen it before this
5 time. Did you ever, moving on then, who did you
6 talk to about the position? You talked to Randy
7 VanCleef you've identified. Did you talk with
8 Michelle Johnson?
9     A Uh-huh.
10     Q Anyone else?
11     A I suppose I talked to my doctors that
12 there might be a way I was going to get to come
13 back and they were excited.
14     Q Anyone else at Centocor about what the
15 position entailed or what it would mean?
16     A Probably Michael Montgomery. Oh, and
17 probably Mike Verlotta (sp). He had been with
18 Abbott and was the product manager for that, for
19 peripheral vascular disease.
20     Q Well, what was your understanding about
21 what would happen to your territory if you became a
22 vascular specialist?
23     A That I would cover basically the St.
24 Louis district and overlap the cardiovascular reps.

Page 156

1     Q Was it your understanding the territory
2 would be larger?
3     A Yes.
4     Q Was it your understanding it would be
5 about the same amount of accounts?
6     A No. It's my understanding originally
7 that I was going to have 12 accounts and that I
8 picked them and worked with William, the man that
9 hired me for that position and they wanted like
10 three to five of those really focused upon
11 originally so we could really get the rapport and
12 get the product going and then expand outward from
13 that.
14     Q Okay. Did you ever tell anyone that this
15 was a dream position for you?
16     A Did somebody say I said that? That's
17 funny.
18     Q Do you recall?
19     A I remember Michelle saying that it was
20 just like the perfect fit. I don't remember saying
21 it was a dream position but I might have. I don't
22 know. That's a long time ago to remember saying
23 one word. Dream team?
24     Q They already had some vascular

Page 157

1  specialists. Why were they looking for more? Do
2  you know?
3     A  Expansion and they were supposed to
4  expand again, which would mean the territory would
5  even be smaller.
6     Q  Did you understand this to be a
7  promotion?
8     A  I thought it was a promotional level and
9  I guess if it was anybody but when they hired me to
10  get me the salary they wanted, I guess they graded
11  me as a senior cardiovascular rep. So for all the
12  reps, it was a promotion. So originally I thought
13  it was a promotion but I guess it was a lateral
14  move.
15     Q  As you sit here today, your understanding
16  is it's a lateral move?
17     A  I guess so. I thought at the time it was
18  a promotion but it doesn't matter. I got the same
19  money and I got to do the job.
20     Q  Do you recall alleging in your complaint
21  that this was a promotion?
22     A  I remember, and until that was happening,
23  I was believing that I was promoted, I think.
24     Q  Then at some point after--

Page 158

1     A  After reading it and stuff like that, it
2  started occurring to me maybe it was a lateral
3  move.
4     Q  Okay.
5     A  But I didn't think it was really
6  significant. What was the question?
7     Q  That's okay. What changed your mind to
8  think it was not a promotion and it was more of a
9  lateral move? I mean nonprivileged discussion with
10  your attorney or with anyone else? What
11  information did you come across that made you
12  rethink your attitude?
13     A  Somebody said something at some point and
14  I don't even remember what it was.
15     Q  Who said it?
16     A  I have no idea who said it, but you know
17  what? It's not like it really mattered to me. So
18  I mean I think that my brain only had so much so
19  room and it doesn't really matter to me. I just
20  don't keep it. Sorry about that one but if I think
21  about it, I will tell you. I haven't read all this
22  yet. Are you going to let me read it all?
23     Q  I think we have to move on. I think your
24  attorney will have a copy. I'm sure Mr. Baker will

Page 159

1  let you read it.
2     MR. BAKER: Yes, you can read it.
3     MR. BRODERICK:  Q  Let me show you what I'm
4  going to mark as Exhibit E.
5           (Whereupon said document was
6           duly marked for purposes of
7           identification as Exhibit E,
8           as of this date.)
9     MR. BRODERICK:  Q  Do you recall receiving
10  something like this document?
11     A  Yeah, I remember receiving it.
12     Q  Okay. So does that accurately reflect
13  the terms of your employment with Centocor as a
14  vascular sales specialist?
15     A  I think it does.
16     Q  Okay. Now, at some point you had to
17  engage in some training as a vascular sales
18  specialist?
19     A  Yes.
20     Q  How many weeks of training was that?
21     A  Let's see. It was a couple of weeks.
22     Q  What did it involve?
23     A  Well, first they went back to Retavase as
24  a product and they went through all the papers

Page 160

1  again about Retavase and the package insert and the
2  different studies with Retavase and how it
3  decreased AMI.
4     Q  What was the setting--
5     A  That was the first part of the training.
6     Q  What was the other part?
7     A  And that, in this training with Centocor
8  is where I met Tony. We were in a small group
9  together.
10     Q  This is the first time you met Mr.
11  Ciciliano?
12     A  Uh-huh.
13     Q  I guess we can call him Tony for short?
14     A  That's okay with me. Or T.S., one or the
15  other. We were selected to be in the same group
16  and to work on our little project together and I
17  remember that we were going to divide up the
18  package insert to go through it.
19     MR. BAKER: I think you're getting a little
20  afield here.
21     THE DEPONENT: Okay.
22     MR. BRODERICK:  Q  Okay. At some point
23  there was, the first part you said that the first
24  part of the training was lecture, was it lecture

