Monday, 28 February, 2005  03:07:57 PM
Clerk, U.S. District Court, ILCD

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE CENTRAL DISTRICT OF ILLINOIS
 3                  SPRINGFIELD DIVISION
 4
    M. JANE MINOR,
 5                    Plaintiff,
 6        vs.                        No. 02-3354
 7
    CENTOCOR, INC. and JOHNSON
 8  AND JOHNSON, INC.,
 9                    Defendants.
10
11        THE TELEPHONIC DEPOSITION of ANTONIO
12  SICILIANO, taken in the above-entitled case before
13  Tricia L. Gudgel, a Notary Public of Menard County,
14  acting within and for the County of Sangamon, State
15  of Illinois, at 9:04 o'clock A.M., on December 14,
16  2004, at 415 South Seventh Street, Springfield,
17  Sangamon County, Illinois, pursuant to notice.
18
19
20
21
22        Baldwin Reporting & Legal-Visual Services
              Serving Illinois, Indiana & Missouri
23      24hrs (217)788-2835   Fax (217)788-2838
                  1-800-248-2835
24
```

## Page 3

```
 1                      I N D E X
 2  DEPONENT                            PAGE NUMBER
 3  Antonio Siciliano
 4      Examination by Mr. Baker         5, 276
        Examination by Mr. Broderick     268
 5
 6
 7
 8
 9
10
11                   E X H I B I T S
12  NUMBER                  MARKED FOR IDENTIFICATION
13  Exhibits 1-86           (Prior to deposition.)
    Exhibit 87                    192
14  Exhibit 89                    200
15
16
17
18
19
20
21
22
23
24
```

## Page 2

```
 1  APPEARANCES:
 2  BAKER, BAKER & KRAJEWSKI, LLC
 3  BY:  James P. Baker, Esq.
         415 South Seventh Street
 4       Springfield, Illinois 62701
         On behalf of Plaintiff.
 5
    PUGH, JONES & JOHNSON, P.C.
 6  BY:  John M. Broderick, Esq.
         180 North LaSalle Street, Suite 3400
 7       Chicago, Illinois 60601
         On behalf of Defendants via telephone.
 8  ALSO PRESENT:
 9  Ms. M. Jane Minor
    Ms. Velma Bailey
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 4

```
 1              S T I P U L A T I O N
 2        It is stipulated and agreed, by and
    between the parties hereto, through their
 3  attorneys, that the deposition of ANTONIO SICILIANO
    may be taken before Tricia L. Gudgel, a Notary
 4  Public and Certified Shorthand Reporter upon oral
    interrogatories, on the 14th of December A.D.,
 5  2004, at the instance of the Plaintiff at the hour
    of 9:04 o'clock A.M., 415 South Seventh Street,
 6  Springfield, Sangamon County, Illinois;
 7        That the oral interrogatories and the
    answers of the witness may be taken down in
 8  shorthand by the Reporter and afterwards
    transcribed;
 9
10        That all requirements of the Federal
    Rules of Civil Procedure and the Rules of the
11  Supreme Court as to dedimus, are expressly waived;
12        That any objections as to competency,
    materiality or relevancy are hereby reserved, but
13  any objection as to the form of question is waived
    unless specifically noted;
14        That the deposition, or any parts thereof
    may be used for any purpose for which depositions
15  are competent, by any of the parties hereto,
    without foundation proof;
16
17        That any party hereto may be furnished
    copies of the deposition at his or her own expense.
18
19
20
21
22
23
24
```



**Page 5**

1  (Whereupon the Witness was
2  sworn by the Notary Public.)
3  A N T O N I O   S I C I L I A N O
4  having been first duly sworn by the Notary Public,
5  deposeth and saith as follows:
6  EXAMINATION
7  BY MR. BAKER:
8  MR. BAKER: For the record, this is the
9  deposition of Antonio Siciliano taken pursuant to
10  the Federal Rules of Civil Procedure.  Today I am
11  located, together with Ms. Minor, in Springfield,
12  Illinois.  And we have with us here today a court
13  reporter.
14  We're talking by telephone with
15  Mr. Siciliano and with John Broderick, who is a
16  counsel for Centocor in this case.  And as I
17  understand it, they are located in Minneapolis,
18  Minnesota.
19  Mr. Broderick, for the record, we have
20  agreed that this deposition could be conducted
21  telephonically with the court reporter here with me
22  and with the witness in Minneapolis with you; is
23  that correct?
24  MR. BRODERICK: Yes.

**Page 6**

1  MR. BAKER: Very good.
2  EXAMINATION
3  BY MR. BAKER:
4  Q  Tony, will you state your name and
5  address for me.
6  A  Antonio Paolo Siciliano.  My address is
7  5884 Pintail Lane, White Bear Township, Minnesota,
8  55110.
9  Q  What is your date of birth?
10  A  September 22, 1971.
11  Q  What have you done to prepare yourself to
12  give this deposition?
13  A  I met with Mr. Broderick last night and
14  we -- I reviewed a couple of documents, a couple of
15  field contact reports and some of the accounts that
16  we had selected for Jane during the time in
17  question.
18  Q  Can you be a little more specific
19  concerning the documents you reviewed?
20  A  I reviewed an Excel spreadsheet, a list
21  of Jane's accounts for the fourth quarter of 2000,
22  as well as her accounts that were under review for
23  the first quarter of 2001.  And then I believe I
24  reviewed an April field contact report and a

**Page 7**

1  September field contact report written by myself.
2  Q  To prepare you to give this deposition,
3  have you reviewed any other documents?
4  A  I don't believe so.
5  Q  I'm sorry, I didn't hear that.
6  A  I said I don't believe so.
7  Q  How long did you meet with Mr. Broderick
8  last night?
9  A  It was about three hours.
10  Q  Other than meeting Mr. Broderick and
11  reviewing the documents you have referred to a
12  moment ago, have you done anything else to prepare
13  you for this deposition?
14  A  No, sir.
15  Q  Where are you presently employed?
16  A  Boston Scientific.
17  Q  Somehow you're cutting off at the
18  beginning of your words.
19  A  Okay.  I'm currently employed at Boston
20  Scientific.
21  Q  What is your position?
22  A  Senior product manager.
23  Q  Is that a sales position?
24  A  It's a marketing position.

**Page 8**

1  Q  And what is the nature of the work done
2  by Boston Scientific?
3  A  They are a medical device company and
4  cardiovascular and peripheral medicine, they have
5  several divisions.
6  Q  How long have you been with Boston
7  Scientific?
8  A  Since June 24 of this year.
9  Q  Where did you work immediately before
10  joining Boston Scientific?
11  A  I was employed with Centocor.
12  Q  And when --
13  A  I began my employment with Centocor June
14  12 of 2000.
15  Q  June 12 of what year?
16  A  2000.
17  Q  That's the date you began your employment
18  with Centocor?
19  A  Right.
20  Q  When did you end your employment with
21  Centocor?
22  A  I resigned two weeks prior to June 24.
23  In fact, I think...
24  Q  Was that a voluntary resignation?

Page 9

1    A  Yes, sir.
2    Q  What is the nature and extent of your
3  education?
4    A  I have a few years of college.  I am
5  currently enrolled to finish my bachelor's degree.
6    Q  Where are you presently enrolled?
7    A  At La Cross University, it's a
8  correspondence program out of Mississippi.
9    Q  And can you identify for me the
10  educational institutions you have attended in your
11  effort to secure a bachelor's degree.
12    A  Let's see here.  Prior to La Cross, I had
13  taken some courses through another correspondence
14  program, University of Phoenix.  Prior to that, I
15  was at the University of Texas in Arlington, and
16  that was actually during college.  And prior to
17  that, I was at the University of Texas in Austin.
18    Q  When you joined Centocor, how many hours
19  of college credit did you have?
20    A  I would say roughly 75 hours.  And some
21  of that, I had taken a couple of community college
22  courses along the way.
23    Q  When and where did you graduate from high
24  school?

Page 10

1    A  1989 in Plano, Texas, Plano Jr. High
2  School.
3    Q · Can you trace for me your employment
4  background beginning with your graduation from high
5  school up until the time you joined Centocor?
6    A  I'm sorry, you cut out there.
7    Q  What I would like you to do is just
8  identify for me the jobs you held in chronologic
9  order beginning with when you graduated from high
10  school and ending with the last position you held
11  before joining Centocor.
12    A  Okay.  After my first year of college, I
13  transferred schools from UT Austin to UT Arlington
14  and begin working full-time in the cardiac cath lab
15  at HGA South Arlington Hospital as a cardiovascular
16  tech.
17        I then moved to Dallas and worked at
18  Presbyterian Hospital.  Do you need the dates
19  around this?
20    Q  No, that's not necessary.  Just identify
21  for me what you did at your second job.
22    A  Okay.  Same type of position, I was a
23  cardiovascular tech in the cardiac cath lab.  And
24  then a couple years later moved up to Plano and

Page 11

1  worked at Columbia HDA Medical Center in Plano,
2  once again as a cardiovascular tech in the cardiac
3  cath lab.
4        I left that position to work for
5  Microvena, which is a medical device company, and I
6  started off as a clinical specialist.  After a
7  year, I moved into a sales position.  And after a
8  year roughly, I moved into a marketing position for
9  approximately 18 months.
10        That brought me up to Minnesota.  We
11  moved back to Texas and I began employment with
12  another medical device company called Accumetrics.
13  I was a senior clinical specialist for them.  At
14  that point, I was hired by Centocor as a vascular
15  sales specialist.
16    Q  What training did you receive to become a
17  cardiovascular tech?
18    A  That training was on-the-job training.
19  And then I, after approximately two years, I took
20  the registry exam for a registered cardiovascular
21  technologist.
22    Q  Before you joined Centocor, how many
23  years of experience did you have in marketing
24  either pharmaceuticals or pharmaceutical products?

Page 12

1    A  I had a year-and-a-half in marketing.
2    Q  As I understand it, you joined Centocor
3  on June 12, 2000?
4    A  Correct.
5    Q  And what was the first position you held?
6    A  A sales position, and I believe it was
7  called the vascular sales specialist.
8    Q  What was your area of the country where
9  you worked?
10    A  I had the north half of Texas, and I
11  covered the state of New Mexico, and the north half
12  of Louisiana, I believe.
13    Q  How long did you hold that position?
14    A  For approximately six months.
15    Q  That would take us to sometime toward the
16  end of 2000?
17    A  Correct.
18    Q  And what position did you serve at that
19  time?
20        Are you waiting for me?
21    MR. BRODERICK:  He said that's correct.  We
22  are waiting for you.
23    MR. BAKER:  Q What position did you assume
24  after you left the vascular sales specialist

| Page 13 | Page 15 |
|---|---|
| 1 position? | 1 from Cordis, a sister company, called the |
| 2   A I was promoted to the vascular sales team | 2 hydrolyzer -- the product was the hydrolyzer, it |
| 3 leader. | 3 was a mechanical thrombectomy product used to |
| 4   Q Tony, you should have in front of you or | 4 declot hemodialyses axis grafts. And we were also |
| 5 John has with him a packet of documents, I would | 5 there to represent -- or to answer unsolicited |
| 6 like you, if you would, to turn to -- excuse me -- | 6 requests as it relates to Retavase, a thrombolytic |
| 7 Exhibit 63. | 7 agent. |
| 8   A Still flipping. | 8   Q What do you mean to answer and solicit |
| 9   Q Okay. | 9 requests? |
| 10   A Okay. | 10   A Urokinase had been a product that had |
| 11   Q If you're looking at the same document I | 11 been used for a couple of decades in interventional |
| 12 am, it is headed: Centocor Employee Position | 12 radiology, most of its use was off label, meaning |
| 13 Description. | 13 it was not FDA approved. That product was pulled |
| 14   A Yes. | 14 from the marketplace roughly towards the end of |
| 15   Q Could you identify that document for me. | 15 1999, and the physicians looked to two different |
| 16   A I believe it's an HR document from | 16 cardiovascular companies, Genentech and Centocor |
| 17 Centocor, Employee Position Description Number 702. | 17 who had thrombolytic agents approved for acute |
| 18   Q And does that appear to you to be a | 18 myocardial infarction. |
| 19 position description for the position vascular | 19   Q That would be heart-related products? |
| 20 sales specialist? | 20   A Correct. |
| 21   A Yes, it is a vascular sales specialist | 21     And these were the only suitable |
| 22 job description. | 22 alternative agents to Urokinase in the marketplace |
| 23   Q Have you seen that document before? | 23 and physicians were not familiar with the use of |
| 24   A I don't recall. | 24 the products. But essentially, if they wanted to |

