| Page 113 | Page 115 |
|---|---|

**Page 113**

1   A  I believe that was through Jane Minor.

2   Q  Were all of the accounts you were

3 assigned, Tony, considered key accounts?

4   A  Yes.

5   Q  And would a vascular rep be expected to

6 give special care and attention to key accounts?

7   A  Vascular specialists would be expected to

8 call on their account list.  You know, not every

9 customer is treated identically, obviously, for

10 business purposes.  So, yes, there would be some

11 leaning towards of maybe a slightly higher focus

12 for some accounts, but certainly, there's

13 expectation that they call on their account list.

14   Q  How frequently was a vascular specialist

15 supposed to call on key accounts during the year

16 2001?

17   A  As a general rule, I would say that just

18 about everybody in the pharmaceutical industry is

19 typically expected to cover their entire account

20 list in a two perhaps three-week time period.  More

21 important accounts or where there's more activity

22 at certain accounts, perhaps once a week.

23   Q  And you're saying that's a trend in the

24 pharmaceutical industry?

**Page 115**

1 that that is just a standard business practice,

2 certainly at Centocor, and once again I would

3 reiterate, throughout the pharmaceutical industry.

4 So I don't believe there's a company document

5 generated from HR, let's say, part of a job

6 description, but it is an understood general rule.

7     As I became aware that individuals were

8 not covering their territory in a timely manner,

9 then in field contact reports, verbal

10 communication, etc., there was that communication,

11 yes.

12   Q  There was what communication?

13   A  The expectation of a timely account

14 coverage in a two-week time period.

15   Q  You were supposed to cover all accounts

16 in a two-week time period?

17   A  Yes, sir.

18   Q  One of the accounts you listed was --

19 help me with the pronunciation, is it Oshener or

20 Ochsner?

21   A  Ochsner.

22   Q  And that apparently is in New Orleans?

23   A  Yes, sir.

24   Q  Is that a large hospital?

| Page 114 | Page 116 |
|---|---|

**Page 114**

1   A  Those are pretty-well accepted terms in

2 the pharmaceutical industry.

3   Q  Tony, are you sure about that?

4   A  At Centocor.

5   Q  You're reciting changes a bit.

6     Are you referring that that was a

7 practice at Centocor?

8   A  Yes, I am.  I mean Centocor was obviously

9 part of the pharmaceutical industry, that's a

10 general practice, we were considered to be a

11 biotech company, we were slightly more specialized

12 than your average big pharma company.

13     And therefore, you know, you may have a

14 representative at Bristol-Myers Squibb whose got

15 300 doctors, they are not going to call on them

16 every two weeks.  Somebody that has 12 accounts,

17 they are expected to call on that account every two

18 weeks.

19   Q  Is there anything in writing that you're

20 aware of, Tony, that would identify that during the

21 year 2001 Centocor expected its vascular

22 representatives to call on accounts with that

23 regularity?

24   A  I believe -- first of all, I would say

**Page 116**

1   A  It is.

2   Q  Was that a key account?

3   A  Yes, sir, it is.

4   Q  How frequently did you call on Ochsner?

5   A  I don't recall.

6   Q  Did you call on Ochsner every two weeks?

7   A  No, it was not -- a vascular sales team

8 later was not -- I would be working with -- my

9 priorities was to work with each of the

10 individuals.  I stated -- I tried to work with each

11 team member in areas that I would be able to also

12 call on my key accounts, and so generally that was

13 what happened.

14     There were certainly times where an

15 individual was covering non -- all of our key

16 accounts -- let me say, they are calling on other

17 accounts on their account list that are not

18 identified as key accounts, and if I was working

19 with them in that time period, whether it be

20 Houston, or Dallas, or St. Louis, or Denver, then I

21 may not get to that -- one of my key accounts in

22 that time frame.

23   Q  Was Ochsner an account of Carolyn

24 Kopecky?

| Page 117 |
|---|

1    A  Yes, sir.
2    Q  And how frequently was she required to
3  call on Ochsner?
4    A  The expectation was that all individuals
5  cover their territory in a timely manner.
6    Q  What is timely for calling on Ochsner?
7    A  Once again, two weeks as a general rule,
8  two to three weeks.  There's some -- there's some
9  flexibility there.  But every two to three weeks,
10  you're expected to call on your account.
11    Q  So it could be as much as every three
12  weeks to call on a key account?
13    MR. BRODERICK: Objection.  Mischaracterizes
14  his testimony.
15    MR. BAKER: Well, he said it could be up to
16  two or three weeks.
17    MR. BRODERICK: I don't want to make a
18  speaking objection, I will just let it stand.
19    MR. BAKER: Well, I don't want to
20  mischaracterize your testimony, Tony.
21    Q How frequently was Caroline Kopecky
22  supposed to call on Ochsner, was it one week, two
23  weeks, or every three weeks, or something more than
24  that?

| Page 118 |
|---|

1    A  The expectation was that the entire
2  territory be covered in a two to three-week time
3  period.  Most people could accomplish that in two
4  weeks.  Based on travel, there was -- sometimes it
5  was three weeks.
6    Q  What travel needs are you referring to,
7  Tony?
8    A  What I'm saying is if somebody had -- if
9  there was a territory where there was perhaps more
10  travel, than it may take them three weeks to get to
11  all of the outlying accounts.
12    Q  Using Houston as the center of the
13  territory, what was the furthest distance
14  Caroline Kopecky had to travel to call on an
15  account?
16    A  I don't know.  These territories were --
17  the territories were established as part of -- once
18  again, they overlapped the cardiovascular
19  districts, so the boundaries of the territories
20  were already set in place by the company.  So I
21  don't recall ever seeing any documentation that
22  stated how many miles it was from someone's home
23  address to each and every one of their accounts.
24    Q  Let's go to the second page of Exhibit 38

| Page 119 |
|---|

1  and under the hospitals Caroline Kopecky called
2  on.
3    A  Okay.
4    Q  Can we agree that seven of those accounts
5  were in Houston, Texas?
6    A  Yes, sir.  It appears so.
7    Q  And there was one account in Conroe,
8  Texas?
9    A  Conroe, I believe.
10    Q  Where's that?
11    A  In the Houston metro area.
12    Q  And then there were two accounts in
13  San Antonio, Texas; do you know how far San Antonio
14  is from Houston?
15    A  I believe it's roughly a two or
16  three-hour drive but I do not know.
17    Q  And there was one account in Weslaco,
18  Texas; do you know where Weslaco is?
19    A  I don't.  I believe that's somewhere
20  south of Houston, south, southwest, but I don't
21  particularly know exactly where that one's at.
22    Q  What about Harlingen, Texas?
23    A  Harlingen is right near McAllen near the
24  Mexico border.

| Page 120 |
|---|

1    Q  Do you know how far that is from Houston?
2    A  I know it's a flight.  I don't know how
3  far it is.
4    Q  And then there is an account, in fact
5  it's Ochsner in New Orleans?
6    A  Yes, sir.
7    Q  Do you know how far New Orleans is in
8  driving time from Houston?
9    A  I believe it took me about
10  four-and-a-half or five hours to get from
11  New Orleans to Houston.
12    Q  Would Caroline Kopecky's travel records
13  identify the frequency she would have traveled to
14  New Orleans to visit Ochsner?
15    A  Generally the only way I could gauge
16  anyone's activity would be based on expense
17  reports.
18    Q  So the expense report would identify
19  where the sales rep traveled; am I correct?
20    A  Yes, sir, it should.
21    Q  And by looking at Caroline Kopecky's
22  sales reports -- or expense reports, excuse me, in
23  a given month, you could identify the number of
24  times she would have traveled to, say, New Orleans

Page 121

1  to visit Ochsner or to this place down in the
2  Mexico border?
3     A  Correct.
4     Q  And the same would be true with all of
5  your other sales reps on your team, wouldn't it?
6     A  Yes, sir.
7     Q  Getting back to Exhibit 38, do you have
8  any recollection as to how it was that a
9  determination was made as to what accounts should
10  be assigned to Randy Van Cleave?
11     A  That would have been based on the same
12  process for everybody, looking at business
13  opportunities, business needs, input from Randy,
14  input from the cardiovascular manager for the
15  Denver district.
16     Q  So you would have actually then met with
17  Randy and gotten his thoughts and views about what
18  accounts he should call upon?
19     A  Yes.
20     Q  Do you recall any accounts you assigned
21  to Randy that he did not feel would be appropriate
22  or he didn't want to call on?
23     A  I don't recall any.
24     Q  Do you recall any accounts that Randy

Page 122

1  asked to call upon that were not given to him?
2     A  I don't recall.
3     Q  Let's go to Denise Hill.  When she joined
4  the company, she had no prior experience, as I
5  understand it, in selling Centocor products; am I
6  correct?
7     A  Correct.
8     Q  Did she have any prior experience in
9  marketing any heart attack medications or vascular
10  products?
11     A  I don't believe so.
12     Q  Did you get input from Denise about what
13  accounts she should call on?
14     A  No.
15     Q  I'm assuming because she came in with no
16  market experience, you basically told her what her
17  accounts would be?
18     A  Yes.  But by the time -- and I don't
19  remember the exact time -- but knowing she wasn't
20  hired until March, I believe these territories
21  would have already been set in place at that point.
22     Q  You were covering them before Denise
23  arrived?
24     A  Correct.

Page 123

1     Q  Just out of curiosity, how far is
2  Wichita, Kansas from Dallas?
3     A  It's a flight, generally.  I have never
4  --
5     Q  Is there a direct airline flight from
6  Dallas to Wichita, Kansas?
7     A  There is on American airlines.
8     Q  How far is Wichita Falls from Dallas?
9     A  I'm going to guess somewhere between an
10  hour-and-a-half and two hours maybe.
11     Q  And my recollection is that Fort Worth,
12  Plano, and Arlington are all located in the greater
13  Dallas metropolitan area?
14     A  Yes, sir.
15     Q  How far is Austin from Dallas?
16     A  It's about three-and-a-half hours, four
17  hours.
18     Q  And is there air connections directly
19  between Austin and Dallas?
20     A  There is.
21     Q  If we move to the second page of Exhibit
22  38 again to the area that has Caroline Kopecky's
23  assignments, how is it determined what account she
24  would call on?

Page 124

1     A  I'm sorry, it cut out.
2     Q  How did you determine what
3  Caroline Kopecky's accounts would be?
4     A  The process was the same for everyone.
5     Q  So you met with Caroline?
6     A  I likely would have met with Caroline or
7  spoken to her.  And let me just say, in general,
8  based on sales data, there was -- we believe we had
9  a pretty good idea of where people should go, and
10  lists were generated and then people had an
11  opportunity for feedback.  Jane certainly had more
12  feedback than anyone.
13     Q  What do you mean she had more --
14     A  So there was more discussion with Jane --
15     Q  Excuse me.  Tony, excuse me.  This will
16  go a whole lot quicker if you answer my questions
17  directly.  And if there's any point in time you
18  want to add something, just let me know that.
19  Okay?
20     A  Yes, sir.
21     Q  How do you know Jane had more feedback?
22     A  I guess what I meant to say I spoke with
23  Jane more frequently than I did the others.
24     Q  About her account assignments?

Page 125

1  A  Yes, sir.

2  Q  Other than what you testified to earlier
3  this morning, do you have any recollection of any
4  other conversations you had with Jane concerning
5  account assignments?

6  A  I'm not sure I understand.

7  Q  Well, this morning you said you had
8  several conversations with Jane concerning her
9  account assignments, were there any other
10  conversations you recall having with her other than
11  the several you identified this morning?

12  MR. BRODERICK:  I'm going to object to the
13  form of the question as being a little vague.  I
14  don't know how extensively the content of the
15  conversations were covered, but, you know, he
16  identified what he identified.

17  MR. BAKER:  I agree with that.

18  THE DEPONENT:  Are you referring to other
19  topics or just in addition to the --

20  MR. BAKER:  We'll go back and cover it again.

21  THE DEPONENT:  (Continuing)--conversations
22  about the same thing?

23  MR. BAKER:  We'll go back and cover it again.

24  Q  Tell me, if you can, approximately

Page 126

1  when you had discussions with Jane concerning what
2  accounts she should be assigned?

3  A  At the time these lists were generated,
4  once again they were initiated from historical
5  sales data, the district managers had some input
6  into, you know, their thoughts and opinions on what
7  was important to their business, and these lists
8  went out for review for the sales team.

9  Q  Was that in late 2000?

10  A  It would have either been late 2000 or
11  very early in 2001, I don't recall the specific
12  time.  And at that point in time, you know, I was a
13  new manager and certainly would have wanted to take
14  into consideration the thoughts that -- or --
15  thoughts or recommendations from each individual
16  vascular sales specialists, so I did that with each
17  individual as far as E-mailing out the proposed
18  account lists, if there were recommended changes,
19  then those changes would be reviewed and discussed,
20  and some type of decision would have been made.

