**Page 225**

1  the unsolicited requests from physicians, that that
2  would have, if a person is doing that job and doing
3  it well, the belief was that that would be -- or
4  the presumption is there would be an impact
5  positive in sales.
6     MR. BAKER: Q Would it have been unlawful for
7  a Centocor representative to mention to a physician
8  Retavase's use in vascular disorders without some
9  request being first made by the physician.
10    MR. BRODERICK: Objection. Calls for a legal
11 conclusion. You can answer, if you know.
12    THE DEPONENT: I don't know if that's against
13 the law. I know that our objective was to discuss
14 the knowledge that we had obtained in regards to
15 Retavase in its vascular application when solicited
16 from physicians.
17    MR. BAKER: Q So it would have been
18 prohibited for a vascular representative to mention
19 to a physician Retavase's use in the treatment of
20 vascular disorders unless the physician had first
21 requested that information.
22    MR. BRODERICK: Objection. Calls for a legal
23 conclusion.
24    MR. BAKER: I don't think it does.

**Page 226**

1     MR. BRODERICK: He can answer. I'm allowing
2  him to answer but I just got to make the
3  objection. Go ahead.
4     THE DEPONENT: The direction from Centocor was
5  to not do that.
6     MR. BAKER: Q Tony, at any time during your
7  employment with Centocor, did any representatives
8  of either Johnson and Johnson or Centocor ever
9  speak to you about the manner in which you marketed
10 Retavase for vascular purposes?
11    A I'm not sure if this is what you're
12 asking. But there was -- my manager had asked me
13 when I was a vascular sales specialist -- part of
14 our role was to in-service accounts. So she had
15 asked me, based on my prior experience with power
16 point, to create a power point presentation using
17 some of that information.
18    Subsequent to that, after I became
19 manager, and others had learned about this, we had
20 a discussion regarding that presentation, and that
21 it was inappropriate, and that once again the
22 direction was to not participate in that type of
23 activity.
24    Q Other than that, Tony, at any time, did

**Page 227**

1  any individuals within the Centocor or in the SCD
2  and Johnson ever inquire of you concerning your
3  activities or the activities of your team in
4  selling Retavase?
5     A I don't recall anything specific.
6     Q We have talked about, I guess, a change
7  in focus of the company where it discontinued
8  marketing Retavase for vascular purposes; am I
9  correct in that respect?
10    A Yes. I believe it was May of 2002, the
11 company's decision was to stop the function of the
12 vascular sales force and shift that focus to an
13 immunology product.
14    Q Do you know why they decided to stop the
15 focus of the vascular sale force in marketing
16 Retavase?
17    A We had a conference call, they announced
18 the decision. I'm not sure if there was a reason
19 stated at that time. You know, everybody had their
20 own opinion as to what may have led up to that
21 point.
22    Obviously, there's some risk in having a
23 sales force out there trying to balance between
24 providing information for an unmet need in the

**Page 228**

1  marketplace and promoting off label.
2     And, you know, my time at Centocor, I
3  believe they tried to tow that line very carefully
4  and made a decision at some point that that --
5  there was too much risk involved, that if somebody
6  decided to promote off label outside of guidelines
7  that the company was at too much risk. I'm not
8  sure if that was actually what was conveyed to us.
9     Q That's fine.
10    If you go back to Exhibit 23, again in
11 the category: Sales Performance; at the right-hand
12 corner is a box for Cordis, and then at least with
13 respect to Jane it's marked 87 percent; what does
14 that mean?
15    A That would mean that the information I
16 was given from Cordis would suggest she was at 87
17 percent to plan.
18    Q What information were you given?
19    A We were provided Excel spreadsheets
20 typically at the end -- sometime after the quarter.
21    Q Can you go to Exhibit 28.
22    MR. BRODERICK: Jim, is this an actual
23 stopping point or is this connected, only because
24 it's gone almost an hour-and-a-half? I think Tony

Page 229

1  could probably go a little more but I'm just
2  wondering.
3      MR. BAKER: You said it's an hour-and-a-half.
4      MR. BRODERICK: I think it's almost an
5  hour-and-a-half since our last break, if I'm not
6  mistaken.
7      MR. BAKER: Tell you what, this is a good
8  point to take a break.
9          (Whereupon a short recess
10         was taken.)
11     MR. BAKER: Q I think when I broke off, I
12 referred to Tony Exhibit 28, do you have that in
13 front of you, Tony?
14     A I do, sir.
15     Q Can you identify it? Can you identify it
16 for me?
17     A It is a memorandum to myself,
18 Antonio Siciliano, from Jane Minor, dated November
19 8, 2001, regarding your September 19, 2001 field
20 contact report.
21     Q Do you recall receiving this document
22 sometime proximate to November 8, 2001?
23     A Yes, sir, I do.
24     Q If I can take you down to the second from

Page 230

1  the last paragraph -- second from the last
2  paragraph on page one, I'll read it into the
3  record. It states: Second, your reflection of my
4  Cordis sales, while accurate for the second
5  quarter, while I was still recuperating, omits to
6  note that the time of your report on September 9,
7  2001, I was at 147 percent of quota and was the
8  leader the sale of Cordis products of all members
9  of our team.
10         Do you see that?
11     A Yes, sir.
12     Q Do you disagree with Jane's statement?
13     A Well, I don't recall at this point what
14 the actual sales were.
15         However, I would just like to clarify, at
16 the time I wrote the report, some of the challenges
17 that we face in the industry is timely sales
18 reporting. So in September, which was towards the
19 end of Q3, we were just receiving data for Q2.
20 There was a luxury of another seven weeks that had
21 elapsed at the time this was written. I don't
22 believe I had information at that time that it was
23 147 percent.
24         And what's mentioned in the field contact

Page 231

1  is just to reflect Q2, as it is the first field
2  contact report to address Q2 performance. And the
3  information put in this field contact report does
4  not affect SICT. Actual sales performance is what
5  actually determines someone's compensation.
6      Q Where does this document reflect that it
7  measures only Q2 performance?
8      A Exhibit 23, sales performance, it states
9  Q2 baseline, Q2 sales volume. And under comments,
10 I believe I refer to it as the second quarter.
11     Q Well, there's nothing on the face of the
12 document that says it's limited to the second
13 quarter, is there?
14     A No. But under sales performance, it
15 clearly states it is referring to second quarter
16 sales.
17     Q Not with respect to Cordis, does it?
18     A It does. Under comment, it says: You
19 finished Q2 87 percent in dollars to plan with your
20 Cordis products.
21     Q Let me go through this document, or at
22 least parts of it, with you.
23         When we go down to observations,
24 comments, etc., in category four.

