**Page 1**

1   UNITED STATES DISTRICT COURT

2   FOR THE CENTRAL DISTRICT OF ILLINOIS

3   SPRINGFIELD DIVISION

4   M. JANE MINOR,

5        Plaintiff,

6   vs.                    No. 02-3354

7   CENTOCOR, INC., AND JOHNSON
    AND JOHNSON, INC.,

8        Defendants.

9

10

11

12        TELEPHONIC DEPOSITION of RANDY VAN

13   CLEAVE, taken in the above-entitled case before

14   Julie A. Brown, a Notary Public of Christian

15   County, acting within and for the County of

16   Sangamon, State of Illinois, at 10:00 o'clock A.M.,

17   on December 16, 2004, at 415 South Seventh Street,

18   Springfield, Sangamon County, Illinois, pursuant to

19   notice.

20

21

22        Baldwin Reporting & Legal-Visual Services
23        Serving Illinois, Indiana & Missouri
     24hrs (217)788-2835   Fax (217)788-2838
24             1-800-248-2835

---

**Page 3**

1                I N D E X

2   DEPONENT                          PAGE NUMBER

3   Randy Van Cleave

4        Examination by Mr. Baker        5, 92
         Examination by Mr. Broderick    90

5

6

7

8

9

10              E X H I B I T S

11   NUMBER              MARKED FOR IDENTIFICATION

12   (None.)

13

14

15

16

17

18

19

20

21

22

23

24

---

**Page 2**

1   APPEARANCES:

2   BAKER, BAKER & KRAJEWSKI, LLC
    BY:  James P. Baker, Esq.
3        415 South Seventh Street
         Springfield, Illinois  62701
4        On behalf of Plaintiff.

5   PUGH, JONES, JOHNSON & QUANDT, P.C.
    BY:  John M. Broderick, Esq.
6        180 N. LaSalle Street, Suite 3400
         Chicago, Illinois  60601
7        On behalf of Defendants via telephone.

8   ALSO PRESENT:

9        Ms. Jane Minor
         Ms. Velma Bailey
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

**Page 4**

1            S T I P U L A T I O N

2        It is stipulated and agreed, by and
    between the parties hereto, through their
3   attorneys, that the telephonic deposition of RANDY
    VAN CLEAVE may be taken before Julie A. Brown, a
4   Notary Public and Certified Shorthand Reporter,
    upon oral interrogatories, on the 16th of December
5   A.D., 2004, at the instance of the Plaintiff at the
    hour of 10:00 o'clock A.M., at 415 South Seventh
6   Street, Springfield, Sangamon County, Illinois;

7        That the oral interrogatories and the
    answers of the witness may be taken down in
8   shorthand by the Reporter and afterwards
    transcribed;

9        That all requirements of the Federal
10   Rules of Civil Procedure and the Rules of the
    Supreme Court as to dedimus, are expressly waived;

11

12        That any objections as to competency,
13   materiality or relevancy are hereby reserved, but
    any objection as to the form of question is waived
14   unless specifically noted;

15        That the deposition, or any parts thereof
    may be used for any purpose for which depositions
16   are competent, by any of the parties hereto,
    without foundation proof;

17        That any party hereto may be furnished
18   copies of the deposition at his or her own expense.

19

20

21

22

23

24

COPY

Page 5

1  (Whereupon the Deponent was
2  sworn by the Notary Public.)
3  R A N D Y  V A N  C L E A V E
4  having been first duly sworn by the Notary Public,
5  deposeth and saith as follows:
6  EXAMINATION
7  BY MR. BAKER:
8  Q  Good morning, Randy.  Would you state
9  your name and address, please?
10  A  Randy L. Van Cleave.  My address is 14370
11  Northwest 61st Street, Parkville, Missouri, 64152.
12  Q  All right.  And what is your date of
13  birth?
14  A  11/15, 1952.
15  Q  Presently where are you employed?
16  A  Centocor, Incorporated.
17  Q  And what do you do for Centocor at this
18  time?
19  A  I am an immunology specialist on the
20  gastroenterology side.  My title is IS/G as in
21  gastro.
22  Q  Is that a sales position?
23  A  Yes, sir, it is, Jim.
24  Q  Randy, did you do anything to prepare

Page 6

1  yourself for today's deposition?
2  A  Yes.  Yes, I did.
3  Q  Can you take me through what you did to
4  get ready for today?
5  A  John discussed with me what the possible
6  things were going to be asked so that I was, up to
7  this point I wasn't aware of anything going on.  I
8  mean I didn't know what to expect, I guess.
9  MR. BRODERICK: Just for the record, I'm sorry,
10  I'm just going to object.  I am representing Mr.
11  Van Cleave today.
12  MR. BAKER: I'm not asking him to tell me what
13  you guys talked about.
14  MR. BRODERICK: Okay.  It's privileged, our
15  conversation.  Okay.
16  THE DEPONENT: Yeah.  I spoke with John about
17  it.
18  MR. BAKER:  Q  Sure.  Okay.  Other than, how
19  long did you talk with John?
20  A  Two hours.
21  Q  And was that was sometime
22  yesterday?
23  A  Yes, sir.
24  Q  Okay.  Other than talking with John, have

Page 7

1  you done anything to prepare for your deposition?
2  A  No, I have not.
3  Q  Have you reviewed any documents or papers
4  to get you ready for your deposition?
5  A  Other than what John showed me?
6  Q  Yes, that's correct.  Other than what
7  John showed you.
8  A  No, I have not.
9  Q  Do you recall what documents you reviewed
10  with John?
11  A  Yes, I do.
12  Q  What were those?
13  A  What were those?
14  Q  Yes.
15  A  I reviewed some field contact reports and
16  territory alignments and that was really the only
17  two documents I actually reviewed.
18  Q  Okay.  Were these field contact reports
19  that were done for you?
20  A  Yes, sir.
21  Q  And were those field contact reports that
22  were done for you by Tony Siciliano?
23  A  That is correct.
24  Q  Okay, very good.  Randy, I'd like to get

Page 8

1  to know you a little better.
2  A  Okay.
3  Q  Find out a little bit about your
4  background.  Let's begin this way.  Can you
5  describe for me the extent of your education taking
6  you from high school to today?
7  A  Graduated 1971 from Sidney High School,
8  Sidney, Nebraska.  I attended Chadron State College
9  for a year and a half at Chadron, Nebraska.  I
10  transferred to the University of Wyoming.  I was at
11  the University of Wyoming for one and a half
12  years.  I quit school and went to Lincoln,
13  Nebraska.  I enrolled at Done College in Lincoln
14  Nebraska in, oh, I don't know what year I
15  graduated.  '96, I guess, and graduated from Done
16  College in Lincoln with a bachelor's degree in
17  human relations and allied health.
18  Q  Okay.  After getting your bachelor's
19  degree, have you done anything to further your
20  education?
21  A  No, sir.
22  Q  Okay.  If you would, can you tell me what
23  your employment experiences were between leaving
24  high school and joining Centocor?

Page 9

1  A  Yes, sir.  When I left school my first
2  real job was, what I consider a real job was in
3  1974 as a respiratory therapy technologist at
4  Lincoln General Hospital in Lincoln, Nebraska.  I
5  advanced from respiratory therapy to
6  cardiopulmonary.  In the mid 80s I was named
7  director of vascular diagnostic services at Lincoln
8  General where I was a registered vascular
9  technologist.
10      In 1996, I was offered a position with
11  Abbott Laboratories as a vascular specialist for
12  Abbott Laboratories.  I was with Abbott
13  Laboratories from '96 to 1999 where I left Abbott
14  Laboratories and was hired by Centocor in either
15  December of '99 or January of 2000 and I've been
16  with Centocor since.
17  Q  Now, your job at Abbott Laboratories, was
18  that a sales position?
19  A  Yes, it was.
20  Q  And did that involve selling either drugs
21  or medical products?
22  A  That involved selling drugs, the drug
23  Urokinase and I was, and that's what I did for
24  Abbott Laboratories until Urokinase was eliminated

Page 10

1  from the market.
2  Q  We'll talk about that in a moment.  Was
3  your job at Abbott Laboratories your first job that
4  involved selling product?
5  A  Yes.  I do forget.  There was a, 1978 to
6  '79 I owned an oil and gas leasing company in
7  Denver, Colorado.  So that was major employment.
8  Sorry.  I did forget that little part of my life,
9  but that wasn't a true sales position but we, but
10  it was a sales like position.  We were buying oil
11  and gas leases from major oil companies.  But
12  Abbott was the true first sales position that I've
13  ever had.
14  Q  And if my notes are accurate here, you
15  worked for Abbott for somewhere around four years?
16  A  About, from '96 to '99, so about three
17  years.
18  Q  Okay.  And when you worked for Abbott,
19  what was your sales territory?
20  A  I had Springfield, Joplin, Missouri;
21  Columbia, Missouri; Kirksville, Missouri and parts
22  of Kansas City, Missouri.  So it was pretty much
23  the western half of Missouri.
24  Q  I see.  And you mentioned Urokinase.

Page 11

1  A  Yes, sir.
2  Q  Was that the product you sold for Abbott
3  during that three year time frame?
4  A  I sold Urokinase until it was removed
5  from the market in '98 and then I sold Depakote
6  Depakene product for about I guess three months and
7  then I sold OxyCodone for about two months.
8  Q  What is OxyCodone?
9  A  OxyContin.
10  Q  Oh, OxyContin.  That's a pain medication?
11  A  Yes, sir.
12  Q  Okay.  I know that from--
13  A  That was a co-marketing with Purdue that
14  Abbott was doing.
15  Q  And the other products you sold after you
16  quit selling Urokinase, what did they do?
17  A  Depakote and Depakene, they're for
18  bipolar disease.
19  Q  That would be something you would call on
20  psychiatrists?
21  A  Yes, sir.
22  Q  Okay.  Can you describe for me what
23  Urokinase was?
24  A  I'm sorry.  Repeat that, please.

Page 12

1  Q  What is Urokinase?
2  A  Urokinase is a, it's a drug that is
3  derived from fetal kidney cells that works as a
4  thrombolytic agent.  It lysis or dissolves blood
5  clots.
6  Q  And is it used in treating heart disease?
7  A  It was indicated for acute MI as well as
8  pulmonary embolism.  That was the indication.
9  Q  When you say indication, you mean what?
10  A  That was on our package label insert.
11  That was what the drug was studied for and that's
12  what they got the FDA approval for.
13  Q  I see.  And when you use the term MI,
14  you're talking about--
15  A  Myocardial infarction.
16  Q  Or heart attacks to us lay people?
17  A  Yes.
18  Q  Okay.  Did you sell Urokinase when you
19  were with Abbott for purposes other than pulmonary
20  embolisms and heart attacks?
21  MR. BRODERICK: Objection to the form.
22  MR. BAKER: What's your objection?
23  MR. BRODERICK: That you used the word but he
24  can answer?

