Page 1

1    UNITED STATES DISTRICT COURT
2    FOR THE CENTRAL DISTRICT OF ILLINOIS
3    SPRINGFIELD DIVISION

5    M. JANE MINOR,
6        Plaintiff,
7    vs.                    No. 02-3354
8    CENTOCOR, INC., and JOHNSON &
     JOHNSON, INC.,
9        Defendants.

12       THE CONTINUED DEPOSITION of M. JANE MINOR,
13   taken in the above-entitled case before Rhonda K. O'Neal,
14   CSR, RPR, a Notary Public of Sangamon County,
15   acting within and for the County of Sangamon,
16   State of Illinois, at 10:13 o'clock A.M., on
17   September 10, 2004, at 107 East Allen Street,
18   Springfield, Sangamon County, Illinois, pursuant
19   to notice.

22      BALDWIN REPORTING & LEGAL-VISUAL SERVICES
23         SERVING ILLINOIS, INDIANA & MISSOURI
     24 hrs (217) 788-2835  Fax (217) 788-2838
24              1-800-248-2835

Page 3

                    I N D E X
1
2    DEPONENT                    PAGE NUMBER
3    M. Jane Minor
4        Examination by Mr. Broderick          5

9              E X H I B I T S
10   NUMBER          MARKED FOR IDENTIFICATION
11   Exhibit O              10
     Exhibit P              12
12   Exhibit Q              37
     Exhibit R              57
13   Exhibit S              59
     Exhibit T              75
14   Exhibit U             113
     Exhibit V             116
15   Exhibit W             118
     Exhibit X             126
16   Exhibit Y             127
     Exhibit Z             142
17   Exhibit AA            146
     Exhibit BB            162
18   Exhibit CC            164
     Exhibit DD            172
19   Exhibit EE            174
     Exhibit FF            175
20   Exhibit GG            212
     Exhibit HH            232
21   Exhibit II            234
     Exhibit JJ            238
22   Exhibit KK            240
     Exhibit LL            241
23   Exhibit MM            258
     Exhibit NN            259
24   Exhibit OO            260

Page 2

1    APPEARANCES:
2    BAKER, BAKER & KRAJEWSKI LLC
3    BY: James P. Baker, Esq.
         415 South Seventh Street
         Springfield, Illinois 62701
4        On behalf of Plaintiff.
5    PUGH, JONES, JOHNSON & QUANDT, P.C.
6    BY: John M. Broderick, Esq.
         180 North LaSalle Street
         Suite 3400
7        Chicago, Illinois 60601
         On behalf of Defendants.
9    DRAKE, NARUP & MEAD, P.C.
     BY: Christian D. Biswell, Esq.
10       107 East Allen Street
         Springfield, Illinois 62704
         On behalf of Defendants.

Page 4

1              S T I P U L A T I O N
2        It is stipulated and agreed, by and
     between the parties hereto, through their
3    attorneys, that the deposition of M. JANE MINOR
     may be taken before Rhonda K. O'Neal, a Notary
4    Public, Certified Shorthand Reporter, and
     Registered Professional Reporter, upon oral
5    interrogatories, on the 10th of September A.D.,
     2004, at the instance of the Defendants at the
6    hour of 10:13 o'clock A.M., 107 East Allen Street,
     Springfield, Sangamon County, Illinois;
7
         That the oral interrogatories and the
8    answers of the witness may be taken down in
     shorthand by the Reporter and afterwards
9    transcribed;
10       That all requirements of the Federal Rules
     of Civil Procedure and the Rules of the Supreme
11   Court as to dedimus, are expressly waived;
12       That any objections as to competency,
     materiality or relevancy are hereby reserved, but
13   any objection as to the form of question is waived
     unless specifically noted;
14
         That the deposition, or any parts thereof
15   may be used for any purpose for which depositions
     are competent, by any of the parties hereto,
16   without foundation proof;
17       That any party hereto may be furnished
     copies of the deposition at his or her own
18   expense.

COPY

Page 5

1    (Whereupon the Deponent was
2    sworn by the Notary Public.)
3    M. J A N E  M I N O R
4  having been first duly sworn by the Notary Public,
5  deposeth and saith as follows:
6         EXAMINATION
7      BY MR. BRODERICK:
8    Q  Let the record reflect that it's
9  September 10, 2004 at approximately 10:15 a.m.,
10  and we are continuing with part two of the
11  plaintiff's deposition in this matter. And I've
12  been advised off the record that, Ms. Minor, you
13  have a clarification that you'd like to make?
14    A  Yes.
15    Q  Okay. Why don't you go ahead?
16    A  Somewhere near the end of when we were
17  talking last, you asked me something about the
18  function of--I don't even remember the question
19  specifically, but it was something about
20  hydrolyzer and infusion catheters and whatnot and
21  explained to you that originally it had been they
22  brought the patient back in and kept just taking
23  regular endhole catheter and moving it every
24  couple of hours, and then they came out with

Page 6

1  infusion catheters where they had multi holes so
2  that they had more contact area with the clot.
3  Hydrolyzer is actually a device like a
4  thrombectomy device in that it would push saline
5  in and create what they call the Venturi effect
6  and it would suck out some of the blood clot.
7    Q  Okay.
8    A  And somehow I--somehow I didn't explain
9  it clearly. I don't even recall how I didn't, but
10  I'm aware that I don't think I explained it very
11  clearly.
12    Q  Okay. Do you think you've explained it
13  clearly?
14    A  I think it's reasonably explained here.
15    Q  Okay, very good. Thank you.
16    A  All right?
17    Q  All right. Let me just ask you one
18  question back at when you were at Abbott and your
19  territory was changed, you testified that there
20  was a change in your territory I think when you
21  started to cover then Michigan, Indiana, and
22  Illinois whereas before your territory was
23  Illinois, central Illinois, and perhaps Iowa.
24    Do you recall that?

Page 7

1    A  Yes.
2    Q  Time at Abbott?
3    A  (Nodded head up and down.)
4    Q  Did you think that the change in your
5  territory in any way was discriminatory against
6  you based on your age or gender?
7    A  Not at all. They bumped the other
8  specialist because they wanted me.
9    Q  And just so we're, at that time frame was
10  when urokinase was discontinued? Am I remembering
11  that correctly?
12    A  That was at a time when I was selling
13  physician office diagnostics, which was a blood
14  chemistry analyzer with the name of Vision.
15  Because earlier on, Abbott had some products, but
16  to keep their whatever rate up for the stock of
17  their shareholders, they had taken some of the
18  research money, so thus, we didn't have any new
19  products to talk about.
20    So they made this decision since Abbott
21  Diagnostics Division, ADD, was the world leader in
22  diagnostics and they had designed this office
23  diagnostic chemistry analyzer, which was pretty
24  cool, that they would have the sales force, since

Page 8

1  they really didn't have new products, our sales
2  force, which was just a regular general sales
3  force. You know what I mean? Call-in doctors,
4  internal medicine, family practice.
5    They decided that they would have us sell
6  that product. And a lot of them had trouble and
7  left the company with that. And so my boss, I
8  think I previously told you, saw that I could sell
9  them, and he wanted me to help them, help sell
10  them for everyone else, and I was the first
11  all-star. You know, I had the highest sales,
12  obviously the highest increase since it was the
13  first semester with it or first year with it.
14    Q  So that territory change was based on
15  some business needs that Abbott saw and saw a way
16  to utilize your talents in a different area?
17    A  Yes. And some improvements, yes. Sounds
18  good to me.
19    Q  Let me also ask just to wrap up a couple
20  issues from Centocor in the year 2000, do you
21  think that Tim Schafer did anything discriminatory
22  against you based on your age or gender?
23    A  No. Not at all.
24    Q  Do you think William Alexander did

Page 9

1  anything discriminatory to you based on your age
2  or gender?
3    A  No.
4    MR. BAKER: Excuse me. We're talking about
5  the time period William Alexander was your
6  supervisor.
7    MR. BRODERICK: Correct.
8    THE DEPONENT: He was the one that hired me
9  over to the vascular sales force. He was the
10  first manager, and then the second manager was Tim
11  Schafer.
12    MR. BRODERICK: Q And counsel put a
13  qualification on that. Let me just ask you
14  broadly about William Alexander. At any time, do
15  you think Mr. Alexander did anything
16  discriminatory against you based on your age or
17  gender?
18    A  I sensed nothing and know of nothing that
19  he did that was discriminatory to me.
20    MR. BRODERICK: Okay. Let me just mark this
21  as our next exhibit.
22    (Whereupon a document
23    was duly marked for
24    purposes of

Page 10

1    identification as
2    Exhibit O as of this
3    date.)
4    MR. BRODERICK: Q You can look at this one
5  that's been marked. Ms. Minor, it's just a list
6  of your accounts that we made just to present,
7  just to be able to present something to you. Does
8  this look like an accurate reflection of the list
9  of your accounts as of quarter 4, 2000?
10    A  I think so.
11    Q  Okay. Tell me when the Iowa accounts
12  were added to your list of accounts.
13    A  Well, it appears to me quarter 4 of 2000.
14    Q  Okay. When we were last talking about
15  how these accounts got put together for your
16  coverage, it sounds like you had some input, you
17  had a list of, you had shown us a handwritten note
18  which we marked as a previous exhibit with some
19  accounts that you wanted to put in there. And I
20  was just wondering, did somebody suggest to you to
21  add the Iowa accounts?
22    A  Yes.
23    Q  Who was that?
24    A  I don't remember who at this point, but

Page 11

1  I'm sure they were suggested to me or they
2  wouldn't be on this list.
3    Q  Okay. And just so I exhaust this part of
4  your memory, can you tell me if it was in the
5  early, in October or November when these accounts
6  were added to your territory?
7    A  It just says quarter 4, 2000, and other
8  than that I cannot tell you.
9    MR. BAKER: Excuse me. John, can I--?
10    MR. BRODERICK: Please.
11    MR. BAKER: Jane, I think this was a document
12  that was prepared for purposes of this litigation,
13  as I understand it. It was not a document that
14  was prepared in the fourth quarter of 2000.
15    MR. BRODERICK: That's correct.
16    MR. BAKER: So what I think the question is is
17  to make sure you agree that these were indeed your
18  accounts in the fourth quarter of 2000. Is
19  that--?
20    MR. BRODERICK: Yes.
21    MR. BAKER: Fair? Okay.
22    THE DEPONENT: I need to look at something
23  because I'm a little confused.
24    MR. BRODERICK: Let's go off the record then.

Page 12

1    (Discussion off the record.)
2    THE DEPONENT: I'm not sure that for fourth
3  quarter of 2000 those were my accounts.
4    MR. BRODERICK: Q That are listed on Exhibit
5  O? This is Exhibit O.
6    Ms. Minor, then is there any document
7  that you know of that would refresh your
8  recollection?
9    A  I had given you one the last time, and it
10  was directed toward William Alexander, and it had
11  listed the accounts.
12    (Whereupon a document was
13    tendered to the deponent.)
14    THE DEPONENT: Yeah. That's the one.
15    MR. BRODERICK: Okay. Let's mark that as
16  Exhibit P.
17    (Whereupon a document
18    was duly marked for
19    purposes of
20    identification as
21    Exhibit P as of this
22    date.)
23    THE DEPONENT: Can I have a copy of it too
24  then? When they copied everything, it all got out

**Page 13**

1 of order, so I was trying to put it back in order.

2 MR. BRODERICK: Q You can look at this copy,

3 ma'am.

4 A Okay, thank you.

5 MR. BAKER: What's the date on that?

6 THE DEPONENT: October 3, 2000.

7 MR. BRODERICK: Q If you could tell me the

8 circumstances around this e-mail that you sent to

9 William Alexander that's been marked as Exhibit P.

10 A William asked for input on which accounts

11 I thought would be the best accounts for the most

12 business and considering where we would have the

13 quickest impact for overall business.

14 Q Okay.

15 A And he also, and I believe Tim also had

16 this, but I can't speak totally correct about it.

17 But they felt, like most of the world, that 20

18 percent of your accounts do 80 percent of the

19 business, so they wanted us to focus on the top

20 three to five accounts and get that business and

21 then from that work on it.

22 Q Okay. Then it appears that as of--?

23 A October 3.

24 Q October 3, the accounts in Iowa were not

**Page 14**

1 yet added to your territory?

2 A Right.

3 Q And do you agree that at some point

4 thereafter, several accounts were added?

5 A Yes. Sometime after that. And I'm

6 sorry, I don't remember.

7 Q And you don't remember how it came about

8 that they were added to your territory?

9 A I know that Tony at some point did add

10 the Des Moines accounts.

11 Q Okay. You believe it was Tony who added

12 the Iowa accounts?

13 A That's my recollection.

14 Q Okay. Do you remember when?

15 A One of the reasons it's hard to remember

16 is that we had a national sales meeting in

17 January. February I started having surgery, I was

18 in the hospital three times and had all these

19 problems, so I don't remember the exact date. I

20 know, I think that it was done--I don't know. I

21 just can't remember.

22 Q Do you remember any conversations you had

23 with Tony about adding the Iowa accounts?

24 A Yeah.

**Page 15**

1 Q And--well, first, tell me, what did you

2 say to him and he say to you?

