9/10/04
9/09/01-03354-RM-CHE    # 58-18    Page CondenseIt™

M. Jane Minor

E-FILED
Monday, 28 February, 2005  03:13:08 PM
Clerk, U.S. District Court, ILCD

Page 117

1   A  Yes.
2   Q  Was there anything--did you put it in
3  writing?  Did you put the request in writing?
4   A  Let's see.  No.  It was something I spoke
5  with him about either over the telephone or
6  meeting him.  I just simply said, you know, it
7  isn't right.  There have been these major sales
8  with this GUSTO V account because then since--I
9  mean, I did my part.
10      I went in and I got the lunches
11  scheduled, I got the data to the people, they even
12  called the pharmacy for me, they signed a request
13  for CEKs.  I did everything possible.  And in
14  fact, it was the cardiology reps that made that
15  Dr. Ferrini just furious, and there was--when
16  someone's that angry, you're not going to sell
17  them something right away.
18   Q  Let me ask you to look at this.
19      (Whereupon a document was    .
20      tendered to the deponent.)
21  THE DEPONENT:  The radiology side is ready to
22  go, but the cardiology was not, nor was the
23  pharmacy.  So I did my part.
24  MR. BRODERICK:  Q So as of October 2001,

Page 118

1  they're still--?
2   A  I still had that account.
3   Q  And anything change from the time you had
4  a verbal discussion with Tony in October of 2001?
5   A  No.  I just kept working it, trying to do
6  my part, but it wasn't going to go anywhere.
7  MR. BRODERICK:  Let's mark that as an exhibit.
8      (Whereupon a document
9      was duly marked for
10      purposes of
11      identification as
12      Exhibit W as of this
13      date.)
14  THE DEPONENT:  I'm just saying I didn't give
15  up just because--I was told to do it, so I did it.
16  MR. BRODERICK:  Why don't we break now.
17      (Whereupon a short recess
18      was taken at 12:42 p.m.)
19  MR. BRODERICK:  Q Ms. Minor, did you submit
20  expense reports during 2001?
21   A  I'm sure that I did.
22   Q  Okay.  Were you timely submitting them?
23   A  Sometimes, but sometimes not.
24   Q  Okay.  What was your understanding of how

Page 119

1  often or how frequently you were to submit them?
2   A  It was pretty casual up until Tony was
3  manager and then--actually he wasn't that uptight
4  about it either until after the July meeting, and
5  then he became really uptight.
6   Q  What was your understanding prior to
7  July--what officially was the policy?  I
8  understand there might have been, you're talking
9  about its enforcement, but what was the policy in
10  terms of how frequently you were to submit an
11  expense report?
12   A  Probably weekly.
13   Q  Okay.  And you filled them out weekly?
14   A  Expense reports?
15   Q  Yes.
16   A  Sometimes.
17   Q  Okay.  And up until, for instance, July
18  of 2001, had you submitted your expense reports
19  for the time period you were back from sick leave?
20   A  I don't recall.  Maybe.
21   Q  Okay.
22   A  Because I was traveling a lot, and I
23  didn't have any down time whatsoever to do
24  paperwork.

Page 120

1   Q  Do you remember how soon after you
2  returned from sick leave in April did you start
3  submitting your expense reports?  I mean, did you
4  have an idea?
5   A  You know, I don't remember.  I'm assuming
6  I did, but I don't know.
7   Q  What, how did Tony's attitude towards the
8  expense report policy change after the July
9  meeting?
10   A  After the July meeting--well, what
11  happened in the July meeting were several things.
12  June meeting, I think it was.  I get confused.
13  Sorry.  There had been so much tension between
14  Tony and I that I called Stephanie Moore at that
15  meeting, who was the director of human resources,
16  and I talked to her at what I thought was
17  confidentially and asked her basically that I
18  really felt I was being treated differently than
19  the other representatives and from her experience,
20  how could I improve this relationship.
21      She says she thought she should take it
22  to a higher level, and I said, I don't really want
23  to go to a higher level, I just want to--I mean,
24  she's been in human resources for many years, so I

---

Page 121

1  felt that she would be able to give me some ideas
2  of communication skills that could enhance my
3  relationship with Tony. So it was an effort for
4  me to try to enhance the relationship that was
5  really getting stressful.
6     Q  Okay.
7     A  What else did you want?
8     Q  I'm just wondering, describe how Tony's
9  attitude changed towards the expense report policy
10 or towards enforcing their timely submission.
11    A  Well, what had happened was he at one
12 point in time, he had never really questioned my
13 expenses, but I remember it was, it was around the
14 October time frame somewhere, I think. Trying to
15 remember when it is.
16       What was the question again?
17    Q  That's okay. I think you indicated to me
18 that after the June meeting, Tony's attitude
19 towards enforcement of the expense report policy
20 changed after that time?
21    A  Well, I said a lot of things changed, and
22 you asked me if the expense report changed, right?
23    Q  Yes.
24    A  And then what happened was on, it was one

Page 122

1  of the final things that happened. During that
2  last month or so, he was making the issue about a
3  ticket to Des Moines. What had happened was when
4  the thing was scheduled, we had to call through
5  Johnson & Johnson's travel, set up appointments.
6       I'd set an appointment up from
7  Springfield to St. Louis to Des Moines. I think
8  it was to Des Moines. At any rate, whoever took
9  it thought I was talking about Springfield,
10 Missouri. And so I got to the airport, and there
11 was no ticket. And so--
12    Q  Let me just--I understand that issue.
13 I'm sorry. As far as how often you were to submit
14 the expense reports, I just want to finish that
15 topic, if you don't mind.
16    A  Well, here was the problem.
17    Q  Okay.
18    A  I mean, he just kept calling me about
19 this ticket, which when I got to the airport, I
20 tried calling a lady that was very difficult to
21 understand, and she could not get the fact that
22 there was a Springfield, Illinois and Springfield,
23 Missouri.
24       Okay. So I get to St. Louis, and I had

Page 123

1  no choice but to use a credit card. There was no
2  longer any time because they were going to board
3  the plane which was probably the only one that
4  would let, give any business time left. And so I
5  put it on my credit card.
6       And he just kept wondering--I mean, I
7  can't even tell you how many times he acted like I
8  was trying to do something weird with this ticket.
9  So I finally called J & J expensing, and I said,
10 would you please send all the documentation to
11 Tony Siciliano about this whole thing because I
12 was tired of trying to explain to him how it went
13 down, and he wasn't believing me or listening to
14 me or whatever it was.
15       Okay. So then the next question was
16 about expense reporting and when he really got to
17 me about it or was starting to seem more tense
18 about it?
19    Q  Yes. Let me just ask you one question.
20       When was that flight scheduled that, to
21 Springfield or to Des Moines? What date in
22 particular were you going to Des Moines and then
23 the ticket got screwed up? You know what I'm
24 saying? When were you traveling?

Page 124

1     A  I have that in my documentation
2  somewhere.
3     Q  Okay.
4     A  I do have it documented and everything
5  about it, and it was, it might have been prior to
6  the October 19 time frame where he just really
7  started calling me and everything about expenses
8  like he had not told me prospectively because it
9  was well known that all vascular specialists were
10 allowed to have much more leeway with their car
11 telephone bill.
12       And because 8 to 5 is when you make
13 appointments with doctors generally or try to get
14 in to see them or see who's where, and that's the
15 time when I was in my car getting places, and so,
16 therefore, since I had most of my things out of my
17 area code and I would be put on hold or whatever,
18 I mean, my phone bill was big.
19       And he did not tell me beforehand. He
20 made me, he just all at once in the October time
21 frame started cutting off and said, it's a maximum
22 of a hundred dollars, blah blah blah. And Tim and
23 William, nobody else did that because they knew as
24 much as I was on the road that was my only really

Page 125

1 good time to make appointments and to follow up on
2 things.
3   MR. BAKER: Can we go off the record for just
4 a second?
5   MR. BRODERICK: Sure.
6     (Discussion off the record.)
7   MR. BRODERICK: Q Okay. So then was there
8 ever an issue, to your knowledge, of how
9 frequently you were submitting your expense
10 reports?
11   A He never said anything to me prior to
12 that that I'm aware of.
13   Q But I mean, in terms of the timely
14 submission of them. I understand there was issues
15 with particular expenses at that time that he was
16 making?
17   A At that time.
18   Q Yes.
19   A But prior to that, he did not say to me,
20 Jane, get your expense reports in on time. That
21 I'm aware of.
22   Q Okay. As far as you know, there wasn't
23 an issue that they were late?
24   A He didn't make an issue of it.

Page 126

1     (Whereupon a document
2     was duly marked for
3     purposes of
4     identification as
5     Exhibit X as of this
6     date.)
7   MR. BRODERICK: Q Can you just look through
8 that and identify that for the record.
9   A That looks pretty much like it.
10   Q Okay. Just for the record, then, Exhibit
11 X is your time line of events that you prepared?
12   A (Nodded head up and down.)
13   Q Okay.
14   MR. BAKER: That's a yes?
15   THE DEPONENT: Yes.
16   MR. BRODERICK: Q Is this something you need
17 to refer to occasionally to refresh your
18 recollection as to events?
19   A It would be helpful.
20   Q Okay. And you have your own copy of that
21 there?
22   A Yes, I do.
23   Q So just let us know when you're referring
24 to it and where you refer to it, and that would be

Page 127

1 great.
2     Okay. Let me also identify Exhibit Y as
3 a group exhibit.
4     (Whereupon a document
5     was duly marked for
6     purposes of
7     identification as
8     Exhibit Y as of this
9     date.)
10   MR. BRODERICK: Q Ms. Minor, if you could
11 look through Group Exhibit Y.
12   A I had not seen this circle before where
13 it says $150 limit.
14   Q Let's make a note of that. We'll talk
15 about that.
16   A Dated 7-14 of '01, expense report number
17 1292023.
18   Q In general is your--let's identify it's
19 Group Exhibit Y for the record, if you don't mind
20 for the record.
21   A Say what about it?
22   Q Are these your expense reports?
23   A It appears that they are.
24   Q And I think the date range for these

Page 128

1 expense reports, the most latest one is on top,
2 and the earliest one is on the bottom. From April
3 21 to September 29?
4   A April 21, '01, yeah.
5   Q I don't know if that's a 4 or a 1 but--.
6   A 4-20 of '01 the week ending, and then
7 9-29 of '01 was the week ending of that one.
8   Q And is that your signature on each of the
9 pages?
10   A Well, as much as I can read, it appears
11 to be because some of them are pretty bad. I
12 think it is.
13   Q Okay. All right. And on that one
14 document where you saw the handwriting that said
15 $150 limit, you hadn't seen that handwriting
16 prior, is that correct?
17   A It wasn't on something that's returned to
18 me at that point that I'm aware of. It was a note
19 that he had made, I guess, or somebody made.
20   Q All right. Before we get to the
21 July--excuse me--the June meeting in Florida,
22 we've talked about how you had a conversation with
23 Tony before you received your FCR in May, and you
24 had a conversation regarding St. Joseph's.

Page 129

1    Up and to the end of June 2001, were
2 there any other conversations or contact you had
3 with Tony that you remember? You can look at your
4 outline.
5    A April 23 he worked with me, it said. And
6 he gave me the priorities.
7    Q Okay.
8    A And we disagreed on the time line
9 necessary to finish them. And the question then
10 was?
11    Q Okay. So between April 23 and then I
12 think the end of June, did you have any other
13 conversations that you recall with Tony?
14    A Well, I mean, he voice com'd, e-mailed,
15 and called on the phone frequently, so it would be
16 hard for one to stand out because once I came back
17 into work, I mean, there were lots of calls.
18    Q Okay. There were calls between the both
19 of you frequently during that time period?
20    A There would have been calls, pages,
21 e-mails, everything that went out to the whole
22 sales force would also come to me on e-mail and
23 voice mail. So there's a lot of messages you get
24 in a day.

Page 130

1    Q Okay, sure. I understand.
2    A I'm sure there was. I mean, there had to
3 have been.
4    Q Did he ride with you at all before the
5 end of June of 2001?
6    A Trying to put in line with thinking. Say
7 that again.
8    MR. BRODERICK: Maybe if you could repeat the
9 last question.
10    (Whereupon the requested
11    portion of the record was read
12    back by the Reporter.)
13    THE DEPONENT: To my best recollection, no.
14    From the--you mean from the, you're
15 talking about after he gave me my FCR?
16    MR. BRODERICK: Q Correct.
17    A The first one?
18    Q Correct.
19    A No.
20    Q Okay. I believe on page 2 of Exhibit X,
21 which is your outline, and I'm not trying to trip
22 you up or anything, but it looks like you may have
23 driven, given Siciliano and Dr. Castaneda a ride
24 in a storm?

