Page 229

1  A  Uh-huh.
2  Q  Did you talk with her personally?
3  A  Well, everybody in our, Suzanne and
4  everybody in our district knew that she was
5  relocated and she--yeah, I talked to her. She was
6  unhappy that she was clear out in the toolies (sp)
7  when she was a young 20-something-year-old, and
8  she wanted to be downtown St. Louis where things
9  were happening, so she was relocated. In fact,
10 Michele realigned the whole St. Louis district so
11 that she could have a territory there.
12 Q  And to your knowledge, Chris Praseeb's
13 relocation expenses were paid for my Centocor?
14 A  That was my understanding.
15 Q  Anybody else that you know of?
16 A  Not anymore. Might dig through the
17 records, but I mean I know it happened if it was,
18 if the right person wanted it to happen.
19 Q  What's that?
20 A  It would happen in any company if the
21 right person went to bat for you, it would happen.
22 Q  Regarding--let's see. Regarding the,
23 your efforts to transfer, at some point did you
24 seek a transfer?

Page 230

1  A  Are you speaking of transfer to
2  St. Louis, or are you talking about a transfer
3  to a different state?
4  Q  Transfer to--well, actually I was
5  thinking of your desire to seek employment with a
6  different Johnson & Johnson subsidiary.
7  A  Right. And I had had an outstanding
8  recommendation from John Villeneau who was a
9  corporate recruiter from Centocor or from J & J
10 corporate, and the lady had already told me they
11 would pay for my move.
12 Q  When did you first start to seek
13 employment with a different subsidiary?
14 A  It was prior to my negative ranking. It
15 was just, I could just see that he was coming down
16 on me so much and I was getting so stressed it
17 just was not worth putting up with what kind of
18 stress level when I wanted to just go and work and
19 make money.
20 Q  Now, when you say negative ranking, what
21 are you referring to?
22 A  Well, he pulled out August where I was
23 22nd, as you could see. Then others months, I was
24 not 22nd. And there was another reason for that.

Page 231

1  He didn't include the vial equalization program.
2      (Whereupon a document was
3      tendered to the deponent.)
4  THE DEPONENT: There. You could see Caroline
5  was 23 out of 23 during quarter 1, and she was not
6  put on any special program.
7  MR. BRODERICK: Q So when you say he pulled
8  out August, is something that he pulled out? Is
9  this what you're talking about?
10 A  When I was ranked 22? That was August.
11 See August 2001?
12 Q  Okay.
13 A  So it was pulled out of context.
14 Q  Is this the subject--so is this the
15 subject, this is what caused you to try and seek
16 employment elsewhere?
17 A  Right. It was just getting not good.
18 That's one of the things. I mean, the behavior
19 your that I was receiving was not good. And one
20 was the vial equalization program.
21      (Whereupon a document
22      was duly marked for
23      purposes of
24      identification as

Page 232

1      Exhibit HH as of this
2      date.)
3  MR. BRODERICK: Q So did you have a
4  conversation with Tony then about this ranking
5  from August 2001?
6  A  I don't even remember anymore. I just
7  really don't. I'm sure he said something, but I
8  don't even remember.
9  Q  Okay. Well, I thought you said that this
10 is what you were upset about?
11 A  This was just one of many things.
12 Q  Do you think Tony was responsible for
13 this ranking?
14 A  Partially.
15 Q  In what way?
16 A  Do you know want to know how?
17 Q  Yes?
18 A  Okay. He didn't fight for me to get my
19 RELAX vials which would total $96,800 which would
20 have really dramatically changed my ranking.
21 There was something called a vial equalization
22 program, and what that was is they, if someone had
23 stocked half kits, they decided during quarter 3
24 that those would be counted as whole kits. Well,

