**Page 1**

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF ILLINOIS

 3                   SPRINGFIELD DIVISION

 4

 5    M. JANE MINOR,

 6              Plaintiff,

 7       vs.                      No. 02-3354

 8    CENTOCOR, INC.,

 9              Defendant.

10

11

12          THE DEPOSITION of JOSEPH G. BOHLEN, M.D.,

13    taken in the above-entitled case before Rhonda K.

14    O'Neal, CSR, RPR, a Notary Public of Sangamon

15    County, acting within and for the County of

16    Sangamon, State of Illinois, at 3:04 o'clock P.M.,

17    on November 17, 2004, at 3001 Spring Mill Drive,

18    Springfield, Sangamon County, Illinois, pursuant

19    to notice.

20

21

22          BALDWIN REPORTING & LEGAL-VISUAL SERVICES
               SERVING ILLINOIS, INDIANA & MISSOURI
23          24 hrs (217) 788-2835  Fax (217) 788-2838
                      1-800-248-2835
24
```

**Page 3**

```
                I N D E X

 1

 2    DEPONENT                        PAGE NUMBER

 3    Joseph G. Bohlen, M.D.

 4      Examination by Mr. Broderick   5, 79
        Examination by Mr. Baker         66
 5

 6

 7

 8

 9              E X H I B I T S

10    NUMBER              MARKED FOR IDENTIFICATION

11    Exhibit 1           (Marked prior to
                           deposition.)
12    Exhibit 2                  23

13

14

15

16

17

18

19

20

21

22

23

24
```

**Page 2**

```
 1    APPEARANCES:

 2      BAKER, BAKER & KRAJEWSKI LLC
          BY: James P. Baker, Esq.
 3          415 South Seventh Street
            Springfield, Illinois 62701
 4          On behalf of Plaintiff.

 5      PUGH, JONES, JOHNSON & QUANDT, P.C.
          BY: John M. Broderick, Esq.
 6          180 North LaSalle Street
            Suite 3400
 7          Chicago, Illinois 60601
            On behalf of Defendant.
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**Page 4**

```
 1              S T I P U L A T I O N

 2          It is stipulated and agreed, by and
      between the parties hereto, through their
 3    attorneys, that the deposition of JOSEPH G.
      BOHLEN, M.D., may be taken before Rhonda K.
 4    O'Neal, a Notary Public, Certified Shorthand
      Reporter, and Registered Professional Reporter,
 5    upon oral interrogatories, on the 17th of November
      A.D., 2004, at the instance of the Defendant at
 6    the hour of 3:04 o'clock P.M., 3001 Spring Mill
      Drive, Springfield, Sangamon County, Illinois;
 7
            That the oral interrogatories and the
 8    answers of the witness may be taken down in
      shorthand by the Reporter and afterwards
 9    transcribed;

10          That all requirements of the Federal Rules
      of Civil Procedure and the Rules of the Supreme
11    Court as to dedimus, are expressly waived;

12          That any objections as to competency,
      materiality or relevancy are hereby reserved, but
13    any objection as to the form of question is waived
      unless specifically noted;

14          That the deposition, or any parts thereof
15    may be used for any purpose for which depositions
      are competent, by any of the parties hereto,
16    without foundation proof;

17          That any party hereto may be furnished
      copies of the deposition at his or her own
18    expense.

19

20

21              COPY

22

23

24
```

Page 5

1    (Whereupon the Deponent was
2    sworn by the Notary Public.)
3    J O S E P H  G.  B O H L E N, M. D.
4    Having been first duly sworn by the Notary Public,
5    deposeth and saith as follows:
6    EXAMINATION
7    BY MR. BRODERICK:
8    Q  Good afternoon, Doctor. My name is John
9    Broderick, and I represent defendant Centocor in
10    action Minor versus Centocor. And I'm going to be
11    asking you a few questions about that today. Can
12    you just state your name for the record.
13    A  Sure. Joseph Glenn with two n's, Bohlen,
14    B-o-h-l-e-n.
15    Q  And Doctor, have you been deposed before?
16    A  Yes.
17    Q  So you know that the court reporter here
18    is going to take down everything we say and that I
19    will do the best I can to ask clear questions, but
20    if you don't understand a question of mine, please
21    tell me to rephrase it and I'll do the best I can
22    to make it understandable. And if you just make
23    your answers audible for the court reporter so she
24    can take everything down for us because she can't

Page 6

1    take down gestures. And if at any time you need
2    to take a break, just let us know.
3    A  Yes.
4    Q  How many times have you been deposed in
5    the last five years?
6    A  Probably five or six.
7    Q  Were those in all civil cases?
8    A  No. The other part of the practice that
9    I do is with sex offenders. So those would be
10    what? Prosecution?
11    Q  Criminal matters?
12    A  Criminal matters, right. Forensic
13    matters.
14    Q  How many of those depositions were civil
15    matters, to the best of your knowledge?
16    A  Probably half of it.
17    Q  Did any of those cases have any
18    similarities to any issues you are dealing with in
19    this case?
20    A  I remember one or two that have. It had
21    to do with individuals who were, had been employed
22    in companies and that they were filing suit
23    against the company.
24    Q  And were these individuals filing some

Page 7

1    sort of discrimination claims, to the best of your
2    knowledge?
3    A  Yes.
4    Q  Do you remember, did those issues
5    involved in those deposition involve plaintiffs
6    having--excuse me. I'm assuming you represented,
7    you were testifying on behalf of plaintiffs in
8    those civil cases, is that correct?
9    A  Yes.
10    Q  That's correct?
11    A  Yes.
12    Q  And in each of those cases where you were
13    testifying on behalf of the plaintiff, could you
14    just briefly describe what the nature of the
15    damages were of the plaintiffs or the conditions
16    of the plaintiffs were?
17    A  Yes. One was a woman who had been
18    sexually harassed by her employer, by an employer.
19    That was also the case with the second one. I'm
20    not coming up with a third.
21    Q  Do you remember the captions of those
22    cases? That is, the names of the parties in those
23    cases?
24    A  One was Barb Fafoglia.

Page 8

1    Q  Could you spell that?
2    A  F-a-f-o-g-l-i-a.
3    Q  Okay.
4    A  The other was Barb, is it Clemm? Is that
5    right?
6    MR. BAKER:  (Nodded head up and down.)
7    MR. BRODERICK:  QAnd do you remember the
8    third one?
9    A  Not right now.
10    Q  In each of those cases, did Mr. Baker
11    represent the plaintiffs?
12    A  Yes.
13    Q  And just so I'm clear, you were deposed
14    in each of those cases?
15    A  Yes.
16    Q  And did you testify in each of those
17    cases at a trial?
18    A  I believe the, I did not against the one
19    with 186, and I believe that I did with the other.
20    These were probably five or six years ago.
21    Q  Okay. And in these cases, did each of
22    these plaintiffs' mental conditions involve any
23    similarities to the mental condition of the
24    plaintiff in this case?

Page 9

1   A  Yes, they do.
2   Q  In what way?
3   A  That part of the symptomatology had to do
4   with depression, anxiety, complicated by the
5   reactions to the litigation.
6   Q  And in any of those cases, were you
7   actually retained by the plaintiffs in those
8   cases?
9   MR. BAKER: What do you mean by retained?
10  MR. BRODERICK: Q Retained as in testifying
11  expert or as opposed to a treater.
12  MR. BAKER: He may not know the difference.
13  MR. BRODERICK: He may not.
14      Q Do you understand that distinction?
15  A  I think so.  I felt that I was being
16  retained as the treater, the psychiatrist.
17  Q  Were you actually giving, rendering
18  treatment to each of these plaintiffs?
19  A  Yes.
20  Q  You weren't just retained for purposes of
21  rendering an opinion in the litigation?
22  A  No.
23  Q  Typically in those cases, do you review
24  matters outside of your medical record?  Do you

Page 10

1   know what I mean by that question?
2   A  Do you mean interviewing collateral
3   sources?
4   Q  Would you have reviewed other materials
5   such as deposition transcripts of other witnesses
6   in the case or read?
7   A  No.
8   Q  Would you have done that?
9   A  No.
10  Q  No?  Okay.
11      Would you have looked at any of the
12  employment records involved in those cases, to the
13  best of your recollection?
14  A  No.
15  Q  Would you have looked at any nonmedically
16  related documents that relate to the underlying
17  litigation involving those patients?
18  A  Like for instance?
19  Q  Documents produced in discovery like
20  e-mails or compensation documents or--?
21  A  No, no.
22  Q  Would you have typically looked at
23  records of other medical treaters of those
24  plaintiffs?

Page 11

1   A  Not that I recall.
2   Q  Have you ever been a party to any
3   lawsuit?
4   A  About me?
5   Q  Yes.  Well, have you yourself been a
6   plaintiff or a defendant in a lawsuit?
7   A  No.
8   MR. BRODERICK: I'm going to have that
9   attached as Exhibit 1 to the deposition.
10      (Whereupon a document was
11      tendered to the deponent.)
12  MR. BRODERICK: Q Could you just identify
13  Exhibit 1 for the record, Doctor?
14  A  This is my curriculum vitae.
15  Q  And to the best of your knowledge, is
16  that your most recent CV?
17  A  I'm not sure if it has all of the most
18  recent entries in the past year or so, but it's
19  reasonably current.
20  Q  Thank you.  Have you had any publications
21  in the last year?
22  A  No.
23  Q  What did you do to prepare for today's
24  deposition?

