**E-FILED**
Friday, 01 April, 2005  03:09:00 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| M. JANE MINOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Nos.  02-3354 and 04-3114 |
| | ) | Consolidated |
| CENTOCOR, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF THE PLAINTIFF, M. JANE MINOR, IN OPPOSITION
TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.  INTRODUCTION**

Between September of 1999 and October of 2001, M. JANE MINOR ["PLAINTIFF"]

worked for the CENTOCOR, INC. ["COMPANY"] as a pharmaceutical sales representative.  During

the last fifteen months of her employment, she worked for it as a vascular specialist.  In that position,

she called upon medical specialists to sell the COMPANY's products used for the treatment of

peripheral vascular disease.

During the year 2001, the PLAINTIFF became a member of a five person sales team headed

by Antonio Siciliano.  At that time, the PLAINTIFF was in her mid-50's.  Mr. Siciliano, a male, was in

his late 20's.  Two members of the team were females in their early 30's.  The fifth member, a male,

was in his late 40's.

The PLAINTIFF who previously had a highly successful career both with the COMPANY and

other pharmaceutical sales representatives began encountering problems with Mr. Siciliano.  These

problems became progressively worse as the year 2001 progressed.  As a result of Mr. Siciliano's

treatment toward her, the PLAINTIFF's health deteriorated and she suffered a breakdown in October of 2001. She at that time took a medical leave of absence which continues to this day.

In the instant consolidated case, the PLAINTIFF advances claims of age and gender discrimination against the COMPANY arising out of the treatment she received from Mr. Siciliano during the six month time period she worked under his supervision in 2001. She claims his conduct violated her rights under both the "Age Discrimination in Employment Act" ["ACT"] (29 U.S.C. §621 et.al.) and Title VII of the "Civil Rights Act of 1964" ["TITLE VII"] (42 U.S.C. §2000e). Specifically, the PLAINTIFF claims in her complaint that in multiple respects Mr. Siciliano treated her differently and less favorably than he treated other employees working under his supervision particularly the younger females. As a result of the treatment she received from Mr. Siciliano, the PLAINTIFF suffered a breakdown and has not been able to return to work.

Following discovery, the COMPANY now moves for summary judgment. Its principle reason for seeking the dismissal of the PLAINTIFF's claims is its belief that its conduct toward the PLAINTIFF did not constitute a materially adverse employment action. It also claims that none of the other individuals working under Mr. Siciliano were treated more favorably than was the PLAINTIFF. For those reasons, it claims that the PLAINTIFF cannot establish a *prima facie* claim of discrimination. It also claims that any decisions made by Mr. Siciliano toward the PLAINTIFF were predicated upon legitimate business considerations.

For reasons which follow, the PLAINTIFF takes issue with the COMPANY's contentions. As will be shown, the treatment extended toward the PLAINTIFF by Mr. Siciliano while she served on his team significantly and unfavorably altered the terms and conditions of her employment and under

settled law of this Circuit rises to the level of a material adverse employment action.  Secondly, the

unrefuted evidence is that Mr. Siciliano treated other employees particularly the younger, female

employees significantly better than he treated the PLAINTIFF and after the PLAINTIFF went on a

medical leave replaced her with a person twenty five years her junior.  Finally, given the difference in

treatment between the PLAINTIFF and other employees, there is no rational or legitimate business

justification for Mr. Siciliano's conduct toward the PLAINTIFF.[1]

## II.   STATEMENT OF FACTS

### A.  <u>The DEFENDANT'S Undisputed Material Facts.</u>

With respect to the material facts claimed to be undisputed by the COMPANY, the

PLAINTIFF agrees that the following facts are undisputed and material except as otherwise shown:  1-

13, 15-26 (only to the extent that the PLAINTIFF proposed that some, but not all, of the accounts be

included in her portfolio), 27-32 (the PLAINTIFF has never claimed discriminatory treatment on the

part of William Alexander), 33-40 (only to the extent it sets forth some, but not all, of the supervisory

responsibility of Antonio Siciliano as a team leader), 41-53, 56-59 (only to the extent that she offered

her opinions as to her account assignments), 60-63, 65 (Antonio Siciliano, without explanation,

dropped Proctor Hospital from the PLAINTIFF's account portfolio; ¶24-25 of the PLAINTIFF's

Affidavit), 64 (only to the extent the PLAINTIFF told Mr. Siciliano why it was mistaken to remove her

---

[1]  The PLAINTIFF understands that the COMPANY has filed as a part of its summary judgment appendix the transcripts of all depositions taken in this case.  To avoid any unnecessary expansion of this record, the PLAINTIFF will not submit excerpts of the depositions referred to in this submission.  She does, however, submit as an appendix both her affidavit and various exhibits received during the course of discovery in this proceeding.

accounts), 66 (without explanation to the PLAINTIFF, Antonio Siciliano removed Memorial Medical Center from her account portfolio; ¶25 of the PLAINTIFF's Affidavit), 67-68, 70-73 (only to the extent it describes some, but not all, reasons the PLAINTIFF opposed the removal of those accounts), 75-85, 87-95, 99-100, 104, 108, 111-122 (only to the extent the PLAINTIFF was not placed on a performance improvement plan), 123 (to the extent it sets forth some, but not all, of the comments made by Antonio Siciliano in the FCR), 124, 131, 133-135 (except the period covered by the rating was the time the PLAINTIFF was away from work due to her sick leave), 137, 140-151, 153-159, 161 (only to the extent it represents what Antonio Siciliano stated in his deposition. The account coverage of other vascular sales representatives on his team is discussed in subsection D of this section), 165, 167-168, 170-171, 178 (the period covered by that ranking included the time the PLAINTIFF was away from work on her medical leave), 180-192 (except Ms. Bannister Hill never during the year of 2001 covered her account/territory rotation every two weeks; Bannister Hill Exs.1-7), 193-198 (except Mr. Van Cleave never during the year 2001 did his account rotation every two weeks; PLAINTIFF Ex.16), 200-208 (only to the extent that is what Antonio Siciliano claims in his deposition; see PLAINTIFF's statement of additional undisputed facts concerning the dinner programs), 209-212, 214-216 (to the extent it set forth some, but not all, of the reasons why the PLAINTIFF felt Antonio Siciliano was attempting to rid her), 217-218, 220-228, and 232-233.

### B. Material Facts Claimed to be Disputed.[2]

With respect to the Defendant's claim of material facts which are undisputed, the PLAINTIFF

---

[2]  As used in this document, the term "PLAINTIFF's Statement" refers to the PLAINTIFF's Statement of Additional Undisputed Facts contained in subsection D of this section.

disputes paragraph 14 (¶7 of PLAINTIFF's Affidavit), 15 (vascular sales specialists were expected to

do more in marketing retavase than respond to unsolicited questions; ¶6-14 of the PLAINTIFF's

Statement); 53-55 (Van Cleave Dep.25,27-28), 59 (¶60-62 of the PLAINTIFF's Statement), 69

(¶51-58 of the PLAINTIFF's Statement), 132 (Kopecky Dep.50-53), 152 (¶43-44 of the

PLAINTIFF's Affidavit), 160 (¶87 of the PLAINTIFF's Statement), 162 (¶47 of the PLAINTIFF's

Affidavit), 163 (¶48 of the PLAINTIFF's Affidavit), 164 (¶48-50 of the PLAINTIFF's Affidavit), 166

(¶48-50 of the PLAINTIFF's Affidavit), 172 (¶95-98,105,114 of the PLAINTIFF's Statement), 173-

174 (¶105,111-117 of the PLAINTIFF's Statement), 175 (¶94-96 of the PLAINTIFF's Statement),

176 (¶86,92,97 of the PLAINTIFF's Statement), 177 (¶114-117 of the PLAINTIFF's Statement),

and 229-231 (¶168-170 of the PLAINTIFF's Statement).

### C. Facts Which the PLAINTIFF Claims Are Immaterial.

The PLAINTIFF asserts that paragraphs 13 (the PLAINTIFF did not know of the job

description when she became a vascular sales specialist), 14 (the fact that the PLAINTIFF is aware her

territory might expand somewhat is immaterial to her claims), 74, 86, 96-107, 109-110, 136-139, 143,

167 (Antonio Siciliano's territory as a vascular sales representative constituted a geographic area

proximate to Dallas, Texas), 170-171 (contain objectionable hearsay under Rule 801 of the Federal

Rules of Evidence and should not be considered in this proceeding under both Rule 56 of the Federal

Rules of Civil Procedure and Rule 802 of the Federal Rules of Evidence), 179, 213 and 219.

### D. The PLAINTIFF's Additional Undisputed Facts.

**The PLAINTIFF's Background in Pharmaceutical Sales.**

1.    Prior to going to work for the COMPANY the PLAINTIFF had worked for over 25 years as

a pharmaceutical sales representative [PLAINTIFF's Affidavit 2].

2.      The PLAINTIFF had worked for over 18 years for Abbott Laboratories, Inc. where she sold Urokinase, a medication which dissolved blood clots for the treatment of peripheral vascular disease [PLAINTIFF's Affidavit 3].

**The PLAINTIFF's Initial Employment with the COMPANY.**

3.      In September of 1999 the PLAINTIFF accepted a job offer with the COMPANY as a cardiovascular representative [PLAINTIFF's Affidavit 6].

4.      Initially, the PLAINTIFF worked for the COMPANY as a cardiovascular representative. In the early summer of 2000, she was asked by COMPANY officials to become a vascular specialist. She was told that if she accepted that position the size of her sales territory would temporarily increase until the end of the year 2000 when, as the result of an expansion of the vascular sales force, it would be divided in half [PLAINTIFF's Affidavit 7].

5.      The PLAINTIFF worked as a vascular representative for the COMPANY from the early summer of 2000 until October of 2001. Her sales territory included most of the state of Missouri, the state of Illinois south of Interstate 80, a portion of the states of Indiana and Kentucky proximate to Evansville, Indiana and part of the state of Iowa to Des Moines [PLAINTIFF's Affidavit 8].

6.      As a vascular specialist, the PLAINTIFF was responsible for selling both Cordis products which were used for the treatment of cardiovascular disease and Retavase. She called on physicians treating patients for peripheral vascular disease such as Interventional Cardiologists, Interventional Radiologists and Vascular Surgeons [PLAINTIFF's Affidavit 9].

7.     While she worked as a vascular sales specialist, Retavase had not been indicated by the Food and Drug Administration ["FDA"] for use in treating peripheral vascular disease.  Accordingly, she could not solicit the sale of Retavase for the treatment of peripheral vascular disease.  She was expected to field inquiries from physicians with the hope that without any solicitation they would develop an interest in and request information concerning Retavase and its use in treating peripheral vascular disease [PLAINTIFF's Affidavit 10-11].

8.     In marketing retavase for peripheral vascular disease, the PLAINTIFF would make an initial contact at an account with its pharmacy, interventional radiologist, interventional cardiologist doing peripheral work or vascular surgeons.  She would inform those individuals that she had formerly worked at Abbott Laboratories and sold urokinase.  Hopefully, they would ask what she was selling presently.  She would respond, among other things, by indicating that she had a product not indicated by the FDA for vascular disease.  She indicated that if they would sign a request for information she could then provide them information concerning retavase [PLAINTIFF's Dep.II, pp.18-21].

9.     The PLAINTIFF would then follow up with the individual who had requested the information.  Her pretense for contacting those individuals was to determine whether they had reconsidered the possibility of purchasing COMPANY product which had been indicated by the FDA.  She would also ask if they had received medical information requested concerning retavase.  In selling retavase, she would then ask if it would be possible to observe some of their cases.  If they consented, she would spend time observing their cases [PLAINTIFF's Dep.II, pp.19-22].

10.    The PLAINTIFF would attempt during the observation process to learn concerns which

physicians had about the products of the COMPANY's competitors [PLAINTIFF's Dep.II,

pp.23-24].

11.    The PLAINTIFF would also attempt to provide meetings or seminars to educate physicians in

how retavase could be used for treating peripheral vascular problems.  Often this was

connected with a social event.  At these events physicians having experience in the use of

retavase would speak [PLAINTIFF's Dep.II, pp.24-26].

12.    In order to get retavase on a hospital formulary for use and treatment of peripheral vascular

problems, the PLAINTIFF in addition to speaking with physicians would also speak with

representatives of the hospital pharmacy [PLAINTIFF's Dep.II, pp.25-27].

13.    Much of the PLAINTIFF's time in calling upon physicians and hospitals, therefore, was spent

observing cases and speaking with pharmacists, physicians and support technicians to obtain a

greater knowledge of how they were treating their patients.  Through these efforts, they would

hopefully make inquiry with her about how Retavase could be used to fill the void which

occurred when Urokinase left the market [PLAINTIFF's Affidavit 14].

14.    During the time period between the early summer of 2000 and January of 2001, the

PLAINTIFF's supervisors as a vascular specialist were William Alexander and Tim Shaffer.

While they were her supervisors, she enjoyed an excellent relationship with each of them and

consistently received positive written performance evaluations, reviews and field progress

reports [PLAINTIFF's Affidavit 15; PLAINTIFF's Dep.II, p.13].

15.    When she was supervised by them, the PLAINTIFF advised both Mr. Alexander and Mr.

Shaffer of the accounts which she felt were worthy of calling upon. Generally, they accepted her recommendations about which accounts she should work in her sales territory. The PLAINTIFF had approximately 15 accounts while she worked under them. She was directed by them to focus on the top 3-5 accounts and pay secondary attention to the others [PLAINTIFF's Affidavit 16].

16.    Between the early summer of 2000 and January of 2001 as a Vascular Specialist, the PLAINTIFF focused upon five or six accounts which were located in central Illinois and in the St. Louis area. She was never directed to call upon each of her assigned accounts in two week cycles [PLAINTIFF's Affidavit 17].

17.    As a vascular specialist, the time the PLAINTIFF spent at each individual account varied directly with the level of business activity going on at that account [PLAINTIFF's Affidavit 18].


