E-FILED
Friday, 01 April, 2005   03:10:43 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| M. JANE MINOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Nos. 02-3354 and 04-3114 |
| | ) | Consolidated |
| CENTOCOR, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF M. JANE MINOR

STATE OF ILLINOIS      )
                       ) ss.
COUNTY OF SANGAMON )

M. JANE MINOR, being duly sworn upon her oath, deposes and states as follows:

1. I am an adult resident of Sangamon County, Illinois. My date of birth is August 2, 1946.

2. On September 20, 1999 I went to work for Centocor, Inc. ["COMPANY"] as a pharmaceutical sales representative. Prior to that time, I had worked for over 25 years as a pharmaceutical sales representative.

3. Immediately prior to going to work for the COMPANY, I had worked for over 18 years for Abbott Laboratories, Inc. For many years while I worked for Abbott Laboratories, Inc., I sold Urokinase, a medication which dissolved blood clots, to Vascular Surgeons, Interventional Radiologists, Interventional Cardiologists and Pharmacists for the treatment of peripheral vascular disease.

4. During the time period I sold Urokinase it was the only drug generally utilized for treating peripheral vascular disease. In 1999 Urokinase was removed from the market by Abbott

Laboratories, Inc.

5. In the summer of 1999 Susanne Bolger, a cardiovascular representative for the COMPANY, recruited me to work for it.

6. I accepted a job offer with the COMPANY as a cardiovascular representative. In that position I was to call upon many of the physicians I had called upon when selling Urokinase for Abbott Laboratories, Inc. The COMPANY offered me a higher salary than what I was making, a bonus to go to work for it and stock options.

7. I worked for the COMPANY as a cardiovascular representative from September of 1999 until the early summer of 2000. At that time, I was asked by Michael Montgomery, M.D., the head of vascular medicine with the COMPANY, and Michelle Johnson, the cardiology district manager, if I would be interested in becoming a vascular specialist. I was informed by them that if I accepted the position the size of my sales territory would temporarily increase until the end of the year 2000 when, as the result of an expansion of the vascular sales force, it would be divided in half.

8. I worked as a vascular representative for the COMPANY from the early summer of 2000 until October of 2001. Initially, my sales territory as vascular specialist included most of the state of Missouri, the state of Illinois south of Interstate 80, a portion of the states of Indiana and Kentucky proximate to Evansville, Indiana and part of the state of Iowa to Des Moines.

9. As a vascular specialist, I was responsible for selling both Cordis products which were used for the treatment of cardiovascular disease and Retavase. I called on physicians treating patients for peripheral vascular disease such as Interventional Cardiologists, Interventional Radiologists and Vascular Surgeons.

10. While I worked as a vascular sales specialist, Retavase had not been indicated by the Food and Drug Administration ["FDA"] for use in treating peripheral vascular disease. Because it was not indicated by the FDA, it would have been improper for me to solicit the sale of Retavase for the treatment of peripheral vascular disease.

11. I was expected to field inquiries from physicians with the hope that without solicitation from me they would develop an interest in and request information concerning Retavase and its use in treating peripheral vascular disease.

12. Retavase had never been used for the treatment of peripheral vascular disease while Urokinase was on the market. After Urokinase left the marketplace, there were only a few medications available for the treatment of peripheral vascular disease. Retavase had been used for that purpose even though its use was not indicated by the FDA. Activase, a product of Genentech, Inc., was also used for the treatment of peripheral vascular disease.

13. Even though it had not been indicated by the FDA, vascular sales specialists for the COMPANY were to sell Retavase to physicians and hospitals for use in the treatment of peripheral vascular disease. My job was to develop a relationship with physicians and pharmacists so that they would request information to educate themselves on the use of Retavase for that purpose. Because Retavase was not indicated by the FDA, neither I nor any other vascular representative could make overt or direct efforts to sell Retavase for the treatment of peripheral vascular disease.

14. My job as a vascular sales specialist was to use Cordis presentations as a point of entry that would gain unsolicited inquiries about Retavase from physicians and pharmacists for the treatment of peripheral vascular disease. Consequently, it was important in my dealings with

physicians and pharmacists to develop a rapport with them. This took a great deal of time. When I called upon physicians, it was important that I become educated in their medical practice and the procedures that they were using to treat peripheral vascular disease. Oftentimes, this meant that I would spend considerable time when they were available to discuss the nature of their practice and to observe them performing procedures. Much of my time in calling upon physicians and hospitals, therefore, was spent observing cases and speaking with pharmacists, physicians and support technicians to obtain a greater knowledge of how they were treating their patients. Through these efforts, they would hopefully make inquiry with me about how Retavase could be used to fill the void which occurred when Urokinase left the market.

