UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| M. JANE MINOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case # 02-3354; and |
| | ) | Case #04-3114 |
| CENTOCOR, INC., and JOHNSON | ) | |
| & JOHNSON, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

RICHARD MILLS, U.S. District Judge:

The Court now considers Defendants' Motion for Summary Judgment.

### I.  FACTS

Plaintiff M. Jane Minor was born August 2, 1946.  She worked for Defendant Centocor, a subsidiary of Co-defendant Johnson & Johnson, Inc., as a sales representative beginning September 1999.  Minor was 53 years old at that time.

Prior to accepting employment, Centocor told Minor that if she

1

took the job her sales territory would temporarily increase until the end of the year 2000 when, as the result of an expansion of the vascular sales force, it would be divided in half.  When Minor began working, her sales territory included most of the state of Missouri, the state of Illinois south of Interstate 80, a portion of the states of Indiana and Kentucky proximate to Evansville, Indiana and part of the state of Iowa to Des Moines.

In 2000, Minor became a vascular specialist responsible for selling Cordis products (which were used for the treatment of cardiovascular disease) and Retavase (a product which, though it had not been indicated[1] by the Food and Drug Administration, was used to treat peripheral vascular disease).  Until January 2001, Minor was supervised by William Alexander and Tim Shaffer.  In January 2001, she became part of a five person sales team led by Antonio Siciliano.  As team leader, Siciliano was responsible for five or six accounts and management of four vascular sales specialists: Minor; Randy Van Cleave (a male in his late

---

[1] The parties explain that a product is "indicated" if the FDA has cleared it for a particular use.

forties); Denise Bannister Hill; and Caroline Kopecky (two females in their early thirties).

When Minor first became part of Siciliano's team, her sales territory included Springfield, Illinois, Peoria, Illinois, the St. Louis, Missouri area, Des Moines, Iowa, Evansville, Indiana and Owensboro, Kentucky.  In January or early February 2001, Siciliano told Minor that Memorial Medical Center in Springfield, Illinois and Proctor Hospital in Peoria, Illinois would no longer be part of her sales territory.  Minor wished to keep the Memorial Medical Center and Proctor Hospital accounts because they were proximate to her Springfield, Illinois home and she believed they had excellent potential.  Instead, she was assigned accounts in Des Moines, Iowa, accounts she regarded as geographically distant and relatively poor prospects.

On February 7, 2001, Minor began a medical leave that lasted until late April 2001.  She was hospitalized on three separate occasions during this period.  Siciliano and Michelle Johnson covered Minor's accounts while Minor was on leave.  The Monday after Minor returned to work,

Siciliano spent approximately a day and a half with her in Springfield. Siciliano identified five goals for her and established a timeline for their completion via an FCR (a report card of sorts). Minor, who was easily exhausted following her medical leave, expressed concern that the timeline was not sufficient for her to complete the goals Siciliano outlined. She requested more time, but Siciliano refused. Siciliano also began requiring Minor to spend five days a week visiting her accounts, a requirement that left her no office time to complete paperwork or arrange for contacts and meeting.

In June 2001, Minor attended Centocor's national sales meeting. During that meeting, she noticed that Siciliano eagerly interacted with all team members except her. Minor called Stephanie Moore, a Centocor human resource representative, and expressed to her a concern about how she was being treated. Minor asked Moore for ideas about what she might do to develop a more positive relationship with Siciliano. At a subsequent break-out session, Siciliano looked directly at Minor and said "First, I want to say that no one is being treated differently other than

4

someone on the team is making more money than I am".

After the June 2001 sales meeting, Siciliano increased his frequency in paging, e-mailing, and calling Minor. Siciliano would routinely contact Minor between five and fifteen times a day. Most often his inquiries were fairly trivial, but were nonetheless ones he wanted an immediate response from her. Later that June, Siciliano asked Minor to provide him with a routing schedule showing how she would cover her accounts. Minor submitted a routing schedule that would allow her to call on her accounts every four weeks and visit key clients more frequently as the situation required. The routing schedule was consistent with the arrangement she had throughout her career in pharmaceutical sales. Siciliano did not discuss Minor's proposed routing schedule with her.