Page 161

1 based on the product?
2   A  Pretty much and then break down--
3   Q  In groups?
4   A  (Continuing.)--in groups and stuff.
5   Q  What were the other facets of training?
6 Do you recall?  Was that pretty much it or was
7 there other--
8   A  Oh, we always had these little
9 vignettes.  If so and so and so is a doctor and
10 then you'd get up and what would you say to him.
11   Q  Okay.
12   A  And then we broke off and had information
13 given to us about what they had already gathered
14 about the use of Retavse.
15   Q  Where was the training located at?
16   A  Malvern.  You mean for that point in
17 time?
18   Q  Where did you go for your training, for
19 this two week training period?
20   A  I think it was two rather than three but,
21 you know, I've been through so many training
22 programs they all start running amuck here.  I
23 think it was a couple of weeks in, I'm sure it was
24 the Malvern, I think they had an off-site, it

Page 162

1 wasn't at the actual Malvern office but there was a
2 place in that area that we went to.
3   Q  Was that in Pennsylvania?
4   A  Uh-huh.  Yes.
5   Q  Tony you said, you were talking about you
6 and Tony were paired off as a group?  Were you
7 paired off as a group?
8   A  There were four of us in that group.
9   Q  What was the group supposed to do?
10   A  We were at that point in the, well, we
11 had package insert and we were supposed to, each
12 group was supposed to take a part of it and
13 describe it and there were two other gentlemen,
14 Tony and myself in this little group and so we
15 started going through it.  You know, blah, blah,
16 blah, blah, blah and then he wanted to be with the
17 flipbook and that's fine if he wanted to get up and
18 present the whole thing in front of the group, you
19 know, that was fine with me.  Been there, done that
20 type of thing.
21   Q  Did you say flipbook?
22   A  You know, flip chart?  You get up in
23 front and he was printing up what he wanted to put
24 on the flip chart that was important and

Page 163

1 significant and he, well, I told him that I thought
2 that reperfusion arrythmia was really important and
3 he basically said no, I don't want to put that on
4 there.  I said okay.  And so then when he was
5 presenting it, the trainer said by the way,
6 reperfusion arrythmia is an extremely important
7 point.
8       So all that is to say he just didn't seem
9 to, he didn't want my input particularly in that
10 group is what it was coming down to but it didn't
11 matter because I knew what I knew already.  I had
12 worked out in the field and the competitive drug
13 was given as one bolus and then sent to the ICU.
14 If there was any reperfusion arrythmia, it would
15 occur in the ICU.  Since we were a double bolus, it
16 was much more likely to occur in the emergency room
17 and that's why it was important.
18   Q  Did you have any other interaction with
19 Tony there in the training that you recall?
20   A  No.  We weren't in the same group again.
21   Q  Okay.  Now, let me just jump a head and
22 I'll come back.  As you went out in the field of
23 vascular sales rep over the next two quarters into
24 the year 2000, did you have any interaction with

Page 164

1 Mr. Ciciliano?
2   A  At some point they were dividing the
3 country into what they called seal teams and there
4 were going to be five of them and so William was no
5 longer going to be my manager and Tim was
6 temporarily my manager, Tim Shaffer and then I
7 remember there was a point where I had to go to
8 Dallas for a sales meeting and I thought that was
9 kind of fishy for me to be going to Dallas and the
10 rest of my district be going somewhere else but
11 they weren't telling.
12       So at that meeting I was in a district,
13 Susan Lansman (sp) was the leader of it and Tony
14 was another representative and that was when he
15 presented the in-service that he had created that
16 did not go through regulatory and he had added
17 quite a bit of information of his own.
18   Q  And this is sometime in, do you know
19 approximately when that was or--
20   A  Maybe like July 2000.
21   Q  Did you speak with him at all at that
22 program?
23   A  Sure.
24   Q  Okay.

**Page 165**

1    A  Hi, whatever. You know, nothing big,
2 little or otherwise.
3    Q  Well, what was your impression of Tony
4 when you first met him?
5    A  Just fine. Are you talking about back in
6 the training?
7    Q  Yes.
8    A  My first impression was that he was
9 going, that he was really wanting to get promoted
10 and be on the fast track and he really wanted to be
11 at the front of the class and present everything
12 and that he didn't necessarily respect my knowledge
13 or want any information I might have to offer. He
14 kind of, there were two other fellows that were
15 there and he was talking with them and he was
16 pretty much excluding me from the conversation.
17       He had no idea what my background was or
18 that I could have, you know, helped. But at that
19 point, it didn't matter because he was going to go
20 his way and I was going to go my way and I knew
21 what I knew. So I definitely got a pretty good
22 feeling that--
23    Q  Did you like him?
24    A  I didn't dislike or like. I just knew.

**Page 166**

1 I've seen so much of that. When someone comes in
2 and they just want to burn their way up to the top,
3 and actually, I was just trying to help because I
4 knew how important it is to have the fact about the
5 reperfusion in there. So anyway.
6    Q  Had you heard anything about Tony before
7 that?
8    A  I just heard that he was with Bob Russell
9 all the time. That was just gossip. So am I
10 supposed to sit here and tell you dumb gossip?
11    Q  Yes. That's what I'm asking for.
12    MR. BAKER: That's the good stuff.
13    THE DEPONENT: And I did not know this at all
14 but they called him kiss ass Tony because he was
15 always sucking up to the, oh, please don't put that
16 word.
17    MR. BAKER: That's okay.
18    THE DEPONENT: Kissing up to the, to Bob
19 Russell at the regional office. He was in there a
20 lot. I don't know that first hand. Just from all
21 the other reps were joking about they call him KAT,
22 kiss ass Tony.
23    MR. BRODERICK:  Q This is at training?
24    A  This was at the sales meeting where Sue