| Page 14 | Page 16 |
|---|---|
| 1   Q Take a moment if you like and thumb | 1 continue to perform thrombolysis, dissolving of |
| 2 through it, and after you've done so, I want you to | 2 blood clots, they were turning to these two |
| 3 answer this question: Does that document appear to | 3 medications, one from Centocor and one from |
| 4 you to accurately describe the responsibilities and | 4 Genentech. |
| 5 nature of a vascular sales specialist position? | 5   Q What was the medication from Genentech? |
| 6   A Yes, that appears to represent the | 6   A TPA, whose trade name is Activase. |
| 7 requirements for the sales position. | 7   Q And what was the medication from |
| 8   Q If you turn to the top of page two. | 8 Centocor? |
| 9   A Uh-huh. | 9   A It was RPA, its trade name was Retavase. |
| 10   Q As I interpret that, a requirement to | 10   Q If you know, was the vascular sales group |
| 11 hold that position is a baccalaureate degree in | 11 created after Urokinase was removed from the |
| 12 business, life sciences or other scientific fields; | 12 market? |
| 13 am I correct? | 13   A I'm not certain but that's my |
| 14   A I'm not sure if that's an actual | 14 understanding. |
| 15 requirement. But these are generated by HR so I'm | 15   Q Apparently, Urokinase was removed from |
| 16 not -- that's outside my area of expertise. | 16 the market before you joined Centocor? |
| 17   Q Do you have any understanding one way or | 17   A Correct. |
| 18 another as to how you were able to secure a | 18   Q As a vascular rep -- or excuse me, a |
| 19 position with Centocor without a bachelor's degree? | 19 vascular specialist, you would call upon |
| 20   A Only that they were aware that I did not | 20 physicians; am I correct? |
| 21 have a bachelor's degree. | 21   A Yes, that's correct. |
| 22   Q What type of products did you market when | 22   Q Would you call upon any health care |
| 23 you were a vascular specialist? | 23 specialists other than physicians, for example |
| 24   A We marketed -- we co-promoted a product | 24 pharmacists or other health care practitioners? |

Antonio Siciliano

Page 17

1    A  Yes, primarily physicians but also
2  pharmacists.
3    Q  And as a vascular rep, what would be the
4  specialty of physicians you would call upon?
5    A  Essentially physicians performing
6  thrombolysis, that would be primarily
7  interventional radiologists; to some extent,
8  interventional cardiologists; as well as vascular
9  surgeons.
10    Q  Bear in mind that Mr. Broderick and I are
11  lay people when it comes to health care issues so
12  we may be fairly basic in some of our questioning.
13        Were Urokinase and Retavase medications
14  used to either treat people for strokes or to treat
15  people to avoid strokes?
16    A  I'm don't recall if Urokinase had the
17  actual indication for stroke, and I'm not sure if
18  its utilization is stroke.  That was not a primary
19  focus for the vascular sales force.
20    Q  When the vascular sales force marketed
21  Retavase to these radiologists and vascular
22  surgeons, what was it they were intending to
23  recommend it for, what type of treatment?
24    A  Well, what would have been typically

Page 18

1  solicited from the physicians would have been
2  hemodialyses axis grafts that had thrombosed,
3  essentially clotted off, also blood clots that have
4  formed in the peripheral arteries in the legs.
5  Those would have been the primary -- those were the
6  primary requests for information that we received.
7    Q  So the medication then would have been
8  used to dissolve blood clots?
9    A  Correct.
10    Q  With respect to peripheral arteries, what
11  would be the other available treatments to dissolve
12  or remove blood clots other than these types of
13  medications?
14    A  Well, there really would be no other
15  treatment to dissolve the blood clots.  There is an
16  opportunity to perform a surgical thombectomy and
17  my understanding of that procedure is that it has a
18  very high morbidity rate, it's not a very good
19  procedure for the complication of thrombosis.
20    Q  Are mechanical devices used in that
21  particular procedure?
22    A  You could use a mechanical thrombectomy
23  catheter.  I do believe there was one approved on
24  the market at that time.

Page 19

1    Q  You also marketed certain products of
2  Cortis; am I correct?
3    A  Correct.
4    Q  And is the Cordis company a subsidiary of
5  John and Johnson?
6    A  That is correct.
7    Q  Can you tell me, hopefully in language I
8  can understand, what the products of Cordis were
9  that you marketed and how they were used in patient
10  care?
11    A  The product was the Cordis hydrolyzer,
12  it's function was a mechanical thrombectomy
13  catheter, so it essentially removed blood clot from
14  thrombosed areas.  It was approved for hemodialyses
15  axis grafts, it essentially was sucking the clot
16  out, if you will.
17    Q  And is that done as a part of the
18  surgical procedure?
19    A  Yes.
20    Q  And is that the only Cordis product that
21  you marketed?
22    A  No.  After the first year, I believe we
23  changed products, we dropped the co-promotion with
24  Cordis endovascular, that division which had the

Page 20

1  Cordis hydrolyzer.  And we co-promoted with a
2  different division within Cordis, Cordis
3  neurovascular, and we co-promoted neurovascular
4  infusion catheters, they are essentially micro
5  catheters, they are very, very small end-hole
6  catheters for delivery of whether it be a
7  thrombolytic agent or coils to actually clot a
8  vessel.
9        And they had a few other products, they
10  did have micro coils and what they called PVA,
11  polyvinyl alcohol, essentially is a material used
12  to embolyze or clot a blood vessel.
13    Q  And what type of medical specialist would
14  use that type of product?
15    A  It would have been the same, primarily,
16  interventional radiologist's; to some extent,
17  interventional cardiologist and vascular surgeons.
18    Q  So the first Cordis product was used to
19  remove clots and the second Cordis product was used
20  to create clots?
21    A  The micro catheters could have been used
22  to do opposite procedures.  One would have been to
23  deliver a drug, such as Retavase or TPA, as in many
24  cases.  And then there were embolization products

Page 21

1 to actually clot off a vessel if somebody had,
2 let's say, some type of internal bleed, whether it
3 be from a car accident or some disease that they
4 might have.
5 Q Do you recall when it was that you
6 switched Cordis products?
7 A I don't recall the specific time. My
8 recollection is after the first year -- or towards
9 the end of that first year, we made a change.
10 Q The first year being 2000?
11 A I'm sorry.
12 Q The first year being 2000?
13 A Correct.
14 Q Have we talked about all of the products
15 that were marketed by the vascular group while you
16 worked in that group?
17 A I believe so.
18 Q When did you leave the vascular group --
19 or did you leave it prior to June of 2004?
20 A Well, the company had made the decision
21 to shift the vascular sales force essentially from
22 the cardiovascular division into the immunology
23 division.
24 The success of another product called

Page 22

1 Remicade was such that they wanted additional
2 support in selling the product, and therefore, we
3 had stopped all activity around Retavase and Cordis
4 products. I forget the year now, it was either May
5 of -- roughly May/June of '01 or '02.
6 Q Was it before or after Jane Minor left
7 the company?
8 A It would have been after, I believe.
9 Q And what was the product you switched
10 to? You mentioned it, I didn't take it down.
11 A The product's name is Remicade, it's
12 approved to treat rheumatoid arthritis and Crohn's
13 disease.
14 Q And is that what it was marketed for by
15 your group?
16 A Correct. Actually, we focused on Crohn's
17 disease, the gastroenterology specialty.
18 Q During the time period you worked --
19 well, let me come back to that in a moment.
20 And were you involved in the marketing of
21 Remicade until you left the company?
22 A Yes.
23 Q Now, as I understand it, at some time in
24 late 2000, you were promoted to the position of

Page 23

1 team leader?
2 A Correct.
3 Q How did you secure that promotion?
4 A There was an interview process, I had
5 interviewed with Bob Russell, the regional
6 director, and upon a successful interview, I was
7 promoted to the position.
8 Q Do you know how that particular position
9 was advertised or announced?
10 A I'm sorry, you cut out.
11 Q How did you become aware of that
12 position?
13 A How did I become aware of the
14 opportunity?
15 Q Yes.
16 A Or the promotion itself?
17 Q The opportunity for the promotion.
18 A We had -- the company went through a
19 realignment, we shifted from three regions to five
20 regions. They did away with the previous regional
21 manager positions, and the decision was made --
22 that decision to realign the company was made
23 towards the end of the year, probably at the end of
24 the third quarter or beginning of the fourth

Page 24

1 quarter.
2 And by the end of 2000, it was clear that
3 there would need to be some type of management
4 position for the vascular sales specialist. And in
5 just communication with my regional director, I
6 became aware of the position. Other than that, I
7 don't recall.
8 Q Who appointed you the team leader?
9 A Bob Russell, the regional director, was
10 responsible for hiring the position -- for the
11 position.
12 Q What was the name of the team you headed?
13 A I'm sorry, the name of the team?
14 Q Yes. Did it have a name?
15 A Well, the representatives were vascular
16 sales specialists and so that was the sales group,
17 if you will.
18 Q Did your team have a name that
19 distinguished it from other teams that marketed
20 vascular products?
21 A I don't recall any names.
22 Q As the team leader, while you held that
23 position, at least prior to marketing Remicade,
24 were your duties always the same?

Antonio Siciliano

Page 25

1   A  The first year -- the answer is no.  The
2  first year as a vascular -- as a team leader I had
3  both account responsibility and management
4  responsibility.  And I'm sure the end of 2001, they
5  made that position a full management position to
6  where there was no specific account responsibility.
7   Q  Let's talk then about the first year.  As
8  a team leader, during the first year who was your
9  boss, to whom did you report?
10   A  To Bob Russell.
11   Q  And what was his job title?
12   A  Regional -- he was essentially the
13  regional director.  They went through many
14  different iterations of the name, but he was the
15  regional director.
16   Q  Would that have been the regional
17  director of vascular sales?
18   A  No.  He was the regional director for all
19  of the cardiovascular business.  So all four
20  cardiovascular managers and the one vascular sales
21  manager reported to Bob Russell.
22   Q  Who was the vascular sales manager?
23   A  Well, the team leader position.  Excuse
24  me.

Page 26

1   Q  So there was no one that you reported to
2  whose sole responsibility was with the marketing of
3  vascular products?
4   A  Correct.
5   Q  And if you know, to whom did Mr. Russell
6  report?
7   A  I don't recall.
8   Q  What was the area of the country that
9  Mr. Russell had responsibilities for, if you know?
10   A  It went roughly from Texas up to Iowa and
11  I believe as far west as Colorado.  I don't know
12  the exact boundaries.
13   Q  And in Mr. Russell's Terry, if you will,
14  how many vascular teams were there?
15   A  One.
16   Q  Your team was the only one?
17   A  Correct.
18   Q  How many vascular teams were there in
19  Centocor during the first year you were the team
20  leader?
21   A  Five, one per region.
22   Q  So if I understand it then, Mr. Russell
23  was a regional director of cardiovascular marketing
24  and you were the head of the vascular team in his

Page 27

1  region?
2   A  Correct.
3   Q  Now, was there a team in his region --
4  were there other teams in his region that marketed
5  other types of products?
6   A  No, the cardiovascular responsibilities
7  were solely around Reta... -- excuse me -- Retavase
8  and Reopro, so, yes, they had other products.
9   Q  How many teams reported to Mr. Russell
10  during your first year as a team leader?
11   A  One vascular group, which is my team, and
12  four cardiovascular groups, so a total of five.
13   Q  And can you describe for me what the
14  difference was in terms of what the cardiovascular
15  teams did from what the vascular team did.
16   A  The cardiovascular group was responsible
17  for Retavase and Reopro, their primary call was
18  interventional -- excuse me -- cardiology.
19   Q  So they marketed the products for
20  purposes of heart problems?
21   A  Right, basically heart attacks.  And then
22  that was what Retavase was for.  Reopro was
23  utilized during -- basically, during like balloon
24  angioplasty and stinting procedures in the cath

Page 28

1  lab.
2   Q  That again would be for heart problems?
3   A  For heart problems, yes.
4   Q  And your group, as I understand it,
5  marketed products for medical problems other than
6  heart problems?
7   A  Correct.
8   Q  Now, during this first year you were the
9  team leader, what were your marketing
10  responsibilities?
11   A  I'm not sure if I understand the
12  question.  I was not responsible for marketing.  I
13  mean there is -- within a sales -- within a
14  company, there is a separate marketing organization
15  and a separate sales organization so my
16  responsibility was --
17   Q  Good point.  Let's do it that way.
18   What were your sales responsibilities?
19   A  We were responsible for selling the
20  Cordis neurovascular products which were the micro
21  catheters and embolic products.
22   Q  I'm speaking about specifically your job
23  as a team leader, what were your sales
24  responsibilities?