21  Q  Was that done orally or in writing?

22  A  Well, I would probably say more so
23  orally.  I believe though there were probably at
24  least one if not a couple of E-mails with proposed

Page 127

1  changes and after a discussion may have taken
2  place.

3  Q  Do you recall any such E-mails that were
4  transmitted either from you to Jane or from Jane to
5  you concerning changes?

6  A  I don't recall specifically.

7  MR. BRODERICK:  I'm going to object to going
8  over the same territory.  I mean --

9  MR. BAKER:  John, the reason I'm doing it is
10  because he was changing his testimony, and I just
11  wanted --

12  MR. BRODERICK:  I object to that.

13  MR. BAKER:  I just want to get it nailed down.

14  MR. BRODERICK:  I don't think that's true.  I
15  just think -- you know, you asked the questions you
16  asked, and I think he gave responsive answers.  If
17  the questions didn't elicit particular pieces of
18  information, I don't think he should be locked into
19  saying, without looking at the transcript, if there
20  was anything more to say about this subject.

21  MR. BAKER:  I am trying, that's why I'm going
22  over this again.

23  MR. BRODERICK:  And I don't mean to be
24  disruptive, I'm just saying --

Page 128

1  MR. BAKER:  Well, you are.

2  MR. BRODERICK:  I don't think so.

3  THE DEPONENT:  I apologize if I'm not being
4  clear.

5  MR. BAKER:  All I'm trying to do is determine
6  what conversations you had with Jane that you
7  remember that dealt with her account assignments.

8  THE DEPONENT:  I just recall that there were
9  several discussions about her particular account
10  assignments.

11  MR. BAKER:  Q  And would those discussions
12  have occurred either in late 2000 or early 2001?

13  A  Yes, sir.

14  Q  You recall that Jane went on a medical
15  leave --

16  A  Yes, sir.

17  Q  (Continuing)--sometime in early 2001?

18  Would all of your conversations with Jane
19  relating to her account assignments have occurred
20  before she went on her medical leave?

21  A  Yes, sir.

22  Q  As you sit here today, Tony, do you have
23  any specific recollection of any of these
24  conversations?

Antonio Siciliano

| | |
|---|---|
| **Page 129** | **Page 131** |

**Page 129**

1      A   What I recollect is that there was some

2   disagreement with Jane about certain accounts.

3   Once again, she had 16 in 2000, at the end of the

4   year in 2000. I think we were moving towards 12

5   accounts. Roughly, I would guess eight of those

6   there was pretty good agreement on, and there was a

7   few that Jane wanted, ultimately that she did not

8   get, and some she didn't want that she was not

9   required to keep, and there were several that

10   Michelle Johnson wanted Jane to have and some that

11   Michelle Johnson did not want Jane to have, and

12   there was a compromise on both fronts.

13      Q   If we move to Caroline Kopecky for a

14   moment, do you recall that there were any accounts

15   she wanted that she did not get?

16      A   I don't recall if there were any

17   accounts. I don't recall that.

18      Q   Randy, you said something about going to

19   12 accounts -- excuse me -- Tony, you said

20   something about going to 12 accounts.

21      A   Yes, sir.

22      Q   Can you explain that for me, please.

23      A   I believe there was some type of guidance

24   as to a window, a range of accounts, and so that

**Page 130**

1   number fell within that range. I don't believe we

2   were specifically given the number 12, necessarily.

3      Q   Well, let me ask you this: Were all of

4   the vascular reps on your team given the same

5   number of accounts?

6      A   I don't believe so. I just counted

7   Houston, it looks like there's 15. At the

8   beginning of the year, I don't recall if there was

9   a specific number of accounts or if there was a

10   range. I just realized the document I'm looking at

11   is for the end of the year 2001, and at that point,

12   there had been some changes made.

13      I don't know at the start of 2001 what

14   the requirement or the guidance was from the

15   company, if it was a specific number of accounts or

16   if it was -- or what the window was, if there was a

17   window or a range.

18      Q   Got you.

19      John, it is now 25 after 12:00, and I'm

20   prepared to go on now for a while or prepared to go

21   on until we get done, but I'm also prepared to

22   break, and this will be a logical time for a break.

23      MR. BRODERICK: Why don't we do that, let's

24   break.

**Page 131**

1      (Whereupon a recess

2      was taken.)

3      MR. BAKER: Q   Tony, sometime this morning we

4   talked about account coverage in the vascular

5   group.

6      A   Yes, sir.

7      Q   And just to tighten this down, when you

8   joined -- or when you became a team leader in the

9   vascular group, what was the Centocor policy

10   concerning account coverage or was there one?

11      A   I don't believe there is a written

12   policy, certainly not one I would have ever seen.

13   But in -- I was trying to explain, at least when I

14   was a sales rep, I always covered my accounts in

15   what I believe to be a timely manner, which was

16   roughly two to three weeks, depending on the

17   location of the account. And I also assumed, as a

18   manager, that's how everybody conducted

19   themselves.

20      I did have conversations about this with

21   my regional director, Bob Russell, and his view was

22   the same as mine, and that is you should be

23   covering accounts in that time frame. But he also

24   stressed to me that not everybody had the same view

**Page 132**

1   or work ethic, and that some individuals may not be

2   covering their accounts in a timely manner, which,

3   once again, would be roughly two to three weeks,

4   and therefore, that would require me intervening

5   and coaching that individual on that particular

6   matter.

7      Q   Within your team, Tony, during the year

8   2001, who did you coach about their adequacy or

9   inadequacy in covering accounts?

10      A   I believe everyone. As it became -- once

11   again, as a new manager, I kind of had the

12   assumption that it was a given. I do think it's an

13   expectation in the industry and certainly at

14   Centocor, it was my expectation. It was clear to

15   me, you know, earlier in the year -- early in that

16   year that that was not the understanding -- or that

17   everybody may not have that understanding, and

18   therefore, I tried to communicate that with

19   everybody.

20      Q   Was this done orally, or E-mail, writing,

21   how was it done?

22      A   It was done verbally; it was done, I

23   believe, in some, perhaps all of the field contact

24   reports.

Page 133

1    Q  When a vascular rep during the year 2001
2  called on an account, was there some process they
3  were supposed to follow?  And by that I mean were
4  they supposed to call on a particular person, and
5  what were they to do when they called upon that
6  individual?
7    A  It certainly varied depending on who was
8  doing the vascular procedures and depending on the
9  pharmacy's involvement at that particular
10  institution.  You know, there may have been more of
11  us involved in the pharmacy.  But it would be to
12  call on any or all of those individuals.
13    Q  So you would call on the pharmacies and
14  you would be calling upon the physicians who were
15  doing vascular procedures?
16    A  Correct.  There may be the occasion to
17  participate in meetings with other administrators,
18  that was certainly less common but not unheard of.
19    Q  When they called upon pharmacists, what
20  was the vascular rep supposed to do?
21    A  They would be providing them with
22  clinical information about the product; trying to
23  understand what the formulary process was at that
24  institution; if formulary was important to that

Page 134

1  institution, help to get Retavase on formulary.
2    Q  Now, could they provide to pharmacists
3  information concerning how Retavase could be used
4  in the treatment of vascular disorders?
5    A  Yes.  If it was requested by the
6  pharmacist then we actually would provide them that
7  information.
8    Q  How did you get your sales reps to have
9  the pharmacists make that request?
10    A  Well, we didn't get them to make that
11  request, that was generally -- if you walk into --
12  I mean in any pharmaceutical sales role, your
13  interaction with pharmacy is typically from a
14  knowledge standpoint, you are trying to provide
15  them knowledge about your product.
16      And when you're there with pharmacy,
17  they're going to have, typically, a number of
18  questions for you about, you know -- let's just say
19  a generic example would be a doctor at a hospital
20  wants to use product, pharmacy is aware, either
21  they have or have not used it yet for a vascular
22  procedure, and the pharmacists wants information so
23  they can help guide the physician on the use of a
24  product, as well.

Page 135

1    Q  Why would that have to be done every two
2  or three weeks?
3    A  That in itself wouldn't have to be done
4  every two or three weeks.
5    Q  Would the vascular rep call upon the
6  pharmacist at the hospital every two or three
7  weeks?
8    A  No.  It would depend on what was
9  occurring -- what activity was occurring at that
10  institution.  If you had an institution such as
11  Barnes where there was this interest in converting
12  their catheter clearance business from Activase to
13  Retavase, then there would be more interaction with
14  pharmacy if that was being driven by pharmacy.  And
15  in that regard, you would want to have frequent
16  communication with that individual to support
17  whatever you could in that institution making that
18  decision.
19    Q  Frequent being more frequently than two
20  to three weeks?
21    A  I would say frequently being at least two
22  to three weeks, depending on the scenario, perhaps
23  more.
24    Q  Now, with respect to physicians, should a

Page 136

1  vascular rep, when going to an account every two to
2  three weeks, speak to physicians on those visits?
3  And when I say "physicians," I mean physicians
4  doing vascular procedures.
5    A  Yes.
6    Q  And what would be the purpose of that
7  contact?
8    A  The purpose would be, once again,
9  depending on where the account was and their
10  transition, if they weren't using a product then --
11  let me just frame it as this and take a step back.
12      At this point in time there still was
13  very little knowledge about the use of these
14  products in the marketplace from a
15  published-literature standpoint.  And, in fact,
16  what had been published, to my recollection, was
17  only with our competition, and the results were
18  very bad because the doses were higher than we
19  utility ended up using.
20      So there was a lot of concern about
21  bleeding complications, managing bleeding
22  complications, mixing the drug, storing the drug,
23  different doses for different types of procedures,
24  how long the patient could be on the drug, and this

Page 137

1 was something that was evolving literally the
2 entire time.
3        And people were using -- ended up being
4 able to use smaller and smaller doses and made the
5 product safer and safer, and that obviously was our
6 goal. Having a very large market in heart attack
7 patients, we did not want the product to be used in
8 a vascular procedure creating bleeding -- or having
9 the drug used in a manner that would, perhaps,
10 create a lot of bleeding complications and then
11 tarnishing the reputation of the product for heart
12 attacks and losing that market share and that
13 business.
14    Q  We're talking about the Retavase product
15 now, I take it?
16    A  Correct.
17    Q  Well, here is what causes me some
18 confusion. As I understand it, a vascular rep
19 could not even mention Retavase to a vascular
20 physician unless the physician asked about it?
21    A  Correct.
22    Q  So what would be the purpose of visiting
23 an institution every two or three weeks if the
24 physician had never asked about Retavase?

Page 138

1    A  Well, there was a co-promotion with
2 Cordis, first it was the hydrolyzer in 2000, then
3 it was the neurovascular product line in 2001, so
4 people should have been continually calling on
5 these customers to use these products, as well.
6    Q  But why every two or three weeks to call
7 upon a vascular physician about a Cordis product?
8 I guess my question is why so frequently?
9    A  The reason would be, when you have a
10 dozen or so accounts, we wanted -- you need the
11 frequency to be there because otherwise they will
12 use other products. It's just a fundamental of
13 sale, if you're not calling on these people
14 frequently, then you're not going to get the sale,
15 it's as simple as that. Repetition matters.
16    Q  Even to professional people who are
17 selecting product based upon the quality of its
18 ability to treat patients?
19    A  Absolutely.
20    Q  So you say repetition at the interval of
21 every two to three weeks is important, perhaps even
22 essential --
23    A  Yes, sir.
24    Q  (Continuing)--in marketing Cordis

Page 139

1 product?
2    A  Yes, sir.
3    Q  Was that based upon your experience,
4 Tony, in pharmaceutical sales?
5    A  Was that my experience in pharmaceutical
6 sales?
7    Q  Was your opinion you just expressed based
8 upon your experience in pharmaceutical sales?
9    A  It's based upon my experience and
10 obviously over my time in the industry, both
11 medical devices and pharmaceutical, just the
12 fundamental of sales.
13    Q  As I understand it, you've had roughly
14 presently five or six years of sales experience?
15    A  Including sales management, yes.
16    Q  Tony, I'd like you to pull out Exhibit 6
17 and Exhibit 15 from your stack, if you would.
18    A  Okay.
19    Q  Let's to Exhibit 15 first. That looks
20 like it's an E-mail that you sent to Jane Minor on
21 July 6, 2001; --
22    A  Yes, sir.
23    Q  (Continuing)--am I correct?
24        And the first sentence says: Here is a

Page 140

1 sample routing; do you see that?
2    A  Yes, sir.
3    Q  Now, if you would go to Exhibit Number 6,
4 my question to you, is Exhibit 6 the sample routing
5 that's referred to in Exhibit 15?
6    A  Yes, sir.
7    Q  Prior to July 6 what, if any, discussions
8 had you had with Jane Minor concerning her routing
9 or her customer coverage?
10    A  There were some discussions essentially
11 letting her know that the accounts needed to be
12 covered in a two to three-week time period. And
13 I'd actually asked Jane to complete for me a
14 routing schedule for a two-week routing and a
15 routing schedule for a three-week routing, which
16 Jane never provided me. So I at that point decided
17 to demonstrate to Jane how the territory could be
18 managed in a two-week time period.
19    Q  Are you saying she didn't provide any
20 routing schedule at all or she provided one that
21 did not meet the frequency you required?
22    A  I don't recall ever getting one from
23 her. If I did, it certainly wasn't -- it wasn't
24 what I had asked for.