Page 232

1      A Okay.
2      Q You speak about the Evansville and
3  Des Moines dinner programs, and you say, and I'm
4  going to quote: But due to poor follow-up and
5  recruitment, the Evansville program was poorly
6  attended with only three attendees.
7          Do you see that?
8      A Yes, sir.
9      Q We've already talked about there only
10 being three attendees. What did you mean when you
11 talked about poor follow-up and recruitment?
12     A The normal process when you plan for a
13 dinner program would be to drive attendance. I
14 know we discussed this a little earlier. But
15 essentially, Pharmedica's role is in actually
16 securing a speaker, securing payment for the
17 speaker, travel arrangements, the location, etc.
18 The sales representative's responsibility is to
19 drive attendance.
20         So once a program is scheduled, then the
21 expectation is that they are actually in those
22 accounts making them aware and reminding them,
23 through the process of the program, and trying to
24 drive attendance.

Page 233

1    Q  What did Jane do or not do with respect
2  to driving attendance?
3    MR. BRODERICK: I'm just going to object.
4  Asked and answered. He can answer.
5    MR. BAKER: It hasn't been answered, that's
6  why I'm asking the question.
7      Q Do you understand my question, Tony?
8    A  I do. I'm just trying to think here.
9    Q  Take your time.
10   A  You know, my recollection is that based
11 on, once again, certain discussions with Jane about
12 her account coverage, along with documentation I
13 had based on expense reports, that the quality and
14 the quantity of visits to these locations were
15 insufficient to drive attendance.
16   Q  Is that it?
17   A  Yes.
18   Q  You don't know what Jane did or did not
19 do to drive attendance, do you?
20   MR. BRODERICK: I object. Asked and answered.
21   MR. BAKER: You can answer it.
22   MR. BRODERICK: You can answer it.
23   THE DEPONENT: I mean other than that, no.
24 Let me just add, at the end of the day, if

Page 234

1  attendance isn't what it should be, then regardless
2  of excuses that one might make, that is a
3  reflection of the performance of the sales
4  representative.
5      Just like when you don't meet your
6  baseline or your quota, somebody can come up with
7  all kinds of reasons. But your job as a sales
8  representative is to meet your quota, if you
9  initiate a dinner program that is to drive
10 attendance at the dinner program. It is not an
11 industry standard to do dinner programs for three
12 people.
13   Q  So you're assuming just because there
14 were only three people, Jane, in some fashion,
15 screwed up; is that what you are telling me?
16   MR. BRODERICK: Objection. Mischaracterizes
17 his testimony. You can answer.
18   THE DEPONENT: I would say she did not follow
19 through on that program as she should have.
20   MR. BAKER: Q Other than what you have
21 already told us, Tony, is there anything else that
22 Jane didn't do that she should have done or did and
23 she shouldn't have done that contributed to the
24 poor attendance?

Page 235

1    A  Not to my recollection.
2    Q  You refer to Jane's third critical
3  objective which involved a catheter clearance
4  project at Barnes; can you tell me what that
5  involved?
6    A  Jane had expressed to me that there was
7  interest at Barnes regarding Robin Schaffe, I
8  believe her name was.
9    Q  One of the pharmacists?
10   A  The pharmacist.
11     That there was interest in converting
12 from TPA to Retavase.
13   Q  Is that what you're talking about when
14 you say catheter clearance?
15   A  Yes, sir.
16   Q  Okay. Got you.
17     And then you talk about a breakthrough;
18 what was that breakthrough?
19   A  I don't recall. I mean it states that
20 the process kind of drug on for a period of time,
21 and that there was a break. I presume there was
22 some kind of momentum or something moved forward
23 but I don't recall the specifics of that.
24   Q  If you know, did Jane get that business

Page 236

1  at Barnes?
2    A  I don't recall.
3    Q  Assuming she did get that business at
4  Barnes, would she have been entitled to some bonus
5  points for it?
6    A  There were no guidelines around bonus
7  points, there was no structure. Also we had -- the
8  way it was explained was that there was no
9  guarantee for any one rep of any of those bonus
10 points.
11   Q  The reason I ask the question, Tony, was
12 I see that you did award bonus points to some
13 representatives for new stockings. Would there
14 have been any reason why Jane would not have gotten
15 bonus points for Barnes?
16   A  I don't recall. I don't recall if they
17 had already stocked Retavase or not, I don't know.
18   Q  You speak about Jane's work critical
19 objective at St. Joseph's and then talk about some
20 uncontrollable circumstance; do you recall what
21 that was?
22   A  Let me take a second to read it here.
23   Q  Sure.
24   A  I believe that was the scenario discussed

Page 237

1  earlier where the chief of critical care, or
2  something like that, had -- I don't recall if it
3  was taking Retavase off the shelf or just not
4  allowing us to pursue a follow-up on the
5  physicians' interest in radiology in using
6  Retavase, but it was something to that affect.
7      Q  Could that have been when St. Joseph's
8  discontinued using Retavase for heart attacks?
9      A  It might have.  I don't know.  I don't
10 recall.
11     Q  I see.
12         The next point you talk about, let me
13 read it into the record here:  Your fifth critical
14 objective was to follow-up on the interest
15 previously expressed at HDAG.
16         What is that?
17     A  HDAG stands for hemodialysis axis
18 grafts.  Once the patient requires dialysis, they
19 put a tube in the arm essentially to dialyze the
20 patient, they often become clotted.  And it looks
21 like here there was some interest expressed
22 regarding that application with Retavase.
23     Q  Do you recall what facility that was,
24 Tony?

Page 238

1      A  I don't.
2      Q  Could it have been St. Louis?
3      A  I'm thinking it was SLUH,
4  St. Louis University Hospital.
5      Q  Jane is nodding affirmatively, so.
6         What did Jane not do that she should have
7  done that contributed to your comments?
8      A  I'm just taking a moment to read the
9  section.
10     Q  That's fine.  Take whatever time you
11 need.
12     A  You know, I can't speak to the specifics
13 just because it's been too long.  The best I can
14 gather from reading my commentary in here is just
15 that there was poor follow through, follow-up on
16 interest that had been expressed there.  It looks
17 as if we even brought in Dr. Castaneda and got some
18 nephrology support but no progress had been made
19 after that.
20     Q  And is this again dealing with Retavase?
21     A  Yes, sir.
22     Q  And dealing with Retavase for a
23 nonindicated purpose?
24     A  Yes, sir.

Page 239

1      Q  I don't want to put words in your mouth,
2  but in this document, you say, referring to what we
3  just talked about:  This is another example where
4  inadequate territory coverage and poor follow
5  through has prevented your success.
6         Do you see that?
7      A  Yes, sir.
8      Q  And if I understand your testimony,
9  you're not able today to identify for me what Jane
10 did or did not do that caused you to believe that
11 the territory coverage was inadequate or she did
12 not have sufficient follow through?
13     MR. BRODERICK:  Objection.  Outside of what he
14 talked about already all day today?
15     MR. BAKER:  No.  I'm talking about what he
16 talked about a moment ago when I asked him.
17     MR. BRODERICK:  Objection.  Question is vague
18 and mischaracterizes his entire testimony today.
19     MR. BAKER:  Q Tony, --
20     A  Yes.
21     Q  (Continuing)--what was Jane's poor follow
22 through with respect to the HDAG project and with
23 respect to the catheter clearance which is noted in
24 your report?