Page 13

1    A  I, I represented Abbott to interventional
2  radiologists to, and vascular surgeons for their
3  use in nonindicated procedures as arterial
4  occlusion, deep vein thrombosis, peripheral
5  vascular disease. I did not call on cardiologists.
6    Q  I see. When you use the term peripheral
7  vascular disease, Randy, what do you mean?
8    A  I mean acute arterial occlusions caused
9  by blood clots or acute venous occlusions caused by
10  thrombosis. Deep vein thrombosis and or arterial
11  occlusions including stroke.
12    Q  These would be unrelated to the heart?
13    A  Unrelated to the heart.
14    Q  Or the lungs I guess too.
15       What happened to Urokinase?
16    A  Urokinase was, the FDA pulled Urokinase
17  from the market for safety concerns regarding, to
18  my knowledge safety concerns regarding the
19  production of the drug being a human source drug
20  and not having the appropriate testing for
21  Hepatitis B, C and HIV.
22    Q  Okay.
23    A  To my understanding.
24    Q  When you were--

Page 14

1    A  I'm not privileged to what the FDA
2  actually said to Abbott.
3    Q  Sure. When you were involved in making
4  Urokinase available to physicians for treating
5  peripheral vascular disease, were there other
6  medications that were being marketed or sold to
7  physicians that had the same purpose as Urokinase?
8    A  Could you clarify your question? You
9  mean from other companies?
10    Q  Yes. What medication was your
11  competitor, I guess?
12    A  The only drug that had FDA approval for
13  peripheral vascular disease at that time was
14  streptokinase which was commercially available.
15  There were other thrombolytic agents that were on
16  the market, TPA which is produced by Genentech and
17  Urokinase and I believe Retavase. To be honest
18  with you, I had never heard of Retavase. We did
19  compete with TPA to some extent.
20    Q  And we'll talk about this more later.
21  Retavase was a Centocor product?
22    A  Yes, it was.
23    Q  Okay. Randy, when you worked for Abbott
24  in this territory you described, if you remember,

Page 15

1  how many accounts did you have?
2    A  About 12 to 15 maybe. In that area.
3    Q  Okay.
4    A  Give or take.
5    Q  All right. And these accounts were all
6  located as I understand your testimony generally in
7  the western half of the State of Missouri?
8    A  Yes. The line started at Springfield and
9  then transfers up top Columbia and then north to
10  Kirksville, Missouri and then there was a
11  representative in Kansas City that had Kansas City,
12  half of Kansas City and then Kansas and then I
13  picked up the other half of Kansas City.
14    Q  Okay. Then I assume there was someone in
15  the St. Louis area that covered Eastern, Missouri?
16    A  And there was a rep that covered Eastern
17  Missouri and St. Louis up into Illinois, I guess.
18    Q  When you worked for Abbott in this
19  Western Missouri territory with, dealing with
20  Urokinase, how frequently would you call on your
21  accounts?
22    A  I would call on my accounts, well, I've
23  called on my accounts within a two week period,
24  every account within two weeks.

Page 16

1    Q  Was that a standard in the industry?
2    A  Pretty standard. I really don't know. I
3  mean that's kind of an unfair question because I
4  don't know what the industry standard would be. I
5  just know that that was standard with Abbott or
6  tended to be. You had your key customers which you
7  were more focused on and the lesser accounts you
8  weren't quite as focused on. So you go where you
9  can drive the business.
10    Q  How frequently would you call on your key
11  accounts?
12    A  Weekly.
13    Q  And then your less key accounts every
14  other week?
15    A  Yes.
16    Q  Okay.
17    A  Every other week. Yeah, every other week
18  within a two week period.
19    Q  Okay. And what would, were you living in
20  Springfield, Missouri at that time?
21    A  Yes. Abbott relocated me to Springfield
22  from my previous job.
23    Q  What was the furthest distance from your
24  home to, what customer or account was located

## Page 17

1 furthest from your home in Springfield?
2    A  Kirksville, Missouri, which was the
3 furthest which was actually one of my key customers
4 and that was 260 miles maybe.
5    Q  Okay.
6    A  It took five hours to get there.
7    Q  Can you explain for me how it was you
8 left Abbott and joined Centocor?
9    A  We did not have a product to sell for
10 Abbott.  We were co-promoting Depakote, Depakene
11 with the neuro sales force.  We weren't trained in
12 neuro sales so we weren't able to sample the
13 drugs.  They pulled us off of that and did the
14 OxyContin with Purdue Pharma but that was Purdue
15 Pharma's drug and we co-promoted that with them but
16 we weren't the primary sales reps and I received a
17 phone call from Centocor and asked me if I would
18 like to interview with them and that's how it came
19 about.
20    Q  Okay.  Did you interview?
21    A  I interviewed.  I'm sorry.  What was the
22 question, please?
23    Q  I think you answered the question.  You
24 did interview.

## Page 18

1    MR. BRODERICK: You cut out a little bit, but.
2    MR. BAKER: All right.  Sorry.
3       Q  Do you recall who you interviewed
4 with, Randy?
5    A  Who interviewed me?
6    Q  Yes.  Correct.
7    A  A gentleman by the name of Chris Dansu.
8    Q  Could you spell his last name?
9    A  Spell it?  D-A-N, Dansu.  He's no longer
10 with the company so, but Chris Dansu was the person
11 who interviewed me.  He was the western, or the
12 eastern regional manager for the sales force.
13    Q  And during the interview process, did you
14 find out what position Centocor wanted you to, was
15 considering you for?
16    A  Yes.  This was a new sales force called a
17 vascular specialist position.
18    Q  And what did Mr. Dansu tell you about
19 that particular sales force?  What would it do?
20    A  It was the sales force to promote
21 Retavase and a Cordis product to interventional
22 radiology for peripheral vascular disease.
23    Q  Okay.  When you first went to work for
24 Centocor, who was your boss?

## Page 19

1    A  I'm sorry.  You cut out again.
2    Q  I'm sorry.  When you first went to work
3 for Centocor, who was your boss?
4    A  Chris Dansu was my boss.
5    Q  And how long was he your boss?
6    A  Approximately four, maybe six months.  I
7 believe he left the company in June of 2000.
8    Q  Okay.  While he was your boss, what was
9 your sales territory?
10    A  I had St. Louis; Springfield, Missouri;
11 St. Louis; Springfield, Illinois and Peoria,
12 Illinois was in my sales territory.
13    Q  And how many accounts did you have?
14    A  I'm not sure at this point.  I think I
15 probably had a dozen accounts.  I don't know.  It
16 was five years ago.  I'm not exactly sure.
17    Q  Okay.  How was it you came to be, to get
18 these accounts?
19    A  I'm sorry, Jim.  What?
20    Q  How was it that you had these accounts?
21 Were they assigned to you?
22    A  Yes, they were assigned to me.
23    Q  Did you have any input in the selection
24 of those accounts?

## Page 20

1    A  No, I did not.
2    Q  And while you had those accounts, how
3 frequently would you call upon them?
4    A  I was in St. Louis every week.  I was in
5 Springfield, Missouri every week and I was in
6 Springfield, Illinois every week.  I never called
7 on Peoria.
8    Q  What was your account in Peoria?
9    A  I don't know.  I never called on them.
10    Q  Oh.  Okay.  Was there another Centocor
11 rep that called on the Peoria account?
12    A  Actually Jane Minor called on the Peoria
13 account.
14    Q  Okay.  How did it work then?  Did you and
15 Jane both have Peoria as an account?
16    A  Well, I don't know how it worked on her
17 side but Jane was a cardiovascular rep in Peoria
18 who had a relationship with Dr. Castaneda and had
19 been working that area both on the cardiac, to my
20 understanding on the cardiac and vascular side for
21 some time.  It was, her relationship with strong
22 and I didn't feel that it was necessary or even the
23 right thing to do to intercede where she had the
24 relationship.

Page 21

1　　Q  Okay.  Randy, during this time period,
2　how many accounts did you have in St. Louis?
3　　A  Primarily I had Barnes and, I had three
4　accounts in St. Louis.  Three or four.  I believe
5　it was three though.
6　　Q  Okay.
7　　A  Barns Jewish and Wash U.  I think there
8　was an account there and then another hospital in
9　St. Louis which I forget the name of it.  There
10　were three primary accounts in St. Louis.
11　　Q  And how many accounts did you have in
12　Springfield, Illinois?
13　　A  There were two accounts in Springfield,
14　Illinois.
15　　Q  What were those?
16　　A  St. Francis and St. John's.
17　　Q  You said St. Francis and St. John's?
18　　A  In Springfield, Illinois.
19　　Q  Are you sure about St. Francis?
20　　A  No, I'm not sure.
21　　Q  Could it have been--
22　　A  I wasn't sure if it was St. Francis.
23　　Q  Could it have been Memorial Medical
24　Center?

Page 22

1　　A  It could be.  It could be.  I called on
2　those accounts a very short amount of time and
3　again, that was five years ago, so.
4　　Q  Okay.  And how many accounts did you have
5　in Springfield, Missouri?
6　　A  There were two accounts in Springfield,
7　Missouri and two accounts in Joplin, Missouri.
8　　Q  So you had a total then of nine accounts?
9　　A  That sounds correct.  Target accounts.
10　　Q  All right.  How did you go about covering
11　your St. Louis accounts weekly?
12　　A  I drove to St. Louis and made calls.
13　　Q  And did you have prescheduled
14　appointments for these calls?
15　　A  Sometimes but no, not often.  It was
16　because you were calling on an interventional
17　radiology department so it was pretty open access.
18　Did not really need appointments.
19　　Q  So when you went in, what would you do?
20　　A  I would detail them on, I would detail
21　them on the materials that were approved for detail
22　as well as my Cordis thrombolytic catheters and
23　Cordis products that I had.
24　　Q  Why did you call on them weekly?

Page 23

1　　A  To drive business.  I don't know how to
2　respond to that other than the fact to drive
3　business.
4　　Q  Why would calling on them weekly tend to
5　drive business?
6　　A  As a vascular specialist, you were more
7　than just I believe a sales rep.  You were a
8　resource to those physicians to answer questions, a
9　face in the door keeps your company, your products,
10　your name at the front of their frame so when a
11　patient presents themselves with a condition that
12　may be a candidate for thrombolytic therapy that
13　they think of your product before they think of a
14　competitor's.
15　　Q  Well, I can understand that.  I guess my
16　question is why would you need to do that weekly as
17　opposed to monthly for example?
18　　A  I don't know how to respond to that other
19　than the fact that I was being paid a good wage for
20　a good day's work and so I don't know how else to
21　respond to that.
22　　Q  Okay.  Did you always call upon the same
23　physicians when you visited the hospitals in St.
24　Louis and Springfield?