3 A Basically he wanted them added, and I

4 said that it probably wouldn't be the best to have

5 them at this point because Steve Shreen, who was

6 the local rep for Des Moines and had had the

7 product on formulary, got pushed out of his job

8 basically because he lost the contract at the two

9 big hospitals.

10 So here you'd have positive sales for

11 Retavase going along, and then when you lose

12 contract you have negative, so it would reflect

13 negatively against me. And it was a very

14 competitive contract; it's called Premiere (sp).

15 Q Now, do you know, when did that happen?

16 MR. BAKER: Excuse me. The when is what

17 when--

18 MR. BRODERICK: Q When Mr. Shreen was pushed

19 out of the--.

20 MR. BAKER: Thank you.

21 THE DEPONENT: After the Premiere account from

22 the competitor took over the business.

23 MR. BRODERICK: Q Do you know what month and

24 year?

**Page 16**

1 A I don't remember the date for that.

2 Q Do you remember when you had this

3 conversation with Tony about adding the Iowa

4 accounts? Was it before your surgery or after

5 your surgery?

6 A I don't remember.

7 Q Okay.

8 A Sorry. I just don't remember.

9 Q Do you know if it was in person or over

10 the telephone?

11 A Probably both, but I don't totally

12 recall.

13 Q Do you remember anybody else who might

14 have been present for the conversation?

15 A No. Not that far back.

16 Q Okay. Okay. By the end of 2000, had you

17 visited all the accounts in person in your

18 territory?

19 MR. BAKER: That she was assigned at that

20 time?

21 MR. BRODERICK: Correct.

22 THE DEPONENT: Well, I know I visited them

23 all. Now, whether it happened before the end of

24 2000 I'm not positive.

Page 17

1  MR. BRODERICK: Q I'm just asking if you
2  recall.
3  A I don't recall.
4  Q Okay. Can you--briefly you talked about
5  how some of the Abbott products were sold. If you
6  could just walk me through the steps of how
7  Retavase was sold. And what I'm looking for is
8  was this a similar process as you approached with
9  the Abbott products such as urokinase where you
10  contacted someone at the department who might be a
11  champion at the hospital for the product and then
12  tried to get it on formulary, et cetera?
13  MR. BAKER: John, are we talking about the
14  vascular business of Retavase or the cardiac
15  business?
16  MR. BRODERICK: Correct. Yes. The vascular
17  business.
18  THE DEPONENT: Yeah. Because there are two
19  sales forces the cardiology reps called on; the
20  indicated acute myocardial infarction or heart
21  attack, which is the only indicated usage, and
22  then it differed greatly from urokinase because
23  urokinase was considered the gold standard. So,
24  and I had worked that job for a long time, and

Page 18

1  when I walked through the door, they knew I was a
2  urokinase rep. They called me Jane Abbott
3  sometimes.
4  Beside the point. Okay. And then when
5  it was with Retavase, it varied several ways.
6  One, because they expanded accounts that I had
7  never had, I had to find out who thought leaders
8  were in those accounts or people that would help
9  get that business. But in addition--
10  MR. BRODERICK: Q Did you say thought
11  leaders? I'm sorry. Or who the leaders were?
12  A Whoever would get the business. In my
13  old accounts, I knew who the thought leaders were.
14  Q And I'm just wanting to clarify for the
15  record. You're saying thought leaders? Is that
16  the term?
17  A What do you mean by thought leaders?
18  Q I--
19  MR. BAKER: That's the term you used, Jane.
20  I think. Did you say thought leaders?
21  THE DEPONENT: I thought first he said thought
22  leaders.
23  MR. BRODERICK: Q No. I'm--well, who were
24  you trying to contact initially at the hospitals

Page 19

1  and the institutions?
2  A Well, we contacted pharmacy. We would
3  contact interventional radiology, interventional
4  cardiology that did peripheral work or vascular
5  surgeons.
6  Q And did you have a term that you used in
7  the industry to identify these people that you
8  initially made contact with?
9  A What do you mean?
10  Q I'm just wondering if there's a general
11  term you described, that you used to describe the
12  individuals at these institutions that you tried
13  to contact in order to get a foot in the door to
14  get the product on formulary?
15  A You mean like something like
16  interventionalists?
17  Q I don't know. If you don't have a term,
18  then okay.
19  A (Shook head back and forth.)
20  Q Okay. So you made initial contact with
21  pharmacy or somebody in radiology, and then what
22  would you do?
23  A When I would go in, I would introduce
24  myself, say that I had worked for Abbott

Page 20

1  Laboratories. And they'd asked what, and I said,
2  well, I sold urokinase. What do you sell now?
3  And I said, well, I have a product that's--well,
4  since there is no urokinase and it's gone, there
5  have been requests to the companies to, you know,
6  bring information if you request it.
7  I mean, basically they would request,
8  after I said I was selling urokinase, they'd ask
9  what products I had available to sell. Another
10  format would be I would go in, if I thought they
11  used mechanical thrombectomies and things, and
12  that was frequent, I would go in and say I had a
13  hydrolyzer.
14  And since they would, almost all of them
15  had already tried the hydrolyzer and didn't like
16  that, they'd say, what else do you have? And then
17  I would say, well, I have a product now that is
18  not indicated by the FDA, and if you sign this
19  information form, I can get you stuff sent from
20  our medical department.
21  Q Okay. And then if, then what would
22  happen if they signed the information form?
23  A Then I would, we could call actually or
24  put on our computer, and they even had a box set

Page 21

1 up that we could X saying that they requested the
2 information. That's all we had to do was put
3 information into a computer and it would be sent
4 to them.
5    Q And then what would happen?
6    A They'd have the information sent to them.
7    Q And then would you follow up or would you
8 wait for them to call you?
9    A No. I would follow up and say, you know,
10 have you reconsidered hydrolyzer? And they
11 probably might say no. And did you receive any
12 medical information?
13    Q And then if they said yes?
14    A Yes. Then they'd say, they'd start
15 talking. And from there I would just, you know, I
16 made sure in the conversations that I said, this
17 is not indicated by the FDA.
18    Q And then what would be the next step
19 towards them purchasing Retavase?
20    A I would ask them if it would be possible
21 just to observe some cases in the specials lab
22 because I really liked to learn, and a lot of them
23 are teachers. So I would just start watching what
24 cases were done, and if they were primarily

Page 22

1 mechanical devices, then I, you know, at first
2 when we just had hydrolyzer, I would say something
3 to the effect that how would this compare to the
4 hydrolyzer, and when you used it how long ago was
5 it and did they have the six or seven french size
6 and just different questions like that to get them
7 talking.
8    And if they were already using a
9 thrombolytic drug such as TPA, which was the
10 competitor to us by Genentech, I'd ask them what
11 they did or did not like and if they were having
12 problems. Because the whole idea is not for me to
13 come in and tell some medical physician what he
14 has specialized in.
15    Q Sure.
16    A But to simply find out what his thoughts
17 and his way of looking at things would be so I
18 could understand possibly where the products
19 could, you know, be helpful in his practice.
20    Q So if there's, and if you reach an
21 agreement with the doctor that he finds a way that
22 Retavase could be helpful, then what would happen?
23    A Well, it would entirely depend on his
24 answer. Let me think of who would have been one

Page 23

1 that would ask.
2    For example, at St. Francis Hospital
3 where they had used almost a million dollars worth
4 of urokinase, they wanted to know what the product
5 was. And I told them it was not indicated by the
6 FDA, and there was not a lot of information at
7 that time. So they went through their internal
8 review board to set up a protocol to try to use
9 different doses to see how effective it would be
10 without harming someone.
11    Because when TPA came out after urokinase
12 was gone, some people had died because they were
13 using doses that were for heart attack and not for
14 peripheral. So the doctors at St. Francis wanted
15 to do a thorough because they were well known for
16 being a thorough research institution.
17    Q Okay. At other places did they approach
18 this differently?
19    A Yes.
20    Q Okay.
21    A Some were friends of the competitive rep
22 and just were not interested at all, but they
23 would let me observe, and then I would try to find
24 out any of their concerns about the competition,

Page 24

1 and I would also try to get medical information to
2 them. Or if I, usually it seems to me that, say,
3 in a group of four doctors, one might be more
4 aggressive or possibly have more business, you
5 know, would produce more business.
6    So then Centocor had what were called
7 advisory boards where we paid doctors $500 to go
8 to Colorado for half a day. They'd probably fly
9 in on a Friday. Everybody in our team could pick
10 doctors that they thought would be high potential,
11 and they were called, because it was not correct
12 for us to pay them to come, they were called
13 consultants, that's it.
14    And they were paid--I have the--$500, and
15 they would have hors d'oeuvres and things Friday
16 night, then the following morning there would be a
17 couple scientific sessions, like maybe one they'd
18 have some Centocor speakers and like another
19 doctor who would come and talk about how Retavase
20 was used in the periphery, and then they would be
21 able to select whether they wanted to play golf or
22 whatever they wanted to do in the afternoon. And
23 they were welcome to stay the next day as well.
24    Q Okay. Was Dr. Castaneda one of these

Page 25

1  consultants?
2     A  Dr. Castaneda was in a total different
3  level.  It would be like Cleveland Clinic.  You
4  wouldn't advise the head to go ahead and go to one
5  of these ad boards that was directed--we paid them
6  to come, in other words.  We paid them to try to
7  get business.
8     Q  Right.  Okay, okay.
9     A  We meaning Centocor, not meaning me.  I
10  don't have that kind of money.
11     Q  Going back to St. Francis, then, did
12  St. Francis at some point then approve a protocol
13  for using Retavase?
14     A  Yes, they did.
15     Q  And then did they begin to start to
16  purchase the product?
17     A  Yes, they did.
18     Q  And how would the order process work, if
19  you could just give me the mechanics of that?
20     A  I spoke with pharmacy and said
21  that--well, actually I think the doctors contacted
22  pharmacy themselves because that was a much more
23  powerful thing, saying that they thought there
24  were some possibilities that Retavase might be

Page 26

1  safer and they wanted to try Retavase, and they
2  went through the whole IRB thing.
3        And then I called on the pharmacy, and
4  we'd just, again, get them to sign for medical
5  information, get the information sent to them, and
6  it was really hard at first because there wasn't
7  much medical information.  Wasn't much of
8  anything.
9     Q  Okay.  Then pharmacy would get the
10  information?
11     A  They'd get the information, they would
12  talk with the doctors, and in the case of
13  St. Francis, they had some IRB, which is an
14  internal review board, and so patients would have
15  to say they were taking this thrombolytic drug,
16  and they had all these different things set up,
17  you know, informationalwise that people on call so
18  if someone came in they would take down all the
19  data.  And so it was--what was the question you
20  asked me?
21     Q  I was just asking you to walk me through
22  the steps of how--
23     A  Getting it on pharmacy.
24        Okay.  So then they could either do a

Page 27

1  temporary trial while carrying the other product,
2  or they could just go ahead and put it on
3  formulary.  And so actually doctors ordered or
4  told pharmacy and pharmacy ordered from the
5  wholesaler and the wholesaler ordered from the
6  company pretty much would be I believe the
7  pattern.  There may be some places where the
8  hospital ordered directly, but I think almost all
9  of it went through wholesalers.
10     Q  Okay.  And then so the actual purchase
11  and sale wouldn't be handled by you?
12     A  Well, what do you mean?
13     Q  Or the vascular specialists?  Or would
14  they?  I'm just wondering if they wanted to order
15  it from the wholesaler, would they call you or
16  contact you?
17     A  No.
18     MR. BAKER:  Excuse me.  No what?
19     THE DEPONENT:  No, I would not like handle
20  drugs per se, I mean.
21     MR. BRODERICK:  Q Or handle the purchase
22  orders or--?
23     A  No.  Not that I'm aware of.  I mean,
24  simply the doctors would request it, the pharmacy

Page 28

1  would get it through the wholesaler as much as I
2  can recall.
3     Q  And then what's your understanding, then,
4  of how the sale is recorded and how you're given
5  credit for the sale?
6     A  Okay.  Then there's something called DDD.
7  And if a company wants to participate, they pay
8  DDD to collect all the information per zip code or
9  whatever of the sales of their products and the
10  competitors'.  And they report that to the company
11  so the company can know by zip code how they're
12  doing versus how the competitor is doing.  And
13  it's used throughout the industry.
14     Q  Okay.
15     A  Is that what you wanted to know?
16     Q  Well, I'm just wondering, then, is it
17  your understanding, then--I mean, what's your
18  understanding of how you were given credit for the
19  sales of Retavase to the accounts assigned to you?
20  Is Centocor utilizing the information from DDD?
21     A  Primarily.
22     Q  Okay.
23     A  I think they did have some other things
24  that, I can't remember the name of something.  I

Page 29

1  can't remember the name of it, but there was some
2  place that didn't report to DDD that Michele knew
3  of, Owens or something. I can't remember the name
4  of it, but at any rate, it didn't really affect me
5  much.
6      Q Okay. And what kinds of reports could
7  you get regarding the status of your accounts and
8  the sales and that sort of thing?
9      A I would get a printout of the accounts,
10 and they would list Retavase if it had been
11 purchased in whole kits. And then once it became
12 available in half kits, they put that number, and
13 then Genentech they would put the TPA 50s, 100s,
14 and then when TNK, their other product, came out.
15     Q And who would give you these reports?
16     A They'd be on the computer.
17     Q Would it be e-mailed to you or available
18 through the internet?
19     A Well, when you log on to the site for
20 Centocor, you could just download them.
21     Q Okay. And were there any other reports
22 given to you like monthly ranking reports or
23 anything like that?
24     A Again, you could get things off the

Page 30

1  internet. Or not the internet, but the Johnson &
2  Johnson Centocor place that you could contact.
3  They called it razzing (sp) is what they called
4  it. When you contact the company through this
5  secure line, you could get the sales data.
6      Q So just so I'm clear, was there any kind
7  of monthly or quarterly or weekly report that was
8  published to you, or are you saying that generally
9  this information is just available on that website
10 and you can go check it out any time you want?
11     A Well, you could print it off, so you
12 would have it. It was provided.
13     Q So it's a running total provided on that
14 website?
15     A What you mean by running total?
16     Q Well, you could check it weekly or daily
17 if you wanted to, is that correct?
18     A I guess.
19     Q It would be constantly updated?
20     A It would be updated.
21     Q On a daily basis, to your knowledge?
22     A No, I don't think so. I think we, weekly
23 or monthly or something like that.
24     Q Okay.