Page 131

1    A Okay. That's correct.
2    Q Okay.
3    A He came to that meeting that I was going
4 to have there.
5    Q What was this meeting? Where was this
6 meeting going to be at?
7    A Okay. There were two meetings. The
8 first one was at St. Louis University. These were
9 part of the goals. And so I'd arranged for the
10 nephrologist, Dr. Martin, and his staff to be
11 present for a meeting with Dr. Flavio Castaneda.
12 And there was bad weather, and his plane was
13 delayed for an hour.
14    Q Whose plane?
15    A Castaneda's plane. I was at the airport,
16 and so Michele and Tony went ahead to entertain
17 the troops, so it was an hour late getting there
18 and most of the people left except Dr. Martin,
19 who's the only one that really was the
20 decision-maker. He had a good conversation with
21 Flavio Castaneda.
22    And then from there, we were going to
23 have a meeting over in Evansville where
24 Dr. Castaneda was going to speak. So I drove a

Page 132

1 car, and again, because of this horrible weather,
2 it was probably--it was just pouring. And so we
3 didn't have the turnout we thought we would have
4 in Evansville because it was pouring rain.
5    But however, the most important
6 decision-makers at St. Mary's Hospital were the
7 clinical pharmacist and the two interventional
8 radiologists, and they were there. And they
9 talked with him, and that's one of the reasons I
10 got it on formulary. So again, the weather was a
11 huge response, responsibility there.
12    Q Okay. Was Dr. Castaneda disappointed
13 with the turnouts at either of these meetings?
14    A He didn't tell me that because he knew
15 his plane was late. I'm sure that he drove all
16 the way down there, he probably would have rather
17 have had more, but the truth is the key
18 decision-makers were there. So return on
19 investment, fewer meals with key people, is really
20 a better investment.
21    Q Yes. So he didn't express to you any
22 disappointment?
23    A Huh-uh.
24    Q Do you know if he expressed any

Page 133

1  disappointment to anyone else and then it got back
2  to you and you found out some other way?
3      A  Only because Tony said he did.  But then
4  I asked Dr. Castaneda, and he said that wasn't
5  true.
6      Q  Okay.  And when did Tony tell you this,
7  that Dr.--?
8      A  I think--well, it was sometime after
9  that.
10     Q  Okay.  Do you know--
11     A  I don't remember any specific date of
12 when.
13     Q  Do you remember what was said between
14 you--do you know if that conversation was in
15 person or over the phone?
16     A  Let me see.  It might have been when we
17 were in Chicago we were going to go, there was
18 some meeting up in Chicago that Flavio was going,
19 Dr. Castaneda was going to speak at.  And that's
20 just a might have been.  I don't really know when
21 he told me, but I think he told me in person at
22 some point in time that he thought Dr. Castaneda
23 had told him that.
24         And so I asked Dr. Castaneda because, I

Page 134

1  mean, I had taken care of him for 11 years, and he
2  would call me at home.  I mean, anything he needed
3  he knew I would take care of for him.
4      Q  And what did Dr. Castaneda tell you?
5      A  He said that was not the case.
6      Q  Okay.  And so did you have a
7  conversation--when you were driving Siciliano at
8  this point, was Dr. Castaneda in the car with you?
9      A  Yes, he was.
10     Q  And do you remember what you folks talked
11 about?
12     A  Knowing Dr. Castaneda, we probably talked
13 about hunting or something like that.  I don't
14 know.  Small talk.  I was really focused on the
15 road because it was pouring buckets, and I was
16 responsible for two other people.  So I primarily,
17 I mean, Tony was sitting right up, you know how
18 the front seats are?  He was right there talking.
19     Q  Okay.  Did he make any comments
20 age-related or gender-related, to your knowledge?
21     MR. BAKER:  During that automobile trip?
22     MR. BRODERICK:  Yes.
23     THE DEPONENT:  During that trip?  Not that I
24 recall.

Page 135

1      MR. BRODERICK:  Q Okay.  Do you remember any
2  other time you spent with Tony prior to the end of
3  June?  Well, he was at both meetings, is that
4  correct?
5      A  Yes.
6      Q  Okay.
7      A  And then as I said, there was
8  going--well, I didn't say on this, but I said on
9  here on my paper that I had scheduled a meeting as
10 he had wanted for Des Moines, Iowa, and I have
11 everything here that, invitation and everything at
12 the Splash restaurant.
13         Dr. Castaneda, after he went to Chicago,
14 he was going to go to Des Moines and speak at that
15 engagement, but all the radiologists for Iowa
16 Methodist broke up their group.  So that leg of
17 the trip was cancelled because there would be no
18 reason for him to go when no one could attend.
19 And I have a note from the tech that I was talking
20 to about that.  Odson, I think is his last name.
21     Q  That's something you previously gave us?
22     A  I think if it was in that notebook, you
23 probably copied it.  It was just a handwritten note
24 on the letterhead.

Page 136

1         Here it is right here.  Iowa Methodist
2  Medical Center, Jane Minor.  See this handwritten
3  note dated June 3, 2001.  I'm sure you copied it
4  because you took everything and put purple pieces
5  on it.  Do you remember this?  Can you look?
6      MR. BAKER:  It's maybe three-quarters of the
7  way through the stack.
8      THE DEPONENT:  You want to just make a copy of
9  this and call it your specimen?
10     MR. BRODERICK:  Yes.
11     MR. BAKER:  Here.  Why don't you take mine.
12     THE DEPONENT:  But he cancelled it.  That was
13 nothing to do with me.
14     MR. BRODERICK:  Q And that was set up for
15 June 15?
16     MR. BAKER:  I think it was June 7.
17     THE DEPONENT:  Thank you.
18     MR. BRODERICK:  Q I see.  June 7, okay.
19         And did you show that to Tony?  That
20 note?
21     A  No.  He didn't, I was trying to explain
22 to him, and he was like not believing me.
23     Q  What did you say to him and he say to
24 you?

M. Jane Minor

## Page 137

1    A  I said, Tony, that the radiology group
2  broke up, and so they want to cancel this luncheon
3  and it will do no good because the doctors are
4  gone at the one account, and the other account is
5  handling double.  I mean, they're handling double
6  the number of patients, and they don't have time
7  for this, and so they want to cancel till a later
8  date.
9    Q  And what did Tony say to you?
10    A  He was very displeased.  And he just--he
11  was really displeased.
12    Q  And do you think he blamed you?
13    A  Yeah, he blamed me.
14    Q  Do you remember what he said particularly
15  or what?
16    A  You know, why did this fall apart, I
17  guess.
18    Q  Did you have conversation about the
19  Des Moines dinner prior to going to the
20  Evansville, Indiana event?  Is that when that took
21  place?
22    A  The Evansville dinner event was 6-30, and
23  when did he say the Splash restaurant thing was?
24    Q  June 7.

## Page 138

1    A  June 7.  So yes.  From what I'm
2  calculating here, it would appear that I, yeah.
3  Because there was no way after--.
4    Q  Do you think--
5    A  The docs to talk to.
6    Q  Do you think Tony blamed you in a
7  discriminatory manner based on your age or gender?
8    A  At that time?  It was just getting really
9  stressful between us, and I would think it's more
10  in retrospect that I just look at all the
11  different times that he just seemed to be not
12  discussing on a businesslike manner with me.
13    Q  You say things were starting to be
14  stressful.  Describe that.  What were all the
15  factors coming into play do you think that was
16  causing things to be stressful?
17    MR. BAKER:  Are we talking about in June?
18    MR. BRODERICK:  Yes, yes.
19    MR. BAKER:  June of 2001, okay.
20    THE DEPONENT:  Because the meeting was in
21  June, right?
22    MR. BRODERICK:  Q Right.  The one in Florida
23  you mean?
24    A  Yes.

## Page 139

1    Q  Yes.  That was at the end of June, I
2  believe.
3    A  Okay.  At that meeting, for an example, I
4  know I was stressed because I called the human
5  resources, Stephanie Moore.  Did I tell you that
6  already?
7    Q  Yes.  Okay.  But that's one thing?  Okay.
8    A  That was one thing.  And that this point
9  distribution thing.  They had so many points they
10  could give out, and I opened an account and got
11  250 points, Randy opened an account and got 400
12  points or something like that.  Wish I could
13  remember all the points, but I've got them here
14  somewhere.  But at any rate, and then Caroline
15  Kopecky he gave four or five hundred points for
16  being rep of the month and responding to pages and
17  calls promptly.
18        She lived in Houston, he lived in Dallas,
19  and Randy and I both had huge geographic areas.
20  You know yourself between here and Peoria there's
21  a dead spot, not to mention the fact that when I
22  went into any coronary care area, you know, you're
23  not supposed to have your cell phone on or a pager
24  on.  So it was irrational to me that, you know,

## Page 140

1  first Caroline was given this rep of the month and
2  then the second time Denise in Dallas, the same
3  metro area as he was, I would hope she could
4  return his calls and pages promptly.
5    Q  When did the bonus points first become an
6  issue?
7    A  Probably as soon as they started coming
8  out.
9    Q  Was that before or after the June
10  meeting, the June 30 meeting in Florida?
11    A  See if I have it on the time line.  At
12  the national sales meeting June 27-29 tension was
13  growing.  He awarded 400 points to Randy Van
14  Cleave for stocking an account, 250 points to me
15  for stocking an account, and 350 points to
16  Caroline Kopecky for promptly returning pages and
17  voice coms.
18    Q  Sounds like you first found out these
19  things were happening at the national sales
20  meeting.  Is that--
21    A  That particular one I did.
22    MR. BAKER:  The bonus point?
23    MR. BRODERICK:  Yes.
24    THE DEPONENT:  The bonus point dealie-bob

| | Page 141 | | Page 143 |
|---|---|---|---|
| 1 | that he was giving more to others for the same | 1 | say. |

**Page 141**

1 that he was giving more to others for the same
2 thing. I was really aware of it then. And
3 another thing he did at that national sales
4 meeting, he somehow made a graph that I had never
5 seen before of us four people. And three of them
6 were going in a positive trend line, and mine was
7 going down. And he congratulated three.
8     And he didn't bother to say that I had
9 just returned from medical leave. And I thought,
10 you know, that was not such a great way to handle
11 that. He could have said, well, Jane's been on
12 medical leave, and so we hope she's going to bring
13 hers up. You know, something. But instead,
14 congratulations to the three of you that are on
15 medical leave.
16     And the first thing I entered that
17 meeting, I had spoken with the Stephanie Moore,
18 and I thought it was confidential. He looked
19 directly at me and in a very terse voice said,
20 first of all, I want everyone here to know they're
21 being treated fairly and equally. Now, where do
22 you suppose that came from?
23   MR. BRODERICK: Q What could you get with the
24 bonus points?

**Page 142**

1   A It was a very thick--I mean, I could have
2 gotten a trip, canoe, refrigerators, freezers,
3 dining room sets. It was--
4   Q Was this a thick catalog?
5   A Yeah. Lot of nice presents.
6   Q What would like 100 points get you?
7 Approximately what was that worth, do you know?
8   A It was worth maybe a $100 or something.
9 I don't really know. I don't really know, but I
10 just know it wasn't a bad thing.
11   MR. BRODERICK: Okay. Let me just have this
12 marked as an exhibit.
13     (Whereupon a document
14     was duly marked for
15     purposes of
16     identification as
17     Exhibit Z as of this
18     date.)
19   MR. BRODERICK: Q Were you given this letter
20 by hand?
21   A Uh-huh.
22   Q So at some point you were at Iowa
23 Methodist Medical Center?
24   A Yeah. Right about that point, I would

**Page 143**

1 say.
2   Q Okay.
3   A Well, it was after that point. I guess.
4   Q It's dated June 3, it appears, which is
5 before when the event was supposed to take place,
6 is that right?
7   A Yeah. I think I'd spoken to him, and
8 maybe I just, I think I just asked him if he would
9 write a note because stuff was stressful enough
10 between Tony and me so I just asked him if he
11 would just write me a note to that effect.
12   Q So by the beginning of June, I mean,
13 before the national sales meeting, you say things
14 were stressful between Tony and you already, is
15 that right?
16   A Yeah.
17   Q Is that primarily based on the
18 interaction between you after you got off sick
19 leave?
20   A Yes.
21   Q Okay.
22   A I guess so.
23   Q Well, any other factors up until that
24 point?