Page 233

1  since my biggest account, St. Francis, had a
2  couple hundred vials in the whole kit arena, I
3  didn't get my sales doubled.
4      But he knew about this before it even
5  happened because he was in the home office, and
6  you see that Caroline and Denise's sales jumped
7  dramatically. That would be, if you would check
8  the information, probably because they got the
9  additional credit of, if you had half kits you got
10 them counted as whole kits where since I had
11 mostly whole kits, mine didn't get doubled.
12     Q  Okay.
13     A  So there were a lot of factors involving
14 the numbers at that point. And every single
15 quarter I showed you they changed accounts.
16 Sometimes Caroline Kopecky had 16 when I had 12 in
17 a population of four thousand or four million, and
18 I had less than a million. It's like apples and
19 oranges statistically, so it was like--.
20     Q  So you wanted to have more accounts?
21     A  I wanted to have better accounts, and I
22 wanted to have equal accounts with other people.
23 I just wanted to be on--I knew that I could do
24 just fine as long as I was on a level playing

Page 234

1  field.
2      Q  At some point you sent an e-mail to Tony
3  requesting to send a release, is that right?
4      A  Yes. I think it was on a pretty famous
5  day.
6      Q  Is that the e-mail?
7      A  September 10, 2001.
8          (Whereupon a document
9          was duly marked for
10         purposes of
11         identification as
12         Exhibit II as of this
13         date.)
14     Q  What's been marked as Exhibit II, this is
15 the e-mail you sent to Tony regarding seeking
16 release?
17     A  Yes.
18     Q  Okay. And it's dated September 10. And
19 this is a result of seeing your August rankings?
20     A  No. It was a result of all the things.
21 The two-week routing, the, once you showed me a
22 job description which I had never seen and I read
23 over the weekend, it said that the person should
24 have an extreme amount of flexibility. So I mean,

Page 235

1  even the company recognized it and every other
2  vascular person recognized.
3      And he was like forcing me to do things
4  that were counterproductive, not letting me have
5  input into any of it, and frankly, I just thought,
6  I've been successful in every other area, why not
7  just seek something more, why beat your head
8  against a wall?
9      I mean, it's obvious he was just getting
10 nastier, so I found out about this job, John
11 Villeneau recommended me, and usually if a
12 corporate recruiter actually recommends you, I
13 talked to the lady over the phone, I know her name
14 was Melissa, and she already went ahead and
15 checked to see if they would pay to relocate me to
16 Texas for Ethicon, and she said yes, they would.
17     Q  What subsidiary was this? Ethicon?
18     A  Ethicon.
19     Q  Okay. And John Villeneau is a recruiter?
20     A  Corporate recruiter.
21     Q  For who?
22     A  Johnson & Johnson corporate.
23     Q  How did you find out about the job?
24     A  I had a friend who worked for Ethicon.

Page 236

1      Q  And when did you first find out about the
2  job?
3      A  Within the last month or so before this
4  whole mess.
5      Q  Okay. Sometime before you asked for the
6  release?
7      A  Yeah. Before I asked for release.
8      Q  One or two weeks?
9      A  Something like that.
10     Q  Okay. And who told you that they would
11 pay to relocate you to Texas?
12     A  Melissa, the manager of Ethicon. She had
13 already gotten it cleared that they would pay for
14 my move to Texas.
15     Q  And what requirements were there that had
16 to be fulfilled before you could transfer to
17 Ethicon?
18     A  I had to have the okay from a manager in
19 writing, and that's, I requested that. And then
20 almost immediately Tony wrote the first negative
21 report he'd really written. You can see it
22 yourself.
23     Q  Okay. Any other requirements, or is that
24 primarily the one?

Page 237

1  A  That I had to have a release. And I
2  remember there was a corporate recruiter from the
3  central area who called me and she said, Jane, did
4  you get the release? And I said, well, yeah, I
5  sent you the written release through John
6  Villeneau. And she said, but is your boss really
7  on board with this? And I said, well, I thought
8  so. She said, well, I think you better do some
9  checking.
10   Q  Who told you this? Melissa?
11   A  No. This was a corporate Johnson &
12  Johnson recruiter who, John Villeneau could
13  probably tell you who it was. She was the
14  central. He was more the east coast one, and I
15  just knew him.
16   Q  And what, did she tell you why she had
17  doubts?
18   A  She just said, you really need to check
19  this because even though you have a written paper,
20  it does not appear that your boss is really on
21  board with you.
22   Q  And she didn't explain what the basis of
23  her opinion was?
24   A  (Shook head back and forth.)