Page 12

1   A  I reviewed my clinic notes, I reviewed
2   the articles of, I believe it's Kemper Insurance
3   Company, the ones that I had filled out for her
4   disability, and I reviewed the KNS Physician
5   Review general, and this was by a Lawrence
6   Burstein, psychologist for Kemper who evaluated my
7   summaries and either supported or failed to
8   support her disability.  Those were the salient
9   points.
10  Q  Okay.  I'm not going to mark this, but if
11  you just--this is the documents that we received
12  in response to our subpoena to your office, and
13  they're marked J&J0085 to J&J0232.  And I was
14  wondering if you could just briefly look at these
15  documents and see if that's a complete record.
16      I would like to note that just prior to
17  the deposition Dr. Bohlen gave us a couple of
18  pages of his notes from appointments that, with
19  the plaintiff since after 3-18-04.
20  A  There are some lab values from St. John's
21  Hospital that I have not, I don't have in my
22  chart, have not been reviewed nor the ones from
23  Springfield Clinic.  Here are some more from
24  St. John's Hospital that I have not.  Here is it

|  | Page 13 |  | Page 15 |
|---|---|---|---|

**Page 13**

1  appears to be a bone density image that I've not.
2  Some more lab values from St. John's Hospital.
3  Mammogram ultrasounds that I have not. Some more
4  St. John's Hospital medical records that I have
5  not. More St. John's records.
6        Here's an echo Doppler color map that
7  I've not. This looks like an echocardiogram
8  report that I have not. More St. John's records
9  that I have not. Radiology report that I've not.
10 Again, more information from St. John's that I
11 have not. A note from Dr. Miller that I've not.
12 Hadn't seen a cardiac stress test risk protocol.
13 Cardiolite stress test that I have not. That's
14 some more St. John's records that I have not.
15 Urinalysis urine culture that I have not.
16       Cytology report that I've not. Pap smear
17 that I've not. Results of a cardiac profile that
18 I've not. More cardiovascular data that I have
19 not. Nursing assessments that I've not. CBC that
20 I've not. Some EKGs that I've not. Looks like a,
21 results of an x-ray that I've not. Some more
22 EKGs. More St. John's Hospital records. Physical
23 therapy initial evaluation that I've not. Looks
24 like a knee injury assessment for physical therapy

**Page 14**

1  that I've not. MRI left knee that I've not.
2        Athleticare patient history that I've
3  not. More physical exams about her knee injury.
4  More St. John's Hospital about radiculopathy.
5  Lumbar data, MRI that I've not. More lumbar spine
6  data that I've not. The same. EMG that I have
7  not. Looks like another list of blood values that
8  I have not. More cardiology reports, another echo
9  cardiogram that I've not seen. Sorry that's so
10 tedious.
11    Q  Sorry. No. I appreciate you doing that.
12 Just so it's clear, I'm clear that the records
13 that you were identifying are not in your chart,
14 is that--?
15    A  They're not in my chart.
16    Q  Typically in your chart do you have the
17 documents you identified that you reviewed in
18 preparation for this deposition?
19    A  Right. So these would be my individual
20 clinic notes and then insurance information.
21    Q  Okay. Did you review any document, any
22 medical records from Dr. Tsang?
23    A  No.
24    Q  Do you know who Dr. Cynthia Tsang is?

**Page 15**

1    A  I think that's who has been her primary
2  care physician.
3    Q  And have you ever had any conversations
4  with her about Ms. Minor?
5    A  No.
6    Q  And you haven't reviewed any of her
7  records or notes?
8    A  I have not.
9    Q  And how about Dr. Miller? Are you aware
10 of that doctor?
11   A  Yes. He's a cardiologist.
12   Q  Have you had any conversations with
13 Dr. Miller?
14   A  I have not.
15   Q  Have you reviewed any of his records in
16 the course of your treatment of Jane?
17   A  No, I have not.
18   Q  And how about Susan Yarrington? Do you
19 know who she is?
20   A  No.
21   Q  Okay. So then you haven't had any
22 conversations with Ms. Yarrington?
23   A  Not as far as I know.
24   Q  Okay. And just so the record is clear,

**Page 16**

1  have you reviewed any of Susan Yarrington's notes
2  or records?
3    A  No.
4    Q  Told you that Susan Yarrington was a
5  counselor at the Living Hope Center who Jane has
6  seen since--don't quote me on this, but September
7  of 2000 and has seen her since then on a regular
8  basis, it appears, would you be interested in
9  seeing her notes, and would that matter to your
10 care and treatment of Jane?
11   A  Possibly it would.
12   Q  Okay. And just so I'm clear, does your
13 CV have all your licenses and certifications?
14   A  Yes.
15   Q  Okay. Thank you.
16       What texts or journal articles do you
17 regularly consult in treating someone like
18 Ms. Minor, if any? Texts or journal articles?
19   A  Synopsis of Psychiatry by Kaplan and
20 Sadock; that's a classic. And then just the
21 general archives of psychiatry. Don't remember
22 the exact titles. Annals of Psychiatry, something
23 on that order.
24   Q  And did you in fact consult any of these

Page 17

1 resources in connection with your treatment of
2 Ms. Minor? Or did you feel the need to?
3    A Really didn't feel the need to.
4    Q Okay. Just so I have this as a
5 background question, what do you consider your
6 specialty to be?
7    A General adult psychiatry.
8    Q I don't know if you can break this down,
9 but can you break it down in terms of how much
10 time you devote to giving, to treating patients
11 and treating patients in connection with or
12 connected with litigation?
13    A About five percent.
14    Q Five percent of your patients are
15 connected with litigation?
16    A Well, five percent of my time.
17    Q I'm sorry. Okay. So the majority of the
18 patients you see are not, don't, to your knowledge
19 don't have any connection with litigation?
20    A Right. About 75 percent are depressed,
21 anxious, 15 percent are family issues, marital
22 issues, sexual issues, five percent teaching at
23 the local medical school, and then the rest is
24 forensic sorts of things.

Page 18

1    Q And would you classify Ms. Minor as a
2 forensic type of patient, case?
3    A Basically not.
4    Q Okay. Why not?
5    A She has a combination of depressive
6 symptoms, anxious symptoms including panic attacks
7 and family issues.
8    Q Okay. So--
9    A And but--
10    Q Not all those are--well, you go ahead and
11 finish what you were saying.
12    A A typical one-hour session, which all of
13 hers have been, would consist of going through
14 things that are happening with her mood and her
15 anxiety symptoms and her activities of daily
16 living, socialization, issues with her son and
17 with her mother, and then what's happening with
18 litigation. So and that's typical of patients who
19 come in. They talk about all the things that are
20 happening in their lives. Litigation was one of
21 those.
22    Q When did you first start to treat
23 Ms. Minor?
24    A November 1, 2001.

Page 19

1    Q And how was it that it came about that
2 she came to see you, or do you know who referred
3 her to you?
4    A No, I don't. And I don't have that
5 recorded here. I'm not sure whether it was from
6 Mr. Baker or she had known me before. We both
7 sang at Illinois Symphony Chorus, and she knew
8 that I was a psychiatrist. And so it may have
9 been a self-referral. Actually I don't recall.
10    Q And you would have remembered if you had
11 actually treated her before that?
12    A I had never treated her before that.
13    Q Okay. And what complaints did she
14 present herself with to you?
15    A That she was, felt depressed. She had
16 problems with memory, anxiety. She said, I feel
17 broken. She said that she had had an initial
18 panic attack the previous August. She was
19 exhausted, had trouble keeping it all together,
20 and was having difficulty at work. She had just,
21 she had returned to work.
22    Q And at that time, did you make a
23 diagnosis of Ms. Minor?
24    A I did. Major depression, single episode.

Page 20

1    Q And could you explain that diagnosis in
2 laymaen 's terms?
3    A Certainly. Major depression is one of
4 the mood disorders. And it's characterized by a
5 change in sleep, appetite, concentration, memory,
6 energy, motivation, feeling hopeless, helpless,
7 worthless, slow self-esteem. Social withdrawal,
8 loss of interest in fun activities. Those are,
9 cover the primary symptoms.
10    Q Okay. And what does it mean to be a
11 single episode?
12    A That there had not been a recurrence from
13 previous aspects of her life. Recurrence would be
14 if she had had an episode as a teenager, then one
15 in early adulthood. It tends to be or some forms
16 of major depression tend to be recurrent. That
17 is, they are episodic over the portion of a life
18 span.
19    Q Did you take a history of Ms. Minor in
20 your first encounter with her?
21    A She gave me her current history. Do you
22 mean a history prior to her coming to see me?
23    Q Yes. Or what does it mean to you to take
24 a history I guess I should ask so we know we're

**Page 21**

1 talking about the same kind of thing.

2   A Usually in the first episode or the new

3 patient evaluation it's 50 or 55 minutes. And in

4 that time I have to find out as much as I can

5 about, first of all, how they're doing currently,

6 what brought them here, what things have worked,

7 haven't worked.

8      If there's time to find out what things

9 they've tried to do to improve the situation,

10 what's worked, hasn't worked. Previous

11 medications, if they've seen other psychiatrists.

12 And if there's further time, information about

13 their previous psychiatric history and any family

14 history of mental illness.

15   Q And did you have time to cover all those

16 areas with her in the first session?

17   A Not in detail. I focused on the current

18 problems.

19   Q Okay. At some point were you able to

20 cover, for instance, her previous psychological,

21 any previous psychiatric care or treatment or

22 family history? Were you able to cover that in

23 subsequent sessions?

24   A Generally when she came in she was in

**Page 22**

1 some form of crisis, and when that happens it's

2 pretty much just treating what's active at that

3 time.

4   Q Okay.

5   A So when she left that I had revised a

6 treatment plan. Often includes changing

7 medications. Offering any behavioral cognitive

8 things that she might do to help her prepare for

9 the next interval between that and the next

10 session.