**The COMPANY's Vascular Sales Program.**

18.    In 1999 Urokinase was removed from the market by Abbott Laboratories, Inc. [PLAINTIFF's Affidavit 4].

19.    Retavase had never been used for the treatment of peripheral vascular disease while Urokinase was on the market. After Urokinase left the marketplace, there were only a few medications available for the treatment of peripheral vascular disease. Retavase had been used for that purpose even though its use was not indicated by the FDA. Activase, a product of Genentech, Inc., was also used for the treatment of peripheral vascular disease [PLAINTIFF's Affidavit 12].

20.     Even though it had not been indicated by the FDA, vascular sales specialists for the

COMPANY were to sell Retavase to physicians and hospitals for use in the treatment of

peripheral vascular disease.  Their job was to develop a relationship with physicians and

pharmacists so that they would request information to educate themselves on the use of

Retavase for that purpose.  Because Retavase was not indicated by the FDA, they could not

make overt or direct efforts to sell Retavase for the treatment of peripheral vascular disease

[PLAINTIFF's Affidavit 13].

21.     A vascular sales specialist was to use Cordis presentations as a point of entry that would gain

unsolicited inquiries about Retavase from physicians and pharmacists for the treatment of

peripheral vascular disease.  It was important for a vascular specialist to develop a rapport with

them.  It took a great deal of time to become educated in their medical practice and the

procedures that physicians were using to treat peripheral vascular disease [PLAINTIFF's

Affidavit 14].

22.     In 2001 Retavase was non-indicated for peripheral vascular disease.  Vascular specialists,

therefore, were restricted.  They had to respond to unsolicited questions about the product.

They could not bring unsolicited information to the doctors.  If a physician asked a question a

vascular specialist could have information concerning Retavase sent to the physician.  However,

they could not simply provide information about a new product. Physicians knew about

Retavase.  Once a physician asked a question about retavase, vascular specialists could

respond [Van Cleave Dep.54-56].

23.     "Formulary" is the term used when a product is approved by a pharmacy committee to place it

in the hospital for physicians' use [Van Cleave Dep.61].

24. Vascular specialists worked to have Retavase placed on the formulary of the hospitals to use in treating peripheral vascular disease [Van Cleave Dep.61].

25. New stocking means that an account that never previously used a product had placed its first order [Brown Dep.51-52].

26. A vascular specialist sold Cordis products and Retavase [Siciliano Dep.14-15].

27. "Indicated" means that the FDA has cleared a product for a particular use [Siciliano Dep.61].

28. If a product is indicated then a sales rep for the COMPANY can discuss it within the guidelines of the indication. If a product is not indicated then only unsolicited requests can be answered or information be provided [Siciliano Dep.62].

29. Of all the cities the vascular specialists called on, Houston had one of the highest number of physicians treating for vascular problems [Siciliano Dep.198, Ex.87].

30. The goal of a vascular specialist was to increase the usage of Retavase in hospitals [Kopecky Dep.36].

31. The rankings of vascular specialists fluctuated from quarter to quarter. Sometimes Caroline Kopecky was close to the top and sometimes close to the bottom. It was the same for the other vascular specialists [Kopecky Dep.42, Ex.47].

**The Siciliano Team.**

32. Antonio Siciliano was born on September 22, 1971. He graduated high school in 1989 [Siciliano Dep.6-10].

33. Before joining the COMPANY, Tony Siciliano had one and a half years of experience

marketing pharmaceuticals [Siciliano Dep.11-12].

34.    When he began in June 2000 with the COMPANY, Tony Siciliano was a vascular sales specialist.  He held that position for six months until he was promoted to vascular sales team leader in late 2000 [Siciliano Dep.12-13, 22-23].

35.    As team leader Tony Siciliano was responsible for five or six accounts and management of four vascular sales specialists [Siciliano Dep.28-29].

36.    The vascular sales specialists on Tony Siciliano's team were: the PLAINTIFF, vascular specialist for the St. Louis district, Randy Van Cleave, vascular specialist for the Denver district, Denise Bannister Hill, vascular specialist for the Dallas District, and Caroline Kopecky for the Houston District [Siciliano Dep.40-41].

37.    Denise Bannister Hill had not worked for the COMPANY prior to the team being formed.  She replaced Tony Siciliano [Siciliano Dep.42-43].

38.    Tony Siciliano's vascular sales specialists team covered Texas, Louisiana, New Mexico, Oklahoma, Kansas, Colorado, Missouri, parts of Illinois, small parts of Indiana and Kentucky, Iowa and Nebraska.  Each vascular sales specialists' territory was defined by an overlapping cardiovascular district [Siciliano Dep.51].

39.    Caroline Kopecky was born on June 16, 1970 [Kopecky Dep.3].

40.    Caroline Kopecky became a vascular specialist after Urokinase was taken off the market in December 1999.  There were no vascular specialists marketing Retavase before Caroline Kopecky became one [Kopecky Dep.39].

41.    Each time Caroline Kopecky called on a hospital in 2001 she would visit with the physicians

and departments in the hospital pertinent to her product.  Sometimes she had to wait for the physician to become available [Kopecky Dep.48].  Caroline Kopecky would watch procedures being performed by physicians that were relevant to her products.  That was normal.  She also visited the pharmacy.  She could be at a hospital the full day.  That was typical.  She did not always have an appointment when she called on a hospital.  She did not just go to a hospital, visit with a doctor for half an hour and leave [Kopecky Dep.49].

42.    Caroline Kopecky, during the first quarter of 2001, was ranked 23rd in sales of vascular specialists [Kopecky Dep.41, Ex.47].

43.    Denise Bannister Hill was born on October 23, 1970 [Brown Dep.5].  In March of 2001 she was hired by the COMPANY [Brown Dep.9].  Prior to working for the COMPANY, Denise Bannister Hill did not sell products used to treat heart attack or vascular disorders [Brown Dep. 11].

44.    When she first started with the COMPANY, Denise Bannister Hill had no prior experience selling vascular products.  She had never marketed anything comparable to Retavase [Brown Dep.22].

45.    As a vascular specialist, Denise Bannister Hill called on hospitals in Dallas, Texas and in certain other locations in the state of Texas [Brown Dep.23-24].  Denise Bannister Hill was never assigned an account where she had to travel further than 2 ½ hours from her home [Brown Dep. 25].

46.    Arlington, Texas was added to Denise Bannister Hill's account list while Austin and Wichita Falls were removed.  Wichita Falls had not been a Retavase user for vascular purposes [Brown

Dep.28-29].   She had expressed a desire not to call on the Wichita Falls and Austin accounts because of the travel [Brown Dep.29-30].

**The PLAINTIFF's Experiences with Siciliano Prior to Her Medical Leave.**

47.    Tony Siciliano first met the PLAINTIFF at the sales training when he was hired.  They were both vascular sales specialists.  They had a disagreement in the training session on how to approach an assignment.  He thought it should be done one way, and she thought it should be done another [Siciliano Dep.202-203].

48.    Beginning in January of 2001, the PLAINTIFF's sales territory included Springfield, Illinois, Peoria, Illinois, the St. Louis, Missouri area, Des Moines, Iowa, Evansville, Indiana and Owensboro, Kentucky [Defendant Ex.G].

49.    During the first quarter of 2001, the PLAINTIFF, based upon sales from the earlier quarter, was ranked eleventh nationally among all of the COMPANY's vascular specialists [Defendant Ex.S].

50.    Shortly after becoming her team leader, Mr. Siciliano met with the PLAINTIFF in Springfield, Illinois.  During that meeting, Mr. Siciliano unexpectedly said to the PLAINTIFF, "I am 29 years old.  How old is your son?"  Prior to that statement, they had been talking only about business and had not discussed matters of a personal nature [PLAINTIFF's Affidavit 22; PLAINTIFF's Dep.II, pp.39-42].

51.    Tony Siciliano had conversations with the PLAINTIFF regarding the account assignments in late 2000 or early 2001 [Siciliano Dep.36].

52.    During those conversations the PLAINTIFF indicated she would like to have the Memorial

Medical Center account in Springfield, Illinois and a hospital in Peoria [Siciliano Dep.36-37].

53.    At some time in January or early February of 2001 Mr. Siciliano informed the PLAINTIFF that she would no longer call upon either Memorial Medical Center in Springfield, Illinois or Proctor Hospital in Peoria, Illinois.  For several reasons Memorial Medical Center had high potential for buying the COMPANY's products used for peripheral vascular disease.  First, it had on its staff Dr. Kim Hodgson, a vascular surgeon who was a national leader in interventional techniques in treating peripheral vascular disease.  The PLAINTIFF had been calling on Dr. Hodgson and he seemed interested and receptive to the possibility of utilizing Retavase [PLAINTIFF's Affidavit 22-23].

54.    Second, Prairie Cardiovascular Consultants, the largest cardiology group in Illinois, performed many interventional procedures at Memorial Medical Center and the PLAINTIFF had an established rapport with many of the physicians in that group.  Third, the interventional radiologists on staff at Memorial Medical Center were interested in utilizing Retavase for peripheral vascular disease and the PLAINTIFF had already established a rapport with them.  Finally, the Director of the Pharmacy at Memorial Medical Center was a personal friend of the PLAINTIFF's [PLAINTIFF's Affidavit 23; PLAINTIFF's Dep.II, pp.74,95].

55.    Tony Siciliano does not know why the PLAINTIFF was not given the Memorial account [Siciliano Dep.39-40].

56.    Proctor Hospital for several reasons also was an excellent prospect.  First, it had recently hired Dr. Schlagel, an interventional radiologist, who had worked with Dr. Flavio Castaneda, a well known physician, and a proponent in the use of Retavase for peripheral vascular disease.

Second, all of the interventional radiologists in Peoria were joining a group called Central Illinois Radiological Associates which meant that the biggest proponents of Retavase would rotate through all three hospitals in Peoria. Finally, there was also a new interventional nephrologist at Proctor Hospital and it was slated to become a Nephrology Treatment Center for Peoria, Illinois [PLAINTIFF's Affidavit 24; PLAINTIFF's Dep.II, pp.95-97].

57.    The PLAINTIFF informed Mr. Siciliano of her concerns in losing both Proctor Hospital and Memorial Medical Center. Mr. Siciliano ignored everything she told him [PLAINTIFF's Affidavit 25].

58.    In removing both Memorial Medical Center and Proctor Hospital from the PLAINTIFF's territory and assigning her hospitals in Des Moines, it became significantly more difficult for the PLAINTIFF to cover her territory. Additionally, both Memorial and Proctor were good prospects for retavase [PLAINTIFF's Dep.II, pp.102-04].

59.    Tony Siciliano met with Randy Van Cleave and obtained his thoughts and views on what accounts he should be assigned [Siciliano Dep.121, Ex.38]. Tony Siciliano does not recall any accounts assigned to Randy Van Cleave which were objectionable to him [Siciliano Dep.121-122].

60.    Tony Siciliano does not recall any account that Caroline Kopecky wanted which was not assigned to her [Siciliano Dep.129].

61.    Caroline Kopecky does not recall informing her supervisors of any account she thought would not be good that she was still assigned. She does not recall any account that she informed management would be a good account which was taken from her [Kopecky Dep.16-17].

62.    There were no accounts that Caroline Kopecky recommended she receive that were not given to her [Kopecky Dep.58].

63.    After he became her supervisor, Antonio Siciliano assigned the PLAINTIFF accounts in Des Moines, Iowa. Because the cardiovascular representative of the COMPANY had lost retavase business in Des Moines, the PLAINTIFF felt it they would not be good accounts. Nonetheless, she was required to call upon them [PLAINTIFF's Dep.II, pp.13-16].

64.    There was no period of time in the 1st quarter when Caroline Kopecky was unable to work. Nonetheless, she ranked near the last in sales of all the vascular sales specialists [Kopecky Dep.43, Ex.47].

65.    Antonio Siciliano, throughout his dealings with the PLAINTIFF, tended not to listen and consider her input. When the PLAINTIFF first met him at a sales meeting before he was her supervisor, Mr. Siciliano and the PLAINTIFF were part of a project. Two males who are contemporaries of Mr. Siciliano were also on the project. During it, he tended to discuss and receive input from the two males, but not the PLAINTIFF [PLAINTIFF's Dep.II, pp.102-03].

**The PLAINTIFF's Medical Leave.**

66.    On February 7, 2001 the PLAINTIFF began a medical leave of absence. She was hospitalized on three separate occasions [PLAINTIFF's Affidavit 26; PLAINTIFF's Dep.II, p.39].

67.    While the PLAINTIFF was on her medical leave, she would call some of her accounts to keep in touch with them. Mr. Siciliano and Michelle Johnson were supposed to cover her accounts while she was on medical leave [PLAINTIFF's Dep.II, p.56].

68.    The PLAINTIFF's medical leave lasted until late April of 2001 when she returned to work [PLAINTIFF's Dep.II, pp.50-51].

69.    In late April of 2001 the PLAINTIFF was released to return to work.  Her physician recommended that she return to her work duties on a graduated basis by initially working half days and build up to a full day of work [PLAINTIFF's Affidavit 27; PLAINTIFF's Dep.II, pp.71-72].

70.    When the PLAINTIFF returned to work, she was easily exhausted.  She informed Mr. Siciliano that she did not feel she had recovered completely [PLAINTIFF's Dep.II, pp.72-73].

**The PLAINTIFF's Return From Medical Leave.**

71.    The Monday following her return to work, Mr. Siciliano came to Springfield to observe the PLAINTIFF.  He spent approximately 1½ days with her.  During that visit, Mr. Siciliano identified five goals which he had for the PLAINTIFF and established a timeline for completing those goals.  Shortly following his visit, he sent to the PLAINTIFF an FCR which stated those goals in written form [PLAINTIFF's Affidavit 28; PLAINTIFF's Dep.II, pp.73-78].

72.    The PLAINTIFF was concerned about the time period Mr. Siciliano established for her to complete each of those goals.  Given the fact that she had just returned to work from an extended medical leave of absence, she felt she needed more time and the time period he had set for each goal was inadequate given the nature of the tasks.  She expressed her views in that respect to Mr. Siciliano.  She told him that because of her health she did not believe that she was physically capable of completing each of those objectives within the time period he established.  She pointed out to him why regardless of her health the time allotted for those

objectives was too short.  She explained that there had not been a COMPANY representative in Des Moines for some period of time in marketing Retavase for cardiovascular purposes and that one of the Des Moines hospitals had recently signed a contract to use Activase and thus, the objective he established for Des Moines was not feasible.  She also told him that given the work schedules of both the speaker that would be utilized and the physicians in Evansville as well as the logistics of arranging a dinner that a June objective for a dinner was just not adequate.  She requested more time.  He refused [PLAINTIFF's Affidavit 29].