15. During the time period between the early summer of 2000 and January of 2001, my supervisors as a vascular specialist were William Alexander and Tim Shaffer. While Mr. Alexander, Mr. Shaffer and Ms. Johnson were my supervisors, I enjoyed an excellent relationship with each of them. I consistently received positive written performance evaluations, reviews and field progress reports.

16. When I was supervised by them, I advised both Mr. Alexander and Mr. Shaffer of the accounts which I felt were worthy of calling upon. Generally, they accepted my recommendations about which accounts I should work in my sales territory. I had approximately 15 accounts while I was a vascular specialist working under them. I was directed by them to focus on the top 3-5 accounts and pay secondary attention to the others.

17. Between the early summer of 2000 and January of 2001 as a Vascular Specialist, I focused upon five or six accounts which were located in central Illinois and in the St. Louis area. I also went to Evansville, Indiana and Owensboro, Kentucky approximately once a month. I was

never directed to call upon each of my assigned accounts in two week cycles.

18. As a vascular specialist, the time I spent at each individual account varied directly with the level of business activity going on at that account. After physicians expressed an interest in utilizing Retavase and signed a Medical Request Form, I would speak to the physicians, technical employees, nurses and pharmacy staff concerning the application of Retavase to the treatment of peripheral vascular disease. This often involved the expenditure of significant periods of time at an account.

19. In late 2000 the COMPANY had a realignment of its vascular sales force and created five teams. I was assigned to the central team. Initially, Sue Landsman was the leader of that team. 20. In January of 2001 Antonio Siciliano replaced Ms. Landsman as the team leader. At that time, the members of the team, in addition to myself, consisted of Randy Van Cleave and Caroline Kopecky. Denise Bannister Hill joined the team some time during the early part of 2001.

21. Prior to January, 2001 I had met Antonio Siciliano on only two occasions. That occurred in June of 2000 when I first became a vascular specialist. Mr. Siciliano and I went through vascular training together. During the course of the training, Mr. Siciliano, two male vascular representatives who were about his age and I were assigned to a subgroup for purposes of making a presentation. During the course of preparing for the presentation, Mr. Siciliano assumed the leadership role for our subgroup. Because of my experience in selling Urokinase, I provided some observations with the subgroup which Mr. Siciliano ignored. Later following the presentation, our group was criticized for not coming forth with the information I had shared with our group. Mr. Siciliano glared at me when he was criticized by the trainer for that

shortcoming.

22.  Shortly after becoming my team leader, Mr. Siciliano met with me in Springfield, Illinois.  During a breakfast meeting, we talked about selling products for peripheral vascular disease particularly Retavase.  During that conversation, Mr. Siciliano unexpectedly said, "I am 29 years old.  How old is your son?"  I was taken back by his comment for two reasons.  First, up to that point in time we had been talking only about business and had not discussed matters of a personal nature.  Second, I had never mentioned to Mr. Siciliano that I had a son and was surprised that he was aware I had one.  I responded to his question by telling him that my son was 28 years old.

23.  At some time in January or early February of 2001 through emails I received from Mr. Siciliano, I was informed by him that there was going to be a change in my account assignment.  Among other things, I was told that I would no longer call upon either Memorial Medical Center in Springfield, Illinois or Proctor Hospital in Peoria, Illinois.  For several reasons Memorial Medical Center had high potential for buying the COMPANY's products used for peripheral vascular disease.  First, it had on its staff Dr. Kim Hodgson, a vascular surgeon who was a national leader in interventional techniques in treating peripheral vascular disease.  I had been calling on Dr. Hodgson and he seemed interested and receptive to the possibility of utilizing Retavase.  Second, Prairie Cardiovascular Consultants, the largest cardiology group in Illinois, performed many interventional procedures at Memorial Medical Center and I had an established rapport with many of the physicians in that group.  Third, the interventional radiologists on staff at Memorial Medical Center were interested in utilizing Retavase for peripheral vascular disease and I had already established a rapport with them.  Finally, the Director of the Pharmacy at

Memorial Medical Center, Mike Short, was a personal friend. I had known Mr. Short for many years.