Instead, on July 6, 2001, he sent her a schedule that proposed she call on her St. Louis and Peoria accounts weekly and her Des Moines, Evansville and Owensboro accounts bi-weekly. Minor believed Siciliano's sample routing schedule was impossible to adhere to because she could not meet with all necessary persons in the specified time and it did not

5

afford her adequate time with each client. Moreover, the sample routing schedule did not take her travel requirements into consideration. It seemed not to recognize that, to call on her accounts, Minor would have to drive two hours each way to St. Louis, an hour and a half each way to Peoria, five and a half hours each way to Des Moines, Iowa[2], eight hours each way to Evansville, Indiana, and eight hours each way to Owensboro, Kentucky. Upon receiving the sample routing schedule, Minor called Siciliano. She attempted to explain to him why she felt the schedule was not only unrealistic, but would be overly burdensome upon her. Siciliano responded by stating that was the routing schedule he expected her to follow. Based on conversations Minor had with others, it appeared that Centocor did not have a policy requiring complete account rotation every two weeks. Furthermore, none of Siciliano's team members covered their accounts bi-weekly and no one Minor spoke with thought such a schedule could be feasible.

    Minor also found the manner in which Siciliano awarded "bonus

---

[2] Although Minor's memorandum states that the drive was seven hours long, the Court takes judicial notice that the driving distance from Springfield, IL to Des Moines, IA, is approximately five and a half hours.

6

points" objectionable. Though the parties' briefs do not indicate what value or purpose bonus points had, it is clear that Siciliano had complete authority to award them at his discretion. For example, on June 18, 2001, Siciliano awarded Denise Bannister Hill 250 bonus points for doing a good job. Other team members received bonus points for great team work, helping out, getting hospital formulary stockings, etc., but Siciliano did not award Minor bonus points for her accomplishments in these respects.

    Beginning in August 2001, Siciliano was constantly critical of Minor's performance and the progress she was making with her accounts. Minor felt it was in her best interests to look for other employment opportunities either within Centocor or other Johnson & Johnson subsidiaries. She interviewed for a position with Ethicon and was tentatively offered a position. In order for her to secure that position, she was required to secure a release from her supervisor under Johnson & Johnson recruitment policies. On September 10, 2001, Minor e-mailed Siciliano for permission to apply for other job opportunities within

Johnson & Johnson. However, Centocor's regional director promptly gave Minor permission to seek other job opportunities. On September 13, 2001, Minor was told by Lisa Huston, a Johnson & Johnson corporate recruiter, that in order for her to receive a position with Ethicon, Siciliano had to be "on board" with her transfer and he was "not on board" with the transfer request.

On September 19, 2001, Siciliano issued a negative FCR to Minor. In Minor's opinion, the FCR wrongly criticized attendance at an Evansville dinner program she arranged even though the low attendance was caused by a severe rainstorm. Similarly, Siciliano criticized a Des Moines program even though attendance there was affected by the dissolution of a radiology group. It was in this FCR that Siciliano began requiring Minor to submit a weekly report stating progress which had been made on each account she visited.

During the time period between early July 2001 and October 2001, Minor typically worked between 70 and 90 hours a week. Prior to Siciliano's supervision, Minor typically worked 50 to 55 hours per week. Minor was getting approximately five hours sleep per night. When she

8

was on the road she would typically eat food from fast food restaurants in the car while she was driving. On several occasions she had to pull over to the side of the road late at night to sleep because she was exhausted and was about to fall asleep while driving.