**Page 167**

1 Lansman was a regional manager that I was going to
2 get put in that vicinity. The St. Louis district
3 was going to be moved into that group which I
4 didn't know yet. He was just another rep just like
5 me. So I thought it was kind of amusing and he
6 dressed well and spoke well and blah, blah, blah.
7 I just thought it was funny. That was all.
8    Q  Okay. Had you heard anything else about
9 him?
10    A  No, I don't think so.
11    Q  Okay. Do you have any other, anything
12 else to say what your impression was about him?
13    A  He does a good power point presentation.
14 His skilled with it. Let's put it that way. I
15 would not necessarily say the information in it was
16 appropriate.
17    Q  Okay. Okay. Now, did you have to
18 interview to become a vascular specialist, jumping
19 back?
20    A  I had an interview with William
21 Alexander.
22    Q  And who hired you?
23    A  William. I had a recommendation from
24 Michael Montgomery, the physician in Centocor for

**Page 168**

1 peripheral vascular disease which was a really
2 strong recommendation.
3    Q  Who was Michael Montgomery?
4    A  He was the head of, he was the physician
5 that was in charge of peripheral vascular disease.
6    Q  Did he give a recommendation in writing,
7 to your knowledge?
8    A  Not to my knowledge.
9    Q  Okay. So now once the training was
10 complete and you moved out into the field, did your
11 accounts change?
12    A  From?
13    Q  From what you had.
14    A  The cardiovascular rep?
15    Q  Correct.
16    A  Yes. They changed every quarter as it
17 would turn out. Totally unusual.
18    Q  Did you say as a vascular rep they
19 changed every quarter?
20    A  Yeah.
21    Q  All right.
22    A  As it happened.
23    Q  Let me mark this as Exhibit F.
24       (Whereupon said document was

Page 169

1     duly marked for purposes of
2     identification as Exhibit F,
3     as of this date.)
4     THE DEPONENT: I don't remember seeing this
5     one.
6     MR. BRODERICK:  Q Have you had a chance to
7     review this document, Ms. Minor?
8     A It just says senior cardiovascular
9     specialist to a sales specialist.
10    Q And you haven't seen this document
11    before?
12    A No. I wonder what that signature is. It
13    might be Tim Shaffer's. I don't know. I have no
14    idea.
15    Q I think at the top it indicates that your
16    effective date was June 1st, 2000. Does that seem
17    about right?
18    A Seems about right. Yeah, because we had
19    a national sales meeting in July of 2000, so it
20    does sound right. Where does it say that though?
21    Q I'm sorry. Top corner.
22    A Okay.
23    Q I'll have this marked as G.
24    (Whereupon said document was

Page 170

1     duly marked for purposes of
2     identification as Exhibit G,
3     as of this date.)
4     MR. BRODERICK:  Q I think you've seen this
5     before.
6     A That looks familiar.
7     Q Is this, did you create this document?
8     A No, I did not.
9     Q Do you know who created it?
10    A No.
11    Q Do you have a copy of it in your
12    possession?
13    A Only after I was able to get it through
14    my attorney. I had not seen it prior to that.
15    Q Does this document accurately reflect
16    the, more or less the geographic layout of your
17    accounts as of the Summer of 2000?
18    A No.
19    Q Okay. Do you have to--
20    A Take a pill.
21    (Whereupon a short break was
22    taken.)
23    MR. BRODERICK: Let the record reflect that we
24    took a short break at 4:00 o'clock and it's about

Page 171

1     4:08 and we're back on the record.
2     Q Ms. Minor, we're looking at what's
3     been marked as Exhibit G and I asked you if this
4     was an accurate representation of the geographic
5     layout of your territory in the Summer of 2000 and
6     I believe you told us it wasn't. Can you just tell
7     me what's not accurate about this document or this
8     representation?
9     A Okay. First of all, William Alexander
10    hired me on October 3rd of 2000. We set up, there
11    would be three accounts in Peoria, two in
12    Springfield, one in Owensboro, two in Evansville,
13    Indiana and two in St. Louis.
14    Q And that's Owensboro, Kentucky?
15    A Yes, it is.
16    Q And what document are you referring to,
17    if you don't mind?
18    A This is an e-mail that you copied.
19    Q Thank you. Let me see if I can have that
20    marked.
21    MR. BAKER: Let's give him a date. October
22    3rd, 2000.
23    MR. BRODERICK: Jim, do you want a stack of
24    these?

Page 172

1     (Whereupon said document was
2     duly marked for purposes of
3     identification as Exhibit H,
4     as of this date.)
5     MR. BRODERICK:  Q Could you affirm that
6     Exhibit H is an accurate copy of the document
7     you're referring to?
8     A Yes.
9     Q And could you describe Exhibit H? This
10    is an e-mail from you to Mr. Alexander. Is that
11    correct?
12    A Yes. Did I hand it to you and you copied
13    it and I didn't get it back yet? Thanks. Sorry.
14    I knew it was in here somewhere.
15    Q Well, first let me back up. Your start
16    date, it's your understanding your start date as a
17    vascular specialist is October 1st, 2000?
18    A I think it was. I thought we said June
19    from something I saw here.
20    Q Okay. That's what I thought.
21    A That's what I thought too and then we
22    went to a national sales meeting I think in July of
23    that year, or was it the July the next year? Well,
24    at any rate.

Page 173

1  Q  So you were a vascular specialist in
2  October and were you servicing accounts?
3  A  Yes.
4  Q  Okay.
5  A  These accounts.
6  Q  These accounts that are on this e-mail?
7  A  Uh-huh.  And William's, do you want to
8  know William's theory or not?
9  Q  Okay.  William Alexander's theory?
10  A  Yes.
11  Q  Okay.  Please describe that.
12  A  He felt that you pick anywhere from three
13  to five of the accounts that are called focus
14  accounts where you really spend 90 percent of your
15  time or more to establish the appropriate rapport
16  necessary to gain the business.
17  Q  Is that the complete theory?
18  A  Pretty much.
19  Q  Did he communicate that to you?
20  A  Yes, he did.
21  Q  During when?
22  A  At the time we were discussing some of
23  these accounts.
24  Q  In October of 2000 or thereabouts?