Page 29

1    A  I had, I believe it was maybe five or six
2  accounts that I had account responsibility for.
3  And then I had management responsibilities for the
4  four vascular sales specialists.
5    Q  We'll get to that in a moment.
6       What were your accounts during the first
7  year?
8    A  I don't recall.
9    Q  Do you remember any of them?
10       Were you waiting for a question or were
11  you thinking.
12    MR. BRODERICK:  Did you get his answer?
13    THE DEPONENT:  I just stated I don't recall.
14    MR. BAKER:  Q  You don't recall any of your
15  accounts?
16    A  I don't recall any of the accounts at
17  this time.
18    Q  Was St. Francis Hospital an account?
19    A  That may have been.  My accounts would
20  have been some of the top, what we would have
21  considered some of the key accounts.
22    Q  How was it you were assigned those
23  accounts?
24    A  Those accounts would have been selected

Page 30

1  essentially by myself with the approval of
2  Bob Russell and generally with some input from the
3  team as far as what we would have considered to be
4  key accounts.
5    Q  How did the team offer that input?
6    A  They just would have made recommendations
7  on what their key accounts were in their area.
8    Q  How was that done, was there a team
9  meeting where that was discussed or did you talk
10  individually with team leaders -- or team members,
11  excuse me?
12    A  I don't recall.
13    Q  You have no recollection one way or
14  another?
15    A  No.  It very well could have been either
16  one of those.
17    Q  As you sit here today, do you have any
18  recollection of ever speaking with Jane Minor about
19  key accounts and account assignments?
20    MR. BRODERICK:  I'm just going to object.  Do
21  you mean which account should be his, or her
22  accounts?
23    MR. BAKER:  Well, I was not limiting it in any
24  respect, I was talking about a more general sense.

Page 31

1    MR. BRODERICK:  Okay.
2    MR. BAKER:  Do you want me to read the
3  question back?
4    THE DEPONENT:  Yes.
5         (Whereupon the requested
6         portion of the record was read
7         back by the Reporter.)
8    MR. BAKER:  That was a bad question, let me
9  start it over.
10    Q  Tony, as you sit here today, do you
11  have any recollection of ever talking with
12  Jane Minor about account assignments?
13    A  Yes.
14    Q  All right.  And tell me what you recall.
15    A  I recall having a list of accounts from
16  the previous year, that was the starting point.  I
17  had discussions with Jane about which accounts to
18  keep and potentially which accounts to drop and
19  which accounts to add.
20    Q  When you say "the previous year" you are
21  talking about the year 2000?
22    A  Yes, sir.
23    Q  And those were her accounts during that
24  year?

Page 32

1    A  I'm sorry.
2    Q  Those were her accounts during the year
3  2000?
4    A  Correct.
5    Q  And when did you have this discussion
6  with her?
7    A  I believe that would have been either at
8  the very end of 2000 or the very beginning of
9  2001.  I don't recall the specific date.
10    Q  And was that done by a personal meeting
11  or by a telephone call, how was it done?
12    A  It was done by, I believe, both phone
13  conversations as well as E-mails back and forth.
14    Q  If there were these telephone
15  conversations, would they have been followed-up by
16  an E-mail?
17    A  The E-mail follow-up would have been
18  suggestions of those changes, not necessarily
19  documenting a phone call.
20    Q  And would these be E-mails you would have
21  sent to Jane Minor?
22    A  Correct.
23    Q  So she should have these E-mails in her
24  position if they exist?

Page 33

1    MR. BRODERICK: What was the question, Jim,
2  sorry?
3    MR. BAKER: Q So Jane should have these
4  E-mails in her possession, assuming, of course,
5  that they do exist?
6    MR. BRODERICK: I'm going to object as to what
7  this witness will know what Jane will have. He can
8  answer if he knows what Jane might or might not
9  have.
10   MR. BAKER: That's fair.
11   MR. BRODERICK: Do you know?
12   THE DEPONENT: No, I don't know what she would
13  have had.
14   MR. BAKER: Q You E-mailed it to her, did you
15  not?
16   A I believe there were multiple E-mails
17  between -- or at least -- there was a combination
18  of both, discussions over the phone and E-mail
19  transactions. How many E-mail transactions there
20  were, I don't recall, and I don't know specifically
21  what I sent to Jane.
22   Q So there may have been E-mails or there
23  may not have been?
24   A Essentially, yes. I believe there was at

Page 34

1  least one E-mail but it's been a while, I don't
2  recall.
3    Q Do you have any idea when that E-mail
4  would have been sent?
5    A It would have been during that process,
6  which I believe it was either the end of 2000 late
7  December or the very early part of 2001.
8    Q Now, how many telephone conversations do
9  you recall having with Jane where account
10  assignments were discussed?
11   A I don't recall a number, a specific
12  number. My recollection is that it was probably
13  several phone calls.
14   Q Do you recall anything that was said in
15  any of these phone calls?
16   A Yes. I would say there were, you know,
17  certain accounts that Jane opposed, there were
18  certain accounts that Jane wanted added, and those
19  were the nature of the conversations.
20   Q What accounts was she opposed to
21  receiving?
22   A Accounts in Iowa City, Iowa, there was at
23  least one or two accounts there, I believe. There
24  was an account in Columbia, Missouri, Boone

Page 35

1  Hospital. I believe there was an issue with
2  St. Joseph's Hospital in St. Louis. And --
3    Q What was the issue with St. Joseph's
4  Hospital?
5    A I'm not sure at that time that it was
6  clear to me. I don't recall a specific issue at
7  that point in time other than there were accounts
8  that Jane favored and there were accounts that Jane
9  did not want.
10   Q The St. Joseph's Hospital, was that one
11  in St. Charles, Missouri or was it St. Louis?
12   A I'm sorry.
13   Q The St. Joseph's Hospital account, I'm
14  trying to figure out if that was an account that
15  was located in St. Charles, Missouri, the one you
16  just referred to.
17   A Yeah, I think the actual address is in
18  St. Charles, it's essentially in the St. Louis
19  metro area, if I get my geography correct.
20   Q Okay.
21   A And just to be clear, there was -- this
22  process included not only myself and Jane but also
23  the local cardiovascular manager.
24   Q Who was that?

Page 36

1    A Michelle Johnson.
2    Q And did Michelle participate in these
3  conversations with you and Jane?
4    A Not in a conference call matter, but I
5  would -- essentially, I approached this process as
6  trying to get input from what I consider to be the
7  local experts. So for St. Louis, that would have
8  been the sales manager for the cardiovascular
9  division, which was Michelle Johnson, and
10  Jane Minor, who was the vascular sales specialist
11  for that same district, they overlapped -- her
12  territory overlapped the entire cardiovascular
13  district of St. Louis.
14   Q When you say "her," you're referring to
15  Jane?
16   A Jane, yes.
17   Q So kind of summarizing, you believe you
18  had several conversations with Jane concerning
19  account assignments, and those conversations would
20  have occurred in late 2000 or early 2001?
21   A Correct.
22   Q And you've identified some accounts that
23  Jane did not want, were there any accounts she told
24  you she would like to have?

Page 37

1    A There was an account in Springfield,
2 Illinois. I forget the name of the account.
3    Q Is that Memorial?
4    A There was an account in Peoria, Illinois,
5 I believe it was Proctor Hospital. There may have
6 been others, those are the two I recollect at this
7 point.
8    Q Was the account in Springfield, Illinois
9 Memorial Medical Center?
10    A That sounds correct.
11    Q And did Jane also mention to you she
12 would like the Carle Hospital?
13    A That's not familiar to me. The Carle
14 Hospital?
15    Q Yes.
16    A I don't recall that.
17    Q Is your testimony you don't recall one
18 way or another or you don't believe Jane mentioned
19 that account?
20    A I don't recall ever having that
21 conversation with her.
22    Q Well, I guess my question is: Might you
23 have had that conversation, and in the passage of
24 time it has slipped your memory?

Page 38

1    A I don't believe so, but I guess that's a
2 possibility.
3    Q Was the Memorial account assigned to
4 Jane?
5    A I don't believe so.
6    Q And who made the decision that it not be
7 assigned to Jane?
8    A I'm sorry.
9    Q Who made the decision that it not be
10 assigned to Jane?
11    A The process would have been, once again,
12 ultimately it was my decision and my
13 responsibility. These accounts were approved by my
14 director, Bob Russell. And I approached this
15 process to get input from both Jane and Michelle.
16 There were a number of accounts that Michelle
17 wanted Jane to cover that was key to her business.
18    Q To whose business?
19    A To Michelle's business.
20       And as managers, both I and Michelle, our
21 success was dependent upon the sale's force
22 success. So Michelle had her opinions as to what
23 would be best for the overall business, therefore
24 best for her. And Michelle, at the end of the day,

Page 39

1 had some accounts she wanted, some of those
2 accounts were given to Jane and some of them were
3 not given to Jane.
4       Jane had some accounts she didn't want,
5 some of those were not given to Jane, and some of
6 the accounts that Jane did want were not given to
7 her.
8    Q We'll talk about this a little later but
9 let me just follow-up with one other question.
10       I asked you why it was that Jane was not
11 given the Memorial account and I'm not sure I
12 received an answer from you.
13    MR. BRODERICK: You cut out there.
14    MR. BAKER: Q Why was Jane not given the
15 Memorial account?
16    A I don't recall the specifics. Once
17 again, it was a balancing act. We were permitted
18 to have a certain number of accounts. I believe
19 out of the 12 accounts that we went with, there was
20 agreement with the majority of those accounts,
21 there was disagreement with a few on both sides, on
22 Jane's side and on Michelle's side.
23       And at the end of the day, it became
24 compromise trying to make a determination as to

Page 40

1 what was both best for the overall business, at the
2 same time trying to take into consideration some of
3 Jane's positions on certain accounts.
4    Q Was there anything in writing that would
5 memorialize this compromise?
6    A I think simply that -- no, other than the
7 account was what we ended up with.
8    MR. BRODERICK: Is this a good time to take a
9 quick break?
10    MR. BAKER: Sure. We've been at it for an
11 hour.
12       (Whereupon a short recess
13        was taken.)
14    MR. BAKER: Q Tony, when you became the team
15 leader, how were team members assigned to your
16 team?
17    A The alignments were driven by the
18 regional alignment. So Bob Russell's region
19 contained the St. Louis district, the Denver
20 district, the Dallas district, and the Houston
21 district. And so all four of those vascular sales
22 specialist were now part of -- I think they were
23 called the central region and that would have been
24 the alignment.

Page 41

1    Q  Let's go through names then.  Jane would
2  have been the vascular specialist for the St. Louis
3  region?
4    A  She would have overlapped the St. Louis
5  district.
6    Q  Who overlapped the Denver district?
7    A  Randy Van Cleave.
8    Q  And Randy lived in Springfield, Missouri?
9    A  Correct.
10    Q  What about the Dallas district, who
11  overlapped that district?
12    A  That would have been Denise Hill.
13    Q  And where did Denise live?
14    A  In Dallas.
15    Q  And the Houston district?
16    A  Caroline Kopecky, she resided in Houston.
17    Q  Had all four of those individuals worked
18  for Centocor before this team was formed?
19    A  No.
20    Q  Which ones did not?
21    A  Denise Hill.
22    Q  So her first job with the company was as
23  a member of your team?
24    A  Correct.  She was my replacement.

Page 42

1    Q  If you know, what type of work did Denise
2  do before she joined Centocor?
3    A  She was in pharmaceutical sales.
4    Q  Do you recall what company and what type
5  of products?
6    A  I don't recall.
7    Q  Do you know how it was she came to be
8  employed by Centocor?
9    A  She went through an interview process for
10  a cardiovascular sales position with the
11  cardiovascular manager for Dallas, Aaron Millstein,
12  and was also interviewed by Bob Russell for that
13  position.
14        She was regarded as a very strong
15  candidate by the two of them, but they ultimately
16  gave the position to a different person.  And upon
17  making that decision, I had been promoted to
18  vascular sales team leader, and they had
19  recommended her as a replacement for myself.
20    Q  And who hired her, if you know?
21    A  I would have been the hiring manager.
22  Essentially what happened was Bob Russell and Aaron
23  strongly recommended Denise.  I was a brand-new
24  manager, I had never gone through any interviewing

Page 43

1  workshops, didn't have the slightest clue as to how
2  to interview someone at that point in time, and
3  therefore, I relied heavily on their
4  recommendation.
5        Bob suggested a meeting between myself
6  and Denise just to see if there was good repor.
7  And upon doing so, once again, I relied heavily on
8  their recommendation and decided that their several
9  years of hiring and management experience, that
10  they were probably more qualified than I to make
11  that decision and decided to hire Denise Hill.
12    Q  So you deferred to their recommendations?
13    A  Yes.
14    Q  If you know, were there any other
15  candidates considered to fill your position other
16  than Denise?
17    A  I don't believe so.
18    Q  During the time period you were the head
19  of the vascular team, did you have any involvement
20  in hiring any other team members?
21    A  Could you repeat the question.
22    Q  While you were the team leader of this
23  particular team, did you hire any other members of
24  the team other than Denise?