Page 141

1    Q  Now, with respect to Exhibit 6, did you
2  prepare a similar routing schedule for each of the
3  other vascular representatives on your team?
4    A  No, sir.
5    Q  Why was that?
6    A  Because although routing had come up with
7  other individuals, it was not a persistent problem
8  with other individuals.  This is generally
9  something that most -- a manager would not do from
10  day one, but by July 6, it was evident that the
11  territory was not being covered and would not be
12  covered in a timely manner.
13    Q  So this was a coaching device?
14    A  Yes, sir.
15    Q  You say, and I think I'm quoting you, it
16  became evident that the territory was not being
17  covered in a timely manner?
18    A  Yes, sir.
19    Q  When did that become evident to you?
20    A  When did it become evident?
21    Q  Sure.
22    A  It became evident after conversations
23  with Jane.
24    Q  When?

Page 142

1    A  It became evident after reviewing expense
2  reports, which aren't a perfect system, but it was
3  the best tool I had at the time.
4    Q  And what prior to July 6, 2001, what was
5  your understanding about the frequency Jane was
6  covering her accounts?
7    A  My understanding was some accounts she
8  was covering with a very, very high frequency.
9    Q  Such as?
10    A  St. Francis and I think some account in
11  Springfield.  And some accounts there was no
12  coverage at all, as best as I could determine.
13    Q  What accounts were those?
14    A  I believe the accounts in Iowa and
15  Kentucky.
16    Q  So your testimony is she never covered
17  the Iowa account -- accounts at all?
18    A  My testimony is I don't recall that she
19  ever covered it, if she did, it was certainly not
20  on any type of regular basis.
21    Q  When you say a regular basis, you mean
22  every two or three weeks?
23    A  Yes.
24    Q  Tony, if I wanted to look at some

Page 143

1  documents that would identify not only Jane's
2  coverage of accounts but also the coverage of other
3  vascular representatives on your team, would their
4  expense reports be the best information that could
5  identify that for me?
6    A  I believe so.
7    Q  You just saved yourself three hours of
8  testimony going through expense accounts.
9      Let's go to Exhibit Number 6 then.
10    A  Okay.
11    Q  Can you tell me what your thought process
12  was in preparing that document?
13    A  Prior to myself generating this document,
14  I had some conversations with Jane about covering
15  the territory on a more frequent basis, trying to
16  get her to manage the territory in a two to
17  three-week time frame.
18      And after having those discussions with
19  Jane -- and once again, I don't recall she ever
20  gave me anything, if she did, it wasn't what I had
21  asked for.  So my purpose with this was to just
22  demonstrate that the territory could physically be
23  covered without great difficulty in a two to
24  three-week time period, and for this document, it's

Page 144

1  in a two-week time period.
2      And I would also just add, it's not a --
3  it's not standard practice for a pharmaceutical
4  sales rep to take an office day or to take part of
5  their day as an office day.  I was able to pertain
6  concerns about needing to do a certain amount of
7  administrative work.  I was able to create this
8  document including that as part of a working day,
9  an office day.
10    Q  I see that.
11      Typically, when a rep calls upon a
12  physician -- or a vascular rep, do they do it by
13  appointment?
14    A  It varies.  It would either be by
15  appointment or depending on relationships and
16  hospital policy that they just show up.
17    Q  Would you agree with me that typically a
18  marketing rep for a pharmaceutical company has to
19  fit into the physician's calender rather than the
20  physician fitting into the marketing rep's
21  calendar?
22    A  For the sales representative?
23    Q  Sure.
24    A  You said marketing rep.

Antonio Siciliano

## Page 145

1  Q  I'm sorry.  I was using the terms
2  interchangeably.
3  A  Yes, obviously if an appointment is
4  required, you know, you have to rely upon the
5  physician -- the physician or the hospital
6  schedule.
7  Q  How did you factor-in a physician's
8  availability in preparing this routing schedule?
9  A  These are not specific to any one
10  physician, they are specific to the hospital.  And
11  it mentions on there pharmacy and specials.  There
12  is generally at least one or more contacts in
13  pharmacy that you might call on.  And there is, in
14  most of these institutions, if not all of them,
15  there certainly is more than one interventional
16  radiologist.
17       So although you might not be able to get
18  a particular physician on any given one day, you
19  should be able to get some physician.  And once
20  again, this was just to demonstrate you could
21  physically cover the territory in a timely manner.
22  This is something --
23  Q  Working how many hours a day?
24  A  Representatives are expected to work a

## Page 146

1  full eight hours a day.
2  Q  And you're saying that following this
3  schedule would only require eight hours a day?
4  A  No.  I'm saying representatives are
5  expected to work at least eight hours a day.  They
6  are expected to work as many hours in the day as
7  they need to accomplish their sales objectives.
8  Q  Did you give any thought consideration as
9  to how many hours on average per week would
10  realistically be required to perform this two-week
11  routing schedule?
12  A  My focus wasn't how many hours in the day
13  they would actually have to do this.  The position
14  is a sales position, and the understanding for a
15  sales position is you actually perform the
16  functions of the job in whatever time it takes for
17  you to complete that task.
18  Q  So you didn't factor-in how much time
19  would be required?
20  A  No.  I don't believe time was the focus
21  of my -- was the focus when I generated this
22  document.
23  Q  I would agree with that assessment.
24       As I am interpreting this document, Tony,

## Page 147

1  Jane would be required to visit many, in fact,
2  perhaps, all of her St. Louis area accounts each
3  week?
4  A  Correct.
5  Q  And that would include St. Joseph
6  Hospital?
7  A  Correct.
8  Q  Why was it that you wanted Jane to cover
9  St. Joseph Hospital weekly?
10  A  St. Louis was, I think you referred to it
11  as the hub of the territory before, it was the hub
12  of the territory, it is where there was more
13  opportunity, and therefore, it would require more
14  time spent.
15  Q  What was the opportunity you thought
16  existed at St. Joseph's Hospital?
17  A  I don't recall the specifics to
18  St. Joseph's, I just recall that St. Louis was a
19  focus of the territory, and it's a larger
20  metropolitan area, it's where there is more
21  business throughout, and the impact -- and I wasn't
22  looking specifically at St. Jo's, I don't recall
23  what health system it was in, but there were times
24  where market share of a product greatly impacts the

## Page 148

1  overall business at a hospital, and sometimes if
2  it's part of the health system, that market share
3  at that hospital impacts the health system,
4  therefore, it impacts whether or not that product
5  is going to be used throughout the health system.
6       And so these types of considerations is
7  what's made in determining the target list, and
8  priorities, and focus, along with, you know, if
9  there are more challenges.  And I think at this
10  time --
11  Q  What were the health systems you were
12  referring to in the St. Louis area?
13  A  I don't recall the health systems.
14  Q  Do you recall that St. John's Hospital in
15  Springfield was a part of a health system?
16  A  I don't recall if it was or not.
17  Q  It had approximately eight hospitals that
18  are a part of that system?
19  A  I don't recall.  We had health system
20  account managers, that was their area of expertise.
21  Q  Then why were you concerned --
22       What was the health system's significance
23  of weekly coverage?
24  A  The hospital's business within the health

Page 149

1 system would impact the health system's discount on
2 refund. I can't think of the proper name, but
3 whatever it was. You know a hospital in a health
4 system could impact the overall cost of
5 thrombolytics at that health system for every
6 hospital in that system.
7        So some hospitals may not have had as
8 much business as others, but may have had more
9 influence because they were part of an important
10 health system. Some hospitals were more important
11 just based on the fact they had more volume of
12 thrombolytic agents and therefore was a focus.
13    Q As I see the schedule you have
14 constructed, at least with respect to two hospitals
15 in St. Louis, Barnes and St. Louis University
16 Hospital, you contemplated that Jane would spend a
17 half day each week at each hospital?
18    A Say that again.
19    Q It looks like with respect to Barnes,
20 St. Louis University Hospital, and St. John's and,
21 St. Louis Hospital, and I guess St. Joseph's
22 Hospital, as well, you anticipated that Jane would
23 spend a half a day each week at each hospital?
24    A Correct.

Page 150

1    Q And during that half day, what would she
2 be expected to do at each hospital?
3    A She would be expected to perform the
4 functions of her job which would be to sell the
5 Cordis co-promotion products and to -- once again,
6 when you are in there, there's a high demand in the
7 marketplace for information on Retavase, and the
8 market was rapidly changing, it was to be able to
9 discuss what we had learned as a company about the
10 use of the product in vascular applications, to
11 talk to the physician about their concerns,
12 whatever to address whatever.
13    A lot of it is also establishing
14 relationships. People buy from who they like. And
15 if you're not there, they don't know you, they're
16 not going to buy from you. As strange as that
17 might sound, because doctors are professionals, it
18 is the reality. And some drug companies have
19 obviously gone to multiple reps calling on the same
20 doctor.
21        So there is plenty to do, some of it
22 would be to spend time in a special procedures lab,
23 get to know the people in the lab, find out what
24 their issues are, talk to them. You may spend a

Page 151

1 couple hours in the lab, and there may be no actual
2 procedures there that use your product. Sometimes
3 you would wait around to try and do a procedure.
4 So there are a number of different things that one
5 could do in that time frame.
6    Q Did you ever ask Jane Minor her thoughts
7 concerning what would be the best frequency to
8 cover accounts?
9    A I had asked her for a routing schedule,
10 and I don't recall whether or not she provided me
11 with one, my recollection is she did not, or if she
12 did, it was not what I had asked for.
13    Q Did you ever ask her what her view was
14 concerning how frequently she should call some
15 accounts?
16    A I don't recall if we had that
17 conversation.
18    Q Tony, do you know how many year's
19 experience Jane had in pharmaceutical sales in
20 2001?
21    A I don't recall. I know she provided me
22 with her resume at one point early on. But I don't
23 recall. I would guess that maybe ten years, maybe
24 longer.

Page 152

1    Q Would you guess maybe 25?
2    A I don't know.
3    Q Do you know how much experience she had
4 in marketing vascular products prior to January 1,
5 2001?
6    A No.
7    Q Do you know how much experience she had
8 in developing a relationship with Dr. Castaneda
9 prior to 2001?
10    A No.
11    Q We talked this morning about a hospital
12 in New Orleans, I think it was called Ochsner?
13    A Yes, sir.
14    Q Was Ochsner an important account for
15 purposes of the activities of your team?
16    A That was an account that I -- it was one
17 of my account targets so it was an important
18 account, that was one of my key accounts.
19    Q Was that --
20        Was Barnes a more important account than
21 the Ochsner account?
22    A Well, the Ochsner account was in a
23 different territory. Every territory -- there may
24 be one territory that has four accounts that are --

Page 153

1 have greater potential or have more impact on the
2 overall business than ten accounts in another
3 territory.
4     I don't recall the specifics behind
5 Ochsner, and I don't recall the specifics behind
6 Barnes other than they are both important accounts.
7     Q  Was the Ochsner account important enough
8 so that it should have had weekly coverage?
9     A  No.
10     Q  Why not?
11     A  Because in the Houston district, there
12 was so much more business in the Houston metroplex,
13 and there was a representative who came over from
14 cardiovascular who knew that business very well.
15 There was more business to gain in the various
16 hospitals in the Houston metro area than there was
17 to gain at Ochsner.
18     Q  What was the frequency you expected Ms.
19 Kopecky to call upon Ochsner?
20     A  I expected all representatives to cover
21 their territories in a two to three-week time
22 frame.
23     Q  So at least once every three weeks?
24     A  Yes.