Page 240

1      A  The thrust of these comments revolve
2  around inadequate territory coverage.  This was
3  based on, once again, conversations from Jane,
4  review of expense reports where it was clear there
5  was not the type of coverage that was expected
6  throughout the company.
7      Q  Expected throughout the company or
8  expected by you?
9      A  Expected throughout the company.
10     Q  Are you talking about this weekly
11 coverage?
12     A  Complete territory coverage in a two to
13 three-week time frame.
14     Q  Well, you wanted Jane to do it in two
15 weeks; am I correct?
16     A  No.  There was a -- I generated a
17 document showing her how she could do it in two
18 weeks.  I had asked her to develop a document
19 showing me how she could do it in a three-week
20 rotation and a two-week rotation.
21         The point I was trying to make with the
22 two-week rotation was you can do it in two weeks.
23 People do it in two weeks.  People that are in the
24 top 10 percent are certainly doing it two weeks, no

Page 241

1  doubt.
2      Q  Was Caroline Kopecky doing it in two
3  weeks?
4      A  Yes, from what I could gather at the
5  time, that was my recollection.
6      Q  Was Denise Hill doing it in two weeks?
7      A  Who?  It cut out.
8      Q  Denise Hill.
9      A  Dense Hill, she no longer worked for the
10 company.
11         I can't hear you.
12 MR. BRODERICK:  Denise Hill.
13 THE DEPONENT:  Dense Hill.  I'm sorry, I
14 thought you said still.
15         I think I mentioned this before.  There
16 were times where every individual, I believe --
17 there is commentary in their field contact report
18 when I would notice that certain accounts were not
19 being covered in a timely manner.
20         And, you know, if it's a matter of one
21 account that's not that significant, there's lots
22 of emphasize on hitting that account every two or
23 three weeks.  But when there's several accounts or
24 most of the territory is not covered in a timely

Page 242

1  manner in two to three weeks, that's when this
2  becomes an issue.
3         So I'm certain that it's normal that some
4  sales reps occasionally don't have the coverage
5  that they should have, their numbers typically
6  slip, their managers typically coach.
7         Our objective -- my objective, and I did
8  consult with Bob Russell on this, and he was in
9  complete agreement that it is an understood rule
10 that representatives should be covering their
11 territory in a two-week time frame without an
12 office day.
13         That this was a way to try and coach Jane
14 on how to manage her territory.  Her sales ranking
15 slipped from quarter to quarter, it negatively
16 impacted me; it negatively impacted Jane,
17 obviously; and it negatively impacted Michelle
18 Johnson; and it negatively impacted Bob Russell.
19     Q  Well, actually, her Cordis performance
20 improved, did it not?
21     A  It did.  In that quarter it did, that is
22 correct.  And she would have been paid accordingly.
23     Q  And to the extent her Retavase
24 performance slipped, she was restricted in terms of

Page 243

1  how she could market that product, correct?
2      A  Correct.
3      Q  With respect to the HDAG and the catheter
4  clearance noted in section four of your field
5  progress report, other than what you characterize
6  as Jane's inadequate coverage, was there anything
7  else she did or didn't do which you felt evidenced
8  poor follow through?
9      A  I don't recall.  I mean, once again, the
10 thrust of this was not adequately covering the
11 territory, and by doing so, you're not adequately
12 following-up on expressed interest for the product.
13     Q  Expressed interest because she didn't
14 call on them every two weeks or every week?
15     A  If there is interest -- based on the
16 commentary that there was interest about converting
17 to catheter clearance or using the product for
18 hemodialysis axis grafts, by not being able to move
19 that project along, that's what I'm implying.
20     Q  And in September of 2001, do you know how
21 frequently Jane called on SLUH?
22     A  At this point, I do not recall.
23     Q  Do you know if it was more or less
24 frequently than every two weeks?

Page 244

1      A  I don't recall.  I'm trying to review my
2  comments here.  I don't recall.
3      Q  If you go down, Tony, to other
4  observations, category seven, the first sentence
5  says:  Jane, as we discussed in our last meeting,
6  and as I have mentioned above, the one area that
7  needs your immediate attention is adequate
8  territory coverage -- in parens -- complete account
9  rotation every two weeks -- end reasons -- with
10 improved follow-up and follow through.
11         Do you see that?
12     A  Yes, sir.
13     Q  I think we have probably beaten to death
14 the account coverage, but what do you mean by
15 improved follow-up and follow through?
16     A  At Barnes, for instance, there was
17 interest in converting from TPA or Activase to
18 Retavase, and that project had no progress and
19 little to no activity on them as far as I could
20 tell from Jane's part.  So my -- as an example of
21 you need improved follow-up and follow through,
22 somebody's interested in converting product, then
23 we need to provide them with all the necessary
24 information they need to be able to make that

Page 245

1 decision.
2    Q How do you know Jane wasn't doing that?
3    A Based on riding with Jane, talking to
4 Jane about her activities, looking at her expense
5 reports, getting feedback from people that worked
6 with Jane.
7    Q Who did you get feedback from, Tony?
8    A I want to make sure I'm clear. I'm
9 speaking in, once again, in general terms. It has
10 been far too long for me to remember the specifics
11 around some of the instances.
12        But I would have been getting feedback
13 from Michelle Johnson, she would have likely been
14 getting feedback from the local sales
15 representatives in the area who are in those
16 accounts more than once a week.
17    Q You're assuming that that's what you did?
18    A I'm sorry.
19    Q You're assuming that that is what you
20 did?
21    A I don't believe Jane had ever spoke with
22 me otherwise.
23    Q What do you mean she hasn't spoken?
24    A I don't think during this time frame --

Page 246

1 she more or less corroborated my concern versus
2 disagreeing.
3    Q Do you recall when she did that?
4    A In the discussions that we would have.
5 Over the course of time, as I mentioned --
6    Q Do you recall any of these discussions?
7    A We had these conversations on multiple
8 many occasions prior to our June national sales
9 meeting, at the June national sales meeting, and
10 during or last visit in August.
11        Those conversations, you know, one of
12 them, and I don't recall which one, is when Jane
13 said -- or admitted she had never actually
14 physically been to Des Moines, Iowa at that point
15 in time, that she had only called on the telephone
16 to the account. You know, she didn't agree
17 necessarily that she needed to be in St. Louis when
18 I felt like she needed to be in St. Louis.
19    Q You felt she needed to be there how
20 frequently?
21    MR. BRODERICK: Asked and answered.
22    MR. BAKER: I don't know that it has, John,
23 that's why I'm asking.
24    MR. BRODERICK: I'm going let him answer but,

Page 247

1 you know.
2    THE DEPONENT: I don't know that she
3 specifically -- I don't recall her specifically
4 stating how much time she had been there, it was
5 less than once a week at those accounts.
6    MR. BAKER: Q And you thought she should be
7 there weekly?
8    A I felt the goal should be to be there
9 weekly. If you are there weekly most of the time
10 and you are there every other week sometimes,
11 that's certainly acceptable. And bear in mind,
12 it's a combination of things, it's not just
13 physically driving a car and showing up and
14 actually being at the hospital, I mean, you know,
15 progress is expected, as well.
16    Q Well, progress in what?
17    A In whatever the activity was at those
18 accounts. So at Barnes -- or, yeah -- Barnes, if
19 it's a cath clearance project, it's progress with
20 that. If at SLUH there's interest in axis grafts,
21 it's progress with that.
22    Q So progress in marketing Retavase or
23 selling Retavase for vascular purposes; is that
24 what you are talking about?