Page 24

1　　A  I called on, I saw the, I called on the
2　same, well, whichever physician was actually
3　working that particular day.  There may be a group
4　of five or six physicians at a teaching institution
5　where you'd have fellows and it may not be the same
6　person every week.  It depends on who's doing what
7　back in the special procedures room since they do
8　rotate to different parts of the department.  It
9　may be a doctor one week and another doctor the
10　next week or two doctors but it varied.  It was not
11　the same physician every week.
12　　Q  Could you speak up a little bit, Randy?
13　　A  It wasn't the same physician every week.
14　It would depend on who was back in doing special
15　procedures.  They would do various, the
16　radiologists would do different tasks, whether it
17　be CAT scan or whatever.  So whoever was working
18　back in special is who I would talk to as well as
19　the nursing and the technical staff as well, but it
20　wasn't the same person every week.
21　　Q  All right.  As I understand it, sometime
22　mid year 2000 you got a new boss.
23　　A  Yes.  Chris Dansu left the company and
24　there was restructuring with the company and I got

Page 25

1    a new boss by the name of Sue Lansden (sp) who was
2    in Arizona and we moved over from the east region
3    to the west, I moved from the east region to the
4    west region and they did territory realignments at
5    that point.
6        Q   Okay.  And at that point in time, what
7    was your, what did your territory become?
8        A   I, technically Springfield, Missouri wide
9    within the Oklahoma City district.  So I moved over
10   to the Oklahoma City district at that point and
11   gave up the St. Louis side.
12       Q   Okay.  And what were your accounts when
13   you moved into the Oklahoma district?
14       A   I had Springfield, Missouri; Joplin,
15   Missouri; Tulsa, Oklahoma; Oklahoma City and
16   eventually I got Denver and Casper, Wyoming but
17   that was later that year.
18       Q   Okay.
19       A   Shortly thereafter, I guess.
20       Q   How was it you got Denver and Casper,
21   Wyoming?
22       A   They decided, the company decided to put
23   a vascular specialist, align them with a
24   cardiovascular district and the Oklahoma district,

Page 26

1    cardiovascular district had Denver and Casper in
2    that district.  There was a rep out of Arizona who
3    was asked to leave the company, so I took over his
4    coverage in Denver but it went with the realignment
5    with the Oklahoma City district and Denver and
6    Casper, Wyoming as well as Omaha, Lincoln and
7    Kansas City.
8        Q   Did you request those accounts?
9        A   Did I request them?
10       Q   Yes.
11       A   No.
12       Q   Did you request the Omaha and Lincoln
13   accounts?
14       A   No.
15       Q   Are you sure about that?
16       A   No, I did not request them.  I was given
17   an option.  I was given an option to move over to
18   the Oklahoma City side or stay in the St. Louis
19   side.  I opted to go to Oklahoma City.
20       Q   Okay.  Why was it you opted to go to
21   Oklahoma City?
22       A   I thought it was the best thing for the
23   company.  I just looked at it and I thought it was
24   the best thing for the company.  Springfield

Page 27

1    technically lies within the Oklahoma City
2    district.  It did not lie in the St. Louis
3    district.  So I thought it was, I was fine with
4    that.  I grew up in Nebraska so I had customers in
5    Lincoln that I already knew.  So that was part of
6    it.
7        Q   When was it you were given the choice of
8    going to the Oklahoma City territory or staying in
9    the St. Louis area?
10       A   The discussion happened in June of 2000.
11   May or June of 2000.
12       Q   Okay.
13       A   And I was contacted by Chris Dansu and
14   was asked to make a decision.  I also spoke with
15   Bill Pinion (sp) about that as well and after
16   discussion, I decided that it was best for the
17   company for me to be over there on the Oklahoma
18   City side it was okay with me as well.
19       Q   I'm a little unclear about why you felt
20   it was best for the company that you be on the
21   Oklahoma City side.
22       A   There was, from Springfield to St. Louis
23   was 220 miles just to go to St. Louis and to go to
24   Springfield, Illinois was a distance up too.  So it

Page 28

1    was a lot of seat time in the car.  The only
2    accounts that I had close were Springfield,
3    Missouri.  So with Oklahoma City it was
4    Springfield, Tulsa and Oklahoma City which were all
5    closer.  It was easier on me personally as far as
6    travel was concerned.  My over nights were going to
7    be decreased with the exception of trips out to
8    Denver.  So I thought it was, I truly believed it
9    was in the best interest of the company and we had
10   a position over in St. Louis that they were in that
11   area that could take care of it too.
12       Q   Okay.  Who was that?
13       MR. BRODERICK: Could you repeat the question?
14       MR. BAKER:  Q   Randy said there was a
15   position or person in St. Louis.
16       A   Well, Jane was already doing some of the
17   work up in Peoria anyway, so I thought it was good
18   for Jane to come over on this side if she wanted
19   it.
20       Q   So you understood that Jane was going to
21   come over on the vascular side?
22       A   I didn't understand that but it was my
23   hope that she would.
24       Q   Okay.  Let me ask you this, Randy.  At

Page 29

1  the time you left the St. Louis territory and went
2  to the Oklahoma City territory, were you personally
3  acquainted with Jane?
4      MR. BRODERICK: You dropped out at the last
5  minute there.
6      MR. BAKER:  Q When you took over the
7  Oklahoma City territory, were you personally
8  acquainted with Jane?
9      A Yes, I was.
10     Q And how long had you known her?
11     A I had known her for approximately three
12 years.
13     Q Okay. That would have, would that have
14 predated your employment with Centocor?
15     A I knew Jane when I worked for Abbott
16 Laboratories.
17     Q How did you know Jane back in your Abbott
18 days?
19     A Jane worked for Abbott as well.
20     Q Did she sell the same type of product you
21 sold?
22     A Yes, sir. She was not in the same
23 district but Jane and I were friendly. We knew
24 each other.

Page 30

1      Q Okay. Tell me how you and she would come
2  to know each other.
3      A Well, that's a good question. We didn't
4  really have, I don't recall the first time I met
5  Jane. We, probably more at the end of the tenure
6  with Urokinase when we were having management
7  meetings into Chicago regarding some of the things
8  that was going on with Urokinase. That's probably
9  how I got to know her better. We weren't, we
10 didn't socialize at all. I knew her by name and
11 reputation and that's pretty much it.
12     Q What do you mean you knew her by
13 reputation?
14     A Well, I mean only by, I heard her name
15 out there, I guess, and that she had, where she was
16 working. I knew that she was, one of our key
17 customers with Urokinase was Dr. Castaneda and Jane
18 was well known within Abbott Laboratories as
19 working very closely with Dr. Castaneda.
20     Q Okay.
21     A I also had relationships with a physician
22 similar up in Omaha. So that's, that's pretty much
23 how I knew Jane is through those type of
24 relationships and those types of interactions, I

Page 31

1  guess.
2      Q Okay. At the time you left the Oklahoma,
3  you left to go to the Oklahoma region, were you in
4  a position where you could assess Jane's
5  capabilities as a pharmaceutical sales
6  representative?
7      A No.
8      Q Okay. At any time, Randy, were you in a
9  position where you could assess Jane's capabilities
10 as a pharmaceutical sales rep?
11     A No, not really.
12     Q How much contact did you have with Jane
13 after you went into the Oklahoma City territory?
14     A I had substantial contact with Jane.
15     Q And how was that contact?
16     A Via e-mail, via telephone.
17     Q Why is it you and Jane would communicate
18 with one another?
19     A I believe because we both came from
20 Abbott. We had the same supervisor. We were in
21 the same district.
22     Q Were these work related communications or
23 was it just because you were co-employees and you
24 talked about things unrelated to work?

Page 32

1      MR. BRODERICK: You cut out. I'm sorry.
2      MR. BAKER: It wasn't a very good question.
3  Let me strike it.
4      Q Randy, what I'm interested in knowing
5  is why it was you and Jane would communicate with
6  one another.
7      A Jane would call me on my cell phone and
8  we would discuss personal things, what's going on
9  within our families as well as professional things
10 that were going on within our work atmosphere.
11     Q Okay. So the nature of your
12 communications would not necessarily relate
13 to--strike that. Give me just a minute here.
14     In you doing your job and in Jane doing
15 her job, was it necessary that the two of you
16 communicated with one another?
17     A No.
18     Q So if I understand it, these
19 communications were not necessary for business
20 related purposes?
21     A That is correct.
22     Q Okay. Just two colleagues that had
23 things in common and you would chat from time to
24 time?

Page 33

1  A That is correct.
2  Q Okay. Randy, I want to take you, let me
3  ask you this. How long did you work under Sue
4  Lansden?
5  A Oh, from June, approximately six months.
6  Q So that would take us up to late 2000?
7  A To my knowledge, that is correct.
8  Q And what happened in late 2000?
9  A They, the company did a realignment again
10  and they, at that point they, Sue was demoted from
11  a regional manager's position to, back to a area
12  business manager's position and she left the
13  company. Then they aligned the vascular sales
14  force up with the cardiovascular districts and I
15  believe there were five cardiovascular districts or
16  regions or districts in the country, or regions and
17  we went over to the central region which was headed
18  by Bob Russell and that was our vascular sales
19  force. So her position was essentially eliminated,
20  to my knowledge.
21  Q Okay. Now, let me make sure I understand
22  this. Bob Russell headed a region?
23  A He was regional business director of the
24  central region for the cardiovascular business

Page 34

1  unit.
2  Q And at the time you went to work in Bob
3  Russell's region, was there a team concept created?
4  A Yes, there was. Tony Siciliano became
5  the vascular specialist team leader, the STO.
6  Q I'm sorry. I didn't hear the last part
7  of that.
8  A You didn't get the last part of that?
9  Tony Siciliano was hired, promoted from a sales
10  position into the vascular sales team leader
11  position.
12  Q Okay.
13  A And he managed the vascular specialists
14  within that region.
15  Q Okay. The other teams in Bob Russell's
16  region would have marketed to the cardiovascular
17  market? Would have sold to the cardiovascular
18  market?
19  A That is correct. They sold Retavase to
20  cardiology for acute MI as well as GP, the
21  glycoprotein, TB3A inhibitor.
22  Q Randy, did you express any interest in
23  becoming the team leader of the vascular team?
24  A I interviewed for the position, yes.

Page 35

1  Q And do you recall who you interviewed
2  with?
3  A Bob Russell.
4  Q If you know, how many people interviewed
5  for that position?
6  A I do not know.
7  Q Who was selected for that team leader
8  position?
9  A Tony Siciliano.
10  Q And was it ever explained to you why Tony
11  got the job?
12  A It was explained to me that Tony had
13  management experience.
14  Q Did you have any management experience,
15  Randy?
16  A Yes, I did.
17  Q What was your management experience? I'm
18  sorry. Did you hear that?
19  A Yeah. I'm sorry. I had management
20  experience prior to--
21  MR. BRODERICK: Did you ask the question after
22  his answer?
23  MR. BAKER: Yes, I did.
24  MR. BRODERICK: We didn't hear it at all.

Page 36

1  MR. BAKER:  Q What was your management
2  experience, Randy?
3  A I managed a noninvasive vascular
4  department at a hospital.
5  Q How long did you manage that department?
6  A Approximately ten years.
7  Q How many employees worked in that
8  department under your supervision?
9  A Four.
10  Q Okay. Now, once Tony Siciliano became
11  your team leader, was there any change in the
12  accounts you were assigned?
13  A I believe so, yes.
14  Q And can you tell me what the nature of
15  the changes were?
16  A They, some accounts were eliminated from
17  my target list and some were added to my target
18  list.
19  Q Do you recall those that were added?
20  A Do I recall those? No, I don't recall
21  specifically which ones. I would have to look at
22  the alignment. I'm not sure exactly at this point
23  now which ones were added and which ones were
24  deleted.