Page 31

1      A Not aware of daily. Would have been
2  spectacular.
3      Q I think we've talked about Operation SEAL
4  and your understanding of that, and let me just
5  clarify it then. From your understanding of
6  Operation SEAL--
7      A When did we talk about Operation SEAL?
8      Q At the last session.
9        Well, tell me your understanding of what
10 Operation SEAL was?
11     A Starting, they had the expansion, and
12 then they decided that handling everything from
13 the home office wasn't prudent because different
14 geographical areas had different geographic needs.
15 So they broke it into five SEAL teams where the
16 managers would be responsible for their own
17 funding so that it would be more of a
18 regional-based thing.
19     Q Okay. And do you recall, was it your
20 understanding that as a result of the
21 implementation of Operation SEAL that there would
22 be some change to your accounts that were assigned
23 to you from quarter 4, 2000 to quarter 1, 2001?
24     A No.

Page 32

1      Q Okay.
2      A Go ahead.
3      Q When did--to the best of your
4  recollection, when was Operation SEAL implemented?
5      A Well, around the time William left
6  because I guess he didn't want to participate in
7  Operation SEAL. And Sue Landsman became central
8  POD manager, and I think as far as I could
9  recollect would have probably been, I think it was
10 June, July of 2000 that they decided to do that
11 because that's about when I came on board as a
12 specialist.
13     Q All right.
14     A And then there was William. So I had
15 William for a manager for a while. And so
16 then--because I had meetings with William where I
17 went to them, and then for whatever reason,
18 William was leaving. And at that point, they
19 divided us up without telling us where or why
20 about the SEAL team, but I went down to the
21 district that would be headed by Sue Landsman.
22 That's what I recollect.
23     Q Let me direct your attention back to
24 Exhibit O and the accounts that are in bold. And

**M. Jane Minor**

Page 33

1  if you could just identify for the record the
2  accounts that have been bolded.
3      A  It's not very easy to see.
4  MR. BAKER:  Beginning with Boone Hospital.
5  MR. BRODERICK:  Just the accounts that have
6  been bolded.
7  MR. BAKER: Excuse me.  Missouri Baptist.
8  THE DEPONENT:  Is that one of them?
9  MR. BRODERICK:  Yes.
10  THE DEPONENT:  Okay.  Boone Hospital, Memorial
11  Medical Center.  Is Proctor bolded?  It looks
12  bolded.
13  MR. BRODERICK:  Yes.
14  THE DEPONENT:  And University of Iowa Hospital
15  and Clinic.
16  MR. BRODERICK:  Q These five accounts.  Did
17  it come to your attention at some point that these
18  five accounts were going to be removed from your
19  territory?
20      A  Yes.
21      Q  Okay.  When did you first, when did that
22  first come to your attention?
23      A  Well, I think it was during my medical
24  leave.

Page 34

1      Q  And when did you start your medical
2  leave?
3      A  February 7, 2001.
4      Q  And after that date, to the best of your
5  recollection, it was first communicated to you
6  that those accounts would be removed from your
7  territory?
8      A  Sometime during that, I believe.  I'm not
9  sure.
10      Q  All right.  Before that was Mr. Siciliano
11  made a team leader for, over you and several other
12  vascular specialists?
13      A  Yes.  They dropped Sue Landsman.  And
14  Tony, who had been one of the regular team VSS's,
15  became the manager--not, they wouldn't call him a
16  manager.  The team leader, the TL, because he was
17  only over four of us.
18      Q  And you say they dropped Sue Landsman.
19  Why do you say they dropped her?
20      A  Well, she had just gotten a promotion not
21  too far before then.
22      Q  Okay.  And when you say dropped, do you
23  mean that, was she let go from the company?
24      A  My understanding was she was let go.

Page 35

1      Which may or may not be true, but that's what I
2  heard.
3      Q  I believe from your testimony last time,
4  you had a conversation, you had met Tony in person
5  in the fall at a meeting in Texas.  Did you have
6  any contact with him--do you recall that?
7      A  I recall the first time I met him was in
8  training.
9      Q  Right.  And then you met him another
10  time?
11      A  Yes.  When Sue Landsman was the manager,
12  and he was at the meeting and he gave, I think I
13  gave you that whole presentation that he did.
14      Q  Yes.
15      A  That was of indication and the cover
16  letter that said, this is illegal but use it.
17      Q  From the time that he did the
18  presentation and the time he became your team
19  leader, did you have any contact with him?
20      A  Not that I'm aware of.  Not that I can
21  recall.
22      Q  And then when was the first time, do you
23  remember about the first time you had contact with
24  him?

Page 36

1      A  Wait a minute.  The region and the
2  team--wait a minute.  From the time he was my
3  manager--say that again.  Confused.
4      Q  Sure.  From the time that he gave his
5  presentation in the fall of 2000 and between that
6  time and the time that he became the team leader,
7  did you have any--
8      A  I don't think so.
9      Q  Let me finish my question just so we have
10  a clear record.
11      A  Okay.
12      Q  Did you have any contact with Tony?
13      A  Not of any substance that I'm aware of.
14      Q  Okay.  Do you recall then after he gave
15  his presentation in the fall of 2001, when was the
16  next time that you had contact with Tony?
17      A  Physical or through e-mail or something
18  or what?
19      Q  You tell me.  Was it by e-mail or--?
20      A  He sent me an e-mail of the presentation.
21      Q  After the presentation?
22      A  Okay.  Yeah.  It was after the
23  presentation he did.  He sent me out a copy of it.
24      Q  Is that in his capacity as team leader,

Page 37

1  or was that before he was made team leader?
2    A  Actually he sent it to Sue Landsman
3  who--did I show you the cover letter that she
4  said, this is illegal but--would you like me to
5  show you the letter?
6    Q  No.  I think you produced it.
7    A  I think I did before too.  And she
8  basically said, this is the in-service that Tony
9  showed us at this meeting, it's illegal, but it's
10  all we have, so don't show it to CIS and all that
11  kind of thing.  Because it wasn't, it did not go
12  through regulatory.
13    Q  Is this the e-mail that you're talking
14  about?
15    A  I believe so.
16    MR. BRODERICK:  Okay.  Let's mark that as our
17  next exhibit.
18        (Whereupon a document
19        was duly marked for
20        purposes of
21        identification as
22        Exhibit Q as of this
23        date.)
24    MR. BRODERICK:  Q Where does it say that the

Page 38

1  in-service was illegal?
2    A  This is the in-service that Tony
3  previewed for us at the regional meeting.  He has
4  done a great job pulling this together, and I know
5  it will be a great tool for all of us.  Remember,
6  this is for our use only.  Do not forward it on to
7  others, this is not an approved tool and
8  fortunately cannot be left behind.  CIS has not
9  appreciated the kind of Power Point presentation
10  being done by the reps, so please don't present in
11  their presence.  It's unfortunate that we have to
12  work like this, but it's the way it is, and I want
13  you to have every tool possible to be successful.
14    Q  Okay.  And is it your understanding--and
15  what was your understanding of then of that
16  section that you read?
17    A  It's not an approved tool.  If it's not
18  an approved tool, you could lose your job.  It was
19  against what J & J--Centocor had a more liberal I
20  guess outlook than J & J.
21    Q  So it was, it was not approved?
22    A  It was not approved.
23    Q  In terms of company policy?
24    A  In terms of company policy.

Page 39

1    Q  Okay.  All right.  So then after this
2  e-mail, when was the next time that you had
3  contact with Mr. Siciliano?
4    A  I would believe it was, as far as I can
5  remember, when he came to Springfield just to meet
6  me in terms of as my team leader.
7    Q  And do you know when that was?
8    A  In January of, I believe it was in
9  January 2001.
10    Q  And did you know by the time he was
11  coming to meet you that he was already named team
12  leader?
13    A  Yes, I did.
14    Q  And how were you told that?
15    A  I'm sure it was probably announced.
16    Q  Okay.  Do you recall specifically if it
17  was by an e-mail or--?
18    A  No.
19    Q  Or who announced it?
20    A  I would--I could only speculate.
21    Q  Okay.  I don't want you to speculate.
22        So Tony came to meet you in person?
23    A  Yes.
24    Q  And how long did he stay?

Page 40

1    A  Not very long.  Kind of flew in, and we
2  had breakfast.
3    Q  Where did you meet him?
4    A  At the Renaissance, the little restaurant
5  where you can have breakfast.
6    Q  In Springfield?
7    A  In Springfield.
8    Q  And so how long did your meeting with him
9  last?
10    A  For a while.  I'm not good at measuring
11  the time that far long ago.  Sorry.  It's three
12  and a half years ago.
13    MR. BAKER:  Jane, would it be less than a half
14  a day, for example?
15    THE DEPONENT:  I believe it was less than a
16  half a day.  It wasn't a long time.
17    MR. BRODERICK:  Q And what did you talk
18  about?
19    A  Man, this is so hard.  We talked about
20  probably, sure we talked about vascular stuff and
21  that he was excited about being the leader.  And
22  at some point, he wanted to know what I would
23  expect out of him.  That wasn't that meeting
24  though.  Let's see.

Page 41

1 He was just generally talking about
2 probably the SEAL approach and that he, you know,
3 would be the one that would approve money to be
4 spent. We also spoke about--well, I don't know.
5 Somewhere out of the clear blue, he asked me how
6 old was my son.
7 Q Did that occur at this meeting?
8 A Yes, it did. And I wasn't sure if he
9 hadn't gotten my records yet to know my age. It
10 was like why out of the clear blue are you asking
11 me that? Because I said, I think he said he was
12 29, and my son was 28, so it was like he was
13 looking at me to see how old I was.
14 Q How did that come about? Were you
15 talking about family or background or--?
16 A We'd just been kind of generally talking
17 about the vascular business and Abbott and
18 urokinase. That's what I recall.
19 Q Was anyone else present for this
20 conversation?
21 A No.
22 Q At that conversation did he make any
23 other comments about your age?
24 A No. It was just a strong feeling I got.

Page 42

1 Q Which was--?
2 A That something like he was old enough to
3 be my, I was old enough to be his mother or
4 something.
5 Q That's the impression you got?
6 A That's the impression I got.
7 Q Did he make any comments about your
8 gender or sex?
9 A Not that I can recall.
10 Q Were you offended by him asking about the
11 age of your son?
12 A It just struck me as strange, and
13 it--sort of, yeah.
14 Q Did you complain to anyone about it?
15 A Probably, but I don't, you know, a
16 friend. Like he must not have had my records
17 because otherwise he would have known how old I
18 am. And what does that have to do with the price
19 of rice in China? That would have been my typical
20 response to a friend.
21 Q Did you complain to anyone at Centocor
22 about it?
23 A Not until later because at that point I
24 didn't like it, but I hadn't really worked with

Page 43

1 him much so I was going to give him the benefit of
2 the doubt.
3 Q Did you--so this was the first meeting.
4 Did you have any phone conversations with Tony
5 prior to this meeting?
6 A Probably Tim telling me when he was
7 coming in either via e-mail or voice mail or
8 telephone call. So he would tell me when he was
9 going to be there and when we would meet.
10 Q And are you saying at this conversation
11 that you didn't have any, there was no general
12 talk about your background or his background or
13 his--
14 A I said we discussed urokinase, and we
15 discussed that it had been pulled and that it had
16 been the gold standard and that I'd worked for
17 Abbott 18 and a half years. And then I asked him
18 what he had done, and he had sold basically like
19 the competitor, the hydrolyzer. He had just sold
20 equipment. He had not sold thrombolytic therapy.
21 Q Other than the conversation about the age
22 of your son, did any other personal topics come up
23 in the conversation about family or--?
24 A That's the only one that stuck out, and

Page 44

1 it stuck out because it was kind of out of context
2 to me.
3 MR. BAKER: John, when you get done with this
4 conversation, can we take a short break? But I
5 don't want to take you out of your--.
6 MR. BRODERICK: Okay. We can take a break
7 now.
8 MR. BAKER: You sure?
9 MR. BRODERICK: Yes.
10 (Whereupon a short recess
11 was taken at 11:04 a.m.)
12 MR. BRODERICK: Q Ms. Minor, how old were you
13 in the beginning of 2001?
14 A Fifty-five.
15 Q Okay. And how did you feel that a person
16 who was almost 25 years younger than you was put
17 in a supervisory capacity over you?
18 A It happens all the time. I mean,
19 William, Tim, they were great managers. Great
20 ideas. So I had no problem with that part.
21 Q And they were younger than you?
22 A Sure.
23 Q And how much younger?
24 A They were like, they would be more like