**Page 144**

1   A You know, the times we spoke before I
2 took note of, but it wasn't like it was affecting
3 my work which was basically all I cared about is
4 just getting my job done. I can't say that's all
5 I cared about, but I wanted to get my work done.
6 I was a type, hard-work type person.
7   Q Okay. Well, I guess I just want to know
8 up until June 3 is there anything we haven't
9 talked about that was a factor in causing stress
10 between you and Tony?
11   A I am trying to remember the date when he
12 wouldn't allow me to, he told me he didn't want me
13 to call Bob Russell or Keith Cramsey. That was
14 like within two weeks after, I guess.
15   Q Two weeks after the national sales
16 meeting?
17   A It was right after returning from
18 national sales meeting he gave me the two-week
19 routing schedule, and no one else did have that
20 because I called and no one else had that. I have
21 a note that you have from Randy Van Cleave that I
22 said, great seeing you, Randy, I'm trying to get
23 this two-week routing schedule back to Tony, and
24 since you have a rural area like me, how are you

Page 145

1  planning on handling it.
2      And he said he hadn't been requested to
3  do that nor did he think it was feasible and that
4  he'd see some priority counts every two weeks, but
5  the other ones were just on maintenance.  The
6  first points I got that were 250 were dated
7  2-18-2001.
8    Q  Do you know what those were for?
9    A  Stocking a new account, St. John's
10  Hospital, in quarter 1.  And here's another point
11  one dated October 10 where he gave 350 points
12  quarter 3 rep for the quarter and 500 points for a
13  new stocking to Denise.
14      Caroline Kopecky got 500 points for
15  Colorado Springs ad board attendance, 500 points
16  for Caroline for Ochsner stocking, 500 points
17  again for another stocking at Methodist.  And
18  Michele Johnson had told me that he should give me
19  1,000 points for stocking St. Mary's because I
20  was the lead person.
21    Q  When did you have a discussion with
22  Michele Johnson about that?
23    A  I was attending, it was a breakout with
24  the rest of the district or whatever she was

Page 146

1  discussing the district business.  Whenever she
2  had district business, I tried to attend to find
3  out and keep a pulse on what was going on.  She
4  always invited me, and I tried to be there.
5    Q  But do you remember the month?
6    A  I know this is dated Wednesday, October
7  10 from Antonio Siciliano about the points system.
8    Q  Is that this exhibit?  Let's have this
9  marked as an exhibit.
10    A  Yes.  That looks like it.  And did you
11  get this other one that was 2-18-2001?  It was in
12  my book when you copied everything.  So evidently
13  the points were in place in February of 2001.
14      (Whereupon a document
15      was duly marked for
16      purposes of
17      identification as
18      Exhibit AA as of this
19      date.)
20    MR. BRODERICK:  Q Is Exhibit AA the e-mail
21  you were reading from regarding the points?
22    A  In October?
23    Q  Yes.
24    A  Yeah.  I wasn't that aware of such big

Page 147

1  differences.  Actually at the meeting I knew that
2  I got 250, and then when I saw that in the time
3  line I had a thing that he said 400 points for
4  Randy Van Cleave for stocking an account, that was
5  at the national sales meeting June 27 through 29.
6  250 points for me for stocking an account, and he
7  awarded 350 points to Carolyn Kopecky for promptly
8  returning pages and voice coms.
9    Q  Do you think from the time you were off
10  on sick leave, do you think you should have been
11  awarded bonus points for anything?
12    A  While I was on sick leave?
13    Q  Yes.
14    A  No.
15    Q  What did you say to Michele and she say
16  to you when you discussed with her the awarded
17  bonus points?
18    A  She was just congratulating me because in
19  10 years there had never been any Retavase used
20  every in St. Mary's Hospital in Evansville and
21  that I basically had done it myself.  And so that
22  since I was the lead player in that conversion,
23  her understanding was at least she gave 1,000
24  point to a person who was the one main player.

Page 148

1      And that I said something to her and I
2  said, I don't think Tony's doing that.  And she
3  said, well, maybe it's different for vascular
4  sales.  She quickly shoveled it to one side
5  because she didn't want to be in the middle of
6  something.  And so I didn't pressure her because
7  what good would that do?
8    Q  What was the purpose of the meeting in
9  Florida?
10    A  Well, it was to try to--the Florida one
11  is the 27th?  Let me see.  This January 2001
12  starts depicting how they wanted us to go in the
13  back door using Cordis products to get the
14  business.  You're saying Florida was June 27?
15    Q  The national sales meeting was at the end
16  of June of 2001, correct?
17    A  Yeah.  There was one of them.  This is
18  another meeting that we had.
19    Q  Okay.
20    A  And I think it says that it's a national
21  sales meeting too.  Maybe that was a regional
22  meeting.
23    Q  Do you remember going to a national sales
24  meeting in January 2001?

Page 149

1    A  I do because that's where I got, January
2  2001 is where I got this stuff. Tuesday, January
3  23, 2001 CVBU national sales meeting.
4    Q  Where was that held at?
5    A  Desert Salon, so it must have been in
6  Desert Springs, California.  I think it was Desert
7  Springs, California.
8    Q  Did you meet Tony out there?
9    A  Probably.
10    Q  But do you recall talking with him or
11  having conversations with him?
12    A  I don't know if he was my manager at that
13  point or not, but he probably would have been,
14  wouldn't he have?  So if he was, he would have led
15  the breakout probably.  Just talks about this
16  vascular surgery mission catheter clearance.
17    Q  Well, do you think you recall having a
18  conversation with Tony?
19    A  I don't remember.
20    Q  Okay.  Back to the national sales meeting
21  in--
22    A  Did I give you a copy of all this?
23    Q  We'll get a copy of that afterwards.
24    A  Okay.  Because this talks about they

Page 150

1  wanted--this specifically says noncoronary
2  indications that they wanted us to use to get in
3  the back door.
4    Q  I think we talked about that already too.
5      The national sales meeting in Florida.
6  Do you know what the purpose of that meeting was?
7    A  I think it was because maybe--I'm not
8  positive, but I think GUSTO V, the major coronary
9  trial, had been completed which they had been
10  waiting for to prove that we were better than the
11  competitor in heart attack, and they gave us a
12  breakdown of how that would apply in peripheral
13  vascular disease.
14    Q  So there was a presentation?
15    A  Presentations, yeah.
16    Q  And do you remember any of the people who
17  spoke at the meeting?
18    A  And this is the June one?
19    Q  Yes.
20    A  Okay.  I know that there was some J & J
21  regulatory person there because we were required
22  to sign a statement saying that they were pristine
23  and they didn't, you know, don't talk out of
24  indication or blah blah blah or use aids out of

Page 151

1  indication.  And that was in such stark contrast
2  to what we were being told in our meetings, and so
3  that caused conflict in my head.  Stress.
4    Q  Did, was any presentations there about a
5  change in how the SICP was going to be calculated?
6    A  There could have been.
7    Q  Do you know who Paul Williams is?
8    A  That name sounds familiar.
9    Q  Okay.
10    A  But I don't know who he was.  Who was he?
11    Q  So you don't recall one way or another if
12  there was a presentation about the SICP at that
13  point?
14    A  I'm trying to remember if this is when we
15  started with the more Cordis products.  I think it
16  might, this is just a, might have been the time
17  when we started having the additional Cordis
18  products that that might have changed the
19  coverage.  Because let me see when I have this
20  Centocor or this Cordis agreement thing they had.
21  It has a date on it maybe.  Somewhere I know I
22  gave you the agreement between Cordis and
23  Centocor.
24    Q  And that may have been talked about at

Page 152

1  the meeting?
2    A  Probably was.  Here we go.  See if I can
3  see a date on it.  Okay.  This is expected to
4  start in April 1st, 2001.  And we were called
5  clinical vascular specialists with Cordis.  We
6  were supposed to spend 25 percent of our time with
7  Cordis products, would be based on a quarterly
8  basis, and if we got 89--80 to 89, I know that you
9  took a copy of this because it was in my folder.
10  Three hundred a month 99 to 94 percent, 400 a
11  month 95 to 99, 500 a month--
12    Q  Okay.  What were the Cordis products?
13    A  What were the Cordis products?  They were
14  because hydrolyzer was kind of considered a dog,
15  they were microcatheters, they were neurological
16  products.  Transit, mass transit, PVA, which is
17  polyvinyl alcohol.  They're little teeny particles
18  that they use.
19      If there's some kind of bleeding or even
20  if there's like a woman has tumors in her uterus
21  that are, you know, instead of having her have her
22  whole uterus out, what they would do is they would
23  go in and put these little particles to block off
24  the blood vessels so that the tumor would shrink,

## Page 153

1  and she wouldn't have to be sterile. So they used
2  these to block bleeds.
3      Q  And part of this national sales meeting
4  in Florida was a discussion of the Cordis
5  products?
6      A  Yeah, probably.
7      Q  Okay. This was in Orlando, correct?
8      A  I don't remember. Sorry. There's so
9  many meetings I don't remember. It's been too
10  long ago.
11      Q  Did all of the other vascular specialists
12  attend?
13      A  I believe so.
14      Q  Okay. To the best of your knowledge, did
15  all the cardiovascular reps attend?
16      A  I guess so. Maybe it was Orlando because
17  we went with Tim at that point, and Tony would
18  have been my team leader, but he didn't take any
19  activity, take us all out. Like there's always
20  this team bonding thing, and so I went with Tim's
21  group and I remember we did that and I think it
22  was in Florida, I think.
23      Q  You told me about the conversation you
24  had with Stephanie Moore. Any other things that

## Page 154

1  happened between you and Tony at this national
2  sales meeting?
3      A  I don't think we had the bio legalization
4  (sp) program yet. I don't remember anything else.
5  Sorry. I just don't remember.
6      Q  Okay. During that time period, during
7  the meeting, did Tony make any comments to you
8  about your age or gender?
9      A  When, he obviously, when he started the
10  whole meeting saying and looking right at me in a
11  very terse voice saying, I want all of you to know
12  that you're being treated equally and fairly. I
13  had just almost within the last hour spoken to
14  Stephanie Moore confidentially, quote, unquote,
15  about being treated fairly and equally. And he
16  never said something like that at the beginning of
17  any other meeting or whatever.
18      Q  Was this the first day that you were down
19  there in Orlando?
20      A  It was the first time we had a breakout
21  with Tony and the four of us. And he showed those
22  graphs and said congratulations to the three of
23  them and didn't bother mentioning I'd been on
24  medical leave. And then he gave the extra points

## Page 155

1  to somebody for returning pages instead of getting
2  business for the company.
3      Q  That day in front of everyone he awarded
4  points?
5      A  Yeah.
6      Q  Okay. Were there any other breakout
7  meetings that you recall?
8      A  I don't recall any specific ones after
9  that.
10      Q  Okay.
11      A  Unless we heard a lecture or something.
12  That was the major one, I believe.
13      Q  Did Tony award you any points while you
14  were in Florida for the national sales meeting?
15      A  At the national sales meeting. The 250
16  points that I had for my stocking my account.
17      Q  I know you had this conversation with
18  Stephanie Moore. Did you tell her why you felt
19  you were being treated differently?
20      A  I did tell her that I thought it was
21  because I was an older female. And that, that
22  when I would say things, I mean, it's just like he
23  viewed me almost like a ghost like he would just
24  as soon I wasn't around, and whatever I had to say

## Page 156

1  obviously could not be valuable.
2          And I totally wasn't used to being
3  treated like that since I had always been
4  outstanding and had people wanting me to help
5  train, and I wasn't even allowed to give training
6  sessions or anything to my own district because
7  they didn't understand the difference between
8  catheter clearance and dialysis access grafts.
9      Q  Tony wasn't letting you give training
10  sessions?
11      A  He and Michele decided somehow, I guess,
12  that I shouldn't give--I had presentations that I
13  never gave, let's put it that way.
14      Q  Okay. And Michele decided that as well?
15      A  I don't know who decided, but it was
16  somewhere around there.
17      Q  Well, did you make a request to do
18  training sessions?
19      A  Uh-huh.
20      Q  And did you make a request to Michele?
21      A  Yeah. I know I did to Michele at one of
22  these meetings I said, could I please just have a
23  few moments to explain the difference between
24  catheter clearance and peripheral vascular

Page 157

1  disease, this whole specifically dialysis access
2  grafts because there seems to be confusion, and
3  when people call me and they want information, we
4  just help them understand.
5    Q  The other reps you mean?
6    A  The cardiovascular reps to understand.
7  And in order also when we invited people to
8  advisory board just because they're a great
9  doctor, if they aren't doing anything that
10 pertains to advisory board, that's a waste of
11 company money.
12   Q  Do you remember when you specifically
13 asked Michele to be able to give a presentation to
14 the other reps?
15   A  I know one was just around the time that
16 Tony became key leader.
17   Q  And she said no or she denied the request
18 or--?
19   A  Yeah.  She denied the, I guess.  It just
20 never came around to that.  Well, I don't remember
21 exactly what she said, but it just, she had a
22 really busy schedule already.  But I know every
23 other vascular specialist was talking about they
24 were able to give their presentations to people

Page 158

1  and educate them a little bit.
2    Q  Well, do you think Michele denied that
3  request based on your age or gender?
4    A  I didn't think so at the time.
5    Q  Well, as you sit here today, do you think
6  so?
7    A  No.  I don't think so.
8    Q  Did you ever make that request to Tony?
9    A  I'm sure I talked to him about it at that
10 point.
11   Q  About making presentations?
12   A  (Nodded head up and down.)
13   Q  And do you recall--and he denied that
14 request?
15   A  Now we're going back to stuff that I
16 don't know if I remember.
17   Q  Okay.  All right.  If you don't know--.
18   A  I don't.
19   Q  All right.  Where was this conversation
20 with Stephanie Moore?  It was before a breakout
21 meeting, I understand that?
22   A  I was in my room, and I called her room,
23 so it was over the telephone.
24   Q  And how long was the conversation?