Page 238

1  She just said I needed to check it out.
2   Q  And this is the release you got from Bob
3  Russell?
4   A  Uh-huh. Pretty sure it is.
5      (Whereupon a document
6      was duly marked for
7      purposes of
8      identification as
9      Exhibit JJ as of this
10     date.)
11  THE DEPONENT: And that was September 13.
12  MR. BRODERICK: Q And then after having the
13  conversation with the recruiter, what did you do?
14   A  What did I do?
15   Q  Yes?
16   A  Good question. What did I do? I
17  probably tried to talk to John to see if he could
18  find out what in the world was going on. Because
19  I got my release--what did we say--9-13? So it
20  wasn't very much longer then after that. Let me
21  look at the e-mail from Villeneau, and I could
22  tell you the time frame when things were a little
23  bit more happening here.
24      September 10 I sent it, and then,

Page 239

1  September 23, 2001 I'd like to schedule a time to
2  talk live. I see you have been released to look
3  at other J & J companies. Please contact me. And
4  her name was Lisa Huston. I would like to
5  understand what you're wanting to do in order to
6  ensure I contact the right companies.
7   Q  What was the date of that e-mail?
8   A  September 23, 2001. And here's the
9  recommendation John Villeneau gave me on that same
10  one. The release form is officially now in hand.
11  She would ideally like to stay in Springfield, but
12  if she has to relocate, she would like to relo to
13  Texas. Tim, I believe you trained Bernadette
14  Brand, she was a referral of mine to Lori and was
15  recently hired by GyneCare. I assure you that
16  Jane is in the same category as Bernadette. Jane
17  is very highly qualified and should be a
18  relatively easy placement for one of you. You
19  guys must live right. Good luck.
20   Q  Okay. And at some point thereafter, you
21  had a conversation with Ms. Huston, was it?
22   A  Yeah. And she said, are you sure you've
23  gotten a release? And I said, well, yeah, I faxed
24  it to John Villeneau. And she said, well, are you

Page 240

1  sure this boss is really on board with you? And I
2  said, well, I thought so.
3   Q  And what did you do after that
4  conversation?
5   A  Well, in the meantime, I had gotten this
6  9-19 report from Tony, the FCR, the first negative
7  report that he had really written about me that I
8  knew of, 9-13. And then he knew that I'd
9  requested and gotten the release from Bob 9-13,
10  and on 9-19 he writes an exceedingly negative
11  false report about me.
12      (Whereupon a document
13      was duly marked for
14      purposes of
15      identification as
16      Exhibit KK as of this
17      date.)
18  MR. BRODERICK: Q Ms. Minor, what's been
19  marked as KK. That's the e-mail you were reading
20  from Lisa Huston?
21   A  Yes.
22  MR. BRODERICK: Ms. Minor, I'm going to have
23  this exhibit marked as LL.
24      (Whereupon a document

Page 241

1     was duly marked for
2     purposes of
3     identification as
4     Exhibit LL as of this
5     date.)
6     MR. BRODERICK: Q Did anyone ever tell you
7  that the field contract report dated 9-19 was in
8  any way a reason that you weren't able to
9  successfully gain employment at Ethicon?
10    A  I think you should read it and use common
11 sense, and you would understand why no one would
12 want somebody with that report.
13    Q  That would be a no?
14    A  Say that question again then.
15    MR. BRODERICK: Could you read that back.
16         (Whereupon the requested
17          portion of the record was read
18          back by the Reporter.)
19    THE DEPONENT: I think it was that
20 conversation with Lisa on the 26th where she said,
21 are you sure that your boss is really on board
22 with you.
23    MR. BRODERICK: Q Okay. Anyone else?
24    A  No. I wasn't exactly thrilled to tell