11   Q Okay. So it appears then from the

12 notes--well, let me ask you this: From her notes

13 from 11-1-01 to the most current ones of 11-15-04,

14 is that the complete set of your notes?

15   A Yes.

16   Q If you don't mind just looking through

17 this set, and I guess we'll mark those and attach

18 it to the deposition.

19   A Uh-huh.

20      It appears to be.

21 MR. BRODERICK: Off the record for a minute.

22     (Discussion off the record.)

23     (Whereupon a document

24     was duly marked for

**Page 23**

1     purposes of

2     identification as

3     Bohlen Exhibit Number 2

4     as of this date.)

5 MR. BRODERICK: Q So Doctor, we just reviewed

6 what has been marked as Exhibit 2, and this

7 appears to be a complete copy of your notes of

8 your meetings with Ms. Minor?

9   A That's correct.

10   Q And just for the record, these are

11 stamped with control numbers, and the first page

12 is stamped with J&J0087, the second page is

13 J&J0089, but in fact, there is no skipping, there

14 is no page that should be inserted between those

15 two pages, and we took care of that off the

16 record. And secondly, Dr. Bohlen indicated that

17 on J&J0091 there's a note that simply was taken

18 out of order that's dated 11-15-02, and that that

19 note was in fact taken on 11-15 of '02?

20   A Yes.

21   Q Okay.

22   A And P/C stands for phone call so that PC

23 was not a session where she was here. So it's

24 just a note about a phone call with her.

**Page 24**

1   Q Okay, thank you. All right. So then

2 would you have taken notes with Ms. Minor every

3 time she came in to see you?

4   A Yes.

5   Q And would you have taken notes every time

6 you talked to her on the phone?

7   A Most of the time unless it was a phone

8 call at home after hours, and I try diligently to

9 take notes on a piece of paper and then bring it

10 in to work and record it. There may be some

11 missing phone calls that did not get recorded.

12 I can't tell you what those are.

13   Q Okay. But for the most part--or not for

14 the most part, but in fact, anything that would

15 have been significant that you learned from

16 Ms. Minor would be contained in your notes. Is

17 that fair to say?

18   A That's correct.

19   Q I know you have, you testified you have

20 more than one patient and that you wouldn't

21 necessarily have an independent memory of every

22 session you would have had with every patient,

23 correct? So is that the reason why you take

24 notes?

Page 25

1    A  That's correct.
2    Q  Okay.  And what part does your opinion as
3  far as your diagnosis and treatment of Ms. Minor
4  depend on the information you learn from
5  Ms. Minor?  Can you quantify that?
6    A  Nearly a hundred percent.  I mean, that's
7  from her conversations with me and my observations
8  of her.
9    Q  Okay.  And is it important that the
10  information you learn from the patient be accurate
11  so that your treatment of her will be the best
12  treatment you can give her?  Is that fair to say?
13    A  Accurate in terms of what I can discern
14  from what she tells me and also my interpretation
15  of that, yes.
16    Q  So therefore you will strive--would it
17  have been your intent then to keep the most
18  accurate records you could have kept in terms of
19  your notes?
20    A  Yes, sir.
21    Q  You explained your diagnosis that you
22  made of Ms. Minor initially.  Has that diagnosis
23  changed over time?
24    A  No, it hasn't.

Page 26

1    Q  What's her current diagnosis?
2    A  Major depression, single episode, severe.
3  There is a provision in DSM IV for severity of
4  symptoms.
5    Q  Okay.  And do you have a prognosis for
6  her?  Do you have an expectation of how, what the
7  course of her condition will go?
8    A  I do.  And that depends on completion of
9  the litigation and then getting to the actual
10  beginning of the healing process.  And partly that
11  is a result of the anxiety that occurs every time
12  she is part of any sort of litigation process or
13  procedure and that seems like there's a setback.
14    And so the ones that I have dealt with
15  before that the actual healing and resolution of
16  the signs and symptoms of depression and anxiety
17  then are much easier to work with.  They don't
18  keep getting re-exacerbated by issues that come up
19  in litigation.
20    Q  Do you hold an opinion as to the cause of
21  the major depression that she developed in 2001?
22    A  I do.
23    Q  And what is your opinion on that?
24    A  Prior to the issues for which she came to

Page 27

1  see me, she had had about 25 years history as
2  being a pharmaceutical representative.  These are
3  with at least three different pharmaceutical
4  companies.  In each of these positions that she
5  held, her evaluations had always been outstanding.
6  She had a number of accolades, honors, so that is
7  a long history of successes.
8    At some time in early 2001 she had a
9  D and C, dilatation and curettage, and about two
10  weeks later she had a hysterectomy, and I can find
11  those dates for you if you wish.  April 21 or 26.
12  When--and she had, I think it was about a
13  two-and-half-month leave of, medical leave of
14  absence and recovery from the hysterectomy.
15    When she returned to work, she had a new
16  supervisor, and at that time her past territories
17  had been changed so that the territories were more
18  extensive and that they were becoming impossible
19  for her or she found them very difficult to manage
20  because of the distance that she had to travel.
21  She was also not getting, not receiving the
22  positive feedback even though she was trying to
23  work as hard as she had worked before that
24  produced the outstanding evaluations.

Page 28

1    And this is a woman whose career had
2  really been a focus of her life.  I mean, it
3  really was part and parcel of her feelings of
4  self-esteem, her self-worth.  So as she tried to
5  explain it to me, that she was asked to do more
6  which became nearly impossible for her to
7  accomplish, was not getting credit for what she
8  was doing.  And she had asked for a transfer
9  within the company, and she said that that was
10  denied.
11    And so she's in a position where with her
12  best efforts she's feeling incompetent, can't get
13  out of it, and is feeling trapped.  I believe that
14  was the first time when she had a panic attack,
15  and she had a, an episode of atrial fibrillation
16  which was treated by Dr. Tsang, I think is the,
17  her primary care.  I'm not sure of the spelling of
18  that.
19    And then she also in the feeling trapped
20  was having more depressive signs and symptoms,
21  more panic attacks, deterioration of her physical
22  condition, that is, the sleep and the appetite and
23  the energy, fatigue, poor concentration, and
24  memory.  Started eroding her self-confidence, her

Page 29

1 self-esteem, and that in combination with problems
2 with her physical condition. And it got to the
3 point where there was a deterioration of her life
4 and became disabled.
5 Q In your opinion does she have any kind of
6 pre-existing condition outside of what you've
7 talked about in terms of her emotional or mental
8 state?
9 MR. BAKER: Object to the question. Are you
10 asking if she had an earlier diagnosis of this?
11 MR. BRODERICK: Q Well, any pre-existing
12 mental or emotional condition.
13 A I don't recall any that had been
14 diagnosed. And I don't believe that she'd had any
15 cardiovascular problems or treatment prior to that
16 time. There were some childhood issues, but
17 again, her--what did I say--25 years or so of
18 exemplary performance hadn't been affected by
19 things that had happened in her childhood.
20 Q And you haven't reviewed any performance
21 evaluations of Ms. Minor from her 25 years of
22 work, is that correct?
23 A Nothing other than what she's told me.
24 Q And in terms of her treatment and in

Page 30

1 terms of her diagnosis, the diagnosis of her
2 atrial fibrillation, have you reviewed any medical
3 records in connection with that?
4 A No, I have not.
5 Q And have you reviewed records in
6 connection with the treatment of her atrial
7 fibrillation?
8 A No records by a physician, correct.
9 Q Would it change your opinion if you knew
10 the basis--assuming that what she told you was
11 true about her lack of feedback and critical
12 evaluations, would it change your opinion if you
13 saw the content, actual content of those
14 evaluations?
15 A I would have to read the evaluations and
16 assess what I felt the validity of those might be.
17 That in conjunction with what I already know, and
18 it perhaps might.
19 Q For lack of a better word, the stress
20 that she endured from her employment, is it severe
21 enough in your opinion to have been a cause of the
22 major depression episode?
23 A I believe that it was for her.
24 Q And what treatment did you prescribe for

Page 31

1 her as a result of that diagnosis?
2 A She had been or at the time when I saw
3 her at the new patient evaluation, she had been
4 placed on Wellbutrin, which is one of the
5 antidepressants, and it at that time was a
6 therapeutic dose. And that had been prescribed to
7 her after her return to work after the medical
8 leave from the hysterectomy.
9 And I typically start out at a low dose
10 and then increment or titrate upward as they
11 tolerate the side effects of the medication until
12 I get to what I believe is an optimal or
13 therapeutic dose for her. And that's what I did.
14 Zoloft I started at 25, went to 50 and then to 75
15 and then to 100 milligrams. And a typical adult
16 therapeutic range is 100 to 200 milligrams.
17 Q And prior to seeing you, to your
18 knowledge, had she been on any antidepressant
19 medication?
20 A She came in on Wellbutrin, which is an
21 antidepressant.
22 Q Who prescribed that for her?
23 A That was Dr. Tsang, I believe.
24 Q And do you know what the purpose of that

Page 32

1 prescription was for?
2 A It was because she was having some
3 symptoms of depression after coming back to work.
4 Q Do you know prior to that prescription,
5 do you know if she had been on any antidepressant
6 medication?
7 A I believe--well, let me look up my notes.
8 In the middle of the first page I ask about any
9 past medications. I have Prozac, dash,
10 nightmares, Zoloft, dash, okay. So apparently she
11 had been tried on two additional antidepressants.
12 I assume that those were prescribed by Dr. Tsang
13 as well.
14 Q Do you know what the nightmares consisted
15 of?
16 A No, I don't.
17 Q Do you know how far back or how long
18 she'd been taking Tranxene?
19 A I don't know that.
20 Q Would it change your opinion about her
21 diagnosis or the cause of her condition if you
22 knew the circumstance or the length of time which
23 she was taking Tranxene?
24 A Tranxene is one of the old forms of

Page 33

1  benzodiazepines. It's commonly prescribed by many
2  primary care physicians for complaints of anxiety.
3  It probably wouldn't affect my conclusion much.
4     Q Okay. Why is that? Why wouldn't it
5  affect it?
6     A Again, having discussed this issue
7  with a lot of different physicians--not with
8  Dr. Tsang--is that with primary care physicians,
9  when somebody comes in and they're anxious,
10  particularly a woman who's anxious, it's commonly
11  prescribed and so and quite liberally prescribed.
12  So it wouldn't have to be much that's unusual for
13  that to be prescribed.
14     Q Okay. And do you--so the fact that she
15  had previous complaints of anxiety and that she
16  was prescribed Tranxene by her primary care
17  provider, do you have an opinion--do you have a
18  qualitative opinion or assessment about the nature
19  of what that anxiety might have been and as
20  to--and either if that was a precursor to the
21  depression she was suffering when she saw you?
22     MR. BAKER: I'm going to object. I think the
23  question is vague, and I think there's a series of
24  subquestions.