73. During the same conversation, the PLAINTIFF told Mr. Siciliano that St. Louis University Hospital ["SLUH"] was without an interventional radiologist and its director of pharmacy was working on a temporary basis and thus would not commit to acquiring Retavase until his permanent replacement was in position.  She indicated to Mr. Siciliano that while she would attempt to meet his objectives, the time period was not realistic and requested additional time [PLAINTIFF's Affidavit 30].

74. Mr. Siciliano without offering any explanation summarily stated to the PLAINTIFF that they would proceed with the goals in the timeframe he had established [PLAINTIFF's Affidavit 31].

75. With respect to the Evansville goal Mr. Siciliano had established for the PLAINTIFF, she arranged a dinner meeting within the time period he established.  The night the event was scheduled, a very hard rainstorm occurred in Evansville.  Consequently, a number of physicians who were scheduled to attend that event did not attend it.  There were, however, two Interventional Radiologists and a clinical pharmacist who did attend.  As a result of that event, the PLAINTIFF was able to secure Retavase business at St. Mary's Hospital in Evansville,

Indiana [PLAINTIFF's Affidavit 38].

76.   With respect to the objective established for SLUH, the PLAINTIFF arranged for Dr. Castaneda to speak to a group of Nephrologists. Dr. Castaneda's plane was delayed because of bad weather in the St. Louis area. Consequently, most of the attendees ate lunch and returned to work before Dr. Castaneda arrived. However, Dr. Kevin Martin, the most influential Nephrologist at SLUH for purposes of possible Retavase use, did stay and met with Dr. Castaneda. As a result of that meeting, Dr. Martin developed an interest in possibly using Retavase in the treatment of peripheral vascular disease [PLAINTIFF's Affidavit 39].

77.   With respect to the Iowa objective established for the PLAINTIFF by Mr. Siciliano, she scheduled a dinner in Des Moines, Iowa for June of 2001. She arranged for Dr. Castaneda to be the speaker at the event and arranged a restaurant where the event would be held. She also secured confirmation from some attendees. During the early portion of the week when the event was scheduled, she received a call from Bryce Odson informing her that the radiology group at Methodist Hospital had disbanded and it would be pointless to have the dinner. The other hospital in Des Moines, Mercy Hospital, had earlier entered into a contract with Activase and accordingly was not in the market for using Retavase for peripheral vascular disease [PLAINTIFF's Affidavit 40; PLAINTIFF Exs.78,79].

78.   With respect to Barnes Jewish Hospital, the PLAINTIFF made arrangements with Robyn Schaiff, its Director of Pharmacy prior to May 15, 2001, to provide her with information concerning the use of Retavase for peripheral vascular disease and catheter clearance. Because Retavase was not indicated for peripheral vascular disease, there was nothing further

the PLAINTIFF could do until that information was provided by the medical affairs division of the COMPANY and reviewed by Ms. Schaiff [PLAINTIFF's Affidavit 41].

79.   With respect to the objective established for the PLAINTIFF by Mr. Siciliano for St. Joseph Hospital, during the week of May 17, 2001 she traveled to that Hospital and met with Dr. Halverson, the head of the radiology department.  Several days later, she again met with Dr. Halverson as well as the other Interventional Radiologists practicing at that Hospital.  As a result of these meetings, she arranged for a trial usage of Retavase and Dr. Halverson signed a requisition for Retavase kits.  Because of some concerns the pharmacy of that Hospital had with Retavase in the treatment of heart attacks, the requisition was later canceled.  The events giving rise to the cancellation involved activities on the part of the COMPANY's cardiovascular representative calling upon the Hospital which did not involve the PLAINTIFF [PLAINTIFF's Affidavit 42].

80.   Territory ranking reports show how the rep is ranked.  In June of 2001 Denise Bannister Hill was ranked 14 at that point in the year for her sales of vascular products [Brown Dep.56, Ex.18].

81.   During the year 2001, the COMPANY had 23 vascular specialists.  During the first quarter of 2001 (based upon sales the preceding quarter), the PLAINTIFF led her team with a ranking of eleventh.  Randy Van Cleave was twelfth and Caroline Kopecky was twenty third.  During the second quarter (which was based upon the first quarter sales which coincided with her medical leave), the PLAINTIFF was eighteenth, Randy Van Cleave was ninth and Caroline Kopecky was fifth [Defendant Ex.HH].

82.  The PLAINTIFF's sales activities for retavase for the treatment of peripheral vascular disease during the second quarter of 2001 equaled or exceeded those of the other vascular specialists on her team [PLAINTIFF Ex.73; Siciliano Dep.76-79].

**The June, 2001 Sales Meeting.**

83.  In June of 2001 the PLAINTIFF attended the COMPANY's National Sales Meeting.  During that meeting, she had an opportunity to observe Mr. Siciliano interacting with Randy Van Cleave, Caroline Kopecky and Denise Bannister Hill.  She noticed that Mr. Siciliano eagerly interacted with the other three members of the team concerning both business and non-business matters and tended to ignore her.  This became so noticeable that the PLAINTIFF called Stephanie Moore, a human resource representative of the COMPANY during the meeting. The PLAINTIFF expressed to her a concern about how she was being treated by Mr. Siciliano as compared to what she observed of his interactions with other members of his team. At that time she wanted Ms. Moore's thoughts and ideas about what she might do to develop a more positive relationship with him [PLAINTIFF's Affidavit 36].

84.  Later during the conference, Mr. Siciliano had a breakout session with members of his team. At the outset of that session, he, looking directly at the PLAINTIFF, made the following statement:  "First, I want to say that no one is being treated differently other than someone on the team is making more money than I am" [PLAINTIFF's Affidavit 37].

85.  At the National Sales Meeting of the COMPANY the PLAINTIFF became concerned that Mr. Siciliano was not accurately communicating to her superiors information pertaining to her work activities.  This arose when COMPANY officials voiced concern that the PLAINTIFF

had not forwarded to Mr. Siciliano certain information. The PLAINTIFF in fact had provided

that information to him. Following that incident, whenever she reported on important activities

she sent a copy of her report to both Mr. Cramsey and Bob Russell, Mr. Siciliano's supervisor.

In early July 2001 Mr. Siciliano informed the PLAINTIFF that she should not provide that type

of information to them because they had both stated a preference that she not communicate

with them. After that conversation, she contacted Mr. Cramsey who informed her that she was

not burdening him and he would like to receive any significant sales activity related to her

territory [PLAINTIFF's Affidavit 43-44].

**The Account Coverage Requirement Imposed upon the PLAINTIFF.**

86.    Prior to working under the supervision of Antonio Siciliano, the PLAINTIFF's other

supervisors with the COMPANY did not require her to cover her accounts in two week

intervals. Instead, they felt it was important that she figure who her most important accounts

were and spend time with them. This is because it was time consuming to develop a rapport

with physicians [PLAINTIFF's Dep.II, pp.170-171].

87.    In June, 2001 Mr. Siciliano asked the PLAINTIFF to provide him with a routing schedule

showing how she would cover her accounts. In response to his request the PLAINTIFF

submitted a routing schedule in which she would call on all of her accounts during a four week

time span and on key accounts and those where there was currently some matter pending more

frequently as the situation required. The routing schedule she submitted to him was consistent

with the routing arrangement she had throughout her career in pharmaceutical sales with both

the COMPANY and other employers [PLAINTIFF's Affidavit 47].

88.    Mr. Siciliano did not discuss with the PLAINTIFF the routing schedule she had prepared.

Instead, on July 6, 2001 he sent her a  routing schedule that required her to call on her St. Louis

and Peoria accounts every week and her Des Moines, Evansville and Owensboro accounts

every other week [PLAINTIFF's Affidavit 48].

89.    The routing schedule established by Mr. Siciliano was impossible to adhere to for multiple

reasons.  First, under his schedule the PLAINTIFF would only call upon pharmacies and the

interventional radiology suite (commonly known as specials).  In order to adequately call upon

an account she also had to call upon the nephrology unit, cardiac cath lab, the dialysis lab, the

operating room for vascular surgeons as well as meeting with various nurses and technicians.

Second, if the PLAINTIFF was acquainting the staff concerning various applications of the

product she would have to speak with the technicians and nurses on all three shifts.  Third, in

order for her to understand how Retavase might be useful in a physician's practice she had to

understand the nature of his practice.  This required her to observe the physician in treating

patients.  Oftentimes when she called upon a physician she had to wait for the physician to

complete treating patients.  This occupied considerable time.  Fourth, Mr. Siciliano's routing

schedule did not accurately take into consideration her travel requirements.  From the

PLAINTIFF's home in Springfield to her accounts in St. Louis required a two hour drive each

way.  Travel to her accounts in Peoria required travel of approximately one and one half hours

each way.  Her driving time from her home in Springfield to Des Moines, Iowa approximated

seven hours.  Even traveling by air required several hours and was dependent upon airplane

scheduling.  The travel distance from her home in Springfield to Evansville, Indiana and

thereafter to Owensboro, Kentucky involved eight hours of travel each way. The travel distance between St. Louis and Evansville by car involved five and one half to six hours. Because of all of these things it was not possible for her to call upon hospitals within the time period prescribed by Mr. Siciliano [PLAINTIFF's Affidavit 49].

90. Upon receiving Mr. Siciliano's routing schedule the PLAINTIFF spoke with him about it during a telephone conversation. She attempted to explain to him why she felt the schedule was not only unrealistic, but would be overly burdensome upon her. He immediately responded by stating that was the routing schedule he expected her to follow [PLAINTIFF's Affidavit 50].

91. The distance between the PLAINTIFF"s home and her accounts in Peoria, Illinois is 70 miles. The distance between her home and her accounts in the St. Louis area approximates 100 miles. The distance from her home and her accounts in Des Moines, Iowa was 330 miles. The distance between her home to her accounts in Evansville, Indiana was 404 miles. The distance from her home and her accounts in Owensboro, Kentucky was 445 miles [Defendant Ex.MM].

92. Upon receiving an email from Mr. Siciliano containing a routing schedule for covering her accounts in a two week interval, the PLAINTIFF spoke with Mike Ferlada, a product manager for retavase. Mike Ferlada indicated that the account coverage requirement was both impossible and ridiculous [PLAINTIFF's Dep.II, pp.164-167].

93. The PLAINTIFF's national ranking as a vascular specialist for the COMPANY in July of 2001 was 14 out of 23. Denise Bannister Hill was ranked 18 out of 23. Caroline Kopecky was ranked 11 out of 23. Randy Van Cleave was ranked 6 out of 23 [PLAINTIFF Ex.47].

94. Randy Van Cleave was not aware of any COMPANY policy requiring complete account

rotation every two weeks [Van Cleave Dep.85,87].

95.   Randy Van Cleave does not recall any conversation with Antonio Siciliano in which Mr.

Siciliano verbalized an expectation that he have completed account rotation every two weeks

[Van Cleave Dep.85, Ex.37].

96.   Randy Van Cleave did not feel a set schedule would work given the geography of his area and

the fact that business needs change daily.  A customer might not be available on a set day.  The

schedule needed to be flexible to achieve coverage.  Randy Van Cleave did not feel a set

schedule was workable [Van Cleave Dep.77-78, Ex.16].

97.   After receiving her routing schedule from Antonio Siciliano, the PLAINTIFF inquired of Randy

Van Cleave if he had submitted a two week routing schedule and how he was able to set up a

routing schedule accounting covering every account within two weeks.  In response, Randy

Van Cleave emailed the PLAINTIFF on July 7, 2001 indicating he had not been requested to

submit a routing schedule of any kind and felt it would be unworkable to see all of his accounts

every other week.  According to him, he went to his high priority accounts at least once every

other week with the lower priority accounts being considered maintenance [PLAINTIFF

Ex.16; Van Cleave Dep.67-68,77-78].

98.   Tony Siciliano did not prepare a routing schedule for any of the other vascular specialists.

According to him, it was a coaching device for the PLAINTIFF [Siciliano Dep.141].

99.   Tony Siciliano did not estimate how many hours in the day it would take to complete the routing

schedule he prepared. That was not his focus. The sales rep takes whatever time is necessary

to complete the task [Siciliano Dep.146, Ex.6].

100.    In preparing the routing schedule, Tony Siciliano did not ask the PLAINTIFF how often she felt she should meet with any of her accounts [Siciliano Dep.151].

101.    Tony Siciliano's routing shows the PLAINTIFF spending a half day each week at each of the four St. Louis area hospitals assigned the PLAINTIFF. She would be expected to perform her duties to sell Cordis products and provide information on Retavase [Siciliano Dep.149-151, Ex.6].

102.    When Tony Siciliano sent the PLAINTIFF her two week coverage schedule she would have worked a little over two months since returning from medical leave [Siciliano Dep.161].

103.    Vascular specialists generally manage their own territory. Antonio Siciliano was more detailed in managing the PLAINTIFF than other specialists. The account routing schedule was created only for the PLAINTIFF [Siciliano Dep.155-156].

104.    Tony Siciliano indicated to the PLAINTIFF that she had to do complete account coverage every two weeks with improved follow up and follow through [Siciliano Dep.244, Ex.23].

105.    On July 7, 2001 Randy Van Cleave emailed the PLAINTIFF and told her that he had never been requested nor did he feel that it would be workable to have a routing schedule in which he saw all of his accounts every other week. He indicated that he had three high priority accounts which he called on at least every other week and his lower accounts were considered maintenance accounts [PLAINTIFF Ex.16; Van Cleave Dep.66-70].

106.    In 2001 Randy Van Cleave called upon six hospitals in the region around Denver, Colorado. Two hospitals in the Lincoln-Omaha, Nebraska area, two hospitals in Springfield, Missouri and two hospitals in Tulsa, Oklahoma [PLAINTIFF Ex.38].