24. Proctor Hospital for several reasons also was an excellent prospect. First, it had recently hired Dr. Schlagel, an interventional radiologist, who had worked with Dr. Flavio Castaneda. Dr. Castaneda, a well known physician, was a proponent in the use of Retavase for peripheral vascular disease and was very influential with Dr. Schlagel. Second, all of the interventional radiologists in Peoria were joining a group called Central Illinois Radiological Associates which meant that the biggest proponents of Retavase would rotate through all three hospitals in Peoria. Finally, there was also a new interventional nephrologist at Proctor Hospital and it was slated to become a Nephrology Treatment Center for Peoria, Illinois.

25. I informed Mr. Siciliano of my concerns in losing both Proctor Hospital and Memorial Medical Center as described above. Mr. Siciliano ignored everything I told him.

26. On February 7, 2001 I began a medical leave of absence. During February of 2001, I was hospitalized on three separate occasions. During the last hospitalization, I underwent a hysterectomy. I suffered an allergic reaction to morphine and a life threatening anaphylactic reaction to Vancomycin during the hospitalization. Because of the allergic reactions, my recovery was delayed.

27. In late April of 2001 I was released to return to work. My physician recommended that I return to my work duties on a graduated basis by initially working half days and build up to a full day of work.

28. My first day back at work was on a Thursday. The following Monday, Mr. Siciliano came to Springfield to observe my work. I spent approximately 1½ days with him. During that

visit, Mr. Siciliano identified five goals which he had for me and established a timeline for completing those goals. Shortly following his visit, he sent to me a field contact report which stated those goals in written form. A copy of that report is appended to this instrument at Exhibit "A".

29. I was concerned about the time period Mr. Siciliano established for me to complete each of those goals. Given the fact that I had just returned to work from an extended medical leave of absence, I felt I needed more time. I also felt that the time period he had set for each goal was inadequate given the nature of the tasks. I expressed my views in that respect to Mr. Siciliano. I told him during our conversation that because of my health I did not believe that I was physically capable of completing each of those objectives within the time period he established. I further pointed out to him why regardless of my health the time allotted for those objectives was too short. I explained to him that there had not been a COMPANY representative in Des Moines for some period of time in marketing Retavase for cardiovascular purposes and that one of the Des Moines hospitals had recently signed a contract to use Activase and thus, I felt that the objective he established for Des Moines was not feasible at that time. I also told him that given the work schedules of both the speaker we would utilize and the physicians in Evansville as well as the logistics of arranging a dinner that the June objective for a dinner was just not adequate. I requested more time. He refused.

30. During the same conversation, I told Mr. Siciliano that St. Louis University Hospital ["SLUH"] was without an interventional radiologist and its director of pharmacy was working on a temporary basis and thus would not commit to acquiring Retavase until his permanent replacement was in position. I indicated to Mr. Siciliano that while I would attempt to meet his

objectives, I felt the time period was not realistic and requested additional time.

31. Mr. Siciliano without offering any explanation summarily stated to me that we would proceed with the goals in the timeframe he had established.

32. Prior to joining Mr. Siciliano's team as a vascular specialist I would work approximately four days each week in the field and reserve one day a week to do office work. This schedule was similar to the work schedule of other vascular sales specialists.

33. Upon my return from medical leave, Tony Siciliano required that I begin spending five days each week working in the field calling upon accounts. This schedule left me no office time to complete paperwork and arrange for contacts and meetings.

34. As a normal matter, when I called upon an account, I could easily spend most of the day at that account waiting to speak, speaking with and observing procedures being performed by physicians. This time was necessary to developing a rapport with these accounts.

35. Beginning in May of 2001 and continuing through October of 2001, Mr. Siciliano began contacting me frequently by either telephone, email, voice mail or pages. Typically, on these contacts he would assign me to a task and establish a very short turnaround time for completing it. I began receiving voice mails and pages from him multiple times each day. Given my travel schedule, I could not perform the tasks he assigned me immediately and often had to perform those tasks during the evening or late at night. The frequency of his contacts with me and the demands increased with passage of time. Through the summer and early fall of 2001, his assignments normally involved fairly trivial matters. Nonetheless, he demanded that I perform them immediately.

36. In June of 2001 I attended the COMPANY's National Sales Meeting. During that meeting, I had an opportunity to observe Mr. Siciliano interacting with Randy Van Cleave, Caroline Kopecky, Denise Bannister Hill and myself. I noticed that Mr. Siciliano eagerly interacted with the other three members of the team concerning both business and non-business matters. He tended, however, to ignore me and did not communicate with me. This became so noticeable that I called Stephanie Moore, a human resource representative of the COMPANY during the meeting. I expressed to her a concern about how I was being treated by Mr. Siciliano as compared to what I observed of his interactions with other members of his team. At that time I wanted her thoughts and ideas about what I might do to develop a more positive relationship with him. At the time of that conversation, I requested and understood from her that our conversation would be considered confidential.