In August 2001, Minor went to the emergency room at the hospital because of atrial fibrillation, a condition whose symptoms include rapid heartbeat, light headedness, and weakness. Minor's doctor believed her atrial fibrillation was related to job stress. Minor cut back her travel and, on her doctor's advice, took two weeks off of work. In September and October 2001, Minor made additional emergency room visits due to atrial fibrillation. Minor was also experiencing depression.

On October 19, 2001, Dr. Celina Tsang recommended that Minor discontinue working because of her medical problems. Minor left active employment with Centocor and began drawing short and then long term disability benefits. Eventually, she also began securing social security disability benefits. Minor has remained unable to resume her work duties for Centocor since her October 2001 departure.

In 2002, Siciliano hired thirty year old Lori Schneiderhan to fill

9

Minor's position. On February 26, 2002, Minor filed an employment discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that Centocor and Johnson & Johnson discriminated against her based on her *age*. On June 2, 2002, Minor amended her charge to include a *gender* discrimination claim. Minor filed her claims under separate case numbers and the Defendants move for summary judgment on both claims.

## II.  STANDARD

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Herman v. National Broadcasting Co., Inc., 744 F.2d 604, 607 (7th Cir. 1984), cert. denied, 470 U.S. 1028 (1985). When determining whether factual issues exist, a "court must view all the evidence in the light most favorable to the non-moving party." See Black v. Henry Pratt Co., 778 F.2d 1278, 1281 (7th Cir. 1985). However, "[s]ummary

judgment is appropriately entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" See McKenzie v. Illinois Department. of Transportation, 92 F.3d 473, 479 (7th Cir. 1996) (quoting Celotex, 477 U.S. at 322 (1986)).

To successfully oppose a motion for summary judgment, the nonmoving party must do more than raise a "metaphysical doubt" as to the material facts. See Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, she "must come forward with 'specific facts showing that there is a genuine issue for trial.'" See id. at 587 (quoting Fed.R.Civ.P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" See id. Finally, "[a]lthough [the court] must, for purposes of summary judgment review, draw any inferences from the record in favor of [the plaintiff, it is] not required to draw every conceivable inference from the record. [It] need draw only reasonable ones." See Tyler v. Runyon, 70 F.3d 458, 467 (7th Cir. 1995) (citation omitted).

### III.  ANALYSIS

#### A.  *Discrimination Claims*

Minor claims that the Defendants discriminated against her in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").  Courts use essentially the same analytical framework to resolve employment discrimination cases whether they are brought under the ADEA or Title VII.  See Cerutti v. BASF Corp., 349 F.3d 1055, 1061 (7th Cir. 2003).  Thus, a plaintiff can prove an ADEA or Title VII claim using direct or indirect evidence.  Id. at 1060-61.  Instead of presenting direct evidence of discrimination[3], Minor relies on indirect evidence.

To establish a prima facie ADEA claim under the indirect method, Minor must show that: (1) she falls within the protected age group; (2) she performed her job satisfactorily; (3) despite her satisfactory

---

[3]  The closest Minor comes to offering direct evidence is her claim that Siciliano once said to her: "I am 29 years old.  How old is your son?"  Siciliano's question has no real probative value.  Moreover, Minor does not attempt to argue or analyze her claims under a direct evidence proof model.  Therefore, the Court must analyze her claims under the indirect evidence proof model.  See Bennington v. Caterpillar Inc., 275 F.3d 654, 659 (7th Cir. 2001).

performance, she suffered a materially adverse employment action; and (4) younger, similarly situated employees were treated more favorably. See Adreani v. First Colonial Bankshares Corp., 154 F.3d 389, 394 (7th Cir.1998)(applying test announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). If she makes out a prima facie case, a presumption of discrimination arises. Id. To rebut that presumption, the Defendants must come forward with a legitimate, nondiscriminatory reason for the way it treated Minor. Id. If Centocor articulates a nondiscriminatory reason, Minor must show that Centocor's stated reason is pretextual. See E.E.O.C. v. Our Lady of the Resurrection Med. Ctr., 77 F.3d 145, 149 (7th Cir.1996). A showing of pretext requires Minor to demonstrate that Centocor did not honestly believe the reason it gave for its action. See Jordan v. Summers, 205 F.3d 337, 343 (7th Cir.2000). The process for a Title VII claim is identical, except that for the fourth element of her prima facie Title VII claim, Minor must show that the Defendants treated a similarly situated male employee more favorably than they treated her. See McDonnell Douglas, 411 U.S. at 802.