Page 174

1  A  Well, let's see.  I know we had a meeting
2  with him and we had to do little presentations.
3  That must have been the July time frame.  So
4  anywhere from August 'til October we had this
5  discussion and he was very much interested in the
6  presentation I had given of my accounts and what I
7  knew and how they could interact with each other
8  and bring business and he had agreed these would be
9  excellent accounts because he thought that if you
10  covered too many and didn't have any rapport or
11  support from cardio reps, you'd be so diluted you'd
12  end up fried and nothing done.
13  Q  And was this an in-person meeting you had
14  with him?  You were one on one with Mr. Alexander?
15  A  No.  It was something that he was
16  discussing with all of us and, that were in there
17  at the time.
18  Q  Was it a group meeting?
19  A  Uh-huh.
20  Q  Where was the group meeting held?
21  A  Man.  If I remember, it was southeast, I
22  don't think it was Florida.  Oh, darn.  It was like
23  in the south and east.  You know, one of the
24  states.  I don't know.  You fly so many meetings,

Page 175

1  after a while.
2  Q  Okay.
3  A  You fly, you do your thing.  I'm sorry.
4  I can't remember.
5  Q  Do you remember there was a particular
6  purpose for this meeting.  Is that correct?
7  A  Yeah.  So we'd all meet with each other,
8  bond with the team.  Share ideas of what was
9  working for us and he especially liked it when the
10  Abbott reps gave presentations of how we built our
11  accounts.
12  Q  Were you required to give a presentation?
13  A  I was requested to, sure, and I wanted
14  to.  I liked it.
15  Q  And how many people?
16  A  Let's see.  Again, six, seven.  I'm
17  trying to remember.
18  Q  Were these just the vascular reps?
19  A  These were only vascular reps.  So if
20  there were only 23 of us--
21  Q  These were just the reps under Mr.
22  Alexander?
23  A  Yes.
24  Q  And you think it could be eight?

Page 176

1  A  No.  I think it could be five.
2  MR. BAKER: Let's go off the record for just a
3  second.
4  (Discussion off the record.)
5  MR. BRODERICK:  Q  Do you remember who the
6  other vascular sales reps were?
7  A  There was a gal named Jennifer
8  Richardson.  I do have a list at home.  It's just
9  everything has changed so many different times that
10  after a while.  As if you're going to know who they
11  are.  Let's see.  There was a guy that covered
12  Florida that was really nice.  I can remember their
13  faces.  I'm sorry.  I just don't remember all the
14  names.  I can get that to you if you would like.
15  You know, I always made myself a little
16  sheet that would just say the names and phone
17  numbers or whatever so if I needed to talk to them,
18  I could.  We were geographically pretty far apart
19  though.
20  Q  Do you know who determines the accounts
21  and the territory initially?
22  A  With William, you mean, my manager?
23  Q  Okay.
24  A  We did.

## Page 177

1  Q  You and Mr. Alexander?
2  A  Uh-huh.  He wanted my input because he
3  knew I had experience in it and rapport.
4  Q  Do you have some lists, did you have some
5  master list of accounts in the nation that you
6  worked off of?
7  A  What I did was, this sheet that you see
8  the handwriting, which I didn't think anybody was
9  going to see or it might have been a little neater,
10  that would be this.  For the area that I knew would
11  overlap with our district, and I knew our district
12  because I knew where all the sales representatives
13  that I had been working with covered, what I did
14  was I took Urokinase sales data that I had and that
15  way, I broke it down to where the pockets of
16  business that I felt that I could get good business
17  relatively quickly.
18  Q  And you're referring to this handwritten?
19  A  That would be the one.
20  Q  Let me have this marked as the next
21  exhibit.
22        (Whereupon said document was
23        duly marked for purposes of
24        identification as Exhibit I,

## Page 178

1        as of this date.)
2  MR. BRODERICK:  Q  Where did you get the
3  information to compile that list?
4  A  I, part of it I had on my own.  Then I
5  just asked the representatives with Abbott and also
6  we had national sales ranking and regional ranking.
7  Q  Well, you complied it on your own.  You
8  complied it from a source?
9  A  Abbott statistics.
10  Q  And you had access to those after you
11  left?
12  A  Uh-huh.  Well, yeah, boxes.
13  Q  Okay.
14  A  Because we always thought the product was
15  going to come back.
16  Q  These are based on Urokinase sales
17  figures?
18  A  Exactly.  The product that had been
19  pulled from the market, so I had all that.
20  Q  Do you know if Centocor also created a
21  list of potential accounts based on any particular
22  set of data?
23  A  Yeah.  I think then we got this, they
24  decided after the expansion and what not they had

## Page 179

1  the, like the top whatever it was, ten or whatever
2  accounts I had, and then they added what they
3  called weighted accounts or something where they
4  wanted us to secure or increase business and to
5  that there was St. John's, Creve Coeur, Mercy and
6  Iowa Methodist, both in Des Moines, U of Iowa and
7  Boone.
8  Q  Prior, now the expansion, you're talking
9  about the expansion in what time frame?
10  A  I don't know.
11  Q  I guess I mean prior to--
12  A  Here's the quarter 1 sales.  I have that
13  sheet.  That one you mean?
14  Q  That's quarter 1, 2001?
15  A  Uh-huh.  This was prior to that with
16  William and Tim and Michelle and Michelle wanted to
17  add some of these other accounts on, other than the
18  ones that--
19  Q  After you became a vascular specialist,
20  you no longer reported to Ms. Johnson.  Is that
21  correct?
22  A  I didn't report to her but we talked.
23  Q  Okay.  But did you talk about your
24  accounts?