Page 44

1    A  Not as my role as team leader during
2  2001.
3    Q  What about in 2002?
4    A  Yes.
5    Q  And who did you hire?
6    A  I hired I believe her name was
7  Lori Schneiderhan.
8    Q  And what position did she fill?
9    A  She filled the vascular sales position
10  for St. Louis.
11    Q  That was Jane's old position?
12    A  Correct.
13    Q  How many candidates did you interview to
14  fill that position?
15    A  I don't know the number but it was
16  several.  We were actually in a position to offer
17  the job to a gentleman prior to Lori, but he had
18  already accepted an offer from another J&J company,
19  which by policy, prevented us from pursuing his
20  candidacy and we had to start the process over
21  again.
22    Q  Was an offer ever made to him?
23    A  No.  He was going up for a final
24  interview, the next step would have been an offer,

| Page 45 | Page 47 |
|---------|---------|

**Page 45**

1 but upon learning that he had already accepted an
2 offer from another J&J company, our hands were
3 tied, we were not allowed to pursue him without the
4 approval of his hiring manager.
5    Q  What was his name, if you remember?
6    A  I don't recall.
7    Q  Do you recall his age?
8    A  I don't recall.  I mean I wouldn't have
9 known his age.
10    Q  Do you know whether he was under 50?
11    A  If I had to guess, I would guess, but I
12 don't know.
13    Q  Do you know if he was under 40?
14    A  I don't know.
15    Q  Can you take a guess?
16    MR. BRODERICK:  What?
17    MR. BAKER:  Q Can you take a guess?
18    MR. BRODERICK:  You cut out, sorry.
19    MR. BAKER:  I was asking if he could take a
20 guess at his age.
21    MR. BRODERICK:  I'm just going to object to
22 the question.  Foundation.  But you can answer if
23 you can guess.
24    THE DEPONENT:  I don't know.  I just don't

**Page 46**

1 know.
2    MR. BAKER:  Q Have no idea one way or
3 another?
4    A  Correct.
5    Q  He could be 60, he could be 25?
6    A  I guess that's possible.  I just don't
7 know.
8    Q  Other than this individual who took
9 another position and Lori, were any other
10 candidates considered for the position Jane
11 vacated?
12    MR. BRODERICK:  I'm going to object to that.
13 The vagueness of the question assumes other
14 candidates were available.  You can answer if you
15 understand the question.
16    THE DEPONENT:  I don't understand the
17 question.
18    MR. BAKER:  Q Did you interview anyone for
19 Jane's old position other than Lori and this man
20 who took another position?
21    A  Yes, I interviewed several candidates
22 both before we had decided upon this one gentleman
23 and before we decided upon Lori.  There were -- if
24 I had to guess, I would guess there was about a

**Page 47**

1 dozen candidates.
2    Q  And were you the individual that selected
3 Lori?
4    A  Correct.
5    Q  Do you recall Lori's age?
6    A  No.
7    Q  If I told you she was 30 years old, would
8 that surprise you?
9    A  No.
10    Q  Other than Lori and your role with
11 Denise, did you hire anyone else while you were a
12 team leader?
13    A  My position as team leader was only
14 during 2001.  As a sales manager, I did hire other
15 individuals.
16    Q  Do you recall who they were?
17    A  I hired Julie Olson.
18    Q  For what position?
19    A  Gosh.  An immunology specialist.
20    Q  Do you recall her age?
21    A  Let's see here.  I had hired
22 Andrea Brooks, she was actually with the company.
23    Q  Do you recall Julie's age, Tony?
24    A  I don't.

**Page 48**

1    Q  Have no idea?
2    A  I don't.
3    Q  The other position you hired was whom?
4    A  Andrea Brooks, she was part of the
5 cardiovascular division, and I hired her as one of
6 the vascular sales specialist, and then she became
7 an immunology specialist, as well.
8    Q  Do you know Andrea's age?
9    A  I do not.
10    Q  Have any idea what her age is?
11    A  I don't know.
12    Q  No idea at all?
13    A  No.
14    Q  Who else did you hire?
15    A  I'm trying to think here.  Prior to
16 leaving Centocor in June, there was another person
17 in Dallas that I had hired, I'm trying to think of
18 her name, I believe it's Donna Forte but I'm not
19 certain.
20    Q  And do you know Donna's age?
21    A  I think that's it.
22    Q  Do you recall Donna's age?
23    A  I don't know.
24    Q  No idea?

Page 49

1    A  I don't know.
2    Q  Let's go back to your job
3 responsibilities as a team leader. We talked about
4 your sales responsibilities, what were your
5 supervisory responsibilities?
6    A  I was responsible for coaching and
7 development of the individual team members and that
8 would have included coaching on their day-to-day
9 sales skills, their territory management. I was
10 responsible just as they were for the sales at the
11 end of the day.
12       There was obviously some administrative
13 aspects to the job, signing-off on expense reports
14 to have those submitted, completion of field
15 contact reports, year-end evaluations.
16    Q  Any other responsibilities?
17    A  I'm sorry.
18    Q  Any other supervisory responsibilities?
19    A  That's essentially it. That's the nature
20 of the position; management; individual team
21 members, once again, kind of coaching and
22 development; and at the end of the day I'm
23 responsible for the bottom-line sales.
24    Q  Did you have any responsibilities when it

Page 50

1 came to disciplining team members?
2    A  I'm not sure what you mean by
3 "disciplining." As a manager, you're responsible
4 for coaching your individuals. At some point if
5 somebody is not performing adequately, there are
6 steps in the process that I guess you would
7 consider discipline such as a performance
8 improvement plan, and then ultimately termination.
9    Q  And what were your responsibilities with
10 respect to performance improvement plans and
11 terminations as a team leader?
12    A  I would have been responsible for
13 developing a performance improvement plan for an
14 individual and if -- this would also have been done
15 in concert with the regional director as well as
16 termination -- a decision based on termination
17 would have been something that would have been
18 cleared through by the regional director as well
19 and HR, both for performance improvement plan and
20 the termination.
21    Q  So how it would work, you would make some
22 sort of recommendation and they would approve or
23 disapprove that recommendation?
24    A  Correct.

Page 51

1    Q  Tony, I may have asked this earlier, and
2 I apologize if I'm asking it again. Could you
3 describe for me what the -- what states were
4 covered by your team?
5    A  I'll do my best.
6    Q  Okay.
7    A  Some of these -- well, my best
8 recollection would be Texas, Louisiana, New Mexico,
9 Oklahoma, Kansas, Colorado, Missouri, parts of
10 Illinois, small part of Indiana, small part of
11 Kentucky, Iowa, Nebraska. I think that's it as a
12 vascular sales team leader. But it would have been
13 the entire boundary of the central region at that
14 time.
15    Q  Of the what region?
16    A  The central region. Just to be clear,
17 our -- my territory was based on the region, it
18 wasn't based on any part of the region that I
19 particularly wanted or didn't want. And each of
20 the vascular sales specialist's territory was
21 defined by the overlapping cardiovascular
22 district. Once again, there was no playing within
23 those boundaries, the territory was the territory.
24    Q  I want to hand you -- or ask you to turn

Page 52

1 to Exhibit 5.
2    A  Okay.
3    Q  Can you identify that document for me.
4       Let me ask you this before you identify
5 it. In the upper left-hand corner is the word
6 "territory" and the number "342104"?
7    A  Yes.
8    Q  Good, we're on the same page then.
9       Can you identify that document for me.
10    A  This looks like it would be the geography
11 for the territory, for Jane's territory.
12    Q  And it looks like it would extend maybe
13 as far as west as the western extremities of the
14 states of Missouri and Iowa?
15    A  Yes.
16    Q  And as far east -- why don't you tell me
17 how far east it goes, I'm having trouble reading
18 this.
19    A  Me too. It looks like it would have
20 extended into the outskirts of Indiana and Kentucky
21 and a fair portion of Illinois with the exception
22 of Chicago and some of the surrounding local area
23 in Chicago.
24    Q  And it looks like the hub might be the

Page 53

1 St. Louis area?
2   A  That would be correct.
3   Q  We'll come back to that in a moment.
4     Let me ask you this:  Jane's
5 responsibility would have been to market the
6 vascular products offered by Centocor within this
7 given territory; am I correct?
8   A  Correct.
9   Q  And I guess following-up on this, I don't
10 know for sure, but my guess is there would be
11 hundreds, perhaps thousands of hospitals within
12 that territory; am I correct?
13   A  Well, yeah.  I'm not sure about thousands
14 but certainly a hundred or so.
15   Q  And as I understand it, Jane couldn't go
16 out and pick and choose the hospital she wanted to
17 call upon?
18   A  Correct.  No representative in a company
19 could go pick and choose entirely.  We certainly
20 relied on Jane's expertise having covered that area
21 as well as Michelle's expertise in managing that
22 entire area.
23   Q  Let me ask you this:  As I understand it,
24 Michelle was responsible for marketing products for

Page 54

1 the treatment of heart attacks; am I correct?
2   A  Correct.
3   Q  So she would call upon different
4 physicians than would vascular specialists?
5   A  Well, to some extent, yes.  Both groups
6 would have called on cardiologists.
7   Q  Would her group have called upon vascular
8 surgeons?
9   A  Prior to the creation of the vascular
10 sales specialists, if there was other physicians in
11 the hospital seeking information on Retavase then
12 the local sales representative would have been
13 responsible for providing them with the appropriate
14 information.
15   Q  Wasn't that when Urokinase was still on
16 the market?
17   A  Correct.
18   Q  And Centocor was not involved in seeking
19 out opportunities for its product in the vascular
20 market, was it?
21   A  Correct.
22   MR. BRODERICK:  Let me just clarify, what was
23 the last question?  Sorry.  It sounded like it kind
24 of cut out at the beginning.

Page 55

1     (Whereupon the requested
2     portion of the record was read
3     back by the Reporter.)
4   THE DEPONENT:  Prior to the creation of the
5 vascular sales force, there was no sales
6 responsibility directly to call on other
7 specialties other than cardiologists.  You know,
8 during that time period, certainly on a
9 case-by-case basis, a physician would request
10 information and the local rep would have been
11 responsible to follow-up whether it be through, you
12 know, basically with medical affairs, getting the
13 medical letter on the product.
14   MR. BAKER:  Q Now, once the vascular group
15 was created, Michelle Johnson's responsibility was
16 to market the Centocor products for purposes of
17 treating heart attacks; am I correct?
18   A  Correct.
19   Q  Now, how was it she would be of
20 assistance in determining appropriate hospitals to
21 call upon for marketing these products to vascular
22 specialists?
23   A  I can't speak directly to Michelle's
24 involvement and knowledge.  What I can tell you is

Page 56

1 in general once Urokinase was taken off the
2 marketplace, Centocor was not in a position to
3 answer the market need of another thrombolytic
4 agent on the market.  So there essentially was
5 numerous questions being solicited to the company.
6     Certainly Michelle should have been aware
7 of accounts in her district that were inquiring
8 about the use of Retavase in applications outside
9 of the heart.  Once the establishment of the
10 vascular sales specialist was created beginning of
11 2000 or the end of 1999, there were -- my
12 understanding is there was only nine people in the
13 country, therefore, there still would have been a
14 lot of communication to the local cardiovascular
15 rep about many of the needs that these physicians
16 had.
17   Q  When you say many of the physicians,
18 you're talking about vascular specialists?
19   A  Outside of cardiologists or cardiologists
20 that are also doing procedures outside of the
21 heart.
22   Q  So what you are saying, if I understand
23 it, is because of the cardiovascular specialists
24 that marketed the product, the heart specialists,

Page 57

1 they should have some idea of what vascular
2 opportunities would exist?
3    A  Correct.  Let me just add, I don't recall
4 the entire history behind Urokinase but before it
5 was removed from the market, it had a few other
6 problems along the way.  So there was an extended
7 period of time where there was uncertainty about
8 the availability and ultimately the removal of the
9 product.
10    So once again, there were numerous
11 requests from physicians, interventional
12 radiologists, interventional cardiologists, and
13 vascular surgeons about the use of both TPA or
14 Activase and RPA Retavase, which was sold by
15 Centocor, in the use of these vascular applications
16 outside of the heart.
17    So certainly any cardiovascular manager
18 would have to have some knowledge of the potential
19 volume and opportunities at various hospitals
20 within their districts.
21    Q  Explain to me how they would have
22 knowledge of what the vascular opportunities would
23 be.
24    A  The history of problems that Abbot had

Page 58

1 with Urokinase caused a situation in the
2 marketplace where physicians, primarily,
3 interventional radiologists; to some extent,
4 interventional cardiologist and vascular surgeons
5 were soliciting information from our cardiovascular
6 representatives on the use of Retavase outside of
7 heart applications.
8    Q  And are you saying Michelle would know
9 who --
10    A  Prior to the creation of vascular sales
11 and also during the early stages of the creation of
12 the vascular sales.
13    Q  So Michelle would know what physicians --
14 what noncardiologist physicians had solicited
15 information?
16    A  She would likely have some information on
17 that, she would also have information on -- based
18 on conversations that a physician might have with a
19 representative, I'm sure the representative would
20 try and gauge what their volume of business with
21 Urokinase was to gauge what their volume of
22 business might be with Retavase.
23    Q  But that again would be based upon
24 inquiries made by a physician?