Page 154

1     Q  Were there any accounts that
2 Caroline Kopecky had that she was required to cover
3 weekly?
4     A  There are -- I don't recall specifically
5 I'm certain that there would have been some
6 accounts she called on -- or needed to call on
7 weekly.  I guess I will leave it at that.  I don't
8 recall the specifics.
9     Q  Why don't you go back to Exhibit 38.
10     A  Okay.
11     Q  Go to the second page under
12 "Caroline Kopecky," there are a list of her
13 accounts, I think we talked about that this
14 morning.
15     A  Yes, sir.
16     Q  Can you identify which of those accounts
17 was important enough so she should have called upon
18 it weekly?
19     MR. BRODERICK:  I'm just going to object to
20 the time frame.
21     MR. BAKER:  2001.
22     MR. BRODERICK:  I'm just going to make that
23 objection and not say anymore.
24     MR. BAKER:  Well, I want to resolve your

Page 155

1 objection, John, what is it?
2     MR. BRODERICK:  I think that represents the
3 accounts for -- you know, I think he testified that
4 the accounts manager changed from quarter to
5 quarter, and this document -- the document purports
6 to show a list for Q4 2001, that's what I guess
7 we're assuming.  So I am just going to say -- I
8 don't know what's going to -- some of these
9 accounts you may not have had through all of 2001.
10 Subject to that, he can talk about that.
11     MR. BAKER:  Q Tony, do you know if
12 Caroline Kopecky through the year 2001 had
13 generally the same accounts.
14     MR. BRODERICK:  Objection.  Vague.
15     THE DEPONENT:  I don't know specifically.  I
16 can tell you there certainly are a number of
17 accounts on this list she likely would have had all
18 year.
19     MR. BAKER:  Q With respect to the accounts on
20 the list that she would have likely had all year,
21 are you aware of any she was supposed to call on
22 weekly?
23     A  You know what, I apologize, but too much
24 time has passed.  I don't recall what those

Page 156

1 accounts would have been.
2     Q  Would there be anything in writing that
3 would tell me, E-mails to her, something in your
4 field reports?
5     A  I don't think so.  You know typically,
6 sales representatives are going to manage their
7 territory.  As a manager you try and coach them on
8 that process, it's generally not done to the level
9 of detail that it was for Jane because over time
10 there appeared that there wasn't a coverage in
11 several accounts.
12     This, as I mentioned, the document,
13 Exhibit 6 was not created for any other individual,
14 there were certainly conversations with other
15 individuals about --
16     Q  Can we agree then, Tony, just to make
17 this simple, that Jane was the only sales rep that
18 you required to at least weekly call on certain
19 accounts?
20     A  No, sir.  No.
21     Q  What other sales reps did you require
22 call weekly on certain accounts?
23     A  Everybody was supposed to call on
24 business that they thought and felt was key to

Page 157

1 their overall business on a weekly basis and cover
2 the entire territory in a two to three-week basis.
3     Q  What hospitals was Randy Van Cleave
4 required to call upon on a weekly basis?
5     A  Essentially everybody would have been
6 required to call on their most important accounts,
7 accounts where there was more activity at that
8 time, to call on those people once a week if
9 possible.
10     Q  Well, just going back to
11 Randy Van Cleave, give me the name of one hospital
12 that he was supposed to call on weekly?
13     A  I don't remember.
14     Q  With respect to Denise Hill, give me at
15 least one hospital that she was required to call
16 upon weekly?
17     A  I don't remember.
18     Q  Caroline Kopecky, what hospital was she
19 required to call upon weekly?
20     A  I don't remember.  I wouldn't have
21 remembered Jane either, there's a document to
22 obviously show me what was discussed.
23     Q  How did you become aware that there was
24 an inadequacy in Jane's account coverage?

Page 158

1     A  Once again, from conversations I had with
2 Jane, reviewing expense reports, and then some
3 general feedback that I had received from other
4 individuals.  I don't know -- I can't recall the
5 specific --
6     Q  Who were the individuals you received
7 feedback from?
8     A  That would have been Michelle Johnson.
9     Q  What did Michelle tell you?
10     A  I don't remember specifics other than
11 there was the thought that territory was not being
12 covered on a regular basis, i.e., two to three --
13 the entire territory being covered in a two to
14 three-week time period.
15     Q  How would Michelle know that?
16     A  Everywhere Jane goes or should have gone
17 to, there was a cardiovascular rep responsible for
18 that same area, and these individuals should have
19 been coordinating their efforts together.  Because
20 in some instances they are calling on the same
21 customers, it is a standard business practice, and
22 common courtesy, and to minimize confusion to the
23 customer to coordinate your timing on those
24 customers.

Page 159

1         So based on that, certain sales rep, I
2 imagine, may have given feedback to Michelle and
3 therefore Michelle had given me feedback.
4     Q  Do you recall anything about what
5 Michelle told you?
6     A  Just that the coverage was not in a
7 timely manner, in a two to three-week time period.
8 And the general sense.  I don't recall any
9 specifics.
10     Q  When did she tell you that?
11     MR. BRODERICK:  Did you say "when," Jim?
12     MR. BAKER:  Yes.
13     THE DEPONENT:  I don't recall.  Sometime
14 obviously during the --
15     MR. BAKER:  Let's do it this way, Tony, --
16     MR. BRODERICK:  He didn't finish his answer.
17     MR. BAKER:  I'm sorry.
18     THE DEPONENT:  I think, and I don't know for
19 certain, I think I may have been given some of that
20 feedback prior to the first of the year of 2001.
21 But certainly sometime throughout that year, that
22 feedback was given to me.
23     MR. BAKER:  Q  Would you agree with me, Tony,
24 that sometime in February of 2001, Jane went on a

Page 160

1 medical leave?
2     A  Yes, sir.
3     Q  Would you also agree with me that you had
4 been supervising Jane for approximately six weeks
5 at the time she went on a medical leave?
6     A  Yes, sir.
7     Q  Prior to her going on a medical leave,
8 did you ever have any conversations with Jane
9 concerning the adequacy of her account coverage?
10     A  I don't believe so.  I don't recall.
11     Q  And prior to Jane going on medical leave,
12 do you recall having any conversations with
13 Michelle Johnson about the adequacy of Jane's
14 account coverage?
15     A  I don't recall.  I know I received
16 feedback from Michelle, I don't recall if it was
17 prior to that or after.
18     Q  In reviewing Jane's expense reports, for
19 the time period before she went on medical leave,
20 did you come upon any information that caused you
21 to believe her account coverage was not adequate?
22     A  I don't recall if I received any expense
23 reports prior to Jane going on medical leave.
24     Q  Now, can we also agree that sometime in

Page 161

1 late April 2001, Jane returned from medical leave?
2   A Yes, sir.
3   Q So she would have worked two full months
4 and perhaps two additional weeks between the time
5 she returned from medical leave and the time you
6 sent to her your two-week coverage schedule?
7   A Yes.
8   Q Now I want to talk with you about this
9 time period of roughly ten to 12 weeks, I guess.
10 When was it during that time period that you began
11 to develop a concern that Jane's account coverage
12 was not adequate?
13   MR. BRODERICK: You dropped out there.
14 Sorry. Could you repeat the question?
15   MR. BAKER: Sure.
16      Q During the time period between April
17 when Jane returned and July when you wrote -- or
18 sent her the account coverage, when was it you
19 began to develop a concern that her coverage was
20 not adequate?
21   A I don't recall. It would have been
22 obviously prior to the 6th of July. But I don't
23 recall when that would have occurred.
24   Q Prior to July 6, do you have recollection

Page 162

1 of having any conversations with Jane verbalizing
2 your concern about the adequacy of her account
3 coverage?
4   A I believe, yes. There was at least one
5 conversation I recall discussing two programs that
6 Jane had set up, educational programs, evening
7 programs with physician speakers. And at the time
8 that the one program was carried through and one
9 program was canceled, at some date later than that,
10 I had learned that either the -- in regards to the
11 one that was canceled, I learned Jane had never
12 actually physically visited the account based on --
13 I think based on expense reports and Jane --
14   Q A what account was that, Tony?
15   MR. BRODERICK: What was the question?
16   MR. BAKER: Q What account was that?
17   A It was two accounts in Iowa, Des Moines.
18      And then there was a very poorly attended
19 account in Evansville, Indiana. So because of that
20 situation, there was a conversation about account
21 coverage, and that was at least one conversation
22 that we had.
23   Q Actually, let me do something, Tony.
24 Just for reference, can you go to Exhibit 9.

Page 163

1   A Yes, sir, I've got it.
2   Q Is that a Centocor field contact report
3 form?
4   A Yes, sir, it is, for Jane Minor.
5   Q And what's the date on it?
6      Did you hear my --
7      What's date on it, Tony?
8   A April 24 of '01.
9   Q And that's a document you prepared, I
10 assume?
11   A Yes, sir.
12   Q And as I look at this document, it
13 appears it was prepared at about the time Jane
14 returned from her sick leave?
15   A Correct.
16   Q If you go down to the section marked:
17 Critical objectives.
18   A Okay.
19   Q You wanted Jane to schedule dinner
20 programs for Dr. Castaneda in both Evansville and
21 Des Moines?
22   A Correct.
23   Q And were those the things that -- the
24 event you referred to a moment ago?

Page 164

1   A Yes, sir.
2   Q And it looked like the Des Moines program
3 was to be scheduled prior to the end of June; is
4 that correct?
5   A Yes.
6   Q And the Evansville program was to be
7 scheduled late May or early June?
8   A Yes.
9   Q What happened with the Des Moines
10 program?
11   A I believe Jane had canceled the program.
12   Q And do you know why it was canceled?
13   A There was actually two programs, one was
14 a lunch at one hospital and a dinner program for
15 the other hospital. My understanding from Jane was
16 that the two different hospitals' physicians did
17 not get along, doing one program for both groups
18 was not conducive.
19      I believe at the time that it was
20 canceled the reason was that the group at one
21 hospital had broken up where the dinner program was
22 going to occur. There was never -- I don't believe
23 or I don't recall there was a reason for cancelling
24 the lunch program. If I'm not mistaken the

Page 165

1  response that the company that tracks and operates
2  these programs for us was zero response from these
3  physicians involved.
4      Q  What group -- who was that that did that?
5      A  We have used a couple of different
6  vendors, but I believe at this time the company's
7  name was Pharmedica.
8      Q  Is there anything in writing that
9  reflects that, Tony?
10     A  They should have something, I don't.
11     Q  They never sent you anything?
12     A  I don't recall.  I don't know if it was a
13 conversation with them or if it was discussion with
14 Jane or exactly what information I had at the time.
15     Q  Let's go -- can you refer to Exhibit 78
16 and 79.
17     A  Okay.
18     Q  Have you seen Exhibit 78 before?
19     A  I don't recall if I ever saw an
20 invitation.
21     Q  That document appears to be an invitation
22 to an event on the evening of June 7, 2001 at the
23 "Flash" seafood restaurant in Des Moines?
24     A  Yes, sir.

Page 166

1      Q  Now, was there another event scheduled
2  for Des Moines other than this event?
3      A  My understanding is that Jane had
4  scheduled a lunch appointment to have Dr. Castaneda
5  come in and speak with the other physicians at the
6  other hospital.
7      Q  The reason I ask, her directive on
8  Exhibit 9 was to scheduled a dinner program with
9  Dr. Castaneda in Des Moines, there's nothing about
10 scheduling a luncheon.
11     A  Correct.  That was Jane's determination
12 based on information she had that was -- once
13 again, these physicians at these two different
14 hospitals did not have a good relationship, and so
15 instead of flying in Dr. Castaneda to meet with
16 just one of the two groups, many times we would try
17 and get the speaker to other locations, and Jane's
18 initiative was to bring them into the other account
19 in Des Moines for lunch.
20     Q  So Jane was going above and beyond what
21 you directed her to do?
22     A  I'm not sure if I would phrase it as
23 such.
24     Q  Well, there's nothing in Exhibit 9 about

Page 167

1  her scheduling a luncheon as well as a dinner, is
2  there?
3      A  No.
4      Q  And scheduling the luncheon was Jane's
5  idea, not yours, wasn't it?
6      A  The dinner program for Des Moines was to
7  get Dr. Castaneda to speak to both key accounts in
8  Des Moines, and Jane's solution of doing a luncheon
9  and dinner certainly satisfied the requirement of
10 scheduling a dinner program with Dr. Castaneda in
11 Des Moines.
12     Q  Actually, it was more than scheduling a
13 dinner program.
14     A  Okay.  The intent of doing a dinner
15 program in Des Moines is not specific to one of the
16 institutions so it would be to do it for both
17 institutions.  Because there was the unique
18 situation of hostility between two different
19 accounts, the solution to that was to bring in
20 somebody for lunch and to do a dinner program.
21 Doesn't really require more effort or more work on
22 one's part.
23     Q  It doesn't.
24         Who made the arrangements for each event?