Page 248

1    MR. BRODERICK: Objection to the form of the
2 question but subject to that...
3    THE DEPONENT: Progress in performing the
4 duties of the job. If somebody is expressing
5 interest for a particular application, it doesn't
6 -- and it's off label, not indicated use, if Dr. X
7 at this hospital wants to use the product for this
8 particular application it's not indicated, it is
9 our duty -- one of our duties to try to provide
10 them with the appropriate information so that they
11 could, one, if they were going to perform the
12 procedure, perform it safely; two, if it was to get
13 information to pharmacy, to help that physician get
14 through the roadblocks of that institution to be
15 able to use the product.
16    Q How do you know Jane did not do that?
17    MR. BRODERICK: Objection. Asked and
18 answered.
19    MR. BAKER: It hasn't been answered.
20    MR. BRODERICK: Yes, it has been. I'll let
21 him answer again, but this has got to be the fifth
22 time.
23    MR. BAKER: We have never gotten an answer
24 about what Jane did not do.

## Page 249

1   THE DEPONENT: Jane did not cover her accounts
2 in a timely manner.
3   MR. BAKER: You're not telling me anything,
4 Tony. Let's get down to specifics.
5   MR. BRODERICK: Objection. Argumentative.
6   MR. BAKER: Let's get down to specifics.
7   Q What did she not do in her account
8 coverage?
9   MR. BRODERICK: I think he's explained what
10 the consequences are if you are not there. He's
11 explained it several times.
12   MR. BAKER: Well, we're not getting any direct
13 answers.
14   MR. BRODERICK: The answer it what it is.
15   MR. BAKER: You really want to say that,
16 John? He's your witness.
17   MR. BRODERICK: My position has been
18 consistent. He's answered these questions over and
19 over again. You asked him the question several
20 different ways, he's answered them. I think he's
21 told you the best he can recall.
22   MR. BAKER: Here is my problem, okay --
23   MR. BRODERICK: The --
24   MR. BAKER: May I finish?

## Page 250

1   MR. BRODERICK: Okay. I'm sorry.
2   MR. BAKER: I'm trying to make this as short
3 and efficient as possible.
4   MR. BRODERICK: I apologize.
5   MR. BAKER: After four hours covering this, I
6 still am not getting straight answers about what
7 was expected of Jane and account coverage and what
8 was expected of other reps in account coverage.
9 I'm not getting any answers about what Jane did not
10 do or what she did do which characterized poor
11 follow-up.
12   I'm not trying to make this anymore
13 difficult than it is, I'm just trying to get more
14 specific responses about Jane's inadequacies. And
15 if the witnesses's answer is he doesn't know or he
16 can't recall, I will accept that.
17   Q Do you understand where I'm going,
18 Tony?
19   MR. BRODERICK: Can you get more specific than
20 you've already been, Tony?
21   THE DEPONENT: I'm trying. You're asking for
22 specific details about account activity that
23 happened four years ago, we stopped -- I stopped
24 calling on these, my focus has changed, I sold a

## Page 251

1 different product the last couple of years, I'm
2 managing a totally different group over a totally
3 different geography, and I no longer even work at
4 the company.
5   So to get very specific, I really have to
6 rely on the documents. But I can tell you my
7 memory is such that the goal of these field contact
8 reports was to try and get Jane to cover her
9 territory what we considered to be on a normal
10 basis, which is two to three weeks.
11   Jane would push back, she would argue
12 that, you know, she needed to be in Peoria a couple
13 times a week and didn't need to be in Des Moines,
14 or didn't want to be in Des Moines, or it was too
15 far, or didn't want to fly, or didn't want to
16 drive, and that was not an acceptable answer.
17   Do I know all the day-to-day routine
18 activities that Jane did, no, I didn't know those
19 of anybody. What would tell me best of what one
20 person was doing in their territory was the success
21 through their numbers plus what I would witness
22 when I was there.
23   Q The numbers speak for themselves, I
24 guess, right?

## Page 252

1   A Basically, yes.
2   Q What did you witness when you were with
3 Jane that allowed you to believe there was poor
4 follow-up on her part other than what you've
5 already testified to?
6   A I just can't give you specifics because I
7 do not remember specifics at this point. If there
8 is other documentation through E-mails about
9 certain activity and account that would refresh my
10 memory, great. But beyond that, just looking at
11 this field contact report, you know, this is four
12 years ago, I do not remember the specifics around
13 this activity.
14   Q Tony, if you had a concern about what
15 Jane was doing or not doing with the specific
16 account, would you have sent her some E-mail
17 addressing that concern?
18   A I could have. It could have been and
19 certainly was verbal as well and certainly would
20 have been in writing as the field contact reports.
21   Q We have talked about the field contact
22 reports.
23   A I understand.
24   Q And you don't recall what was verbally

## Page 253

1  expressed, but you believe if there were concerns
2  you had, you would have put them in E-mail form at
3  least at some point in time?
4     A I'm saying there could be E-mail
5  documentation. I don't know if there is, but if
6  there is, that would be a good source to look at.
7     Q Give me just a minute here. Tony, can
8  you here me?
9     A Yes, sir.
10    Q What was the policy of Centocor about
11 paying the relocation expenses of a sales
12 representative?
13    A I don't know what the exact policy was.
14 I did talk to Bob Russell and he commented that
15 there was a -- his interpretation was that there --
16 the policy was that they did not relocate sales
17 representatives, in general.
18    Q What do you mean by "in general"?
19       Did you hear that, Tony?
20    A No.
21    Q You used the phrase "in general," and I
22 wanted to know what you meant through the use of
23 that qualifier?
24    A At a later date, Centocor shifted, I