Page 37

1    Q  Give me just a second here.  Can you
2  explain for me what the process was in terms of
3  having your accounts added and deleted, how that
4  came about?
5    A  Well, I'm not privileged to what went on
6  at the management meeting in Malburn when the
7  management team got together to look at that.  I
8  wasn't there.  So I'm not sure of the process.
9  There was, I was asked for input on to what
10  accounts I thought were good accounts to grow and
11  ones that were not good accounts and I had some
12  input on that.  That was just input.  Other than
13  that, I don't know.
14    Q  Who asked you for that input?
15    A  Tony Siciliano.
16    Q  Do you recall what input you gave to
17  Tony?
18    A  I recall one account specifically in
19  Wyoming that I thought was an untapped resource
20  that I wanted to have in my territory.
21    Q  Okay.
22    A  But other than that, I pretty much went
23  with what was decided.
24    Q  Okay.  I'm shuffling through some paper

Page 38

1  so if you don't hear from me in a moment, don't get
2  alarmed.
3    A  That's okay.
4    Q  Randy?
5    A  Yeah, Jim.
6    Q  Do you have a stack of paper in front of
7  you or approximate to you that John showed you
8  yesterday?
9    MR. BRODERICK: Are you looking for a
10  particular exhibit or--
11    MR. BAKER: Yes, I am.  Exhibit 38.
12    MR. BRODERICK: Okay.
13    MR. BRODERICK: That's really the only reason
14  I'm here, Jim, is to pull papers.
15    THE DEPONENT: I'm looking at it now, Jim.
16    MR. BAKER:  Q If we're both looking at the
17  same document, Randy, it's headed Central Region VS
18  Territory Changes for Q4?
19    A  Yes, I'm looking at that.
20    Q  And if you look down toward the top of
21  that two page document, the first page, there's the
22  name Randy Van Cleave and then VS342103.
23    A  Yes.
24    Q  And then beneath that there seems to be a

Page 39

1  list of hospitals?
2    A  Yes.
3    Q  Okay.  My question to you, Randy, is are
4  those hospitals that you at one time or another in
5  2001 called upon?
6    A  That is correct.  I know the date isn't
7  on here for what Q4 that is, so to be honest with
8  you, I don't know if this is the Q4, 2001 or not.
9  It doesn't say.  I'm assuming that's the case, but
10  I called on these hospitals.
11    Q  Okay.  Well, let's, and I'm not going to,
12  I don't know either and I'm not so interested in
13  what the date is.  I'm using this more as a
14  reference source.
15    A  Sure.  That's fine.  Again, yeah, I
16  called on these hospitals.
17    Q  Okay.  Now during the year 2001, was
18  there any change in the alignment of your
19  accounts?  And by that, I mean were any accounts
20  gained, were any accounts lost?
21    A  In 2001?
22    Q  Yes.
23    A  You mean from Q4 2000 to Q1 2001?
24    Q  No.  I'm talking about the year 2001 was

Page 40

1  there any change in your accounts?
2    A  Accounts dropped or lost?
3    Q  Either accounts dropped or accounts
4  added.
5    A  Jim, I don't recall exactly what accounts
6  I had in Q1 2001 to the account changes in Q4,
7  2000.  So I don't recall what accounts I had and
8  which ones were dropped off.  I think that this is
9  real similar to what I had at the beginning of the
10  year, but I'm not going to swear to it.
11    Q  Do you recall, and again, I'm not, I just
12  want your best recollection.
13    A  Yes, sir.
14    Q  As you sit here, Randy, do you recall any
15  other hospitals you might have called upon in 2001
16  other than those that are listed on Exhibit 38 for
17  you?
18    A  Yes.  I called on, these were target
19  hospitals.  I called on other nontarget hospitals
20  as well in Denver.  Let's see.  I called on Aurora
21  Medical Center in Denver.  I believe that was
22  probably, I don't know if it was a target then but
23  I did call on them.  It's not listed here.  Also
24  another hospital in Tulsa I called on.  Yeah.  So

Page 41

1  there were other hospitals I guess that were
2  non-targets I called on.
3      Q  How many hospitals in Tulsa did you call
4  on?
5      A  There were three hospitals in Tulsa.
6      Q  Okay.
7      A  Two of the hospitals were affiliated, so.
8      Q  What do you mean?  They were both owned
9  by the same company?  Randy, what did you mean by
10  affiliated?
11      A  They had a business affiliation between
12  the two of them.  The Tulsa Regional and St.
13  Mary's, I believe it was.
14      Q  Okay.
15      A  I also called on hospitals in Joplin that
16  aren't listed on the target list as well.
17      Q  Were the Joplin accounts nontarget
18  accounts?
19      A  In Joplin, Missouri.  St. John's and
20  Freeman Hospital in Joplin.
21      Q  Okay.  What do you mean, at least as of
22  2001 when you use the term target account, you mean
23  what?
24      A  I meant that the accounts that were

Page 42

1  dedicated as primary accounts to call on.  Primary
2  as opposed to secondary or tertiary.
3      Q  What did it mean in terms of your job
4  responsibilities with a primary account as opposed
5  to a secondary account?
6      A  There was no difference in
7  responsibility.  Probably maybe not, well, I didn't
8  treat secondary accounts any differently than my
9  primary accounts because again, you're in a
10  location.  You're calling on accounts that use your
11  product.  So it didn't really matter to me whether
12  they were a targeted account or a non-targeted
13  account.  So in filling my responsibilities, it
14  didn't really change a whole lot.
15      Q  What is a tertiary account?
16      A  I just meant a small hospital.  For
17  instance, in Bolivar, Missouri which was not on
18  anybody's radar screen as being an account but they
19  did have cardiovascular coverage there.  As a
20  backup as a vascular specialist, I would work with
21  my cardiovascular counterpart to discuss the use of
22  the product for peripheral vascular use, whether it
23  be a targeted account or non-targeted account.
24      Q  During the year 2001, Randy, with respect

Page 43

1  to hospitals other than those that are listed on
2  Exhibit 38, how frequently would you call on those?
3      A  On hospitals other than ones that are
4  listed?
5      Q  Right.
6      A  Probably, and I'll have to guess, once a
7  month or so.
8      Q  Okay.  And let me talk with you a little
9  bit about what your routine was for calling on
10  accounts during the year 2001.  Was your routine
11  basically the same in terms of how you would spend
12  your week?
13      A  Yes.
14      Q  Okay.
15      A  It was very similar, yes.
16      Q  Okay.  So let's do it this way.  Could
17  you identify for me what your routine was each week
18  in terms of where you would go on Monday and where
19  you'd go on Tuesday, etcetera?
20      A  I went to Colorado probably, well, I
21  don't know the dates but I probably went to Denver
22  every week.  I went to Casper probably every other
23  week.  I went to Tulsa, you know, again probably
24  every week or so.  I don't know.  I don't have, I

Page 44

1  don't have records of that of actual travel but
2  that was pretty much my routine.
3      Q  Now, Randy, when you went to Denver,
4  would you fly?
5      A  Yes, sir.  I would fly to Denver.
6      Q  All right.  And looking at this chart,
7  there are, I'm counting six Colorado hospitals that
8  are listed here.
9      A  That's what I have.
10      Q  Okay.  Other than Fort Collins, were
11  those hospitals in the Metropolitan Denver area?
12      A  Yes.
13      Q  And if my recollection is correct, Fort
14  Collins is 70 to 80 miles north of Denver?
15      A  That is correct.
16      Q  Okay.  There's an interstate highway
17  connecting the two?
18      A  Interstate 25.
19      Q  Okay.  And when you went to Denver each
20  week, how long would you be there?
21      A  Two to three days.  Typically three days.
22      Q  Okay.  And then as I understand it, you
23  have, you also went to Tulsa weekly.
24      A  Yes.  I tried to go to Tulsa either

1  weekly or within ten days or so.  Within the two
2  week period.
3      Q  And when you went to Tulsa, would you fly
4  or drive?
5      A  I would drive.
6      Q  And my recollection is it's either
7  interstate highway or toll road between Springfield
8  and Tulsa?
9      A  That's correct.
10     Q  And approximately how far is--
11     A  Interstate highway.  Interstate 44.  It
12 was approximately 170 miles.
13     Q  That's what?  A three hour drive?
14     A  Yeah.  Two and a half hour drive.
15     Q  And when you went to Tulsa, would you be
16 there one day or two days?  How long would you be
17 there?
18     A  I'd be there a day.  It was, it did not
19 involve an overnight.
20     Q  Okay.
21     A  Or seldom involved an overnight, I should
22 say.
23     Q  All right.  And were you entitled to
24 mileage reimbursement?

1      A  No.
2      Q  So the mileage expense for traveling to
3  Tulsa was your expense?
4      A  I drive a company car.
5      Q  Okay.  You had a company car?
6      A  Yes, sir.
7      Q  Would you prepare any type of itinerary
8  to submit to the company identifying where you
9  went?
10     A  I'm not sure what you're asking.
11     Q  Okay.  Let me ask you this.  Was there
12 any expense you incurred when you went to Tulsa
13 that you were entitled to company reimbursement
14 for?
15     A  Tolls on the highway, meals.  I expensed
16 my lunch usually when I was up there and tolls and
17 of course if I spent the night, my room and meals.
18     Q  Sure.  Now, when you went to Tulsa, would
19 you submit some sort of expense report to get
20 reimbursement for your meals and your toll expense?
21     A  Yes, I did.
22     Q  And would those expense reports identify
23 that it was in connection with a trip to Tulsa?
24     A  Yes.

1      Q  Now, when you were in Tulsa, you would
2  call on, was it two hospitals or three hospitals?
3      A  Three hospitals.
4      Q  So you called on those three hospitals
5  every week?  Did you hear that question, Randy?
6  Hello?
7      MR. BRODERICK: You dropped out there.  Sorry.
8      MR. BAKER:  Q  Okay.  Randy, when you went
9  to Tulsa, would you call on all three hospitals
10 each week?
11     A  Yes, I would.
12     Q  Okay.  Randy, I see that you had
13 hospitals in Nebraska that you called on.
14     A  In Nebraska?
15     Q  Correct.
16     A  I'm sorry.  You cut out again, sir.
17     Q  You had two hospitals in Nebraska you
18 called on?
19     A  Yes.  Actually three hospitals in
20 Nebraska.
21     Q  One was Bryan Medical Center in Lincoln?
22     A  Bryan Lincoln General Hospital Medical
23 Center in Lincoln.  There's two hospitals there.
24     Q  Okay.  Were they both affiliated with the

1  same organization?
2      A  Yes.  Bryan and, and I also called on St.
3  Elizabeth Hospital in Lincoln as well but it was
4  not a target hospital.  So I called on three
5  hospitals in Lincoln.
6      Q  And you called on one hospital in Omaha?
7      A  Nebraska Methodist Hospital was a target
8  hospital although I also called on Clarkson Medical
9  Center as well, University of Nebraska Medical
10 Center.
11     Q  How frequently did you go to Nebraska?
12     A  Once every two to three weeks, I suppose.
13     Q  And would that be a driving or flying
14 trip?
15     A  I drove mostly.  Occasionally I would
16 fly.  I would fly occasionally.  I take that back.
17 I think the majority of the times I actually flew
18 up there.
19     Q  Was there direct air connection between
20 Springfield and the Lincoln Omaha--
21     A  No.  It was commuter from Springfield via
22 Kansas City to Lincoln.
23     Q  Okay.  And if my recollection is correct,
24 Omaha and Lincoln are approximately 50 miles apart?