Page 45

1  Tony's age, William.  They would be in that same
2  20--I don't, I'm not a good judge of age.  But
3  they were definitely like in that same 20, 30.
4      Q  And had anyone prior to this, any
5  supervisor or coworker ever inquired to you about
6  your age at Centocor?
7      A  Well, I mean, not really because when I
8  sent my application and everything in, there it
9  was.  There was I guess no reason to ask.  Tim
10  never asked, William never asked.
11      Q  Did anyone at Abbott's?
12      A  Not that I can recall.
13      Q  Okay.
14      A  I don't know why they would.  Maybe they
15  did.  I don't remember.
16      Q  Okay.  When was the next time that you
17  had a conversation with Tony or any contact with
18  him?
19      A  Well, I don't remember every voice mail
20  or e-mail or anything else.  Once it became, I'm
21  sure there were probably different ones, but I
22  know I had to tell him that I had surgery
23  scheduled for February 7, 2001.
24      Q  And how long had you been planning to

Page 46

1  have that surgery?
2      A  Whenever my doctor told me I should have
3  the surgery.  I'm sorry.
4      Q  Do you remember when that was?
5      A  Probably was less than a, between a week
6  and a month.  I don't know.  A week or two or
7  something like that.  But not for a year.
8      Q  Did you, would you call Tony on your own
9  during that time period?
10      MR. BAKER:  The time period we're talking
11  about is before she had her surgery?
12      MR. BRODERICK:  Yes.
13      THE DEPONENT:  If he asked me to or if there
14  was something I needed to call him about, I'd feel
15  free to call.
16      MR. BRODERICK:  Q Okay.
17      A  But I don't remember specifically.
18      Q  Did you find out at some point that he
19  was married?
20      A  At our training his wife had fallen, and
21  he had to leave early because she was going to
22  have a baby.
23      Q  So December of 2000 at that training
24  session?

Page 47

1      A  Yes.
2      Q  I see.  So by the time you had this
3  meeting--
4      A  Whatever meeting it was where he was just
5  a regular rep and I was just a regular rep for
6  vascular.  That meeting where we were being
7  trained on vascular medicine, his wife slipped and
8  fell, and he was worried because she was pregnant.
9  And that's when I became aware of it.  He needed
10  to leave early.
11      Q  So as of January of 2001, then, you knew
12  he was married and had at least one child?
13      A  Yeah.  I mean, yeah.
14      Q  And prior to the time you had surgery,
15  did you have any conversations with him about his
16  family, or outside of this comment about asking
17  about your son's age, did you have conversations
18  about your family?
19      A  We mostly discussed urokinase and why it
20  was pulled, he wanted to know why it was pulled
21  off the market and things like that.  That's what
22  I remember.
23      Q  So your answer to my question--could you
24  read back my question.

Page 48

1      (Discussion off the record.)
2      MR. BRODERICK:  Q Let me rephrase the
3  question.
4      Prior to the time that you had surgery
5  and around the time that he was made team leader,
6  did you have any conversations with him about his
7  family?
8      A  Not that I can recall.
9      Q  Outside of this conversation you
10  described for us about him asking about your son's
11  age, did you have any conversations about your
12  family?
13      A  Not that I recall.
14      Q  Okay.  Do you recall how frequently you
15  may have contacted Tony prior to the time you had
16  surgery?
17      A  No, I don't recall.
18      Q  Do you recall if you had, how long your
19  conversations might be with Tony?
20      A  Whatever was necessary.  It could be
21  longer or shorter.
22      Q  Did you call at any time during the day?
23  And I mean did you call him during working hours
24  and evenings as well?

Page 49

1  A  Are we talking about just from January 1
2  to February 7?
3  Q  Yes.
4  A  In that time frame?
5  Q  Yes.
6  A  It's entirely possible.
7  Q  Do you recall any specific conversations?
8  A  No.
9  Q  Okay.  And during that time period, did
10  he make any other comments to you about your age?
11  A  Not that I recall.
12  Q  Or any other comments that left you with
13  an impression that he was thinking about your age?
14  A  I wasn't--I mean, he was a new boss.  I
15  was just, you know, listening.  So that's the only
16  thing that really stuck out of my mind at that
17  point in time.
18  Q  And did he make any other comments about,
19  any comments about your gender during that time
20  period?
21  A  I don't recall.
22  Q  Did you have any discussions with him
23  about any changes to your, to the accounts
24  assigned to you prior to the time, prior to

Page 50

1  February 7?
2  A  I don't think so.
3  Q  After your surgery, did you go on
4  short-term disability?
5  A  Well, I was in the hospital three times.
6  Are you aware of that?
7  Q  During what time period?
8  A  February 7 I had a surgery, February 14 I
9  went in to have another surgery, but as soon as
10  they gave me vancomycin, I went into anaphylactic
11  shock, my head was like a pumpkin, my eyes were
12  swollen shut, neck was out to here, and I couldn't
13  have the surgery, and I had to be on prednisone
14  and benadryl for the following week.
15  And so then would have been the 21st I
16  was rescheduled for surgery, but I had to go in
17  early so they could try to find some antibiotic
18  combination that would protect me prophylactically
19  that wouldn't cause me to have another
20  anaphylactic reaction so that I could go ahead and
21  have surgery.
22  Q  And what surgery are you talking about?
23  A  Hysterectomy.
24  Q  Okay.  And so you were, from February 7

Page 51

1  to a date in April, I believe, is that correct?
2  A  (Nodded head up and down.)
3  Q  When did you return to work?
4  A  I think it was April 24, 26, something
5  like that.
6  Q  And during that time period, is it your
7  understanding that you were on short-term
8  disability?
9  A  I was on sick leave, whatever that is.
10  Q  Okay.  During that time period, did you
11  have any conversations or contact with Tony?
12  A  Probably.  I also had an allergic
13  reaction to morphine when they finally did do my
14  surgery.  I had rash all over my body, so I was
15  having a lot of problems with medications.
16  Q  What doctors were you seeing during this
17  time period?
18  A  Nancy Khardori; she was infectious
19  disease for trying to help me find an antibiotic.
20  John Young, who is a gynecologist.
21  Q  Who was going to do the hysterectomy?
22  A  John Young.
23  Q  Any other physicians?
24  A  No.  Just the anesthetist or whomever

Page 52

1  else was there.
2  Q  Was Dr. Tsang consulted during this time
3  period as well?
4  A  Well, you know, I don't know.  Probably I
5  told her.
6  Q  Was she your primary physician?
7  A  Uh-huh.  She was primary care, but all
8  the gynecological stuff definitely was with
9  Dr. Young.
10  Q  Were you seeing any psychiatrist,
11  psychologist, or counselors during this time
12  period?
13  A  Huh-uh.
14  MR. BAKER:  What time period?
15  THE DEPONENT:  Yeah.  What time period?
16  MR. BRODERICK:  Q Let's say from January 1,
17  2001 till the time you returned to work in April.
18  A  Any psychiatrist?
19  Q  Yes.
20  A  I don't think so.
21  Q  Any counselors?
22  A  Yeah, probably.
23  Q  Who?
24  A  Susan Arrington.

Page 53

1    Q Anyone else?
2    A Not that I'm aware of. Not that I
3  remember.
4    Q I don't want to be too technical, but any
5  psychologists?
6    MR. BAKER: Any mental health therapists?
7    MR. BRODERICK: Q Any mental health
8  therapists?
9    A Okay. Susan Arrington, the counselor,
10  had her master's in clinical social work.
11    Q I'm not trying to play games. I'm just
12  trying to get all the facts.
13    A No. I'm trying to remember.
14    Q When did you first start seeing
15  Dr. Arrington or Susan Arrington?
16    A That's hard. I started seeing her around
17  the time for sure. I mean, I might have seen her
18  brief times before about like my sister being sick
19  or, you know, things like that. When I started
20  really seeing her again was after this time frame
21  when I became upset with the situation with Tony
22  pretty much. I might have seen her at some points
23  when things kept changing around. It's very hard
24  for me to remember time frame. I think

Page 54

1  basically--I know for sure I saw her after 2001.
2    Q Okay. Do you recall seeing her before or
3  after April of 2001?
4    MR. BAKER: Before or after?
5    MR. BRODERICK: Q Do you recall seeing her
6  before April, before the end of April 2001, do you
7  recall seeing her?
8    A Yeah. I did. It really put me in
9  contact with my own humanity when I almost died.
10    Q Okay. And it was about that
11  situation--the purpose of your seeing her at that
12  time was about the complications you were having
13  associated with the hysterectomy?
14    A Uh-huh. I think so.
15    Q Was there any diagnosis made? Did she
16  make any diagnosis of you at that time?
17    A Like what do you mean?
18    Q Well, did she identify any particular--
19    A She wasn't an MD, so she doesn't, you
20  know, wasn't able to do that.
21    Q Did she make any kind of, did she give
22  you any kind of treatment or course of treatment?
23    A It was just, we talked.
24    Q Okay. So to the best of your

Page 55

1  recollection, then, from the time that you went
2  out on February 7 to the time that you returned
3  from short-term disability, do you have any memory
4  of any conversations or contact with
5  Mr. Siciliano?
6    A Yeah, I know I did.
7    Q Okay. How many?
8    A I don't know. I just know that I told
9  him--when the surgery was over, and I was still
10  alive, I know I told him about the anaphylactic
11  shock the second time, and therefore, I wasn't
12  having surgery till the next time, and then I'm
13  pretty sure I told him, but I don't remember
14  exactly if I told him I had a reaction to morphine
15  and a rash all over me and all that kind of stuff.
16  And so it was pretty draining.
17    Q Do you remember what he said to you?
18    A He said, I kind of understand the female
19  stuff because my mom had that.
20    Q And when did he say that to you?
21    A Whenever I was talking to him around that
22  time frame.
23    Q Were you a offended by that remark?
24    A It just reminded me of the time before

Page 56

1  when he asked how old my son was. I mean--.
2    Q How did that remark make you feel?
3    A Like he put me in the same class as his
4  mom. That's how I felt about it.
5    Q Do you remember any other conversations
6  you had with Tony during this time period before
7  you returned?
8    A You know, I don't remember I'm sorry to
9  say. I mean, I probably should, but unless you
10  give me hint, I probably don't.
11    Q Okay.
12    A That's a long time ago, three and a half
13  years.
14    Q What was happening with your accounts
15  during this time period?
16    A I think that I would probably call some
17  of them and see how they were doing. I think Tony
18  was supposed to cover them during that time frame
19  maybe or something or the regular local account
20  rep was supposed to call. I don't specifically
21  remember. I know. I think Michele Johnson was
22  going to cover them because she was familiar with
23  them.
24    Q Do you remember how you performed in the

Page 57

1 first quarter or how your accounts performed in
2 the first quarter?
3    A  I know that they did, that they were
4 pretty good because it's reflected from the end of
5 the last year, so there is kind of a carryover
6 such that the end of the prior year would be how
7 well I did the first part of.
8    Q  Okay.  I'm not asking you to pull out any
9 documentation.  I just wanted to ask you if you
10 remembered.
11    A  I remember that.  I think I was like 11th
12 or something like that.
13    MR. BRODERICK: Okay.  Let me just have this
14 marked.
15        (Whereupon a document
16        was duly marked for
17        purposes of
18        identification as
19        Exhibit R as of this
20        date.)
21    MR. BRODERICK: Q Why don't you just review
22 what's been marked as Exhibit R.
23    A  Number one, this is for cardiovascular,
24 not vascular.  Just thought I'd mention that.