Page 159

1    A  Half hour or so.  It's hard for me to
2  judge the time exactly.  Wasn't real long.
3  Fifteen minutes to a half hour maybe.
4    Q  Did you give her particular examples of
5  how you felt you were being treated differently?
6    A  I'm sure I did at that time.
7    Q  Do you recall what just point by point
8  what you might have told her?
9    A  I know.  Wouldn't that just be great?  I
10 think that I told her that my accounts were being
11 changed without my input and that I felt that even
12 for Centocor as a whole, that this possibly wasn't
13 the best for business but that I would like to at
14 least have had my input because with Michele I
15 could give my input and we would talk about it.
16      And sometimes she'd go my way, sometimes
17 I'd go her way, but it was a constructive
18 discussion.  With Tony it was his way or the
19 highway, and he just didn't want me to give any
20 input.
21   Q  So you think it was lack of input?
22   A  It was lack of input.  It was, just if I
23 had any idea, it was not a worthy idea.  But it
24 was in a different context, you know, whether it

Page 160

1  was--even who should go to meetings.  Full gamut,
2  I guess.  Just anything where I might have an
3  input on.
4      I remember there was one that Michele
5  had, there was a hospital rep, a hospital HSAM,
6  sales contracting guy, I think, that requested
7  over in Iowa that since Steve wasn't there, Steve
8  Shreen, that I guess Centocor had always taken
9  care of half the price of this meeting of
10 cardiologists.
11     There was no local rep there, and she
12 says, well, this will be right down your alley
13 because it's about PVD.  And I wrote a note to
14 Tony on my computer and said, Tony, it's a lot of
15 money, I think we could spend it better somewhere
16 else, but I want your input.
17     He didn't return the call, so I almost
18 got in trouble with Michele until I showed her on
19 my computer that actually I had forwarded the
20 message to Tony, and he apologized a week or so
21 later saying he was sorry after I followed up.
22 And he didn't think it was a good use of the money
23 either.
24   Q  And this was something you told



**Page 161**

1 Stephanie?
2    A  I don't know.
3    Q  Okay.
4    A  Sorry.
5    Q  That's okay.
6    A  It's just too much stuff that happened.
7    Q  Sure.  Did you tell Stephanie about
8 problems, the issues related to the events
9 scheduled in June?
10    A  I told her from the first conference I
11 had had with him about the age thing, I told her--
12    Q  The age comments?
13    A  The age comments.  And when I came back
14 it was like his mom had had that kind of a
15 problem.
16    Q  You told her he made that comment?
17    A  Yeah.  So I just basically, she wanted to
18 take it to a higher level, and I just said I did
19 not want that.  I wanted a win-win situation, and
20 surely with all her human resources experience,
21 she could give me advice of how to change my
22 communication such as that it would improve my
23 communication with Tony.  And that's what it was
24 about.  I wasn't trying to go up and clobber him

**Page 162**

1 or I would have said that.
2    Q  What else did she say to you?
3    A  It was mostly that she thought it should
4 go up higher, and I wanted her word that it would
5 not because she just said well, maybe there'll be
6 a situation where he can use your expertise or
7 something.  I don't know.
8    Q  Did you tell her about the FCR from
9 April?
10    A  I might have but I don't recall.
11    Q  Okay.  Do you remember anything else that
12 she said to you or you said to her?
13    A  I don't recall any more than that.
14 Sorry.
15    MR. BRODERICK:  No.  Let's mark this.
16       (Whereupon a document
17       was duly marked for
18       purposes of
19       identification as
20       Exhibit BB as of this
21       date.)
22    THE DEPONENT:  It was Orlando all right.
23 Thanks for confirming that.
24    MR. BRODERICK:  Q I know before this you got

**Page 163**

1 an e-mail from Tony with a routing schedule
2 attached.
3    A  It was immediately after that meeting,
4 uh-huh.
5    Q  Did you have any discussions about
6 routing at the meetings?
7    A  I don't recall that, no.
8    Q  Did he just on that day suddenly send you
9 a routing schedule?
10    A  I think that he was upset about my
11 conversation with Stephanie Moore, and I really
12 felt things were starting to happen after that
13 like the two-week routing schedule.  To me, there
14 wasn't any apparent reason for it, and within two
15 weeks of that meeting decided that I should be in
16 every account every two weeks.
17    Q  Did you have any conversation with him
18 prior to that about the frequency with which to
19 visit your accounts?
20    A  I don't think so.  I don't recall.
21    Q  So was this kind of out of the blue, so
22 to speak?
23    A  Well, stress was building, let's put it
24 that way.

**Page 164**

1    Q  Okay.  Well, I guess the e-mail would
2 be--the routing attached to it, was that sort of
3 came out of the blue?  Is that a fair
4 characterization?
5    A  Out of the blue.  Well, there's some
6 place in here that says--in that job description
7 which I said I had not seen, I was reading it
8 later, and I think this is something that
9 absolutely you have.
10    MR. BAKER:  Hold on.  Let's go off the record.
11       (Discussion off the record.)
12       (Whereupon a document
13       was duly marked for
14       purposes of
15       identification as
16       Exhibit CC as of this
17       date.)
18    MR. BRODERICK:  Q All right.  Ms. Minor, this
19 has been marked as Exhibit CC.  Do you recall
20 getting this e-mail from Tony?
21    A  Yes.
22    Q  And there was an attachment to it, is
23 that correct?
24    A  Yes.

Page 165

1   Q   Page 2? Sample routing?
2       Okay. And how did you feel when you got
3 this e-mail?
4   A   I thought, first of all, that he didn't
5 even know my accounts because he said Memorial's
6 in Peoria instead of Methodist in Peoria. And I
7 talked to the product manager, Mike Ferlada--I
8 wrote that on there, that it wasn't even the right
9 account. Because I don't think most humans could
10 accomplish any business with that kind of a
11 schedule, and he said he thought it was impossible
12 and ridiculous.
13   MR. BAKER: Who is he?
14   THE DEPONENT: Mike Ferlada was the product
15 manager.
16   MR. BRODERICK: Q For what product?
17   A   Retavase peripheral vascular disease.
18   Q   And when did you have a conversation with
19 Mike Ferlada about it?
20   A   About as soon as I received that.
21   Q   You picked up the phone and called Mike?
22   A   Yeah.
23   Q   Had you talked to Mike previously about
24 Mr. Siciliano and the way you were being treated?

Page 166

1   A   I might have, but I know my doctor,
2 Flavio Castaneda, because he was doing speaking
3 all over the place, and he let Mike Ferlada know
4 that I had been the rep 11 years, that I was the
5 best pharmaceutical rep they ever had. Of course,
6 he was being flowery, but that he felt a lot of
7 tension (sp), and that I was the rep that he
8 wanted to continue having, and he didn't like what
9 was happening.
10   Q   Did Mike Ferlada have a supervisory
11 position over you?
12   A   Mike Ferlada was like the--well, you
13 know, like there's marketing and then there's like
14 your sales supervisors? No. Mike was like sales
15 or marketing manager for the whole peripheral
16 vascular disease.
17   Q   Do you remember anything else about this
18 conversation you had with Mike about the routing
19 schedule?
20   A   He just said, he said, I do not
21 understand, because he'd been with Abbott, and
22 he'd seen me train half the sales force at Abbott
23 on vascular disease. I do not understand with all
24 your qualities why he will not let you get

Page 167

1 involved in training or helping other reps or
2 anything. Why won't he use your experience.
3   Q   Do you remember anything else that Mike
4 said?
5   A   He said, I'm going to have a talk with
6 Tony.
7   Q   Well, to your knowledge, did he have a
8 talk with Tony after that?
9   A   I believe that he did.
10   Q   How do you know that?
11   A   Because he said he would.
12   Q   Okay. Did he ever tell you that he did,
13 in fact, talk to Tony?
14   A   I don't recall.
15   Q   Okay.
16   A   Dr. Castaneda told me, though, that
17 Mike Ferlada knew because he had talked with
18 Dr. Castaneda when he was out talking, and
19 Dr. Castaneda was--I guess Mike said, I sense
20 you've probably heard that there's some tension
21 between Jane and Mr. Siciliano, and he said, yeah,
22 I don't like it. She's our rep, and we want to
23 keep her our rep. That was Dr. Castaneda.
24   Q   When was that conversation between those

Page 168

1 two?
2   A   After the national sales meeting
3 sometime. Because Dr. Castaneda was speaking all
4 over the east coast.
5   Q   Okay. So prior to the time getting this
6 e-mail, there was no discussion between you and
7 Tony about the frequency with which to visit your
8 accounts?
9   A   I can't say no absolutely, but I don't
10 think so.
11   Q   Doesn't sound like it was an issue before
12 this?
13   A   Nothing like every two weeks.
14   Q   Okay. You don't remember one way or
15 another either it was an issue or not?
16   A   I remember that he had never said I
17 should be in every account every two weeks or
18 every single week because I probably would have
19 had more to say.
20   Q   So was it a surprise to get this e-mail
21 with this routing schedule?
22   A   It was very much of a surprise.
23   Q   Just so I know, before this--just so
24 we're clear--.

Page 169

1  A  Are we clear?
2  Q  I don't know.  Did you and Tony have any
3  conversations one way or another about hitting
4  your accounts every two weeks?
5  A  Not prior to this.
6  Q  Any frequency at all?  Three weeks, four
7  weeks?
8  A  I don't particularly remember discussing
9  that with Tony.
10  Q  Okay.  And then you sent an e-mail to
11  Randy Van Cleave?
12  A  Yes.
13  Q  And that's Exhibit BB?  I mean, the
14  e-mail ling chain there, that's your e-mail to him
15  and his response?
16  A  Right.
17  Q  Okay.  Did you have a telephone
18  conversation with him at all about it?
19  A  I think afterward.
20  Q  Do you recall when you had the
21  conversation with him?
22  A  No, I don't.
23  Q  Do you remember what you said to him or
24  he said to you?

Page 170

1  A  Probably said what's the gig, what's up.
2  Because he'd never been told by Tony to have to be
3  there every two weeks.  And he didn't think it was
4  even feasible.  He'd always been able to run his
5  own accounts.  Some were just maintenance you
6  didn't see very often at all.
7  Q  Okay.  Do you think that Tony imposed
8  this routing schedule on you--excuse me, strike
9  that.
10  When Tony imposed this, when Tony sent
11  you this routing schedule, do you think he did so
12  because he was discriminating against you based on
13  your age and gender?
14  A  Yes, I do.
15  Q  And what facts do you have to support
16  that conclusion, or what facts do you know of to
17  your knowledge to support that conclusion?
18  A  What facts do I have?  Just that no one
19  else was being treated that way, and I was the
20  most senior person in his team.  The two females
21  were in their 20s and 30s, and Randy Van Cleave
22  was 40 or 43 or something like that.  And none of
23  them were told that they had to do that.
24  Q  Did any manager at Centocor prior to that

Page 171

1  ask you to cover your accounts in any particular
2  frequency?
3  A  I'd say both William and Tim were of the
4  opinion that we would pick anywhere from three to
5  five accounts that we would cover frequently, and
6  the rest of them as necessary primarily because
7  they felt--it's just there's an old pharmaceutical
8  rule, the 20/80, if you spent--I mean, the top 20
9  percent of your doctors write 80 percent of the
10  business.
11  So it's most important to figure out who
12  those important ones are and spend the time with
13  them and get the business, and it's a very
14  time-consuming thing to establish rapport.  You
15  just don't do it overnight.
16  Q  Anyone else?
17  MR. BAKER:  Anyone else what?
18  MR. BRODERICK:  Q Any other manager request
19  that you visit your accounts in any particular
20  frequency other than who we discussed?
21  A  Other than Tony, no.
22  MR. BRODERICK:  All right.
23  (Whereupon a document
24  was duly marked for

Page 172

1  purposes of
2  identification as
3  Exhibit DD as of this
4  date.)
5  MR. BRODERICK:  Q Have you seen this document
6  before, Ms. Minor?
7  A  No.  And I don't see a date on it.
8  MR. BAKER:  For the record, that's Exhibit DD?
9  MR. BRODERICK:  DD.
10  Q I think if you look at the top, it
11  says name, Randy Van Cleave.
12  A  Okay.
13  Q  I think the date's third quarter?
14  A  Okay.
15  Q  If you'd direct your attention to section
16  V number 6.  It's true then he at least asked
17  Mr. Van Cleave to cover his accounts?
18  A  Look at the time frame.  I left October
19  19, and this was dated October, down here the date
20  time line October 26, November 1, October 26.
21  Q  Okay.
22  A  That is after the time line in which I
23  went on medical.
24  Q  Okay.

Page 173

1    A  And so therefore, I had heard that later
2  he was trying to cover.
3    Q  Who did you hear that from?  Who did you
4  hear that from?
5    A  I know.  Now, I'm trying to think of all
6  my friends.
7    Q  Okay.  Well, before we go on to this next
8  exhibit, why don't you tell me what it is you
9  heard later?
10    A  That later people were scheduled with
11  some kind of routing schedule.
12    Q  And you think Tony was doing that for a
13  particular reason?
14    A  Yeah.
15    Q  And what was that reason?
16    A  So it would look like we were all treated
17  the same.
18    Q  And do you recall who told you that?
19    A  It might have been--I can only say might
20  have been, and that's not a fair thing to do to
21  put on someone else.
22    Q  Well, I mean, to the best of your
23  knowledge?
24    A  I don't remember.