Page 242

1  anybody what this mess was. I was upset.
2     Q  I understand. I was just wondering if--I
3  understand you have this opinion that the field
4  contract report was an obstacle to getting
5  employment at Ethicon?
6     A  Yes. I do have that opinion.
7     Q  The basis of the opinion is the
8  conversation with Lisa Huston that we talked
9  about, correct?
10    A  Yes. I think that had a strong impact.
11    Q  Is there any other source of information
12 that you have that you can tell me about that you
13 found out that this field contact report was an
14 obstacle to your gaining employment at Ethicon?
15    A  No, I guess not. I can't think of
16 anybody.
17    Q  Okay. What about the field contact
18 report dated 9-19 is false?
19    A  Where it says Cordis 87 percent. On the
20 date 9-19 I was at 147 percent.
21    Q  And how do you know that?
22    A  I'd love to show you the statistics.
23 Robin Kinney, who was my neurovascular
24 counterpart, sent me this e-mail dated September

Page 243

1  23 saying, thought you might like to see how well
2  you are doing. This is a report dated 9-7 of '01
3  in which I was 147 percent, Van Cleave was 138
4  percent, Kopecky was 144, Hill was 94. So on
5  indicated products with Cordis, I was number one.
6     Q  And what was the date of that e-mail?
7     A  September 23. I think I have a copy of
8  it if you'd like.
9     Q  And that was from Robert Kinney?
10    A  Robin Kinney. Here it is. You want a
11 copy?
12    Q  Yes. We'll make a copy of it. And
13 there's a chart that he attached to that?
14    A  Dated 9-7 of '01.
15    Q  Is this your writing on the side of it
16 down there?
17    A  Yes, it is.
18    Q  Okay. We'll copy this and make this an
19 exhibit.
20       Why did Robin Kinney send this to you?
21    A  We had a great working rapport.
22    Q  Did he generally send sales results to
23 you?
24    A  Yeah. We were--I mean, it was exciting,

Page 244

1  it was fun working on the products, and like he's
2  the one that sent the message that we had that
3  $10,000 order in a day, and it went on up to Bill
4  Pinion--.
5     Q  So you didn't request this from him?
6     A  No.
7     Q  Okay.
8     A  But I when I saw it I--.
9     Q  What are the other alleged falsehoods
10 with the 9-19 report?
11    A  Okay. Starting in IV. Do you see that?
12 IV?
13    Q  Okay.
14    A  Observations. Jane, your first two
15 critical objectives in April FCR were to schedule
16 dinner programs in Evansville and Des Moines.
17 Both were scheduled promptly, but due to poor
18 follow-up and recruitment, the Evansville program
19 was poorly attended with only three attendees, and
20 the Des Moines program had to be cancelled
21 altogether.
22       Evansville, as you recall, was pouring
23 rain, but the three people that came were the
24 clinical pharmacist and the two interventional

Page 245

1 radiologists. And at that point, they decided to
2 use Retavase. It's not numbers, it's who you have
3 there. And then on the Des Moines program. One
4 radiology group disbanded, and you saw the note,
5 the handwritten note that that was cancelled, and
6 that was, none of that was due to me.
7      Future programs will require a higher
8 degree of follow-up and follow-through to ensure
9 their success. Well, if you look at the list of
10 150 attendees to the MIIT and all the work I did
11 with that. In addition, when they had an ad
12 board, I not only submitted my first
13 possibilities, but I would always, I tried to even
14 if they couldn't do it attend second possibilities
15 so that hopefully I would get some people in my
16 territory.
17      My third critical objective was to follow
18 up on the interest of cath clearance project at
19 Barnes. This has moved very slowly over the past
20 five months, however, it seems last week there was
21 a breakthrough at Barnes.
22   Q  Was that true?
23   A  Yes. Will require your follow-through to
24 make sure that pharmacy follows through to your

Page 246

1 commitment. Your fourth critical was to make
2 initial contact at St. Joe's and generate some
3 interest which you were able to achieve, but due
4 to uncontrollable circumstances, pharmacy put a
5 temporary hold on it.
6      You will need to continue developing
7 relationships at St. Joe's in anticipation of
8 pharmacy giving the green light. Your fifth
9 critical objective was to follow up on interest
10 previous.
11   Q  I'm sorry. I know you read this on to
12 about the fourth critical objective. Is that
13 true? You generated some interest, but due to
14 uncontrollable circumstances, there's a hold put
15 on us?
16   A  Yes.
17   Q  Then I guess--
18   A  And continue to develop at St. Joseph's.
19 Okay. And then unfortunately there has been no
20 progress in regards to hemodialysis access grafts
21 even in bringing Dr. Castaneda and getting the
22 nephrologists' support. Well, he had told me he
23 was going to be out of the country for a month,
24 the nephrologist, but to keep nagging at him