Page 34

1     MR. BRODERICK: Q Did you understand what I
2  was trying to get at?
3     A Yeah. Yes. I'm sorry. What I don't
4  know is whether it had been prescribed prior to
5  her D and C and her surgery, how far back that
6  might have been prescribed, whether it was PRN
7  use--pro re nata; it means use as needed for any
8  sorts of feelings of anxiety--or whether the first
9  time that it had been prescribed was after she
10  came back to work returning from surgery. I don't
11  know that.
12     Q And outside of what you have written
13  about the Prozac and the Zoloft, do you have any
14  knowledge as to how frequently or how far back she
15  was taking Prozac or Zoloft prior to seeing you?
16     A No, I don't.
17     Q Was Ms. Minor, to your knowledge, did she
18  have any symptoms of depression during a time
19  period prior to seeing you?
20     A Yes. She was off work, as I said, for
21  about two and a half months from February through
22  mid April. And so from some time between mid
23  April and when I first saw her in November, these
24  were started. I don't know exactly when those

Page 35

1  were started.
2     Q And prior to that time period, are you
3  aware of whether or not she expressed any symptoms
4  of depression prior to that time period?
5     A I would have no idea.
6     Q Is it possible it might change your
7  opinion as to whether she had, this was a single
8  episode of depression if you, if you knew about
9  whether or not she expressed symptoms of
10  depression prior to that time period, prior to
11  early 2001?
12     A I would have to examine the records.
13  It's possible that it might change my opinion.
14     Q And typically what are the debilitating
15  effects from depression just in general?
16     A In general rather than in her terms?
17     Q Yes. We're just going to start with
18  generally first.
19     A Okay. As I said, it's a disturbance of
20  sleep, so they usually either have trouble falling
21  asleep or early-morning awakening, so they are
22  sleep deprived. They have a change in appetite;
23  in most cases it's a loss of appetite, so there is
24  loss of weight. They have poor concentration and

Page 36

1  poor memory. They have loss of energy, they
2  fatigue easily, lack of motivation.
3        They are frequently tearful, they feel
4  blue, pessimistic, loss of interest in hobbies or
5  any other fun activities. They tend to withdraw
6  socially, they tend to be more irritable or have,
7  more easily frustrated or have thin skin. They
8  complain of hopelessness, helplessness, not being
9  able to improve the depression. Worthlessness,
10  low self-esteem, and suicidal ideation at times.
11     Q And which of these did Ms. Minor present
12  to you?
13     A Most of those. You want me to recite
14  those?
15     Q If it's possible or else I can try and
16  tick these off for you if it's easier.
17     A Okay. She had disturbance of sleep. She
18  had very poor concentration and memory. She had
19  low energy, fatigued easily. Have I mentioned
20  poor concentration?
21     Q You did. How about appetite?
22     A I don't remember about any changes in
23  appetite. She had retreated socially from a lot
24  of events that she used to engage in, for example,

| Page 37 |
|---|

1 the Illinois Symphony Chorus. She dropped out of
2 Illinois Symphony Chorus.
3    Q When did she do that, do you know?
4    A I have no idea. Loss of interest in
5 hobbies. She had been a painter. As I said, a
6 singer. Had done--what is it when you're taking
7 pieces of glass and making them into a mosaic?
8    MR. BAKER: Stained glass?
9    THE DEPONENT: Stained glass? Thank you.
10    MR. BRODERICK: Q Was she tearful?
11    A Yes. Tearful almost on a daily basis.
12 Anxiety was common, and I'm not sure at this time
13 but certainly many later times that she would
14 complain of having panic attacks almost on a daily
15 basis that would last between a half an hour to an
16 hour. She felt hopeless, that there was nothing,
17 there wasn't a light at the end of the tunnel,
18 that this was going to continue indefinitely.
19    Q What? The depression or litigation?
20    A There was one entry in here which she
21 said, I was just told that this may last for
22 another two years, and that was November of '02.
23 How prophetic.
24      And she had passive suicidal ideation,

| Page 38 |
|---|

1 and let me distinguish between active and passive
2 suicidal ideation. Active suicidal ideation is
3 when a person is thinking about it, they've made
4 plans, and sometimes they start accumulating the
5 means as opposed to passive suicidal ideation
6 where they would tell you that, my life really
7 doesn't have much meaning, and if I weren't here
8 nobody would really care, and if I didn't wake up
9 in the morning it wouldn't bother me a bit.
10    Q Now, is that feeling of passive suicide
11 ideation, is that feeling a result of the stress
12 she suffered from her employment?
13    A Well, it's hard to separate that from
14 depression, but it certainly is one of the
15 hallmarks of the depression.
16    Q How does anxiety fit in with her
17 diagnosis for depression?
18    A Good question. And it's a good question
19 because as more and more research comes in, the
20 co-morbidity--c-o, hyphen,
21 m-o-r-b-i-d-i-t-y--between anxiety and depression
22 is about 50 percent. Which causes which, it
23 really doesn't make any difference. When you see
24 one, half the time you also see the other. And

| Page 39 |
|---|

1 it's really hard to tease apart.
2      I can get into some of the neurochemistry
3 that some anxiety disorders and some depressive
4 disorders have the same neurotransmitter chemical
5 messenger in short supply so that when that
6 happens, when serotonin is in short supply, that
7 it may manifest itself in one or the other or both
8 ways, anxiety and depression. So that they are
9 very frequently closely linked.
10    Q And in this case it appears to be so?
11    A Yes.
12    Q You talked earlier that earlier in 2001
13 she had surgery, she had a D and C?
14    A Right.
15    Q What is a D and C?
16    A Dilatation and curettage.
17    Q And could you explain that in laymen's
18 terms?
19    A When some women go, are in perimenopause
20 around that time of menopause that they have very
21 unpredictable menstrual cycles. And so one common
22 means at that time was to do a scraping of the
23 wall of the uterus, and sometimes that would
24 recycle or begin to recycle their menstrual

| Page 40 |
|---|

1 periods. It was also a means of acquiring tissues
2 to test for cancer, cervical and uterine cancer.
3    Q She had that procedure in 2001, to the
4 best of your knowledge?
5    A Right. Early in February. And about two
6 or three weeks later she did have the
7 hysterectomy.
8    Q In your opinion, do these medical
9 conditions, are these causative factors in her
10 diagnosis in any way?
11    A They certainly produce anxiety because a
12 woman is always concerned about cancer. It's also
13 an invasion of the body, and so that often results
14 in grieving about loss of a significant body part.
15 Particularly this would mean, although she was--I
16 don't know how old she was at the time, but it
17 would mean that she could never have any other
18 children.
19      It also meant that she had a
20 two-and-half-month hiatus from her job. And it's
21 always hard to tease these things apart, but when
22 she went back from her job, she had a new boss,
23 supervisor, who was 29, and she was 50-something
24 at the time.

Page 41

```
 1    Q  And so, so is it your opinion it's
 2  unclear whether these medical procedures are a
 3  causative factor or can you--?
 4    A  It's unclear.  I mean, there are a number
 5  of woman who have a D and C or they have a
 6  hysterectomy, and once they recover they go back
 7  to work and there aren't any major sequelae from
 8  that.
 9    Q  And in Ms. Minor's particular case, is it
10  unclear whether those procedures had an effect--
11    A  It's unclear because there were other
12  factors when she went back to work that had
13  changed.
14    Q  And one of the factors was that she had a
15  new supervisor who was 29?
16    A  Twenty-nine, yes.  She had a new
17  supervisor.
18    Q  Well, is the difference in age between
19  herself and her supervisor, do you think, was that
20  an issue for Ms. Minor?
21    MR. BAKER:  What do you mean an issue for
22  Ms. Minor?
23    MR. BRODERICK:  Q That difference in age, was
24  that a dynamic that affected her?
```

Page 42

```
 1    A  Well, there are two people involved here,
 2  and I'm not sure whose issues they were.  There's
 3  one thing that I recall that she told me one of
 4  his early questions when he found out that she had
 5  a son was how old's your son, she said 28, and he
 6  said, I'm 29, implicating that you're old enough
 7  to be by mother, I presume.  So I'm sure that she
 8  had reaction to that, and he did too or he
 9  wouldn't have asked the question.
10    Q  How do you think she handled, or do you
11  have an opinion as to the way she reacted or
12  handled having a boss who's significantly younger
13  than she was?
14    A  I'm not sure that was the issue as much
15  as the fact that the things that she had been
16  trained to do and the acknowledgment of her
17  abilities, which had been outstanding before, now
18  those were being revisited, and she was not
19  getting the credit that she had gotten before for
20  doing essentially the same work at the same
21  quality.
22        There were also other changes.  I think
23  he changed her territory, making it strung out
24  rather than centralized.  I don't remember all of
```