107.  At least every two weeks Caroline Kopecky would submit her expense reports to Tony Siciliano [Kopecky Dep.24-25].

108.  Caroline Kopecky submitted expense reports to be reimbursed for travel expenses.  She submitted those reports weekly.  The reports documented each trip she took.  There is no better record to identify where she went [Kopecky Dep.18-19].

109.  Caroline Kopecky's expense reports would disclose where she travels.  Those reports are the best means to tell where she went [Kopecky Dep.29-30].

110.  Caroline Kopecky's accounts were in Houston, Corpus Christi, San Antonio, Galveston and New Orleans.  Corpus Christi was a three hour drive so Caroline Kopecky usually flew.  It was a direct flight.  She drove the hour to Galveston from Houston.  Caroline Kopecky would drive the three hours to San Antonio.  She would fly to New Orleans because it was a five hour drive.  There were multiple direct flights from Houston to New Orleans [Kopecky Dep.46-47].

111.  With respect to Caroline Kopecky during the year 2001, most of her accounts were in Houston, Texas or its suburbs.  With respect to those that were not in Houston, the distance of those accounts from Houston is as follows:  Galveston, Texas - 47 miles; Corpus Christi, Texas - 215 miles; Harlington, Texas - 430 miles; New Orleans, Louisiana - 351 miles; and San Antonio, Texas - 199 miles [Defendant Ex.MM].

112.  From February through September of 2001, 70% of the account calls made by Caroline Kopecky were in the Houston, Texas area.  During that time period, she called on her account in Harlington on three occasions, Beaumont on two occasions, Pasadena on two occasions and Corpus Christi and New Orleans on eight occasions.  At no time during that time frame did she

cover all of her accounts every two weeks [Kopecky Ex.1-8].

113.    Denise Bannister Hill submitted her expense reports to Tony Siciliano for approval [Brown Dep.35-36].

114.    Denise Bannister Hill was not told when she started as a vascular specialist how frequently she had to see each account.  She does not remember ever receiving a requirement about the frequency she had to call on accounts [Brown Dep.37-38].

115.    Denise Bannister Hill received a list of her accounts and determined who she would see on what days.  Her travel to destinations would be in her expense reports [Brown Dep.38-39]. The expense reports would show the number of times she visited her accounts other than those in Dallas [Brown Dep.40, 78].

116.    With respect to Denise Bannister Hill most of her accounts during the year 2001 were in the Dallas-Fort Worth, Texas area.  With respect to those outside of the Dallas-Fort Worth area, the distance of those accounts from Texas are as follows:  Waco, Texas - 96 miles; Temple, Texas - 134 miles; Austin, Texas - 195 miles; and Wichita Falls, Texas - 134 miles [Defendant Ex.MM].

117.    During the time period between March and September of 2001, 77% of the account calls made by Denise Bannister Hill were in the Dallas, Texas area.  During that time period, she called on her account in Wichita Falls on four occasions, Waco on five occasions, Temple on two occasions, Arlington on five occasions, Plano on one occasion and Fort Worth on four occasions.  At no time during that time frame did she cover all of her accounts every two weeks [Bannister Hill Ex.1-7].

**The Bonus Points Program.**

118.  Tony Siciliano had complete and total discretion in awarding bonus points [Siciliano Dep.187-88, 192-93, 272].

119.  On June 18, 2001 Denise Bannister Hill received 250 points from the COMPANY for doing a good job [Brown Dep.52, Ex.87].

120.  On June 29, 2001 Denise Bannister Hill received points for great seal attack at Seton.  Seal time refers to the cardiovascular counterparts [Brown Dep.53, Ex.87].

121.  On August 30, Denise Bannister Hill received 150 points for great team work.  She has no idea why [Brown Dep.53-54, Ex.87].

122.  Denise Bannister Hill received 500 points for a new stocking at a hospital in Fort Worth [Brown Dep.54, Ex.87].

123.  On November 17, Denise Bannister Hill received 150 points for "thanks for your help" and 250 points for Cordis Q3.  She has no idea why she received the them [Brown Dep.54, Ex.87].

124.  On November 17, 2001, Denise Bannister Hill received 1500 points for new stockings at three hospitals for Retavase [Brown Dep.54-55, Ex.87].

125.  In 2001 Caroline Kopecky was awarded 4850 bonus points [Kopecky Dep.62-64, Ex.87].

126.  On April 17 Caroline Kopecky was awarded 300 bonus points.  She was awarded 150 points for helping at vascular basic and received 50 points for being a team player [Kopecky Dep.65-66, Ex.87].

127.  During the year 2001 Antonio Siciliano awarded the PLAINTIFF 1,050 bonus points for four

separate activities including two new accounts.  He awarded Denise Bannister Hill 3,750 bonus points.  He awarded Caroline Kopecky 4,850 bonus points.  He awarded Randy Van Cleave 2,285 bonus points [PLAINTIFF Ex.87].

128.    During 2001, the PLAINTIFF had new stockings at Covenant Medical Center, Decatur Memorial Hospital, Methodist Medical Center, Proctor Hospital, St. John's Hospital and Deaconess Hospital for which Mr. Siciliano gave her no bonus points [PLAINTIFF's Affidavit 66].

129.    During the year 2001, the PLAINTIFF had a formulary acceptance at both Barnes Hospital and St. Francis Hospital.  Mr. Siciliano awarded her no bonus points for the accomplishments [PLAINTIFF's Affidavit 67].

130.    Notwithstanding her activities in organizing and promoting the Midwest Institute of Interventional Therapy Meeting during the summer of 2001, Mr. Siciliano awarded her no bonus points [PLAINTIFF's Affidavit 68].

131.    During the year 2001, the PLAINTIFF developed Dr. Castaneda and Dr. Swischuk as national speakers in support of using Retavase for peripheral vascular disease.  Each of those speakers spoke throughout the country on that topic.  Mr. Siciliano awarded her no bonus points for that effort [PLAINTIFF's Affidavit 69].

132.    The COMPANY promoted a clinical trial in the use of Retavase for the treatment of peripheral vascular disease.  One of the PLAINTIFF's accounts, St. Francis Medical Center, was the top facility in the country in enrolling patients in that study and Dr. Castaneda, a staff member at that Hospital, was the Principal Investigator in the study.  The PLAINTIFF received no bonus

points for the effort [PLAINTIFF's Affidavit 70].

133.    The PLAINTIFF obtained formulary approval at Barnes Hospital.  Tony Siciliano does not

know why he did not give her any bonus points for that accomplishment.  He had a lot of

discretion to award points [Siciliano Dep.199].

**Siciliano's Criticisms of the PLAINTIFF.**

134.    During the summer of 2001 St. Francis Medical Center was using Retavase for a study.  St.

Francis was the PLAINTIFF's largest account and she was instrumental in its participation in

that study.  Because it was using Retavase for that study, however, it did not have to pay the

COMPANY for the use of Retavase.  St. Francis used 88 vials of Retavase in the study which

if sold to them would have produced revenue of over $96,000.00.  If the PLAINTIFF had

received credit for Retavase use by St. Francis in that study, she would have well exceeded her

goal for selling Retavase.  Mr. Siciliano during the summer of 2001 was aware of the

PLAINTIFF's activities in the St. Francis account and the usage it was making of Retavase

[PLAINTIFF's Affidavit 80].

135.    Beginning in August of 2001 and continuing through the balance of her active employment with

the COMPANY when the PLAINTIFF spoke to Mr. Siciliano he was constantly critical of her

performance and the progress she was making with her accounts.  During this time period,

other managers and representatives of the COMPANY such as Bill Pinon, the national sales

manager, Michael Montgomery, M.D., the vascular physician for the COMPANY, Michelle

Johnson, the cardiovascular manager, Keith Cramsey, the regional marketing manager, Linda

Piccinini, a technical consultant, and Mike Varlotta, the product manager, were complimentary

about her accomplishments [PLAINTIFF's Affidavit 65].

136.    In the summer of 2001, the PLAINTIFF was traveling a great deal and did not have time available to do her paperwork.  Accordingly, she could not always submit her expense reports on a weekly basis [PLAINTIFF's Dep.II, p.119].

137.    On September 7, 2001 the COMPANY issued a report concerning the activities of vascular specialists in selling Cordis products.  At that time the PLAINTIFF was 147% of her goal and the leader on her team in selling Cordis products [PLAINTIFF's Affidavit 79; Defendant Ex.NN].

138.    On September 19, 2001 Mr. Siciliano issued an FCR to the PLAINTIFF which was highly negative.  Contrary to his assertion in the report, the attendance at the Evansville dinner program was limited not because of poor follow through or inadequate recruit, but instead because of an unanticipated severe rainstorm.  Mr. Siciliano was aware of that because he was in attendance.  Furthermore, the key physicians and pharmacists did attend that program and as a result the PLAINTIFF was able to secure the Retavase business in Evansville.  The Des Moines program was canceled because of the dissolution of the radiology group, not because of any lack of follow up on the PLAINTIFF's part.  The failure to secure catheter coverage at SLUH was not because of poor follow up, but instead because there was no permanent director of pharmacy at SLUH and the temporary director would not make a decision until the permanent director was appointed.  Mr. Siciliano was aware of all of the foregoing when he made these inaccurate comments in the field contact report.  During the time period of July, August and mid-September of 2001 the PLAINTIFF was covering her territory in accordance

with his account coverage requirements except for the time period when she had health

problems in August of 2001 and in September of 2001 because she was involved with the

interventional therapy meeting [PLAINTIFF's Affidavit 75; PLAINTIFF's Dep.II, pp.240-

241; Defendant Ex.LL].

139.    In his FCR of September 19, 2001 Mr. Siciliano failed to note that the Evansville dinner

program was poorly attended because of a rainstorm, but that the individuals who did attend

were the individuals responsible for making selections of product and who decided to use

retavase [PLAINTIFF's Dep.II, pp.244-245].

140.    Mr. Siciliano in his FCR falsely indicated that on multiple times he had discussed with the

PLAINTIFF the inadequacy of her territory coverage.  He never raised that subject with her

prior to July 6, 2001 when he sent to her his suggested coverage itinerary [PLAINTIFF's

Affidavit 78].

141.    In his FCR Mr. Siciliano began requiring that the PLAINTIFF submit a weekly report stating

progress which had been made on each account she visited.  In his field progress report he was

critical of the frequency that she responded to his voice mails and pages.  His criticism was not

accurate. Even though she was on the road and not permitted to respond through the use of her

cell phone, she typically would respond to his voice mails and pages on the day she received

them and always within twenty four hours [PLAINTIFF's Affidavit 77].

142.    The FCR failed to mention a program conducted by the PLAINTIFF at MIIT which drew over

150 attendees [PLAINTIFF's Dep.II, p.245].

143.    The status at SLUH was not due to any failure to follow through on the PLAINTIFF's part as

suggested in the FCR, but instead because the Hospital had a temporary pharmacist who refused to make any formulary decisions until a permanent pharmacist was in place. Additionally, a radiologist had left that Hospital [PLAINTIFF's Dep.II, pp.246-247].

144.   It would have been impossible for the PLAINTIFF to follow up on the accounts in Des Moines, Iowa because there was no radiology group in place and thus there was no radiologist for the PLAINTIFF to call upon [PLAINTIFF's Dep.II, p.248].

145.   The slowness of account progress at Barnes Hospital was not due to the failure of the PLAINTIFF to follow through with that account as claimed in the FCR.  The PLAINTIFF worked with the head pharmacist at Barnes on a consistent basis and provided her with information she had requested [PLAINTIFF's Dep.II, pp.248-249].

**The PLAINTIFF's Work Schedule in the Summer of 2001.**

146.   Prior to joining Mr. Siciliano's team as a vascular specialist the PLAINTIFF worked approximately four days each week in the field and reserved one day a week to do office work. This schedule was similar to the work schedule of other vascular sales specialists [PLAINTIFF's Affidavit 32].

147.   Upon her return from medical leave, Tony Siciliano required that the PLAINTIFF begin spending five days each week working in the field calling upon accounts.  This schedule left her no office time to complete paperwork and arrange for contacts and meetings [PLAINTIFF's Affidavit 33].

148.   As a normal matter, when the PLAINTIFF called upon an account, she might easily spend most of the day at that account waiting to speak, speaking with and observing procedures being

performed by physicians.  This time was necessary to developing a rapport with these accounts [PLAINTIFF's Affidavit 34].

149.   As a vascular specialist, when possible the PLAINTIFF would attempt to make appointments to see physicians prior to making a trip to their hospital.  However, merely making an appointment with a physician did not guarantee that the physician would see her at the appointed time.  Oftentimes the physician was delayed or otherwise occupied due to patient care.  In those instances she would have to wait until he was available to see her [PLAINTIFF's Affidavit 51].

150.   Even though she was concerned about his routing schedule, the PLAINTIFF followed Mr. Siciliano's direction by adhering to his schedule and calling upon her accounts with the frequency he demanded except for August of 2001 when she was ill and September of 2001 when she was committed to arranging for and attending an interventional therapy meeting [PLAINTIFF's Affidavit 53].

151.   The PLAINTIFF began spending approximately two days of each week calling upon her accounts in St. Louis. Typically, on a short work day in St. Louis she would spend approximately 12 to 13 hours inclusive of her travel time.  On a long day in St. Louis she would spend between 15 and 16 hours [PLAINTIFF's Affidavit 54].

152.   She traveled to Peoria under Mr. Siciliano's routing schedule one day each week.  Inclusive of travel time her Peoria work day normally lasted approximately 10 to 11 hours.  However, if there was an evening program she would have to spend additional time [PLAINTIFF's Affidavit 55].

153.   The PLAINTIFF normally traveled to Des Moines by car.  Typically this involved an eight hour

drive each way.  A Des Moines trip would typically involve a full two days of her work

schedule [PLAINTIFF's Affidavit 56].

154.   The PLAINTIFF began going to Evansville and Owensboro approximately twice per month

except for August and September of 2001.  She would spend a full day in Evansville and the

better part of a full day in Owensboro assuming the physician she was to call upon was

available.  Typically, she would spend between five and one half to eight hours each way in

traveling to Owensboro and Evansville.  She attempted to fulfill her Owensboro and Evansville

trips in two full days.  However, because of travel this generally meant that by the time she

returned home from those trips it would be very late at night [PLAINTIFF's Affidavit 57].