37. Later during the conference, Mr. Siciliano had a breakout session with members of his team. At the outset of that session, he, looking directly at me, made the following statement: "First, I want to say that no one is being treated differently other than someone on the team is making more money than I am."

38. With respect to the Evansville goal Mr. Siciliano had established for me, I arranged a dinner meeting within the time period he established. This was a significant undertaking because I had to secure a date which was good for our guest speaker, Dr. Flavio Castaneda, and was also available on the schedule of the physicians and pharmacists in Evansville. Once I found a date, I had to send out invitations and locate a restaurant. I received confirmations from physicians who would attend. The night the event was scheduled, a very hard rainstorm occurred in Evansville. Consequently, a number of physicians who were scheduled to attend that event did not attend it.

There were, however, three individuals who did attend, two Interventional Radiologists and a clinical pharmacist. As a result of that event, I was able to secure Retavase business at St. Mary's Hospital in Evansville, Indiana.

39. With respect to the objective established for SLUH, I arranged for Dr. Castaneda to speak to a group of Nephrologists. Dr. Castaneda's plane was delayed because of bad weather in the St. Louis area. Consequently, most of the attendees ate lunch and returned to work before Dr. Castaneda arrived. However, Dr. Kevin Martin, the most influential Nephrologist at SLUH, for purposes of possible Retavase use did stay and met with Dr. Castaneda. As a result of that meeting, Dr. Martin developed an interest in possibly using Retavase in the treatment of peripheral vascular disease.

40. With respect to the Iowa objective established for me by Mr. Siciliano, I scheduled a dinner in Des Moines, Iowa for June of 2001. I arranged for Dr. Castaneda to be the speaker at the event and arranged a restaurant where the event would be held. I also secured confirmation from some attendees. During the early portion of the week when the event was scheduled, I received a call from Bryce Odson informing me that the radiology group at Methodist Hospital had disbanded and it would be pointless to have the dinner. A copy of Mr. Odson's message to me is appended to this instrument as Exhibit "B". The other hospital in Des Moines, Mercy Hospital, had earlier entered into a contract with Activase and accordingly was not in the market for using Retavase for peripheral vascular disease.

41. With respect to Barnes Jewish Hospital, I made arrangements with Robyn Schaiff, its Director of Pharmacy prior to May 15, 2001, to provide her with information concerning the use of Retavase for peripheral vascular disease and catheter clearance. Because Retavase was not

indicated for peripheral vascular disease, there was nothing further I could do until that

information was provided to her by the medical affairs division of the COMPANY and reviewed

by her.

42.  With respect to the objective established for me by Mr. Siciliano for St. Joseph

Hospital, I did during the week of May 17, 2001 travel to that Hospital and met with Dr.

Halverson, the head of the radiology department.  Several days later, I again met with Dr.

Halverson as well as the other Interventional Radiologists practicing at that Hospital.  As a result

of these meetings, I arranged for a trial usage of Retavase and Dr. Halverson signed a requisition

for Retavase kits.  Because of some concerns the pharmacy of that Hospital had with Retavase in

the treatment of heart attacks, the requisition was later canceled.  The events giving rise to the

cancellation involved activities on the part of the COMPANY's cardiovascular representative

calling upon the Hospital which did not involve me.

43.  At the National Sales Meeting of the COMPANY I became concerned that Mr.

Siciliano was not accurately communicating to his superiors my work activity.  This arose when

Michelle Johnson and Keith Cramsey, the regional marketing manager, voiced some concerns to

me that I had not forwarded to Mr. Siciliano some information they had provided me.  I had

provided that information to Mr. Siciliano and upon hearing their concerns provided them with

evidence of what I had done in that respect.

44.  Following that incident whenever I reported on my important activities I also sent a

copy of my report to both Mr. Cramsey and Bob Russell, Mr. Siciliano's supervisor.  In early

July 2001 Mr. Siciliano informed me that I should not provide that type of  information to Mr.

Russell and Mr. Cramsey because they had both stated a preference that I not communicate with

them. After that conversation with Mr. Siciliano, I contacted Mr. Cramsey and apologized to him if I had unnecessarily burdened him with emails and other reports. He responded by saying I was not burdening him and he would like to receive any significant sales activity related to my territory.