The Defendants do not take issue with the first two elements of Minor's prima facie ADEA and Title VII discrimination claims. Thus, the Court turns its attention to the third element of the McDonnell Douglas test. In an effort to satisfy this element—adverse employment action—Minor alleges that Siciliano discriminated against her by failing to award bonus points, writing negative FCRs, calling her excessively, requiring weekly reports, refusing to pay her relocation costs, unreasonably expecting her to have bi-weekly visits with clients, effectively imposing longer work weeks, and reassigning accounts.

Adverse employment actions are ones that significantly alter the terms and conditions of the employee's job. See Stutler v. Ill. Dep't of Corr., 263 F.3d 698, 703 (7th Cir.2001); see also Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465 (7th Cir.2002)(an adverse employment action must be materially adverse, not merely an inconvenience or a change in job responsibilities). While it is unclear how Centocor employees benefitted by accruing bonus points, the denial of bonuses are not adverse employment actions for Title VII purposes. See Miller v. American Family Mutual Ins. Co., 203 F.3d 997, 1006 (7th Cir.2000).

14

The negative FCRs cannot be considered adverse employment actions since they were not made part of Minor's personnel file and had no impact on her pay.  See Oest v. Illinois Dept. of Corr., 240 F.3d 605 (7th Cir. 2001); Smart v. Ball State University, 89 F.3d 437 (7th Cir. 1996). Siciliano's volume of phone calls, e-mails, and pages to Minor may have aggravated and inconvenienced her, but that does not make them actionable.  See Hilt-Dyson, 282 F.3d at 465.  Similarly, while Minor may have disliked filing weekly reports, the imposition of such an additional job responsibility is not a materially adverse employment action.  See Haugerud v. Amery Sch. Dist., 259 F.3d 678, 691-92 (7th Cir.2001) (discussing additional job duties); see also Bell v. EPA, 232 F.3d 546, 555 (7th Cir.2000) (trivial matters are not actionable).

    The more serious of Minor's allegations are her claims that Siciliano reassigned accounts and imposed unreasonable travel requirements. However, no reasonable juror could conclude that these things were done pursuant to a discriminatory motive.  Siciliano reassigned accounts as part of Centocor's business plan, and the plan to diminish her sales territory preceded Siciliano's tenure as supervisor.  Furthermore, there is

15

no evidence that the accounts Siciliano assigned to Minor were less valuable than the ones he took away. Although Minor wanted to keep the Memorial Hospital account, the reassignment was equivalent to a lateral transfer, with a greater commute, but without loss of benefits. This sort of change is not unlawful. See <u>Williams v. Bristol Myers Squibb Co.</u>, 85 F.3d 270 (7th Cir. 1996) (reassignment of accounts does not amount to materially adverse employment action); <u>Stutler</u>, 263 F.3d at 702-03 (lateral transfer without loss of benefits and increased commute are not materially adverse employment actions); <u>Spring v. Sheboygan Area Sch. Dist.</u>, 865 F.2d 883, 886 (7th Cir.1989) (discussing increased travel time).

Siciliano's travel expectations, likewise, do not qualify as materially adverse employment actions. Although Siciliano's suggestion of bi-weekly client-contact visits increased Minor's travel, the evidence shows that Siciliano asked all members of his sales team to adopt that practice. Accordingly, bi-weekly travel is not an indicia of discriminatory animus. Finally, the decision not to pay for Minor's relocation costs appears to be a moot point given that Minor never relocated. For these reasons, the

Court finds that Minor has failed to establish any materially adverse employment actions.