## Page 180

1  A  Sure.  She sent me some nice things.  For
2  the first time ever business here.  Yah!
3  Q  Okay.  So she was giving you leads?
4  A  No.  She made suggestions via Tony what
5  she wanted where she thought there was some cardio
6  business.  The whole purpose was we were given a
7  hydrolyzer which was an indicated product by the
8  FDA.  Even though it was a dog from Cordis, which
9  is another division of Johnson and Johnson and that
10  would be our reason to even be in radiology and
11  they wanted us to get the radiologist to get it on
12  formula where they hadn't been able to with their
13  local cardio rep or whatever and get business going
14  there.  That's what became evident after, that
15  would probably be the July 2001 time frame.  No.  I
16  wouldn't have had it then.  I would have had it
17  January time frame.
18  MR. BAKER: Excuse me.  Can we go back off the
19  record?
20        (Discussion off the record.)
21  THE DEPONENT: We had--
22  MR. BRODERICK:  Q  Let's--
23  A  (Continuing.)--two different kinds of
24  sales.

Page 181

1    Q  What were those?
2    A  Cordis products, which were totally
3  indicated by the FDA and Retavse which was
4  indicated in acute myocardial infarction or heart
5  attack.
6    Q  Okay.  Now, was it your understanding
7  that as you became a vascular specialist in the
8  Summer of 2000, at that time did you know, do you
9  know or did you know if Centocor had constructed or
10  complied a master list of accounts for the vascular
11  specialists?
12    A  I never heard of it.
13    Q  Okay.
14    A  We were asked for our input with William
15  and was Tim.  Tim had been with Abbott and he knew
16  I knew where the business was.
17    Q  So initially constructing your first
18  territory, this was a process of Mr. Alexander and
19  Mr. Shaffer asking you for your input on accounts?
20    A  Yeah.
21    Q  Were all of those accounts in your
22  initial territory from your suggestions or did they
23  also have suggested accounts?
24    A  We talked about it and they, I knew there

Page 182

1  was a good account called Christian down in St.
2  Louis because I talked to the St. Louis Urokinase
3  rep but they didn't, they wanted to give me a
4  different account than that, but that was okay.  So
5  we had interactions with it but this is, you know,
6  we came up with this.
7    Q  Who suggested the Owensboro account?
8    A  When I saw that I had it, it was fine
9  with me because I knew Dr. Bora.  He's the one and
10  only guy down there but it was a good account for
11  Abbott.  Like I went down and looked at the sales
12  for it and it was a big account.  Deaconess was not
13  very great nor was St. Mary's but hey, it was on
14  the way.
15    Q  Okay.
16    A  And Michelle really wanted that because
17  the local rep that had been in Evansville had not
18  been able to get it on either formulary.  On either
19  formulary.
20    Q  Did the bonus structure change when you
21  became a vascular specialist?
22    A  Yes.
23    Q  Okay.  What's your understanding of how
24  it was being computed.  And when I mean bonus, I

Page 183

1  mean the SICT.
2    A  Okay.  At first, we got a portion of the
3  whole district sales because we were increasing the
4  whole district sales and a part of it was just on
5  the hospitals that we covered and I don't remember
6  percentages.
7    Q  Okay.
8    A  Nor do I know who contacted this program.
9    Q  Now, you were being compensated for sales
10  for Cordis products and for Retavase?
11    A  I think we were supposed to, yes, I'm sure
12  we were supposed to be compensated for the Cordis
13  product.  It was interesting but I don't know.  I
14  don't remember it very much.  All the emphasis was
15  being put on Centocor by, to do Retavase.  I mean
16  all of our biggest goals was absolutely with
17  Retavase.  There was no doubt.  Okay?
18    Q  Now, in constructing the accounts, if
19  Michelle had proposed an account that you disagreed
20  with, could you refuse to add it into your
21  territory?
22    A  Probably.  I mean she was reasonable.  We
23  may have disagreed about some stuff but I would
24  give it a shot and see.  I told her I'd give it the

Page 184

1  old one, two and see what we find.  Because she had
2  reasons why she, she was a good business person and
3  I knew she had good reasons why, whatever.
4    Q  Did William Alexander and Tim Shaffer
5  ride with you?
6    A  Did he ride with me?  I know you must
7  think I should know this right away, but I'm not
8  sure that he did.
9    Q  Not necessarily, Ms. Minor.  I just need
10  to know if you know.  I have to ask.  I might ask
11  you a lot of questions you may not know the answer
12  to.
13    A  You've got that right at this point.
14    Q  Well, do you recall?
15    A  Just let me, I'm trying to look at the
16  time frame.  Let me stop and think.  June, then we
17  had a meeting in July with Tim.  And William left.
18  Whenever the five seal teams came, became evident,
19  William left and I joined with Tim.  Whenever they
20  broke into five seal teams.  That's what they
21  called them, not me.  And at that time, but I
22  became under the cover with Tim and I know I saw
23  Tim at meetings and things like that and in fact,
24  when we were at a national sale meeting, they

Page 185

1  always try to have an activity where everybody
2  bonds. You know, that famous word, and Tony had
3  not, when he became manager, he hadn't prepared
4  any--
5     Q  Ms. Minor, I'm sorry. I hope you don't
6  object, Jim. I just need to know if you remember
7  if Mr. Shaffer or Mr. Alexander rode with you.
8     A  I don't remember.
9     Q  Okay.
10    A  Sorry.
11    Q  That's okay.
12    A  I just remember seeing him at meetings
13  and stuff.
14    Q  Okay. You saw them at meetings but you
15  just don't recall that you rode--
16    A  And we talked.
17    Q  Okay. Did they ever do any field contact
18  reports about you?
19    A  I think that Tim did.
20    Q  Okay.
21    A  Tim Shaffer.
22    Q  Do you know approximately how many?
23    A  I think one because it wasn't like it was
24  a long time.