Page 59

1    A  Correct.  It can also occur with inquires
2 made by pharmacists.  Certainly pharmacists are
3 kind of the gate keeper, if you will, when it comes
4 to drugs in the hospital.  Pharmacists would have
5 had conversations with our sales reps, and they
6 would have certainly known what volumes the
7 Urokinase was in any given hospital so it's
8 potential might be for Retavase.
9    Q  You made an interesting comment I would
10 like to ask you about.  You said a pharmacist was
11 the gate keeper of the hospital; what did you mean
12 by that term?
13    A  Well, pharmaceutical sales
14 representatives go through the pharmacy to sign in
15 to the hospital.  Pharmacists have a fair amount of
16 control in many instances of what products the
17 hospital's going to stock.
18    Q  Is that called a formulary?
19    A  Yes.
20    Q  Do you know how a hospital determines
21 what its formulary is going to be?
22    A  A combination.  But there's essentially a
23 physician panel that pharmacy runs and that
24 determines what products go up for formulary.  And

Page 60

1 then it has to go up for formally to become part of
2 formulary, and certainly it can get voted off or
3 voted not to be put on formulary.
4    Q  With respect to the role of either a
5 vascular specialist or a cardiovascular specialist,
6 is it one of their objectives to have Centocor
7 products placed on a hospital formulary?
8    A  Generally, yes.  It's not a requirement
9 to have a product used necessarily at every
10 hospital but that would be the norm.
11    Q  So if I understand correctly, when a drug
12 is on the hospital's formulary, it's the typical
13 drug that would be used by that hospital to treat a
14 particular medical problem?
15    A  That would be one scenario.  There are in
16 some cases multiple products offered for the same
17 application.  So formulary, in a broader sense, is
18 just what is allowed for any physician to
19 essentially order without any additional scrutiny.
20 When you request something that is off formulary,
21 that generally has greater scrutiny.
22    Q  So if a physician orders or prescribes a
23 medication that's not on the hospital's formulary,
24 that physician has some oversight that he has to go

Page 61

1  through before that medication can be used; is that
2  what you're telling me?
3      A  In general, yes.  You have to keep in
4  mind that there are no hard and fast rules across
5  the board for for every hospital.  Some hospitals,
6  if it's not on formulary, there is no way a product
7  is going to be used off formally.  In many
8  hospitals, there's a lot of drugs that are used off
9  formally.
10         I would say in many cases, not in all,
11 but in many cases, that would create greater
12 scrutiny if products are used off formally.
13     Q  Do you know what the term "indicated"
14 means?
15     A  Yes.
16     Q  What does that term mean?
17     A  To me it means they're referring to a FDA
18 indication which means that a drug or product has
19 been cleared by the FDA for marketing.
20     Q  Would that be for marketing for a
21 particular use?
22     A  Yes, for a given disease state or
23 application.
24     Q  With respect to the marketing of the

Page 62

1  product of Centocor, did it make any difference how
2  you're going about your sales activities in terms
3  of whether a product was indicated or not
4  indicated?
5      A  Yes.
6      Q  And can you explain that for me.
7      A  I'm sorry, I answered yes.
8      Q  Could you explain to me what the
9  significance is.
10     A  Well, when something is indicated then
11 you're able to discuss it within the guidelines of
12 that indication.  When something is not indicated
13 then you're -- you know, the position at Centocor
14 was, at least my understanding was, that we would
15 be there to answer unsolicited requests for
16 information.
17        And so we would have to clarify with the
18 physician if the product was not indicated for that
19 particular use, and then share with them what
20 information we had, and then provide them with
21 documentation that they would generally request,
22 such as a medical letter, you know, clinical
23 information on the product, package insert
24 information.

Page 63

1         My understanding was that the vascular
2  sales position was created to essentially serve as
3  this -- Centocor recognized that there was -- they
4  didn't want to have a hundred some odd people
5  promoting, they didn't want to have anybody
6  promoting, and therefore, they created the vascular
7  sales position to co-promote the Cordis product.
8         And in the reality that Urokinase was no
9  longer available, because the company had literally
10 been bombarded over time with numerous requests for
11 information, they wanted these individuals to be
12 prepared to know how to handle an off-label request
13 and essentially provide the information that the
14 physician were requesting.
15     Q  You say these individuals, are you
16 talking about --
17     A  Vascular sales specialists.  The
18 physicians that the vascular sales specialists were
19 selling the Cordis products to.
20     Q  How did the role of the vascular sales
21 specialist differ with products that had been
22 indicated for vascular use?
23     A  I'm sorry, could you repeat the
24 question.  I'm not sure I understand.

Page 64

1      Q  My understanding is that to the extent
2  vascular sales representatives marketed a product
3  that was not indicated for vascular use, their
4  proper role was limited to responding to requests
5  for information and informing the physician that it
6  was not indicated for vascular use; and if the
7  physician elected to purchase the product or the
8  hospital elected to purchase the product with that
9  understanding that was okay; am I correct in that
10 respect?
11     A  That is correct.
12     Q  Now, with respect to products that were
13 indicated, could a vascular representative be more
14 aggressive in marketing those products?
15     A  Yes.
16     Q  And could you explain to me what they
17 could do with respect to indicated products.
18     A  They could start a conversation with a
19 physician about that product, about the use of that
20 product for that indication, about the clinical
21 information supporting the use of that product.
22 They had promotional materials that advocated the
23 use of that product for that indication versus
24 essentially not being able to do any of that.

Antonio Siciliano

Page 65

1    Q Now, with respect to the products during
2 the year 2001 that vascular specialists sold, what
3 products were indicated for vascular use?
4    A The Cordis hydrolyzer.
5    Q And was that the primary product that
6 vascular reps were supposed to sell?
7    A Well, they were responsible for both the
8 Cordis hydrolyzer as well as they were responsible
9 for the Retavase business, for all of the Retavase
10 business.
11    Q When you say "all of the Retavase
12 business," you mean what?
13    A There was -- the sales reports that the
14 company received, there is no way to know what the
15 use of the product was for. So let's just say
16 hospital X orders ten units of Retavase, there is
17 no way for Centocor to know if all ten were for
18 heart problems or if none were for heart problems
19 and all were for vascular problems.
20    Q I'm a little confused.
21    MR. BRODERICK: We all were.
22    THE DEPONENT: Essentially, Retavase -- we
23 were responsible for Retavase, we were there to
24 support the Retavase business. We were there to

Page 66

1 keep the sales force focused -- the cardiovascular
2 sales force focused on selling Retavase for its
3 indicated use.
4    MR. BAKER: Q What could vascular
5 representatives do to keep cardiovascular reps
6 focused?
7    A They were there to answer the questions
8 that were coming from customers about how to use
9 these products in off-label situations.
10    Q You mean for nonindicated use?
11    A In nonindicated use.
12    Q So just for clarification, a vascular rep
13 was not supposed to assist cardiovascular reps in
14 marketing and selling Retavase for cardiovascular
15 purposes?
16    MR. BRODERICK: Can we have that question read
17 back.
18    MR. BAKER: Let me start over, it may be
19 quicker.
20    MR. BRODERICK: All right.
21    MR. BAKER: Q I want to make sure I have this
22 correct. The cardiovascular reps marketed Retavase
23 for cardiovascular purposes; am I correct?
24    A Correct.

Page 67

1    Q And Retavase had been indicated by the
2 FDA for use in heart attacks, cardiovascular
3 treatment; am I correct?
4    A Correct.
5    Q Do I understand that vascular reps had no
6 involvement in marketing or selling Retavase for
7 heart attack or cardiovascular purposes?
8    A For the most part, that is correct.
9 Certainly, on a case-by-case basis, for a variety
10 of reasons, a cardiovascular representative could
11 have certainly had a vascular specialist help them
12 in an account for it's indicated use.
13    Q But the primary responsibility in that
14 situation would rest with the cardiovascular rep?
15    A Absolutely.
16    Q So then when it came to selling Retavase,
17 the role of the vascular specialist was to sell it
18 for its nonindicated use?
19    MR. BRODERICK: Objection to the form of the
20 question. Did you understand the question?
21    THE DEPONENT: You are asking me if the
22 vascular sales specialists were responsible for
23 selling Retavase off label?
24    MR. BAKER: We're using two different terms.

Page 68

1    Q Is off label the same as nonindicated
2 use?
3    A Correct.
4    Q Then yes, that's my question.
5    MR. BRODERICK: Mischaracterizes his
6 testimony. Same objection.
7    MR. BAKER: I don't think I'm characterizing
8 his testimony, I'm asking a question.
9    THE DEPONENT: I guess I wouldn't phrase it as
10 such. It was made clear to us that we were not to
11 be promoting the product off label. However, with
12 the elimination of Urokinase, which was roughly a
13 350 million dollar market from Urokinase standards
14 -- what I'm trying to get at, there was a lot of
15 demand in the marketplace for another thrombolytic
16 agent such as Retavase.
17    The company had not done the research,
18 they had not performed clinical trials, they were
19 not prepared for this change in the marketplace.
20 They created a vascular sales force to, one,
21 co-promote Cordis hydrolyzer products and also be
22 there to help with answering these questions that
23 were coming from the marketplace regarding the use
24 of Retavase in nonindicated uses.

Page 69

Q Well, Centocor is in the business of selling product; is it not?
A It is.
Q And it was trying to sell Retavase for vascular treatment; was it not?
A In the sense that the product was being used in nonindicated uses, they knew it was going to be used in nonindicated use due to the vacation -- the removal of Urokinase, yes.
However, I would characterize it more as we were there as to provide -- once again, let me just take a step back. Centocor was completing with Genentech. Genentech was the market leader in heart attack patients.
Q Competing with Genentech for what?
A In heart attack patients. They wanted that cardiovascular sales force to stay focused on pursuing that competitive market. If the radiologist kept calling the cardiovascular reps and trying to get information, it would have distracted their primary focus.
There was a large demand in the marketplace for the understanding of these new lytics for vascular use; therefore, the vascular --

Page 70

our role as a vascular sales specialist was to provide the customers with the information that they were requesting.
And certainly, I would imagine the hoax for Centocor was to sell more product and providing the customer the information they needed to be able to use the product safely.
Q Well, Centocor, to your knowledge, never turned down Retavase orders for vascular purposes, did they?
A Correct. No. There wouldn't have been -- let me say, there would be no order for vascular use. That hospital's pharmacy orders product, it orders product from a distributor. There is no classification when they order it what they are going to use it for.
Q Let me ask you this, Tony: When vascular specialists were created, my understanding is they were expected to call on interventional radiologists, vascular surgeons, and interventional cardiologists; am I correct?
MR. BRODERICK: Objection. Asked and answered. Go ahead.
THE DEPONENT: Yes.

Page 71

MR. BAKER: Q And typically, these particular physicians that they were calling upon would not be dealing with cardiovascular problems, would they?
A Correct.
Q And the role of the vascular specialist was to educate these individuals that they were calling upon concerning how Retavase might be a good tool in their practice?
MR. BRODERICK: Objection to form. Asked and answered. You can answer.
THE DEPONENT: Correct.
MR. BRODERICK: Could you hear my last response?
MR. BAKER: I did. I was thumbing through some papers.
Tony, can you go to Exhibit 73 for a moment.
THE DEPONENT: Okay.
MR. BAKER: Q To make sure we're on the same page, is that document headed: Q2 VSS Account Targets - Central Region?
A Yes, it is.
Q Does Q2 refer to second quarter?
A Yes, it does.