Page 168

1      A  The vascular sales specialist has a role
2  in scheduling these events, they initiate paperwork
3  for Pharmedica and Pharmedica puts the program
4  together.  If you note, the invitation comes
5  directly from the company, Pharmedica, they manage
6  the process.
7      Q  And Pharmedica in doing it coordinates
8  all the arrangements with the vascular rep?
9      A  No.
10     Q  They don't?  If Jane said she disagreed
11 with you, are you saying she's wrong?
12     A  I'm saying the policy wasn't that the
13 vascular sales specialist is supposed to set up the
14 program, the company was supposed to set up the
15 program.  Sometimes the sales representatives
16 wanted to influence where the program was to be
17 held so they may have communicated that to
18 Pharmedica and Pharmedica secured the site, that
19 may have occurred.
20         I'm not saying that individuals didn't
21 have some role in that, I'm just saying Pharmedica
22 -- we were paying Pharmedica a significant amount
23 of money to manage the process, to select a site,
24 to set everything up for the speaker, to arrange

Antonio Siciliano

**Page 169**

1  travel.
2      Some people, some sales specialist,
3  because their position might be involved with the
4  speaker, they may want to have a bigger role in
5  some of that, but that is the responsibility of
6  Pharmedica.
7      Q  Would Jane have a better idea than you,
8  Tony, what she actually did with respect to the
9  Des Moines events?
10     A  I would imagine she would.
11     Q  Go to Exhibit 79.
12     A  Okay.
13     Q  Have you seen that document before today?
14     MR. BRODERICK: Objection of any discussion
15  about it. Attorney/client privilege. With that
16  instruction -- I guess I will just be clear --
17     MR. BAKER: I will rephrase the question.
18     MR. BRODERICK: Okay.
19     MR. BAKER: Q Tony, other than any
20  discussions you've had with Mr. Broderick either
21  yesterday or today, have you seen this document
22  before?
23     A  I don't remember if I ever saw this
24  document.

**Page 170**

1      Q  You may have, you may not have?
2      A  Correct.
3      Q  That document contains an explanation as
4  to why the doctors at Methodist Hospital could not
5  attend the event at the Flash restaurant; am I
6  correct?
7      A  Yes, sir.
8      Q  Is that consistent with the
9  understandings you had in June of 2001?
10     A  Yes, sir.
11     Q  And did you further understand that with
12  the cancellation of the Methodist doctors, there
13  was still supposed to be an event in Des Moines?
14     A  I'm sorry, could you repeat the question.
15     Q  Did you have an understanding that even
16  in the wake of the cancellation by Methodist that
17  Jane was still supposed to go ahead and have an
18  event with Dr. Castaneda in Des Moines?
19     A  I think that would have been desirable.
20  I believe when Jane canceled it, she canceled it
21  across the board.
22     Q  Did she talk with you about cancelling
23  it?
24     A  Yes, she did.

**Page 171**

1      Q  And do you recall what she said?
2      A  She told me the group had split and they
3  needed to cancel the program.
4      Q  And cancelling the program meaning the
5  entire Des Moines program?
6      A  Cancelling -- yeah.
7      Q  And you approved that?
8      A  I'm sorry.
9      Q  And you approved that?
10     A  I disagreed.
11     Q  Did you tell her you disagreed?
12     A  In this conversation, we were discussing
13  the cancellation, and I was trying to explain to
14  Jane that there was a very legitimate reason to
15  cancel the program. My issue with Jane about
16  cancelling the program was not the actual
17  cancellation but the fact that what I had learned
18  from her that she had not physically been to
19  Des Moines that she had done this over the phone,
20  that that was not the appropriate way to manage the
21  situation.
22      As a tenured rep, you mentioned 25 years
23  of experience, she should have known you actually
24  have to physically be there to engage these

**Page 172**

1  customers to sign up to go to the program, that's
2  the real role of what a sales specialist has in
3  driving attendance, getting their customers to
4  actually attend to respond to Pharmedica's
5  invitation.
6      And my disagreement with Jane about the
7  cancellation -- or about the Des Moines program was
8  the lack of initiative on her part in driving that
9  attendance. If the program -- if the group hadn't
10  broken up, we still -- there was no or very little,
11  to my recollection, RSVPs at that point in time so
12  it would have been an unsuccessful program.
13     Q  Would you agree with me that usually
14  doctors don't submit RSVPs?
15     A  No.
16     Q  You don't?
17      So it's been your experience in your
18  two-and-a-half years as a sale rep by the summer of
19  2001 that doctors normally did give RSVPs?
20     MR. BRODERICK: I'm going to object to
21  relevance. He can answer.
22     THE DEPONENT: I'm not sure what your question
23  is in a sense that overall, there may be 200
24  invitations sent out in a large metroplex like

Page 173

1 Dallas, and maybe only 20 reply. So in that
2 regard, yes, many don't respond which is why the
3 rep is there to drive attendance.
4     However, the 20 that do respond, that is
5 generally the bigger piece of who shows up. There
6 is a small percentage of doctors that show up that
7 did not reply. I'm not sure what you're trying to
8 get at, but that does occur.
9     If you get 20, you might expect ten to
10 show up, you might expect 30 to show up, you may
11 end up getting extra, you may get some fallout, a
12 lot of that depends on what the rep does on the
13 ground in the city that the program is occurring
14 in.
15   MR. BAKER: Q Do you know how many
16 interventional cardiologists, interventional
17 radiologists, and vascular surgeons practiced in
18 Des Moines in June of 2001?
19   A I don't recall.
20   Q Let's go then to the Evansville program;
21 did that take place?
22   A Yes, sir, it did.
23   Q And, in fact, you attended that program,
24 did you not?

Page 174

1   A I did.
2   Q And I believe you and Jane traveled with
3 Dr. Castaneda from St. Louis to Evansville?
4   A Yes, sir.
5   Q Do you recall what the weather was like?
6   A I think it was raining.
7   Q What was the attendance like at the
8 Evansville program?
9   A Poor. There were three people there, not
10 including myself and Jane. I believe one of those
11 three was a spouse.
12   Q So there --
13   A Two customers.
14   Q Two actual customers?
15   A Yes, sir.
16   Q Was there also a pharmacist there?
17   A I believe one of the two was a
18 pharmacist.
19   Q Could there have been two doctors and a
20 pharmacist there?
21   A I don't recall specifically. I thought
22 one of the three was a spouse, I may be wrong.
23 Even at three, it was poorly attended.
24   Q These physicians were all from St. Mary's

Page 175

1 Hospital, were they not?
2   A I don't recall.
3   Q Do you recall getting business from
4 St. Mary's Hospital after this event?
5   A I don't recall the specifics behind that.
6   Q Do you recall how much business you had
7 gotten from St. Mary's prior to this event?
8   A No, I do not.
9   Q Would you agree with me that, at least at
10 some point in time, St. Mary's became a customer of
11 the vascular products of Retavase?
12   A I don't recall.
13   Q You don't recall one way or another?
14   A I don't.
15   Q Did you keep track of the trends of
16 customers in your territory, Tony, while you were
17 the team manager?
18   A I had access at the time to the sales, so
19 I would have had that information at the time.
20   Q If Jane Minor were to say that Retavase
21 -- or that St. Mary's became a customer, would you
22 be in a position to disagree with her?
23   A I'm sorry, the phone cut out.
24   Q If Jane were to say that St. Mary's

Page 176

1 became a customer of the vascular products of
2 Centocor during the period of time she worked on
3 your team, would you disagree with her statement?
4   A I wouldn't agree or disagree, I would
5 want to look at the sales, the sales may very well
6 support that, I just don't recall.
7   Q Okay. That's fair.
8   A And I haven't reviewed that document so I
9 can't make that determination.
10   Q Tony, going back to Exhibit Number 9, can
11 we agree that there is nothing in Exhibit 9
12 identifying your expectations of Jane with respect
13 to her account coverage?
14   A Correct.
15   Q And if there had been a problem by April
16 24, 2001 in your mind, about account coverage, is
17 that something you would have put in this report?
18   A I would have if that was my assumption at
19 the time, correct. At this point in time, Jane had
20 not been in the field that much so I think I had
21 gotten some feedback from Michelle Johnson
22 regarding this issue, but my goal was to, as I
23 think I tried to convey in this document, that this
24 is essentially kind of a fresh start, let's move

Page 177

1  forward, and let's get the job done, and that was
2  the driving force behind section four.
3      Q  If we go back to the critical objectives,
4  you wanted Jane to make an initial contact at
5  St. Joseph's to determine business opportunities?
6      A  Yes, that's what it says.
7      Q  And that's the account in St. Charles,
8  Missouri; if I'm correct?
9      A  I believe so.
10     Q  Did Jane do that?
11     A  I believe she did but --
12     Q  How did she report back to you about
13 business opportunities at St. Jo's?
14     A  I don't recall specifically.  Generally
15 there would have been phone conversations and
16 E-mail.
17     Q  Do you recall one way or another what her
18 assessment was about how good a business prospect
19 St. Jo's was?
20     A  At some point in time, there was an issue
21 at St. Jo's with the director of I believe it was
22 ICU or critical care, I don't recall the specifics
23 as far as what the issue was, what the obstacle was
24 we faced, but I do recall that there were some

Page 178

1  barriers at that account, which is not uncommon in
2  sales.
3      Q  Do you recall that St. Joseph's
4  discontinued using Retavase for heart attacks?
5      A  That sounds correct.  I don't recall
6  when.
7      Q  Tony, you indicated that you developed a
8  concern about account coverage in part based upon
9  discussions with Jane?
10     A  Correct.
11     Q  Do you recall when these discussions
12 occurred and what the nature of the discussions
13 were?
14     A  Around the time frame that the program in
15 Evansville was poorly attended and the program in
16 Des Moines was canceled, shortly thereafter
17 Dr. Castaneda was speaking for another
18 representative in Chicago, Jane was going to
19 attend, I was going to attend as well, and I
20 believe just prior to leaving for that trip, there
21 was a lengthy phone conversation about account
22 coverage and, you know, what needed to be done in
23 the territory.
24     And I believe in that conversation, Jane

Page 179

1  had discussed the fact she had only called on the
2  telephone to Des Moines and had not actually been
3  there.  And I don't know if I knew that ahead of
4  time because of an expense report or if that was
5  something she just conveyed to me, but I do
6  remember having that discussion with her --
7      Q  So at the end -- excuse me, I interrupted
8  you, go ahead.
9      A  I was going to say that was essentially
10 the time frame when this -- when I became concerned
11 about her account coverage.
12     Q  Now, was your concern related to coverage
13 in Des Moines or did Jane say things that allowed
14 you to be concerned about her coverage at other
15 facilities?
16     A  I don't recall the specifics.  You know
17 so much time has passed.  I know that there was a
18 concern in Des Moines, there was a concern not so
19 much I don't think coverage in Evansville but just
20 execution.  I believe there was a concern of
21 coverage in Owensboro, Kentucky.
22     Q  What was the concern in Evansville about
23 execution?
24     A  The poor attendance at the dinner

Page 180

1  program.
2      Q  I'm sorry, what was that, Tony?
3      A  It was the poor attendance at the dinner
4  program.  Actually at the meeting that I attended
5  in Chicago with Jane where Dr. Flavio Castaneda
6  spoke, he actually pulled me aside and told me he
7  did not appreciate being used in a format where
8  there was only two or three customers.  He really
9  felt that his best utilization would be in front of
10 larger groups.
11     Q  He pulled you aside and did this outside
12 of Jane's presence?
13     A  I don't recall if Jane was there but I
14 don't believe she was.
15     Q  Would it surprise you that Dr. Castaneda
16 denies that?
17     A  Yes.
18     Q  What was there in Jane's expense report
19 that caused you to be concerned about account
20 coverage?
21     A  What was it in her expense reports?
22     Q  Sure.
23     A  Once again, the expense report was not a
24 perfect way to identify everything but it was the

Page 181

1 best tool that I had. And based on what you can
2 glean from the expense report, whether it be where
3 they are getting gas, or if they are spending the
4 night in a hotel, or if they are buying lunch in
5 the city, you know, you look to various things such
6 as those to determine whether or not they are
7 actually physically going there.
8    Q What cities did it appear that Jane was
9 not visiting on an adequately-regular basis?
10    A I don't recall from the expense report
11 specifically. But once again, using the tool such
12 as the expense report, having these conversations
13 with Jane, discussions occurred where Jane was
14 telling me that she didn't want to fly, that she
15 didn't want to spend the night out, so she would
16 have to drive a few hours into Owensboro and then
17 drive several hours back to Springfield, which is
18 generally not the best utilization of one's time.
19 Six hours in a car in one day is six hours not
20 selling at a hospital in front of a physician.
21    Q So you're saying she should have driven
22 when?
23    A She could have driven to Evansville and
24 worked Evansville, and then driven to Owensboro and

Page 182

1 spent the full day in Owensboro and then driven to
2 Springfield. My direction was not to do any one
3 particular thing, my goal was to provide Jane with,
4 you know, if you need to fly somewhere, fly
5 somewhere, if you prefer to drive, drive, but you
6 have to be efficient in your role as a sales
7 representative. We're not paying you to drive for
8 six or seven hours a day and only spend an hour or
9 two at an account and that be your entire day.
10    It's not uncommon in this industry for
11 somebody who has to drive great distances to drive
12 to one account, drive to the next account, spend
13 the night, drive further away, and then start
14 heading back home again. This is a common practice
15 in the industry.
16    Q Do you know how far Owensboro, Kentucky
17 is from Springfield, Illinois?
18    A No, sir.
19    Q Do you know how far Evansville, Indiana
20 is from St. Louis, Missouri?
21    A No, sir. I can tell you -- well, I don't
22 recall ever having those conversations about how
23 far they were if that was a discussion.
24    Q In putting together a two-week coverage,

Page 183

1 did you consider driving distances?
2    A I don't have that document in front of
3 me. Here it is.
4    Q It's Exhibit 6.
5    A I believe I tried to take that into
6 consideration.
7    Q How did you do that?
8    A Well, let's see here. We have got on the
9 second week on Wednesday it said Evansville. So it
10 allowed her plenty of time in the morning to drive
11 out to Evansville. It shows her spending the day
12 in Evansville calling on three different customers
13 and then cutting her day pretty early at 2:30 and
14 driving to Owensboro. And spending Thursday in
15 Owensboro and half a day in Owensboro and then
16 taking the rest of the day off and driving home.
17    So I mean I think allowing somebody from
18 11:00 o'clock on Thursday to drive to Springfield,
19 Illinois is taking the drive distance into
20 consideration.
21    Q Actually, to Peoria, Illinois.
22    A No, it's to Springfield.
23    Q Well, she was supposed to be in Peoria at
24 8:00 o'clock the next morning?