## Page 254

1  believe it was after we sold our cardiovascular
2  business all together to a sister company, and
3  there was an opportunity for some people to have
4  totally lost their current sales position, and I
5  think in that scenario, they were looking to
6  relocate those individuals who needed to pick up a
7  territory at a different part of the country.
8     So I guess my point was there may have
9  been exception. But my understanding in talking to
10 Bob Russell was that that was not a standard
11 practice.
12    Q Do you know a Chris Perzee: P-E-R-Z-E-E?
13    A I'm sorry. What?
14    Q Are you familiar with an individual named
15 Chris Perzee: P-E-R-Z-E-E?
16    A No, I'm not.
17    Q Do you know Kevin Brown?
18    A That name sounds familiar, it sounds like
19 a sales rep in St. Louis, but I'm not certain.
20    Q Do you recall Jane making a request to
21 relocate from Springfield to St. Louis?
22    A No. My recollection is that there was no
23 request. Jane discussed that she was interested in
24 possibly moving to St. Louis, and I encouraged her

## Page 255

1  to explore that opportunity because it was my
2  opinion that part of her challenge was where she
3  was located, according to the feedback she had
4  given me; and therefore, being located in St. Louis
5  would have been more conducive for her in that
6  territory based on Jane's needs.
7     Q Did you put that into writing to her,
8  Tony?
9     A I don't understand. Did I put my
10 perception in writing to her?
11    Q Yeah. Did you encourage her in written
12 form?
13    A No, I did not. And I don't believe Jane
14 ever requested anything in writing for an actual
15 transfer.
16    Q If she requested a lateral move --
17    MR. BRODERICK: We are just talking about
18 relocation, right?
19    MR. BAKER: Yeah, we are just talking about
20 relocating not a transfer of jobs.
21    MR. BRODERICK: Tony, did you understand
22 that?
23    THE DEPONENT: Yeah.
24    MR. BAKER: Q If she requested to be allowed

## Page 256

1  to relocate at the company's expense, how was she
2  to have gone about doing that?
3     A I would say a starting point would have
4  been to contact me, she certainly could have
5  contacted Human Resources or the regional
6  director. And not having been faced with that
7  issue, I certainly would have discussed it with my
8  regional director and HR to find out what the
9  opportunities were.
10    Q If she contacted you and you said, no, I
11 don't think that's a good idea, could she have gone
12 over your head?
13    A Yeah. I would have no say in the
14 matter. I personally thought it would be
15 advantageous for her because she was having
16 difficulty covering her territory out of
17 Springfield. And my recollection of the
18 conversation with her was that would be a positive
19 move, but that I didn't know she might have to
20 physically move herself; but that, you know, if
21 that's what she wanted to do, then she would need
22 to let me know, and we will explore it further.
23 And as far as I know, that was the last I ever
24 heard of it.

Page 257

1    Q  Do you recall approximately when that
2  conversation occurred?
3    A  No.  Well, I would guesstimate it was
4  probably over the summer time frame, but I don't
5  recall specifically.
6    MR. BAKER: John, are you there?
7    MR. BRODERICK: Yes, Jim.
8    MR. BAKER: I think the good news is I'm
9  winding down here.  My suggestion would be that we
10  take maybe a ten-minute break so I can go through
11  my notes.  And if I have any follow-up questions, I
12  will ask them, okay.
13    MR. BRODERICK: Okay.  Very good.
14    MR. BAKER: Before I do that, I do have one
15  other area I would like to cover.
16    Q Tony, do you recall Jane ever
17  informing you that she would like to find other
18  employment opportunities in Johnson and Johnson?
19    A  Yes, I do.
20    Q  And do you recall, would that have been
21  sometime in the late summer or early fall of 2001?
22    A  If I'm not mistaken, it was September 10,
23  2001.  And the only reason I think I remember that
24  date vividly was because obviously the next day was

Page 258

1  September 11.
2    Q  Within Centocor and I guess within
3  Johnson and Johnson, if a sales rep wants to go to
4  another work unit, do they need to secure the
5  permission of their supervisor?
6    A  Actually, they need to secure the
7  regional director's approval, and she did request
8  it, and he promptly sent an E-mail to who she had
9  asked him to send it to, which I don't know if it
10  was J&J recruiting or some other entity, but I was
11  copied so I'm somewhat familiar.
12    Q  So you -- I interrupted you, go ahead?
13    A  We got the request.  Bob Russell replied
14  to us and gave the green light essentially for Jane
15  to pursue other employment opportunities within
16  Johnson and Johnson.
17    Q  So you would have had no role one way or
18  another in giving that approval?
19    A  Correct.  My understanding of the policy
20  is it is up to the regional director, not up to the
21  sales manager.  I certainly would have supported
22  it, but that's irrelevant, it was up to the
23  regional director as far as I understand the
24  policy.

Page 259

1    Q  When you prepared the field contact
2  report of September 19, 2001, were you aware that
3  Jane had made that request?
4    A  Yeah.  My recollection is the request
5  came on September 10, and that within a few days --
6  I think the original request was to -- she
7  requested a form, and Bob Russell's reply was there
8  was not a form but if there was somebody he could
9  notify he will do that.
10    Generally, how this happens is there is
11  an opening at a specific company and so the request
12  is very specific to a company.  My understanding
13  was that this request was just a general request to
14  seek employment.
15    Q  Tony, if an individual wants to compete
16  for a sales position in another Johnson and Johnson
17  company, does the person that makes the hiring
18  decision have access to the employee's personnel
19  file?
20    A  I'm not sure what that policy is.  I know
21  I had interviewed other J&J candidates, and part of
22  my normal routine in interviewing a candidate is to
23  ask for their last two years evaluation, but I get
24  that from the actual candidate, and in those

Page 260

1  instances, they supplied that to me.
2    I've never requested those documents from
3  another manager, nor, when I was a manager, had
4  anybody ever requested those documents from me.
5  And I'm not sure -- I don't know that the policy is
6  that we would be allowed to provide those or if
7  that is incumbent upon the rep to do that if so
8  desired.
9    Q  If you know, based upon your experience,
10  would it be typical that the person making the
11  hiring decision would ask the candidate for recent
12  performance evaluations?
13    A  I can only speak from my own experience
14  the way I was taught, and the way I was taught from
15  my director was that is absolutely a good practice
16  and you should do that as a manager.
17    Q  Would you also ask for recent field
18  contact reports?
19    A  You might.  Less than important field
20  contact reports are just snapshots.  Are you asking
21  me if I did or...
22    Q  No, I wasn't asking you that.
23    A  Sorry.
24    MR. BAKER: Let's take that break now.

Page 261

1       (Whereupon a short recess
2       was taken.)
3    MR. BAKER: Q Tony, was Dr. Castaneda, did he
4  practice at St. Francis Hospital in Peoria?
5    A Yes, sir.
6    Q And while you headed the vascular team,
7  was Dr. Castaneda's group one of the largest users
8  of Retavase for vascular purposes?
9    A In the entire region?
10   Q Yes.
11   A Or my entire territory?
12   Q Yes.
13   A I'm not exactly sure.  He likely was, if
14  he wasn't, he was certainly right up there.
15   Q Do you recall if at one point in time
16  Centocor encouraged physicians to participate in a
17  study concerning Retavase called "the relax trial"?
18   A I'm not sure if I understood the
19  question.  Are you asking me about the timing of it
20  or aware of the trial?
21   Q Well, right now I'm asking you if you are
22  aware of the trial.
23   A Yes, sir.
24   Q What was the relax trial?