Page 49

1  A  That is correct.
2  Q  When you went to Nebraska, how long would
3  you be there?
4  A  Typically two days.
5  Q  Okay.
6  MR. BRODERICK: I'm going to, if it's okay, I'd
7  like to take a break for just a second, please.
8  Why don't we take about five or ten minutes?
9  MR. BAKER: Sure.
10  (Whereupon a short break was
11  taken.)
12  MR. BAKER:  Q  Randy, when you went to
13  Colorado every week, can you take me through what
14  you did while you were there?
15  A  I did sales calls on my targeted
16  hospitals as well as other hospitals in Denver that
17  used our products.
18  Q  Okay.
19  A  I would call on interventional radiology
20  and that was pretty much it.
21  Q  So you had, as I see it here, six
22  targeted accounts?
23  A  Yes, sir.
24  Q  How much time would you spend with your

Page 50

1  account in Fort Collins each week?
2  A  I would spend usually, I would spend a
3  good part of two to three hours.  Depends on who
4  was there, what they were doing and if they could
5  see me right away or not.
6  Q  Okay.  I guess you have to wait for
7  doctors.  Doctors don't wait for you.  Is that
8  right?
9  A  That is correct.
10  Q  Okay.  Would you watch surgical
11  procedures or watch them perform I guess
12  interventions?
13  A  Not typically.
14  Q  Would you go into the lab to watch work
15  that was being done?
16  A  I would be in the control room usually of
17  the lab but I would not watch procedures.
18  Q  Okay.
19  A  HIPAA forbids that.
20  Q  I'm sorry?
21  A  HIPAA forbids being in patient care
22  areas.  So I do not, I did not watch procedures.
23  Q  I think 2001 predated HIPAA.
24  A  Okay.  Well, I still didn't do it.  Not

Page 51

1  being employed by the hospital I didn't think it
2  was appropriate for me to be in an area where they
3  were actually doing procedures.
4  Q  Okay.  Would you meet with a pharmacist
5  in the hospital?
6  A  Occasionally, yes.  Some hospitals
7  require that you go to pharmacy prior to visiting
8  the departments.  Depends on which hospital, but
9  yeah, I had relationship with pharmacy as well
10  because of, because they're buying, actually
11  purchasing the products.
12  Q  Okay.
13  A  It's important that they knew that I had
14  a relationship with the pharmacist, I guess.
15  Q  As I understand it or at least I assume
16  that you would have flown into Denver.  Am I
17  correct?
18  A  That is correct.
19  Q  How long would it take you to drive from
20  Denver to Fort Collins?
21  A  Approximately an hour.
22  Q  And then there would be an hour back?
23  A  Yeah, an hour back.
24  Q  So you would have devoted somewhere

Page 52

1  between four to five hours each week in calling on
2  Fort Collins?
3  A  Including drive time?
4  Q  Yes.
5  A  That's reasonable, I suppose.
6  Q  Okay.  I mean nothing a mathematic
7  certainty but kind of in a gross time.
8  A  Yeah.  That's probably, that's close.
9  Q  Okay.
10  A  Sometimes it was much, much less.
11  Depends on obviously how quickly you can get in and
12  talk to physicians and see what's going on and talk
13  to techs.  I did lunches there often, so when I
14  would provide lunch for the physicians and staff,
15  of course that carried me over through the lunch
16  hour to an hour and a half just doing the lunch
17  thing.
18  Q  Okay.  Then what was your routine with
19  respect to the hospitals in the Metro Denver area?
20  How would you decide where to go and in what order?
21  A  If I had scheduled appointments,
22  scheduled lunches that I would do, so I would build
23  my day around wherever I had for instance a lunch
24  scheduled and then Denver Metro is pretty

Page 53

1 accessible. The hospitals were clustered together
2 so you could do several hospitals, do several
3 hospitals within a very short amount of time.
4    Q On average, did you always spend about
5 the same amount of time in the Denver hospitals
6 that you did in the Fort Collins hospital?
7    A Actual time in? Probably less time in
8 each hospital simply because of there was so many
9 close together and when you drove the hour down to
10 Fort Collins, you want to make sure that you got
11 your money's worth out of it, I guess.
12    Q So on average, how much time would you
13 spend in each of the Denver hospitals?
14    A It varies. Average I suppose 35 minutes
15 to an hour.
16    Q And what typically would you do during
17 that time frame?
18    A I would use selling aids that were
19 provided by the company to promote Retavase. I
20 would talk to the techs that were, to see what
21 their uses of the product was, talk to physicians.
22 See if they had any concerns or any new cases or
23 any exciting things to tell me about my product
24 which I shared with the company. That type of,

Page 54

1 that was the typical and then ask for the business.
2    Q What were the sales aids you used for
3 Retavase?
4    A We had, we had brochures that talked
5 about Retavase. I don't recall what they exactly
6 were any more because I haven't sold Retavase for
7 sometime.
8    Q Now, my understanding, and correct me if
9 I'm mistaken, back in 2001, Retavase was
10 nonindicated for peripheral vascular disease.
11    A That is correct. It did not have label
12 indications for peripheral vascular disease.
13    Q Did that restrict you in how you could go
14 about informing doctors of the availability of
15 Retavase?
16    A It restricted me inasmuch as I had to
17 respond to unsolicited questions regarding the
18 product. I did not, I could not bring in
19 unsolicited information to the doctor.
20    Q How would you go about getting a doctor
21 to ask you questions about Retavase?
22    A I would ask him questions about his use
23 of thrombolytics or his use of patients and probe
24 the doctor to basically have him ask me something

Page 55

1 or after I had that relationship, I could walk in,
2 the doctor would ask me something new about
3 Retavase, which I would have Medical Affairs send
4 medical information to the physician and once that
5 information was there, then I could respond to it.
6    Q So it wasn't a situation where you could
7 go in and open up your briefcase and say here's
8 something about a new product we have you might be
9 interested in?
10    A That's, that is correct. Although I also
11 had some Cordis products as well that I did that
12 that was used in radiology.
13    Q Okay. Would I understand correctly then
14 that there would be some tiptoeing between you and
15 the doctor to get him to ask questions that would
16 allow you to respond to Retavase as an available
17 drug?
18    MR. BRODERICK: I'm going to object to the form
19 of the question. Go ahead.
20    THE DEPONENT: No, I didn't tiptoe. No. The
21 doctors, to my knowledge, the doctors knew of
22 Retavase because of the, what transpired with
23 Urokinase and the FDA. The doctors knew of
24 Retavase. They asked me questions about Retavase

Page 56

1 and once a physician asked me a question about the
2 product, I can respond to an unsolicited request.
3 But no, I didn't have to tiptoe.
4    MR. BAKER: Q And typically, would you go
5 in and they'd immediately ask you about Retavase?
6    A Immediately, no. I would introduce
7 myself. Initially, I guess, I would introduce
8 myself as a vascular specialist for Centocor. I
9 represent Retavase. I represent Cordis hydrolyzer
10 catheter and later on some microcatheters for
11 Cordis and at that point, because I did represent
12 Centocor in the sale of Retavase and that was, I
13 was just introducing myself. So no.
14    Q Was there, was there some sort of
15 strategy you would go through to try and solicit
16 questions from the doctor about Retavase?
17    MR. BRODERICK: Objection. Form.
18    MR. BAKER: Q Do you understand the
19 question, Randy?
20    A Was there a strategy that I got? Abbott
21 Laboratories started out to sell, asking probing
22 questions about what a doctor, would kind of
23 patients a doctor treats and then asking probing
24 questions and once the doctor, so yeah, there is a

Page 57

1 technique, a method that was taught to me by Abbott
2 Laboratories in socratic (sp) selling, which I
3 utilized.
4        I am also a registered vascular
5 technologist so I was, have a very strong
6 background in peripheral vascular disease. So my
7 expertise went beyond selling the drug. My
8 expertise went with the actual disease itself and I
9 used that to my advantage in talking to doctors
10 about acute arterial occlusions, deep vein
11 thrombosis, the incidence of it in the United
12 States, the comorbidities of the, of those
13 conditions and I used that to my knowledge or to my
14 advantage and the physicians respected that and
15 they responded to the fact that I was a registered
16 vascular technologist.
17    Q  Sure.  I can understand that.  I take it
18 it would take a little bit of time then to
19 cultivate a relationship with the doctor.
20    A  That is, yeah.  I would totally agree
21 with that.
22    Q  Okay.  Randy, when a doctor asks for
23 medical information, was there some sort of record
24 made of that?

Page 58

1    A  Not by me personally as far as keeping a
2 record of it, no.  I can't speak for what was kept
3 at home office in Medical Affairs.
4    Q  Did you carry this information with you
5 or would you have the company send it to the
6 doctor?
7    A  I'd have the company fax it to the
8 account and then they would follow up with a, I
9 believe they would follow up with a Federal Express
10 package with the hard copy, a plain copy of the
11 request.
12    Q  Would the doctor have to sign something
13 saying I would like to receive this information?
14    A  No.  The doctor just simply had to
15 request it.
16    Q  Okay.  So there would be nothing, no
17 record keeping Centocor would have then that would
18 prove the point that it was a doctor requesting the
19 information rather than Centocor just sending it on
20 its own.
21    A  I can't respond to that.  I don't know
22 what Centocor did as far as recordkeeping.
23    Q  Well, you didn't request that from the
24 doctor.

Page 59

1    A  Request what, sir?
2    Q  That he give you a written request form.
3    A  Oh, no.  I did not, the doctor did not
4 give me a written request for information.
5    Q  Okay.  And as I understand it, you were
6 never instructed by Centocor then to get this
7 written request form?
8    A  I was never instructed by Centocor to get
9 a written request for a medical request.  That is
10 correct.
11    Q  Okay.  Fine.  Give me just a minute
12 here.  Randy, do you recall if you had the Omaha
13 and Lincoln hospitals during the entire year of
14 2001?
15    A  I believe I did.
16    Q  Okay.  If I understand what your job was,
17 and if I'm mischaracterizing it, don't let me do
18 that.  Tell me I've got it wrong.  Okay?  But you
19 were trying to answer physician's questions and
20 provide physicians with information concerning how
21 Retavase could be used in the treatment of
22 peripheral vascular disease with the hope that that
23 would enable Centocor to sell those products to
24 those physicians.