Page 58

1    MR. BAKER: Wait until you're asked a
2 question, Jane.
3    THE DEPONENT: Sorry.
4    MR. BRODERICK: Q All right.  Have you seen
5 this document before?
6    A  Well, this says the cardiovascular
7 representative.  This isn't the one for the
8 vascular representative.
9    Q  So it's you understanding that for the
10 first and second quarter of 2001, was there a
11 separate method of calculation of the SICP for
12 vascular specialists?
13    A  Right.  Because this says Retavase 65
14 percent, ReoPro 25 percent, Fragmin 10 percent.
15 And $3,000 in those performance points was average
16 per rep.  So since this is cardiovascular, and we
17 didn't sell Fragmin, this was not our, 65 percent
18 Retavase, ReoPro 25 percent,  Fragmin 10 percent.
19 That's nothing to do with us.
20    MR. BRODERICK: Okay.
21        (Whereupon a document
22        was duly marked for
23        purposes of
24        identification as

Page 59

1        Exhibit S as of this
2        date.)
3    MR. BRODERICK: Q Let me show you what's been
4 marked as Exhibit S.
5    A  Yep.  I have that.
6    Q  Can you identify it for the record?
7    A  Cardiovascular Business Unit Incentive
8 Compensation Report.
9    Q  And what is this document?
10    A  Like I would go onto the computer and
11 print this out, and on quarter 1 earnings $6,250,
12 I was eligible 100 percent.  Quarter 1 CM payout.
13 I don't remember what a CM payout is but, oh, well
14 625.  It's probably the corporate multiplier.
15 That's it.  So the corporate had done above its
16 goal, so I got 625 more dollars, and that's how
17 that was calculated.
18    Q  Well, let me ask you, what's the time
19 frame for Exhibit S?  What time frame is this
20 reflecting?
21    A  It says March 2001, and I was ranked 11.
22    Q  And showing a payout of $6,875?
23    A  6,875.
24    Q  What's your understanding of how the

Page 60

1 rankings worked?
2    A  Well, I don't know if there were 23 of us
3 at that moment or not, but there was something
4 like that.
5    Q  Was it your understanding that all the
6 vascular specialists nationwide would be ranked 1
7 to 23, assuming there were 23 vascular
8 specialists?
9    A  Assuming that that would be the case.
10 That would be my understanding.
11    Q  Was it your understanding that there was
12 a predetermined set amount paid to each of the
13 vascular specialists based on their rank?
14    A  No.  I think it was more--I don't know.
15    Q  Okay.  Well, I'm just saying if you had
16 been ranked--you were ranked 11, and you were paid
17 $6,875?
18    A  Right.  Probably if I was 1, I would have
19 made more.  And they have this thing that if
20 you're 22 or less, you don't get paid at all.  It
21 must be better than 21 for any product
22 calculations and ranking.
23    Q  So if a vascular specialist is ranked--
24    A  Twenty-one, 22, or 23.

Page 61

1    Q Twenty-one, 22, or 23, they would not
2 receive a payment?
3    A Zero.
4    Q Okay. But is it your
5 understanding--well, how was the payout for your
6 rank--
7    A How was it done?
8    Q Determined?
9    A Pretty much how much I sold, I guess.
10    Q Okay. To the best of your understanding?
11    A (Nodded head up and down.)
12    Q Okay. And do you know who was
13 responsible for--do you see in the box with the
14 graphs there? There's--?
15    A That thing that says IC Expert Report
16 created by Synygy?
17    Q The chart there with sales units and time
18 line, and there's some measures--
19    A Where? Show me the spot you're showing.
20    Q Q1 measures?
21    A Rank times weight equals performance.
22    Q Do you know who's responsible for
23 determining those measures and metrics there?
24    A Well, it says right down here IC Expert

Page 62

1 Report created by Synygy, Inc.
2    Q Other than that, do you know who's
3 responsible for that?
4    A No.
5    Q Do you know if Mr. Siciliano has any
6 input or control over the determinations of
7 anything on this sheet?
8    A On this particular sheet?
9    Q Yes.
10    A I don't think at this time that he had
11 anything on there.
12    Q Do you know if you had ranked number 1
13 during quarter 1 what your payout would have been?
14    A No.
15    Q I know you said this is based on your
16 sales. Could you elaborate on your understanding
17 of how your payout was determined?
18    A Okay. One of the problems that I would
19 see is that when your accounts are changed,
20 someone else has 16 accounts and four million
21 people, and you have 12 accounts with less than a
22 million people to call from, obviously they have
23 an advantage because more people have peripheral
24 vascular disease.

Page 63

1    So be that as it may, when a person sells
2 to an account and gets them to start using your
3 product versus TPA, then you have a sales
4 increase. On the other hand, if they've been
5 using Retavase and you get the account and they
6 change to TPA prior to that even, then you get a
7 negative taken off of your other sales.
8    Q Was it your understanding that this
9 payout is directly linked to the dollar volume of
10 your sales?
11    A I'm sure it's linked somehow or the
12 other. Because 100 eligibility.
13    Q Well, Ms. Minor, is it a percentage of
14 the dollar volume of your sales, to your
15 understanding?
16    MR. BAKER: Is what a percentage?
17    MR. BRODERICK: Q The quarter 1 payout?
18    MR. BAKER: Can you read that back?
19    MR. BRODERICK: Well, let me rephrase the
20 question.
21    Q Ms. Minor, is it your understanding
22 that a quarter 1 payout is a percentage of the
23 dollar volume of your sales?
24    A During what? The quarter 1?

Page 64

1    Q Correct.
2    A It is, as I talked about DDD and things
3 going through the wholesaler, there was sometimes
4 a several-month lapse so that in fact quarter 1
5 would actually being showing my sales that maybe
6 were the end of the year. And that's quarter 2
7 would be showing quarter 1 when I was mostly gone.
8    Q I appreciate that.
9    A Do you understand?
10    Q But I'm trying to determine your
11 understanding of how your payout was calculated.
12 I'm just trying to explore your understanding of
13 that.
14    MR. BAKER: John, are you asking what her
15 understanding was of the mathematic formula that
16 came up with this 6,875?
17    MR. BRODERICK: Yes, I am.
18    MR. BAKER: Do you understand the question,
19 Jane?
20    MR. BRODERICK: Q I mean, do you understand
21 there's a formula at work or if there's a
22 commission? I'm just trying to get your
23 understanding.
24    A I'm sure they had a formula.

Page 65

1  Q  Do you know what it was?
2  A  The powers that be.
3     No, I did not know what it was.
4  Q  Okay.  Is it your--but you must have some
5  understanding of what this payout is.  Is it a
6  percentage of the gross volume of your sales?  You
7  know, you had X millions of dollars in sales in
8  your territory, and then is it your understanding
9  you got .05 percent of that gross total?
10  A  No.  It was based on if I had 103 percent
11  over whatever they wanted me to get, I got a 15
12  percent bonus.  If I got 102, 102.99, I got a 10
13  percent.  101 to 101.99, five percent, less than
14  101, zero percent.  It's this (indicating).
15  Q  Okay.  You've indicated the part there,
16  the section on Exhibit S under Year-end Corporate
17  Multiplier Projection?
18  A  Right.
19  Q  Okay.  So your understanding is that this
20  payment is a bonus that's predetermined for the
21  rang you achieved, is that correct?
22  A  Yeah.
23  Q  The bonus itself--I mean, that has
24  something to do with your rank based on the volume

Page 66

1  sales?
2  A  My rank or the volume sales?  Yeah.
3  MR. BAKER:  I'm going to object to the
4  question because I think it's ambiguous, but
5  maybe--do you understand the question?
6  MR. BRODERICK:  Let me rephrase it.
7  Q How was your rank determined?
8  A  My rank was determined I guess by how I
9  did against everybody else that was a specialist.
10  Q  And what went into determining your rank?
11  A  Actually I don't know.  I mean, I just
12  can't tell you what formulas they used and stuff.
13  Q  Okay.  Was your rank determined by some
14  measure of the volume sales?  Not necessarily the
15  dollar amount but the units sold?
16  A  Probably both.
17  Q  Okay.  Was your rank to the best of your
18  understanding determined in some part by the
19  measure of growth in your territory?
20  A  Probably.
21  Q  Okay.  But as far as how those were
22  weighed together, can you tell me how they were
23  weighed?
24  A  See, my thinking is if you go out and you

Page 67

1  get the business to the best of your ability, then
2  you will make the money you deserve to make.  And
3  so I have rather, I look at something to see the
4  potential and what would stand in the way, and
5  then I go for where I think the best opportunity
6  is to sell.  It's somebody else's job to figure
7  out all that.  I just want to sell and make money.
8  I know you think that's simple, but that's the way
9  I looked at it.  Is that the answer?
10  Q  Actually I'm just--do you know how growth
11  and volume were weighed and compared against each
12  other?  I'm just asking if you know.
13  A  I don't understand what you're even doing
14  to me right now.  Thank you.
15  MR. BAKER:  Can I take a stab at this?
16  MR. BRODERICK:  Sure.
17  MR. BAKER:  Okay.  Jane, do you have as you
18  sit here today an operating understanding as to
19  how commissions and bonuses were figured back in
20  2000 and 2001 for Centocor vascular
21  representatives?
22  THE DEPONENT:  I know they paid $21 a
23  hydrolyzer.
24  MR. BAKER:  Okay.

Page 68

1  THE DEPONENT:  And I think the goal the first
2  year was based on district performance as well as
3  my performance.  They had it all figured in
4  together at first.  I remember that all of a
5  sudden.  So it made it really complicated because
6  I didn't have access to what our whole district's
7  sales versus everything else.  Michele knew all
8  that, and she was just absolutely wonderful at
9  figuring it all out and making sure we didn't get
10  cheated.  So I trusted her to take care of that.
11  MR. BRODERICK:  Q Did you ever see a document
12  that described for vascular specialists how the
13  SICP was going to be calculated?  As you sit here
14  today do you recall seeing such a document?
15  A  This was what we got for compensation
16  (indicating).
17  Q  Do you recall an explanation, something
18  similar to Exhibit R but that was for vascular
19  specialists--
20  A  Probably.  If that's what you're asking
21  me, there probably was one for vascular.
22  Q  Do you have an independent recollection
23  here today of reviewing it at that time?
24  A  It's too long ago.

Page 69

1  Q  Do you have a specific recollection of
2  receiving such a document?
3  A  Probably but we always got them late
4  because they were never on time with giving us
5  goals and stuff like that.
6  Q  The actual packet that explained how they
7  were going to calculate the SICP?
8  A  I don't remember when I got it.  I'm
9  sorry.
10  Q  But you did get something, to the best of
11  your knowledge?
12  A  Probably.
13  Q  That would explain how this was
14  calculated?  And I mean Exhibit S?
15  A  Maybe.
16  Q  Okay.  If you don't know, you don't know,
17  and I'm not necessarily saying you should know at
18  this point.  I just want to explore this a little
19  more.  Do you know what a product performance
20  index is?
21  A  No.  Is that--no.  That's not my rank, so
22  I don't know what it is.
23  Q  Do you know how volume, the volume
24  changed--excuse me.

Page 70

1      Do you know how the volume of your units
2  sold in your territory was measured?
3  MR. BAKER:  Can you read that question back.
4      (Whereupon the requested
5      portion of the record was read
6      back by the Reporter.)
7  MR. BAKER:  Objection, ambiguous.
8  MR. BRODERICK:  Q Do you understand the
9  question?
10  A  I'm thinking several sheets.  I mean--.
11  Q  If you don't know, Ms. Minor, it's--.
12  A  I don't know what you're talking about.
13  I know we got sheets that said so many units, so
14  many months, so many whatever.
15  Q  Okay.  For volume, in terms of just
16  volume units sold, do you know what your rank was
17  for that?
18  MR. BAKER:  In the first quarter?
19  MR. BRODERICK:  Q In quarter 1?
20  A  Eleven as of March 11.
21  Q  Well, did you know that independently, or
22  did you only know that by looking at the--?
23  A  Only by looking at this.
24  Q  Okay.  Without looking at Exhibit S, do

Page 71

1  you understand that there was a weight given to
2  your rank as--
3  A  There was a what given.
4  Q  Do you know what weight was given to the
5  rank for your volume of units sold?
6  A  No.
7  Q  Okay.  Do you know what rank was given to
8  your rank in terms of volume growth?
9  A  No.
10  Q  Okay.
11  A  I had a note where Tony was figuring up
12  something, and I wrote him a note asking him to
13  explain what his little formula was because it
14  seemed like it was different than everybody else's
15  formula or something.
16  Q  Okay.  After you returned after sick
17  leave in 2001--well, let me ask you:  Do you think
18  you came back too soon?
19  A  I asked him--my doctor had said to start
20  slowly because of all the drug reactions and
21  things I had had, so I wanted to start a little
22  more slowly, but he wanted to meet with me in like
23  two days or whatever.  He wanted to meet with me
24  Monday or Tuesday or whatever it was, and he

Page 72

1  wanted me to start off with getting five basic
2  things done pretty quickly.
3  Q  Okay.  Well, now, Ms. Minor, you came
4  back on a particular day, correct?
5  A  Yes.
6  Q  Whether it's April 24 or April 27, it is
7  what it is?
8  A  (Nodded head up and down.)
9  Q  Whose decision was it for you to come
10  back on that day?
11  A  My doctor.
12  Q  And which doctor was that?
13  A  Young.
14  Q  Do you think you came back too soon?
15  A  Well, in retrospect it's easier maybe to
16  say maybe I did come back a little too soon if I
17  was going to have to race around like I did, but I
18  think primarily I wanted to come back to work and
19  I wanted--but I just knew I needed to start a
20  little more slowly just so I could kind of build
21  up my strength because I hadn't felt very good for
22  quite a while.
23  Q  How else did you feel when you came back?
24  Is that a complete and accurate description of how

Page 73

1  you felt when you came back?
2    A  Complete and accurate description of how
3  I felt when I came back?  I was easily exhausted.
4  I remember that.
5    Q  Did you tell Mr. Siciliano that you felt
6  100 percent?
7    A  I told him that I didn't feel 100
8  percent.
9    Q  And what else did you tell him at this
10  time?
11    A  I told him that I wanted more time for
12  each of the five objectives he was setting for me.
13    Q  Well, when was the first conversation you
14  had with Tony when you returned?
15    A  Well, it would have been like the April
16  24th, the FCR, the field contact report.
17    Q  Yes.  We'll get to that in a moment.  I
18  do know what you're talking about, but did you
19  have a conversation with him prior to that?
20    A  Well, probably, but I don't know.  I
21  mean, I'm sure he called and said he's coming in,
22  wanted to talk to me.
23    Q  But you don't have any recollection of a
24  specific conversation?