Page 174

1    MR. BRODERICK:  Okay.
2        (Whereupon a document
3        was duly marked for
4        purposes of
5        identification as
6        Exhibit EE as of this
7        date.)
8    MR. BRODERICK:  Q I think up at the top it
9  says it's a field contract report, Exhibit EE, to
10  Randy van Cleave dated 5-10-01.  In section IV the
11  last line, I believe it says, complete account
12  coverage approximately every two weeks.  Do you
13  see that there?
14    A  Well, then it's strange that when was
15  Randy's e-mail to me that said he had never been
16  requested?   That was July 7 that he stated to me
17  he had never been requested by Tony to admit any
18  schedule like that, and he didn't think it was
19  possible.  So interesting.  All I know is what
20  Randy told me is that he had never been requested
21  do it every two weeks, nor did he think it was
22  feasible.  And the product manager said he thought
23  it was ridiculous and not feasible.
24        (Whereupon a document

Page 175

1        was duly marked for
2        purposes of
3        identification as
4        Exhibit FF as of this
5        date.)
6    THE DEPONENT:  What about it?
7    MR. BRODERICK:  Q Can you identify this
8  exhibit for the record?
9    A  This is, it appears what manager Michele
10  Johnson wrote, it's a follow-up report.  Says
11  reviewing the period 9-20 when I was hired to
12  12-31-99, so it looks like a annual type of a
13  report, I guess.
14    Q  Did you receive a copy of this report?
15    A  Uh-huh.
16    Q  So it's like an annual review for 1999?
17    A  It appears to be, yes.
18    Q  Let me direct your attention to the page
19  you're on, which has been numbered Minor ID00132.
20  Let me direct your attention to the second dash in
21  the second sentence.  If you could read that
22  sentence into the record that states, she should
23  develop?
24    A  I don't see that then.  Where Jane?

Page 176

1  What?
2    Q  She should develop.  This sentence here
3  (indicating).
4    MR. BAKER:  What page are you on again?
5    MR. BRODERICK:  Minor ID00132.
6    THE DEPONENT:  Jane must also keep focused on
7  her top priority for all her products and maximize
8  her selling time with customers by balancing all
9  her products within a select number of priority
10  accounts.  She should develop a travel schedule
11  that allows her access to her top accounts on a
12  weekly basis and her secondary accounts at least
13  once every three to four weeks.  This will be
14  important.
15    MR. BRODERICK:  Q Okay.  So Michele Johnson
16  did, in fact, post some requirement that you visit
17  your accounts with some frequency, is that
18  correct?
19    A  Basically that's what I said, the 80/20,
20  but the others were three to four weeks.  And they
21  were all much closer in proximity.
22    Q  Okay.  So you acknowledge that she
23  imposed that, but you feel it was different?
24    A  Sure, it was different.

Page 177

1  MR. BAKER: Wait. Let's get the record.
2  Different from what Tony had done?
3    MR. BRODERICK: Q I guess, yes.
4    MR. BAKER: Well, you used the term it's
5  different, and I want to know--
6    MR. BRODERICK: Q Is that the point you're
7  trying to make, Ms. Minor?
8    MR. BAKER: I think she is attempting to
9  answer your question. And my question is,
10  different from what?
11    MR. BRODERICK: Q Well, is it true that
12  Michele Johnson imposed a requirement that you
13  visit your accounts, all of your accounts with
14  some frequency?
15    A Top accounts on a weekly, secondary
16  accounts at least once every three to four weeks.
17    Q Okay.
18    A Which is very unlike the Tony
19  requirement. Not to mention I had a very much
20  smaller geography. Also I don't think she ever
21  criticized me about my account coverage.
22    Q After the conference, were there any
23  other contact after that breakout meeting with
24  Anthony Siciliano? Did you have any other contact

Page 178

1  with him at the conference in Florida?
2    A We had the breakout. We didn't do any
3  team event. I don't recall any. But, you know,
4  there may have been something just didn't strike a
5  highlight, I guess. We were given this at that
6  sales meeting.
7        (Whereupon a document was
8        tendered to counsel.)
9    THE DEPONENT: You could enter that in your
10  evidence. It was given to us, we were given 50.
11  You could have one. I've got two.
12    MR. BRODERICK: Q Okay. Thank you.
13    A Sure.
14    Q And what was this for?
15    A This was presented to us as if it was
16  okay by regulatory for us to use to present
17  information, and the only reason I knew it wasn't
18  was because when I went to order--we got 50. And
19  when I asked for 50 more to use at my meeting, my
20  MIIT meeting, they said no, they couldn't ship
21  more to be on, displayed at a table because it
22  wasn't approved by the FDA.
23    Q Why don't you just for the record
24  identify what this is, the title.

Page 179

1    A It's New Developments in Vascular
2  Disease, volume two, number one.
3    Q And this is a pamphlet?
4    A No. It's like a magazine.
5    Q And who published it?
6    A It's like a go-between from Centocor.
7  I think it says they did it with an educational
8  grant. Physicians and Scientists Publishing
9  Company.
10    Q Okay.
11    A So it was getting very stressful for me
12  to be using things that--. Sorry.
13    Q Was this routing requirement sent by
14  Tony, was that a proposed schedule, or do you
15  think that was the one you had to follow?
16    A It may have stated proposed, but that's
17  what he wanted.
18    Q Did you propose any routing schedules to
19  him prior to that or after that?
20    A I think I was at the point I was trying
21  to, but I didn't have one formulated yet. I don't
22  remember that there was a deadline that I did not
23  meet, but I got this.
24    Q At some point, did you think that Tony

Page 180

1  wanted to take the St. Francis account away from
2  you?
3    A Yes.
4    Q Okay. And why'd you think that?
5    A Because he wanted to meet with my doctors
6  without me there.
7    Q How'd you know that?
8    A They told me.
9    Q Who told you?
10    A My doctors. They tell me everything.
11    Q What was their names?
12    A Flavio Castaneda, C-a-s-t-a-n-e-d-a,
13  Flavio, F-l-a-v-i-o. James Swischuk,
14  S-w-i-s-c-h-u-k. Terry Brady. And Dr. Smouse,
15  S-m-o-u-s-e.
16    Q Were any of these folks employed at
17  St. Francis?
18    A Uh-huh.
19    Q Was it everyone except Dr. Castaneda, or
20  was Dr. Castaneda employed there also?
21    A They were all part of the MIIT at that
22  point. Midwest Institute of Interventional
23  Therapy. The radiology group that handled
24  St. Francis.

**Page 181**

1  Q  Okay. And what did they communicate to
2  you about Tony?
3  A  They just said he was trying to call, and
4  I mean, there's like a, it's like an unknown rule
5  that you would not go into someone's account
6  without letting them know or talking to them about
7  it especially when they have a good rapport with
8  that doctor. And they were like, what gives?
9  What's he trying to do? Because no manager I'd
10 ever had would try to do a one-uppance on me type
11 thing. It was kind of bizarre.
12  Q  What did they tell you that he did? That
13 he called them?
14  A  Yeah. That he was trying to call.
15  Q  Okay. And trying to get them to order
16 through him or--?
17  A  Trying to get them to let him, to let
18 them know that he was the one they should be
19 dealing with, not me.
20  Q  Did he ever take St. Francis, did he ever
21 remove St. Francis from your territory?
22  A  No. Because I talked to Mike Ferlada, I
23 talked to Michael Montgomery, the head of the PVD,
24 the doctor that was in charge of the whole thing,

**Page 182**

1  and he knew the rapport I had with them.
2  Q  When did you tell Mike Ferlada?
3  A  After I heard from them.
4  Q  Okay. What did you tell him?
5  A  I just told him that, what the doctors
6  had said. And so when he talked Dr. Castaneda on
7  the road, Dr. Castaneda said I had been the rep 11
8  years, and they didn't want it to change, period.
9  They wanted me for their rep. I'd always helped
10 them. He didn't understand what the stress was
11 about, but he didn't like it. He just wanted me
12 for his rep. That Tony was welcome to come in
13 with me.
14  Q  When did this happen with St. Francis?
15 Was this after the national sales meeting in June
16 of 2001?
17  A  I don't remember if it was before or
18 after, to be honest with you. Maybe I should, but
19 I don't.
20  Q  Okay. Do you think his efforts to take
21 St. Francis away from you was discriminatory
22 against you based on your age or gender?
23  A  Well, now I do.
24  Q  Okay.

**Page 183**

1  A  At the time I don't know that I did.
2  Didn't understand what he was trying to do, but
3  now I do because he began attacking my
4  performance, and that was definitely a very
5  important part of my performance.
6  Q  What facts in particular about this, this
7  incident, do you have, do you think support your
8  conclusion that he was trying to take the account
9  away based--as a discriminatory action based on
10 your age and gender?
11  MR. BAKER: Talking about the St. Francis?
12  MR. BRODERICK: Yes.
13  THE DEPONENT: Because--which we will discuss
14 in the future--the one negative report I really
15 had from Tony he was trying to say that my
16 performance was not up to par. He was trying to
17 take it at this point because it was one of the
18 most important accounts in the nation.
19      It was kind of the center, I had worked
20 with these physicians to get studies started, and
21 they spoke to other areas of the country to gain
22 business. I mean, it was a very prominent
23 account, and it was over a half a million dollars
24 in sales. And if he had taken that away, my sales

**Page 184**

1  really would have been bad.
2  MR. BRODERICK: Q Anything else?
3  A  We went up to a Chicago meeting, and it
4  was, I had never been treated like that before,
5  but he was at the airport and he had hired a limo
6  so I had to cancel my limo because he was really
7  convinced he was going to have Dr. Castaneda ride
8  with him. He wanted to meet with Dr. Castaneda
9  alone and talk with him. And it made no sense.
10      I've never had a boss want to meet alone
11 with the physician where you've got really good
12 rapport. It was like some competition that he
13 wanted to win. But I was confident because I knew
14 Dr. Castaneda wanted me for his rep. We had a
15 very good working relationship, and so did I and
16 Dr. Brady and Dr. Swischuk. Been with them a long
17 time.
18  Q  Who was Keith Cramsey?
19  A  Keith Cramsey was made the regional
20 marketing manager. He had been what's called an
21 HSAM when I first started, and then was promoted
22 to regional marketing manager.
23  Q  And did you have an interest in
24 contacting him about things?

Page 185

1    A  Well, what had happened was when things
2  were getting more stressful, I noticed that if
3  something positive happened, it wasn't going up
4  the chain, so I did send like my $10,000 sale up
5  to Bob Russell who sent it on to Bill Pinion
6  because it was important, and I felt like I was
7  being isolated.  Tony told me that I was not
8  supposed to copy Keith Cramsey or Bob Russell on
9  any of my messages, and I said why, and he said,
10  because they say you're sending too many messages.
11    So I left a message up for Keith, I don't
12  know if it was e-mail or not, but I think it was
13  on just voice mail saying, Keith, I know with your
14  new position as regional marketing manager that
15  you get lots more messages, and how would you like
16  me to handle this?  What kind of screening tools
17  or whatever?  And he said if it's about St. Louis,
18  Peoria, anything in your territory, I want to know
19  about it.  Brevity's appreciated just because of,
20  you know.  So in other words, Tony lied.
21    Q  Well, did you ask him about e-mails being
22  sent to Keith or e-mails sent to Bob or Bill?
23    A  I asked Keith about e-mails being sent to
24  him because Bob and Tony were in the same office,

Page 186

1  and Bob had promoted Tony.  But if it was
2  inclusive of all of them, he definitely lied about
3  Keith because that was not what Keith thought.
4  And I didn't send the message on to Bill Pinion,
5  Bob Russell did.  It went up the chain of command.
6    Q  So Tony told you not to send e-mails to
7  Bob or Keith?
8    A  Right.
9    Q  Okay.  Do you know when that conversation
10  happened with Tony?
11    MR. BAKER:  When Tony told her that?
12    MR. BRODERICK:  Yes.
13    THE DEPONENT:  It was after the national sales
14  meeting when things were getting tense.  It was
15  after, there was a point where Suzanne Bolger
16  wanted me to work with--it was after the order
17  that came through for $10,000.
18    MR. BRODERICK:  Q From what institution?
19    A  That was a Cordis order that we had
20  gotten that went on up to Bill Pinion.  Did you
21  remember seeing that letter?
22    Q  Is that a letter or--?
23    A  It was an e-mail forwarded, forwarded,
24  forwarded.