Page 247

1 because he was interested.
2   Q  Who was the nephrologist?
3   A  I think Dr. Martin. I could look back
4 and check, but I think it was Dr. Martin.
5   Q  And Tony wanted you to do what with
6 Dr. Martin?
7   A  Get the whole thing accomplished. But
8 the whole problem here is that they had a
9 temporary or an interim pharmacist who refused to
10 make any decisions till they had a permanent
11 pharmacist there. There the radiologist had left,
12 and the reason I was calling on Dr. Martin was
13 that he was doing interventional work because
14 there weren't radiologists to do that work. So
15 it's a complex sale, sell, whatever you want to
16 call it, but I was doing my part.
17   Q  And you think this is an unfair
18 characterization of what was going on with that?
19   A  Right.
20   Q  Okay.
21   A  This is another example where inadequate
22 territory coverage and poor follow-through has
23 prevented my success. I think that's not true.
24   Q  Okay.

Page 248

1   A  Jane, you've had some great impact at
2 St. Mary's in Evansville and at St. Joe's
3 recently. However, your lack of proper territory
4 coverage prevents the necessary kind of
5 follow-through to accomplish a high level of
6 success.
7      You saw all the notes that I had written
8 about St. Joseph's in St. Charles. I did my part
9 even after the cardio reps made everybody mad. I
10 still was following up and getting Dr. Majeed and
11 different ones, Halverson, to go to ad boards and
12 everything else. So that's not true.
13   Q  Okay.
14   A  Follow-up on--like number two. Follow-up
15 on interest at Mercy/Iowa, October 19. How could
16 I follow up when there was no radiology group? I
17 kept calling on that one tech, Odson, and there
18 was no radiologists to call on.
19   Q  Even as of October of 2001?
20   A  Well, this was written 9-19.
21   Q  Okay. As of--?
22   A  I believe that it was. I mean, if it was
23 different, he was going to, Bryce was going to
24 call me as soon as anybody, whatever.

Page 249

1  Q  Bryce was the--?
2  A  The tech that wrote that note stating
3  that, cancelling the program. Complete new
4  business opportunities at Barnes. I got a signed
5  form from--I became friends with Robin, the, who
6  was the head PharmD, head pharmacist at
7  Barnes-Jewish. And she was working with me, and
8  she just requested more and more information, and
9  as I was able to get medical, to provide it, she
10 got it okayed.
11      And I have a letter stating such and such
12 a date it will be on pharmacy. So I did follow
13 through on that or it wouldn't have happened.
14 Follow up with knew DOP, director of
15 pharmacy--see, I told you there wasn't one--and
16 bring project at SLUH to closure. That was just
17 another goal.
18      Complete account territory rotation every
19 two weeks. Ongoing. And that was the first thing
20 about that. And then you've expressed an interest
21 career path with greater responsibilities. I will
22 be postponing any developmental activities until
23 significant improvement of these issues has been
24 made. Remember the most important component for

Page 250

1  making yourself eligible for increased
2  responsibilities is significant success in your
3  current position.
4       Any manager that was looking to hire you
5  I don't think after that in this paragraph would
6  be too excited.
7       Jane, as we discussed in our last
8  meeting, and as I mentioned above, the one area
9  that needs your immediate attention is adequate
10 territory coverage. Complete account rotation
11 every two weeks with improved follow-up and
12 follow-through. This has been addressed multiple
13 times prior to the June--I disagree with that
14 prior to the June national sales meeting.
15      But at the June national sales meeting,
16 it was after that that he wrote that note to me.
17 And that was the first--remember the letter?
18 Q  With the e-mail with the routing?
19 A  Yes.
20 Q  Okay.
21 A  So it wasn't mentioned prior to then.
22 And his last visit in August, which is what caused
23 this to be written, this report is from that
24 visit.