Page 43

```
 1  the details, and I think ways in which she had to
 2  report in had changed.  I think some of the--I'm
 3  too vague about those.
 4    Q  Okay.  But that's the best of your
 5  knowledge as to what was going on with her at
 6  work?
 7    A  Yes.
 8    Q  Does it make a difference in your opinion
 9  whether or not these changes were--assuming all
10  these changes occurred the way she told you, does
11  it make a difference in your opinion as to if
12  these changes were imposed on her in a
13  discriminatory fashion, whether it was
14  discriminatory based on her age or gender?
15    A  Would it make a difference if they were?
16    Q  Yes.
17    A  Yes.
18    Q  So if these changes were, in her job
19  situation were simply imposed in a
20  nondiscriminatory fashion, how would that change
21  your opinion?
22    A  I believe it would have had less of an
23  impact.  This has nothing to do with Jane or this
24  other fellow, but I think in general if a group of
```

Page 44

```
 1  people feel that they're, they're suffering and
 2  they're suffering under the same oppression,
 3  whether that's a hurricane or whether that's a
 4  boss in a department, it's easier to tolerate
 5  because we are all being treated equally but
 6  poorly than it is if I feel I'm singled out and
 7  nobody else has to or is receiving the same
 8  discrimination that I am.  I think that is more
 9  damaging.
10    Q  And in this situation that is true?
11    A  As reported to me, yes.
12    Q  Is it possible that if these changes that
13  occurred in Jane's job environment occurred in a
14  nondiscriminatory fashion, could she still have
15  suffered an episode of depression?
16    A  Yes.  It's possible.
17    Q  And how is that possible?  Or why is that
18  possible, excuse me?
19    A  Again, this is not about Jane.  I work
20  with a number of people from the State of
21  Illinois.  And there have been many layoffs within
22  different departments because of shortage of
23  funds.  And there may be 25 people laid off in a
24  department, and a few of them may get depressed.
```

Page 45

1  They're the ones that--I mean, if they come to see
2  me. But that also means that 22 others weren't.
3  And so it's not something that occurs across the
4  board.
5      Q  Did you review any records from her
6  hysterectomy or D and C?
7      A  No.
8      Q  Do you know if she had any complications
9  or unusual complications with her hysterectomy or
10  D and C?
11     A  I'm trying to remember. It seems as
12  though there might have been a reaction to a
13  medication that was given, but I'm unclear about
14  that.
15     Q  Okay. And so whether or not there
16  were--strike that. Sorry.
17         If it turned out that--strike that.
18         Is there a part of the--one of the
19  details that Jane described for you as one of her
20  stresses at her job, is there one of those details
21  that she described for you that is a more
22  significant detail than the others? And if you
23  want me to give you an example I will to make that
24  clearer, but I mean, for instance, is her

Page 46

1  territory, the fact that her territory was
2  changed, is that a more significant factor than
3  how she was evaluated?
4      A  Both were significant. Of the two, I
5  think the fact that she was not given credit for
6  the things that she felt she was doing quite well
7  was more significant in deteriorating her
8  condition.
9      Q  Is there any factor that you know of from
10  her job that she described for you that was the
11  most significant factor? Maybe you just described
12  it?
13     MR. BAKER: Most significant factor?
14     MR. BRODERICK: Q Most significant factor in
15  causing her depression.
16     A  I think it was that one.
17         Let me just reflect on something I
18  mentioned earlier. And what I said earlier was
19  that not only was she, how she was being evaluated
20  got changed and the contentiousness with her
21  supervisor, but the fact that when she asked to be
22  transferred, that had been blocked, and so here
23  she is stuck or trapped in a situation where doing
24  more of the only thing that she knows how to do to

Page 47

1  be accountable and to receive good reviews no
2  longer worked, but also there was also no exit
3  from that. And so it may be the trapped feeling
4  that may have been perhaps the most important.
5      Q  Just to review, what--we talked a lot
6  about cause, and we talked a lot about symptoms,
7  but could you just give me generally a list of
8  causes of depression?
9         And maybe that's too general. Is that
10  too general? You diagnosed her with a major
11  depression, single episode. What would typically
12  cause a major depression, single episode? Or what
13  are the causes of that?
14     A  Okay. It might be that there is a
15  genetic predisposition; some sort of trauma that
16  pushes one past one's own innate abilities to be
17  resilient or to be flexible; that these be chronic
18  enough so a single episode may not be enough to
19  bring about this domino effect of things tumbling
20  like all the physical symptoms and all the
21  emotional symptoms.
22         Age has something to do with it. The
23  typical first episode of major depression is
24  anywhere from late teens to late 20s. Sometimes

Page 48

1  it can occur as late as the late 30s, and, you
2  know, the incidence goes down farther on. But I
3  mean, you know, it can occur up to late 50s for a
4  first general episode.
5         Other causes may be loss of a loved one
6  where something that starts out as grieving gets
7  more complicated. And it's basically when it gets
8  to the point where there is a change in
9  biochemistry in the brain in the limbic system,
10  l-i-m-b-i-c system in the brain, which is where
11  the emotions are generated. And once those get
12  past a point of no return, then the symptoms just
13  proceed.
14     Q  And in Ms. Minor's case, did genetics or
15  family history have anything to do with her
16  depression?
17     A  I don't know that. It may be. I just
18  don't know her family history.
19     Q  Aside from what we already talked about,
20  is there any traumatic incident that would, that
21  was a factor? I don't know if you consider what
22  happened with her employment as one such incident
23  but--.
24     A  That is. She has had some other

Page 49

1  significant traumas in the past. One had been a,
2  I don't know whether you'd call it a date rape.
3  This had been a fellow that she had been with. I
4  don't know whether they were boyfriend-girlfriend,
5  but something, an incident occurred in which she
6  felt that she was taken advantage of, and
7  regardless of how the interaction initially
8  started, it got to a point where she wanted to
9  terminate it and he would not.
10  Q  And is that, could that have been, is
11  that a factor, in your opinion, in her current
12  diagnosis?
13  A  That occurred when she was doing--I don't
14  know what year that was, but it was when she was
15  being productive as a pharmaceutical rep and
16  receiving all the accolades and getting
17  outstanding, so it didn't appear to be then.
18  MR. BRODERICK: Do you want to take a break?
19  MR. BAKER: I'd love to take a break.
20      (Whereupon a short recess
21      was taken at 4:24 p.m.)
22  MR. BRODERICK: Q We were talking about
23  traumatic or trauma as a cause of Ms. Minor's
24  depression. Is there any other trauma that we

Page 50

1  haven't talked about that you consider part of a
2  factor?
3  A  Not trauma but stress, and that would be
4  her relationship with her son.
5  Q  Okay.
6  A  That he has a girlfriend, maybe by now a
7  fiancee, and I forget. And she and the fiancee
8  have some difficulty, and that has drawn her son
9  away from her. But again, that vacillates with I
10  don't know what. But when she comes in that's
11  usually one of the topics of conversation, and
12  it's been stressful for her.
13  Q  And that has been some sort of cause in
14  her condition? Has that been a cause in her
15  condition, in your opinion?
16  A  She worries about it. I don't know
17  whether it's causing her condition or not.
18  Q  Well, I guess is a single episode of
19  major depression, is this episode something that
20  can last for a great length of time?
21  A  Well, good point. At some point, and I
22  would have go back and review DSM IV, but once it
23  gets past a certain time span, then you have to
24  rename it recurrent major depression. So I've

Page 51

1  got--I mean, I can look that up for you now if you
2  want to.
3  Q  Okay. That's in the documents you
4  provided, the Kemper or it's in the Kemper reports
5  or disability. I guess what I'm interested in,
6  did you relabel it recurrent?
7  A  No, I didn't. No.
8  Q  Okay.
9  A  I mean, I didn't because it has been a
10  continuous process. Usually recurrent means that
11  they have an episode, it gets treated, goes away,
12  you take them off the medication, three years
13  later, five years later they have another episode,
14  and so that would be a recurrence.
15      Now, whether a single episode over a long
16  number of years gets relabeled as a, as a
17  recurrent major depression--the reason that there
18  are, it's a DSM IV is that about every six or
19  eight years they have another edition and they
20  change the rules and change their criteria.
21  Q  I understand. Is her condition, then, has
22  this been, in your opinion, has this been a single
23  episode that has lasted till this day since
24  November of 2001?

Page 52

1  A  Basically. Although there have been some
2  months when she seems to have done somewhat
3  better. I mean, she still is debilitated, but she
4  comes in and seems somewhat better. I would still
5  consider her not being fit to go back to work.
6  Q  In terms of what has--what has caused it
7  to be so prolonged? I know you touched on this
8  before, but is that because of the ongoing
9  litigation?
10  A  Yes.
11  Q  And it keeps revisiting the facts and
12  circumstances that caused the initial episode?
13  A  Right. And whenever that happens, she
14  decompensates again, and she has recurrence of or
15  exacerbation of depressive symptoms and it
16  increases the incidence of the panic attacks and
17  now the atrial fibrillation attacks which have
18  taken her to the hospital a couple of times.
19  Q  Are there any other factors that cause
20  the episode of depression to be prolonged? Aside
21  from job-related stress and litigation?
22  A  If there are, I can't think of them right
23  now.
24  Q  Okay.