155.   The travel regime the PLAINTIFF established after Mr. Siciliano's directive regarding her

account coverage continued until she left active employment with the COMPANY.  Typically,

she was spending sixty to eighty hours a week in traveling to and calling upon her accounts.

Additionally, she had to respond to Mr. Siciliano's requests and do paperwork.  She normally

did the paperwork on the weekends.  This would involve an additional five to ten hours per

week.  During the time period between early July 2001 and October of 2001 she would

typically spend between 70 and 90 hours a week working for the COMPANY.  Prior to

working under Mr. Siciliano, she would spend 50 to 55 hours per week on her job

[PLAINTIFF's Affidavit 58].

156.   Because of the work schedule imposed upon her by Mr. Siciliano, the PLAINTIFF was forced

to drop out of the Springfield Symphony Choir and discontinued socializing with friends

[PLAINTIFF's Affidavit 59].

157.   In attempting to comply with Mr. Siciliano's travel schedule, respond to the tasks he would message the PLAINTIFF and do the necessary paperwork which was a part of her job she was getting approximately five hours sleep per night.  When she was on the road she would typically eat food from fast food restaurants in the car while she was driving.  On several occasions she had to pull over to the side of the road late at night to sleep because she was exhausted and was about to fall asleep while driving.  On three occasions she asked a friend to drive her on trips because she was simply too tired to drive and was afraid she would fall asleep at the wheel [PLAINTIFF's Affidavit 60].

158.   In late September of 2001 the PLAINTIFF was responsible for representing the COMPANY at a meeting in Oakbrook, Illinois of the Midwest Institute of Interventional Therapy.  The attendees at that meeting consisted of over 150 interventional radiologists and vascular surgeons as well as their support staff.  She was at that meeting for a full five days.  Typically, she spent approximately 18 hours each day manning a booth and entertaining physicians.  A great deal of time was required of her in both August and September in preparing for that meeting, arranging for speakers, coordinating speaker schedules and contacting physicians encouraging them to attend the meeting.  Because of her activities in organizing for and attending that meeting, she did not call on either Evansville, Indiana, Owensboro, Kentucky or Des Moines, Iowa that month.  Immediately following that meeting, she drove to Evansville, Indiana and Owensboro, Kentucky to call on her accounts in those cities [PLAINTIFF's Affidavit 64].

**Siciliano's Contacts with the PLAINTIFF.**

159.    Beginning in May of 2001 and continuing through October of 2001, Mr. Siciliano began

contacting the PLAINTIFF frequently by either telephone, email, voice mail or pages.

Typically, on these contacts he would assign her a task and establish a very short turnaround

time for completing it.  The PLAINTIFF began receiving voice mails and pages from him

multiple times each day.  Given her travel schedule, she could not perform the tasks he assigned

her immediately and often had to perform those tasks during the evening or late at night.  The

frequency of his contacts with the PLAINTIFF and the demands increased with passage of

time.  Through the summer and early fall of 2001, his assignments normally involved fairly trivial

matters.  Nonetheless, he demanded that she perform them immediately [PLAINTIFF's

Affidavit 35].

160.     Following the June 2001 sales meeting Mr. Siciliano increased his frequency in paging the

PLAINTIFF, contacting her by voice mail and email.  Typically, he would contact her between

5 and 15 times a day.  Most often his inquiries were fairly trivial but were nonetheless ones he

wanted an immediate response from her.  Because of the PLAINTIFF's travel schedule it was

often impossible for her to respond to his inquiries within the time he had requested.  With the

passage of time the subject matter of Mr. Siciliano's inquiries became increasingly trivial and

repetitive.  Most of them had very little relevance to the PLAINTIFF's sales activities for the

COMPANY.  During these contacts he became increasingly critical of the PLAINTIFF's

failure to respond immediately to his inquiries.  Because she was on the road and not always in

areas which were accessible for telephonic communication even by cell phone or page, she

could not respond as quickly as he wanted and informed him of that problem [PLAINTIFF's Affidavit 45].

161.  During her employment with the COMPANY, the PLAINTIFF's earlier supervisors had expected her to respond to their emails, pages, or voice mails within 24 hours unless it was an emergency.  Mr. Siciliano, by contrast, wanted immediate responses.  Mr. Siciliano would not approve cell phone expense which exceeded $100.00 a month [PLAINTIFF's Affidavit 46].

162.  Mr. Siciliano was insistent that the PLAINTIFF immediately return his pages and voice mails when she was on the road.  He would not allow her to use a cell phone.  Instead she had to call him using the COMPANY issued telephone credit card.  Consequently, when she had to return a page or telephone call she would have to leave the road and locate a pay phone from which to call him [PLAINTIFF's Affidavit 61].

163.  In 2001 Denise Bannister Hill communicated with Tony Siciliano through voice mail.  He would call her or leave voice mails.  During the three years she worked for him Denise Bannister Hill on average heard from Tony Siciliano about 0 to 1 time a week [Brown Dep.67-68].

164.  Denise Bannister Hill never had to fill out any type of report weekly or monthly while a vascular sales specialist on Tony Siciliano's team [Brown Dep.61-62].

**The PLAINTIFF's Effort to Leave the Siciliano Team.**

165.  As the summer of 2001 passed, the PLAINTIFF was becoming increasingly concerned about her relationship with Mr. Siciliano and her inability to please him.  She had been in pharmaceutical sales at that time for over 25 years and this was the first supervisor with whom she had any type of significant relationship problem.  She felt it was in her best interests to look

for other employment opportunities either within the COMPANY or with other Johnson and

Johnson subsidiaries. She interviewed for a position with Ethicon and was tentatively offered a

position. In order for her to secure that position, she was required to secure a release from her

supervisor under Johnson & Johnson recruitment policies [PLAINTIFF's Affidavit 72].

166.    On September 10, 2001 the PLAINTIFF emailed Antonio Siciliano seeking his permission to

apply for other job opportunities within the Johnson & Johnson Companies. She did this

because of the treatment she was receiving from Mr. Siciliano [PLAINTIFF's Dep.II, pp.234-

235 and Defendant Ex.II].

167.    Tony Siciliano recalls the PLAINTIFF indicated she would like to find other employment

opportunities at Johnson & Johnson in September of 2001 [Siciliano Dep.257-258]. The

COMPANY's regional director promptly gave the PLAINTIFF permission to seek other job

opportunities. Tony Siciliano had no role in giving that approval [Siciliano Dep.258].

168.    When Tony Siciliano prepared the FCR on September 19, 2001 he was aware the

PLAINTIFF had made the request to seek other employment with Johnson & Johnson

[Siciliano Dep.259, Ex.23].

169.    Tony Siciliano, when he interviewed an employee who was working in another position for

either the COMPANY or another Johnson & Johnson Company, asked for a couple of the

recent FCRs for that employee in considering the employee for the position [Siciliano

Dep.280].

170.    On September 13, 2001 the PLAINTIFF was told by Lisa Huston, a Johnson & Johnson

corporate recruiter, that in order for the PLAINTIFF to receive a position with Ethicon Mr.

Siciliano had to be "on board" with her transfer and he was "not on board" with the

PLAINTIFF's transfer request [PLAINTIFF's Affidavit 73; PLAINTIFF's Dep.II, p.237].

**The PLAINTIFF's Health Problem.**

171.    In early August of 2001 the PLAINTIFF began noticing that her heart was racing and she felt

very light headed and weak.  She was diagnosed with atrial fibrillation and was in the hospital

overnight and treated by Dr. Brian Miller, a cardiologist.  Throughout August, September and

into October 2001, she on a number of occasions went to the emergency room at the hospital

because of those same symptoms [PLAINTIFF's Affidavit 62; PLAINTIFF's Dep.II, p.199].


172.    Dr. Brian Miller, a cardiologist, first saw the PLAINTIFF as a patient on August 2, 2001.  His

diagnosis at the time was atrial fibrillation.  Atrial fibrillation is a very rapid, chaotic electrical

activity in the upper chambers of the heart [Miller Dep.6-7].

173.    Symptoms of atrial fibrillation may be none to shortness of breath, skipping of the heart,

fatigueability, exercise incapacity, chest pain, chest pressure and aching to stroke and heart

failure [Miller Dep.7-8].

174.    Extreme stress can cause atrial fibrillation [Miller Dep.13].

175.    In August 2001 Dr. Miller's notes show that the PLAINTIFF was having intermittent

palpitations with increased job stress [Miller Dep.14].

176.    Atrial fibrillation is not common for a person of the PLAINTIFF's age [Miller Dep.15-16].

177.    Dr. Miller believed the PLAINTIFF's atrial fibrillation in 2001 was associated with increasing

amounts of stress in her job [Miller Dep.19-20].

178.    Atrial fibrillation can be very severe and life threatening [Miller Dep.33-34].

179.    From his 22 years of practice, Dr. Miller believes stress is a common cause of atrial fibrillation [Miller Dep.37].

180.    Celina Tsang has practiced internal medicine in Sangamon County, Illinois since 1991 [Tsang Dep.106-107].

181.    Atrial fibrillation is a serious medical condition in which cardiac output is reduced by thirty percent [Tsang Dep.116].  Dr. Tsang diagnosed the PLAINTIFF's episode of atrial fibrillation as severe and hospitalized her [Tsang Dep.116-117].

182.    In the PLAINTIFF's situation Dr. Tsang believes her attack of atrial fibrillation was caused by her exposure to stressful events because the typical organic causes of the condition had been eliminated and the PLAINTIFF's symptoms occurred in the wake of stressful events [Tsang Dep.81-84,114-115].

183.    On April 29, 2000 Dr. Tsang administered a Zung Test to the PLAINTIFF.  It is a questionnaire which assists in making a diagnosis of depression.  The test indicated that the PLAINTIFF was in normal limits on both the anxiety and depression score [Tsang Dep.107-110].  At no time either in April of 2000 or prior did Dr. Tsang ever recommend the PLAINTIFF take time off work because of psychiatric symptoms [Tsang Dep.110].

184.    In October of 2001 Dr. Tsang saw the PLAINTIFF.  At that time the PLAINTIFF was very tearful and evidenced symptoms of depression [Tsang Dep.111-112].

185.    In the fall of 2001 Dr. Tsang concluded that the PLAINTIFF needed the care of a psychiatrist [Tsang Dep.113].

186.    Susan Yarrington has a master's degree in counseling psychology.  She is licensed by the state

of Illinois as a clinical professional counselor.  Between the mid 1990s and 2001 Ms.

Yarrington saw the PLAINTIFF periodically for situational stress.  In those situations the

PLAINTIFF was struggling to cope with stress arising from an external source [Yarrington

Dep.6, 116].

187.    Between the mid 1990s and July of 2001 Ms. Yarrington believed that the PLAINTIFF was

capable of coping and dealing with the stressors which brought the PLAINTIFF to see her

[Yarrington Dep.118-119].

188.    Between the mid 1990s and July of 2001 when Ms. Yarrington saw the PLAINTIFF she

diagnosed her for adjustment disorder which is often referred to as situational depression or

situational anxiety.  It is a short term condition which all people go through [Yarrington

Dep.119-120].

189.    When the PLAINTIFF met with Susan Yarrington in August of 2001 she was upset and fearful

of her supervisor, Tony [Yarrington Dep.47].

190.    Beginning on August 8, 2001 and continuing to the present, Susan Yarrington has treated the

PLAINTIFF on a relatively consistent basis [Yarrington Dep.120-121].

191.    When Susan Yarrington began seeing the PLAINTIFF on August 8, 2001 the PLAINTIFF's

dominant concerns were her problems at work [Yarrington Dep.121-122].

192.    When Susan Yarrington saw the PLAINTIFF on December 13, 2001 she characterized the

PLAINTIFF as being "dismantled" and described her as being a "lump on a couch".  At that

time the dominant concern on the PLAINTIFF's part was her problems at work [Yarrington

Dep.122].

193.   The PLAINTIFF in Ms. Yarrington's view had remained "dismantled" at all times since

December 13, 2001 [Yarrington Dep.122-123].

194.   While treating the PLAINTIFF in the late fall of 2001 Ms. Yarrington noticed that she suffered

from symptoms of post-traumatic stress disorder.  These symptoms were:  tearfulness, hyper-

vigilance, a reduction in cognitive thought, and a sense of hopelessness and powerlessness in

situations where she felt threatened [Yarrington Dep.124-125].

195.   In November of 2001 the PLAINTIFF began treatment with Joseph Bohlen, M.D., a

psychiatrist.  Dr. Bohlen diagnosed the PLAINTIFF to suffer from major depression, single

episode, severe [Bohlen Dep.25-26].

196.   It is the opinion of Dr. Bohlen that the cause of the PLAINTIFF's major depression is the

treatment she received from her supervisor for the COMPANY during the year 2001 [Bohlen

Dep.26-30].

197.   Because of the severity of her symptoms of atrial fibrillation and difficulties she had in adjusting

to the medications prescribed because of that condition, the PLAINTIFF cut back her travel

during August of 2001 and, at the advice of her physician, took two weeks off work.  As a

result, she did not that month go to either Des Moines, Iowa, Evansville, Indiana or

Owensboro, Kentucky.  Because of the severity of the symptoms of atrial fibrillation and the

periodic medical care she was receiving, she did not feel comfortable making lengthy trips from

her home.  She did, however, during that month call regularly on her accounts in both St. Louis

and Peoria [PLAINTIFF's Affidavit 63].

**The PLAINTIFF's Departure from the COMPANY.**

198.    In late September and into October of 2001 the PLAINTIFF began suffering from symptoms that she had never earlier experienced.  She found herself uncontrollably crying at various periods of time and often at inappropriate times.  She began developing trouble concentrating and focusing on tasks.  Even though she rarely had more than five hours available to sleep she found it difficult to sleep.  During this time period she continued to have a rapid heartbeat and symptoms of atrial fibrillation.  She began developing headaches of an intensity that she had never earlier experienced.  On October 19, 2001 Dr. Celina Tsang recommended that she discontinue working because of these symptoms [PLAINTIFF's Affidavit 81].