45.  Following the June 2001 sales meeting Mr. Siciliano increased his frequency in paging me, contacting me by voice mail and email. Typically, he would contact me between 5 and 15 times a day. Most often his inquiries were fairly trivial but were nonetheless ones he wanted an immediate response from me. Because of my travel schedule it was often impossible for me to respond to his inquiries within the time he had requested and also attend to my sales activities. As a vascular specialist, I was typically on the road all day and because of that, I could often not respond to his inquiries until late in the evening. With the passage of time the subject matter of Mr. Siciliano's inquiries became increasingly trivial and repetitive. Most of them had very little relevance to my sales activities for the COMPANY. During his voice mail contact with me he became increasingly critical of my failure to respond immediately to his inquiries. Because I was on the road and not always in areas which were accessible for telephonic communication even by cell phone or page, I could not respond as quickly as he wanted and I informed him of that problem.

46.  During my employment with the COMPANY, my earlier supervisors had expected me to respond to their emails, pages, or voice mails within 24 hours unless it was an emergency. Mr. Siciliano, by contrast, wanted immediate responses. Mr. Siciliano would not approve cell phone expense which exceeded $100.00 a month.

47.  In June 2001 following the cardiovascular district sales meeting, I spoke with Mr. Siciliano by telephone.  At that time he asked me to provide him with a routing schedule showing how I would cover my accounts.  In response to his request I submitted to him a routing schedule in which: 1) I would call on all of my accounts during a four week time span; and 2) I would call on key accounts and those where there was currently some matter pending more frequently depending upon what situation at the account required.  The routing schedule I submitted to him was consistent with the routing arrangement I had throughout my employment for the COMPANY both as a cardiovascular and vascular specialist.  Moreover, it was the same type of routing schedule I had maintained during the time period I worked for Abbott Laboratories, Inc.  From my experience in pharmaceutical sales, I was aware that it was important to make contact with customers and let them know you were available.  At the same time I was aware that with physicians you could wear out your welcome by seeing them too frequently.  My routing schedule had served me well for many years and had enabled me to spend adequate time calling on my accounts and generate sales which led to many honors.

48.  Mr. Siciliano did not discuss with me the routing schedule I had prepared.  Instead, on July 6, 2001 I received a routing schedule from him.  A copy of that document is attached as Exhibit "C".  Under that routing schedule I was to call on my St. Louis and Peoria accounts every week and my Des Moines, Evansville and Owensboro accounts every other week.

49.  The routing schedule established by Mr. Siciliano was impossible to adhere to for multiple reasons.  First, under his schedule I would only call upon pharmacies and the interventional radiology suite (commonly known as specials).  In order to adequately call upon an account I had to call upon the nephrology unit, cardiac cath lab, the dialysis lab, the operating

room for vascular surgeons as well as to meet with various nurses and technicians. Second, if I was acquainting the staff concerning various applications of the product I might have to speak with the technicians and nurses on all three shifts. Third, in order for me to understand how Retavase might be useful in a physician's practice I had to understand the nature of his practice. This required me to observe the physician in treating patients. Oftentimes when I called upon a physician I had to wait for the physician to complete treating patients. This occupied considerable time. Fourth, Mr. Siciliano's routing schedule did not accurately take into consideration my travel requirements. From my home in Springfield to my accounts in St. Louis required a two hour drive each way. Travel to my accounts in Peoria required travel of approximately one and one half hours each way. My driving time from my home in Springfield to Des Moines, Iowa approximated seven hours. Even traveling by air required several hours and would be dependent upon airplane scheduling. The travel distance from my home in Springfield to Evansville, Indiana and thereafter to Owensboro, Kentucky involved eight hours of travel each way. The travel distance between St. Louis and Evansville by car involved five and one half to six hours. There is no direct airline travel between Springfield and Evansville, Indiana and traveling from St. Louis to Evansville by air is dependent upon airline scheduling. Because of all of these things it was not possible for me to call upon hospitals within the time period prescribed by Mr. Siciliano.

50. Upon receiving Mr. Siciliano's routing schedule I spoke with him about it during a telephone conversation. I attempted to explain to him why I felt the schedule was not only unrealistic, but would be overly burdensome upon me. He immediately responded by stating that was the routing schedule he expected me to follow. At no time did he state, infer or in any

respect suggest that his routing schedule was only a suggestion.

51. As a vascular specialist, when possible I would attempt to make appointments to see physicians prior to making a trip to their hospital. However, I quickly discovered that merely making an appointment with a physician did not guarantee that the physician would see me at the appointed time. Oftentimes the physician was delayed or otherwise occupied due to patient care. In those instances I would have to wait until he was available to see me. It was more frequent than infrequent that making an appointment only assured me that the doctor was at some time that day available. I still had to wait to see him.