As for the fourth element of Minor's prima facie claims, the Defendants *briefly* argue that Minor is not similarly situated to any other employee. The Seventh Circuit has made it clear that in order to be considered similarly situated, an employee must be "directly comparable in all material respects." See Jordan v. City of Gary, Ind., 396 F.3d 825, 835 (7th Cir. 2005), quoting Hudson v. Chicago Transit Auth., 375 F.3d 552, 561 (7th Cir.2004). While Minor identifies various members of Siciliano's sales team whom she considers to be similarly situated to herself, she completely ignores the fact that she was the only team member who took medical leave from February 7, 2001, to late April 2001. See Def.'s Mot. for Summ. Judg. at p.9, ¶ 39; Pl.'s Mem in Opp. to Summ. Judg. at p.18, ¶68. The Defendants' memorandum explains that Minor's absence created "coaching challenges that were specific to her situation in that she had to make up for lost time . . . ." See Def.'s Mot. for Summ. Judg. at p. 52. Due to her time away, Siciliano informed Minor that "[t]here was a lot of work to accomplish due to your absence

from the territory," and that it was necessary for her to "get in front of every account and let them know you are back in the territory." See Ex. X (FCR for Minor dated April 24, 2001).

Minor ignores these facts and states that the Defendants "seem[] to concede that other members of [Siciliano's sales] team were similarly situated to her." See Pl.'s Mem in Opp. to Summ Judg. at p.63, n.5. This is clearly not the case. The Defendants contested this element—albeit sparingly—and Minor had the burden of establishing it. She failed to do so. Thus, the Court finds that Minor has not established this aspect of her ADEA or Title VII claims. See City of Gary, Ind., 396 F.3d at 835. Due to Minor's failure to establish a prima facie ADEA or Title VII claim, the Court does not reach the issue of pretext.

### B. Constructive Discharge

Both parties devote a portion of their brief to the topic of constructive discharge. A constructive discharge is an adverse action that occurs when an employee formally alters the employment relationship. Employees most often cut their ties because of intolerable working conditions, but constructive discharges also occur when employers simply

make it clear to reasonable employees that they will be fired if they do not quit. See Herrnreiter v. Chicago Hous. Auth., 315 F.3d 742, 744-45 (7th Cir.2002), EEOC v. Univ. of Chicago Hosps., 276 F.3d 326, 332 (7th Cir.2002) (collecting cases).

Minor has not resigned her position with Centocor. There is authority to suggest that this by itself precludes her from even lodging a constructive discharge claim. See Smith v. Bath Iron Works Corp., 943 F.2d 164, 167 (1st Cir.1991)(suggesting that an employee cannot state a constructive discharge claim unless they resign), cited by Hunt v. City of Markham, Ill., 219 F.3d 649, 655 (7th Cir. 2000). Moreover, there is no evidence that Centocor made it clear that it intends to fire her if she does not quit. Either way, there is no basis for a constructive discharge claim under the ADEA or Title VII.

As a final matter, the Court notes that it is arguable that Siciliano treated Minor poorly and insensitively when he supervised her. Even if Siciliano's conduct was uncivil, incivility by itself is not prohibited by the ADEA or Title VII. See 29 U.S.C. § 621 *et seq.*; Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)

19

(discussing incivility).  Minor had to present prima facie evidence that the Defendants discriminated against her on the basis of her age or gender.  Her failure to do this makes summary judgment proper.

ERGO, Defendants Centocor, Inc. and Johnson & Johnson, Inc.'s Motion for Summary Judgment (d/e 57) is ALLOWED.

These cases are CLOSED.

IT IS SO ORDERED.

ENTER:  June 17, 2005

FOR THE COURT:

                                                s/ Richard Mills
                                    United States District Judge