Page 186

1     Q  Do you still have a copy of it in your
2  possession?
3     A  I probably, well, let's see here.
4  Probably have something buried in my possession
5  somewhere it looks like. And I remember this now,
6  on 12, 2000 we had to do a self, you copied
7  everything in here. Right?
8     Q  Yes.
9     A  So you should have it. It says
10  performance coaching. Does that look familiar to
11  you? I gave it to you.
12    Q  Yes, it does. Thank you. I'm going to
13  move on to that. Is that the only written document
14  you recall that's an evaluation or review from Mr.
15  Shaffner or Mr. Alexander?
16    A  Shaffer.
17    Q  Sorry. So he may have done a field
18  contact report or--
19    A  I don't think so.
20    Q  (Continuing.)--maybe not. Okay. All
21  right.
22    A  I think this was it.
23    Q  And--
24    A  Tim was really laid back. So was

Page 187

1  William.
2     Q  All right. Let me have that. I'll mark
3  that document as the next exhibit.
4           (Whereupon said document was
5           duly marked for purposes of
6           identification as Exhibit J,
7           as of this date.)
8     MR. BRODERICK:  Q  Okay. So it appears that
9  Exhibit J then is their annual review and it
10  appears to be the only written evaluation that you
11  got from Mr. Shaffer or Mr. Alexander.
12    A  (Moved head up and down.)
13    Q  Is that a yes?
14    A  That's a yes.
15    Q  Thank you. Now, at some point in time in
16  the year 2000, perhaps late 2000, quarter 3 and
17  quarter 4, were the accounts in Iowa added to your
18  territory?
19    A  2001 we're saying now?
20    Q  2000.
21    A  Okay. I thought you said 2001 but you
22  said 2000.
23    Q  Late 2000. I'm just wondering when the
24  accounts in Iowa were added to your territories.

Page 188

1     A  That one that showed there were, the five
2  like weighted, where are they there? I think it
3  says here on this memorandum that was 4/26, 2000
4  about the expansion 15 to 20 accounts. And then I
5  have mine and then there was this top--
6     Q  What document were you referring to,
7  4/26?
8     A  This one?
9     Q  And let's mark this as the next exhibit.
10          (Whereupon said document was
11          duly marked for purposes of
12          identification as Exhibit K,
13          as of this date.)
14    MR. BRODERICK:  Q  The time frame is April
15  of 2000?
16    A  I have written on the top of this one for
17  William, Tim Shaffer and Michelle, which means it
18  had to be around the October I would say 2000 time
19  frame because William left and that was Tim.
20  Yeah.
21    Q  Let's have this marked as an exhibit.
22          (Whereupon said document was
23          duly marked for purposes of
24          identification as Exhibit L,

| Page 189 |
|---|
| 1      as of this date.) |
| 2    MR. BRODERICK:  Q To the best of your |
| 3 knowledge, Ms. Minor, Exhibits L and K, who made |
| 4 these charts? |
| 5    A  Well, I mean somebody did them and sent |
| 6 them to me.  Like this is an attachment and an |
| 7 e-mail or something or other because I didn't |
| 8 design them.  Let's put it that way. |
| 9    Q  That's how you came into possession of |
| 10 them was through an e-mail from somewhere? |
| 11    A  I believe so or they were handed to me |
| 12 but I think it was probably e-mail. |
| 13    Q  So sometime in about October of 2000, the |
| 14 accounts in Iowa were added to your territory? |
| 15    A  Uh-huh. |
| 16    Q  So then is Exhibit G an accurate |
| 17 reflection of the geographic layout of your |
| 18 accounts as of October of 2000? |
| 19    A  There's no date on here. |
| 20    Q  That's correct. |
| 21    A  I would feel more comfortable saying that |
| 22 if there was a date on here.  It just implies there |
| 23 are, is one in Des Moines and there are two in Des |
| 24 Moines.  There are four in St. Louis. |

| Page 191 |
|---|
| 1 Des Moines for one thing. |
| 2    Q  Who was that? |
| 3    A  I knew-- |
| 4    Q  Well, was it a cardiovascular |
| 5 representative? |
| 6    A  Yeah, there was a cardio representative |
| 7 present there.  And he was kind of forced to quit |
| 8 after Mercy, which was on a premier situation with |
| 9 TPA, they got a better deal, so they dropped |
| 10 Retavase and then he was pushed out because once |
| 11 they change contracts, you go from all these sales |
| 12 to zero which means you are negative in your graph. |
| 13    Q  And you don't remember who that |
| 14 individual was? |
| 15    A  Yeah, I do. |
| 16    Q  Who was it? |
| 17    A  I know but I'm going to have to think |
| 18 about it for a second here.  Let's see.  I wish I |
| 19 would have brought a list of names. |
| 20    Q  If it comes to you, you can let us know. |
| 21 Let me move this along here.  I know you've already |
| 22 mentioned-- |
| 23    A  Steve Shreen.  I didn't even have it.  I |
| 24 found it.  Steve Shreen. |