Page 72

Q And VSS, what does that mean?
A Vascular sales specialist.
Q And the term "account targets," what is an account target?
A Those were the accounts that the vascular sales specialists were responsible for.
Q And then it appears like there is a box for each of the team members, and, in fact, a box for the team leader; am I correct?
A That's correct.
Q And then there are hospitals listed under each person?
A I'm sorry, you cut out.
Q There are hospitals listed under the name of each individual; am I correct?
A That is correct.
Q Now, there are a series of columns that extend to the right of these hospitals, and I want to go through each column and have you tell me what that means, okay?
A Okay.
Q The first column is AMI R12; what is that?
A This is the total -- at that time -- let

**Page 73**

1 me see here. Rolling total refers to rolling 12
2 months of sales for full kits.
3 Q  Full kits of what product?
4 A  Of Retavase.
5 Q  An then the next column is Retavase AMI
6 R12?
7 A  Correct.
8 Q  What does that mean?
9 A  That is same thing. Actually, the first
10 column refers to -- I believe that would refer to
11 total -- it would refer to our best guess, if you
12 will, for accounts that, as we learned more about
13 an account, what we thought was coming from AMI and
14 what we thought might be coming from vascular
15 sales.
16    The first column is a total of all of the
17 AMI Retavase units. The first one there -- the
18 next one there Retavase AMI R12 is -- I want to
19 make sure I understand this, I want to look at it.
20    I can tell you that a dose of Retavase
21 for AMI is -- was 20 units, and it basically came
22 in what we called a full kit, which was two vials
23 of ten units.
24 Q  AMI refers to an acute myocardial

**Page 74**

1 infarction?
2 A  Correct.
3 Q  A heart attack.
4 A  Some hospitals ordered what we call a
5 half kit which was a 10 -- 10 millimeter vial.
6 Because what some physicians were doing, sometimes
7 they would give the first bolus of Retavase and the
8 patient would respond and they wouldn't need to
9 give that second dose, so there was a half-kit
10 option for the customer.
11    And then over time the company did
12 research with Retavase and Reopro where you would
13 only use a half dose of Retavase.  Early on the
14 company tried to understand where its business was
15 coming from.  There were certain assumptions made
16 that a full kit generally indicated a heart
17 indication use and a half kit might be more of a
18 vascular use.
19    Over time I think we realized that it was
20 very difficult at best to make any sense out of how
21 these kits were being ordered and what they were
22 being used for.  Some hospitals would order two
23 half kits for cardiac use and some hospitals were
24 ordering a full kit for vascular use.

**Page 75**

1    And so this spreadsheet is an attempt at
2 this point in time to understand to the best of our
3 ability what was being used for cardiac indication
4 and what was being used for peripheral or vascular
5 use.
6 Q  Why did you want to know that?
7 A  Because physicians that were doing high
8 volume vascular use would be accounts that we were
9 going to call on both for hydrolyzer, as well as
10 the fact that they would be the account that would
11 be soliciting information in regards to Retavase
12 for vascular use.
13 Q  And could we agree that the individuals
14 that are identified on Exhibit 3 were all vascular
15 representatives?
16 A  Exhibits 73?
17 Q  Excuse me, Exhibit 73, correct.
18 A  I'm not sure if it cut out.  It sounded
19 like you said Exhibit 3.
20 MR. BRODERICK:  The exhibit for this
21 deposition, right?
22 MR. BAKER:  No.  Excuse me.  Let me go back.
23 I was referring to Exhibit 73.
24 THE DEPONENT:  Yes, the individuals are

**Page 76**

1 vascular sales specialists.
2 MR. BAKER:  Q And as we've covered earlier,
3 they weren't involved in marketing this product for
4 cardiovascular purposes, right?
5 A  Correct.
6 Q  I'm a little confused then why you even
7 prepared this document.
8 MR. BRODERICK:  Objection.  Foundation and
9 form and as to whom prepared it.
10 MR. BAKER:  Q Did you prepare it?
11 MR. BRODERICK:  Do we know who prepared it, is
12 that what you are asking?
13 MR. BAKER:  I asked if he prepared it.
14 MR. BRODERICK:  Okay.
15 THE DEPONENT:  I believe this would have been
16 created by myself but I created several
17 spreadsheets over the years.  I'm not certain, but
18 this is likely something that I would have
19 created.  And the purpose would have been to make
20 sure we understood what accounts we should be
21 calling on.
22    The hydrolyzer would have been used in
23 some of the same applications that Retavase would
24 have been used for.  So knowing what -- especially

Page 77

1  having come from -- let me put it this way:
2  Selling a mechanical demecular (sp) device, you
3  would need to know what an interventional
4  radiologist, a vascular surgeon, or interventional
5  cardiologist vascular procedure volume is.
6      MR. BAKER: Q Which box would tell me that?
7      A  The boxes related -- for the letters
8  "PVD" standing for peripheral vascular disease
9  would have been our assumptions at that time.
10  Nothing clearly on there can tell you specifically
11  that information. My best-guess scenario.
12      Q  If you go to the last column, it says:
13  Retavase PVD MS?
14      A  MS stands for market share.
15      Q  Okay. So let's go down to
16  St. John's Hospital in Springfield that's on page 1
17  under Randy Van Cleave, there is in that column
18  34.7 percent; what does that figure represent?
19      A  That was our guesstimation as to what
20  percentage of the vascular business was Retavase
21  versus Activase.
22      Q  Versus --
23      A  34.7 percent of the business we guessed
24  was Retavase -- or excuse me -- was the Retavase

Page 78

1  vascular use versus the Activase vascular use.
2      Q  And Avtivase was your competitor?
3      A  Correct.
4      Q  Or your competitor's product, okay.
5         How are you able to make that
6  calculation?
7      A  The estimation would have been based on
8  looking at half doses of both Retavase and
9  Avtivase.
10      Q  How would you know what the Activase
11  product was that was sold to St. John's?
12      A  The sales data that we purchased from
13  some vendor would list both Retavase unit sales and
14  Activase unit sales.
15      Q  And with the columns that refer to heart
16  attacks, the AMI columns, would that be the product
17  that the cardiovascular reps marketed to that
18  particular hospital?
19      A  Correct.
20      Q  So if for example, using St. John's of
21  Springfield, the total Retavase for AMI was 167,
22  that would reflect not what Randy van Cleave sold
23  but instead what the cardiovascular rep calling on
24  that hospital sold?

Page 79

1      A  That would be a guesstimation.
2      Q  That would not refer to what Randy sold,
3  it would refer to what the cardiovascular rep sold?
4      MR. BRODERICK: Objection. Asked and
5  answered.
6      MR. BAKER: It was asked, I don't think it was
7  answered.
8      THE DEPONENT: It would have been a
9  guesstimation. What I want to make clear is that
10  there were assumptions that were made and changed
11  over time. Early on the belief was if a full kit
12  was purchased it was purchased for AMI. We later
13  -- and that was a way to try to understand the
14  business so we would segregate the vials of the
15  half kits and full kits.
16         Over time, you know, I came to the
17  realization that there was no really good way to do
18  that. But, yes, the purpose of that column would
19  be to represent what we believed to be the cardiac
20  use of Retavase, so 167 out of a total of 180 or
21  92.8 percent we believed to be for cardiac use.
22      Q  And using St. John's Hospital as an
23  example, Randy Van Cleave would not have been the
24  individual that would have marketed Retavase for

Page 80

1  heart attack purposes to St. John's?
2      MR. BRODERICK: Objection to form.
3      MR. BAKER: What's your objection?
4      MR. BRODERICK: Just to form.
5      MR. BAKER: I don't understand your objection.
6      MR. BRODERICK: I think there's a discussion
7  as to what the VSS's role was in marketing and
8  sales of the products. I'm sure that question is
9  consistent with it. But subject to that
10  observation, he can answer if he understands the
11  question.
12      THE DEPONENT: If the question is was Randy
13  responsible for the heart attack indication for
14  Retavase, the answer is no.
15      MR. BAKER: Q Now, why was it this document
16  was even prepared, Tony?
17      A  Once again, we wanted to make sure that
18  our -- well, at this point this was the account
19  list so this was a way to try and track the
20  business at these accounts.
21      Q  You're talking about the Retavase
22  business for vascular purposes?
23      A  Yes. But for all purposes, certainly
24  wanting to know what we thought, of what we could

Antonio Siciliano

Page 81

1  learn from the information, what we believe to be
2  vascular use of the product, as well.
3      Q  The reason I'm asking the question, the
4  individuals on this list were not marketing
5  Retavase for heart attack purposes?
6      A  Correct.
7      Q  So might I assume that this document was
8  something that was prepared to analyze the sales
9  activity of Retavase for vascular purposes?
10     A  Yes, it was prepared so that we could
11 better understand the use of Retavase in vascular
12 applications.
13     Q  And that was done to hopefully enhance
14 the sale of product for vascular purposes; am I
15 correct?
16     A  I guess I would say it was done to
17 understand where opportunities were, where there
18 would be a greater demand for the use of Retavase
19 so that we could make sure we were calling on
20 institutions, that they understood that once again
21 we were kind of the liaison between medical affairs
22 and the customer to provide them with information,
23 as well as to market and promote the Cordis
24 hydrolyzer.

Page 82

1      Q  You're providing them information so you
2  could ultimately sell the product; am I correct?
3      A  Yes.
4      Q  With respect to vascular representatives
5  during the year 2000, were they given any quotas or
6  expectations with respect to Retavase they were
7  supposed to sell?
8      A  I'm not -- I don't recall specifically
9  how the SICP structure was at that point in time,
10 if it was an actual number that they had to achieve
11 or if it was -- there would have been some type of,
12 I'll refer to it as a baseline, some type of
13 historical data that was used as a -- as a metric
14 or future performance.
15     Q  So their performance in part was
16 evaluated based upon their success in selling
17 Retavase?
18     MR. BRODERICK: Objection.  Vague.  You can
19 answer if you can answer.
20     THE DEPONENT: I guess, once again, we were
21 there to support this unmet need in the
22 marketplace, and we were also there to provide
23 assistance so that the cardiovascular sales
24 specialists were not distracted from selling in the

Page 83

1  AMI marketplace.
2      And there was no way to differentiate
3  what we thought perhaps was vascular use versus
4  nonvascular use or AMI use versus vascular use, so
5  we were all, both cardiovascular and vascular sales
6  specialists, were responsible for the total sales
7  in that hospital.
8      A successful vascular specialists would
9  have been successful by, one, selling the Cordis
10 hydrolyzer; two, being the go-to person as an
11 account had questions about the use of Retavase for
12 vascular use and providing that physician with
13 information; supporting pharmacy or formulary with
14 information regarding the use of Retavase in
15 vascular.
16     And by doing all those things, it would
17 have allowed the cardiovascular representative to
18 be more successful in their role; therefore,
19 everybody was tied to the same Retavase number.
20     Q  Tony, can you go to Exhibit 11.
21     MR. BRODERICK: Give us a second.
22     MR. BAKER: I'm sorry, I didn't hear that,
23 John.
24     MR. BRODERICK: I said just give us a second

Page 84

1  to look through the papers.
2      MR. BAKER: Oh, sure.
3      THE DEPONENT: Okay.
4      MR. BAKER:  If your document is the same as
5  mine, at the top it says:  Centocor Field Contact
6  Report.
7      A  Correct.
8      Q  And it looks like that's a field contact
9  report that was prepared by Randy Van Cleave on May
10 10, 2001?
11     A  Correct.
12     Q  Are you the person that prepared that?
13     A  I am.
14     Q  Now, if you go down to box two, Roman
15 numeral two, it says:  Sales Performance.
16     A  Okay.
17     Q  And the second column says:  Q1
18 baseline.  I'm assuming "Q1" refers to the quarter;
19 am I correct?
20     A  Correct.
21     Q  What does the term "baseline" mean?
22     A  That would have been -- and I don't know
23 what the particular baseline period was for this
24 SICT plan -- but baseline is generally some type of

Page 85

1  historical, whether it be the previous quarter
2  sales performance or the previous average over the
3  previous two or three or four quarters, there would
4  have been some type of metric used to judge
5  performance in Q1 versus a historical performance.
6      Q  And then in the far left-hand column, it
7  looks like there are a series of products; do you
8  see that?
9      A  Yes, sir.
10     Q  And the first product is Retavase; do you
11 see that?
12     A  Yes.
13     Q  Do I understand from just as far as we
14 have gone that Randy was being evaluated concerning
15 his sales performance in selling Retavase?
16     A  Correct.
17     Q  And then there is a percentage, 161
18 percent, can you generally tell me what that would
19 mean, I'm not asking particularized to Randy, but
20 that percentage would be calculated how?
21     A  Yes, that actually should -- I think
22 that's a typo, I think that represents 161 units.
23     Q  Okay.  How would you know what his
24 Retavase sales units were?