Page 184

1    A Correct. She would have spent the night
2 at her house on Thursday. You have to keep in
3 mind, these times, I was not expecting her to be --
4 it's not an accurate assessment to say I expected
5 her to be somewhere at 8:00 o'clock, this was an
6 example to show that you could. How do you get to
7 Peoria by 8:00 o'clock in the morning, you get up
8 and you drive at 6:30.
9    Q Tony, would you agree with me that the
10 amount of time you would have to spend at a
11 particular account would vary directly with the
12 physician's availability to see you?
13    MR. BRODERICK: I'm going to object. It was
14 asked and answered. I think we covered this
15 before.
16    MR. BAKER: You can answer, Tony.
17    THE DEPONENT: Can you repeat the question.
18       (Whereupon the requested
19       portion of the record was read
20       back by the Reporter.)
21    THE DEPONENT: No.
22    MR. BAKER: Q Why not?
23    A Because there are generally more than one
24 physician that you're calling on at an account.

Page 185

1 And the special procedures labs in hospitals that
2 these doctors practice medicine, they don't have
3 offices, they're generally doing procedure after
4 procedure after procedure.
5     In most cases, it's been my experience,
6 that you schedule time with doctors but you also
7 schedule time with the labs. And you may schedule
8 a whole morning with a lab in the hopes that as the
9 doctor passes through the lab, you can get some
10 time with them.
11     You are not just going to an account once
12 you have 100 percent confirmation that you're going
13 to see somebody.
14     Q So you are going to go to a lab once a
15 week or at least once every other week?
16     A Absolutely. If you do that, you'll
17 actually see those customers.
18     MR. BRODERICK: I'm going to object. I think
19 we have covered this ground before.
20     MR. BAKER: Let's talk about something else.
21 Tony, were --
22     MR. BRODERICK: Before you ask that question,
23 let me just have a word with Tony on one thing.
24 I'm going to put you on mute.

Page 186

1     (Whereupon a short recess
2     was taken.)
3     MR. BAKER: Q Tony, how many physicians were
4 there in Owensboro, Kentucky that were potential
5 users of the products of Centocor -- the vascular
6 products of Centocor?
7     A At this time, I do not recall. I mean
8 I'm going to have to see some type of document that
9 listed the physicians, I just don't recall.
10     Q I would like to talk about something else
11 then, if I might. Were vascular representatives
12 eligible for earning a bonus points?
13     A Is there a question?
14     Q You didn't hear the question?
15     A No. Sorry.
16     Q Did vascular representatives have some
17 eligibility for earning bonus points?
18     A There was an award points program that
19 was set up, yes.
20     Q And did that program exist in the year
21 2001?
22     A I believe it did.
23     Q Tell me in a general sort of way how it
24 worked.

Page 187

1     A It was a new program for the company,
2 there was not a lot of structure around how points
3 would be awarded. Different districts awarded
4 points for different reasons. It was essentially a
5 tool to motivate and reward individuals for their
6 performance.
7     Q And what did the bonus points convert to?
8     A Well, you would use them to purchase
9 products from Merits, which was a rewards company.
10     Q So if I got maybe 3,000 bonus points, I
11 could get a trip to Mexico, something like that?
12     A Correct, something like that.
13     Q For your team, who would be the decision
14 maker that would decide what activity or what
15 performance by a vascular specialist would earn
16 bonus points?
17     A I would. There were generally, I believe
18 at this time, certainly later, there was -- the
19 regional director also could reward individual
20 representatives for stellar performance. And I
21 don't recall, once again time line, it's been quite
22 awhile, but I certainly elicited feedback from
23 individuals as well for suggestions as to what
24 types of activities would best be suited for award

Page 188

1 points.
2     Q Who did you solicit input from?
3     A When I solicited input was from the
4 entire team, I just don't recall when that was. It
5 may have been the next year, I just -- we had this
6 program every year that I was a manager there, and
7 I just can't -- I don't specifically recall for the
8 year 2001.
9     Q Did you prepare anything to guide you for
10 determining how many points you would award for a
11 particular accomplishment?
12     MR. BRODERICK: Did he prepare something?
13     MR. BAKER: Yeah.
14     THE DEPONENT: No.
15     MR. BAKER: Q What types of accomplishments
16 would you give bonus points for?
17     A It would vary. You know it might be
18 things like initial stockings, you know, account
19 conversions. It would depend, and I don't recall.
20 I know there's a document somewhere that I kept
21 track of points, but I haven't seen that in quite
22 some time, so I don't recall all what I had given
23 points for.
24     Q Would you award points for attending an

Page 189

1 event?
2    A  I'm not sure what you are referring to,
3 attending an event.
4    Q  Attending a meeting or an symposium,
5 would you award points for that?
6    A  I don't know.
7    Q  Would a sales -- a vascular specialist
8 make a request for bonus points by saying here's
9 what I accomplished, can I be put in line for bonus
10 points?
11    A  You know, some people may have done
12 that.  That's not how they earned points but some
13 people may have tried to lobby for points, sure.
14    Q  At the risk of repetition, can you take
15 me through what you did in 2001 in determining who
16 would be entitled to bonus points?
17    A  I'm not sure if I understand.  What I did
18 to determine who would be eligible for those
19 points?
20    Q  Correct.  How did you go about that?
21    A  I don't recall what I had awarded points
22 for, but once again, in general, it would have been
23 to motivate certain individuals and reward them.
24 You know, I can't speak specifically to 2001, I

Page 190

1 just don't recall that time period.
2       I know over time, as individuals were
3 doing things, sometimes if they went above and
4 beyond the call of duty, if they did something that
5 was above and beyond the call and duty towards
6 their development, we might give them award points,
7 initial stockings.  It just depended on the
8 territory and maybe what some of those key
9 objectives were and how that person was performing.
10    Q  Give me just a minute here.
11    A  Okay.
12    MR. BAKER:  John.
13    MR. BRODERICK:  Yes, sir.
14    MR. BAKER:  Did you bring any documents with
15 you?
16    MR. BRODERICK:  Some.
17    MR. BAKER:  What I'm looking for is a document
18 Centocor produced that we did not, by oversight,
19 didn't make an exhibit.
20    MR. BRODERICK:  Okay.
21    MR. BAKER:  I will give you the Bate stamp
22 number, it's EEOC000534 and 535.
23    MR. BRODERICK:  Okay.  Give me --
24    MR. BAKER:  And there's another document too

Page 191

1 AS0025.
2    MR. BRODERICK:  The EEOC one was 534, 535?
3    MR. BAKER:  Correct.
4    MR. BRODERICK:  Give me a couple seconds.
5    MR. BAKER:  Okay.  Sure.
6    MR. BRODERICK:  I happen to have some of these
7 scanned in, I don't actually have the hard copies
8 so we could do the best we can.
9    MR. BAKER:  Okay.  If he has a copy, that's
10 good enough.
11    MR. BRODERICK:  I'm sorry.
12    MR. BAKER:  If he has a copy, that is good
13 enough.
14    MR. BRODERICK:  I don't have actually hard
15 copies.
16    MR. BAKER:  Can he see on your screen?
17    MR. BRODERICK:  These are two separate -- they
18 are not identical, right, the AS document and the
19 EEOC document?
20    MR. BAKER:  That's correct.
21    MR. BRODERICK:  Which document would you like
22 him to look at first?
23    MR. BAKER:  Let's go to the EEOC document.
24 For purposes of the record, we will refer to this

Page 192

1 as Exhibit 87.
2            (Whereupon said document was
3             duly marked for purposes of
4             identification as Exhibit 87 by
5             Mr. Baker as of this date.)
6    MR. BAKER:  Q Tony, do you have that document
7 in front of you?
8    A  I do.
9    Q  Give me just a second so I'm sure I'm
10 marking it correctly.
11       Tony, Exhibit 87 is Bate stamp number
12 EEOC534 and 535; am I correct?
13    A  Yes, sir.
14    Q  Can you identify that document for me.
15    A  It looks like a scan spreadsheet that was
16 created to keep track of award points that were
17 distributed to the team.
18    Q  And does that appear to you to be an
19 accurate representation of award points that were
20 distributed?
21    A  Yes.
22    Q  And with respect to these award points,
23 would you have been the individual that would have
24 made the determination as to what points each of

| Page 193 | Page 195 |
|---|---|

**Page 193**

1  the vascular specialists would receive --
2      A  Yes, sir.
3      Q  (Continuing)--as reflected in this
4  document?
5          I'm not going to cover this in great
6  detail, but I just have a question or two for you,
7  if I could.
8          With respect to Jane Minor, what does
9  Cordis Q3 refer to?
10     A  I don't recall.  And in looking through
11 several of these entries, some of my -- I simply
12 don't recall.  I would guess it had to do with her
13 performance with Cordis for Q3.
14     Q  And then there is the phrase that we see
15 here called "new stocking," do you see that?
16     A  Uh-huh.
17     Q  And that goes to a number of sales reps;
18 what does new stocking refer to?
19     A  If there was an initial stocking of
20 Retavase let's say in the radiology department for
21 vascular procedures then they were awarded points
22 for that.
23     Q  I see in most instances, a new stocking
24 would get 500 points; am I correct?

**Page 195**

1  that reflect?
2      A  The date on there was the date that I
3  submitted for those points.
4      Q  And do you know when the new stocking
5  occurred?
6      A  It says it occurred in Q1, what that
7  tells me is that, once again, there was not any
8  real structure around these points, so as the year
9  progressed, and I had made a decision to stock for
10 something -- or to award for one thing, to the best
11 of my ability, if I could go back in time and see
12 that somebody had done one of those things, then in
13 trying to be fair, wanted to award points.
14         I believe only 250 were rewarded because
15 it says it was in Q1, I would presume that would
16 have occurred during the time Jane was out, so less
17 impact from Jane if she was out, therefore, less
18 points.
19     Q  If the stocking had occurred before Jane
20 went on her medical leave, would there be any
21 explanation why she got 250?
22     A  Not that I'm aware of.  I don't recall.
23     Q  If you go back down to Denise Hill, she
24 got 250 points for great start; what does that

**Page 194**

1      A  Correct.
2      Q  And there's certain instances where less
3  than 500 points would be awarded; do you see that?
4      A  Can I just take a second to look through
5  here?
6      Q  Sure.
7      A  Okay.  What was the question again?  I'm
8  sorry.
9      Q  Do you see where on a few entries for new
10 stockings there would be less than 500 points
11 awarded?
12     A  Yes, sir.
13     Q  I'm wondering under what circumstances
14 were less than 500 bonus points awarded?
15     A  It was based on, I believe, on what their
16 role would have been.
17     Q  Can you explain that for me.
18     A  The only account that I can see where
19 there's 250 points for a new account stocking is
20 St. John's in Q1, and I believe, and I don't
21 recall, but my presumption would be that that
22 occurred during the time frame that Jane was out on
23 medical leave.
24     Q  Date of deposit is June 29, what would

**Page 196**

1  refer to?
2      A  She had made an early impact in her
3  territory, she was getting off to a great start as
4  a new employee.
5      Q  Then she got 350 points the same day for
6  rookie rapid impact; do you see that?
7      A  Uh-huh.
8      Q  What's the difference between the points,
9  the 350 points and the 250 points?
10     A  Once again, all I can go off of is what
11 it actually says.  I don't recall the specifics.
12 There's obviously a little more description around
13 the 350.  But I really can't tell you any more than
14 what's on that page.
15     Q  Do you know what Denise Hill had to do to
16 get on August 30, 150 points for great team work?
17     A  No, I do not recall.
18     Q  Do you know what she had to do on
19 November 17 to get 150 points for thanks for your
20 help?
21     A  I don't recall the specifics.  I believe
22 that's something to do with some type of project
23 that I may have asked her to do.
24     Q  Go down at that Caroline Kopecky on May

| Page 197 | Page 199 |
|---|---|

**Page 197**

1  31, she got 250 points for great job at driving
2  attendance at McNamara symposium; do you know what
3  she did there?
4      A  I recall there was a program in Houston
5  where Dr. McNamara -- it was a satellite symposium,
6  and if I'm not mistaken, out of the two markets
7  that we -- I don't remember how many markets this
8  program went off in, but I do recall she had the
9  greatest attendance of anybody on the team.
10     Q  And what did she do to drive attendance?
11     A  I don't know specifically what she did
12 other than what generally most people would do and
13 that is actually call on those customers
14 frequently, in some cases more than one time in the
15 same week to try and get them actually attend.
16     Q  Was this a Houston symposium?
17     A  Correct.
18     Q  Would you agree with me that of all of
19 the cities that comprise the geographic territory
20 of your team, Houston had the most medical
21 specialists that would engage in some sort of
22 vascular procedure?
23     A  I'm sorry, can you repeat that.  Houston
24 has the most compared to what?