Page 262

1    A It was what they called a combination
2  therapy trial for Retavase and Reopro in
3  essentially peripheral arteries, the lower
4  extremity, legs.
5    Q And were physicians recruited to
6  participate in this trial?
7    A Yes, it was a trial with physicians as
8  pants participants.
9    Q And would this have occurred sometime in
10  the warm-weather months of 2001?
11   A I don't recall the timing of it.
12   Q The physicians who participated in the
13  trial, was the Retavase they used provided without
14  charge by the company?
15   A I don't recall.  Generally, my
16  understanding of clinical trials is that product is
17  provided specifically for the trial.
18   Q Without charge for the product?
19   A Correct.  As a typical practice.
20   Q When that occurs, and by that I mean the
21  product is provided to the physician without
22  charge, and the physician practices within the
23  territory of a vascular specialist, does the
24  vascular specialist receive any credit toward their

Page 263

1  baseline or quota for that product?
2    A I don't believe so.
3    Q Do you have any recollection of how many
4  patients Dr. Castaneda's group enrolled in that
5  program?
6    A I believe it was in the twenties but I'm
7  not certain.
8    Q How did that compare with the patients
9  that were enrolled by other physicians in that
10  study?
11   A I believe he was the highest enroller but
12  I'm not certain.
13   Q When he enrolled patients in the study,
14  how did that implicate the amount of Retavase which
15  was sold to his patients?
16      That probably was a lousy question; do
17  you understand it?
18   A I think I understand what you're asking
19  me.
20   Q Well, good, you're doing better than I
21  am.
22   A I'm getting good at this.
23      It would have been -- any time there's a
24  clinical trial with any product, there certainly is

Page 264

1  some type of impasse in the territory.  Twenty some
2  odd patients for this particular trial would have
3  been, you know, just depending on how many were
4  mixing and storing Retavase, the impact would have
5  been little to very little.
6      This was an account that was doing
7  roughly 250 vials a year, 20 patients.  My
8  understanding of the relax trial was that it was
9  low-dose Retavase and half-dose Reopro; and
10  therefore, the infusions would have accumulated to
11  just a few units per patient.
12   Q Do you know how many vials of Retavase
13  Dr. Castaneda's group used during this study?
14   A For the study?
15   Q Yes.
16   A The answer is no, regardless.  I'm just
17  not sure if you are asking for the study or
18  overall, I don't recall.
19   Q I was talking about the study.
20   A No, sir.
21   Q Tony, was there any restriction or
22  limitation placed upon vascular representatives in
23  communicating with Centocor officials who were
24  above your level?

Page 265

1    A  No, sir.
2    Q  For example, could a vascular specialist
3  communicate with Bob Russell concerning his sales
4  activities, at least letting know -- letting
5  Russell know what he was doing on a particular
6  project?
7    A  Yes, they could.
8    Q  Do you know a Keith Cramsey?
9    A  Yes, I do.
10    Q  And back in 2001, what was his position
11  in Centocor?
12    A  When I first knew Keith, he was a health
13  system account manager, and then -- actually, I
14  think he managed health system account managers,
15  and he was -- I believe in 2000 -- was the question
16  2001 or 2002?
17    Q  2001.
18    A  2001 he would have been, I believe, a
19  regional marketing manager.
20    Q  Could a vascular specialist communicate
21  with Mr. Cramsey to let Mr. Cramsey know what the
22  productivity was of that vascular specialist?
23    A  Certainly anybody has a prerogative to
24  communicate with these individuals.  I think -- I

Page 266

1  mean for Keith -- with Bob or Keith, it should be
2  specific to those roles just out of professional
3  courtesy to what these individuals are doing and
4  their time constraints.
5    Q  Did you ever have any conversations with
6  Jane Minor concerning her practices in
7  communicating with Keith Cramsey or Bob Russell or
8  Bill Pinon?
9    A  I believe there was some communication,
10  my recollection is I don't recall if it was from
11  Bob Russell or from Keith Cramsey or from both.
12  But to some extent, there was communication to me
13  that there was excessive communication with a lot
14  of detail in basically daily activity that was not
15  deemed pertinent to these individuals and was asked
16  if I could communicate that to Ms. Minor.
17    Q  So they didn't want -- or at least one of
18  them didn't want Jane to communicate?
19    A  Correct.  My recollection is that one or
20  both did not want the frequent daily updates or
21  just, you know, frequent communication over
22  day-to-day-type activities.  We certainly encourage
23  people to communicate success if you have key
24  successes, key learnings throughout the

Page 267

1  organization.
2    And it is common practice at Centocor to
3  pass E-mails and forward E-mails and voice mails
4  along all the way up to the president of the
5  company, but those are done on a selective basis
6  when they are considered to be impactful.  We don't
7  pass along routine daily activity to those
8  individuals.
9    Q  Do you know, as you sit here, what Jane's
10  practices were in communicating with those
11  individuals during the year 2001?
12    A  I'm sorry, it cut out.
13    Q  Do you have any knowledge as to what
14  Jane's practices were in communicating with those
15  individuals during the year 2001?
16    A  I don't recall other than the comment
17  that was made to me about requesting that daily --
18  or routine-type, daily-type activity not be
19  communicated to those individuals.
20    MR. BAKER:  Very good.  I have no further
21  questions.  Thank you.
22    THE DEPONENT:  Thank you, Jim.
23    MR. BRODERICK:  I just have a few follow-up
24  questions.  For the record, this is John Broderick

Page 268

1  for Centocor.
2    EXAMINATION
3    BY MR. BRODERICK:
4    Q  Tony, let me just direct your attention
5  to Exhibit 29 A.  Tony does this document reflect
6  any final decision as to the importance of any of
7  these accounts that were discussed as being
8  included in Jane's territory if quarter one of
9  2001?
10    A  No, it does not.
11    Q  Do you believe, if you review this
12  document today, that this document appears to
13  reflect input from Jane as to these accounts?
14    A  Yes, it reflects input from Jane, as well
15  as input from Michelle, as well as historical sales
16  data.
17    Q  In some of your field contact reports,
18  you have some baseline information and other
19  information about sales; where do you get the
20  baseline information from?
21    A  That information would not come from me,
22  that came from sales operations, I believe that
23  would come from Jim Alexander.
24    Q  Moving on to the physical boundaries of

Page 269

1 the territories of the vascular specialist, did you
2 design the physical boundaries -- the physical
3 boundaries of the borders of the territories of the
4 vascular specialist?
5    A  No, sir, those were predetermined at the
6 time I came on as a vascular sales team leader, and
7 those were identical -- to the best of my
8 knowledge, they were identical to the overlapping
9 cardiovascular districts.
10    Q  The vascular specialist territories were
11 identical to the cardiovascular districts; is that
12 right?
13    A  The vascular sales specialist positions
14 were identical to the overlapping cardiovascular
15 district. My overall geography overlapped Bob
16 Russell's entire region.
17    Q  And the cardiovascular districts were
18 predetermined prior to you becoming a team leader?
19    A  Yes, sir.
20    Q  And do you know who predetermined those?
21    A  That would have been from upper
22 management.
23    Q  You didn't have a role in that?
24    A  No, sir.