Page 60

1    A  That is correct.
2    Q  Okay.  And if I understand correctly, and
3 again, tell me if I've got it wrong, when you
4 joined Centocor, Retavase was not well known to
5 physicians who dealt with vascular problems.
6    A  That is correct.  To my knowledge.
7    Q  Okay.  All right.
8    A  Certainly in my experience, limited
9 experience that is true.
10    Q  So in 2000 and 2001 when you were calling
11 on these hospitals, you were attempting to develop
12 a relationship between Centocor and the hospitals
13 where they would start using Retavase for vascular
14 disease?
15    A  Yeah, that's what I was attempting to do.
16    Q  Okay.  And I'm assuming not all hospitals
17 responded at the same rate.
18    A  That is correct.
19    Q  And when a hospital was expressing some
20 interest, would you tend to spend more time on that
21 account than you would on some other accounts?
22    A  I think that's a fair statement.
23    Q  Okay.  Randy, do you know what the term
24 formulary means?

Page 61

1 A Yes, I do.
2 Q What does a formulary mean?
3 A Formulary is when a product is approved
4 by the pharmacy committee to place it in the
5 hospital for physicians' use.
6 Q And with respect to the work you were
7 doing involving Retavase for Centocor, did you have
8 an objective to have Retavase placed on the
9 formulary of these hospitals for use in treating
10 peripheral vascular medical problems?
11 A That was my hope to have it placed on
12 formulary, whether it be for peripheral vascular
13 disease or coronary artery occlusive diseases or
14 for acute MI. That's where we worked with the
15 cardiovascular reps. So our goal was to have
16 Retavase available for the physicians to use and
17 that was our goal.
18 Q Now, when a hospital would place Retavase
19 on its formulary, did that mean it could be used
20 either for cardiovascular or for peripheral
21 vascular disease or would it have to be placed on
22 formulary for each to be used in both ways?
23 A I don't know.
24 Q Normally when you called on a hospital,

Page 62

1 would there also be a cardiovascular rep that would
2 call on that same hospital?
3 MR. BRODERICK: Objection. Do you mean with
4 him at the same time or just in general?
5 MR. BAKER: Q No. Just generally.
6 A In generally, yes. Cardiovascular reps
7 overlapped the same hospitals.
8 Q And did you always work with the same
9 cardiovascular rep or would it vary from hospital
10 to hospital?
11 A It would vary from area to area. There
12 were several cardiovascular reps in the district
13 and so it would vary where you were working.
14 Q Now, for example, when you called on the
15 hospitals in the Denver area--
16 A There were two reps.
17 Q I beg your pardon?
18 A There were two reps, cardiovascular reps
19 in Denver.
20 Q Would one or both of them go with you
21 when you called on the Denver hospitals?
22 A No. Neither one would.
23 Q Okay. And generally when you called on
24 any hospital, would you go alone without the

Page 63

1 cardiovascular rep?
2 A Yes.
3 Q And did you typically call on the
4 physicians that dealt with peripheral vascular
5 disease as opposed to the physicians that treated
6 heart attacks?
7 A Yes.
8 Q Okay. How would you and cardiovascular
9 reps work together or did you?
10 A We did not really work together per se,
11 although we communicated via voice mail as to
12 situations that perhaps we discovered in our calls,
13 sales calls. So we pretty much communicated via
14 voice mail.
15 Q How would you be able to help a
16 cardiovascular rep?
17 A I could help them if an interventional
18 radiologist would request Retavase for their use in
19 interventional radiology to place Retavase on
20 formulary. That would help the cardiovascular rep.
21 Q How would it?
22 A Retavase would be available for uses
23 other than peripheral vascular disease. It would
24 be up to the cardiovascular rep to get buying from

Page 64

1 the cardiologist as well as the other staff that he
2 sold to. He or she sold to.
3 Q I'm a little confused then. I want to
4 make sure we're clear on this point.
5 A Sorry.
6 Q If a hospital placed Retavase on its
7 formulary, would that mean that Retavase could be
8 used for both cardiovascular and peripheral
9 vascular disease?
10 MR. BRODERICK: I'm going to object. I think
11 he answered that before but I'll let him answer
12 it.
13 THE DEPONENT: I don't, on the formulary, I
14 don't know what the hospitals' procedures are as
15 far as who has privileges to use the drug.
16 MR. BAKER: Q Okay. Other than what you
17 have described, Randy--
18 A Yeah, John.
19 Q (Continuing.)--in any other way, how were
20 you of assistance to a cardiovascular rep?
21 A We were of assistance by increasing the
22 amount of drug that was sold within a particular
23 territory.
24 MR. BAKER: Can you read that answer back for

Page 65

1  me?
2          (Whereupon the requested
3          portion of the record was read
4          back by the Reporter.)
5  MR. BAKER:  Q Flip side of the coin, Randy,
6  is how could a cardiovascular rep be of assistance
7  to you in selling Retavase for peripheral vascular
8  disease?
9      A Actually, the cardiovascular rep could
10  not really be of great assistance to us because
11  they weren't calling on our customers.  So I
12  didn't, I guess sometimes in communication with
13  them perhaps they would become aware of situations
14  in pharmacies or whatever that I was not privileged
15  to or not aware of that they could make me aware
16  of.  So it was more of a team type of effort.
17  Direct aid or help was minimal.
18      Q Okay.
19      A We would do joint displays together
20  looking at, so that I would have displays for when
21  I represented and he or she could have on the same
22  table displays for what they represented.  So that
23  was an aid, I guess.
24      Q Okay.  That's fine.  Thank you.  Randy,

Page 66

1  I'm going to ask that you turn to Exhibit 16.
2  Maybe John can help you get to that document.
3      A Okay.  All right.
4      Q Randy, take a moment to read through
5  Exhibit 16, but before you do, it looks like it's a
6  series of e-mail messages.  Do you have the same
7  document I do?
8      A I do.
9      Q Okay.  I think the way it works the
10  bottom one would be the first, I think.
11      A The bottom from Jane?  Okay.
12      Q Correct.
13      A Okay.  I've read it.
14      Q Okay.  Exhibit 16 appears to be two
15  e-mail messages.  The first is a message that Jane
16  Minor apparently sent to you on July 3rd, 2001 and
17  the second is a message you sent to her on July 7,
18  2001.  Do you see--
19      A Yes.  That is correct.
20      Q See those?  Okay.  Looks like you were
21  both up late too.
22      A What, sir?
23      Q I said looking at the times, looks like
24  you were both up late when these were written.

Page 67

1      A That was typical.
2      Q Okay.  Do you have recollection of these
3  messages, Randy?
4      A Actually I do.
5      Q Okay.  Let me ask you this.  Before these
6  messages were transmitted, did you and Jane have
7  any discussions related to the subject matter in
8  these messages?
9      A Prior to these messages, I don't recall.
10      Q Okay.
11      A I don't recall if we had a voice
12  communication about this or not.
13      Q Okay.  As I understand it, it looks as
14  though Jane in her message to you, among other
15  things, was asking you a question about a routing
16  schedule.  Would you agree with me?
17      A Yes.  It appears that that was the
18  question.
19      Q Okay.  And if I understand your response,
20  at least as of July 7th, 2001, Tony Siciliano never
21  asked you to submit a routing schedule?
22      A If I believe my e-mail, which I do, the
23  answer is yes.
24      Q At any time after July 7th, 2001, did

Page 68

1  Tony ever ask you to give him a routing schedule?
2      A Not to my knowledge.
3      Q Okay.
4      A Not to my recollection, anyway.
5      Q Okay.  The next sentence in your e-mail
6  says, and I'm going to quote, I have my priorities
7  which I try to see every other week.  And I'll go
8  that far for a moment.
9      A All right.
10      Q What were the priorities that you
11  attempted to see every other week?
12      A I have to assume my priorities at that
13  time were my, were accounts that either had high
14  potential to grow or were on the verge of
15  converting to use of Retavase for their peripheral
16  use.  That would have to be my assumption but I
17  don't recall exactly what I meant by priorities.
18      Q Okay.  As I'm reading this message, I
19  don't see you indicating that you had a practice of
20  calling on any customers weekly.  Am I reading that
21  correctly?
22      A No, you're not.  No, you're not reading
23  that correctly.  I was, this, as I'm looking at it,
24  I try to see my priorities every other week as

**Page 69**

1 scheduled and I'm assuming that has to be with
2 Denver, but I think I was going to Denver about
3 every week. I also saw my accounts in Springfield
4 weekly, so.
5     Q  Well, let's go down to the second
6 paragraph.
7     A  Okay.
8     Q  You refer to high priority accounts.
9     A  Yes.
10     Q  Would those be the most important
11 accounts you at any one point in time had?
12     A  Those are what I considered high priority
13 accounts, not necessarily what Centocor or
14 management thought were high priority accounts.
15 Those are what in my communications to Jane that I
16 thought were high priority accounts.
17     Q  Did you attempt to give those accounts
18 the most attention of all of your accounts?
19     A  Not necessarily.
20     Q  Okay. Who would you try and give the
21 most attention to?
22     A  I don't know. That's, I don't know.
23 There was really not an account that I gave the
24 most at any given time and things change rapidly

**Page 70**

1 within the industry. So it varied but no, there's
2 not an account that--
3     Q  You make a pretty good point I think that
4 if you have a hot prospect, you're going to spend
5 more time with that account than you would
6 another. Am I correct?
7     A  I'm sorry, Jim. Would you repeat that?
8     Q  When you have a prospect that seems to be
9 interested in buying Retavase or to listing it on
10 their formulary, would you spend more time with
11 that customer than you would those that were not as
12 active?
13     A  Yeah, probably, but I want to draw your
14 attention to the second sentence in the second
15 paragraph because it clearly states that I try to
16 get to each of these accounts every week at a
17 minimum. That's at a minimum every other week. So
18 often, and more often times than not it was every
19 week. That's how I read this sentence and I
20 believe that was true.
21     Q  Did you go to Casper, Wyoming every week?
22     A  I went to Casper, Wyoming probably every
23 other week.
24     Q  Okay. So your high priority accounts,

**Page 71**

1 and I want to make sure I understand your
2 testimony. If I got it wrong, tell me. Your high
3 priority accounts you would attempt to go to at
4 least every other week and when you could, you
5 would go to them every week. Am I correct in that
6 respect?
7     A  Yeah. At a minimum every other week.
8     Q  Okay. Fine. Now, tell me what the
9 difference in your mind was when you wrote this
10 e-mail between a high priority account and lower
11 priority accounts?
12     A  Low priority accounts are maintenance
13 accounts which are accounts that we have already
14 secured a relationship and business and so that if
15 I can focus my attention on accounts that have not
16 secured formulary approval or have not tried using
17 the product yet.
18     Q  Okay. Now going back to, hold on to
19 Exhibit 16, but let's go back to Exhibit 38.
20     A  All right.
21     Q  As I am reading this, Randy, in early
22 July of 2001, your high priority accounts would
23 have been, is it Poudre Valley Memorial Hospital in
24 Fort Collins?