Page 74

1    A  Just general stuff.  I was trying to
2  handle some things telephonewise probably.
3    Q  Do you remember any other contact you had
4  between the time you returned and the time that he
5  issued this FCR?
6    A  Such as what?  Are you wanting to know if
7  I got all the e-mails like everybody?
8    Q  Okay.
9    A  Or all the voice mails like everybody.
10    Q  Okay.  But did you have a, do you
11  remember having a specific conversation with him
12  before the FCR?
13    A  About what?
14    Q  About anything?
15    A  Probably, but I mean, I can't remember that
16  far back what I might have said other than that.
17    Q  Well, did Tony ride with you prior to
18  issuing the FCR?
19    A  Let's see.  I know I met with him and--I
20  don't remember.  Probably, but I don't remember.
21  I remember him and I sitting there and talking
22  about the five things he wanted done.
23    Q  So the next conversation you have a
24  memory of is this conversation where you had in

Page 75

1  person with him?
2    A  (Nodded head up and down.)
3    Q  And at that time, did he present you with
4  an FCR?
5    A  Field contact report.
6    Q  For, dated April 24?
7    A  Yes.  4-24 of '01.
8    Q  Where was this conversation?
9    A  I don't remember.
10        (Whereupon a document
11        was duly marked for
12        purposes of
13        identification as
14        Exhibit T as of this
15        date.)
16    MR. BRODERICK:  Q Let me just show you what's
17  been marked as Exhibit T.  I know you have your
18  own copy, but if you would just review Exhibit T.
19    A  Same one as I got.
20    Q  Exhibit T is the field contact report?
21    A  4-24 of '01.
22    Q  Okay.  Now, did Mr. Siciliano bring this
23  document with him to that meeting?
24    A  I think he mailed it to me because right

Page 76

1  here it said, May 11, attached is the Field
2  Contact Report generated from our last meeting.
3  Remember it's a living document, blah blah blah
4  blah.  Keep up the great work.
5    Q  Okay.  If you look at the second page of
6  Exhibit T, is this the e-mail that you were
7  reading from?
8    A  Looks to me like, yeah.
9    Q  And this e-mail was the e-mail he sent
10  you with the field contact report from April of
11  2001 attached?
12    A  Yes.
13    Q  So you had an in-person meeting with him
14  before you received this field contact report
15  then?
16    A  To the best of my recollection I did.
17    Q  Do you recall whether this meeting was,
18  what city it was in?
19    A  I thought that's what we just said, I
20  didn't remember.
21    Q  You don't remember what city it was in?
22    A  (Shook head back and forth.)
23    Q  Okay.  Do you remember any other
24  circumstances regarding the meeting?  Was it in a

Page 77

1  restaurant or in a car?
2     A  I--you know, I'm trying to put myself in
3  the car, I'm trying to put myself places, and I
4  don't remember.
5     Q  Do you remember if anyone else was
6  present?
7     A  I doubt it.
8     Q  Well, do you remember how long the
9  meeting lasted?
10    A  I would assume a couple hours.
11    Q  And what did Tony say to you and you say
12  to him?
13    A  He said the purpose for him was to
14  welcome me back into the territory and update me
15  on activities during my absence.  He wanted to set
16  up some top projects for me, which he put down in
17  the critical objectives.
18    Q  And do you remember anything else?
19    A  I remember that I asked him that this was
20  the end of April, and to set up all these meetings
21  halfway through May, I mean, two weeks to arrange
22  for someone to speak at a program, to make sure
23  the doctors are there, to find a restaurant, to do
24  everything to get invitations out so they have

Page 78

1  enough time to clear their calendar really is not
2  what I call starting off even remotely easing into
3  something.  It was like, it was a demanding
4  schedule.
5     Q  And you told him this?
6     A  Yeah.  I said I needed more time, and I
7  would try to accomplish them sooner.  And he says,
8  no, we're just going to do it this way.  And I
9  said okay, so I did my best.
10    Q  Did he make any comments to you about
11  your age at that time?
12    A  Not that I recall.
13    Q  Did he make any comments regarding your
14  gender?
15    A  Only the one that he understood because
16  his grandma--I mean his mother had had that kind
17  of problem.
18    Q  And do you think he made that comment at
19  this conversation?
20    A  I don't know.
21    Q  Do you think he put this schedule
22  together for you, these critical objectives for
23  you, do you think he put that together because he
24  was discriminating against you?

Page 79

1     MR. BAKER:  Does she think that now, or did
2  she think that then?
3     MR. BRODERICK:  Q As you sit here today.
4     A  As I sit here today?  I guess I feel
5  that--say it again.  As I sit here today what?
6     Q  As you sit here today, do you think he
7  put these critical objectives together to
8  discriminate against you based on your age or
9  gender?
10    A  I think he wanted to make stiff
11  requirements because I thought, because I believe
12  he thought I was a older woman.
13    Q  And what's your basis of believing that?
14    A  Because of his comment--I mean, I just
15  got out of with a female surgery, and he did not
16  listen to--well, and because when he broke his
17  little finger, he got on the phone and said he
18  had, his pinky was broken and he was going to be
19  off a couple weeks.  I mean, it was like such a
20  difference in how he perceived what he could do
21  versus what I could do after surgery and all the
22  drug reactions I had.
23    Q  Anything else?
24    A  I just think for anybody that this would

Page 80

1  have been difficult to achieve those goals by that
2  amount of time, much less somebody that had just
3  gotten done with surgery and some complications.
4     Q  Okay.  Well--.
5     A  So that's why now I look at it and I
6  think, I mean, what he said was he was excited
7  about my return to territory and accomplishments
8  that lie ahead of me and my positive attitude
9  which I had and that was refreshing, but I believe
10  it will help you achieve your goals and assist our
11  district as well as central region.  There's a lot
12  to accomplish due to my absence.
13    Q  Any other--
14    A  That's what I--that's it, I guess.
15    Q  Okay.  So just so we have a clear record,
16  have you told me all the facts to your knowledge
17  that you have that you base your opinion on that
18  he set these critical objectives to discriminate
19  against you based on your age and gender?
20    A  I think so.  They just were difficult.
21  And plus, I didn't get the input.  That's the
22  important one.  He wouldn't listen to my input,
23  and I know he was listening to the other people's
24  input.

Page 81

1  Q  How do you know that?
2  A  Because I would talk to them.
3  Q  And who did you talk to?
4  A  Randy Van Cleave.  And I spoke at a
5  meeting with Caroline Kopecky and then with
6  Denise.
7  Q  Well, when did you speak with Randy
8  Van Cleave and learn that he was getting input?
9  A  Probably around the time frame or any
10  time we talked about accounts he would just say
11  they accepted his input.
12  Q  How did that make you feel?
13  A  Like why won't he accept my input?
14  That's what it made me feel like, like it didn't
15  make any sense.  I'm intelligent.
16  Q  And when did you have a conversation with
17  Caroline Kopecky about--
18  A  At a meeting.
19  Q  What meeting was that?
20  A  I don't remember.  I just know at the
21  meeting that I spoke with them and--.
22  Q  Do you know where the meeting was?  It
23  sounds like a particular meeting?
24  A  It was one of our major meetings.  It

Page 82

1  might have been the one where Tony did that
2  in-service that was the first time I went and met
3  them all and Caroline.  Because I was saying that
4  I was concerned that I wasn't getting much input,
5  and she said she got her input in.  And Denise
6  said she had no problems with getting input in, so
7  I think that was--
8  Q  Let me just focus--go ahead.  This
9  particular where you talked to Caroline, do you
10  know where it was at?  You said the Carolinas?
11  A  It would have been the first meeting we
12  had where William left and I was sent over to be
13  with Sue Landsman, so after she had been named the
14  SEAL leader.
15  Q  Okay.
16  A  And you can check that date, and then
17  you'll know what meeting I'm talking about.
18  Q  At that time Mr. Siciliano wasn't the
19  team leader yet, correct?
20  A  No.
21  Q  But at that time, you felt you weren't,
22  your input wasn't being taken?
23  A  Then that couldn't have been that meeting
24  because it was after he became--yeah.  I felt like

Page 83

1  the whole time I met him that--
2  MR. BAKER:  Excuse me.  We're just trying to
3  identify when the meeting was.
4  THE DEPONENT:  That couldn't have been that
5  meeting if he wasn't my leader.  It had to have
6  been at the, one of the following meetings like
7  maybe the July, probably the July time frame.
8  MR. BRODERICK:  Q  That meeting was in
9  Florida, correct?
10  A  I think so.
11  Q  Let's just clear the record.
12  Was there a meeting where you got
13  together with the other vascular specialists
14  between January 1 and the meeting in Florida?
15  A  I don't think that there was, but I can't
16  be sure, but I can tell you that it was at the
17  meeting where he was made our team leader because
18  I wasn't getting any input in, and I wondered if
19  they were.
20  Q  Now, at that point, what were you--you
21  say you weren't getting any input in.  With regard
22  to what specifically at that point?
23  A  What my objectives were, for example, on
24  this report.  I wanted more time to accomplish

Page 84

1  them.
2  Q  Well, Mr. Siciliano was made team leader
3  in January of 2001, correct?
4  A  Yes.
5  Q  Okay.  I guess going back to your earlier
6  comment, you couldn't have had complaints about
7  his objectives in this report at that time frame,
8  correct, because they weren't formulated yet?
9  A  I just, I mean, to him I wanted them.  I
10  told him I wanted more time.
11  Q  Right.  And that was in April of 2001?
12  A  It was in actually--yeah.  That was when
13  it was.
14  Q  Okay.  You learned that Caroline Kopecky
15  was having input, was getting, was having her
16  input accepted into her critical objectives, is
17  that right?
18  A  Yeah.  And her accounts and everything
19  else.  She was listened to.
20  Q  How often did you talk with Ms. Kopecky?
21  A  Not very often, but I talked to her at
22  that meeting.
23  Q  Whenever this meeting was?
24  A  It must have been like July meeting.

Page 85

1 That's the best meeting I can think of that would
2 be following that where we would have discussed
3 such a thing.
4    Q  Okay.
5    A  That's the best of my recollection.
6    Q  Well, between the time that Tony gave
7 that lecture on Retavase in the fall of 2000 and
8 the time you had the meeting in Florida in July of
9 2001, was there any meeting with all the vascular
10 specialists that you attended, to the best of your
11 recollection?
12    A  What was the first date?
13    Q  The fall of 2000, the meeting--?
14    A  Where I went down where I was in a
15 meeting with Sue Landsman, and Tony gave his
16 illegal, his in-service.
17    Q  Correct.
18    A  And then I thought William or something
19 was still my manager, but then I had an interim
20 manager of Tim.  I'm not sure of the dates in
21 there.
22    Q  I understand.
23    A  And then in January then Tony was named.
24 And do I think I met with the other vascular reps

Page 86

1 at that point in person?  I don't think so.
2    Q  Okay.
3    A  Just--I am not avoiding questions.  I
4 simply do not remember the particulars of some of
5 these dates because it was three and a half years
6 ago.
7    Q  And I appreciate your honesty and your
8 best attempts to answer the questions.
9    A  Because I don't want to say something
10 wrong.
11    Q  But if you don't remember that's--.
12    A  I don't remember.
13    Q  When did you have a conversation with
14 Ms. Hill about her input?
15    A  I think it was at that same meeting we
16 were sitting at a table because they usually have
17 us sit at kind of a table together at a meal, and
18 I was asking her and she said, my territory's
19 really wonderful because I can get to every
20 account practically in a half hour.
21       And I was in a hallway talking with
22 Caroline, and I just said, you know, are you
23 getting any input?  Do you get to give input?
24 Because I had spoken with Randy on the phone or

Page 87

1 something, and he just--he was there before Tony,
2 and he just told Tony, is what he said to me
3 anyway, that he had input.  So my understanding
4 was everybody else had input, and he wasn't
5 letting me have much input.
6    Q  At that time, did you know what the
7 geographic scope was of the vascular specialists'
8 territories were?
9    A  Pretty much.
10    Q  You did?  Okay.
11       At that time, did you have, did you have
12 any complaints about the sizes of, the geographic
13 size of their territories as compared to yours?
14    A  Yeah.  Because they all had big pockets
15 that they were there, they wouldn't have to do a
16 lot of overnight travel, all of them, and I
17 wanted, I asked him if I could move then to
18 St. Louis so I'd be more centrally located
19 because--.
20    Q  Do you recall who was responsible for
21 defining the accounts that were assigned to these
22 other vascular specialists?
23    A  I think they conversed with Tony.
24    Q  Okay.

Page 88

1    A  He hired Denise, so he probably had a
2 strong input there because he hired her.
3    Q  Let's finish the conversation then that
4 you had with Tony in April of 2001 in person.
5    A  Okay.
6    Q  You were saying that you had a problem
7 with these critical objectives in section V?
8    A  Yes.
9    Q  Okay.  And tell me all of the problems
10 that you--describe all of the problems that you
11 had with these objectives.
12    A  Subsequent to him giving them to me or
13 why I wanted more time?
14    Q  Was the only problem you had with these
15 objectives was that you thought they were, that
16 you had too little time to complete them?
17    A  During that conversation that was one of
18 the major parts.  And he said get clarification on
19 Robin Schaiff's cath clearance at Barnes.  Well, I
20 knew we had no data to support because we didn't
21 have any indication or anything there.  So I knew
22 that things just don't--Barnes is huge.  There's
23 no way I was just going to get it totally over the
24 loop and on formulary.