Page 187

1    Q  Well, okay.  That has a date on it?
2    A  From Bill Pinion, from Bill Pinion came
3  to August 27, 2001.  And he's a national sales
4  manager.  Well, then I had copied Tony on this
5  message, so then he sent me a message, said, Jane,
6  great job working with Robin at Cordis.
7      This is exactly the type of success we
8  need to make this copromotion a success.  Thanks
9  for your hard work at St. John's.  Then asterisk.
10  I do need to ask you, however, to hold off on
11  working Decatur and Bloomington with Robin until
12  we work through the issues regarding adequate
13  coverage of your current targets.
14    Q  And who sent about the, what
15  coverage of current targets?
16    A  Tony.
17    Q  What did he mean by that?
18    A  What did he mean by that?
19    Q  Yes.
20    MR. BAKER:  If you know.
21    THE DEPONENT:  I knew that he didn't want me
22  to cover any accounts that I thought were worthy
23  of any more business.  So I spoke with Suzanne
24  Bolger, who is a local rep who liked Michele and

Page 188

1  they got along real well.  She talked to Michele,
2  and Michele talked to Tony about it, and that's
3  why it was added fourth quarter after it couldn't
4  do me any good.
5      But I had to have special permission to
6  even help Suzanne with these accounts.  And Robin
7  in his thank you note had said, you mentioned
8  these two accounts and they would be great
9  prospects and I'd like to work with you on them to
10  build up more Cordis business.
11    MR. BRODERICK:  Q What's the date of the
12  e-mail?
13    A  From Tony?
14    Q  Yes.
15    A  August 26, 2001.  And he copied Bob
16  Russell.
17    Q  And at some point around there, he told
18  you not to e-mail Bob or to Keith?
19    A  Yeah.
20    Q  And--?
21    A  And he wasn't sending me many positive
22  notes.  Other people were.
23    Q  All right.  Well, in August of 2001, what
24  other conversations did you have with Tony?

Page 189

```
1    MR. BAKER: Any conversations?
2    MR. BRODERICK: Q Yes. Do you recall any
3  other conversations you had with Tony?
4    A  Well, you know, there were always, I
5  thanked Robin Kinney in an e-mail. I mean, daily
6  back and forth just general whatever. There were
7  e-mails going back and forth.
8    Q  You had the conversations with him about
9  St. Francis and about talking to Bob Russell. Did
10 he ride with you at all during this time period?
11   A  I don't--not until August something
12 because he wrote the next FCR 9-19, and that field
13 contract report was dated--.
14   Q  Did you think at that point Tony was
15 trying to get you to quit?
16   A  He was--yeah, I thought he was trying to
17 force me out.
18   Q  And who did you tell that to? Anyone?
19   A  Probably my friends.
20   Q  And what facts do you base that
21 conclusion on?
22   A  Because after the two-week routing
23 schedule, then bingo, he wanted me to write a
24 weekly report of everything I accomplished in
```

Page 190

```
1  every account. He, as far as the ranking
2  situation where he pulled August out where I was
3  number 22. I mean, in January Caroline Kopecky
4  was 23 out of 23, and yet she was not put on all
5  this extra activity.
6       The RELAX study. He didn't want me get
7  the extra vials. He wasn't willing to fight for
8  me. I had enrolled the most patients at my
9  account, and I would have been $96,800 ahead in my
10 sales, which would have changed my ranking. Also
11 what I printed out to you before. The VSS's in my
12 team.
13      We didn't have the same number of
14 accounts, we didn't have the same potential. Both
15 Houston and Dallas had nine accounts in their own
16 metropolitan area. He didn't let me move to
17 St. Louis where I could have at least been with
18 four. Took away Memorial, I mean, what else?
19 And he isolated me from my upper management. And
20 then no recognition for this big, this, it's a
21 national meeting that I held.
22      She got all these jillions of points,
23 four or five hundred points for what's called an
24 ad board. This, we all invited people to an ad
```

Page 191

```
1  board. They were paid $500 to go. This meeting
2  with all this national faculty, they paid to come.
3  I got an educational grant, and they paid for all
4  these national speakers. It was a four-day long
5  meeting at Oak Brook.
6    Q  Was this part of MIT?
7    A  MIIT.
8    Q  MIIT, okay. Who got points for setting
9  up an ad?
10   A  Caroline Kopecky.
11   Q  And you're saying for this thing that you
12 set up in Oak Brook you didn't get any points for
13 it?
14   A  Right. And hers was like one, you know,
15 some Centocor speakers and maybe one other
16 speaker, and mine was a lot. I mean, this was a
17 really world-renowned board. September 28 and 30.
18   Q  What was the RELAX study?
19   A  RELAX study? That was a study I very
20 much wanted from what was happening for us to get
21 some very accurate data because people were using
22 a variety of different doses and things like that.
23 So I talked with Dr. Montgomery, and because
24 Peoria was, it was University of Illinois Chicago,
```

Page 192

```
1  Peoria campus, and they did lots of research. And
2  Dr. Castaneda was very well known in the nation.
3       Like UCLA Tom McNamara, Cleveland Clinic
4  Kenneth Orielle (sp). I mean, he was well known.
5  And he was the keynote speaker for the RS and A,
6  which was the National Radiological Society. So he
7  was well known, and there were never supposed to
8  be more than three patients from any one site, but
9  no one was keeping up with that. So at least
10 March 1 of 2002 Dr. Castaneda had enrolled 19 of
11 the patients.
12      So at any rate, at one point he had done
13 11 out of 22. And these were all the statistics.
14 I'm sure you copied all this. But it was looking
15 at Retavase at a very low dose, medium dose, high
16 dose. And they sent a huge database out to take
17 every possible consideration so that all analyses
18 that would come from it would be very thorough and
19 solid. Because they had a reputation.
20   Q  So was it testing for Retavase?
21   A  Yes, it was.
22   Q  And you had a part in setting it up?
23   A  I, I had spoken with them that if this
24 was to go forth, that it should be definitely done
```

Page 193

1 in a very regimented way, and they totally agreed
2 because--
3    Q  Who agreed?
4    A  The doctors at St. Francis.
5    Q  What became the issue with the RELAX
6 study?  How do you think that this was a problem
7 with Tony?
8    A  First of all, because he wasn't--I mean,
9 it wasn't his baby, I guess.  But this account was
10 very important nationally for it.  And he could
11 have fought for me to get those vials or taken it
12 into consideration when he was looking at
13 performance.
14    Q  To have the vials count towards your
15 volume?
16    A  Right.  That should have been a factor.
17 Yeah.
18    Q  Was it company policy that if there were,
19 the vials were being used in a study, they
20 wouldn't count towards--
21    A  They didn't count.  With Abbott they did,
22 you got credit for the vials.  And there was never
23 supposed to be at the original of the study more
24 than three patients per account.

Page 194

1    Q  So you think Tony should have fought
2 harder for you to get the vials?
3    A  Yeah.  So that I wouldn't be left at the
4 bottom of the region.  That was one thing.
5    Q  Did you ask him about it?
6    A  Yes.
7    Q  And what did he say?
8    A  Company policy.
9    Q  Do you think his refusal to fight for you
10 on that issue was a discriminatory action based on
11 your age and gender?
12    A  Yes.  And there was another thing that he
13 did.  There was some strange thing from Paul
14 Williams on September 10.
15    Q  Let me ask you, why do you think that was
16 a discriminatory action based on your age and
17 gender?
18    A  Because he wanted me out of there and
19 because, again, he would not listen to any input I
20 had about this whole issue.  And I mean, sales are
21 sales.  The impact of having the sale.  When the
22 competition had indications by the--do you know
23 what I mean by indications?  Okay.  By the FDA
24 they had the indication for heart attack which

Page 195

1 Retavase had.
2        But they also had pulmonary embolism,
3 they had stroke, and then they got catheter
4 clearance.  They had all these indications to
5 present to any PharmD.  So it was very important
6 that we got this study through.  And I guess he
7 just wanted to take over the account and nullify
8 me.  I was--he just didn't want me around.
9    Q  What was the MIIT?  What does MIIT stand
10 for?
11    A  Midwest Institute of Interventional
12 Therapy.
13    Q  And what was this institute comprised of?
14 Who were the members?
15    A  All of the radiologists in that Peoria
16 group, plus they joined with Methodist Hospital,
17 and they were joining in to include the doctor at
18 Proctor so that they would all be covering for
19 each other.
20    Q  Out of the Peoria group, what institution
21 did they work at?
22    A  Well, St. Francis was the original one,
23 and then they became CIRA, Central Illinois
24 Radiology Association, and they included Methodist

Page 196

1 and I believe at the end Proctor.  They were going
2 to do that so that they could all cover for each
3 other and have it equal treatment to all patients.
4    Q  What was the Oak Brook conference, then,
5 that you were setting up?  What was the purpose of
6 this conference?
7    A  What was that?
8    Q  Yes.
9    A  The purpose of the conference was to
10 promote both Cordis Neurovascular and also
11 doctor-to-doctor conversation from the world
12 thought leaders about Retavase and TPA and any
13 other thrombolytic agent and how they were using
14 it and what thrombectomy devices they were using.
15 And it also covered all kinds of things about
16 uterine fibroids and transhepatic blah blah blahs
17 and, you know.
18    Q  Whose idea was it to set up this
19 conference?
20    A  When I began a long time ago with Abbott,
21 Dr. Castaneda--actually it was Dr. Brady at that
22 point wanted support for this meeting they were
23 going to do.  And he asked me if I would
24 contribute, and so I got permission to contribute.

Page 197

1  And from that point onward, I worked with them.
2       I went out--they could tell. I mean, I
3  really went out and worked to get people to sign
4  up for the conference because it was a good
5  conference. It benefited us both. So I did a
6  high deal. And I have a list of how many doctors
7  went to that. A hundred and fifty. It's lot more
8  than the ad board.
9    Q So what was your function at this
10 conference?
11   A My function? I had a booth and several,
12 I scheduled the reps to work with me. I, I worked
13 with the man that was in charge of the whole
14 convention in terms of where we might have the
15 restaurants and, you know, what night would the
16 faculty dinner be and I just, you know, I was just
17 in communication with them about those kinds of
18 things.
19       And then I arranged for a booth to be
20 shipped. I set the booth up myself. Tony didn't
21 show up till Thursday night--I think it was
22 Thursday or Friday to a meeting. He didn't even
23 come to most of the meetings or listen to the
24 lectures.

Page 198

1    Q I see. And then your issue with this is
2  that he didn't give you any bonus points for this
3  but others were getting bonus points for other--?
4    A For little dinky meetings or returning
5  pages. And yet this, which affected people
6  nationally.
7    Q Did you talk to Tony about his failure to
8  assign bonus points to you for this?
9    A I believe I mentioned to him I thought
10 that this was a real discrepancy, but in
11 retrospect I see that even greater.
12   Q So you did mention to Tony that you
13 thought you should have--?
14   A Yeah.
15   Q Okay. What did he say to you?
16   A Basically that was his job to determine
17 who got points and who didn't.
18   Q Do you remember when you had this
19 conversation? Sometime after the conference?
20   A Yeah.
21   Q When was the date of the conference?
22   MR. BAKER: September 28th to the 30th, 2001.
23   THE DEPONENT: So it was right prior to this
24 whole mess.

Page 199

1    MR. BRODERICK: Q All right. In August of
2  2001, did you have some medical problems develop?
3    A Yes, I did.
4    Q Why don't you describe that for me.
5    A Okay. I was just getting so stressed. I
6  mean, I was trying to drive everywhere, and even
7  parked by a McDonald's light because I was so
8  exhausted. And so August I started my heart was
9  just like going wild. It was like 150 beats a
10 minute or whatever. And it was just real erratic
11 and irregular. It was like you could just even
12 see my shirt moving. It was scary. So I waited a
13 while, and it wasn't calming down, so I went to my
14 doctor, and she said I was in atrial fibrillation.
15   Q And this is Dr. Tsang?
16   A Tsang. T-s-a-n-g. And she put me on
17 Lanoxin .375, and I had to call my son, she didn't
18 want me to drive to the hospital because I was
19 having atrial fib with rapid ventricular response.
20 And so he took me, and they couldn't seem to get
21 my heart back to a sinus rhythm, so I think I
22 stayed the night that night. I was in and out a
23 lot after that. I was afraid to tell Tony.
24   Q So you never told Tony about this?

Page 200

1    A I did not tell Tony because I was afraid
2  at this point he was trying to get rid of me, and
3  I didn't want to give him any reason.
4    Q Did he want to ride with you after--after
5  this incident did he want to ride with you?
6    MR. BAKER: Excuse me. I didn't hear.
7    MR. BRODERICK: Q After this medical
8  incident, did he want to ride with you?
9    A I think that he did.
10   Q Did you see his desire to ride with you
11 as an imposition?
12   A No. But I probably was concerned what he
13 was going to say.
14   Q Well, did he have the right to ride with
15 you?
16   A Sure. So I never said no.
17   Q Do you think his desire to ride with you
18 was discriminatory in any way?
19   A Not at that time I certainly didn't.
20   Q But now you do?
21   A I don't know if it's, I don't know if it
22 was discriminatory. I just know that--here it is.
23 He insisted on working me August 20 and 21st.
24   Q And you're referring to your outline?