Page 251

1  Q  From the, where you were driving him?
2  A  August.
3  Q  Let's first go through the--
4  A  9-19. What he said here is during my
5  last visit in August. However, through September,
6  you have not made the necessary adjustments,
7  whatever that is. This is critical to your
8  success, therefore, starting immediately I'm
9  requiring a weekly account update. This should
10 include what progress has been made at each of the
11 accounts visited. Additionally, your timeliness
12 in turning in expense reports has not lived up to
13 your previous commitment, requiring blah blah.
14 Q  Okay. And I think we've talked about
15 expense reports. You didn't think there was a
16 problem with the expense reports? I mean, turning
17 them in?
18 A  This is where he tells me these things.
19 And he did not tell me prospectively that he was
20 going to cut my phone bill, expense, or anything.
21 Q  Well, okay. As far as turning in the
22 expense reports, we've talked about that. And you
23 didn't think there was a problem with your turning
24 in expense reports, correct? I mean, the actual

Page 252

1  turning them in?
2  A  I mean, they weren't always on time, but
3  he never really got up, any uptightness about it
4  before.
5  Q  And is the attachment to this exhibit,
6  the second page, is this the form he wanted you to
7  use for the account update?
8  A  Yes.
9  Q  And how did that make you feel that he
10 was going to make you do that?
11 A  Further that he was trying to squeeze me
12 out.
13 Q  And what about the remark about the,
14 checking the voice mails and pages? Is that--?
15 A  That was a real insult because having to
16 cover this every two weeks, which I was trying to
17 do, so much of my area is rural that I can't even
18 begin to tell you that your pager and your phone
19 come back in about the same time when you get into
20 a cell.
21      And if the company that hasn't bargained
22 with that cellular or paging company isn't
23 contracted, you just don't get your pages till you
24 get to--you know that, don't you? It's very

|Page 253|Page 255|
|---|---|

**Page 253**

1 difficult. And Randy Van Cleave talked about he
2 had the same problem. And if you're in a
3 cardiovascular--I'm sorry--cardiac cath lab, you
4 have to turn your cell phone off and whatnot.
5   Q Do you think the mischaracterizations
6 contained in this report were made in a
7 discriminatory fashion based on your age and
8 gender?
9   A Yes, I do.
10   Q And just for the record, just explain
11 what facts to your knowledge support that
12 conclusion aside from what we've already talked
13 about in terms, I know you explained why you
14 disputed the report, but what facts do you have to
15 support the allegation that it was discriminatory
16 based on your age and gender?
17   A He was trying to prove that my
18 performance was inadequate in order to get rid of
19 me, and it's basically because he thought I was an
20 older female inadequate or incapable of doing this
21 job.
22   Q Anything else?
23   A Just the sheer fact of at the MIIT
24 meeting I was there Thursday night, I set up the

**Page 254**

1 whole thing and was running the whole--I mean, I
2 got a couple of other people to run it during the
3 days to cover the booth. He only showed up for
4 one dinner.
5   He made no attempt whatsoever as a
6 manager. I mean, it was really apparent. He sat
7 way across the room from me, he didn't want to
8 communicate with me, and at the June meeting, he
9 didn't have anything where we went out. Tim and I
10 were excluded.
11   Q So his behavior at the meeting in
12 Chicago, is that something--how is that
13 discriminatory to you based on your age and
14 gender?
15   A It was all part of this whole thing
16 starting from the very beginning. I mean, I
17 didn't realize it at first, and I couldn't
18 understand why he was trying to be so difficult
19 when he wasn't being that difficult to these other
20 reps.
21   And finally near the end, I could
22 just--and my son just said, it's pretty apparent.
23 In June I recognized I was being treated
24 differently, but I didn't want to go blow it out