Page 53

1    A  Are you going somewhere with this?
2    Q  No.  I'm just trying to explore to the
3  end the limits of your opinions.
4    A  Okay, okay.
5    Q  I don't know if this means I was going
6  somewhere, but I think I recall in your notes a
7  mention of a friend's suicide or a sister's
8  suicide attempt?  Does that ring a bell?
9    A  Help me out.
10  MR. BRODERICK:  Off the record.
11      (Discussion off the record.)
12  MR. BRODERICK:  Q Are you aware whether or
13  not that she has a sister?  Let me ask that.
14    A  Yes.
15    Q  Okay.  Are you aware whether or not that
16  she may have attempted suicide?
17    A  I don't recall, and I apologize.
18    Q  Okay.  Okay.  Would an incident like that
19  be any kind of factor that may cause her
20  depression to be prolonged?
21    A  No.  But it would account for her saying
22  that or for deterring her from taking her own
23  life.  And I'm, this is March 12, 2002, and this
24  is one of the Kemper behavioral health clinician

Page 54

1  statements.  And it asks about suicidal
2  ideations--this is of Jane.  I put yes, passive
3  colon, quote, wouldn't matter if I died, end
4  quote.  Suicide plan reported, no.
5      Quote, I'm of no use if I can't work.
6  Able to report reasons for not harming self, yes.
7  Realizes how it would damage son.  And I think
8  that her, if I remember correctly, that her, if
9  her sister did attempt suicide, how much it
10  affected the family, and so that she translates
11  that to the impact that she would not want to
12  inflict her son.  And that's what's kept her from
13  any active suicidal ideation.
14    Q  Okay.  And just for the record, but that
15  wouldn't be, in your opinion, a factor that has
16  prolonged her depression?
17    A  No.
18    Q  Has the relationship with her
19  son--forgive me if I've asked this already, but is
20  the relationship with her son in any way--was
21  that--prior to her seeing you, was the
22  relationship with her son a factor in causing her
23  episode of depression?
24    A  As I said, it's added to her stress.  How

Page 55

1  that might if at all have protracted her
2  depression would only be speculation on my part.
3    Q  In post November 2001 and the
4  relationship with her son, same opinion?  It's
5  hard to say?
6    A  Yes.
7    Q  Have you reviewed the transcript of
8  Ms. Minor's deposition?
9    A  No.
10    Q  Do you know the name of her supervisor or
11  her boss?
12    A  Tony.
13    Q  I may have asked you this before, but
14  would it change your opinion in any way as to your
15  diagnosis and prognosis if you know more about the
16  facts or circumstances of her work situation?
17    A  What I would have to do is to review all
18  that information and then go back and review what
19  I already have and then come to some conclusion.
20  I'm not saying it would or wouldn't.
21    Q  Do you recall any other statements that
22  Ms. Minor said that Tony said to her?
23    A  Not that I recall.
24    Q  Do you know if she was dissatisfied with

Page 56

1  work prior to--I'm sorry.
2      Do you know if she was dissatisfied with
3  her employment at Centocor prior to the beginning
4  of 2001?
5    A  No.  I don't believe that she was.  I
6  think that when she--and this is soft
7  recollection, but I believe that she had, she had
8  been at Abbott before for like 18 and a half
9  years.  She was recruited I think by Centocor and
10  even got a sign-on bonus so that they were
11  expecting great things from her, and my impression
12  was that she had worked hard and she knows her
13  products and she knows a lot of physicians and had
14  known them well for a long time.
15    Q  And would it be a factor or could it be a
16  factor that would change your opinion about her
17  diagnosis if you knew whether or not she
18  was--excuse me.  Strike that.
19      Would it be a factor that would change
20  your diagnosis if you knew that she was
21  dissatisfied to some degree with her job at
22  Centocor even in 2001 prior to Tony becoming her
23  supervisor?
24    A  What I understand that she told me was

Page 57

1  that she was still getting outstanding reviews.
2  I probably--I'm going to digress just to help you
3  understand this. I probably see a half a dozen
4  drug reps in a week. And they come in and talk
5  about the products, and you also hear a little bit
6  about their relationship with their companies.
7      And they're really under the gun to
8  perform. I mean, they have to go out and see a
9  number of physicians. They're pushing to get
10 their product piece of the pie increased. A lot
11 of their bonuses are based on how many physicians
12 they can get to write more scrips on their
13 product, and so every one of them is under the
14 gun.
15     And so most of them find that pretty
16 stressful, and they complain and so that's just
17 part of the turf. And they all know that, and I
18 would imagine she had the same, they had the same
19 expectations about her, and I imagine it was just
20 as stressful for her as it is for almost each of
21 the drug reps that I see.
22     Q So that kind of level of
23 satisfaction--dissatisfaction, if we can call it
24 that, if she experienced that, would that be or

Page 58

1  not be necessarily a cause in her of her
2  depression?
3      A No. Her performance she told me was
4  still excellent, and it comes with the territory,
5  it comes with the turf with these people. And in
6  most cases there's a pretty high turnover. I
7  mean, they last two or three years and get a
8  different job.
9      Q It seems to be a distinguishing factor
10 maybe the dissatisfaction was tied to some
11 critical--if it turned out that she was
12 experiencing some criticism in 2000, and I'm not
13 saying she was or she wasn't, but I'm just trying
14 to explore your opinions. If she was experiencing
15 some criticism in 2000 that caused her to be
16 dissatisfied?
17     A I didn't know that.
18     Q Okay. Well, assuming that was true--it's
19 a hypothetical--would that be a, could that be a
20 factor that may change your opinion about her
21 diagnosis?
22     A Well, it might be except that it didn't
23 seem to affect her performance and her evaluations
24 until after Tony comes on board.

Page 59

1      Q Okay. If it weren't for the ongoing
2  litigation, how soon would you have expected her
3  depression to resolve itself, if that's a fair way
4  to put it?
5      A Boy, that's a good question. At that
6  point, here would be my short-term goals after
7  getting through a litigation: Continue with the
8  med management, keep her physically healthy, that
9  is, the issues about sleep and appetite and energy
10 and memory and concentration, keep those improved,
11 all the cardiology stuff, that that be managed so
12 that she's physically healthier, to improve her
13 ADLs, her activities of daily living and have her
14 more stress-hardened, if you will; those would be
15 the short-term goals.
16     Long-term goals: Get her to have some
17 purposeful life because right now she tells me
18 that it just feels like it's on hold. I can
19 believe that. I mean, she's barely able to
20 maintain her home. Up until recently she's relied
21 on friends to drive her places because she is a
22 danger behind the wheel. I mean, her
23 concentration and coordination and just focus is
24 dangerous. She has difficulty leaving home, she's

Page 60

1  uncomfortable around large groups of people.
2      Yeah. Purposeful life would be, I think
3  would include getting her to a point where she
4  felt she could engage in some activity, a job that
5  would be rewarding to her. I would probably
6  encourage her to put some restrictions on that;
7  not just any job. I think one with little or no
8  supervision, one with few coworkers. She's an
9  artist; those can be solitary things. That would
10 be an avenue of future occupation for her,
11 artistic endeavors.
12     Q Is it hard to put a time frame estimate
13 on--?
14     A It is. It's not going to be weeks, it's
15 not going to be months. It might be several
16 years. It might be a year. It depends on how
17 broken she is. How long it's going to take to get
18 her self-esteem and self-confidence back. Again,
19 what I said early on was that here's a woman who,
20 she didn't have much family support, her, she had
21 two jobs. One was raising her son, and one was
22 performing for her employers.
23     And all of her or most of her self-worth
24 and her self-esteem were measured by her successes

**Page 61**

1 at work. And so that really was the essence of
2 who she was. And I forget how I, how she said it
3 at the beginning. I've been living a lie. I
4 haven't been true to myself.
5   Q What does she mean by that?
6   A That, the lie is that all of her
7 self-esteem has been promoting something else or
8 somebody else, or it's been about a career rather
9 than, and doing things for others rather than
10 taking care of herself. And the sacrifices were
11 tremendous. And so when you have somebody who has
12 that sort of mentality and then you box them into
13 a position which is totally untenable, it
14 undermined everything that she felt she stood for.
15   Q I'm sorry. Go on.
16   A Well, I mean, an example would be a lot
17 of who I am is about being a competent
18 psychiatrist. And if something happened and
19 people kept me from doing this, I would
20 decompensate because this is a lot of who I am.
21   Q Do you see yourself in any way as doing
22 anything to treat her atrial fibrillation?
23   A In a small way. And that is to teach her
24 some relaxation techniques so that she's better

**Page 62**

1 able to cope with stresses. Now, whether that's
2 yoga, I don't teach yoga, but--and when she's able
3 to get out of her house and be around people, that
4 would be a wonderful exercise for her to do.
5   I do some relaxation training with her; I
6 haven't been able to yet, but I do hypnotherapy
7 for relaxation. I mean, there are different ways
8 of doing that, but just develop better coping
9 skills. And I think that would reduce her
10 vulnerability or susceptibility to these atrial
11 fibs.
12   Q Do you see her limitation in coping
13 skills as resulting from what happened in the year
14 2001 from work, just stresses at work, or do you
15 know that her coping skills were degenerating
16 prior to that or if that was a pre-existing
17 condition?
18   A I can only answer that on the basis of
19 history, and that is, for about 25 years her
20 coping skills were appropriate enough to keep her
21 in the outstanding range of her performance. And
22 since that time they haven't.
23   Q Do you have an opinion as to the cause of
24 her atrial fibrillation?