199.    In October of 2001 Dr. Tsang as a part of her treatment plan for the PLAINTIFF advised her not to work for at least a month.  At that time, in addition to the atrial fibrillation Dr. Tsang diagnosed the PLAINTIFF to be suffering from depression secondary to acute stress [Tsang Dep.71-74].

200.    Dr. Tsang again saw the PLAINTIFF on November 19, 2001.  At that time she recommended to the PLAINTIFF that she not return to work at least until she had seen a psychiatrist [Tsang Dep.75-77].

201.    After the PLAINTIFF left active employment with the COMPANY she began drawing both short and then long term disability benefits.  Eventually, she also began securing social security disability benefits.  She has at all times remained unable to resume her work duties for the COMPANY.  Her disability benefits are significantly less than the salary she earned while working for the COMPANY [PLAINTIFF's Affidavit 82].

202.    In 2002 Siciliano hired Lori Schneiderhan to fill the PLAINTIFF's position.  She is 30 years of

age [Siciliano Dep.43-47].


### III.   STANDARDS WHICH ARE APPLICABLE IN A PROCEEDING FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary judgment

shall be granted only if the pleadings, depositions, answers to interrogatories and admissions on file

together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving

party is entitled to judgment as a matter of law [*Celotex v. Catrett*, 477 U.S. 317, 91 L.Ed.2d 265

(1986)].

Summary judgment is only appropriate when the record reveals that no reasonable jury could

find for the non-moving party [See *Karazanos v. Navistar International Transportation Corp.*, 948

F.2d 332 (7th Cir.  1991); *Konowitz v. Schnadig Corporation*, 965 F.2d 230 (7th Cir.  1992);

*Anderson v. Stauffer Chemical Company*, 965 F.2d 397 (7th Cir.  1992); and *McCoy v. WGN*

*Continental Broadcasting Company*, 957 F.2d 368 (7th Cir.  1992)].

In a summary judgment proceeding the facts and inferences drawn from underlying facts must

be viewed in a light most favorable to the party opposing the motion [See *United States v. Diebold,*

*Inc.*, 369 U.S. 654, 8 L.Ed.2d 176, 82 S.Ct.  993 (1962); and *Matsushita Electric Industrial*

*Company, Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 89 L.Ed.2d 538, 106 S.Ct. 1348

(1986)].

At the summary judgment stage of a case it is not the court's function to weigh the evidence and

determine the truth of the matter, but instead to determine whether there is a genuine issue for trial. The role of the court is not to determine whether it thinks the evidence unmistakably favors one side or the other, but to instead determine whether a fair minded jury could return a verdict for the party opposing the motion on the basis of the evidence presented [See *Anderson v. Liberty Lobby, Inc.* (op.cit. 1985); and *Shager v. Upjohn Company*, 913 F.2d. 398 (7th Cir. 1990)]. If evidence is subject to conflicting interpretations or if reasonable people might differ as to its significance summary judgment must be denied [See *Egger v. Phillips*, 669 F.2d 497 (7th Cir. 1982); and *O'Connor v. Chicago Transit Authority*, 985 F.2d 1362 (7th Cir. 1992)].

Summary judgment is often not appropriate in cases involving claims of discrimination where motive or intent are at issue [See *Stumph v. Thomas Skinner, Inc.*, 770 F.2d. 93 (7th Cir. 1985); *Bartman v. Allis-Chalmers Corporation*, 799 F.2d. 311 (7th Cir. 1986); and *McCoy v. WGN Continental Broadcasting Company* (op.cit. 1992)]. In the area of employment discrimination intent and credibility are particularly crucial issues. Accordingly, in those cases the burden which must be satisfied before granting summary judgment is applied with added vigor [see *Sarsha v. Sears, Roebuck & Company*, 3 F.3d 1035, 1038 (7th Cir. 1993); *Sample v. Aldi, Inc.*, 61 F.3d 544, 546 (7th Cir. 1995); and *Perdomo v. Browner*, 67 F.3d 140 (7th Cir. 1995)]. Summary judgment is only to be granted if the record before the court had it been the record of a complete trial would have entitled the defendant to a directed verdict [See *Sarsha v. Sears, Roebuck and Company*, 3 F.3d 1035 (7th Cir. 1993); *Robinson v. PPG Industries, Inc.*, 23 F.3d 1159 (7th Cir. 1994); *CSX Transport, Inc. v. Chicago & North Wester Transportation Company, Inc.*, 62 F.3d 185, 188 (7th Cir. 1995); and *Illinois Conference of Teamsters v. Steve Gilbert Trucking*, 71 F.3d 1361 (7th Cir. 1993)].

Particular caution is required before granting summary judgment in a claim maintained under a law which allows for trial by jury [See *McCoy v. WGN Continental Broadcasting Company* (op.cit. 1992); *Vissar v. Packer Engineering Company, Inc.*, 924 F.2d. 655 (7th Cir. 1991); and *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999) quoting *Huff v. Uarco, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997)].

In an employment discrimination case a claimant may defeat a motion for summary judgment by raising a genuine issue of material fact regarding the sincerity of the proffered reason advanced by the defendant for its actions [See *Wohl v. Spectrum Manufacturing, Inc.*, 94 F.3d 353 (7th Cir. 1996)].

Summary judgment is proper only if there is no reasonably contestable issue of fact which is potentially outcome determinative. Rule 56 was not intended to permit a summary judgment proceeding to be a substitute for a trial [*Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396-97 (7th Cir. 1997)].

## IV. ARGUMENT

### A. THE PLAINTIFF'S BURDEN OF PROOF

Summary judgment should not be granted where a genuine dispute exists with respect to any issue of material fact. Materiality is determined by the substantive law governing a particular claim. Thus, in ruling on a motion for summary judgment the trial court must view the evidence presented through the prism of the proof burden imposed upon the litigants [See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1985); and *Carson v. Allied News Company*, 529 F.2d 206 (7th Cir. 1976)].

The COMPANY's request for summary judgment, therefore, must be considered within the

context of the PLAINTIFF's burden of proof.

In a claim maintained under either the ACT or TITLE VII it is the ultimate burden of the PLAINTIFF to prove that she was the victim of an adverse employment action because of her protected status. She need not prove that her protected status was the sole factor motivating the employer's actions, but that it was a "determinative factor" in the sense that she would not have been exposed to that treatment "but for" her status [See *La Montagne v. American Convenience Products, Inc.*, 750 F.2d. 1405 (7th Cir. 1984); *McNeil v. Economics Laboratory, Inc.*, 800 F.2d. 111 (7th Cir. 1986); and *Brown v. M&M/Mars*, 883 F.2d. 505 (7th Cir. 1989)].

There are two ways in which a plaintiff may successfully resist summary judgment in a claim of disparate treatment. The first is by submitting enough evidence, whether direct or, more commonly, circumstantial to create a triable issue of whether the adverse employment action of which he complains had a discriminatory motivation. The second is by way of the indirect method of proof [*Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir. 1997)]. The indirect method has its genesis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L.Ed.2d. 668 (1973) as later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 67 L.Ed.2d. 207 (1981).

Under the indirect method a claimant has an initial burden of establishing a *prima facie* case. When this burden is met an inference of discrimination is created. This inference arises because the claimant has offered evidence which tends to show that the complained act, if not otherwise explained, is more likely than not the product of impermissible considerations by the employer [See *Furnco Construction v. Waters*, 438 U.S. 567, 577 (1978); and *Texas Department of Community Affairs v. Burdine* (op.cit. 1981)]. When a claimant has met this threshold burden a rebuttable presumption

arises that "but for" her activities, the acts complained of would not have occurred.  At that point the

defendant bears the burden of articulating a legitimate, non-discriminatory reason for the actions taken

by it.  The explanation offered by the defendant cannot be vague or general, but rather must be clear,

reasonably specific and presented through admissible evidence in order that a claimant will have a fair

opportunity to respond to it [See *Loeb v. Textron, Inc.*, 600 F.2d.  1003, 1011-1012 (n.5) (1st Cir.

1979); and *Texas Department of Community Affairs v. Burdine* (op.cit. 1981)].

Once the defendant has articulated a non-discriminatory reason for its actions the burden shifts

to the claimant to persuade the trier of fact that the employer's explanation is pretextual by showing that

either a discriminatory reason more likely motivated the employer's actions or its explanation is for

some reason not worthy of belief [See *LaMontagne v. American Convenience Products, Inc.*,

(op.cit.1984); *Christie v. Foremost Insurance Company*, 785 F.2d. 584 (7th Cir. 1986); *Dorsch v.

L.B. Foster Company*, 782 F.2d 1421 (7th Cir. 1986); and *Ayala v. Mayfair Molded Products

Corp.*, 831 F.2d. 1314 (7th Cir. 1987)].

Under the burden shifting approach of the indirect method if the claimant convinces the trier of

fact that it is more likely than not that the employer did not act for its proffered reasons, the employer's

decision remains unexplained and the inferences from the evidence offered by the PLAINTIFF in

establishing his *prima facie* case are sufficient to prove the ultimate fact of discriminatory intent on the

part of the employer [See *Ayala v. Mayfair Molded Products Corp.*, (op.cit. 1987); and

*Graefenhain v. Pabst Brewing Company*, 827 F.2d, 13 (7th Cir. 1987)].[3]

---

[3]*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 125 L.Ed.2d 407 (1993) does not alter
the method of establishing pretext under the holding of *McDonnell Douglas* and *Burdine*.  In *Hicks* the

## B. <u>THE PLAINTIFF'S *PRIMA FACIE* CLAIM OF DISCRIMINATION</u>

A *prima facie* claim of discrimination creates a rebuttable presumption that the treatment of a defendant was motivated because of the claimant's protected status [*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 L.Ed.2d 105 (2000); and *Wallace v. SMC Pneumatics, Inc.*, at p.1399]. Because the function of the *prima facie* claim in the indirect proof method is to create an inference of discriminatory motive, the elements of a *prima facie* case are not rigid but instead will very depending upon the facts presented in each case [*McDonnell Douglas v. Green*, (*op.cit.* 1973); and *Van Koteu v. Family Health Management, Inc.*, 1998 W.L. 54615 (7th Cir. 1998)].

A formulation of the elements of a *prima facie* case of sex or age discrimination in a case not involving the discharge of an employee would involve a claimant demonstrating that: a) she is a member of a protected class; b) she was performing her job to the reasonable satisfaction of her employer; c) she suffered an adverse employment action; and d) a similarly situated employee not a member of a protected class was treated more favorably [see for example, *Stalter v. WalMart Stores, Inc.*, 195 F.3d 285, 289 (7th Cir. 1999); and *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 897 (7th Cir. 2003)].[4]

---

Supreme Court confirmed that a finder of fact is permitted although not compelled to infer unlawful discrimination if it chooses to disbelieve the explanation offered by the employer for its actions. The Court in *Hicks* was faithful to its earlier holding in *McDonnell Douglas* and *Burdine* by recognizing that a fact finder was permitted to conclude that intentional discrimination did exist if the credibility of an employer's explanations for its actions is successfully undermined. Under the *Hicks* rule if a claimant establishes a *prima facie* claim and also discredits the employer's explanation for its actions the finder of fact is permitted although not compelled to conclude that intentional discrimination did occur. [See also *Reeves v. Sanderson Plumbing Contractors, Inc.*, 530 U.S. 133, 147 L.Ed.2d 105 (2000)].

[4] In this case, the events complained of by the PLAINTIFF led to her leaving the COMPANY's active employment on a medical leave of absence. Eventually, her position was filled.

For purposes of summary judgment, the COMPANY contests the ability of the PLAINTIFF to establish a *prima facie* claim in two respects.  First, it claims that any action taken by it against her was trivial and inconsequential and did not rise to the level of a materially adverse employment action. Second, it claims that the PLAINTIFF cannot demonstrate she was treated differently than similarly situated employees not members of her protected class.  Neither contention advanced by the COMPANY is well founded when viewed within the context of this case.

### 1)  Siciliano's Conduct Toward The PLAINTIFF Constituted A Materially Adverse Employment Action.

Viewing some, but not all, of the PLAINTIFF's complaints in isolation, the COMPANY contends that Mr. Siciliano's conduct toward the PLAINTIFF did not rise to the level of a materially adverse employment action.  In making this argument, the COMPANY:  a)  ignores evidence concerning the nature of the conduct directed toward the PLAINTIFF by Mr. Siciliano; b) mischaracterizes the law of our Circuit; and c) tends to view each type of conduct in isolation rather than to look at his conduct collectively.  As a consequence, its argument cannot be sustained.

Whether conduct by an employer is sufficiently material to constitute an adverse employment action must be decided on a case by case basis and will normally depend upon the facts of each situation [See *Bryson v. Chicago State University*, 96 F.3d 912, 916 (7th Cir. 1996)].

In *McDonnell v. Cisneros*, 84 F.3d 256, 258-59 (7th Cir.1996) our Circuit recognized an

---

Given the loss of her active employment, the PLAINTIFF could present a *prima facie* claim by showing that:  a) she is a member of a protected class; b) she was performing her job to the reasonable satisfaction of her employer; c) she suffered an adverse employment action causing her to leave its employ; and d) she was replaced by an individual not in her protected class [see for example *Reeves* at p.142].

adverse employment action must be viewed broadly.

Our Circuit has recognized that actionable activity on the part of an employer is not limited solely to reduction of pay or other conduct which constitute a reduction of monetary benefits. Instead, it can encompass other forms of adversity in the workplace [See for example *Collins v. State of Illinois*, 830 F.2d 692 (7th Cir.); and *Smart v. Ball State University*, 89 F.3d 437 (7th Cir. 1996)].

In *Hilt-Dyson v. City of Chicago*, 282 F.3d 456 (7th Cir.2002) our Circuit, in discussing what constituted a material adverse employment action, stated:

"Although creating a precise list of activities that constitutes adverse employment actions would be impossible because of the unique circumstance of individual cases, we have indicated that materially adverse actions may include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices that might be reasonably unique to a particular situation' [See *Rebando v. United Airlines, Inc.*, 200 F.3d 507, 510 (7th Cir.1999)]" (emphasis added).