52. With respect to both Evansville, Des Moines and Owensboro, it was pointless for me to make a trip to those locations if a physician would not be available to see me on the day I was going to be there. Because of the travel distance it had been my normal practice before traveling to any of those destinations to contact the facility to determine whether the physician was available. Mr. Siciliano's routing schedule did not build into it the fact that there would be periods of time when physicians would not be available to see me.

53. Notwithstanding my concerns about his routing schedule, I followed his direction by adhering to his schedule by calling upon my accounts with the frequency he demanded except for August of 2001 when I became ill and September of 2001 when I was committed to arranging for and attending an interventional therapy meeting in the Chicago area.

54. I began spending approximately two days of each week calling upon my accounts in St. Louis. Typically, on a short work day in St. Louis I would spend approximately 12 to 13 hours inclusive of my travel time. On a long day in St. Louis I would spend between 15 and 16 hours.

55. I traveled to Peoria under Mr. Siciliano's routing schedule one day each week. Inclusive of travel time my Peoria work day normally lasted approximately 10 to 11 hours. However, if there was an evening program I would have to spend additional time.

56. Normally I traveled to Des Moines from Springfield by car. Typically this involved an eight hour drive each way. Normally I would stay overnight in Des Moines. A Des Moines trip would typically involve a full two days of my work schedule.

57. I began going to Evansville and Owensboro approximately twice per month except for August and September of 2001. I would spend a full day in Evansville and the better part of a full day in Owensboro assuming the physician I was to call upon was available. Typically, I would spend between five and one half to eight hours each way in traveling to Owensboro and Evansville, depending on whether I left from St. Louis or Springfield. I attempted to fulfill my Owensboro and Evansville trips in two full days. However, because of travel this generally meant that by the time I returned home from those trips it would be very late at night.

58. The travel regime I established after Mr. Siciliano's directive regarding my account coverage continued until I left active employment with the COMPANY. Typically, I was spending sixty to eighty hours a week in traveling to and calling upon my accounts. Additionally, I had to respond to Mr. Siciliano's requests and do paperwork. I normally did the paperwork on the weekends. This would involve an additional five to ten hours per week. During the time period between early July 2001 and October of 2001 I would typically spend between 70 and 90 hours a week on my work for the COMPANY. Prior to working under Mr. Siciliano, I would spend 50 to 55 hours per week on my job.

59. Prior to going under Mr. Siciliano's supervision, I had for many years participated in the Illinois Symphony Choir. Additionally, several times a week I would engage in social activities with friends. Because of the work schedule imposed upon me by Mr. Siciliano, I was forced to drop out of the Springfield Symphony Choir and discontinued going out with friends.

60. In attempting to comply with Mr. Siciliano's travel schedule, respond to the tasks he would message me and do the necessary paperwork which was a part of my job I was getting approximately five hours sleep per night. When I was on the road I would typically eat food from fast food restaurants in the car while I was driving. This became a standard activity several times per day. On several occasions I had to pull over to the side of the road late at night to sleep because I was exhausted and was about to fall asleep while driving. On three occasions I asked my friend, Velma Bailey, to drive me on trips because I was simply too tired to drive and was afraid I would fall asleep at the wheel.

61. Mr. Siciliano was insistent that I immediately return his pages and voice mails when I was on the road. He would not allow me to use my cell phone. Instead I had to call him using the COMPANY issued telephone credit card. Consequently, when I had to return a page or telephone call I would have to leave the road and locate a pay phone from which to call him.

62. In early August of 2001 I began noticing that my heart was racing and I felt very light headed and weak. My pulse beat was 160 beats per minute. I went to my doctor, Celina Tsang, M.D., and after an EKG she stated I was having atrial fibrillation and administered some medication to lower my heartbeat and contacted my son to take me to the hospital. I was in the hospital overnight and treated by Dr. Brian Miller, a cardiologist. Throughout August, September and into October 2001, I had on a number of occasions gone to the emergency room

at the hospital because of those same symptoms. I was administered a number of medications to prevent the formation of a blood clot in my heart. I was diagnosed with atrial fibrillation.