| Page 190 |
|---|
| 1    Q  Okay. |
| 2    A  There were three in Peoria, two in |
| 3 Springfield.  St. Peter, St. Vincent's, Methodist |
| 4 Proctor were the Peoria ones.  St. John's in |
| 5 Springfield.  That was where they took Memorial |
| 6 Hospital from here.  No.  There's Memorial in |
| 7 Springfield.  That wasn't it yet.  So St. John's |
| 8 and Memorial were here in Springfield.  St. Mary's |
| 9 and Deaconnes were in Evansville.  Barnes, SLUH and |
| 10 Owensboro.  See, that's pretty much the top ones I |
| 11 had given them.  Then when they talked then St. |
| 12 John's, Creve Coeur and Iowa. |
| 13    Q  Okay.  How did you feel about the Iowa |
| 14 accounts being added? |
| 15    A  Well, I felt that just like what Tim and |
| 16 William Alexander had said and almost everybody in |
| 17 our whole team was saying, that we were going to |
| 18 focus on the top ones, get the business so we |
| 19 wouldn't dilute our, there were no requirements on |
| 20 any amount of time you had to be at anything. |
| 21    Q  Well, okay.  Sounds like then you didn't |
| 22 really have any problem or issue with those |
| 23 accounts being added at that time. |
| 24    A  No, because there was a representative in |

| Page 192 |
|---|
| 1    Q  How do you spell that? |
| 2    A  S-H-R-E-E-N, I think.  Really nice guy. |
| 3 He was really close in with his pharmacist which |
| 4 was a big help to me. |
| 5    Q  Okay.  Tell my about your understanding |
| 6 of, I believe it's called Operation Seal. |
| 7    A  All I know was the five seal teams, they |
| 8 realized that the business in New York would not be |
| 9 the same as the business in Springfield, Illinois |
| 10 or in San Francisco.  So they divided into five |
| 11 teams that would have more autonomy such that like |
| 12 a regional marketing manager would decide what |
| 13 marketing programs the money should go toward and |
| 14 the regional manager would be the business part and |
| 15 then they need team leaders.  They were not |
| 16 district managers because there were only four of |
| 17 them on a team.  They were called VSTL, vascular |
| 18 specialist team leader. |
| 19    Q  And that was the purpose of this plan, |
| 20 the seal plan? |
| 21    A  Was to try to make it more specific for |
| 22 the geography. |
| 23    Q  And who was the regional marketing |
| 24 manager for your region? |

Page 193

1    A   It was Pete Ramsey.
2    Q   And who was the regional manager?
3    A   Then it would have been Bob Russell.
4    Q   VSTL for your region would then be Mr.
5    Ciciliano?
6    A   Originally it was going to be I guess Sue
7    Lansman.  She was, no.  She was cardio, yeah.
8    There shows somewhere when they broke it down that
9    originally it was going to be Sue Lansman and then
10   she got knocked off and Tony became one.
11   Q   Did you receive any documents or
12   memorandums from Centocor about the Operation Seal?
13   A   I think, I don't remember getting
14   documents about it.  I just remember discussing it
15   at meetings, that that's what they had decided and
16   at first I wasn't happy because I really liked
17   William and then I found out I was going to have
18   Tim and I thought oh, that's okay.  He was, you
19   know, when you change around a lot, you have made
20   friends and you don't see them anymore.
21   Q   What was your understanding of when it
22   would take effect?
23   A   Well, for sure when Tony was there there
24   was five teams.  So that would have been January of

Page 194

1    2001.  Prior to that I don't know.  Now I know
2    because William left because he didn't want to be
3    part of the seal team thing, whatever it was.  So
4    it would have been between the third and fourth
5    quarters of 2000.
6    Q   Did you have an understanding at the time
7    of how it may or may not affect one way or the
8    other the accounts in your territory?
9    A   No.  I assumed they'd stay the same,
10   which may or may not be an appropriate assumption
11   but that's what I thought.
12   Q   Oh.  Who's Bill Pinon, P-I-N-O-N?
13   A   Bill Pinon?  He was the highest
14   management level of vascular sales force.  He was
15   the big mogul.
16   Q   Let me have this marked the next
17   exhibit.
18            (Whereupon said document was
19            duly marked for purposes of
20            identification as Exhibit M,
21            as of this date.)
22   MR. BRODERICK:  Q  You can look at the
23   marked copy.  Just take a second to review that.
24            Have you had a chance to review what's

Page 195

1    been marked as Exhibit M, Ms. Minor?
2    A   Yes.
3    Q   Have you seen this document before?
4    A   Probably.  They probably gave us that at
5    the national sales meeting or something.
6    Q   This is something that's distributed to
7    the vascular sales reps or in this case the cars
8    cardiovascular reps?
9    A   It says vascular.
10   Q   So this would be for the vascular
11   specialists?
12   A   Uh-huh.
13   Q   So you believe you received a copy of
14   this when it was distributed?
15   A   Probably.
16   Q   Did you read it at the time?
17   A   I'm sure I did.
18   Q   What's the intent of this document?
19   A   Tell you how much--
20   MR. BAKER: Can we go off the record for a
21   second?
22            (Discussion off the record.)
23   MR. BRODERICK:  Q  Do you know who authored
24   this document?

Page 196

1    A   Whoever does the SICT, I guess.
2    Q   Do you know who that is?
3    A   No.
4    Q   And I don't necessarily want you to
5    regurgitate what's in the contents of the pages
6    herein, but do you have a general understanding of
7    how the SICP was being calculated--
8    A   I guess.
9    Q   (Continuing.)--at this time?
10   A   Yeah.  It looks like it.
11   Q   Just in your own words, how was the SICP
12   being formulated at that time?
13   A   If you were given a goal of a hundred and
14   you got 80 percent of have goal with Retavase, you
15   would get 20 or one fourth of the payout, $6,000
16   and for everything you got over that, I think you
17   get another $600 per 1 percent or something like
18   that.  If you were, no, that wouldn't be right.  I
19   don't know the 6 percent incremental right now.
20   Ninety percent plan would equal 50 percent of the
21   payout, $1,200?
22            Well, I planned on obviously getting the
23   24,000 and I knew for anything I went over a
24   hundred I got an additional thousand dollars.