Page 86

1      A  There were Retavase unit sales generated
2  for every territory.
3      Q  How would you distinguish his Retavase
4  units from the Retavase units of the cardiovascular
5  rep?
6      A  We did not.
7      Q  So the cardiovascular rep would have also
8  had 161 units?
9      A  He would have been overlapping an entire
10 sales district, and those 161 units would come from
11 the account on that target list for Randy.
12     Q  So that would represent a total of 161
13 units purchased by accounts Randy called upon?
14     A  Yes, sir.
15     Q  And those may have been purchased because
16 of the efforts of the cardiovascular rep or they
17 may have been purchased because of the efforts of
18 Randy in marketing the product for vascular
19 purposes?
20     MR. BRODERICK:  Objection to form.
21     THE DEPONENT:  Those would have been units
22 that were sold at the 12 accounts, or whatever the
23 number of accounts were that Randy had as targets,
24 from both Randy's duties of a vascular sales

Page 87

1  specialist along with any cardiovascular reps that
2  called on those accounts with their duties.
3      MR. BAKER:  Q Would you agree with me in the
4  first quarter of 2001, for each of the accounts
5  Randy called upon, a cardiovascular rep also called
6  on those accounts?
7      A  Yes, sir.
8      Q  So you would not be able to measure
9  Randy's performance in selling Retavase
10 independently of the performance of the
11 cardiovascular representative that called on those
12 accounts; is that correct?
13     A  Correct.  I mean in that regard, it was a
14 team effort.
15     Q  On this team, the role of vascular rep
16 was to promote the product for peripheral purposes
17 and the role of cardiovascular rep was to promote
18 the product for heart attack?
19     A  Essentially, yes.
20     Q  Not limiting it exclusively to Jane's
21 territory but talking about your entire sales
22 territory for your vascular team, how was it you
23 went about identifying those hospitals you would
24 call upon and those hospitals you would not call

Page 88

1  upon; what were the factors you considered?
2      A  Input from the vascular sales specialist,
3  input from the cardiovascular manager that
4  overlapped the same district as the cardiovascular
5  sales specialist, and then sales data on the
6  thrombolytic market.
7      Q  What do you mean by sales data on the --
8      A  For accounts within the entire geography.
9      Q  I'm not sure I understand that.
10     A  So let's just for Randy, Randy had -- his
11 district -- his territory overlapped the entire
12 Denver district, so we would look at all the
13 information we had for the Denver district.  And
14 with input from Randy and input from the local
15 manager on the cardiovascular side, where they were
16 -- where case-by-case scenarios of maybe where
17 there was more vascular opportunity or where
18 protecting the cardiovascular business.
19     Much of the business -- the reason that
20 there's a lot of market share references about a
21 hospital, if they had, let's say, 90 percent
22 Retavase market share then they qualified for a
23 discount.  So business was won and lost based on
24 market shares sometimes.  If you could maintain a

**Page 89**

1 certain market share then that customer would keep
2 your product on formulary or on the shelf because
3 they would get a greater discount.
4      So in many cases decisions were made not
5 only based on what we thought perhaps was a
6 vascular need or opportunity but what the local
7 cardiovascular need was.
8    Q  Well, how would you determine what the
9 need was?
10   A  Based on the unit sales, history.  If
11 let's say a hospital is using Retavase for all of
12 their cardiac indications but there happens to be a
13 center that does a lot of vascular applications and
14 they are using TPA.
15   Q  How would you determine that?
16   MR. BRODERICK: I don't know, were you done
17 with your answer, Tony.
18   THE DEPONENT:  No.
19   MR. BAKER:  I apologize.
20   THE DEPONENT:  That's okay.
21      So if the hospital, let's say, had a
22 rolling 12 of 50 units of Retavase and had a
23 rolling 12 of 50 units of Activase that was all for
24 vascular use, the Activase that is, then the market

**Page 90**

1 share for both products were at 50 percent; and
2 therefore, they would get no discount for TPA, and
3 they may or may not qualify for a discount on
4 Retavase.
5      So all of our cardiovascular business
6 would be at risk based on that scenario.  And
7 looking at historical sales data, you could
8 determine that information.
9    MR. BAKER:  Q Well, looking at historic sales
10 data, you could determine what the hospital's
11 purchases were of Retavase?
12   A  And TPA.
13   Q  TPA is what?
14   A  Activase.
15   Q  And that's the competitor's product?
16   A  Yes, sir.
17   Q  How did you get that sales data?
18   A  It's all provided -- I believe the
19 company is IMS, it's all provided by a third party
20 that purchases -- my understanding, I'm not an
21 expert in this area -- they purchase the sales
22 information from hospitals and they compile it into
23 a database and sell it to drug companies.
24   Q  Would you look at the purchases that a

**Page 91**

1 hospital made of Urokinase when it was on the
2 market?
3    A  I can't speak to that, I was not employed
4 at Centocor when Urokinase was on the market, I
5 don't know if that was part of the review process,
6 if that was part of the sales data or not.
7    Q  After you joined -- became a team leader
8 in determining what hospitals you would call upon,
9 did you look at a hospital's historic purchasing
10 patterns of Urokinase?
11   A  I don't believe that information was ever
12 available.
13   Q  Why would it not have been available?
14   A  I'm not -- I don't know.  I don't know
15 that Centocor ever purchased that information
16 previously.  Had they not purchased it previously,
17 I don't believe they would have been able to get
18 their hands on it after the fact.  But I don't
19 know, that's not my area.
20   Q  How would you go an about determining the
21 hospital's practice in engaging in thrombolytic
22 therapy?
23   A  I'm sorry, could you repeat the question.
24   Q  If I understand one of your earlier

**Page 92**

1 answers, you would consider the level of activity a
2 hospital had in engaging in thrombolytic therapy,
3 do I have that correct?
4    A  Yes.
5    Q  How would you determine that?  How would
6 you find that information out?
7    A  What their volume was in regards to
8 thrombolytic therapy?
9    Q  Yeah.
10   MR. BRODERICK: Did you hear that, Jim.
11   MR. BAKER:  I heard his question and my answer
12 was yes.
13   THE DEPONENT:  Based on the sales data that we
14 would get from the company.
15   MR. BAKER:  Q Sales data for what product?
16   A  They were purchasing sales data that
17 listed both Retavase and Activase.
18   Q  How would you know if that was being used
19 by a hospital for heart attack purposes or vascular
20 purposes?
21   A  You would have to refer to the local
22 knowledge of the sales rep and manager.  And if
23 every doctor, every cardiologist at the hospital,
24 and all the ER nurses in the ER are telling them

Page 93

1 they only use Retavase for AMI, then one would
2 surmise that the Activase used was in radiology or
3 in vascular surgery or in another vascular use in
4 cardiology.
5    Q  Were there any other factors considered,
6 Tony, in deciding what hospitals to call upon other
7 than what you have told me thus far?
8    A  The factors -- well, yes.  The factors
9 that are considered, once again, would be input
10 from the sales rep, the vascular sales specialists,
11 the overlapping cardiovascular manager.  We would
12 look at historical data, we would try and make the
13 best business decisions that we could based on the
14 information that we had.  But we also took into
15 consideration, you know, if you will, I guess I
16 would classify it as maybe personal needs from each
17 individual.
18        All of these territories were very large
19 territories, everybody had to do some type of
20 travel.  And, you know, there were concessions
21 made, particularly to Jane, on her desire not to
22 travel to certain parts of the territory.
23    Q  Where did Jane not want to travel?
24    A  She did not want to travel to Columbia,

Page 94

1 Missouri.  She did not want to travel to Iowa City,
2 Iowa.  And those accounts were not kept as part of
3 her territory.
4    Q  I will represent to you, Tony, that I
5 frequently drive to Iowa City, Iowa, and it's 120
6 miles closer to Springfield, Illinois than
7 Des Moines, Iowa, are you telling me Jane did not
8 want to be inconvenienced to go to Iowa City, Iowa,
9 but had no objection to going to Des Moines, Iowa?
10    A  She would have flown to Des Moines, Iowa
11 -- or at least most representatives would have
12 taken the opportunity to fly.
13    Q  Are you aware of the travel logistics to
14 fly from Springfield, Illinois to Des Moines, Iowa?
15    A  Yes.
16    Q  How long does it take?
17    A  It takes a couple hours, you fly from
18 Springfield into St. Louis and from St. Louis to
19 Des Moines.
20    Q  Would it surprise you to know you can
21 drive quicker?
22    MR. BRODERICK: Objection.  Relevance.
23    THE DEPONENT: I mean I'm not -- that is -- to
24 the best of my recollection, it was travel was the

Page 95

1 reason Jane gave me as to why she didn't want to
2 cover Iowa City.
3    Q  No other reasons, just travel?
4    A  That's my understanding, yes.
5    Q  That's your recollection?
6    A  Yes, sir.
7    Q  And was it also travel that she didn't
8 want to go to Columbia, Missouri?
9    A  That is my understanding.
10    Q  And do you know how long it takes it to
11 travel from Springfield, Illinois to Columbia,
12 Missouri?
13    A  I don't recall.
14        I think it's important to note that Jane
15 was hired as a cardiovascular specialist with the
16 company, and it was upon Jane's request to transfer
17 into the vascular territory which was already --
18 the boundaries were preexisting; that upon Jane's
19 request to transfer into the vascular territory,
20 which included Iowa City; and Des Moines; and
21 Columbia, Missouri; and Owensboro, Kentucky; and
22 Evansville, Indiana, that upon the company -- and
23 this was prior to me becoming her manager -- but
24 once the company gave her that position, allowed

Page 96

1 her to transfer over, then she was responsible for
2 covering a much larger territory upon her request.
3    Q  Prior to Jane becoming a member of your
4 team, do you know what the account coverage
5 requirements were of Jane while she worked in the
6 territory you've described as a vascular
7 representative?
8    A  I do not.
9    Q  Do you know who her prior team leader was
10 or her supervisor?
11    A  I don't recall who the regional manager
12 would have been at that time, I did not know that
13 person.
14    MR. BAKER:  Give me just a minute here.
15    MR. BRODERICK:  Is this a natural stopping
16 point for a short break and then we can maybe go
17 another hour and take a lunch break?
18    MR. BAKER: Sure.  That's fine.
19        (Whereupon a short recess
20        was taken.)
21    MR. BAKER: Q Tony, in your bundle of
22 documents, you should come upon an Exhibit 29 A.
23    A  Yes, sir.
24    Q  The document I have in front of me is

Page 97

1 headed: Top 15 PVD Account Targets.

2    A  Yes, sir.

3    Q  And PVD stands for peripheral vascular

4 disease?

5    A  Yes, sir.

6    Q  Who prepared this document?

7    A  I don't recall. I suspect I did.

8    Q  Well, if you don't recall, do you have

9 any recollection as to when it would have been

10 prepared?

11    A  No. There's no date on here, there's no

12 quarter indication, so I'm not sure when this would

13 have been created.

14    Q  Do you know what the purpose of this

15 document is?

16    A  Well, I mean I presume, because the title

17 says top 15 PVD accounts, these were the 15

18 accounts that were -- that we believed to be the

19 key accounts as it related to vascular business.

20 You notice at the bottom there it says -- well,

21 yeah, that would be my understanding of this

22 document.

23    Q  The left-hand column lists hospitals;

24 does it not?

Page 98

1    A  Yes, it does.

2    Q  And there are a total of 15 hospitals?

3    A  Yes, sir.

4    Q  And do I understand that those are

5 hospitals which Centocor believed were good

6 opportunities to sell Retavase for vascular

7 purposes?

8    A  Yes, sir.

9    Q  Would you agree with me that all of these

10 hospitals are located in Jane Minor's sales

11 territory?

12    A  Yes, sir.

13    Q  Can you identify for me those hospitals

14 which were assigned to Jane?

15    A  I don't recall all of them. I believe

16 she had St. Francis. I'm not sure which

17 Methodist. That's Methodist in Peoria, I believe

18 she had that, as well. I believe she had Owensboro

19 and Barnes, SLUH. I'm not sure about St. Mary's or

20 Deaconess. I believe she had St. John's.

21    I don't believe she -- I don't know about

22 Memorial. I don't believe she had Proctor. I

23 believe she may have had St. John's, Mercy, I

24 believe she had. Iowa Methodist, I believe she

Page 99

1 had. University of Iowa and Boone, I don't believe

2 she had.

3    Q  Was a decision made at some point in time

4 that Memorial in Springfield would not be a

5 targeted account for Retavase for vascular

6 purposes?