**Page 199**

1      A  It would depend on -- I don't recall if
2  -- who had formulary approvals that year.  I do
3  recall there was a lot of time and energy in
4  getting the P&T approval, and that was -- it was a
5  long arduous process, and at that time, I thought
6  it was appropriate to reward her some points for.
7      Q  Would you agree, Tony, that while
8  Jane Minor was working on your team, there was a
9  formulary approval at Barnes Hospital?
10     A  I don't recall.
11     Q  If assuming there was a formulary
12 approval at Barnes Hospital, would there be any
13 reason why Jane would not have gotten bonus points
14 for that?
15     A  In any of these scenarios, nothing is
16 automatic.  It's based on my ability as a manager
17 to determine what role that individual might have
18 played would determine whether or not points would
19 be awarded.
20     Q  I'm kind of distilling this to its
21 essence.  There was a lot of discretion on your
22 part in deciding who would get bonus points and the
23 amount of bonus points that would be awarded?
24     A  Correct.

**Page 198**

1      Q  Of all the cities that were called upon
2  by members of your team, was Houston the city that
3  had the most specialists that engaged in treating
4  patients for vascular problems?
5      A  I don't know.  It would certainly be up
6  there.  If it's not number one, it would be in the
7  top couple.
8      Q  I'm a little confused with
9  Caroline Kopecky, she was awarded points twice,
10 maybe more than that for new stockings at Ochsner;
11 why was that?
12     A  I don't know.  I don't know if that's a
13 typo or what the situation is.  I don't recall.
14     Q  Can you go back to the entry for Caroline
15 for June 29, 2001 where it says:  Ochsner P&T
16 approval?
17     A  Uh-huh.
18     Q  What does that mean?
19     A  That's a formulary approval.
20     Q  And would that represent a new stocking?
21     A  No, that was for a successful formulary
22 approval.
23     Q  So did you typically give points for a
24 new formulary approval?

**Page 200**

1      Q  Let's go -- do you have Exhibit AS0025?
2      A  We do, I'm just pulling it up.
3          (Whereupon said document was
4          duly marked for purposes of
5          identification as Exhibit 89 by
6          Mr. Baker as of this date.)
7      MR. BAKER:  I'm going to mark that as Exhibit
8  89.
9      MR. BRODERICK:  Just so you know, Jim, it will
10 be a little tricky to flip back and forth, so if
11 you do flip back and forth, it will be a little --
12     MR. BAKER:  That's fine.  Just let me know and
13 I'll...
14         Whenever you're ready, Tony.
15     THE DEPONENT:  I'm ready.
16     MR. BAKER:  Q Can you identify for me Exhibit
17 89.  And that bears Bate stamp number AS0025.  What
18 is that document?
19     A  It's 0025?
20     Q  Correct.
21     MR. BRODERICK:  Did you ask him what it was?
22     MR. BAKER:  I did.
23     THE DEPONENT:  I'm sorry, I'm still looking at
24 it.  I guess I'm a little confused, I'm not sure

Page 201

1 how it's different from the other document. It
2 appears to be another spreadsheet with award point
3 distribution.
4    MR. BAKER: Q You see down at the bottom
5 where it says award points total equals 9700?
6    A Yes, sir.
7    Q Did you have a limited number of bonus
8 points that you could award to members of your team
9 in 2000 --
10    A Yes, sir, I only had a given number of
11 award points.
12    Q So you would have to pick and choose
13 among team members how those would be awarded?
14    A Correct.
15    Q Tony, I've been jumping around here a
16 little bit, and I appreciate your patience. I want
17 to spend a few moments talking about your contact
18 with Jane Minor. Do you recall when it was you
19 first met her?
20    A I do.
21    Q And when was it or where was it?
22    MR. BRODERICK: Did you ask him where it was?
23    MR. BAKER: Yes.
24    THE DEPONENT: The first time I met Jane was

Page 202

1 at sales training when I was hired, excuse me, at
2 Centocor.
3    MR. BAKER: Q And that would have been when
4 you were both vascular specialists?
5    A Correct.
6    Q Do you have any recollections of your
7 initial contact with Jane?
8    A I do.
9    Q And tell me what you recall?
10    A I think on the first day or two, we were
11 broken up into groups, and we were asked to review
12 the product package insert, and it was broken up
13 into different sections, and we were to highlight
14 within a given section the -- what the group
15 thought was the most important aspect or aspects of
16 that section.
17    And I recall there was a little
18 disagreement between the approach to the
19 assignment, whether we would highlight everything
20 in the section as important or whether we would
21 just highlight certain parts that were deemed to be
22 most important.
23    Q Is that a disagreement that Jane had with
24 you or was it a disagreement among other group

Page 203

1 members?
2    A Well, I guess I can't speak for anybody
3 else. The only people that probably spoke up --
4 the discussion that ensued was between myself and
5 Jane.
6    Q She thought it should be done one way,
7 you thought it should be done another?
8    A Correct.
9    Q And how was it resolved?
10    A I don't recall. I don't recall. Sorry.
11    Q I mean was it a friendly disagreement or
12 you didn't throw bats at each other or did you?
13    A I thought it was friendly. I thought it
14 was a little awkward. Jane had made a comment, she
15 asked me how long I had been selling Retavase, I
16 took that as an implication that I must not know
17 what I was talking about because she had actually
18 been selling Retavase.
19    My interpretation of the assignment was
20 that we would only actually highlight within a
21 given section the key aspects, not the entire
22 section. That was the basis of the agreement. I
23 don't recall when we had to get up in front of the
24 group how that was resolved. But remainder of the

Page 204

1 week, the relationship between myself and Jane
2 seemed to be very cordial, and I didn't think too
3 much of it beyond that.
4    Q Did you have any other contact with Jane
5 other than that event you've described before you
6 became a team leader?
7    A Well, the reminder of that week there was
8 contact because we were all on the same sales
9 training group. I was driving the van from the
10 hotel to the office, and Jane would sit up front
11 and talk with me on the way into the office. I
12 don't really recall beyond that week anything in
13 particular.
14    Certainly, if we were at meetings or
15 something of that sort, there may have been casual
16 niceties, conversation, but that would have been
17 the extent of it from my recollection.
18    Q So I guess that takes us up to your
19 appointment as team leader which occurred sometime
20 in late 2000; am I right about that?
21    A Yes, sir.
22    Q After you became team leader, when did
23 you first have personal contact with Jane, and by
24 personal contact, I mean a face-to-face meeting?

Page 205

1    A  I'm not certain.  I believe it would have
2  been at the national sales meeting, but I don't
3  recall for sure.
4    Q  Between the time you became team leader
5  and Jane went out on medical leave, do you recall
6  anything unusual or eventful in terms of your
7  contact with one another, whether it be personal
8  contact, telephone contact, E-mail, anything like
9  that?
10    A  Yes.
11    Q  Tell me what you recall.
12    A  I recall receiving numerous phone calls
13  at home from Jane concerning Michelle Johnson.  It
14  was evident to me, upon conversations with Jane,
15  that there was a very poor relationship between the
16  two of them.
17        She would call me and we would have
18  conversations in excess of two hours quite
19  frequently regarding Michelle, the issues she had
20  for Michelle, why she thought Michelle was unfair
21  to her, you know.  She would ask me to protect her
22  from Michelle.  She would ask me if there was ever
23  a meeting she had to attend with Michelle that I be
24  there to protect her.  I thought that was a little

Page 206

1  unusual.
2    Q  What time period was this, Tony, that
3  these calls occurred?
4    A  It would have been in January.
5    Q  January of 2001?
6    A  Yes, sir.
7    Q  And these calls were to your home
8  telephone number?
9    A  Either to my home telephone or to my
10  office line.
11    Q  Can you give me your home telephone
12  number, at least what your home telephone number
13  was in January of 2001?
14    A  My office line would have been (817)
15  923-5048.
16    Q  Okay.
17    A  And my home line was (817) 923-9677.
18    Q  And these calls that you have referred
19  to, were they basically calls after normal business
20  hours?
21    A  Yes.
22    Q  And if I understand your testimony
23  correctly, these would be very lengthy telephone
24  calls?

Page 207

1    A  Yes, some of them were definitely
2  lengthy.
3    Q  I believe you said at least one of them
4  was almost two hours in length?
5    A  Correct, that's my recollection.
6    Q  What would the shortest call have been?
7    A  I'm sorry.
8    Q  What would the shortest call have been
9  where she was complaining about Michelle Johnson?
10    A  I'm not certain.  The shortest one may
11  have been two hours.
12    Q  So these were longer than what we might
13  consider is a normal business call between a
14  supervisor and an employee?
15    A  Yes, sir.
16    Q  And I'm not going to hold you to a
17  precise number, Tony, but can you give me a rough
18  idea of how many of these calls there might have
19  been?
20    A  At that time, it seemed to be frequent.
21  You know, it may have only been over a week or two,
22  it may have been over several weeks.  I don't
23  recall.  I would guess greater than five, maybe as
24  many as ten or more.

Page 208

1    Q  And were these calls that Jane initiated
2  to you rather than you calling her?
3    A  I don't recall.  You know, certainly as a
4  manager, I may have had reason to call an
5  individual to discuss something.
6        And let me just be clear, there were
7  certainly calls that occurred after business hours,
8  they may have all occurred after business hours,
9  they may have been both during and after business
10  hours, I don't recall.  I do remember on more than
11  one occasion upsetting my wife being on the phone
12  as long as I was after hours.
13        I just lost my train of thought.
14    MR. BRODERICK:  I think he's finished.
15    MR. BAKER:  Q And then as I understand it,
16  these calls discontinued?
17    A  They certainly did when she went on
18  medical leave.  And I'm not sure that the same
19  types of calls were taking place when she returned.
20    Q  And do I understand that during these
21  calls, the primary thrust of them, she was
22  complaining about Michelle Johnson?
23    A  That's what I remember most.  We may have
24  been discussing accounts as well.  That was

Page 209

1 certainly the time frame I believe where some of
2 that discussion would have taken place.
3  Q  Did you ever report to Michelle Johnson
4 these calls?
5  A  I don't recall.  I don't think so.
6  Q  Did you ever do anything in response to
7 Jane's complaints about Michelle?
8  A  I don't recall.  You know, I don't know
9 if I had a conversation with my regional director
10 about the nature of the relationship between the
11 two of them, I may or may not have, I just don't
12 recall.
13      As far as taking an action, my thought on
14 the matter was Jane is no longer reporting to
15 Michelle, she doesn't have to worry about Michelle,
16 I will do everything in my power to make the work
17 environment for Jane as suitable as possible as it
18 relates to Michelle.  And that was my thought
19 process moving forward how we would handle it, just
20 being professional.
21  Q  Sure.
22      When was it that Jane reported to
23 Michelle?
24  A  I'm sorry.

Page 210

1  Q  When did Jane report to Michelle?
2  A  I believe Michelle hired Jane and would
3 have reported to -- Jane would have reported to
4 Michelle up until she became a vascular sales
5 specialist.
6  Q  Anything else eventful or unusual that
7 occurred between Jane and yourself prior to her
8 going on medical leave?
9  A  I don't recall anything else.
10  Q  And prior to Jane going on medical leave,
11 did you identify any issues concerning the adequacy
12 of Jane's performance as a vascular specialist?
13  A  I'm not sure I understand the question.
14 Can you repeat that.
15  Q  Do you have any performance issues with
16 Jane before she went on medical leave?
17  A  Jane wasn't in the field -- I don't
18 believe so.  She was not in the field long enough
19 for me to make any determination at that point.
20      I think I stated before, there may have
21 been some feedback from Michelle Johnson.  I don't
22 recall when that would have occurred, it may have
23 occurred at this point in time, it may have
24 occurred later in time.