Page 270

1    Q  Generally, why would Michelle Johnson
2 desire to have Ms. Minor assigned to any particular
3 account in her district?
4    A  Michelle would have had interest as it
5 relates to -- as it impacted her cardiovascular
6 business. So for instance, at one hospital there
7 may be simply the market share at that hospital,
8 that would affect the overall refund at the end of
9 the year that the account would get as it relates
10 to Retavase or how that hospital impacted the
11 overall health system it might be a part of.
12     And certainly there's times where a key
13 customer at an account is influential at other
14 accounts in the city. So for those various
15 reasons, those would be reasons that Michelle would
16 want coverage from a vascular sale's specialist
17 perspective.
18    Q  If the hospital purchased more Retavase
19 for additional use, they might get a discount at
20 the end of the year?
21    A  The contracts were driven by market share
22 so there were two essential products, Retavase and
23 Activase. And the Activase contracts were very,
24 very high-market-share driven. We were more

Page 271

1 competitive. And it varied, but you could get your
2 first discount at 50 percent. But those were the
3 kinds of things that were taken into consideration
4 to the importance of any one hospital or a hospital
5 in a health system, etc.
6    Q  How did you know -- well, excuse me.
7     How did you learn that there was a
8 requirement that you had to take on key accounts in
9 2001 as a team leader?
10    A  That was communicated either by
11 Bob Russell or senior management as a part of the
12 vascular sales team leader position. I don't
13 recall if that was in place from day one or very
14 early in Q1 but in the summer in that time frame.
15    Q  Just so I'm clear, all the accounts you
16 took on as key accounts as team leader, those were
17 shared accounts where a vascular specialist was
18 also assigned to them?
19    A  In my team -- I can't speak to other
20 regions -- but for my team, I believe all those
21 accounts were also covered by a vascular sales
22 specialist.
23    Q  Were you also --
24     Did you get some degree of compensation

Page 272

1 for being assigned to the key accounts?
2    A  Yes.
3    Q  Would the compensation that you derived
4 from being assigned to those accounts, did that
5 deprive the vascular specialist of any
6 compensation?
7    A  No, it was independent from any
8 compensation a vascular sales specialist would have
9 received.
10    Q  Moving on to the bonus points. Did you
11 have complete and total discretion in awarding
12 bonus points?
13    A  Yes.
14    Q  I mean is it possible hypothetically that
15 you could have gone throughout the year 2001
16 without awarding any bonus points whatsoever?
17    A  Correct.
18    Q  Was it made clear to the vascular
19 specialists that the bonus points were not a
20 guaranteed part of their compensation?
21    A  That is my recollection, yes.
22    Q  To your knowledge, did you take any
23 disciplinary action as to Ms. Minor?
24    A  No, I did not.

Page 273

1  Q  I think this was touched upon earlier.
2  What disciplinary action was available for a team
3  leader to take for a vascular specialist?
4  A  We had something called PIP which stood
5  for I believe performance -- I'm drawing a blank
6  now -- performance improvement plan, and those were
7  very detailed.  I believe you would do that with
8  HR's help.
9      And you would establish certain
10  objectives.  There would be a time frame 30, or 60,
11  or 90 days, whatever was deemed appropriate.  And
12  then if somebody met all the objectives, they would
13  come off of the PIP.  If they did not meet those
14  objectives, the next step was typically
15  termination.
16  Q  Who ultimately had to decide
17  termination?
18  A  I believe both a PIP -- in termination,
19  certainly a recommendation might come from the
20  manager, but you would have to get agreement from
21  the regional director as well as Human Resources.
22  Q  Ms. Minor was not terminated, to your
23  knowledge, was she?
24  A  Not to my knowledge.

Page 274

1  Q  Describe how Jane -- how any vascular
2  specialist, including Jane, if they had slipping
3  sales figures, how would that have a neglect impact
4  on your compensation?
5  A  I was paid on an average of my sales
6  representatives, so I was responsible for the
7  entire region or the entire territory -- my
8  territory.  I don't recall the specifics behind the
9  percentage when I had account responsibility that
10  first year.  That would have comprised a small
11  percentage of my pay.
12      And essentially the remainder of it would
13  have been my team's performance on both Retavase as
14  well as Cordis.  So I would -- Jane's territory was
15  one-fourth, so that would have impacted that
16  component of my compensation by one-fourth.
17      I was just going to say, and that's the
18  same, to some extent, the same issue for Michelle
19  Johnson, the cardiovascular manager.  The entire
20  district, the impact that a vascular sales
21  specialist does or doesn't have in a territory can
22  negatively impact the sales manager on the
23  cardiovascular side.
24      And then Bob Russell, being responsible

Page 275

1  for business in the entire region, obviously to a
2  lessor extent, that lack of performance or whatever
3  the performance is would affect him positively or
4  negatively depending on the performance.
5  Q  You say that component was an average of
6  the four vascular specialist in your region, so if
7  one vascular specialist had a zero compensation for
8  that quarter, then that average would be three
9  numbers plus zero?
10  A  Correct.
11  Q  Do the field contact reports, to your
12  knowledge, is it a policy of Centocor for those to
13  be put into an employee personnel file?
14  A  No, they are not.
15  Q  Who sees these field contact reports as a
16  matter of course?
17  A  The manager who obviously creates them,
18  the sales rep who receives them, and it was normal
19  practice for me to copy my regional director.
20  Q  Anyone else?
21  A  No.
22  Q  Did anyone --
23      After Jane obtained a release from
24  Bob Russell, did anyone contact you from other J&J

Page 276

1  subsidiaries about Jane?
2  A  No, they did not.
3  Q  No one contacted you to get a reference
4  or to get your opinion of her performance or
5  anything like that?
6  A  Correct, no one ever contacted me.
7  MR. BRODERICK:  I have no further questions.
8  MR. BAKER:  I have a few questions.
9      EXAMINATION
10      BY MR. BAKER:
11  Q  Tony, when is it a vascular rep is placed
12  on a performance improvement plan?
13  A  I don't believe there's a policy that
14  would definitely, definitively outline exactly when
15  that would occur.  Generally, after consecutive
16  quarters of poor performance, the sales manager, as
17  deemed appropriate, would have the opportunity to
18  do that.
19      Once again, they would typically consult
20  HR in this process.  You know, HR would have an
21  opportunity to provide feedback as to whether this
22  was appropriate or not based on the circumstances.
23  Q  If a sales rep's sales performance in a
24  given quarter was either at the bottom or toward