**Page 72**

1     A  Yes.
2     Q  And Wyoming Medical Center in Casper,
3 Wyoming?
4     A  Yes.
5     Q  And then either one or more accounts in
6 Tulsa, Oklahoma?
7     A  There are three accounts in Tulsa.
8     Q  Were they all what you considered high
9 priority accounts?
10     A  Yes.
11     Q  Okay.
12     A  The potential is huge.
13     Q  Okay.
14     A  Again, that was my, this is only my
15 thinking at the time.
16     Q  Well, sure, and that's what I want.
17 That's, I understand that.
18     A  There were others. I don't, again, the
19 e-mail to Jane was, I mean I guess in contact, I'm
20 not sure what contact I was making when I was
21 writing this e-mail. However, this was not
22 dictated by company policy as far as what were
23 priorities and nonpriority.
24     Q  What was the company policy?

Page 73

1   A  Well, we had our target list which was
2  everybody on the target list was a priority as far
3  as target also.
4   Q  What was the company requirement
5  concerning the frequency of calling on a customer
6  or an account?
7   A  There wasn't a written policy regarding
8  coverage.
9   Q  Was there any unwritten understanding?
10   A  Not to my knowledge.  I don't know.  None
11  that was ever conveyed to me.
12   Q  Okay.  That's fine.  Randy, if we can go
13  back to Exhibit 38.  You referred to lower priority
14  accounts which are more of a maintenance account in
15  your e-mail.  Can you identify what accounts those
16  were?
17   A  Cox Medical Center in Springfield,
18  Missouri, St. John's Medical Center in Springfield,
19  Missouri.  Those I would considered maintenance
20  accounts.
21   Q  Okay.  Now, we have the high priority
22  accounts you referred to and the maintenance
23  accounts you referred to.  What would the remaining
24  accounts have been back in July of 2001?

Page 74

1   A  I don't, they were targeted accounts.  I
2  don't know what else to say.  They were accounts
3  that I went to that I serviced as a
4  representative.  I serviced those accounts.
5   Q  Okay.
6   A  I called on those accounts.  Regardless
7  of whether or not I thought they were a priority or
8  maintenance, I called on all accounts.
9   Q  Okay.  Would you tend to spend, to focus
10  your work time so that, with respect to the
11  attention you gave to accounts you would give the
12  most attention to your high priority accounts or
13  what you thought were your high priority accounts?
14   A  Would I give more attention to them?
15   Q  Yes.
16   A  I did what was, what I felt was required
17  because things, it really depended on what was
18  going on in the account as to what time was
19  required to be in that account, whether it be a
20  formulary issue, a pricing issue.  So the
21  atmosphere of sales dictated what was required as
22  far as time in a particular account.
23   Q  I understand that.  I'm going to give you
24  a real test of your memory.  If you can't answer

Page 75

1  it, that's fine.  Do you recall what was going on
2  in Fort Collins, Colorado and Casper, Wyoming and
3  Tulsa, Oklahoma back in July of 2001 that made
4  those at least at that time high priority accounts?
5   A  In Casper, Wyoming, Retavase was not on
6  formulary.
7   Q  Were you attempting to get it on
8  formulary?
9   A  The cardiovascular rep had been
10  unsuccessful in convincing the cardiologist to use
11  Retavase.  I developed a relationship with the
12  interventional radiology and I got Retavase placed
13  on formulary and used in radiology which was
14  hopeful for the cardiovascular rep to bring in some
15  of the cardiac business.
16       In Tulsa, I had a physician who was a
17  thought leader who was a large Urokinase user back
18  in the late 90s.
19   Q  Randy, can I interrupt you for a second?
20  You used the term some sort of leader and I didn't
21  know what you were referring to.
22   A  A thought leader, a key opinion leader
23  who has national recognition.
24   Q  Thought.

Page 76

1   A  An opinion leader.  He was a high use of
2  Urokinase when it was available and I wanted the
3  same type of commitment from him to use Retavase if
4  possible and in Fort Collins, Colorado was a
5  similar situation where they had not achieved
6  formulary at the hospital yet for cardiovascular,
7  for cardiac use and it was my relationship with
8  interventional radiologist that hopefully got the
9  formulary.  That's why they were priorities.
10   Q  Using a sales acronym, can we say that
11  back in July of 2001 those institutions were prime
12  prospects for Retavase?
13   A  I don't know.  I don't agree with the
14  terminology.  Prime.  I'm sorry.  I don't agree
15  with the terminology.  They were accounts that
16  were, had potential of being--
17   Q  Good customers?
18   A  Good customers.  Yes, sir.
19   Q  Okay.  And you're referring to good
20  customers for using Retavase for peripheral
21  vascular disease?
22   A  That is correct, as well as
23  cardiovascular disease.
24   Q  Okay.  Fine.  Thanks.  Going back to

Page 77

1 Exhibit 16.
2    A  Yes, sir.
3    Q  And I'm going back to the first
4 paragraph.
5    A  Okay.
6    Q  And I'll read in total the second
7 sentence.  Then I want to ask you about it.  I have
8 my priorities which I try to see every other week
9 but a set schedule has not been requested nor do I
10 feel that it would be workable.  Why is it you
11 believe a set schedule or why is it you believed in
12 July of 2001 that a set schedule would not be
13 workable?
14    A  It was my feeling at that point given the
15 magnitude of my geography that a set schedule
16 because things change on a daily basis, so a set
17 schedule would, although my flight to Denver was
18 set, but a set working schedule, I didn't feel that
19 it was workable.
20    Q  Was that because of the large geography
21 you covered or for other reasons?
22    A  For the large geography that I covered
23 primarily.  Other reasons is that things, as a set
24 schedule that, for instance, a customer that uses

Page 78

1 your product may or may not be in the facility that
2 particular day.  So your schedule has to be
3 flexible so that you can make coverage.  I just
4 felt, I felt that it wasn't workable.
5    Q  Give me just a minute here.  Randy, can
6 you hear me?
7    A  Yes, I can.
8    Q  Okay.  Good.  When you would go into an
9 account, I'm assuming that you would talk with the
10 people at the hospital about Cordis and if you
11 could, if the environment was right Retavase as
12 well.
13    A  That is correct.
14    Q  Did you have a greater emphasis on one
15 product line than another or was it equally
16 divided?
17    A  I had a greater emphasis on Retavase.
18    Q  Okay.  And why was that?
19    A  I had one product, a Cordis, depends on
20 what time of the year because we had the hydrolyzer
21 I believe in 2001 which wasn't widely used.  My
22 primary responsibility was not to Cordis.  It was
23 to Centocor.
24    Q  You mean to Retavase?

Page 79

1    A  Retavase.
2    Q  Okay.
3    A  Centocor did not market or own Cordis.
4    Q  Okay.  I got you.  Let me talk with you
5 about something completely unrelated to our earlier
6 line of questioning.
7    A  Okay.
8    Q  Prior to Tony Siciliano becoming your
9 team leader, did you know him?
10    A  Yes.
11    Q  And how was it you knew Tony?
12    A  Tony was a vascular specialist for the
13 Dallas, Texas area and I met him at a regional
14 meeting, western regional meeting with Sue Lansden.
15    Q  When you and Tony were both vascular
16 specialists, would you from time to time receive
17 from Centocor or from your supervisors at Centocor
18 reports reflecting the sales performance of the
19 vascular specialists?
20    A  We did.  I don't recall exactly.
21    Q  Okay.  Do you have any recollection from
22 reviewing those reports how your sales performance
23 compared with Tony's sales performance?
24    A  I have, I don't have recollection as to

Page 80

1 who was ranked higher.
2    Q  Okay.
3    A  I didn't compete with anybody so I don't
4 recall what the ranking was.
5    MR. BAKER: John, are you there?
6    MR. BRODERICK: Yes.
7    MR. BAKER: Let's do this.  I think I'm winding
8 down.
9    MR. BRODERICK: Okay.
10    MR. BAKER: If it's all right.
11    MR. BRODERICK: No.  I think Mr. Van Cleave
12 would like to try to wrap it up.  I mean if you're
13 ready to wrap it up, we don't have to take an
14 extended break.  We can take a short one.
15    MR. BAKER: I think that you're on the same
16 wave length that I am.  What I'd like to do is take
17 five or ten minutes to chat with Jane and then come
18 back and attempt to tie this down.
19        (Whereupon a short break was
20        taken.)
21    MR. BAKER:  Q Randy?
22    A  Yes, sir.
23    Q  While you worked for Centocor, have you
24 received periodic performance evaluations?

Page 81

1  A  Yes.
2  Q  How frequently do you receive them?
3  A  We had a midyear review and a final year
4  review.
5  Q  Okay.  Before Tony became your team
6  leader, who would do your reviews?
7  A  Well, my first review was actually done
8  by Bob Russell because I had already been through
9  two managers by the time my first year was up.  He
10  did my first review.
11  Q  And you would have had one review before
12  Tony became your manager?
13  A  Repeat the question, please Jim.
14  Q  Before Tony became your manager or your
15  team leader, excuse me, you had had one review?
16  A  I believe that is correct.
17  Q  Okay.  Was it a satisfactory review?  How
18  were you rated by Mr. Russell?
19  A  I received a 5, which is a very
20  satisfactory review, as I recall.
21  Q  Okay.  Five would be on a grading scale
22  of what?
23  A  One to 7.
24  Q  Okay.  Did you also before Tony became

Page 82

1  your team leader receive field contact reports?
2  A  Yes.  We had, not an average field visit
3  but, but yeah, he generated field contact reports.
4  Q  Can you generally tell me what your
5  understanding was of a field contact report?
6  A  My understanding was that it was the
7  supervisor's observation when he rode with you as
8  to what went well and what didn't go well.
9  MR. BRODERICK: Are you talking about prior to
10  Tony did he receive a field contact report?
11  MR. BAKER: That's right.
12  THE DEPONENT: Oh.  Prior to Tony?  No.  Prior
13  to Tony I never had a manager ride with me.
14  MR. BAKER:  Q  Okay.  While you worked on
15  Tony's team, did you receive field contact reports?
16  A  Yes, I did.
17  Q  And while you worked on Tony's team, did
18  he ever give you a performance evaluation?
19  A  Yes, he did.
20  Q  I don't believe we've established this,
21  Randy, but how long did you serve on Tony's team?
22  A  Whenever Tony came on board which you
23  have that date and his departure with the company
24  he left November of '03, or whenever he left the

Page 83

1  company I was on his team.  Tony was my manager
2  from the day he was hired as a manager 'til the day
3  he left the company, he was my manager.
4  Q  What type of performance evaluations did
5  you receive from Tony or did they vary?
6  A  They were pretty consistent and I can't
7  tell you what the number was.  I don't recall what
8  the numbers were as far as percentage wise.  2003
9  was a 6 I know for a fact because of my inclusion
10  into the--
11  Q  What was it in 2001?
12  A  I don't recall.
13  Q  Have no recollection at all?
14  A  No, sir.
15  Q  Okay.  You don't know whether it was a
16  good evaluation or a bad evaluation?
17  A  It was a good evaluation.  I don't have a
18  quantitative number to put on it.  I don't recall
19  what the number was but it was a positive
20  evaluation.
21  Q  Okay.
22  A  As I recall.
23  Q  Randy?
24  A  Yes, sir.