Page 89

1 And I don't know if I knew then what I
2 know now about the Des Moines account or if that
3 was later, but I know that half the
4 radiologists--it had to be close to then because
5 right at that point, the radiologists at one
6 account disbanded, and I had to cancel a luncheon
7 I scheduled. So I must not have known then or I
8 wouldn't have scheduled a luncheon unless it was
9 after that. But I just felt like I needed more
10 time.
11   Q Okay. Any other problems with these
12 objectives that we haven't talked about?
13   A I don't even know what this means
14 anymore. Develop project that addresses the
15 interest, previously expressed interest for both
16 hemodialysis grafts and cath clearance. Develop a
17 project that addresses the interest--
18   Q In the first--can you explain the HDAG?
19   A Hemodialysis access graft.
20   Q Okay. Now, this document was sent to you
21 my e-mail on May 11, it appears, correct?
22   A Yes.
23   Q By May 11 had you visited in person any
24 of your accounts?

Page 90

1   A I'm sure that I had because I came back
2 to work.
3   Q Well, okay. Do you have a specific
4 recollection of--?
5   A I'm sure I went to Peoria.
6   Q Did you go to Owensboro?
7   A I went to Owensboro. I cannot tell you
8 what dates I went to Owensboro or Des Moines or
9 the other accounts because I just, I did them.
10 And with the goal in mind to get these things
11 accomplished as quickly as possible. Because I
12 knew I was under the gun here to get them done.
13   Q Did there come a point in time around
14 this time that you learned that the accounts in
15 your, the accounts assigned to you were going to
16 be changed?
17   A Yeah.
18   Q Okay. How did you find that out?
19   A I think there were probably multiple
20 times that I tried to communicate with Tony about
21 it because his thinking was so different than
22 William or Tim, and they both had a lot of
23 experience with thrombolytic therapy and how to
24 handle those accounts. And so I wanted to do what

Page 91

1 he wanted me to do, and yet on the other hand, I
2 wanted to do what was best for the company as
3 well, so I was just trying to talk with him
4 about--.
5   Q With Tony?
6   A With Tony.
7   Q When was the first time that this issue
8 regarding the change in your accounts arose?
9   A Whenever they changed.
10   Q When did they change to the best of your
11 understanding?
12   A They changed every single quarter
13 actually for every different rep. I can show you
14 the colors they took out, put in, took out,
15 put in, took out, put in, which brings--I don't
16 see how anyone can make a statistical analysis of
17 anybody's rank when the hospitals were all
18 changed. That's just not the way it was ever done
19 before.
20   Q What was the change in your accounts
21 assigned to you from the quarter 4, 2000 to the
22 first quarter of 2001?
23   A Well, the ones that I was asked for or I
24 had discussed with William or Tim were not the

Page 92

1 ones that were bold-printed on this thing.
2   Q Well, were those accounts that are in
3 bold there, at some point were those accounts
4 dropped from your territory?
5   A Yes.
6   Q Do you know when that was?
7   A Memorial Medical Center was dropped very
8 quickly after Tony came on board. And we had a
9 lot of discussion about it because Kim Hodgson,
10 number one, as far as the Society of Vascular
11 Surgery is concerned, he is one of the most
12 nationally known interventionalists.
13   Q Who is that?
14   A Kim Hodgson. K-i-m, H-o-d-g-s-o-n. He's
15 a vascular surgeon who is very prominent in the
16 Society of Vascular Surgery who helped write what
17 requirements would be necessary for vascular
18 surgeons to be able to do the procedures in
19 peripheral vascular disease that were like
20 thrombolytic therapy and things like that. They
21 only did cutting before.
22   Q Okay. And how does that relate to the
23 account being dropped?
24   A It shouldn't have been dropped.

Page 93

1  Q  Okay.
2  A  That's one.  Number two, Prairie
3  Cardiovascular is the largest cardiology group in
4  the state of Illinois at that point, and they
5  worked with ISU.
6  MR. BAKER: SIU.
7  THE DEPONENT: SIU.  I knew that wasn't right.
8  Thank you.
9  MR. BAKER: Sorry.
10  THE DEPONENT: No.  I needed that.  Thank you.
11  SIU at both hospitals.  And so they had
12  interventional cardiologists at both hospitals.
13  Like Dr. Gill I wouldn't talk to at Memorial
14  because--I mean I would talk to him at Memorial,
15  he wouldn't be at St. John's.  So there were
16  interventional cardiologists that did peripheral
17  work.  They were part of this whole picture, and
18  they were very important, not to mention the
19  interventional radiologists in the three different
20  areas.
21  MR. BRODERICK: Q What were the sales of
22  Retavase in 2000 to Memorial?
23  A  I would have to look.
24  Q  Okay.  As you sit here today, do you

Page 94

1  know?
2  A  Off the top of my head?
3  Q  Yes.
4  A  No.
5  Q  Okay.  Do you know if they bought a lot
6  or they bought a little?
7  A  They bought some.  Sometimes a person
8  knows what--they called it low-hanging fruit at
9  Centocor.  I had the contacts.  The clinical
10  pharmacist who is in charge of formulary had been
11  my landlord.  Nancy Khardori was on P and T, was a
12  personal friend.  All these different aspects made
13  it such that the business there had a huge
14  potential for growth.
15  Q  And was this account dropped because Tony
16  wanted to move it?
17  A  Yeah.
18  Q  And when did he first communicate to you
19  his desire to remove that account?
20  A  Whenever it got dropped.
21  Q  When to the best of your understanding
22  was it dropped?
23  A  I think it was dropped while I was away
24  or just when I was coming back or something like

Page 95

1  that.
2  Q  Okay.  February or April of 2001?
3  A  Yeah, probably.
4  Q  Did you have problems with these, all
5  these other accounts being dropped from your
6  territory?
7  A  Proctor, yes.  It's in Peoria.
8  Q  Why did you object to Proctor being
9  dropped?
10  A  Because there was a brand-new
11  interventional radiologist who'd done a fellowship
12  with St. Francis, my biggest account, one of the
13  top accounts in the nation.  And he was very much
14  on board with their way of doing things, which was
15  the Retavase way, and he was just going to get
16  started at Proctor.
17  In addition, there was a nephrologist who
18  was starting to do interventional nephrology, and
19  this was Midwest Kidney or something.  It was
20  huge.  It covered all of the central Illinois area
21  for dialysis and stuff.  And he wanted to start
22  with the peripheral vascular disease there.  And
23  in fact, the doctor that was the radiologist was,
24  knew enough coming.

Page 96

1  I mean, there had been no one there for a
2  little while after urokinase, but then this guy
3  was new, and I had spoken with him, had supper
4  with him with the rest of the radiologists at
5  St. Francis, and he wanted, he even took me down
6  that he was going to get Retavase on formulary
7  because he was going to use it for peripheral
8  vascular disease.
9  Q  When did he tell you that?
10  A  When I called on him.  It was, this was
11  prior to Tony wanting to drop him.
12  Q  And you told Tony that?
13  A  I told Tony that, yeah.  Not to mention
14  the fact that I was already there with St. Francis
15  and Methodist, and how easy would it be to just go
16  ahead and talk to Proctor?
17  Q  So do you know, so did it sound like, did
18  Proctor purchase any Retavase in the year 2000?
19  A  I'd have to look.
20  Q  Okay.  Well, it sounds like it wasn't on
21  formulary yet, but there's a possibility to still
22  purchase some or--?
23  A  No, they probably didn't.  I think they
24  had TPA at that point.  This is--I'm just

Page 97

1  recalling what I think.
2      Q  I understand.
3      Okay.  When was Proctor dropped, to the
4  best of your recollection?
5      A  At the same time frame he dropped
6  Methodist--I mean Memorial.
7      Q  All right.  How about Missouri Baptist
8  Hospital?  Did you object to that being removed
9  from your territory?
10      A  Not particularly.  It wasn't even among
11  the ones that urokinase ever even showed up on.
12      Q  Okay.  How about Boone Hospital Center?
13      A  Not particularly.  I didn't mind if that
14  was dropped.
15      Q  How about the University of Iowa Hospital
16  and Clinic?
17      A  Well, I would have rather had it than the
18  ones in Des Moines.  But one of the problems is
19  Michele Johnson's reps that overlapped me, there
20  was a total turnaround of all of them except for
21  Suzanne Bolger and Jerry Knighting.  Jerry
22  Knighting only worked with Randy Van Cleave.  So
23  in my area, everybody had turned over.
24      And what that means is that when somebody

Page 98

1  has all these experienced cardiology reps, it
2  means that they have relationships built with all
3  the pharmacy, and they have relationships built
4  with, they have an idea of if the peripheral's
5  being done by vascular surgery, cardiology or
6  radiology.
7      They have unbelievable amounts of
8  information and rapport, and they know, they know
9  a lot, and they can help a lot.  Plus, they need
10  to work the cardiology side while I'm trying to
11  get the peripheral side going because you need
12  both sides working at the same time.
13      Q  And so that was a problem with--?
14      A  Des Moines.
15      Q  Des Moines?
16      A  Yeah.
17      Q  Okay.  But it sounds like you didn't have
18  a strong objection to University of Iowa being
19  removed?
20      A  Well, it wasn't a good one because they
21  hadn't had a rep there for quite a while.  The one
22  they had there for a short time, Christie, just
23  decided that she didn't like the way things were
24  handled either and left.  But the only reason I

Page 99

1  thought that Iowa might be a good one was because
2  some of my doctors at St. Francis could have had
3  some in-roads, and they would have listened to
4  what they had to say.  Wasn't true in Des Moines.
5      Q  Okay.  Were there any other accounts that
6  you wanted to be removed that weren't being
7  removed?
8      A  Okay.  That says quarter 4, 2000.  And
9  what time frame are we talking about when I wanted
10  something removed?
11      Q  Up until your return from your sick
12  leave.
13      A  I told you I didn't want the Des Moines
14  ones because--
15      Q  Okay.  So you wanted the two Des Moines
16  ones removed?
17      A  Yes.
18      Q  Any others?
19      A  Trying to remember when they assigned me
20  St. John's in Creve Coeur.  I just have to see.
21  Things were changing.  I mean, it would have been
22  nice if things were always the same, but they
23  weren't.
24      Yeah.  St. Joe's in St. Charles.  I mean,

Page 100

1  I liked it fine.  That's 7-3 of '01.  Quarter 2
2  actually started--see, January, February, March is
3  quarter 1.  April, May, and June is quarter 2.
4  And this says quarter 2, '01 vascular alignment in
5  7-3 of '01.
6      Q  Could you just identify for the record
7  the document you're referring to there?
8      A  It's called quarter 2, '01 VS alignment
9  7-3-01.
10      Q  And that's a list of the accounts for the
11  VS under Tony?
12      A  Under Tony.
13      Q  And how they were assigned to each of the
14  VS?
15      A  Yeah.  And it shows pink were added ones.
16      Q  And have you seen those for each quarter?
17  That document for each quarter?
18      A  I've seen different documents.  I've seen
19  some like this, like see the bright orange colors
20  and the yellow colors?  Every single quarter
21  things changed.
22      Q  Have you seen a document like that for
23  the first quarter of 2000?
24      A  Exactly like that, no.

Page 101

1   Q  Well--.
2   A  Some type of a document for one of the
3  VSS accounts. I got this one.
4   MR. BAKER: Jane, read into the record when
5  you say this one what you're referring to.
6   THE DEPONENT: Okay. This says Q1 VSS Account
7  Targets in the Central Region. But right now, I
8  only have Caroline Kopecky and Randy Van Cleave
9  listed there.
10   MR. BRODERICK: Q Well, okay. At some point,
11  St. Joseph's in St. Charles was added to your
12  territory, right?
13   A  Yes.
14   Q  When was that added to your territory?
15   A  Approximately when I came back before--it
16  was probably the end of the second quarter, I
17  think, or the first. I mean, I don't know. Let's
18  see. Maybe the end of the first quarter. I don't
19  know for sure.
20   Q  Do you think, is it your opinion
21  that--the two accounts that you objected strongly
22  to being removed from your territory were Memorial
23  and Proctor, correct?
24   A  Yes.