Page 201

1  A  Uh-huh.  He wanted to meet in Peoria.
2  Q  What page?  The fax page at the top?
3  A  It says the week of July 30, 2001 I was
4  feeling ill.  This is my time line thing.  One, two
5  three, four, five.  I think.  Do you see it up
6  there?
7  Q  Yes.
8  A  Okay.
9  Q  Okay.
10  A  I was getting pretty stressed to the max
11  at that point in time.
12  Q  What was the treatment prescribed for you
13  as a result of your atrial fibrillation?
14  A  They put me on digitalis, Lanoxin.
15  Q  And you were supposed to take that with
16  some frequency?
17  A  Yes.  Each day.
18  Q  Do you still take that?
19  A  No.  It wasn't controlling it.
20  Q  Okay.  How long did you take the Lanoxin?
21  A  I'd have to look on my prescription list.
22  They had to try several different things because
23  it just wasn't working.
24  Q  Was there some diagnosis of the cause of

Page 202

1  the fibrillation?
2  A  At one point I must have had like four
3  days in a row my doctor saying thought.  So I went
4  to the emergency room--I hated going to the
5  emergency room, but I got a Dr. Woodruff, and he
6  said that--I had seen Brian Miller, I'm sorry, and
7  then he did another echo to see what was going on.
8  And my heart, the EF and everything else seemed
9  normal.  I had a mitral valve prolapse, which he
10  knew, and was like a million other people in this
11  country, and he put me on 75 milligrams two times
12  a day of Rythmol since nothing else was working.
13  But since it still wasn't working, I went
14  to the emergency room, Dr. Tsang sent me there,
15  and Dr. Woodruff said, look, nothing seems to be,
16  we're not helping you enough, so I'm putting you
17  in the hospital because to raise it to 150
18  milligrams three times a day, you have to be in
19  constant cardiac monitoring.  So I did that.
20  Q  This is Dr. Miller who said that?
21  A  No.  That time it was Dr. Woodruff, who
22  was on call.
23  Q  Okay.
24  A  And he--then when the 150 milligrams

Page 203

1  didn't work and I went into the emergency room
2  because I knew that Dr. Miller was on call at
3  Memorial, he just decided he was going to do a
4  cardiac catheterization just to see what was going
5  on.  And my vessels were widely patent and I think
6  he determined that it was just in part--I don't
7  know if he totally knew why, but part of it was
8  that I was really overly anxious because of the
9  anxiety attacks and stuff, that was part of it.
10  Q  Were you having anxiety attacks during
11  the summer of 2001?
12  A  Yeah.
13  Q  And who were you seeing?  Who was
14  treating you?
15  A  Dr. Bohlen, Joseph Bohlen.
16  Q  He was treating you for the anxiety
17  attacks?
18  A  (Nodded head up and down.)
19  Q  When did you first start seeing
20  Dr. Bohlen?
21  A  After I started working with Tony.
22  Q  You saw him early in--okay.  So
23  sometime--
24  A  I know I saw him after the April 24 time

Page 204

1  frame sometime.  I would have to locate those
2  dates for you.
3  Q  After April 24, okay.
4  A  Right.  When I came back from my surgery
5  and I was getting these goals, and I think it must
6  have been more around the time of the meeting
7  where things were really, becoming really
8  stressful.
9  Q  Was it possible you didn't see him before
10  November of 2001?
11  A  Yeah.  It's possible.
12  Q  That you didn't see him before that?
13  That you didn't--
14  A  I did see him before that.
15  Q  You're definite--you're pos--okay.
16  A  I'm sure I saw him before December.
17  Q  November of 2001?
18  A  Well, I'm pretty sure.
19  Q  Okay.  How frequently were you seeing
20  Dr. Bohlen at that point?
21  A  When I started seeing him for some
22  medicine, it was once a month.
23  Q  And what was this prescription?
24  A  He tried several different things.

Page 205

1   Q  To treat the anxiety attacks?
2   A  To treat depression and anxiety.
3   Q  Is it true that you have a history of
4  depression?
5   A  Are we talking about a major depression?
6  No. This is the first time I've ever had anything
7  of magnitude like this depression. Nothing's ever
8  kept me from working and doing a good job and
9  winning awards. What do you mean is it true?
10   Q  Well, prior to seeing Dr. Bohlen, what
11  mental health care providers have you seen in the
12  last, in the few years prior to that? Had you
13  seen anyone? You can break it down year by year
14  if you'd like, but I'm just trying to get an idea.
15   A  I did see some counseling about like my
16  son and divorce, things like that.
17   Q  Who were the name of those treaters?
18   A  I think it was Susan Arrington, the
19  counselor I saw.
20   Q  Let me just go back to 1990. Were you
21  seeing any mental health care provider in 1990?
22   A  1990.
23   MR. BAKER: Can we go off the record for a
24  second?

Page 206

1   MR. BRODERICK: Yes.
2      (Discussion off the record.)
3   MR. BAKER: Why don't going back to day one
4  when you were a little girl, identify in
5  approximate chronologic order the therapists that
6  you have seen.
7   THE DEPONENT: I got a divorce from Ray
8  Motluck, I went to a guy named Charlie Tamajo.
9   MR. BRODERICK: Q How do you spell that?
10   A  T-a-m-a-j-o or y-o?
11   Q  Was that out in California?
12   A  That was when I was going to nursing
13  school after I was getting divorced from Ray. And
14  then when I had the marriage problem out there, I
15  came back and I found him because I wanted to know
16  the buck stops here. What have I done that this
17  has happened that I'm having another marriage
18  problem because that was really devastating.
19   MR. BAKER: Was that Mr. Tamajo again?
20   THE DEPONENT: Yes.
21   MR. BRODERICK: Q Is Dr. Tamajo a
22  psychiatrist?
23   A  No. He's a counselor.
24   Q  Did he make any diagnosis or anything

Page 207

1  like that?
2   A  He just said it wasn't so much what I had
3  done, it was just who I'd picked. That's what he
4  said.
5   Q  Okay. Did he recommend any course of
6  treatment or anything?
7   A  No. He wasn't a doctor or anything like
8  that.
9   Q  Just a counselor, okay.
10   A  He said just be careful to really look
11  carefully before you get married again.
12   Q  So you saw Dr. Tamajo at two points in
13  time. Any other counselors during that time
14  period?
15   A  Well, I mean, I saw him more times than
16  just once or twice, but during those two times,
17  those are pretty much who I saw.
18   Q  He's located in Iowa, did you say?
19   A  Yeah. Keokuk, Iowa at the time.
20   Q  All right. After Dr. Tamajo?
21   A  No. Charlie Tamajo. He wasn't a doctor.
22   Q  Sorry. Charlie Tamajo?
23   A  And after I came back I saw him again
24  would have been. Then I started at Abbott. I

Page 208

1  don't remember seeing much of anybody then. And
2  then Randy as he became a teenager and stuff, I
3  definitely started talking to Susan Arrington
4  about that.
5   Q  During the 80s then or--?
6   A  I don't know. On and off maybe. I don't
7  even know. I don't remember. I just know that
8  when I started having problems with Randy again
9  would have been he was in high school. He
10  graduated in '91. So stuff with his dad was
11  always really upsetting him, and I was trying to
12  handle it in a way that wouldn't turn him against
13  his dad but yet, you know, trying to be a mom and
14  dad or all that stuff.
15   Q  Okay. Who'd you see after--so you've
16  seen Dr. Arrington, it sounds like?
17   A  Susan Arrington.
18   Q  Susan Arrington. You've seen Susan
19  Arrington on and off since when? What year, do
20  you think?
21   A  Well, I know I saw her since I've worked
22  with Tony. It had been a long time before then if
23  I did see her. Let's see. I guess around Randy's
24  high school graduation. His college experience

Page 209

1  his dad was mean to him to go to Purdue and stuff,
2  so that would have been around '91, '92.
3      Q  Okay.  And who else have you seen aside
4  from Arrington?
5      A  Joseph Bohlen.
6      Q  Anyone else?
7      A  Not that I can recall.
8      Q  Why would Dr. Tsang put in her notes that
9  you have a history of depression?
10     A  Who?
11     Q  Dr. Tsang?
12     A  She put in my notes that I had a history
13 of depression?
14     Q  Yes.
15     A  She never told me that.
16     Q  Okay.  So other than Dr. Bohlen, Susan
17 Arrington, and Charlie Tamajo, have you seen any
18 other mental health counselor, psychiatrist,
19 treater?
20     A  I don't believe so.
21     Q  Okay.  Well, through the 90s I think some
22 of your medical records indicate you were taking
23 some mood-altering drugs, some, I think--let me
24 take a look.  Zoloft or Prozac.  Do you remember?

Page 210

1  Were you taking any of those type of drugs?
2      A  I might have tried them and they didn't
3  agree with me.
4      Q  Who prescribed those for you?
5      A  That's a good question.  I'm trying to
6  figure out myself.
7      Q  Okay.
8      A  Where did Dr. Tsang say that I had this
9  history?  What date?
10     Q  I would have to--I believe it's pretty
11 early on in the early 90s.  I would have to pull
12 it out but--.
13     A  That would be around the time when I was
14 having to talk to, I was worried about Randy.  His
15 dad was really being mean.  He insisted he go to
16 Purdue, and then he didn't visit him at all while
17 he was there.  And I had to go over there and try
18 to visit him, and he ended up dropping out of
19 Purdue.  He was really sick.
20     Q  Do you recall who would have prescribed
21 you Prozac, Zoloft or anything like that?
22     A  Well, if I was seeing Dr. Tsang, then it
23 would have been her, I guess.
24     Q  Were you also taking Paxil during the 90s

Page 211

1  as well?
2      A  What happened was I'm sure somebody or
3  her tried maybe--what was the first one--Prozac,
4  which I couldn't tolerate, Paxil I couldn't
5  tolerate.  I almost couldn't tolerate any of them,
6  so it was like no good.  It was more a situation I
7  was worried about my son.
8      Q  Okay.
9      A  And his father.  How I was going to pay
10 for his education.
11     Q  Okay.  When were you first prescribed
12 Tranxene?
13     A  I don't know.
14     Q  Okay.
15     A  Want to refresh my mind?
16     Q  You don't recall, okay.
17     A  No.
18     Q  But that was for anxiety, correct?
19     A  (Nodded head up and down.)
20     Q  Was it Dr. Tsang who prescribed that?
21     A  It could have been.  Tranxene was a drug
22 that Abbott had had, and I thought it was a decent
23 drug, so I would just--if I had an anxiety attack,
24 I guess I asked her to--I don't know if it was

Page 212

1  exactly an anxiety attack, but I don't know.  I
2  don't remember exactly, but if I was upset by
3  Randy's dad, I probably took one because I didn't
4  want to show all that upset to Randy because it
5  wasn't very fair.  That's what I recall.
6      MR. BRODERICK:  Okay.  Let me just mark this
7  as an exhibit.
8          (Whereupon a document
9          was duly marked for
10         purposes of
11         identification as
12         Exhibit GG as of this
13         date.)
14     MR. BRODERICK:  Q Ms. Minor, we had issued a
15 subpoena to Dr. Bohlen which I'm sure you're aware
16 of.  It looks like this is the earliest record we
17 received from him.  It was dated November 1 of
18 '01.  But to your knowledge, you saw him prior to
19 November 1 of '01?
20     A  I guess not.
21     Q  Okay.  Well, do you remember or not?  I
22 mean, it's possible that--
23     A  I don't think--
24     Q  (Continuing)--the response is incomplete?

Page 213

1    A  Yeah.
2    Q  It's possible that the response wasn't--
3    A  It's probably complete because, see,
4  October 19 I remember Tony was sending me all this
5  stuff about expenses, and I just pulled to the
6  side of the road because he just kept laying more
7  and more on me to do.  And I was so exhausted I
8  pulled to the side of the road and just cried, and
9  I called Mr. Baker.  I remember.  I said--.
10    Q  Well, don't tell me what you told him.
11       Who referred you to Dr. Bohlen?
12    A  I think Mr. Baker.  But I'd heard all
13  over the place that he was a good doctor.  But I
14  don't know for sure but--I'm not sure.  Or maybe
15  Dr. Tsang did.  I don't know.  I was so upset at
16  that point.
17    Q  Okay.  You're not sure who referred you
18  to Dr. Bohlen?
19    A  No.
20    Q  Just look at the note for 11-1, which is
21  that first page.  If you could just read that, I
22  was wondering if you would just tell me how this
23  conversation--if you recall, how the conversation
24  with Dr. Bohlen began?

Page 214

1    A  I cried.  A lot.  And I told him that my
2  supervisor, I went back to work after my
3  hysterectomy and stuff, and that he just kept
4  adding thing after thing after thing.  And finally
5  when he was starting to cut money from my expense
6  report and say that I was doing stuff wrong, I'd
7  always heard that's when you lose your job, and I
8  don't think I've ever been fired from a job.
9       So that alone when I was a type A wanting
10  to win awards, it was like nothing I could do.
11  And I just, it was my outlet, it was an identity
12  thing.  They say men have that for their identity
13  or whatever.  I mean, I was the breadwinner.  I
14  was providing Randy to go through college.
15    Q  So did the conversation then with you
16  pouring things out or did he ask you questions
17  about your history or do you recall?
18    A  I have no idea.
19    Q  Okay.
20    A  I was probably pretty hysterical at that
21  point in time.
22    Q  Okay.  Well, all right.  Can you just
23  tell me how being a child of an alcoholic affected
24  you?