**Page 255**

1 of proportion, I just wanted Stephanie Moore to
2 help me, which I thought she would do
3 confidentially.
4   Q Any other facts to your knowledge that
5 you have that you think Tony mischaracterized
6 facts in this report because you're an older
7 woman?
8   A Yes, I do.
9   Q Okay. Well, I mean, is there any other
10 facts?
11   MR. BAKER: Any other facts that support that
12 belief?
13   MR. BRODERICK: Yes.
14   THE DEPONENT: I had so many positive reviews
15 from younger managers and females, males alike and
16 in this company. In fact, I don't ever remember
17 getting this negative of a review. And he just
18 kept piling stuff on me more and more and more to
19 make it impossible for me to have a good
20 performance, and I don't think even if--I don't
21 think anyone could actually cover that area in two
22 weeks and be productive.
23   MR. BRODERICK: Q All right. Just touching
24 on that, since July of 2001 until the end of

**Page 256**

1 September 2001, how many times did you visit
2 Owensboro Mercy Health?
3   A I don't know.
4   MR. BAKER: Go ahead and answer the question.
5   THE DEPONENT: I said I don't know.
6   MR. BRODERICK: Q Okay. Since July 2001--
7   MR. BAKER: Excuse me, John. It's 10 after 5,
8 and we're going to--
9   MR. BRODERICK: I'm almost done.
10   MR. BAKER: Okay.
11   MR. BRODERICK: Q Since July 2001 until the
12 end of September 2001, how many times did you
13 visit Des Moines, Iowa?
14   A Several times. I don't remember exactly.
15 Till when? September?
16   Q September of 2001.
17   A September of 2001?
18   Q Till the end of September of 2001.
19   A Well, it was one month till I went on
20 medical leave, so I do not know. I was having
21 problems with the atrial fib, everything else. I
22 don't know that I did or did not go at that point
23 in time.
24   Q Okay. Did you ever make a claim that

### Page 257

1  Antonio Siciliano gave the younger female reps
2  larger cardiology accounts?
3  A  I made the claim that he gave them input,
4  and I made the claim that he pretty much looked at
5  all the accounts and picked the cream accounts,
6  took off what might be difficult, and like in the
7  listing I showed you of accounts and where they
8  were located, that list and the population and the
9  location.
10        I know that he changed the accounts
11 sufficiently because every quarter they were
12 changed, and at one point he took off Ochsner or
13 Tulane. It was either Ochsner or Tulane. But I
14 know at Tulane, Willy Castaneda, who's the uncle
15 of Flavio Castaneda, is a very big peripheral
16 account, and he took that off as something she had
17 to call on or something.
18   Q  Who was that?
19   A  Carolyn Kopecky.
20   Q  He took, he removed that account from
21 her?
22   A  Yeah.
23   Q  Why did he do that, to your knowledge?
24   A  Probably because she couldn't get the

### Page 258

1  business there or something. I felt like he was
2  just switching things around.
3    Q  Are these the four documents you're
4  referring to?
5    A  Yeah.
6    Q  Okay. Did you prepare these documents
7  yourself?
8    A  I did.
9    Q  And bases on what information did you
10 prepare the information about the other sales
11 reps?
12   A  The information that was on the list that
13 I took it from of their accounts, and I looked it
14 up in the--what is the name of the atlas? Rand
15 McNally. That's from Rand McNally's atlas.
16   MR. BRODERICK: Let's mark this exhibit.
17        (Whereupon a document
18        was duly marked for
19        purposes of
20        identification as
21        Exhibit MM as of this
22        date.)
23   THE DEPONENT: Because I wanted to see since I
24 didn't know every account.

### Page 259

1    MR. BRODERICK: Let's mark--this is the e-mail
2  you were talking about previously about the
3  Retavase.
4        (Whereupon a document
5        was duly marked for
6        purposes of
7        identification as
8        Exhibit NN as of this
9        date.)
10   MR. BRODERICK: Q So Exhibit MM is the chart
11 you prepared of all the, of the accounts of all
12 the over vascular specialists and the mileage?
13   A  And the population.
14   Q  And the population?
15   A  And the pockets that they had to show
16 nine in Dallas, nine in Houston.
17   Q  Okay. And Exhibit NN is the e-mail you
18 received from Robin Kinney about the Cordis
19 results?
20   A  Yeah. He was Cordis neurovascular
21 specialist. We worked together, and he thought I
22 would want to see how well I was doing.
23   Q  We talked about that previously?
24   A  And plus, I was never provided any of