**Page 63**

1   A That's not an area of my expertise.
2   Q Okay.
3   A Other than when people get anxious, their
4 heart rate goes up. But I presume that there's a
5 whole qualitative difference between that and
6 atrial fibrillation.
7   Q Okay. Just a couple questions I have to
8 ask. How are your, who is paying your bills for
9 treating her?
10   A Her insurance company, and then she has a
11 copay.
12   Q Okay. And how much do you charge per
13 session?
14   A Well, what I charge is not what I get,
15 okay?
16   Q I know.
17   A My fee is a 175 an hour. And that's
18 pretty much a rate around here. Then the
19 insurance company in their wisdom says that this
20 is above and beyond, and so that is reduced by a
21 certain amount, and with her insurance company I
22 have no idea. So it's, I don't know, 70 cents on
23 the dollar, 60 cents on the dollar, and then her
24 co is a certain, copay is a certain fraction of

**Page 64**

1 that.
2   Q Finally, did you write any kind of a
3 report or summary of your opinions about
4 Ms. Minor?
5   A Other than the ones to the insurance
6 company?
7   Q Yes.
8   A No.
9   Q Okay. Is there anything else significant
10 about Ms. Minor that we haven't covered that was
11 part of your diagnosis or treatment?
12   A When I first met her and knew her, we
13 both sang in the Illinois Symphony Chorus. And
14 she was a really vibrant part of that. Has a
15 beautiful voice and was a significant part of the
16 chorus there. And this is just a--I mean, she's
17 just a shell. And the reason that I'm in this
18 business is that I like to see people reach the
19 full potential for their being. I really hope
20 that happens for her.
21   Q Just remembered. We talked about you had
22 a number of patients or--not a number--a small
23 number or patients who you treated with depression
24 who are ongoing with litigation. Do you see that

Page 65

1  as a subset of your treatment? I mean, is there
2  certain, something in particular about treating
3  patients who have litigation ongoing and their
4  conditions are affected by the ongoing litigation?
5     A  Yeah. It's really tough.
6     Q  Is it?
7     A  Because I end up wearing two hats. I
8  mean, the one hat is the one that I've been
9  trained to do and the one that I'm doing
10  psychiatry at all, and that is helping people get
11  better, feel better, reach their full potential.
12        The other hat is, in the back of my mind,
13  I'm thinking okay, how are all these other factors
14  that I have no control impeding the work that I'm
15  trying to do--I lost my thought. How I alter what
16  things I record just because I know that I'm going
17  to be sitting here with you and having to defend
18  myself.
19     MR. BRODERICK: Okay. I don't think I have
20  any other questions.
21     MR. BAKER: That was the good news. The bad
22  news is I have a few.
23     THE DEPONENT: Okay.
24

Page 66

1        EXAMINATION BY
2        MR. BAKER:
3     Q  Picking up where Mr. Broderick left off
4  and perhaps to relieve any guilt complexes for my
5  treatment of my clients, as I understand it in
6  Jane's situation, the existing lawsuit has
7  implicated the healing process and maybe has
8  delayed the healing process?
9     A  It has.
10    Q  Am I correct in that respect?
11    A  And it has in every case that I've worked
12  with.
13    Q  Okay. So it has nothing to do with
14  Jane's case in particular or the way her lawyer
15  treats her? Can I go home and sleep at night?
16    A  I'm here to assuage your guilt?
17        It's typical of every case that I work
18  with is that these, in the process of litigation
19  that it impedes their recovery. Doesn't mean that
20  eventually they don't recover. I mean, many of
21  them do, but what happens is that they will often
22  take a different career just because this has all
23  of the negative associations with it.
24    Q  Is the fact in litigation that you're

Page 67

1  ruminating about the episodes that gave rise to
2  the lawsuit, revisiting unpleasant events, does
3  that have something to do with the delay in the
4  healing process?
5     A  It does. And what's interesting about
6  that is how similar it is to another diagnosis
7  called posttraumatic stress disorder. I'm not
8  saying that that's what this is except the
9  similarities are that when the individual goes
10  back and revisits either a transcript or revisits
11  their thoughts or in a discussion with an
12  attorney, is that it often brings back some of the
13  initial emotions, and usually after a situation
14  like that that there's a deterioration of their
15  symptoms.
16    Q  In Jane's case, do I understand that your
17  treatment plan during the litigation process is
18  different than what your treatment plan would be
19  once the litigation process is concluded?
20    A  Yes. And that's what it has been for the
21  other cases as well. Is that most of the sessions
22  are putting out brush fires. I mean, she comes in
23  with current problems, and those take up most of
24  the time and it's really hard to get back to some

Page 68

1  of the other issues because that's not where she
2  is, and if I push to get my agenda in there, it's
3  really not helping her manage what she has to do
4  from day to day just to live.
5     Q  Once the litigation process concludes,
6  win, lose, or draw, when it comes to an end.
7     A  Right.
8     Q  I think--and I don't want you to repeat
9  yourself. I think you earlier described what your
10  treatment plan would be at that point in time?
11    A  Right.
12    Q  And given Jane's symptoms as they
13  presently exist, do you have any estimate as to
14  when it would be that she could resume some form
15  of employment?
16    A  There are several courses that she might
17  take. One would be just to find some job that she
18  could do in order to get some modicum of
19  self-esteem back and have some sort of income,
20  whether that would be working in a stained glass
21  shop, whatever. Another would be if she decided
22  that in order to do what she really wanted to do
23  it would require extra training and, say, going
24  back to school in order to do that.

Page 69

1    So you know, that would be an extra two
2 to four years until she got into a profitable or
3 an enjoyable career. Psychologically, as I said,
4 it's not going to be days, weeks, or months, but
5 in several years I think that once she doesn't
6 have to keep repeating these traumas that have to
7 do with the litigation process that her mood is
8 going to be stabilized and hopefully I can get her
9 off of these medicines because she was never on
10 them before this.
11    Q  Are you at the present time in a position
12 where you could project into the future when the
13 healing process takes its course what type of work
14 Jane could do?
15    A  In terms of a job title, no. In terms of
16 qualities of the workplace, I can make some
17 suggestions, and I would to her. And that would
18 be minimal supervision, certainly not a strong
19 supervisor. A situation that was, with a minimum
20 of contention with other coworkers and probably a
21 minimum of other coworkers so that maybe not a
22 solitary job but one that was congenial, you know,
23 small group of people in which she could use her
24 creativity, whether it's artistic creativity or

Page 70

1 her mental creativity.
2    Q  I believe you've indicated that you have
3 some exposure on a weekly basis to pharmaceutical
4 representatives?
5    A  Yes.
6    Q  And you have some idea of what their work
7 entails?
8    A  Right.
9    Q  Do you have an opinion one way or another
10 whether Jane Minor could ever resume her career in
11 pharmaceutical sales whether for Centocor or
12 Johnson & Johnson or some other company?
13    A  And this is going back to the
14 similarities with posttraumatic stress disorder.
15 She would be going back into situations that are
16 so similar to what she's come out of that it would
17 just exacerbate all of those symptoms, and I don't
18 think she'll ever be able to do anything like that
19 again.
20    Q  What seems like hours ago but I suspect
21 was probably within the last hour and a half, you
22 were asked by Mr. Broderick the causes for one
23 contracting or becoming depressed, and I'd like to
24 talk with you about those causes if we could for a

Page 71

1 minute. The first you identified was a genetic
2 predisposition for depression?
3    A  Right.
4    Q  I assume that means that your parents or
5 someone in your family had a history of
6 depression, and it's passed along to you?
7    A  Yes. But that's not an absolute. I
8 mean, there are certainly people who are depressed
9 in which there is no family history. But if there
10 is a family history of depression, the more apples
11 there are on the tree, the higher the probability
12 that subsequent individuals are going to be prone
13 to that, although doesn't mean that they will
14 always develop that.
15    Q  If someone has a history of depression in
16 one's family and there is a connection between
17 that history and that individual's depression, is
18 there any particular age point where the
19 depressive symptoms would expose themselves?
20    A  All of the work that's been done
21 indicates that the first episodes in familial-type
22 depressions occur I think as I said late teens,
23 early, late teens to late 20s. And it tails off
24 from there.

Page 72

1    Q  Okay. So if one had their first
2 depressive episode in their mid 50s, would that
3 suggest one way or another just the fact of one
4 depressive episode occurred whether genetics
5 played a part in it?
6    A  Well, less likely. Here's another
7 example is that a person is 50 or 60, and their
8 spouse dies. And they go through appropriate
9 grieving, but the grieving gets protracted, and
10 they end up a year and a half later with full
11 major depression it has been that that is so
12 stressful.
13    Or let's say that a parent and their
14 child dies. And that is so traumatic for them that
15 they go through the grieving, but it gets
16 protracted, and eventually biochemistry in the
17 brain changes and that could be independent of any
18 genetic predisposition.
19    Q  Well, the fact that--assuming for a
20 moment that Jane Minor's first episode of major
21 depression occurred when she was in her mid 50s.
22    A  Uh-huh.
23    Q  Would that make it more likely or less
24 likely that genetics played some role in her

Page 73

1  depression?
2  A  Less likely.
3  Q  Okay.  You also indicated that--do I
4  understand this correctly that age has something
5  to do with one becoming depressed?
6  A  Well, that, if you were--yeah.  As I
7  said, the peak first experience of depression is
8  in late teens, early 20s, and then it goes down
9  after that, so age has that relationship, yes.
10  Q  Okay.  You indicated, what, loss of a
11  loved one.  Would that include loss of a
12  relationship?  For example, a divorce?
13  A  It could.
14  Q  And if the loss of a loved one or a loss
15  of a relationship was the cause of the depression,
16  would there be a time sequence between when that
17  loss occurred and when the depressive symptoms
18  arose?
19  A  Usually within a year.  And this goes
20  back to Freud's essay on Mourning and Melancholia.
21  Q  In Jane Minor's situation, I believe, and
22  Mr. Broderick can correct me if I'm mistaken, but
23  I believe she had two failed marriages.  Are you
24  aware of that?