Our Circuit has recognized three categories of cases in which an employer's actions create a materially adverse employment action. The first is when the financial terms of employment are diminished. The second occurs when a nominally lateral transfer without a change in the employee's financial terms of employment significantly reduces his career prospects by preventing him from using his skills an experiences. The third category involves situations in which an employee is not moved to a different job or the skill requirements of his present job are altered, but instead the conditions in which he works are changed in a way that subjects him to humiliating, degrading, unsafe, or unhealthful conditions or otherwise significantly alters his workplace environment in a negative respect including an alteration which can be objectively characterized as creating a hardship [see *Tart v. Illinois Power Company*, 366 F.3d 461, 475 (7th Cir. 2004); and *Herrnreiter v. Chicago Housing Authority*, 315

F.3d 742, 744-45 (7th Cir. 2002)].

In the case at bar, a reasonable jury could find that Mr. Siciliano's actions taken against the PLAINTIFF created a materially adverse employment action in both the first or the third categories recognized by our Circuit.

The *Tart* court recognized that imposing upon an employee significantly harsher working conditions that what he previously had constitutes a materially adverse employment action [*Tart* at p.473-74].

A reasonable jury in the case at bar could conclude that the working conditions imposed upon the PLAINTIFF in the summer and early fall of 2001 created an objective hardship upon her.

Prior to early July of 2001, the PLAINTIFF consistent with the expectations of her supervisors prioritized her accounts paying particular attention to her priority accounts [¶86 of the PLAINTIFF's Statement]. At that time Mr. Siciliano required her to call on her priority accounts every week and her other accounts every two weeks, a requirement which the COMPANY's retavase product manager characterized as both impossible and ridiculous [¶88,92 of the PLAINTIFF's Statement]. Given the location of these accounts throughout the midwest and the travel methods reasonably available to the PLAINTIFF, his coverage requirements created a dramatic increase in her workload. Typically, the PLAINTIFF was on the road everyday generally working over 12 hours a day. On the weekends she would do paperwork. While she had formerly worked 50-55 hours per week for the COMPANY, she now found herself working between 70 and 90 hours per week [¶146-157 of the PLAINTIFF's Statement]. At the same time, Mr. Siciliano badgered the PLAINTIFF as many as 15 times per day with telephone messages and pages requiring her to perform trivial (make work) assignments [¶160 of

the PLAINTIFF's Statement].  As the year progressed, Mr. Siciliano was increasingly critical of her

performance and refused to give her credit for significant work related accomplishments even though

her sales of the COMPANY's FDA indicated products exceeded her goal and she had made

significant strides in the placement of retavase [¶134-149 of the PLAINTIFF's Statement].  In many

respects his written criticisms in her September, 2001 FCR were downright false.

From any type of objective point of view, this change created a hardship.  It was not trivial (or

as the COMPANY characterizes "banal"), but instead imposed significant hardships upon the

PLAINTIFF.

Because of the effect of Mr. Siciliano's conduct, the PLAINTIFF's situation also falls into the

first category of cases recognized by our Circuit as materially adverse employment actions.  In August

of 2001 because of the work related stress the PLAINTIFF was enduring, she suffered symptoms of

atrial fibrillation, a serious heart disorder.  As the fall progressed not only did those conditions continue,

but she also developed symptoms of major depressive disorder.  Three physicians and a clinical

therapist all concluded that the PLAINTIFF was suffering from severe physical and mental disorders

arising out of work related stress.  The situation reached a point where the PLAINTIFF because of that

stress was required to take a medical leave of absence resulting in a significant loss of income [¶171-

202 of the PLAINTIFF's Statement].

Try as it may to trivialize the hardships the PLAINTIFF suffered, a reasonable jury could

conclude that Mr. Siciliano's treatment of the PLAINTIFF caused a significant and materially adverse

employment action.

The cases relied upon by the COMPANY in support of its contention that the PLAINTIFF

suffered no materially adverse employment action simply do not fit the facts of this case and involve nothing more than the COMPANY mixing legal apples and oranges.

Both *Smart v. Ball State University*, 89 F.3d 437 (7th Cir. 1996) and *Oest v. Illinois Department of Corrections,* 240 F.3d 605 (7th Cir. 2001) recognize that a negative performance evaluation standing by itself and without any financial consequence does not rise to the level of an adverse employment action. To the extent that the PLAINTIFF's claim was about nothing more than a negative field contact review, her claims would not rise to the level necessary to constitute a materially adverse employment action. The negative criticisms in the FCR, however, was not all that occurred to her. The increased travel requirements, significantly greater work hours, inadequate credit for work she was given and a constant barrage of trivial assignments from her supervisor and the negative FCR all contributed to creating an objective hardship upon the PLAINTIFF.

*Silk v. City of Chicago*, 194 F.3d 788 (7th Cir. 1999) recognizes that our Circuit has construed the term "materially adverse employment actions" broadly and that the term encompasses forms of adversity other than quantifiable losses of pay or benefit. It also recognized only that minor and trivial actions making an employee happy do not meet the form of adversity. The facts in that case do not involve trivialities. None of the conduct complained of in *Silk* is in any respect comparable to the treatment extended to the PLAINTIFF by Mr. Siciliano. It defies credulity to suggest that a requirement that an employee consistently work between 70 and 90 hours per week is trivial.

The COMPANY relies upon *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892 (7th Cir. 2003) and *Haugerud v. Amery School District*, 259 F.3d 678 (7th Cir. 2001) in support of its premise that the requirement the PLAINTIFF cover her accounts in a two week cycle could not

constitute an adverse employment action.  *Johnson* does not adopt a blanket rule that being given

harder work assignments is never a materially adverse employment action.  Instead, the *Johnson* court

merely indicated that the claimant's allegations that he was given harder work assignments "under the

circumstances he describes" did not rise to the level of being a materially adverse employment action

[see *Johnson* at p.901].  The *Johnson* court stated:

> "The definition of adverse employment action is generous, but it is still subject to certain
> limitations.- - -   At the very least, Johnson must show some quantitative or qualitative
> change in the terms or conditions of his employment that is more than a mere subjective
> preference" [p.901].

The complaints of the PLAINTIFF as narrated above do not involve mere subjective

preferences.  Instead, they show from an objective point of view significant work hardships.

A reasonable jury could from the facts in this case be persuaded that the PLAINTIFF has at

the very least shown that her account coverage requirement alone, in causing her to increase the hours

she worked per week by over 30, did involve a quantitative and qualitative change in the terms and

conditions of her employment.

The plaintiff in *Haugerud* claimed that she was given more difficult and responsible work tasks

than given male employees such as cleaning bathrooms at a high school [see pp.686-87].  The court

concluded that that did not constitute a material harm.  The facts in this case simply are not in any

respect comparable to those in *Haugerud*.  The *Haugerud* Court was quick to point out that its

holding was limited to the facts in that case noting that whether conduct constitutes a materially adverse

employment action will "depend on the facts of each situation" and a wide variety of actions can qualify,

'some blatant and some subtle'" [p.691].

*Griffin v. Potter*, 356 F.3d 824 (7th Cir. 2004) is equally unhelpful to the COMPANY.  The

change in job conditions relied upon by the *Griffin* plaintiff was a job transfer which required him

additional time to commute to work.  The *Griffin* court recognized that additional time to commute to

work is not the type of hardship that creates a materially adverse employment action.  A reasonable

jury could conclude that Mr. Siciliano's work requirements of the PLAINTIFF which effectively

required her to work many more hours each week were significantly more burdensome than additional

commuting time.

The COMPANY cites *Rabinovitz v. Pena*, 89 F.3d 482 (7th Cir. 1996) for the proposition

that the denial of a bonus is not an adverse employment action.  In *Rabinovitz,* the claimant's complaint

was that he received a one grade reduction in his performance rating which neither altered his

responsibilities or salary and "at most" prevented him from receiving a $600 bonus.  What separates

*Rabinovitz* from the case at bar is that the PLAINTIFF's claim is not limited only to her failure to

receive a bonus.  It was the failure to receive a bonus coupled with many other things previously noted

which had the effect of making her work environment from both a qualitative and quantitative point of

view burdensome.

*Hotenroth v. Village of Slinger*, 388 F.3d 1015 (7th Cir. 2004) discloses the same infirmity in

the COMPANY's argument.  The *Hotenroth* case merely says that the failure to receive a

discretionary bonus standing by itself is not a materially adverse employment action.  The

PLAINTIFF's case is not only that she did not receive a bonus.  The bonus is only one of many other

things done to her by Siciliano.

Relying upon *Williams v. Bristol Myers Squibb Company*, 85 F.3d 270 (7th Cir. 1996) the

COMPANY contends that changing the PLAINTIFF's account assignments is insufficient to constitute an adverse employment action. In two respects *Williams* fails to help and in fact undermines the COMPANY's contention that no adverse employment action occurred.

First, the *Williams* court recognized that a transfer involving no reduction in pay "and no more than a minor change in working conditions" will not rise to the level of a materially adverse employment action. In this case, however, the change in the PLAINTIFF's job duties were much more than a minor change in working conditions. As more fully described earlier, there was a significant alteration for the worse in the PLAINTIFF's position in the summer and fall of 2001.

Second, the *Williams* court recognized that a constructive discharge would obviously be a materially adverse employment action. In this case the PLAINTIFF never resigned her employment nor made any conscious choice that she would rather not work for it. Instead, she was required to leave active employment with the COMPANY for medical reasons which her physicians attribute to Siciliano's conduct. The effect, however, was the same as a termination since she lost many of the financial benefits of her employment.

It is incontroverted that in October of 2001 in the wake of a serious heart problem and while she was exhibiting depressive symptoms, the PLAINTIFF at the direction of her physician went on a medical leave of absence [¶198-201 of the PLAINTIFF's Statement]. It is further uncontroverted that three physicians and a clinical therapist all attribute the PLAINTIFF's health problems in the fall of 2001 to stress resulting from Mr. Siciliano's treatment toward her [¶171-197 of the PLAINTIFF's Statement]. Regardless of the label which one puts on that occurrence, a reasonable jury could conclude that the PLAINTIFF, because of Siciliano's conduct toward her, was medically required to

leave active employment.

The COMPANY contends that the only viable legal theory the PLAINTIFF has for this occurrence is a constructive discharge. What separates the instant situation from a constructive discharge is that the PLAINTIFF has never resigned her employment with the COMPANY and presumably is still considered an employee on its roles. Instead, because of a medical condition she is and has for some time been unable to work. This may be more of a distinction than difference because if the PLAINTIFF's situation could be evaluated under a constructive discharge analysis there is abundant evidence allowing a reasonable jury could conclude that is what occurred. In a constructive discharge, she must show from an objective point of view that her working conditions were so intolerable that a reasonable person would have felt compelled to resign [*Gurbe v. Lau Industries, Inc.*, 257 F.3d 723, 728 (7th Cir. 2001)]. Since the PLAINTIFF did not resign, the question becomes were her working conditions so intolerable that she was reasonably forced into a medical leave of absence? Her treating physicians all answered that question in the affirmative opining that the PLAINTIFF's medical condition was evoked by work related stress.

A reasonable jury could conclude that being forced to work 70 to 90 hours per week, being inundated with 10-15 calls from her boss daily, being required to be on the road 12-16 hours a day and then be the subject of constant criticism is more than a slight inconvenience and is the type of work environment that could cause a reasonable person to have a breakdown.

In an attempt to buttress its position that a constructive discharge did not occur, the COMPANY relies upon the holding in *Spence v. Maryland Casualty Company*, 995 F.2d 1147 (2nd Cir. 1993). According to the COMPANY, *Spence* stands for the proposition that developing high

blood pressure due to work related stress did not constitute an adverse employment action. *Spence*, however, recognized that a constructive discharge could be found where an employer engaged in conduct which placed an employee in a position that jeopardized her health citing *Meyer v. Brown & Root Construction Company*, 661 F.2d 369, 371-72 (5th Cir. 1981) where a constructive discharge occurred when a pregnant employee was transferred to a position requiring heavy manual labor.  In an attempt to downplay the PLAINTIFF's complaints, the COMPANY trivializes them by characterizing them as "banal" involved nothing more than commonplace complaints about her day to day working conditions and her supervisors management style [p.49 of the COMPANY's brief].

A reasonable jury could conclude that there is nothing commonplace about requiring a middle aged employee to work 70-90 hours per week, be on the road 12-16 hours everyday, be required to respond to 10-15 pages per day and being the constant subject of criticism.  A reasonable jury could further conclude, based upon its own common sense and without even considering the opinions of the PLAINTIFF's physicians, that this conduct would eventually imperil her health.

There is plentiful evidence in this record which would enable a reasonable jury, applying the legal standards of our Circuit, to conclude that the PLAINTIFF suffered an adverse employment action.

### 2)  The Treatment Extended To Other Employees.

In passing, the COMPANY argues that the PLAINTIFF's *prima facie* claim is fatally infirm because she cannot demonstrate that she was treated differently and less favorably than other

employees working under Mr. Siciliano's supervision.[5]  Two points need be made in response to this argument.

First, a reasonable trier of fact could conclude in various ways that the other members of Siciliano's team, particularly the younger, female members were treated significantly better than was the PLAINTIFF.

At the outset of her tenure on the Siciliano team the PLAINTIFF had without explanation two of her most promising accounts (Memorial Medical Center and Proctor Hospital) taken away from her even though she offered a variety of reasons to Mr. Siciliano why it was worthwhile that those accounts be retained.  Mr. Siciliano acknowledges that those accounts were removed over the PLAINTIFF's objections.  By contrast, neither Caroline Kopecky nor Randy Van Cleave ever recall an account being taken away from them which they wanted to keep and the evidence reflects that Kopecky was given each account she wanted [¶52-62 of the PLAINTIFF's Statement].