63. Because of the severity of my symptoms of atrial fibrillation and difficulties I had in adjusting to the medications prescribed to me because of that condition, I cut back my travel during August of 2001 and, at the advice of my physician, took two weeks off work. As a result, I did not that month go to either Des Moines, Iowa, Evansville, Indiana or Owensboro, Kentucky. Because of the severity of the symptoms of atrial fibrillation and the periodic medical care I was receiving, I did not feel comfortable making lengthy trips from my home. I did, however, during that month call regularly on my accounts in both St. Louis and Peoria.

64. In late September of 2001 I was responsible for representing the COMPANY at a meeting in Oakbrook, Illinois of the Midwest Institute of Interventional Therapy. The attendees at that meeting consisted of over 150 interventional radiologists and vascular surgeons as well as their support staff. I was at that meeting for a full five days. Typically, I spent approximately 18 hours each day manning a booth and entertaining physicians. A great deal of time was required of me in both August and September in preparing for that meeting, arranging for speakers, coordinating speaker schedules and contacting physicians encouraging them to attend the meeting. Because of my activities in organizing for and attending that meeting, I did not call on either Evansville, Indiana, Owensboro, Kentucky or Des Moines, Iowa that month. Immediately following that meeting, I drove to Evansville, Indiana and Owensboro, Kentucky to call on my accounts in those cities.

65. Beginning in August of 2001 and continuing through the balance of my active employment with the COMPANY when I spoke to Mr. Siciliano he was critical of my

performance and the progress I was making on accounts. This was a consistent theme on his part even though I had been making significant progress with my accounts and those which were not progressing were because of an understandable reason. Other managers and representatives of the COMPANY such as Bill Pinon, the national sales manager, Michael Montgomery, M.D., the vascular physician for the COMPANY, Michelle Johnson, the cardiovascular manager, Keith Cramsey, the regional marketing manager, Linda Piccinini, a technical consultant, and Mike Varlotta, the product manager, were complimentary about my accomplishments during that same period of time. Invariably, when I spoke with Mr. Siciliano on my activities, he would, regardless of what I told him, be extremely critical of my performance.

66. During the year 2001, I sold new product of the COMPANY used for the treatment of peripheral vascular disease at a number of hospitals. This is typically called a "new stocking". During that year, I had new stockings at Covenant Medical Center, Decatur Memorial Hospital, Methodist Medical Center, Proctor Hospital, St. John's Hospital and Deaconess Hospital for which Mr. Siciliano gave me no bonus points.

67. During the year 2001, I had a formulary acceptance at both Barnes Hospital and St. Francis Hospital. This meant that each hospital had approved using a COMPANY product for the treatment of peripheral vascular disease. Even though I had received those formularies, Mr. Siciliano awarded me no bonus points for the accomplishments.

68. Notwithstanding my organizational activities in organizing and promoting the Midwest Institute of Interventional Therapy Meeting during the summer of 2001, Mr. Siciliano awarded me no bonus points.

69. During the year 2001, I developed Dr. Castaneda and Dr. Swischuk as national speakers in support of using Retavase for peripheral vascular disease. Each of those speakers spoke throughout the country on that topic. Mr. Siciliano awarded me no bonus points for that effort.

70. The COMPANY promoted a clinical trial in the use of Retavase for the treatment of peripheral vascular disease. One of my accounts, St. Francis Medical Center, was the top facility in the country in enrolling patients in that study. Dr. Castaneda, who is on the staff at that Hospital, was the Principal Investigator in the study. Notwithstanding my efforts in promoting the clinical trial at St. Francis Medical Center, I received no bonus points.

71. I secured Dr. Nancy Khardori to perform sterility testing for catheter clearance. I received no bonus points for my efforts in that endeavor.

72. As the summer of 2001 passed, I was becoming increasingly concerned about my relationship with Mr. Siciliano and my inability to please him. I had been in pharmaceutical sales at that time for over 25 years and this was the first supervisor with whom I had any type of significant relationship problem. I felt it was in my best interests to look for other employment opportunities either within the COMPANY or with other Johnson and Johnson subsidiaries. Through a friend I became aware there were openings for pharmaceutical representatives with Ethicon, a Johnson & Johnson subsidiary. I interviewed for a position with Ethicon with Melissa Mason, a manager for Gynecare Division of Ethicon. After my initial interview she tentatively offered me a position. In order for me to secure that position, however, I was required to secure a release from my supervisor under Johnson & Johnson recruitment policies.