**Page 197**

1 That's what I looked at. And then I also knew that
2 per unit of hydrolyzers I get $21. So if I got a
3 very big account that used a lot of mechanical
4 devices to suck out clots, I'd sell some.
5 Q Okay. Very good. Let me have this
6 marked as the next exhibit.
7 (Whereupon said document was
8 duly marked for purposes of
9 identification as Exhibit N,
10 as of this date.)
11 MR. BRODERICK: Q Have you seen this
12 document before?
13 A I'm not sure.
14 Q Ms. Minor, I apologize but I just need to
15 know. We're going to have to move it along. I'm
16 sorry about that but if you recognize that, do you
17 recognize the document or--
18 A No.
19 Q Okay.
20 A I don't.
21 Q Okay. Do you know is it the standard
22 practice of Centocor to send out some statement
23 regarding a bonus payment?
24 A Yeah. Could I get a copy of that?

**Page 198**

1 MR. BAKER: Yes.
2 MR. BRODERICK: Q And do you recall whether
3 the statements look like that or something
4 different?
5 A It doesn't look like the one I was
6 getting. That's why I'm acting confused. It
7 doesn't look like what I got in the mail. That's
8 why I'm trying to figure out what in the world's
9 going on here. If they made up one.
10 Q Okay. That's fine.
11 A This is what I would be used to seeing
12 like this. Cardiovascular incentive compensation
13 report with Centocor on it. Would tell my rank at
14 that point and calculate over there how much money
15 I was making. So I have no idea where that one
16 came from.
17 Q You're referring to an SICP statement
18 dated--
19 A June of 2001.
20 Q Okay.
21 A And what's that one dated? There is no
22 date.
23 MR. BAKER: Looks like it's the third quarter
24 of 2000.

**Page 199**

1 THE DEPONENT: Third quarter of 2000. I'll
2 just look for 2000 and see but this is, this looks
3 familiar to me. How's that?
4 MR. BRODERICK: Q Do you remember at the
5 end of 2000, the end of quarter 4, 2000 what your
6 rank was?
7 A No. I remember half way through that I
8 was at 200 percent of goal. Why? Do you know? Do
9 you have something?
10 Q I better move on. Obviously we probably
11 have that information but I just wanted to know
12 what you know. I have to limit this to what I can
13 find out from you at this point. I'll be working
14 with your attorney to answer your questions.
15 A Whatever.
16 Q That's okay. All right. Between quarter
17 4, 2000 and the first quarter of 2001, were you,
18 was there a change in your accounts?
19 A Yes.
20 Q Okay. And how did that change come
21 about?
22 A I had surgery on the 7th of February. We
23 had probably a national sales meeting in January
24 and so I believe this is it. I'm sure you have a

**Page 200**

1 copy of this quarter 1, VSS account target central
2 region. As you can see, things were deleted. Do
3 you see that?
4 Q Okay. So prior to your surgery in
5 February, was this a change in what accounts were
6 in your territory? I believe the document you're
7 referring to, is it this one here?
8 A Yeah.
9 Q Okay. There's one for you. Correct?
10 A Is there one for me there? I'm not
11 finding the one for me. I see Randy's and
12 Caroline's. I don't see what happened to mine
13 here.
14 Q Is it your understanding that the other
15 vascular sales reps had changes to their accounts
16 as well?
17 A Yes.
18 Q Okay. Let me show you this document.
19 (Discussion off the record.)
20 (Whereupon a break was taken.)
21 MR. BRODERICK: Back on the record. The
22 deposition, we took a break at about 5 'til 5:00.
23 It's 10 after 5:00 and the parties have agreed to
24 continue the deposition to Friday, September 10th

**Page 201**

1   at Jane Minor's request, to continue the deposition
2   to Friday, September 10th, here at the offices of
3   Drake, Narup and Mead.
4                  (Whereupon the deposition was
5                  continued to a later date.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 202**

1        I, JANE MINOR, having read the above and
2   foregoing, find the same to be true and correct
3   with the following additions and/or corrections, if
4   any:
5   Page_____Line_____Change:
6   Page_____Line _____Change:
7   Page_____Line _____Change:
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   JANE MINOR (9/03/04)            DATE

**Page 203**

1   STATE OF ILLINOIS      } SS
2   COUNTY OF CHRISTIAN)
3             C E R T I F I C A T E
4        I, Julie A. Brown, a Notary Public and
5   Certified Shorthand Reporter in and for said County
6   and State do hereby certify that the Deponent
7   herein, JANE MINOR, prior to the taking of the
8   foregoing deposition, and on the 3rd of September
9   A.D., 2004, was by me duly sworn to testify to the
10  truth, the whole truth and nothing but the truth in
11  the cause aforesaid; that the said deposition was
12  on that date taken down in shorthand by me and
13  afterwards transcribed, and that the attached
14  transcript contains a true and accurate translation
15  of my shorthand notes referred to.
16        Given under my hand and seal this 25th
17  day of September A.D., 2004.
18
19        Notary Public and
19        Certified Shorthand Reporter
20
21
22
23  License No. 084-004137

OFFICIAL SEAL
JULIE ANN BROWN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 2-27-2005