7    A  I believe so.

8    Q  What was the reasoning that went into

9 that decision?

10    A  I don't recall the specific. In general,

11 the decisions were based on, you know, once again,

12 input from various individuals. In this example it

13 would have been Michelle Johnson, Michelle Johnson

14 would have, you know, as it related to University

15 of Iowa and Boone -- once again, I don't recall the

16 specifics as to why she wanted those -- but for her

17 overall business, those accounts were deemed

18 important by her.

19    Q  By Michelle?

20    A  And so I would assume that Memorial was

21 deemed, for whatever reason, less important.

22    Q  By Michelle?

23    A  By Michelle.

24    Q  And I guess as we have talked earlier,

Page 100

1 Michelle was responsible for marketing Retavase for

2 heart attacks?

3    A  Right.

4    Q  I would like you to go to exhibits 2, 3,

5 -- 1, 2, 3, 4.

6    A  Okay.

7    Q  And, Tony, for your benefit, I'm not

8 suggesting you had any responsibility for preparing

9 these documents, in fact, I think they may have

10 been prepared by Jane for purposes of this

11 litigation.

12    Exhibit Number 1 is headed: St. Louis

13 Territory Jane Minor; is it not?

14    A  That is correct.

15    Q  Would the hospitals listed on that

16 document appear to accurately reflect Jane's

17 account assignments during the year 2001?

18    MR. BRODERICK: To the best of your

19 recollection, Tony.

20    THE DEPONENT: Yes, to the best of my

21 recollection, it appears accurate.

22    MR. BAKER: Q Do you know why it was Jane

23 assigned St. Joseph Medical Center in St. Charles?

24    A  I do not recall the specifics. Once

Page 101

1  again, I would tell you this was based on input
2  from, in this particular case, I believe it would
3  have been based on input from Michelle Johnson.
4  And this would have been deemed important, for
5  whatever business reasons, important to her
6  business.
7      Q  So it would have been important to the
8  heart attack business?
9      A  Yes.
10     Q  And you don't recall what Michelle told
11  you as to why it would be important?
12     A  No.
13     Q  Do you know why it was Jane was not
14  assigned Proctor Hospital?
15     A  I don't have the numbers from Proctor in
16  front of me.  But if I remember correctly, it is
17  based on the fact that it had had a very low
18  potential for business.
19     Q  For what business, Tony?
20     A  For Retavase business.
21     Q  If you go back to 29 A, Proctor was
22  identified as a good prospect.
23  MR. BRODERICK:  What was the question?
24  MR. BAKER:  Q Tony, do you have Exhibit 29 A

Page 102

1  in front of you?
2      A  I do.
3      Q  Do you see Proctor listed as a good
4  prospect?
5      A  I don't know -- I don't recall how this
6  list came to be.  But if you look at the numbers
7  with Proctor here, it's got 12 -- it looks like 19
8  full kits of business, none of it was Retavase.  I
9  guess what I'm getting at, I don't recall when this
10  was generated if this was generated based on Jane's
11  input of what she thought was her top accounts and
12  therefore we put it on the list or what.  I just
13  don't know.
14         The fact that it's on this list, I would
15  say it doesn't necessarily mean that it is, but
16  with only -- with that type of business, that it
17  was that important.
18         And let me just say that the argument
19  could be made on some of these, certainly some are
20  more important than others for various reasons.  At
21  the end of the day, our primary objective was to
22  secure and grow the cardiovascular business, and
23  that was the overriding consideration for any
24  account that was collected.

Page 103

1      Q  In fact, at St. Joseph's Medical Center,
2  shortly before it was assigned to Jane, you lost
3  the cardiovascular business, did you not?
4  MR. BRODERICK:  Objection to the form of the
5  question.
6  THE DEPONENT:  I don't recall that that
7  occurred before the selection.  I don't recall.
8  MR. BAKER:  Q You don't recall one way or
9  another?
10     A  Correct.
11     Q  But you do recall that that business was
12  lost?
13     A  Yes, sir.
14     Q  I may have asked you this before, at the
15  risk of redundancy I'm going to ask you again.
16         Do you have recollection as to why Jane
17  was assigned the St. Charles, Missouri account,
18  that St. Joseph's Medical Center?
19     A  I don't recall the specifics other than
20  that would have -- once again, the overriding
21  consideration would have been what was important
22  for the overall business.  Sometimes it was there
23  was an opportunity in vascular, sometimes it was to
24  protect certain cardiovascular.  But I don't recall

Page 104

1  the specifics around St. Jo's.
2      Q  Let's go to Exhibit 2.
3      A  Okay.
4      Q  That document is headed:  Houston
5  Territory Caroline Kopecky; is it not?
6      A  Yes, sir, it is.
7      Q  And would that document accurately
8  reflect the accounts Caroline Kopecky called upon
9  during the year 2001?
10     A  I don't recall.  I haven't seen a list
11  from Centocor regarding the Houston territory, so.
12  I certainly recognize some of these accounts, but I
13  couldn't tell you if it's accurate.
14     Q  Let's go to Exhibit 3, it's headed:
15  Dallas Territory Denise -- I think it's supposed to
16  be Bannister Hill, but there is a typo there.  Does
17  that document reflect accurately the accounts
18  Denise called upon during the year 2001?
19     A  I guess I would say once again, these
20  accounts look familiar.  I'm not sure that it's
21  entirely accurate, it may very well may be.
22     Q  That's your old territory, isn't it?
23     A  It is.
24     Q  Any hospitals on that document that don't

Page 105

1  appear to you to be ones that Michelle called on --
2  or excuse me -- that Denise called on?
3      A  Well, all of these hospitals are within
4  the territory, but I don't know specifically if
5  these were the 13 accounts that were given to
6  Denise.
7          You know, it was my old territory, I
8  covered New Mexico, New Mexico is not on here, it
9  may not have been part of Denise's territory, at
10 this time, I don't recall.
11     Q  What hospitals did you call upon in
12 New Mexico?
13     A  I don't recall.  It would have been in
14 the Albuquerque area.
15     Q  Let's go to Exhibit 4.
16     A  Okay.
17     Q  That's headed -- supposed to be headed:
18 Oklahoma City Territory Randy Van Cleave.  Do you
19 have the same document I have?
20     A  Yes, sir.
21     Q  Do you know if the hospitals listed on
22 that document are hospitals Randy Van Cleave called
23 upon during the year 2001?
24     A  Once again, since I didn't create the

Page 106

1  document, these accounts look familiar, they may
2  very well have been his account list, but since
3  it's not the actual account list from Centocor, I
4  can't be certain.  These accounts do follow with
5  his geographic territory.
6      Q  Hold on a second.
7          Randy, can you go to exhibits -- hold on
8  a second.  Can you go to Exhibit 31.
9      A  Okay.
10     Q  Can you tell me what Exhibit 31 is?
11     A  This looks like a list of hospitals in --
12 looks like in Jane's area.  This isn't something I
13 recall ever seeing.
14     Q  Well, if you look at the -- in the
15 left-hand side, there's a fax transmittal that has
16 the name:  William Alexander; do you see that?
17     A  Yes.
18     Q  Do you know who William Alexander is or
19 was?
20     A  I believe he was a regional manager.
21     Q  Was he your predecessor?
22     A  Yes.
23     Q  Will you go to Exhibit 32.
24     A  Okay.

Page 107

1      Q  Do you know what Exhibit 32 is?
2      A  It looks like a list of accounts based on
3  different territories, and I see myself and my team
4  on this list along with others.  This looks like
5  they are representing Cordis products.
6      Q  Have you seen Exhibit 32 prior to today?
7      A  I don't recall.  This probably -- we
8  would get sales reports that were generated from
9  Cordis similar to how you would get things -- I
10 mean we would get two or three months delayed
11 Retavase sales from hospitals, we would also get
12 some delayed results from Cordis.  This looks like
13 a spreadsheet -- an Excel spreadsheet they would
14 have put together.
15     Q  So this would have been prepared by
16 someone other than yourself?
17     A  Correct.
18     Q  And I think I understand that from time
19 to time, you would receive documents like this?
20     A  Yes, sir.
21     Q  And this document, it's your
22 understanding, would reflect activity in the sale
23 of Cordis products?
24     A  Yes, sir.

Page 108

1      Q  Let's go to Exhibit 33, Tony.
2      A  Okay.
3      Q  Have you ever seen a document like that
4  before?
5      A  Yes.  This is a sales roster from
6  Centocor.
7      Q  And that would identify sales
8  representatives who worked as either cardiovascular
9  specialists or vascular specialists?
10     A  Correct.
11     Q  Actually, I guess it's just
12 cardiovascular specialists.
13     A  On this particular sheet, yes, but the
14 entire roster would have had all of it.
15     Q  I think the answer is go to Exhibit 34.
16     A  Okay.
17     Q  And that includes vascular specialists,
18 does it dot?
19     A  It does.  Yes, it looks like a sales
20 force roster prior to myself being employed at
21 Centocor.
22     Q  Sure.
23         Tony, will you go to Exhibit 38 for me.
24     A  Okay.

Page 109

1  Q Have you seen that document before?
2  A Looks familiar.
3  Q The document it headed: Central Region
4  Vascular Sales -- at least I assume that's what the
5  VS stands for -- Territory Changes for Q4.
6  A Yes, sir.
7  Q What does this document tell us?
8  A I'm not sure which Q4 this is referring
9  to. Well, actually, it must be for the end of 2001
10  because it has Denise Hill in here.
11  Q When did Denise join the company?
12  A In March of 2001.
13  Q So would this be the accounts that were
14  assigned as of the fourth quarter of 2001?
15  A I'm sorry, could you repeat that.
16  Q Is Exhibit 38 a roster identifying the
17  account assignments of you and the members of your
18  team as of the fourth quarter of 2001?
19  A That's what it appears to be, yes, sir.
20  Q Let's go to Randy Van Cleave for a moment
21  because he's -- well, let's do this, let's go to
22  you for a moment because back in 2001, you
23  apparently had account responsibilities?
24  A Yes, sir.

Page 110

1  Q As I understand it, you were the person
2  that decided what accounts you would call on?
3  A Well, once again, the process with any
4  account selection would have been -- you know, I,
5  as a manager, had a certain amount of
6  responsibility in creating these accounts, I would
7  look for input from the vascular sales specialist
8  as well as the area managers in the various areas,
9  just as my regional director, who would have final
10  say on any account selection would defer to me for
11  input on what these accounts would be, as well.
12  Q Well, who made the final decision as to
13  what your accounts would be?
14  A I believe that would be Bob Russell. I
15  don't know ultimately if there was somebody
16  internally who would have final say on the accounts
17  or not.
18  Q And did you make a recommendation as to
19  Bob Russell as to what accounts you should be
20  assigned?
21  A Yes, sir.
22  Q And he either approved or disapproved
23  your recommendation?
24  A Yes, sir.

Page 111

1  Q And how did you go about making your
2  recommendation as to accounts you should be
3  assigned?
4  A By input from the vascular sales team.
5  Q How did you get that input?
6  A Let me just say, it would be a
7  combination of that or in certain areas, there was
8  an obvious key customer such as St. Francis in
9  Peoria, there was a national thought leader,
10  somebody who did a lot of research who was
11  certainly by far the largest volume of thrombolytic
12  agent use in the area.
13  Q Is that Dr. Castaneda?
14  A Yes, sir.
15  I mean so certainly there was input from
16  others, namely, the vascular sales specialists.
17  But in certain cases, you know, it was kind of
18  obvious who these accounts would be.
19  Q Why would it be obvious? What skills did
20  you have to call on key accounts, say, that
21  Randy Van Cleave would not have?
22  A Any account that I called on would also
23  be called on by the vascular sales specialist.
24  Q I understand that. But why would you

Page 112

1  call upon these key accounts? What did you bring
2  to the table?
3  A My role would be very similar to, at this
4  point, to what the vascular sales specialist's role
5  was. But I guess in addition to that, it would be
6  just from a management level trying to have a
7  management relationship with key customers, more
8  aware and involved in the inner workings of
9  Centocor, what we were working towards, what our
10  objectives were, what opportunities there were to
11  partnership for scientific symposium or grant
12  requests.
13  Just a number of things, much of which
14  could be, I would say, kind of related to advocate
15  development position. Much of the information that
16  was put out in the marketplace for Retavase was
17  done through speaker programs, and
18  Flavio Castaneda, for instance, was one of our
19  speakers who wanted to make sure we maintained a
20  relationship with him and so that's essentially
21  what I would bring to the table.
22  Q Do you recall how Dr. Castaneda was
23  developed as a proponent of Centocor products for
24  vascular use?