Page 211

1      But my position was, once again, this is
2 a fresh start, there's no -- Jane's not reporting
3 to Michelle, she's reporting to me.  And I had no
4 preconceived notions at that point in time.
5  Q  Did sales representatives for Centocor
6 receive annual performance evaluations?
7  A  Yes.
8  Q  So if Michelle Johnson had performance
9 issues with Jane, and she was doing what she should
10 do as a supervisor, those performance issues should
11 have been identified in a performance evaluation?
12  A  Well, Michelle -- the role that Jane was
13 in when she reported to Michelle was very different
14 than the role Jane was in when she was a vascular
15 specialist reporting to somebody other than
16 Michelle.
17      So if Michelle felt like Jane's territory
18 coverage was inadequate but was no longer her
19 direct supervisor, then that would have depended
20 upon the perceptions of Jane's manager.
21  Q  Well, as I understand it, there was a
22 period of time where Jane worked under Michelle?
23  A  Correct.
24  Q  And one would expect that during that

Page 212

1 time period, it would have been Michelle that
2 prepared her performance evaluations?
3  A  Correct.
4  Q  And it would have been Michelle that
5 prepared Jane's field progress reports?
6  A  Correct.
7  Q  So if Michelle were doing what she should
8 be doing as a supervisor, if during that time
9 period she had concerns about Jane, those concerns
10 would be reflected either in her performance
11 evaluation or in the field progress reports; is
12 that correct?
13  A  If Michelle had concerns at that point in
14 time, then it would have been appropriate for her
15 to put them in a field contact report.  I'm not
16 sure Michelle was responsible for doing the
17 year-end evaluation because Jane had changed roles
18 during that year.
19  Q  She either was or wasn't, we'll find out
20 looking through the evaluations, okay?
21  A  Okay.
22  Q  I take it, while Jane was on medical
23 leave, you had no contact with her?
24  A  I don't believe I initiated any contact

Page 213

1  with Jane while she was on leave. Just prior to
2  her having her procedure, for some reason I'm
3  thinking that we may have had some kind of contact
4  but I'm not sure what it was.
5      I think the time she actually left versus
6  the time she had surgery, there may have been a
7  little bit of delay there, we may have had some
8  contact, but I don't recall contacting her after
9  that.
10     Q  Who covered Jane's accounts while she was
11 on medical leave?
12     A  There would have been coverage from the,
13 to some extent, from the local sales reps in the
14 area that were the cardiovascular reps, and then
15 there would have been some coverage by myself, as
16 well.
17     Q  Did you call on each of Jane's accounts
18 while she was on her medical leave?
19     A  No, I did not.
20     Q  How many of her accounts did you call on
21 when she was on medical leave?
22     A  I don't recall.
23     Q  Do you recall any you called on?
24     A  How many?

Page 214

1      Q  Do you recall the name of any you called
2  on?
3      A  I don't recall.  I believe I called on
4  St. Francis, Barnes, some in the St. Louis area,
5  but I just don't recall, it's been quite a while.
6      Q  Would that be reflected in your expense
7  reports for --
8      A  Yes, that would have been reflected in my
9  expense reports.
10     Q  Following Jane's return to active duty,
11 what contact with her -- well, let me back up.
12         After she returned from active duty, did
13 you ever have a face-to-face contact with Jane?
14     A  I'm not sure I understand.
15         When she returned to work, did I ever
16 have a face-to-face meeting with her?
17     Q  Let me start over.  It wasn't a very good
18 question.
19         I believe we've earlier talked about Jane
20 returning to work in late April of 2001?
21     A  Yes, sir.
22     Q  And I'm assuming after she returned to
23 work, you and she had face-to-face contact with one
24 another on several occasions; am I correct?

Page 215

1      A  Correct.
2      Q  Do you recall when the first time was you
3  had face-to-face contact with her?
4      A  I don't recall the specific date.  I
5  presume it's around the 24th of April since that's
6  when the field contact was generated.
7      Q  Do you normally make the field contact
8  report in connection with a field visit with a
9  vascular rep?
10     A  Yes.
11     Q  And going back to Exhibit 9, might I
12 assume that document was prepared right after a
13 visit?
14     A  Generally that would be the case.  I
15 don't know particularly with this one.  But, yes,
16 generally, you know, I would work two days with a
17 representative, and then ideally within a few days
18 have a field contact report generated.
19     Q  Do you have any recollection of your
20 contact with Jane -- your visit with Jane prior to
21 the preparation of Exhibit 9?
22     A  Do I recollect meetings I had with Jane
23 prior to completing this document?
24     Q  Right.

Page 216

1      A  Not particularly.
2      Q  Do you recall the accounts you and she
3  called on?
4      A  No, I do not.
5      Q  I take it then, it was a fairly
6  uneventful field visit?
7      A  Yes.
8      Q  After April 24, 2001, when was the next
9  time you had face-to-face contact with Jane?
10     A  I don't recall.  I would have to look at
11 my travel records but I don't recall.
12     Q  Do you recall attending a national sales
13 meeting in June of 2001 where Jane was also
14 present?
15     A  Vaguely.
16     Q  Do you recall attending --
17         Well, let me ask you:  You mentioned
18 earlier that you attended an event in Chicago that
19 involved Jane; do I have that correct?
20     A  Correct.  It was an event Jane attended.
21     Q  What was that event?
22     A  It was some type of speaker program
23 involving Flavio Castaneda.
24     Q  And did Jane have any role in that event

Page 217

1 other than just being one of the attendees?
2     A  I don't recall.  You know, Flavio was a
3 key customer of hers, she may have assisted the
4 local sales representative in some way.  But that
5 event was in a different region, in a different
6 territory.
7     Q  Was there any type of booth that Centocor
8 had at that event?
9     A  I don't recall.
10        Now, there's -- the event I'm referring
11 to is one that would have occurred that summer.
12 Flavio has a -- or had a meeting that occurred in
13 Chicago, generally I believe in late September
14 where we would have had a booth.
15        My memory, as poor as it is at this
16 point, was that the event, in roughly the June'ish
17 time frame, summer time frame, was a speaker
18 program similar to the one that Jane had set up in
19 Evansville.
20     Q  Do you recall a meeting in Oakbrook,
21 Illinois in September of 2001?
22     A  Yes.
23     Q  Did you attend that meeting?
24     A  Did I attend?

Page 218

1     MR. BRODERICK: You dropped out there, Jim.
2     MR. BAKER: Excuse me for just a second.
3     MR. BRODERICK: Could you repeat the question.
4     MR. BAKER: Q My question was:  Did you
5 attend any part of the Oakbrook event?
6     A  Yes, I believe so.
7     Q  And what was that event, Tony?
8     A  That was a multi-day scientific symposium
9 that Dr. Castaneda's group put on in the Chicago
10 area.
11     Q  What was Centocor's role at that
12 particular event?
13     A  We had -- I believe we had a booth at
14 that event, and I believe there was a request for
15 financial support, and that Centocor did provide
16 some type of financial support.  I don't recall
17 what the amount was.
18     Q  Did Jane play any role on Centocor's
19 behalf at that event?
20     A  I don't recall.  I believe she probably
21 would have manned the booth, worked the booth.
22     Q  What type of booth are we talking about?
23     A  At these types of meeting, there's
24 generally a tabletop display where you have product

Page 219

1 literature, products such as the Cordis, products
2 -- I don't recall specifically what we had at this
3 particular meeting.
4     Q  Were there a number of Centocor
5 representatives that worked the booth?
6     A  I don't recall.  It would be normal
7 practice for the local Chicago representatives to
8 work the tabletop display, as well.
9     Q  Why was it you attended that event, Tony,
10 or part of the event?
11     A  In the, say, for instance, in being a
12 target account for me and the fact that
13 Dr. Castaneda was somewhat of a national thought
14 leader, in my desire to continue to develop
15 relationships with that account, it made sense for
16 me to attend the meeting that we were supporting.
17     Q  Do you recall how many attendees there
18 were at that event?
19     A  From Centocor or from the public?
20     Q  I was talking --
21        I'm assuming it was an event for
22 physicians?
23     A  Correct.
24        No, I don't remember.

Page 220

1     Q  Tony, can you go to Exhibit 23.
2     A  Okay.  Let me take a second to look at
3 it.
4     Q  Sure.  Take whatever time you need.
5     A  Okay.
6     Q  Can you identify Exhibit 23 for me?
7     A  It is a Centocor field contact report
8 dated September 19 of '01 for Jane Minor.
9     Q  And if you look at area number 1 where it
10 says:  Expectations and Goals of Field Contact; is
11 that another way of saying what you and Jane would
12 do when you visited her territory?
13     A  Yes, sir.
14     Q  And as I understand it, you and she
15 worked the Peoria and St. Louis territory?
16     A  I'm sorry.
17     Q  As I read it, it says:  To work the
18 Peoria and St. Louis marketplace as well as take
19 Dr. Castaneda and his group to dinner to discuss
20 the MIIT meeting in September?
21     A  Yes, that's what it says.
22     Q  Is that what you did during your visit
23 with Jane that preceded this report?
24     A  I don't recall.  I would presume so since

Page 221

1  that was the expectation and goal of the field
2  contact.
3     Q  Do you know how many days you were with
4  her?
5     A  It was generally two days.  I don't
6  recall specifically at this point what that was.
7     Q  Let's go down to the heading:  Sales
8  Performance, Tony.
9     A  Okay.
10    Q  Do you see that?
11       Do you see where it says:  National Rank
12 18th?
13    A  Yes, sir.
14    Q  Would that be her ranking in Cordis
15 products or her ranking in Retavase products or
16 both?
17    A  That would be her ranking in Retavase.
18    Q  Why was it as a vascular rep she was
19 ranked in terms of her sales activities with
20 Retavase?
21    A  Because she was responsible for Retavase
22 sales.
23    Q  To whom?  To whom, Tony?
24    MR. BRODERICK:  Is there a question?

Page 222

1     MR. BAKER:  I said to whom was she
2  responsible.  And let me back up.
3        Q I'm a little confused because Retavase
4  was not indicated for vascular products; am I
5  correct?
6     A  I'm sorry, could you repeat the question.
7     Q  In September of 2001, was Retavase
8  nonindicated for vascular products or for vascular
9  use?
10    A  Correct.
11    Q  How is it then she could be ranked on her
12 sales of Retavase?
13    MR. BRODERICK:  Objection.  Foundation.
14    MR. BAKER:  What's your objection.
15    MR. BRODERICK:  I don't think this witness has
16 any responsibilities for the ranking or deciding to
17 rank her.  And, you know, that hasn't been
18 established, I don't think can be established.
19    MR. BAKER:  Well, let's find out.
20       Tony, do you know why it was --
21       Did you have any role in ranking?
22    A  No, sir.  There was a sales incentive
23 compensation plan, often referred to as SICP.
24 There was a separate individual at the company who

Page 223

1  was responsible for establishing the SICP program.
2  And since this was a sales position, the company
3  was -- they were paying us based on Retavase
4  performance.
5     Q  Now, as I understand it, Jane would have
6  worked in tandem with a vascular rep -- or with a
7  cardiovascular rep with respect to Retavase?
8     A  Correct.
9     Q  So at each account, there will be a
10 cardiovascular rep who would market the -- sell the
11 product or heart attack purposes?
12    A  Correct.
13    Q  And as I further understand it, when a
14 hospital purchased Retavase the company would not
15 be able to identify whether it was using it for
16 vascular purposes or heart attack purposes?
17    A  Correct.
18    Q  Do you have any idea then how Jane or any
19 other vascular rep could be evaluated or ranked
20 concerning their performance in selling Retavase?
21    A  The --
22    MR. BRODERICK:  Would you repeat the question.
23    MR. BAKER:  Q How is it that Centocor would
24 be able to assess or evaluate the sales performance

Page 224

1  of a vascular rep when it came to selling Retavase.
2     MR. BRODERICK:  I object to foundation.
3     MR. BAKER:  Similar objection?
4     MR. BRODERICK:  Similar objection, yes.
5     MR. BAKER:  Okay.  Fine.
6     THE DEPONENT:  Paul Williams was the person in
7  charge of SICP I believe at that point in time.  He
8  was the one that would have designed the
9  compensation plan and developed it and administered
10 it, so I have no role in that as far as that is
11 concerned.
12       The --
13       We were sales representatives.  We were
14 being paid as sales representatives.  We were
15 collecting a salary, and we were collecting
16 commission based on the sales performance of
17 Retavase.  Although we did not have an indication
18 and the ability to go and openly promote Retavase,
19 I believe the position was, any time you have a
20 sales force, you're trying to compensate them based
21 on their impact.
22       And by having vascular sales specialists
23 calling on these different accounts to sell the
24 Cordis product and to be a contact person to answer