Page 277

1  the bottom of all sales reps, would the sales rep
2  typically be placed under a performance improvement
3  plan to bring sales up?
4      A  No.  I mean it would depend on the
5  circumstances, but in general, no.
6      Q  Why is that?
7      A  If somebody's at the bottom after one
8  quarter?
9      Q  Sure.
10     A  Well, because it's our goal -- it was my
11  goal as a manager, and I believe it's Centocor's
12  goal to try and work with representatives to have
13  them achieve their goals, as well as the company's
14  objectives.
15         You know, it's very costly to hire a
16  replacement person, it's much less expensive to
17  work with them and coach to the issues that you
18  feel are what's impacting their poor performance.
19         I certainly have worked for companies
20  that would terminate much quicker than Centocor
21  does.
22     Q  In response to John's questions, you
23  talked about the disciplinary process at Centocor.
24     A  You dropped-out.  Sorry.

Page 278

1      Q  In response to some of Mr. Broderick's
2  questions, you spoke to the disciplinary process at
3  Centocor for sales reps; do you recall your
4  testimony in that effect?
5      A  Yes, sir.
6      Q  Was that based upon your interpretation
7  of a written document?
8      A  No, that is based on my conversations
9  over time with senior management.
10     Q  Are you aware of there existing any type
11  of written document dealing with when and under
12  what circumstances someone would be placed on a
13  performance improvement plan?
14     A  No, sir.
15     Q  What role would a team leader have in
16  placing someone under a performance improvement
17  plan?
18     A  They would generally be the one -- since
19  they are serving as the manager for that sales
20  team, the manager would typically be the one who
21  would initiate the dialogue between the director
22  and HR and the need for a PIP.
23     Q  Tony, if you know, were field contact
24  reports limited to Centocor or did all of the

Page 279

1  Johnson and Johnson subsidiaries have fields
2  contact reports?
3      A  I don't know if all of them do.  There is
4  no standardized form throughout J&J.  As I've seen
5  other J&J employees' field contact reports during
6  my interviewing over the years, what they look for
7  or what they entail or -- they vary from company to
8  company.
9      Q  Do all J&J companies though have some
10  sort of report that is periodically given to sales
11  reps between annual evaluations?
12     A  I don't know if all J&J companies do
13  that.  I can tell you from my experience, that is
14  an industry norm in the pharmaceutical business.
15     Q  So if someone were hiring a candidate for
16  a sales position within the Johnson and Johnson
17  hierarchy, that individual would be aware that
18  there might be some periodic evaluations or
19  reporting assessing performance done of that
20  employee?
21     A  They would likely have that assumption,
22  yes.
23     Q  Have you ever interviewed an individual
24  for a sales position who was working either in

Page 280

1  another branch of Centocor or for another Johnson
2  and Johnson company?
3      A  I'm sorry, I want to make sure I
4  understand the question.  Have I interviewed
5  somebody from Centocor from another division of
6  Johnson and Johnson?
7      Q  Let me start over.
8         Have you ever interviewed a candidate for
9  a position in your work unit who was working for
10  either another Johnson and Johnson company or for
11  some other part of Centocor?
12     A  Yes.
13     Q  And, typically, have you asked, during
14  the interview process, for copies of recent field
15  contact reports?
16     A  I generally ask for -- my requirement is
17  to get the last two years year-end evaluation, and
18  I do solicit, if they have any field contact
19  reports, to provide me with one or two.
20     Q  One or two more recent ones?
21     A  Correct.
22     Q  And was that something you were taught to
23  do?
24     A  Correct.  That was a recommendation from

Page 281

1 my regional director.
2   Q  I'm going through my notes of
3 Mr. Broderick's questions. I think I'm done, let
4 me just check something here.
5       Tony, -- and I promise you, we're right
6 toward the end -- going to Exhibit 23, which is
7 your field contact report for Jane.
8   A  Yes, sir.
9   Q  If you go down to "other observations,"
10 that section, you have some very specific -- or you
11 have some directives of her, to improve in her
12 follow-up and to improve in her territory coverage;
13 do you see that?
14  A  Yes, sir.
15  Q  And you also raise some concerns about
16 her returning pages in a timely manner; do you see
17 that?
18  A  I'm trying to find it.
19  Q  Okay.
20  A  Okay. Yep.
21  Q  And there's something about turning in
22 paperwork for regularly; do you see that?
23  A  Yes.
24  Q  If there had been no improvement in

Page 282

1 Jane's performance in those categories, at the time
2 of her next field contact report, would she have
3 been placed under a performance improvement plan?
4   A  We would have evaluated that opportunity
5 at that time and I can't say she would have been.
6   Q  But it certainly was --
7   A  Sometimes there is -- I'm trying to think
8 here. Once again, I did not have any experience
9 with any of this because I never had to put anybody
10 under PIP. I believe there was kind of an action
11 plan you could put together prior to a PIP.
12       But I guess my point here is that that
13 certainly would have been up for consideration, but
14 I can't say we would have or we would not have.
15  MR. BAKER: All right, I have no further
16 questions. Thank you.
17  MR. BRODERICK: Thank you.
18       FURTHER DEPONENT SAITH NOT.
19
20
21
22
23
24

Page 283

1   I, ANTONIO SICILIANO, having read the above
2 and foregoing, find the same to be true and correct
3 with the following additions and/or corrections, if
4 any:
5 Page_____Line_____Change:
6 Page_____Line_____Change:
7 Page_____Line _____Change:
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23 Antonio Siciliano (12-14-04)       DATE
24

Page 284

1 STATE OF ILLINOIS      )
2                        ) SS
3 COUNTY OF MENARD  )
4       C E R T I F I C A T E
5   I, Tricia L. Gudgel, a Notary Public and
6 Certified Shorthand Reporter in and for said County
7 and State do hereby certify that the Deponent
8 herein, ANTONIO SICILIANO, prior to the taking of
9 the foregoing deposition, and on the 14th of
10 December A.D., 2004, was by me duly sworn to
11 testify to the truth, the whole truth and nothing
12 but the truth in the cause aforesaid; that the said
13 deposition was on that date taken down in shorthand
14 by me and afterwards transcribed, and that the
15 attached transcript contains a true and accurate
16 translation of my shorthand notes referred to.
17       Given under my hand and seal this 31st
18 day of December A.D., 2004.
19       Tricia Gudgel
20       Notary Public and
21       Certified Shorthand Reporter
22 License No. 084-004053

OFFICIAL SEAL
TRICIA GUDGEL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11-3-2007

23
24