Page 84

1  Q  Can you turn to Exhibit 37?  Let me know
2  when you have that.
3  A  I have it.
4  Q  Okay.  If you want to take some time to
5  look over that document, that's fine.  Just--
6  A  I'm familiar with it.
7  Q  Okay.  Can you identify that document for
8  me, Tony?  Randy?
9  A  It is a--
10  Q  I apologize.  That's not a Freudian
11  slip.  I was just thinking.
12  A  It's a field contact report dated third
13  quarter.  I don't see a date on it but third
14  quarter probably of 2001, I would venture a guess.
15  I don't know what the date is, but it's a field
16  contact report.
17  Q  Do you recall how you got that document?
18  A  I believe I received this via e-mail, but
19  I don't recall for sure.
20  Q  And did you receive it after a visit from
21  Tony?
22  A  I received it after a field ride with
23  Tony.
24  Q  Okay.  Do you recall when that field ride

Page 85

1  was in 2001 that preceded this report?
2      A  No, I do not recall.
3      Q  Do you see the box marked critical
4  objective slash action?
5      A  Yes, I do.
6      Q  Do you know what type of information is
7  to be put in those boxes?
8      MR. BRODERICK: Could you repeat the question?
9      MR. BAKER:  Q  What type of information,
10 what is the purpose of the critical objective slash
11 action box as you understand it?
12     A  My understanding it was Tony's
13 observation of what his expectations are as a rep.
14     Q  If you go down to box 6.
15     A  Yes, sir.
16     Q  He talks about complete account rotation
17 every two weeks?
18     A  Yes.
19     Q  Did you have any discussions with him
20 about that subject?
21     A  I don't recall.
22     Q  Do you have any recollection why or do
23 you know why that was included?
24     A  I have no, no, I don't have any

Page 86

1  recollection of why that was included.
2      Q  Randy, if you go down to the box marked
3  other observations.
4      A  Yes.
5      Q  There is a sentence.  Then I'm going to
6  read it into the record and see what it means.
7      A  Okay.
8      Q  Finally, I appreciate your understanding
9  of the issues and your desire to rectify the
10 situation during our last meeting together in
11 August.  You must remember that each and every day
12 you and you alone are ultimately responsible for
13 your success or failure.  I hope you choose
14 success.  Do you know what that refers to?
15     A  No, I don't.  I don't recall exactly what
16 the, what that situation in August he was talking
17 about.
18     Q  Okay.  If you go up to the preceding box,
19 box 6.
20     A  Yes.
21     Q  There is a sentence and it says, without
22 making a significant improvement to the above
23 concerns, the opportunity for additional
24 responsibilities will not occur.  Do you know what

Page 87

1  his concerns were?
2      A  That I, I believe that he wanted me to
3  take some management courses through the company
4  which I didn't do.  Other than that, I don't recall
5  exactly the conversation we had as to specifically
6  what he addressed.  It was a conversation that I
7  don't recall.
8      Q  Okay.  Prior to receiving this document,
9  were you aware of any Centocor requirement of
10 complete account rotation every two weeks?
11     A  Not to my knowledge.  I'm not aware of
12 any Centocor policy regarding that.
13     Q  Okay.
14     MR. BRODERICK: If you had a question there, we
15 missed it.
16     MR. BAKER: I didn't.  I was just starting
17 one.
18     Q  In box 4 there is a sentence, Randy,
19 that's maybe about two thirds of the way down the
20 box.
21     A  Okay.
22     Q  I'm going to read it into the record.
23 During our last meeting on August 29th, I discussed
24 your work efficiency and expressed my concern that

Page 88

1  you are not spending enough time in the appropriate
2  accounts which leads to inadequate follow up on
3  your part.  Do you know what he was referring to
4  there?
5      A  I'm not seeing the sentence.
6      Q  Okay.
7      A  Hang on.
8      Q  I think it's the eleventh line from the
9  bottom.
10     A  I'm looking at it now.  Thanks, Jim.
11     Q  Okay.  Take whatever time you need.
12     A  Okay.  So what is your question again,
13 sir?
14     Q  Do you know what he was referring to in
15 that sentence?
16     A  He was looking at the, my priorities and
17 his priorities, that I was spending time on some
18 accounts that weren't on his target list and he
19 thought that I was spending too much time at and
20 putting too much emphasis on that.  That's my
21 understanding.
22     Q  Do you recall what he was referring to
23 with the appropriate accounts?  And by that, I mean
24 what were his appropriate accounts?

## Page 89

1    A  I don't recall exactly what, I don't know
2  what he meant by that.  And I don't recall the
3  conversation so as to what he meant.  I'm assuming,
4  I don't know.
5    Q  Okay.  Randy, were you satisfied with
6  this field contact report?
7    A  No, I was not.
8    Q  Did you think it was a fair evaluation?
9    A  No.  It wasn't entirely fair given
10  paragraph number 7 which was refuted and so no,
11  that part, no, it was not a fair evaluation.
12    Q  Other than box 7, do you believe it was a
13  fair evaluation of your performance?
14    A  Yeah.  The information was probably
15  accurate.  Tony's assessment of priorities and my
16  assessment of priorities was different.  However,
17  Tony was the manager.
18    Q  Did Tony ever explain to you his thinking
19  on why the accounts he felt were appropriate were
20  more appropriate than the accounts you felt were
21  appropriate?
22    A  No.  That was, to my recollection that
23  wasn't discussed.  He asked for my input as to why
24  I thought these accounts, why I was putting extra

## Page 90

1  time with other accounts that weren't targets and I
2  explained why and justified the way I was doing it
3  which he agreed.
4    Q  He agreed with you?
5    A  He agreed that to some extent that, he
6  understood why I was spending time because of a
7  development over there that I was trying to
8  develop, so.
9    Q  Did he explain to you why he felt other
10  accounts that maybe you were not spending--
11    A  No, he didn't explain.  I can't, I don't
12  know what went on with Tony either but he did not
13  explain to me, to my recollection.
14    MR. BAKER: Tony, Randy, I apologize.  I'm
15  pleased to report to you that I'm finished and I
16  appreciate your cooperation.
17    MR. BRODERICK: I just have a few questions.
18  This is John Broderick for Centocor.
19      EXAMINATION
20      BY MR. BRODERICK:
21    Q  Mr. Van Cleave, we talked previously
22  about targets and account lists and all that.  I
23  just want to verify that generally in 2001 from
24  quarter to quarter you had approximately 12

## Page 91

1  accounts on your account list?
2    A  That is correct.
3    Q  And you might have some accounts you
4  might have prioritized but you did make an attempt
5  to try and visit each of these accounts in person
6  two or three weeks at least?
7    A  That is correct.
8    Q  You tried to visit every account every
9  two to three weeks at least.  Right?
10    A  At a minimum, yes.
11    Q  And did it change over time which
12  accounts you felt were priorities for various
13  reasons?
14    A  That would be a correct statement.
15    Q  Okay.  And regarding Centocor's policy or
16  lack of policy on account coverage, regardless of
17  what, regardless of the fact that Centocor didn't
18  have a written policy on account coverage, as a
19  matter of your own work ethic, would you try to
20  cover your accounts every two to three weeks at a
21  minimum?
22    A  I would try my best to cover every
23  account within the two to three week period.
24    Q  As a matter of your own work ethic?

## Page 92

1    A  As a matter of my own work ethic.
2    MR. BRODERICK: I have no further questions.
3      EXAMINATION
4      BY MR. BAKER:
5    Q  Randy?
6    A  Yes, sir.
7    Q  If I wanted to go back in the year 2001
8  and determine what days you were at each of your
9  accounts, would your expense reports be able to at
10  least document that for me?
11    A  I'm not sure, to be honest with you.  We
12  didn't have electronic expense, yes we did.  They
13  probably would, only inasmuch as if I had receipts
14  from any given town, whether it be Denver, Casper
15  Lincoln, Tulsa, whatever, like for meals or hotel
16  rooms.
17    Q  Sure.
18    A  They would indicate my presence at a
19  particular city.  Not necessarily a particular
20  account.
21    Q  I'm assuming when you called on accounts
22  in Springfield, Missouri you wouldn't have any
23  expense.
24    A  Only expense for lunch if I provided

Page 93

1 lunch for the account.
2   Q  Okay.  But for all your other accounts,
3 whether it was a day trip or an overnight trip, you
4 would have some sort of expense report?
5   A  For the most part.  That is correct.  I
6 was pretty frugal as far as my expenses so if I
7 didn't have to have an expense, I didn't accrue
8 one.  For instance, a day trip to Tulsa would not
9 necessarily involve other than the two dollar toll
10 to go to Tulsa and two dollars to come back, which
11 I usually expensed the four bucks, but that would
12 be it.
13   Q  Okay.  So if I looked at your expense
14 reports, I could find some sort of entry that you
15 expended two dollars or four dollars, I guess, to
16 get on the toll road?
17   A  I don't know.  You probably could but I
18 don't have access to expense reports back to the
19 year 2001 so I don't know what, at this time I
20 don't recall what would be on each report.
21   Q  Okay.  Sure.
22   A  It's a possibility.
23   Q  All right.
24   A  It's a possibility that I just ate the

Page 94

1 four dollars too.
2   Q  Did you have any day of the week that you
3 spent in the office?
4   A  I tried to spend a half a day in the
5 office but it varied and that wasn't, that wasn't
6 set and it wasn't regular.
7   MR. BAKER: Okay.  Very good.  Thank you much.
8   MR. BRODERICK: Thanks.
9   MR. BAKER: Nice meeting you, Randy, or talking
10 with you.
11   MR. BRODERICK: We'll reserve signature.
12        FURTHER DEPONENT SAITH NOT.

Page 95

1   I, RANDY VAN CLEAVE, having read the above
2 and foregoing, find the same to be true and correct
3 with the following additions and/or corrections, if
4 any:
5 Page_____Line_____Change:
6 Page_____Line_____Change:
7 Page_____Line_____Change:

23  RANDY VAN CLEAVE  (12/16/04)          DATE

Page 96

STATE OF ILLINOIS  } SS
COUNTY OF CHRISTIAN}
       C E R T I F I C A T E
  I, Julie A. Brown, a Notary Public and
Certified Shorthand Reporter in and for said County
and State do hereby certify that the Deponent
herein, RANDY VAN CLEAVE, prior to the taking of
the foregoing deposition, and on the 16th of
December A.D., 2004, was by me duly sworn to
testify to the truth, the whole truth and nothing
but the truth in the cause aforesaid; that the said
deposition was on that date taken down in shorthand
by me and afterwards transcribed, and that the
attached transcript contains a true and accurate
translation of my shorthand notes referred to.
  Given under my hand and seal this 29th
day of December A.D., 2004.
       Notary Public and
       Certified Shorthand Reporter

       OFFICIAL SEAL
       JULIE ANN BROWN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 2-27-2005

License No. 084-004174