Page 102

1   Q  Do you think those were removed from your
2  territory based on a discriminatory reason?
3   A  Yeah. Because he wasn't listening to my
4  input whatsoever.
5   Q  And so you feel Tony was discriminating
6  against you based on your age and gender?
7   A  Yes.
8   Q  In removing those accounts?
9   A  Yes.
10   Q  Please describe all the facts that, to
11  your knowledge, on which you base that opinion.
12   A  Since the time I met him at that sales
13  training meeting when he didn't want any input
14  from me, he discussed with two other males of
15  similar age, they talked to me, and he wouldn't
16  accept that I thought that reprofusion arrhythmia
17  was important and totally dismissed it and
18  wouldn't write it on the chart.
19      At that point, he wasn't my boss, so it
20  didn't matter. But the point is, he would not
21  accept my input, and then when he got to the head
22  of the class, the trainer said, by the way, you've
23  overlooked reprofusion arrhythmia, it's extremely
24  important. It's the same disdain for any

Page 103

1  information I might have. Lack of respect, I
2  guess, was what. He didn't want my input.
3   Q  Any other facts that you base your
4  opinion on that he was discriminating against you
5  in dropping these accounts?
6   A  Yeah. It would also make it very much
7  harder for me to cover the territory.
8   Q  How so?
9   A  Well, because I was already in Peoria
10  with Methodist and St. Francis. Proctor had all
11  this potential for I had all the rapport built
12  that I could have really increased that business.
13  To me, increasing business is good for the
14  company. And as far as Memorial is concerned,
15  again, besides being just extremely important
16  nationally because that he was on the SVS and was
17  actually writing protocols, that would affect the
18  business of a whole company.
19      Because he was in charge of saying how
20  many angiograms or how many whatever you have to
21  do before you could be accredited as a vascular
22  surgeon to do procedures in your hospital. In
23  addition, he had, he was one of the few accounts
24  in the nation that actually had set up like a

Page 104

1  three-day proctorship where people would come in,
2  like vascular surgeons would come in, and they had
3  live pigs.
4      First they had glass bodies, plastic
5  bodies to pretend, and then they brought live pigs
6  under anesthesia just as if they were in a sterile
7  environment with a patient, and they would
8  practice putting in catheters, guide wires. I
9  mean, this was an extremely important account that
10  would affect sales throughout this nation. Even
11  if you can't look at one account and say maybe
12  Memorial didn't bring in enough of those, he
13  affected throughout this nation how well Retavase
14  would be accepted.
15   Q  Okay.
16   A  Dramatically.
17   Q  And I just want to make sure, then, that
18  we have all the facts that you know of that
19  support your opinion that Tony was discriminating
20  against you based on your age and gender in
21  dropping these two accounts. Is there anything
22  else that we haven't talked about?
23   A  Well, I guess just, I was talking with my
24  son even, and he just said, it's obvious. You

Page 105

1  know, men don't have hysterectomies. He just, you
2  know, thinks you're an old woman. That's it.
3      Q  And then, and the conclusion, then, is?
4      A  I mean, the messages got stronger and
5  stronger.
6      Q  And what was the message?
7      A  That he thought I was an old woman.
8  How's that?
9      Q  Okay.
10     A  That's what I felt like he was saying.
11  And I didn't get that from any of the other young
12  managers that had me. They had respect for me,
13  they wanted my information, and they wanted my
14  help.
15     Q  Did you have any objection to
16  St. Joseph's being added to your territory?
17     A  St. Joseph's in--?
18     Q  St. Charles.
19     A  St. Charles. Here's what happened with
20  that. Initially I would have thought it was okay,
21  but before everything was in stone, this had been
22  an account that had been what was called the
23  GUSTO V study, so it was all Retavase sales. And
24  I had made one call to find out who their

Page 106

1  radiologists were, and then basically all hell
2  broke loose.
3      I got APBs from everybody saying please
4  come to St. John's Creve Coeur. Because at the
5  end of the GUSTO V, all, you know, Tony, everybody
6  was expecting, all the cardiology people were
7  expecting that this account would stay with
8  Retavase. And in fact, they went with the
9  competitor. So they wanted me to come in--
10     Q  St. John's?
11     A  St. John's Creve--no. You said the one
12  in--
13     Q  I'm talking about St. Charles--St.
14  Joseph's in St. Charles.
15     A  St. Joseph's in St. Charles. That was
16  this account.
17     Q  Okay.
18     A  And so I went in, and I just told the
19  situation to a nurse, and she helped me arrange a
20  luncheon whereas--first of all, the night before I
21  came in, I met with Robert Ginn, who was the one
22  who handled our contract so I could try to be as
23  clear as possible contractually what might be
24  going on with pharmacy.

Page 107

1      So then the next day I went in, and I
2  don't remember how I arranged it, but I got a
3  lunch with the radiologists. And basically I told
4  them, you know, it wasn't my style to try and ram
5  something down their throat, however, a major
6  thing was occurring here. And because of the
7  first time I was there, they'd all signed
8  information requests, and they had all the
9  information about safety data and everything with
10  Retavase.
11     Q  At St. Joseph's?
12     A  At St. Joseph's in St. Charles. And so I
13  talked to them, and they said, well--I was trying
14  to find out what problems they were having with
15  TPA, and they were concerned about oozing at the
16  site and the groin and different bleeding things.
17     Q  And when was this conversation that you
18  were having?
19     A  It was after GUSTO V was going to be
20  dropped and TP was going to be added. And they
21  called me.
22     Q  Do you know approximately month? Year?
23     A  Well, I could tell you because I was set
24  up to work with the Cordis rep, and I had to

Page 108

1  cancel that to come down and rescue this whole
2  mess supposedly.
3      Q  Okay. Well, if you don't remember--
4      A  Everybody should know because they all
5  sent voice coms, e-mails, everything under the sun
6  to me, would I please come. So I cancelled my
7  work with that rep to go down there and to try to
8  handle this scenario. So I went down and had a
9  luncheon, as I discussed.
10     They received the medical information,
11  they were clearly interested then in the product,
12  and we had something called CEKs. And actually I
13  have--I know when it was because I've got a
14  signature because I had to get a signature for the
15  kits for them to do a trial on. So in other
16  words, they wanted me to go through the back door
17  to try to keep Retavase at least a viable option.
18     Q  Who was they?
19     A  Michele and Tony and Robert Ginn and the
20  managers and everything because it was a big
21  account. We were going to lose a lot of sales.
22     Q  Well, do you think St. Joseph's was added
23  to your territory--do you think you were
24  discriminated against based on your age and gender

Page 109

1  when St. Joseph's was added to your territory?
2     A  At that point I did not.
3     Q  But as you sit here today you believe so?
4     A  As I sit here today, because what
5  happened was here was this big account. They
6  dropped the sales. I did my part. I got the
7  radiologists, the, Halverson to agree they'd do a
8  trial. He even called pharmacy, he signed the
9  thing to get free kits to try Retavase. But
10  because the cardiology rep and some other people
11  went in and they made this one doctor furious, he
12  called pharmacy and said no, there will not be any
13  trial, no, we are strictly going to be on TPA.
14     And I told all this to Tony. Because as
15  mad as everyone was, there was no way that account
16  would be turned around immediately. And what it
17  meant was all the sales up to that point till I
18  got the account were positive, and then suddenly I
19  would be in the negative for something that I did
20  my part.
21     And Tony and I had a huge discussion
22  about it because I said, I promised you I'll go in
23  there once a month, I'll keep a pulse on the
24  situation, or I'll even go in more often. I just,

Page 110

1  I want to put on my record where I will gain
2  sales, not be responsible for somebody else
3  messing them up. I don't think that's right.
4     Q  And when did you have this conversation
5  with Tony?
6     A  At the time when he said I had to keep
7  having it when I told him all that information.
8  And that was right after--because the guy signed,
9  this tells the dinner and everything, time, or
10  luncheon time because I had the signature of the
11  guy.
12     Q  Well, Ms. Minor, I have to move on. Was
13  it before or after you went and took a sick leave?
14     A  After.
15     Q  Okay. Was it before the meeting in July
16  in Florida?
17     A  That all this happened?
18     Q  Yes.
19     A  It was around that time.
20     Q  Well, to the best of your understanding,
21  was St. Joseph's assigned to you as of January of
22  2001?
23     A  No.
24     Q  Okay. How early was it assigned to you,

Page 111

1  to the best of your knowledge?
2     A  I think it was around like June.
3     Q  Now, it's assigned, the fact that it was
4  assigned to you--when it was initially assigned to
5  you, do you complain that that was initially
6  assigned to you in a discriminatory fashion?
7     A  No, I do not.
8     Q  But it sounds like what you're saying is
9  the fact that it was kept in your, that Tony would
10  not remove it later?
11     A  Yes.
12     Q  That was a discriminatory action?
13     A  Yes.
14     Q  I see. Why do you think his decision to
15  keep it assigned to you was discriminatory against
16  you based on your age or gender?
17     A  Again, lack of respect. He would not
18  accept my input on something, and other people
19  were having input. Like M.D. Anderson is a huge
20  account, and Caroline was able to remove that from
21  hers. Whether it was hard or not, I mean, it was
22  a huge account.
23     Q  Do you know who St. Joseph's was assigned
24  to before it was assigned to you?

Page 112

1     A  I think it was just a cardiology account
2  because they had set up--well, actually Randy Van
3  Cleave may have had it prior to that, but I don't
4  really know.
5     Q  As far as the five accounts that were
6  removed from your territory, do you know if they
7  were assigned to anyone else?
8     A  No, they were not. To the best of my
9  knowledge.
10     MR. BRODERICK: Would you mind taking a
11  break?
12     THE DEPONENT: Yeah.
13     Okay. May 10.
14     MR. BRODERICK: Q Let's finish this.
15     What's May 10?
16     A  You want to hear?
17     Q  Yes. Well, tell me, what is May 10?
18     A  May 10, Thursday.
19     Hi, Tony. You requested input on St.
20  Joe's Medical Center by May 10, and I do have a
21  bit. As you are aware, I have recently taken this
22  account as part of my target list. One of the
23  primary IR's, Lewis Halverson, has been using two
24  milligram TPA even though he has heard of lower

## Page 113

1  doses, he thinks they take longer.
2  Q  Is the content of that e-mail the same as
3  the content of this?
4      (Whereupon a document was
5      tendered to the deponent.)
6  THE DEPONENT: Yes.
7  MR. BRODERICK: Okay.  Let's have this marked.
8      (Whereupon a document
9      was duly marked for
10     purposes of
11     identification as
12     Exhibit U as of this
13     date.)
14 THE DEPONENT: And this you undoubtedly copied
15 because that was the time he signed, 5-18 of '01,
16 for the kits to do the trial.
17 MR. BRODERICK: Q And who signed for that?
18 A  Lewis Halverson.  St. Joe's Hospital.
19 And then there's Sunday, June 3.  Just a quick
20 summary of St. Joseph's in St. Charles activity.
21 After urgent requests on Thursday, I cancelled my
22 training appointment with the Cordis neurovascular
23 rep to add whatever possible input I could to the
24 request to stop TPA at St. Joe's in St. Charles.

## Page 114

1      Since it was a new account and had I only
2  contacted them once before, I contacted Medical
3  Affairs to fax PVD and stability formation with
4  separate cover to each of the four guys, and
5  Robert Ginn was very flexible and agreed to meet
6  with me Thursday night, the night before, to
7  review the SSM contracting and price analysis.
8  Michele and Robert tried to meet with Dr. Ferrini
9  but met a terse response.
10     I scheduled a lunch and was able to
11 discuss Retavase with three of the four IR's,
12 interventional radiologists, and although they had
13 been using TPA since urokinase was pulled from the
14 market, they agreed to a trial of Retavase based
15 on the data I presented.  Dr. Halverson signed a
16 form for each of them to have a half kit for trial
17 purposes.  He also agreed upon my request to call
18 pharmacy and tell them that they wanted to do a
19 trial on Retavase.
20     I spoke with Michele Johnson who agreed
21 we should let Halverson have time to contact
22 pharmacy and call him next week.  The pharmacist,
23 Tracy, would not agree to receive the kits without
24 the okay of the director of pharmacy.  Evidently

## Page 115

1  Dr. Ferrini and the director pharmacy had pushed
2  TPA through P and T, pharmacy and therapeutics
3  committee, and they refused to accept the kits.  I
4  FedEx'd the form to Robert Ginn for follow-up.
5      Keith Cramsey talked with Dr. Ferrini and
6  had a positive conversation concerning the future
7  of Centocor with him.  On June 1st, however,
8  Robert informed me that Jim Rutgers in pharmacy
9  had told him Dr. Ferrini talked to the
10 radiologists and told them only TPA was going to
11 be on formulary now, that they did not want the
12 radiologists to receive any CEKs, which are trial
13 kits, or to do any trials with Retavase.
14     Although the initial appearance is not
15 the immediate reversal of TPA to Retavase, the
16 St. Louis team truly pulled out all the stops, and
17 each member worked to the max in their area of
18 expertise.  This is truly a great team effort by a
19 truly great team.  We are all still negotiating
20 with our individual areas and will hopefully turn
21 the situation around.
22 Q  Is this a copy of what you described?
23     (Whereupon a document was
24     tendered to the deponent.)

## Page 116

1  THE DEPONENT: Yes.
2  MR. BRODERICK: Okay.  Let's have this marked
3  as our next exhibit.
4      (Whereupon a document
5      was duly marked for
6      purposes of
7      identification as
8      Exhibit V as of this
9      date.)
10 MR. BRODERICK: Q So it sounds as of June 3,
11 there was still some hope of turning the situation
12 around?
13 A  At that point in time, I knew that people
14 were mad, but this was just hot on the burner.
15 And I just was giving a pep talk here at the end.
16 Truly great team, da da da da da, let's get
17 together and do it.
18 Q  Well, at some point, did you have a
19 discussion with Tony about trying to have the
20 account removed from your territory?
21 A  Yes, I did.
22 Q  And when was that?
23 A  It was after that.
24 Q  After that e-mail?