Page 215

1    A  Well--.
2    MR. BAKER:  Excuse me.  You want her
3  perception rather than any clinical assessment?
4    MR. BRODERICK:  Correct.
5    MR. BAKER:  Okay.
6    THE DEPONENT:  Well, I probably would never
7  want to date anyone that was an alcoholic.  And
8  basically I just did everything I could, in my
9  opinion, to read books, to try to become so that
10  it wouldn't pass from my generation to my son's
11  generation.  Because probably I was insecure
12  because of that.  Because I didn't want it to
13  manifest itself anymore in my life.
14    MR. BRODERICK:  Q Okay.
15    A  So is that what you wanted or do you want
16  more than that or something?
17    Q  Well, I just--.
18    A  A lot of people were adult children of
19  alcoholics unfortunately in that era, and I tried
20  to be of help to anyone else that I knew had that
21  problem because I did make it through and I was a
22  survivor of that whole mess.
23    Q  All right.  And--
24    A  And I had made it up to my dad by the

Page 216

1  time he died, so it was no longer really huge.
2    Q  How--this is probably the toughest
3  question I have to ask hopefully during the entire
4  deposition, but how being a victim of childhood
5  sexual abuse, how has that affected you?
6    A  Well, at the time I think it affected my
7  trust of individuals because I was very young.
8  But I did work through that and put closure to
9  that because I wanted to be as healthy as an
10  individual as I could be.  So I worked through
11  some pretty tough things, and I read everything I
12  could get my hands on and tried to improve myself
13  because that's how I am.  I'm that kind of a
14  person.
15    Q  And you didn't necessarily see any kind
16  of mental health care provider or treater?
17    A  I know that I probably told Charlie
18  Tamajo about it because I was really worried.  I
19  thought I had gone through a lot.  And then I'm
20  sure I talked to Susan Arrington probably about it
21  because I wanted to put an end to any feelings I
22  had because I wanted to be as healthy as possible.
23  I did not want my vision clouded.  Does that make
24  sense?

M. Jane Minor

Page 217

1  Q  Yes.
2  A  And those were all before I won all these
3  outstandings anyway, so I never let it really keep
4  me from my work.  It was on my own personal time I
5  was upset about it, I guess.
6  Q  Can you tell me, I think you mentioned
7  that Dr. Bohlen at some point in the notes, do you
8  recall telling him that you felt that you were
9  sick of pleasing other people?  I'm not sure it's
10  on this page but--.
11  A  I think that I was trying very hard to do
12  what Tony wanted.  Even though I didn't agree with
13  it and even though I had a vast experience in
14  thrombolytic therapy and had high success, I was
15  still trying to do whatever Tony wanted me to do,
16  and so I was just pushing and pushing and pushing
17  until I was so physically and emotionally
18  exhausted I just couldn't go any further.
19     It was just piling up of stuff on me, and
20  I wasn't used to being told, you have to do this,
21  you have to do that.  I mean, because people knew
22  that I got the business.
23  Q  I don't know if this is a direct quote
24  that you said to other people, but do you think

Page 218

1  when you were talking to Dr. Bohlen about that you
2  meant Tony specifically?
3  A  I'm sure I meant Tony specifically.
4  Q  Did you mean anybody else?
5  A  Well, I can only think of Tony
6  specifically.
7  Q  Okay.
8  A  I mean, Keith Cramsey was very
9  respectful, Tim was very respectful, William was
10  very respectful.  It was just all this stuff being
11  piled on me, piled on me by Tony and feeling like
12  I was a total failure.  So I said to him how would
13  he feel if, and he said other pharmaceutical
14  representatives had this problem with age as well.
15  Q  And did--did you ever tell Dr. Bohlen you
16  felt that your supervisor was violating you?
17  A  What do you mean violating me?
18  Q  I believe that's a quote from the
19  records.  I'd have to find it.
20  A  Well, I think you better show me the
21  quote.
22  Q  Okay.  Well, do you recall saying that?
23  A  No.
24  Q  Okay.  All right?

Page 219

1  A  And what do you mean by violating anyway?
2  Q  Well, I'm just going to ask you do you
3  recall saying that to Dr. Bohlen?
4  A  I do not recall saying it, but evidently
5  you think you saw it.  I was extraordinarily upset
6  when I was talking to him.
7  MR. BRODERICK:  Let's take a break.
8            (Whereupon a short recess
9            was taken at 4:16 p.m.)
10  MR. BRODERICK:  Q  Ms. Minor, when was the
11  first anxiety attack you remember having?
12  A  The first anxiety attack I remember
13  having.  Probably I might have had one when my
14  father died, and I had just been hired by CEPA
15  (sp), and I came home, visited Dad, went out to
16  CEPA, just got there and they said, go back, he
17  passed a pulmonary embolism.
18     And I was just exhausted and he came
19  back.  And everybody else had left the hospital
20  but me and I heard his last heartbeats, and he was
21  in there alone being worked on and I wasn't there
22  for him so I was pretty upset about that.  It was
23  a lousy mess.
24  Q  What year was that?

Page 220

1  A  1978.
2  Q  Okay.  Did you have any anxiety attacks
3  in the 80s?
4  A  80s.  What happened in the 80s?  I don't
5  know that I would even have called what happened
6  with Dad.  It was probably more that I was upset
7  and depressed.  I don't know that that was an
8  anxiety attack, to be honest with you.
9  Q  Okay.
10  A  In the 80s I was working with Abbott.  I
11  don't remember having anxiety attacks then.
12  Q  In the early 90s did you have any anxiety
13  attacks?
14  A  To be honest with you, I don't really
15  have a lot of anxiety attacks so much as after I
16  felt that Tony was trying to get rid of me, I
17  really had a lot of anxiety attacks then.
18  Q  Were you treated for anxiety or
19  anxiousness by Dr. Tsang?
20  A  Like when do you mean?
21  Q  During the 90s?
22  A  Well, there's a possibility, but I don't
23  remember anything specifically.
24  Q  Well, she prescribed Tranxene to you

## Page 221

1  during the 90s, correct?
2     A  Did she?
3     Q  Or do you recall?
4     A  I don't recall.
5     Q  When was the earliest time that you
6  recall having problems with your back?
7     A  2000.
8     Q  Did you have problems with your back when
9  you worked for Abbott?
10    A  I might have had, I had enough of a thing
11 that I think I wanted to drive a van because I was
12 driving such big areas.
13    Q  During your time with Abbott?
14    A  At the very end when I was covering the
15 big areas as a specialist, I think I wanted to sit
16 upright in a van because there were a lot of us
17 that didn't--when you were driving a big area, it
18 seems like that bothered me.
19    Q  Did you seek treatment for problems with
20 your back while you were with Abbott?
21    A  I don't remember but I know I did in
22 2000.
23    Q  And who'd you seek treatment with?
24    A  Dean Naritoku.

## Page 222

1     Q  In your outline of events I think about
2  the fifth page, you describe driving Tony around
3  Springfield and back.  I think you drove him to
4  Springfield, and then you stayed overnight and got
5  up the next day and drove him back to St. Louis, I
6  believe?
7     A  Yeah.
8     Q  Okay.
9     A  He was tired because he'd been to
10 Disneyland on his vacation.
11    Q  Is there anything regarding that sequence
12 of events, are you using any part of that sequence
13 of events as a basis for the claims in your
14 lawsuit?
15    MR. BAKER:  Are you asking if there's anything
16 that happened there?
17    MR. BRODERICK:  Q  Yes.  Did anything happen
18 in that two-day period where you were spending all
19 that time with him?
20    A  I guess in retrospect we stayed up late.
21 He wanted to be with my key account where they
22 kept telling him how wonderful I was.  And we
23 stayed up to dinner till 12 or 1, and then I drove
24 while he slept because he said he had to sleep

## Page 223

1  because he'd just gotten back from Disneyland.
2  Got there like I don't know what time and I didn't
3  get almost any sleep and then I had to drive him
4  because he was still tried to St. Louis and--.
5     Q  Where was that meeting that you had that
6  dinner the night before?
7     A  A restaurant in Peoria.
8     Q  It was in Peoria?  Okay.  And you drove
9  him from Peoria to St. Louis?
10    A  Yeah.  Peoria to Springfield.
11    Q  Springfield.
12    A  And then on to St. Louis.
13    Q  The next day?
14    A  Yeah.
15    Q  And do you feel that, was there something
16 discriminatory about what happened in that
17 sequence based on your age and gender?
18    A  I just thought it was humorous that he
19 was tired because he came back from a vacation in
20 Disneyland and that I could drive all these hours
21 after setting up a program, and I probably wasn't
22 tired, whatever.  It was just, you know, he was in
23 touch with his own feelings, I guess.  I don't
24 know.

## Page 224

1     Q  Now, at some point did you try to
2  relocate?
3     A  Yes.  I asked if I could relocate when
4  they were giving me so many accounts that were
5  more focused around St. Louis.
6     Q  Who did you ask?
7     A  I asked Tony.
8     Q  Did you ask anyone else?
9     A  I don't remember.
10    Q  When was this conversation?
11    A  At the time when I was getting my
12 accounts cut from, my Springfield account and
13 account up in Peoria and all this, and he was
14 wanting me to cover Des Moines and Evansville and,
15 you know, increased accounts around St. Louis.
16 And it seemed very logical that my time would be
17 better spent if I lived in St. Louis.
18    Q  Was this after you came back from sick
19 leave?
20    A  Yeah.  I think so.
21    Q  Did you submit a formal request to
22 relocate?
23    A  No.  I don't think so.
24    Q  Do you remember what you asked Tony or

Page 225

1   what you said to him?
2     A  I just said because of the way these
3 accounts were being arranged, it just would seem
4 logical that if I lived in St. Louis my time would
5 be much more productive.  Because you can never
6 count--I mean, flights are cancelled out of here
7 easily, and then flights in St. Louis to Owensboro
8 or to Des Moines.  You just can't count on the
9 regular flights.  It was a long time to drive.  It
10 took me seven and a half to whatever hours even
11 though some people might have been quicker.
12     Q  What did he say to you?
13     A  He said that no because it would be a
14 lateral move.
15     Q  Did he check into it at all, or did he
16 just tell you--
17     A  I don't think so.  I think he just said
18 no.
19     Q  Do you know what Centocor or Johnson &
20 Johnson's policy was at that time period on
21 relocations?
22     A  Well, that may have been true, however, I
23 know this Kevin Brown was moved from Michigan to
24 St. Louis to take one of the territories.  He was

Page 226

1 a young man in his 20s or 30s, and he was paid
2 for.  So there is exceptions to every rule
3 probably.
4     Q  Is there anyone else that you know
5 of--well, let's put it this way.  Let me first lay
6 the foundation.
7     Do you think Tony was a decision-maker in
8 denying your request to relocate?  I guess you
9 already said you think it may or may not have
10 been--he may have been repeating company policy,
11 right?
12     A  Right.  But he didn't fight for me, let's
13 put it that way, to help me because if I were in
14 St. Louis, I think I could have, you know, flown
15 out more easily by the airport and all that kind
16 of thing and gotten to places a little more
17 easily.
18     Q  Was his action or inaction regarding this
19 issue discriminary against you based on your age
20 or gender, in your opinion?
21     A  I think it was one of the many straws
22 that was breaking the camel's back.  Yeah.  I
23 didn't think so.  I mean, at the time, it was just
24 like I just wanted to get the work done.

Page 227

1     Q  I have to ask you what facts or knowledge
2 regarding the particular issue of relocation
3 support your opinion that you think this was a
4 discriminary action?
5     A  If I was spread too thinly by trying to
6 get to all these accounts, my performance would
7 have a very difficult time.  Especially in
8 accounts that I did not have a presence or contact
9 and there was no cardiovascular rep there, then me
10 racing every two weeks to an account was certainly
11 not going to get me any business.
12     And quite honestly, the way this business
13 is is not like a pill rep who goes in and gets a
14 signature and comes out every four or six weeks.
15 This is where you go into a cardiac cath lab,
16 observe what they're doing, try to learn, try to
17 partner with them and establish some
18 creditability.
19     Q  How do you know Kevin Brown's relocation
20 expenses were paid for?
21     A  Because evidently he was not liked up in
22 Michigan and they wanted to get rid of him, so
23 they gave him a really positive description to
24 St. Louis.

Page 228

1     Q  What's your basis of knowledge of that?
2     A  Well, it's hearsay from a friend of mine,
3 Wendy Jarosek, because she was just laughing, she
4 said, I'm sorry about this, but it's really great
5 that he's no longer here.
6     Q  Do you have any other sources of
7 information about what happened with Kevin Brown
8 and his relocation?
9     A  It was just my understanding, like it was
10 the general understanding people knew he'd been
11 paid to relocate.  I know for Chris Praseeb--I
12 think it was Michele, but it still was the company
13 policy.  She did not like being out in like
14 Columbia, Missouri or wherever it was.  She wanted
15 to be more downtown St. Louis--
16     Q  Okay.  That's Chris Praseeb?  Okay.  Let
17 me just wrap up Kevin Brown then.  So primarily
18 your information regarding Kevin Brown is from
19 Wendy Jarosek, is that right?
20     A  Right.  And I heard it, you know, it was
21 around the bush.
22     Q  And then Chris Praseeb is another
23 cardiovascular rep who was relocated, to your
24 knowledge?