### Page 260

1  that stuff by Tony, which he should have been
2  providing as an encouragement.
3    Q  What's your information, though, that he
4  gave, what's the source of your information that
5  he gave larger accounts to the younger female
6  sales reps?
7    A  Who said I said that?
8    Q  Okay.
9    MR. BAKER: Larger or better accounts?
10   MR. BRODERICK: Q Larger or better accounts?
11   A  Well, I'm sure I was talking with Randy
12 Van Cleave and Caroline and stuff at that meeting,
13 and they just were saying that they had huge
14 accounts like Baylor and some very well-known
15 accounts and that Tony accepted their input. And
16 he would not accept mine about what a bigger
17 account was or better account.
18        (Whereupon a document
19        was duly marked for
20        purposes of
21        identification as
22        Exhibit OO as of this
23        date.)
24   MR. BRODERICK: Q Can you identify what's

Page 261

1 been marked as Exhibit OO?
2   A  It was an e-mail I sent to Tony because
3 he was doing some other ranking other than what
4 Centocor was sending out, and I wanted to know how
5 he did that, how he calculated it.
6   Q  Was that the ranking we looked at
7 previously?
8   A  Nope.
9   Q  What ranking was this referring to?
10   A  This was something he had done himself.
11 And that is why I wanted to know what formula it
12 was. Because it was not anything within Centocor
13 J & J ranking.
14   Q  Do you know what it looked like at all
15 or--?
16   A  Sorry. I don't remember right now.
17   Q  Okay. And you don't have a copy of it in
18 your possession?
19   A  I don't have a copy of it here. I'm sure
20 I might have at home or something. No, I don't
21 even know if I kept it. Tony should have it.
22   Q  Okay. All right. Generally we've talked
23 about, in terms of your medical problems, we've
24 talked about the atrial fibrillation, the problems

Page 262

1 with your back, and are there any other medical
2 problems you've been diagnosed and treated for in
3 the last 10 years that we haven't talked about?
4   A  Starting with this thing with Tony, I had
5 a major depression. And that I had never had such
6 a depression that totally disabled me.
7   Q  And prior to that, I know you had the
8 surgery, the hysterectomy, and the complications
9 there, and prior to that, over the years other
10 than the back, has there been anything else?
11   A  No. I've been pretty healthy overall, I
12 would say.
13   Q  Okay.
14   A  That I recollect, you know. That I
15 recall right now. I mean, I had tonsils out and
16 stuff like that.
17   Q  I understand.
18   A  Please, let's not go there though.
19   MR. BRODERICK: I don't have anything more.
20   THE DEPONENT: Can I say hallelujah?
21   MR. BRODERICK: I appreciate your time,
22 Ms. Minor.
23   MR. BAKER: Rhonda, I think we need to
reserve.
24   (Further deponent saith not.)

Page 263

1   I, M. JANE MINOR, having read the above and
2 foregoing, find the same to be true and correct
3 with the following additions and/or corrections,
4 if any:
5 Page_____Line_____Change:
6 Page_____Line_____Change:
7 Page_____Line_____Change:

24 M. Jane Minor (09/10/04)          DATE

Page 264

STATE OF ILLINOIS  )
                   ) SS
COUNTY OF SANGAMON )
        C E R T I F I C A T E
   I, Rhonda K. O'Neal, a Notary Public,
Certified Shorthand Reporter, and Registered
Professional Reporter, in and for said County and
State do hereby certify that the Deponent herein,
M. JANE MINOR, prior to the taking of the
foregoing deposition, and on the 10th of September
A.D., 2004, was by me duly sworn to testify to the
truth, the whole truth and nothing but the truth
in the cause aforesaid; that the said deposition
was on that date taken down in shorthand by me and
afterwards transcribed, and that the attached
transcript contains a true and accurate
translation of my shorthand notes referred to.
   Given under my hand and seal this 22nd day
of September A.D., 2004.
                    *Rhonda K. O'Neal*
   Notary Public and
   Certified Shorthand Reporter
   and Registered Professional Reporter

License No. 084-004158

OFFICIAL SEAL
RHONDA K. O'NEAL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 9-13-2008