Page 74

1  A  I knew of one.
2  Q  And I further believe that the last, her
3  last divorce was sometime in the 1980s.  Given
4  that fact, do you feel there's any correlation
5  between her marital failures and the cause of her
6  depression?
7  A  Of this cause of depression?
8  Q  Yes.
9  A  No.
10  Q  You said trauma can be a cause of
11  depression, and you said stress could be a cause
12  of depression.  By trauma are you referring to a
13  physical trauma or being in a catastrophic
14  accident?
15  A  Either of those.  Physical trauma.  Who
16  was Superman that went off the front of the horse?
17  Q  Yes.
18  MR. BRODERICK:  Christopher Reeves?
19  THE DEPONENT:  Yeah.  I mean, major losses of
20  physical function are common cause of depression.
21  MR. BAKER:  Q And where trauma would be a
22  cause of depression, would the symptoms of
23  depression occur within a predictable time period
24  from the trauma?

Page 75

1  A  Again, it's usually within a year, year
2  and a half, yes.
3  Q  Okay.  You indicated also that stress or
4  exposure to stressful events can be the cause of
5  depression?
6  A  Right.
7  Q  And would you consider an unsatisfactory
8  relationship with one's supervisor to be a form of
9  stress?
10  A  It's--sure.  That's a form of stress.
11  Would that put a person past the threshold where
12  it went into a biochemical or a clinical or a
13  major depression?  It could.  In this case, I
14  don't think that was the only, only stress
15  wasn't just her arguments and restrictions by her
16  supervisor.  It's, I think the other part was that
17  any other avenues of escape were blocked of going
18  to another part of the company or any alternate
19  position, job positions.
20  Q  Okay.  Judging from the history you
21  recited based upon your visits with Jane, as I
22  understand it, she explained to you that her
23  problems at work--and I'm using that to encompass
24  all of these things that were going on at

Page 76

1  work--occurred sometime following her return to
2  work in the spring of 2001?
3  A  Yes.
4  Q  And you first saw her in early November
5  of 2001?
6  A  The first of November.
7  Q  Is there any significance in your view to
8  the complaints she had about what was going on at
9  work, assuming they occurred for a moment, and the
10  symptoms you found on November 1 in connection
11  with connecting those two events?
12  A  Uh-huh.
13  Q  And what is that significance?
14  A  Okay.  I was going someplace else in my
15  mind and wasn't listening to your question.
16  Sorry.
17  Q  Let me start over.
18  As I understand it, Jane's complaints
19  about her work situation related to events that
20  occurred beginning in the spring of 2001, am I
21  correct?
22  A  Well, late spring, early summer.
23  Q  Okay.  And you saw her and saw her
24  symptoms in November of 2001?

Page 77

1   A   Correct.
2   Q   Would it be abnormal for one, assuming
3 these events at work did occur, to have these
4 depressive symptoms within several months of when
5 they began occurring?
6   A   Well, they were to her primary clinician
7 in that she was started on Wellbutrin, which is an
8 antidepressant. She was having anxiety to the
9 point of a panic attack. At that time I don't
10 know what--sidebar.
11      When somebody calls for an appointment,
12 the first appointment that they may get may be two
13 or three months into the future. So in this case,
14 I don't know when she first called in and when I
15 was able to see her. But in the meantime, she was
16 on, she had been placed on, she was on one
17 antidepressant and had been tried on two others.
18      And when, with a primary care physician,
19 they typically are comfortable in prescribing
20 several antidepressants, and they try those, if
21 they don't work very well, that's when they refer
22 to a psychiatrist.
23   Q   If an individual--if there is a
24 connection between one's depressive symptoms and

Page 78

1 one's perception that he or she is being unfairly
2 treated at work, would there be a predictable time
3 sequence between when the depressive symptoms
4 would occur after this perception of being
5 unfairly treated at work?
6   A   A predictable sequence? No. It's, would
7 likely occur within a year, but, I mean, not in
8 any fixed delay after that.
9   Q   Okay. When you first saw Jane Minor, did
10 you undertake what's called a mental status
11 examination?
12   A   No, I didn't.
13   Q   Do you have any--having seen her for as
14 long as you have, do you have any doubt about the
15 accuracy of the symptoms she has reported to you?
16   A   I've seen most of those demonstrated in
17 my office.
18   Q   Can you explain what you mean by that?
19   A   There were many office visits where she
20 was tearful off and on the entire hour. Other
21 times when her, I would ask a question and there
22 would be a latency of five or 10 seconds, and I
23 wasn't sure whether she heard the question,
24 understood the question, was pondering the

Page 79

1 question, had forgotten the question. There were
2 times when she was, she would bring in information
3 and time would just be spent shuffling and she was
4 just disorganized.
5      Other times she came in dishevelled.
6 There were times when she was late and I asked her
7 about the, her tardiness, and it was because her
8 friend, a girlfriend whom she was counting on for
9 a ride here didn't show up on time because she was
10 unable to drive here herself. So those are
11 evidences that or more objective evidence than
12 just or that supported what she was telling me
13 about herself. That's what I wanted to say.
14   MR. BAKER: All right. Give me just a second.
15      I have nothing further.
16        EXAMINATION (CONT'D)
17        BY MR. BRODERICK:
18   Q   I just have a few follow-up questions.
19      Do you know when her panic attack
20 occurred specifically as far as month?
21   A   August 2.
22   Q   Do you know what triggered it?
23   A   No, I don't. And I have in parentheses
24 atrial fib, so she also had the, this tachycardia

Page 80

1 as, which would go along with an anxiety episode.
2 And the note under that was, went back to working
3 hard. So I assume that--well, I don't know what
4 triggered that.
5   Q   Do you know how long she's known her
6 supervisor Tony?
7   A   The impression that I got was when she
8 got back from her two and a half months after the
9 hysterectomy was that he was there. I don't know
10 if they had met before that or not.
11   Q   Okay. Would it make a difference at all
12 in your opinions that you've expressed here today
13 about her condition or causes of her condition if
14 you knew that they had known each other for almost
15 a year prior to that?
16   A   It would depend on the condition of their
17 knowing each other. For example, if they were
18 colleagues at the same level and he got promoted
19 that would be quite different.
20   Q   How would that be different?
21   A   The psychodynamics are different with
22 peer-level interactions because she would not be
23 reporting to him, she would not feel that he has
24 any superior position to her. But if he were to

Page 81

1  get promoted then and have to answer to him, I
2  don't know him, I don't know what changes in his
3  attitude he might have in getting the promotion
4  and treating people who had been coworkers prior
5  to that, how he might be treating them
6  differently.
7      Q  Not to be overly simplistic, but
8  hypothetically if she never liked him from the
9  beginning, whatever reason, would that change your
10  opinion about their relationship?  Maybe the
11  reason why she might not have liked him would be
12  an important factor, I don't know.  I'm just
13  wondering if these things would change your
14  opinions?
15     MR. BAKER:  Opinions as to what?
16     MR. BRODERICK:  Q As to her condition and the
17  cause of her condition.
18     A  Can I answer that in a roundabout way?
19     Q  Well, you can answer it how you want to
20  answer it, I guess.
21     A  When I talk to pharmaceutical reps when
22  they come in, after they're comfortable with me
23  and I'm comfortable them, they talk a little bit
24  about their profession.  And most of them have

Page 82

1  some complaint about their supervisor.  There's
2  something that grates on them or that they feel
3  that they have to, that they're being singled out.
4      There's, I don't know whether it's part
5  of the human condition where we just complain
6  about the people who control us or not, but that's
7  not at all uncommon.  And I guess I wouldn't make
8  too much of that.  It just goes with the turf.
9      MR. BRODERICK:  Okay.  I have no more
10  questions.
11     MR. BAKER:  None.  I have nothing further.
12     MR. BRODERICK:  You have the right to review
13  this, or you can waive signature.
14     THE DEPONENT:  I'd like to review it.
15        (Further deponent saith not.)
16
17
18
19
20
21
22
23
24

Page 83

1      I, JOSEPH G. BOHLEN, M.D., having read the
2  above and foregoing, find the same to be true and
3  correct with the following additions and/or
4  corrections, if any:
5  Page_____Line_____Change:
6  Page_____Line_____Change:
7  Page_____Line_____Change:
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24  Joseph G. Bohlen (11/17/04)        DATE

Page 84

1  STATE OF ILLINOIS    )
                         ) SS
2  COUNTY OF SANGAMON )
3        C E R T I F I C A T E
4      I, Rhonda K. O'Neal, a Notary Public,
5  Certified Shorthand Reporter, and Registered
6  Professional Reporter, in and for said County and
7  State do hereby certify that the Deponent herein,
8  JOSEPH G. BOHLEN, prior to the taking of the
9  foregoing deposition, and on the 17th of November
10  A.D., 2004, was by me duly sworn to testify to the
11  truth, the whole truth and nothing but the truth
12  in the cause aforesaid; that the said deposition
13  was on that date taken down in shorthand by me and
14  afterwards transcribed, and that the attached
15  transcript contains a true and accurate
16  translation of my shorthand notes referred to.
17      Given under my hand and seal this 27th day
18  of November A.D., 2004.
19  _____
    Notary Public and
20  Certified Shorthand Reporter
21  and Registered Professional Reporter
22
23  License No. 084-004158

OFFICIAL SEAL
RHONDA K. O'NEAL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 9-13-2008