Beginning in July of 2001 the working conditions of the PLAINTIFF were dramatically altered when she was directed by Mr. Siciliano to call upon her key customers every week and her other accounts every two weeks.  At the time that occurred, the PLAINTIFF had recently returned from a medical leave and based upon her sales during the last full quarters she had worked for the

---

[5]  Wisely, the COMPANY seems to concede that the other members of the PLAINTIFF's team were similarly situated to her.  Another person is similarly situated to the PLAINTIFF if he/she is comparable to her in all material respects [*Grayson v. O'Neill,* 308 F.3d 808 (7th Cir. 2002); and *Patterson v. Avery Dennison Corporation,* 281 F.3d 676 (7th Cir. 2002)].  Like the PLAINTIFF, the other members of her team worked under the supervision of Siciliano and he had the authority to regulate their employment as he did for the PLAINTIFF.  Moreover, the duties and responsibilities of each of those individuals was the same as the PLAINTIFF's.

COMPANY, was a leader of the team in product sales [¶87-88 of the PLAINTIFF's Statement].

By contrast, Caroline Kopecky who during the first quarter of 2001 was near the bottom of all vascular specialists in product sales even though her territory had one of the highest number of physicians treating peripheral vascular disease was not given a similar requirement [¶29,64,112 of the PLAINTIFF's Statement]. Mr. Siciliano acknowledges that the only person given the mandatory coverage requirement was the PLAINTIFF [¶103 of the PLAINTIFF's Statement]. The travel records for both Kopecky and Bannister Hill reflect that during the year 2001 they never called upon their customers in the two week rotation cycle which Mr. Siciliano required of the PLAINTIFF [¶112,117 of the PLAINTIFF's Statement]. Furthermore, Randy Van Cleave in July of 2001 not only acknowledged to the PLAINTIFF that he was not working under that type of coverage requirement but felt that such a requirement was simply unworkable given the nature of the work done by a vascular representative [¶105 of the PLAINTIFF's Statement]. Denise Bannister Hill never recalls receiving any requirement about the frequency she had to call on accounts [¶114 of the PLAINTIFF's Statement]. A reasonable jury could conclude that no other vascular specialist was given the travel requirements which the PLAINTIFF was given.

Furthermore, it is abundantly clear that a reasonable jury could conclude that the PLAINTIFF notwithstanding significant accomplishments received no bonus points while the two young vascular specialists received bonus points for achievements which were either: a) similar to those for which the PLAINTIFF received no bonus points; or b) significantly less than those performed by the PLAINTIFF for which she received no bonus points [¶118-133 of the PLAINTIFF's Statement].

Finally, while the PLAINTIFF was constantly barraged by Mr. Siciliano with pages and other

telephone communication, Denise Bannister Hill, a new employee, would go days at a time without hearing from him [¶163 of the PLAINTIFF's Statement].

Second, because she left the active work force of the COMPANY, the PLAINTIFF could alternatively establish the fourth element of her *prima facie* case by demonstrating that she was replaced by someone outside of the protected group [see for example the analysis in *Reeves* discussed earlier in this instrument].  In this case, after the PLAINTIFF left active employment with the COMPANY, Mr. Siciliano hired her replacement, Lori Schneiderhan, who at that time was 30 years of age [¶202 of the PLAINTIFF's Statement].

## C. <u>THE QUESTION OF PRETEXT</u>

### 1)  The Standards For Proving Pretext.

In passing, the COMPANY claims that Siciliano has offered a legitimate, non-discriminatory reason for his actions toward the PLAINTIFF and she is unable to prove that his reasons are pretextual.

Under the indirect proof method an employer must respond to a *prima facie* case of employment discrimination by articulating some legitimate, nondiscriminatory reason for its actions.

While the employer does not bear the burden of persuading a fact finder that it was actually motivated by its proffered reason, it must, nonetheless, present evidence responsive to a claimant's *prima facie* case which raises a genuine issue of fact as to whether it discriminated against the claimant. To achieve that end an employer must clearly and with reasonable specificity set forth through admissible evidence its justification for the challenged action.  This burden of production satisfies two objectives.  In the first place, it serves as a response to a claimant's *prima facie* case by presenting a

legitimate reason for its actions.  Secondly, it frames the factual issue in dispute with sufficient clarity so that the claimant will have a full and fair opportunity to demonstrate pretext [See *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254-256, 67 L.Ed.2d 207 (1981)].

When the employer satisfies its explanation obligation the claimant must, in order to recover, persuade the trier of fact that the employer's explanation is pretextual [See *Texas Department of Community Affairs v. Burdine*, (op.cit.1981); *LaMontagne v. American Convenience Products, Inc.*, (op.cit. 1984); and *Graefenhain v. Pabst Brewing Company*, (op.cit.1987)].  Pretext may be established through a showing that the employer's explanation is not credible [see for example *Jackson v. E.J. Brach Corporation*, 176 F.3d 971 (7th Cir. 1999) and *Sarsha v. Sears Roebuck & Company*, 3 F.3d 1035 (7th Cir. 1993)].  A claimant can discredit an employer's justification for its actions by demonstrating that either: 1) the proferred reason has no basis in fact; 2) the proferred reason did not actually motivate the decision; or 3) the proferred reason was insufficient to motivate the decision [See *Grohs v. Gold Bond Building Products*, 859 F.2d 1283 (7th Cir.1988); and *Collier v. Budd Company*, 66 F.3d 886 (7th Cir.  1995)].

Disbelief by a fact finder of an employer's reasons for its actions accompanied by evidence sufficient to establish the elements of a *prima facie* claim is sufficient to demonstrate intentional discrimination.  Rejection of the defendant's proferred reason permits the trier of fact to infer the ultimate fact of intentional discrimination [See *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 125 L.Ed.2d 407 (1993) and *Jackson* at pp.983-984].

Proof that a defendant's explanation for its action is unworthy of credence is one form of circumstantial evidence which is probative of intentional discrimination and such evidence may be quite

persuasive.  In appropriate circumstances a trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.  Such an inference is consistent with the general principle of evidence law that the fact finder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.  Once the employer's justification has been eliminated discrimination will be a likely alternative explanation since the employer is in the best position to put forth the actual reason for its decision.  Thus, a plaintiff's *prima facie* case combined with sufficient evidence to find that the employer's asserted justification is false may permit the trier of fact to conclude that the employer was guilty of unlawful discrimination [See *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct.2097, 2108-2109, 530 U.S. 133, 147 L.Ed.2d 105 (2000)].

In order to withstand summary judgment a claimant need not establish that the real reason for an employer's actions was discriminatory, but only that a rational finder of fact could infer that the reason given by the employer for its actions was incredible.  Evidence which calls into question the credibility of the employer's reasons precludes summary judgment [See *Sample v. Aldi, Inc.*, (op.cit. at p.549 7th Cir.1995); and *Perdomo v. Browner*, (op.cit. at p.144 7th Cir.1995)].  The "special virtue of the indirect proof method is that it allows victims of age discrimination to prevail without presenting any evidence that age was a determining factor in the employer's motivation."  Rather, a claimant may recover without discovering "evidence of discrimination simply by proving that the employer's proffered justification is unworthy of credence" [*Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 680 (7th Cir. 2003)].

A claimant may defeat a motion for summary judgment by raising a genuine issue of material fact regarding the sincerity of the proferred reason advanced by the employer by its actions [See *Wohl*

*v. Spectrum Manufacturing, Inc.*, 94 F.3d 353 (7th Cir. 1996)].

**2) Siciliano's Explanation For His Conduct Toward The PLAINTIFF.**

Any reasoned analysis of whether an employer's explanation for its actions is pretextual begins with the explanation itself. To the extent Mr. Siciliano offers any explanation for his treatment of the PLAINTIFF, a reasonable trier of fact could conclude that his reasons either have no basis in fact or because of his treatment toward other members of his team was not the reason for his actions.[6]

According to the COMPANY, Siciliano's explanation for removing the PLAINTIFF's accounts with Memorial Medical Center and Proctor Hospital was that it was the product of a "compromise" between Michelle Johnson and the PLAINTIFF. At no place does it identify the compromise or the process giving rise to it. Typically, a compromise involves some "splitting of the difference." Here, however, there is no evidence of anything of benefit which passed to the PLAINTIFF. A reasonable jury could conclude this is simply not true and there was no compromise. The accounts were removed over the PLAINTIFF's objection and she was given no reason for the removal. Moreover, the evidence in this case is clear that other members of Mr. Siciliano's team never had accounts removed from them over their objection [¶53-57,59-62 of the PLAINTIFF's Statement]. Mr. Siciliano fails to delineate the term of compromise. A reasonable trier of fact could simply conclude either that this explanation has no factual basis or did not motivate Mr. Siciliano's decision.

Mr. Siciliano claims that he imposed a two week requirement for the PLAINTIFF covering her

---

[6] It should be noted that in its brief the COMPANY largely surmises what Siciliano's explanations might be for his conduct and does so without the particularities required by *Burdine* and its progeny.

accounts based upon his own experience and in consultation with the regional director.  This is not an explanation.  It does not explain why Mr. Siciliano imposed that requirement only upon the PLAINTIFF.  In early July of 2001 Caroline Kopecky, another member of Mr. Siciliano's team, was near the bottom of sales and no similar account coverage requirement was imposed upon her [¶103 of the PLAINTIFF's Statement].  Denise Bannister Hill, a new vascular specialist, having no prior experience selling vascular product was never given any account coverage requirement [¶114 of the PLAINTIFF's Statement].  Mr. Siciliano by reviewing the expense reports of account representatives would be aware of the frequency in which they called on their accounts.  Those reports reflect that at no time during 2001 did Kopecky or Bannister Hill ever call on their accounts.  Randy Van Cleave admitted in an email to the PLAINTIFF that he did not call on all of his accounts on a two week cycle and the expense reports of both Caroline Kopecky and Denise Bannister Hill reflect that at no time did they either [¶112,117 of the PLAINTIFF's Statement].

With respect to the April FCR that Mr. Siciliano prepared for the PLAINTIFF, the PLAINTIFF's concern was not with the substance of the report, but instead with the objective that she complete certain requirements in an arbitrarily short time span.  Mr. Siciliano offers no explanation why it was he felt it necessary for her to complete his objections within the time he specified.

In his September, 2001 FCR, Mr. Siciliano criticized the PLAINTIFF's performance in the Evansville and Des Moines dinner meetings by characterizing the result as being caused by poor follow through on her part.  According to the COMPANY, it is undisputed that one meeting had to be canceled because no one was going to attend and the other had low attendance.  While this is true, that does not answer the question about why Siciliano accused the PLAINTIFF of performance

shortcomings.  It is undisputed that the Iowa dinner meeting was canceled not because of any

shortcomings on the PLAINTIFF's part, but instead because the radiology group at the hospital had

been disbanded and thus a meeting would be purposeless.  With respect to the Evansville meeting, the

attendance was poor not because of any failures on the PLAINTIFF's part, but because of a severe

rainstorm and even with the poor attendance the key decision makers did attend and as a result of that

meeting the PLAINTIFF was able to secure sales.  Mr. Siciliano offers no explanation for his slanted

and overly negative criticisms of the PLAINTIFF's performance [¶139,144 of the PLAINTIFF's

Statement].

  Mr. Siciliano's complaints in his September, 2001 FCR concerning the PLAINTIFF's territory

coverage is, according to him, based upon the PLAINTIFF's failure to cover 25% of her accounts

during her first six weeks back from medical leave and the fact that she had covered the accounts

closest to her home.  A comparison of Caroline Kopecky and Denise Bannister Hill's expense reports

reflect that over 70% of their account calls during 2001 were for customers in the metropolitan area

where each lived.  Nonetheless, no coaching was undertaken for them even though Caroline

Kopecky's performance during the first quarter was poor and her territory had one of the highest

number of physicians providing treatment for peripheral vascular disorders [¶112-117 of the

PLAINTIFF's Statement].  Moreover, Mr. Siciliano's complaints in his September field progress

report, according to him, were based upon events which occurred in April and May of 2001.  It is

relatively clear that the PLAINTIFF during July, August and September of 2001 was calling on her

accounts as he required except for the time period in which she was sick in August and had to focus on

an interventional meeting in September [¶146-158 of the PLAINTIFF's Statement].

Finally, the COMPANY contends that there is no evidence that Siciliano did not honestly believe his reasons. For reasons more fully stated, a reasonable trier of fact could discount that self serving assertion. Additionally, he was in attendance at the Evansville meeting and was aware of the rainstorm. He offers no explanation as to why he did not provide coaching to Caroline Kopecky who sales performance was poorer than the PLAINTIFF's and spent much less time traveling than was required of the PLAINTIFF.

Mr. Siciliano offers no explanation for: 1) why he needed to contact the PLAINTIFF 10-15 times a day; 2) why he required the PLAINTIFF to start submitting weekly field reports; 3) why he did not impose a sample routing schedule on any other vascular specialist on his team; and 4) why he totally ignored the PLAINTIFF's accomplishments in awarding bonus points.

Based upon all of the foregoing, a reasonable trier of fact could conclude that Mr. Siciliano's explanations for his treatment of the PLAINTIFF are simply not to be believed.

## IV.  CONCLUSION

Summary judgment is proper only if there are no reasonably contestable issues of fact which are potentially outcome determinative. Summary judgment even in cases of employment discrimination should not serve as a substitute for trial under Rule 56 of the "Federal Rules of Civil Procedure" [see *Wallace* at p.1396-97].

The PLAINTIFF has presented plentiful evidence to demonstrate that this is a case which should be heard by a jury.  For that reason, she asks that the COMPANY's motion for summary judgment be denied.


M. JANE MINOR


By:___s/ James P. Baker_____
Attorney for Plaintiff
James P. Baker
Bar Number: 0097802
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone: (217) 522-3445
Facsimile: (217) 522-8234
E-mail: carenbakerlaw@sbcglobal.net
(Memorandum/minorjoppositionmsj 032105)

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on April 1, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Linzey D. Jones
John M. Broderick
Pugh, Jones & Johnson, P.C.
180 North LaSalle Street, Suite 2910
Chicago,  Illinois   60601

David L. Drake
Drake, Narup & Mead, P.C.
107 East Allen Street
Springfield,  Illinois     62704

        By:___s/ James P. Baker_____
         James P. Baker
         Bar Number: 0097802
         Baker, Baker & Krajewski, LLC
         415 South Seventh Street
         Springfield, Illinois 62701
         Telephone: (217) 522-3445
         Facsimile: (217) 522-8234
         E-mail: carenbakerlaw@sbcglobal.net