73. On September 10, 2001 I requested a release from Mr. Siciliano enabling me to go to work for Ethicon. On September 13, 2001 I secured a release from Bob Russell, my regional manager. In either late September or early October I had a conversation with Lisa Huston, a Johnson & Johnson corporate recruiter. Ms. Huston informed me that in order for me to have a position with Ethicon my manager, Mr. Siciliano, had to be "on board" with my transfer in addition to giving a written release. She indicated that although the written release had been received Mr. Siciliano was "not on board" with my transfer request and I could not transfer until he was.

74. Shortly following my conversation with Lisa Huston I received a field contact report from Mr. Siciliano dated September 19, 2001. A copy of that document is appended to this instrument as Exhibit "D". The field contact report was sent out six days after Bob Russell issued my release.

75. The report was highly negative and in many respects was not accurate. Contrary to his assertion the attendance at the Evansville dinner program was limited not because of poor follow through and inadequate recruit, but instead because of an unanticipated severe rainstorm. Mr. Siciliano was aware of that because he was in attendance. Furthermore, the key physicians and pharmacists did attend that program and as a result I was able to secure the Retavase business in Evansville. The Des Moines program was canceled because of the dissolution of the radiology group, not because of any lack of follow up on my part. The failure to secure catheter coverage at SLUH was not because of poor follow up, but instead because there was no permanent director of pharmacy at SLUH and the temporary director would not make a decision until the permanent director was appointed. Mr. Siciliano was aware of all of the foregoing when

he made these inaccurate comments in the field contact report. During the time period of July, August and mid-September of 2001 I was covering my territory in accordance with his account coverage requirements except for the time period when I had health problems in August of 2001 and in September of 2001 because I was involved with the interventional therapy meeting. Mr. Siciliano never explained to me what he meant by inadequate "follow up " or "follow through".

76. In his field progress report Mr. Siciliano was critical of my timeliness in submitting expense reports. While I attempted to submit the reports weekly I had fallen behind because of the work schedule I was operating under during the summer. However, usually I was only a couple of weeks behind with my expense reports.

77. In his field contact report Mr. Siciliano began requiring me to submit a weekly report stating progress which had been made on each account I visited. In his field progress report he was critical of the frequency that I responded to his voice mails and pages. His criticism was not accurate. Even though I was on the road and not permitted to respond through the use of my cell phone, I typically would respond to his voice mails and pages on the day I received them and always within twenty four hours.

78. Mr. Siciliano in his field contact report indicates that on multiple times he discussed with me the inadequacy of my territory coverage. This is not true. He never raised that subject with me prior to July 6, 2001 when he sent to me his suggested coverage itinerary. It is further not true that I had not made the necessary adjustments that he demanded. Except for the period noted above, I did follow his coverage requirements.

79. On September 7, 2001 the COMPANY issued a report concerning the activities of vascular specialists in selling Cordis products. At that time I was 147% of my goal and the

leader on my team in selling Cordis products.

80. During the summer of 2001 St. Francis Medical Center was using Retavase for the study referred to above. St. Francis was my largest account and I was instrumental in its participation in that study. Because it was using Retavase for that study, however, it did not have to pay the COMPANY for the use of Retavase. St. Francis used 88 vials of Retavase in the study which if sold to them would have produced revenue of over $96,000.00. If I had received credit for Retavase use by St. Francis in that study I would have well exceeded my goal for selling Retavase. Mr. Siliciano during the summer of 2001 was aware of my activities in the St. Francis account and the usage it was making of Retavase.

81. In late September and into October of 2001 I was suffering from symptoms that I had never earlier experienced. I found myself uncontrollably crying at various periods of time, often at inappropriate times. I began to develop trouble concentrating and focusing on tasks. Even though I rarely had more than five hours available to sleep I found myself having difficulty sleeping. During this time period I continued to have a rapid heartbeat and symptoms of atrial fibrillation. I began developing headaches of an intensity that I had never earlier experienced. On October 19, 2001 Dr. Celina Tsang recommended that I discontinue working because of these symptoms.

82. After I left active employment with the COMPANY I began drawing both short and then long term disability benefits. Eventually, I also began securing social security disability benefits. I have at all times remained unable to resume my work duties for the COMPANY. My disability benefits are significantly less than the salary I formerly earned while I worked for the COMPANY.

83. The matters set forth in this Affidavit are based upon my personal knowledge. If called upon, I could fully and competently testify to the matters set forth above.

FURTHER YOUR AFFIANT SAYETH NOT.

_____
M. JANE MINOR

Subscribed to and sworn to before me this
29ᵗʰ day of March, 2005.

_____
NOTARY PUBLIC
(Affidavit/minorj 032305)

OFFICIAL SEAL
BRENDA M. SCHRADER
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10-3-2007